**Law Offices of
DAVID H. RELKIN
David H. Relkin, Esq. (DHR-1049)
575 Eighth Avenue
Suite 1706
New York, New York 10018
212-244-8722**

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **LESLIE DICK WORLDWIDE, LTD. and LESLIE DICK**, | Case No. |
| *Plaintiffs*, | |
| -against- | **08 CIV. 7900 ECF** |
| **GEORGE SOROS, SOROS FUND MANAGEMENT LLC, SFM MANAGEMENT, LLC, CONSECO, INC., VORNADO REALTY TRUST, GERMAN AMERICAN CAPITAL CORP., DEUTSCHE BANK, AG., EASTDIL SECURED, LLC, HARRY MACKLOWE, FIG, LLC, CERBERUS CAPITAL MANAGEMENT, LP, LAZARD FRERES & CO., LLC, KIRKLAND & ELLIS, LLP, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP, CARMEL FIFTH, LLC, 767 MANAGER, LLC, DONALD J. TRUMP and John Does "1" through "10,"** | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

        Plaintiff Leslie Dick Worldwide, Ltd. and Leslie Dick, by their attorneys, The

Law Offices of David H. Relkin, Esq., as and for their Complaint herein, allege as

follows:

David H. Relkin, Esq.

## NATURE OF ACTION

1.　　This action seeks to recover damages arising out of and relating to an ongoing, global RICO Enterprise which engaged in predicate acts of a pattern of racketeering and conspiracy to commit RICO, through and by means of Money Laundering, Bankruptcy Fraud, and Bid Rigging.

2.　　The Money Laundering scheme to control property through acquiring invisible interests in third parties continues to be carried out by defendants and involves a pattern of brazen racketeering predicate acts committed in this district, as well as outside of the United States through shell corporations to avoid detection, which shell entities are then dissolved after the unlawful transactions to conceal their unlawful purposes.

3.　　Defendants engaged in a pattern of racketeering activity to commit the aforesaid crimes, together with others who were aware of, and acted in furtherance of one another's actions and intentions in connection with a sophisticated scheme of the Enterprise to control the Conseco Bankruptcy proceedings filed in the Northern District of Illinois, Eastern Division through Bankruptcy Fraud.

4.　　The RICO conspiracy and unlawful predicate acts of the defendants were to invest in, operate, and acquire control of various entities involved in continuing fraudulent transactions and surreptitious and conspiratorial alliances and agreements involving numerous parties whereby the Enterprise, assisted in part by conspirators, through unlawful means, including but not limited to Money Laundering, Bankruptcy Fraud, and Bid Rigging, acquired Conseco's prime assets, including Conseco Finance and

[2]

David H. Relkin, Esq.

the General Motors Building in New York City, and thereafter attempted to conceal their illicit activities.

5.      Upon information and belief, the illicit conduct of the defendants is continuing in nature and involves interstate commerce.

6.      As a result of the illegal activities alleged in this complaint, the defendants caused direct and consequential damages to plaintiffs.

## THE RELEVANT STATUTES

7.      The relevant statutes involved in this action involve:

(a)      Racketeering Influenced and Corrupt Organizations Act, 18 USC §§1961—1964,

(b)      Conspiracy to violate RICO pursuant to 18 USC §1962 (d);

(c)      Money Laundering, 18 USC §1956;

(d)      Bankruptcy Fraud, 18 USC §152; and

(e)      Anti-Trust Bid Rigging, 15 USC §1 *et seq.*

8.      Due to the extraordinary sophistication of the defendants' surreptitious and conspiratorial conduct, plaintiffs expect to expose additional defendants, and additional statutory violations and illicit conduct during the pre-trial discovery in this action.

## JURISDICTION
## AND VENUE

9.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because plaintiffs bring claims under the federal statutes referred to herein.

[3]

David H. Relkin, Esq.

10.     Venue is proper in this District pursuant to the provisions of 15 U.S.C. §
22 and 28 U.S.C. § 1391(b), (2) since this is a judicial district in which a substantial part
of the events or omissions giving rise to the claim occurred, or a substantial part of
property that is the subject of the action is situated, and (3) this is a judicial district in
which all the defendant are present.

## **PARTIES**

11.     Plaintiff Leslie Dick Worldwide, Ltd. ("Worldwide") is a corporation
organized under the laws of the State of New York, with an office in the City and State of
New York.  World Wide is in the business of real estate acquisition.

12.     Plaintiff Leslie Dick is the Chief Executive Officer of Worldwide and
resides in the City and State of New York.

13.     Upon information and belief, defendant George Soros, is a person and the
head of the RICO Enterprise, is a resident of the City and State of New York and has
performed unlawful activities within this district subjecting him to this Court's
jurisdiction.

14.     Upon information and belief, defendant Soros Fund Management LLC
(Soros Fund Management"), a member of the RICO Enterprise, was at all relevant times a
Delaware Limited Liability Company authorized to do business in the State of New York
and was an instrumental entity of the Enterprise to carry out and conceal his unlawful
conduct of George Soros.

David H. Relkin, Esq.

15.     Upon information and belief, defendant SFM Management, LLC ("SFM Management"), a member of the RICO Enterprise, was at all relevant times New York Limited Liability Company having its principal executive office in Woodbury, New York and was an instrumental entity of the Enterprise to carry out and conceal the unlawful conduct of George Soros.

16.     Upon information and belief, Conseco, Inc. ("Conseco"), a conspirator with the RICO Enterprise pursuant to 18 USC §1962 (d), was at all relevant times an Indiana corporation authorized to do business in the State of New York.

17.     Upon information and belief, non-party Fifth Avenue 58/59 Acquisition Co.  LLC ("Fifth Avenue 58/59 Acquisition Co.") was at all relevant times a Delaware Limited Liability Company authorized to do business under the laws of the State of New York, having an address at 875 Avenue of the Americas, New York, New York.

18.     Upon information and belief, non-party Fifth Avenue 58/59 Acquisition Co. was at all relevant times an affiliate of, or under the control of the RICO Enterprise, including defendants George Soros, Soros Fund Management and/or SFM Management, and Harry Macklowe.

19.     Upon information and belief, once the unlawful purposes for which it had been created were accomplished, namely to launder money through the purchase of the General Motors Building, Fifth Avenue 58/59 Acquisition Co., was dissolved to cover-up such wrongdoing.  (See Exhibit "**A**" in the accompanying Compendium of Exhibits.)

David H. Relkin, Esq.

20.     Upon information and belief, non-party Fifth Avenue 58/59 Junior Mezzanine LLC ("Fifth Avenue 58/59 Junior Mezzanine") was at all relevant times an affiliate of, or under the control of the RICO Enterprise, including but not limited to, defendants George Soros, Soros Fund Management and/or SFM Management.

21.     Upon information and belief, once the unlawful purposes for which it had been created were accomplished, namely to acquire launder money through the purchase of the General Motors Building, Fifth Avenue 58/59 Junior Mezzanine, became a shell entity to cover-up such wrongdoing.  (See Exhibit "**B**" in the accompanying Compendium of Exhibits.)

22.     Upon information and belief, non-party Fifth Avenue 58/59 Mezzanine Fourth, LLC ("Fifth Avenue 58/59 Mezzanine Fourth") was at all relevant times an affiliate of, or under the control of the RICO Enterprise including defendants George Soros, Soros Fund Management and/or SFM Management.

23.     Upon information and belief, once the unlawful purposes for which it had been created were accomplished, namely to launder money through the purchase of the General Motors Building, Fifth Avenue 58/59 Mezzanine Fourth, LLC, was dissolved to cover-up such wrongdoing.  (See Exhibit "**C**" in the accompanying Compendium of Exhibits.)

24.     Upon information and belief, defendant Vornado Realty Trust, LLC ("Vornado Realty Trust"), a member of the RICO Enterprise, was at all relevant times a Maryland limited liability company authorized to do business in the State of New York

[6]

David H. Relkin, Esq.

and was the parent or managing member of Vornado GM III, LLC ("Vornado GM III")

through which it conducted unlawful activities.

25.     Upon information and belief, non-party Vornado GM III was at all

relevant times a Delaware Limited Liability Company with an office in the City and State

of New York.

26.     Upon information and belief, once the unlawful purposes for which it had

been created were accomplished, namely to commit Money Laundering through the

purchase of the General Motors Building, Vornado GM III was dissolved to cover up

such wrongdoing.  (See Exhibit "**D**" in the accompanying Compendium of Exhibits.)

27.     Upon information and belief, defendant German American Capital Corp.

("German American Capital"), a member of the RICO Enterprise, was at all relevant

times a Maryland Corporation authorized to do business in the State of New York and is a

wholly owned subsidiary of Deutsche Bank AG.

28.     Upon information and belief, defendant Deutsche Bank AG ("Deutsche

Bank"), a RICO conspirator pursuant to 18 USC §1962 (d), was at all relevant times a

foreign bank authorized to do business in the State of New York.

29.     Upon information and belief, defendant Eastdil Secured, LLC was at all

relevant times a New York limited liability company, a RICO conspirator pursuant to 18

USC §1962 (d), and was previously named Eastdil Realty Company, LLC ("Eastdil

Realty"). (See Exhibit "**E**" in the accompanying Compendium of Exhibits.)

[7]

David H. Relkin, Esq.

30.     Upon information and belief, defendant Harry Macklowe, a RICO conspirator pursuant to 18 USC §1962 (d), is a resident of the City and State of New York.

31.     Upon information and belief, FIG LLC, was at all relevant times a limited liability company organized under the laws of the State of Delaware, authorized to do business in the State of New York, was a member of the RICO Enterprise, and was known at all relevant times herein as Fortress Investment Group, LLC ("Fortress Investment Group").  (See Exhibit "**F**" in the accompanying Compendium of Exhibits.)

32.     Upon information and belief, defendant Cerberus Capital Management, LP ("Cerberus Capital Management"), a RICO conspirator pursuant to 18 USC §1962 (d), was at all relevant times a limited partnership organized and existing under the laws of the State of Delaware, was authorized to do business in the State of New York, and conducted many of its unlawful acts within the State of New York.

33.     Upon information and belief, non-party defendant J.C. Flowers & Co., LLC ("J.C. Flowers & Co.") was at all relevant times a Delaware Limited Liability Company authorized to do business in the State of New York.

34.     Upon information and belief, defendant Lazard Freres & Co, LLC ("Lazard"), a RICO conspirator pursuant to 18 USC §1962 (d), was at all relevant times a limited liability company organized under the laws of the State of New York and acted as financial advisor to Conseco.

[8]

David H. Relkin, Esq.

35.     Upon information and belief, defendant Kirkland & Ellis, LLP, ("Kirkland & Ellis"), a RICO conspirator pursuant to 18 USC §1962 (d), was at all relevant times a limited liability partnership organized and existing under the laws of the State of New York and was the legal advisor to Conseco.

36.     Upon information and belief, defendant Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried, Frank, Harris, Shriver & Jacobson"), a RICO conspirator pursuant to 18 USC §1962 (d), was at all relevant times a limited liability partnership organized and existing under the laws of the State of New York and acted as legal advisor to Harry Macklowe or an instrumentality controlled by him or others.

37.     Upon information and belief, Carmel Fifth, LLC ("Carmel Fifth"), a RICO conspirator pursuant to 18 USC §1962 (d), was at all relevant times a Delaware limited liability company authorized to do business in the State of New York, and was a wholly owned entity of Conseco.

38.     Upon information and belief, 767 Manager, LLC ("767 Manager"), a RICO conspirator pursuant to 18 USC §1962 (d), was at all relevant times a Delaware limited liability company authorized to do business in the State of New York, and was a wholly owned entity of Donald J. Trump.

39.     Upon information and belief, non-party Trump 767 Manager, LLC ("Trump Manager") was a wholly-owned subsidiary of 767 LLC, and was the actual owner of the General Motors Building from July 1998 to September 2003.

[9]

David H. Relkin, Esq.

40.     Upon information and belief, defendant Donald J. Trump, is a person and a member of the RICO Enterprise, is an individual with a residence in the City and State of New York.

41.     John Does "1" through "10" are intended to designate additional co-conspirators and members of the RICO Enterprise involved in Money Laundering, Bankruptcy Fraud, and/or Bid Rigging as more fully described herein.

42.     The foregoing defendants constitute an RICO Enterprise because they satisfy the definition of 18 USC §1964 (1) in that they are: any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.  The defendants also constitute a RICO association-in-fact Enterprise by evidence of their ongoing organization, formal or informal, and by evidence that the various associates functioned as a continuing unit.

### FACTUAL BACKROUND:
### THE EVENTS LEADING UP TO
### <u>THE BANKRUPTCY OF CONSECO</u>

43.     In 1998, Conseco, one of the largest conglomerate insurance companies in America, was on a buying spree, accumulating 19 insurance and insurance financing companies since 1992.

44.     On or about April 6, 1998, Conseco bought Green Tree Financial, a Minnesota mobile home lender for 6.2 Billion Dollars.  Conseco thereafter changed Green Tree Financial's name to Conseco Finance Corporation ("Conseco Finance").

David H. Relkin, Esq.

45.     Upon information and belief, in connection with the sale of Green Tree Financial to Conseco, Lawrence Coss, the Chairman of Green Tree Financial received 265 Million Dollars, including a 102 Million Dollar Bonus.

46.     Thereafter, upon information and belief, Lawrence Coss was required to return 23 Million Dollars of the 102 Million Dollar bonus he received that year after Green Tree Financial restated its earnings.

47.     The main business of Green Tree Financial was to make loans, then package them and sell the loans to other investors in a process Wall Street calls securitization.

48.     When the loans were sold, Green Tree Financial would make certain assumptions regarding the profits it would earn; if it made incorrect assumptions, such as how soon borrowers would pay off their loans, those gains would prove illusory.

**Conseco's Purchase of**
**The General Motors Building**
**<u>With Donald J. Trump</u>**

49.     In or about May 1998, Conseco and Donald J. Trump entered into a contract to purchase the General Motors Building in New York City, located at 767 Fifth Avenue between 57th and 58th Street, across the street from the Plaza Hotel.

50.     The General Motors Building is considered to this day as a "trophy" property and one of New York's finest and most lucrative commercial real estate locations in New York.

[11]

David H. Relkin, Esq.

51.     The unlawful Money Laundering through the sale of the General Motors
Building, orchestrated and carried out by the RICO Enterprise, including George Soros,
Soros Fund Management, SFM Management, Vornado Realty Trust, German American
Capital, Fortress Investment Group, Donald J. Trump, and the RICO conspirators
Conseco, Deutsche Bank, Lazard, Eastdil Realty, Harry Macklowe, Cerberus Capital
Management, Lazard, Kirkland & Ellis, Fried, Frank, Harris, Shriver & Jacobson, Carmel
Fifth and 767 Manager, and, upon information and belief, other members of the
Enterprise and co-conspirators, operated through a pattern of racketeering and forms one
of the cornerstones of the defendants' illicit activities of Money Laundering and
Bankruptcy Fraud, predicate acts of RICO alleged herein and Bid Rigging.

52.     When the General Motors Building was purchased by Conseco and
Donald J. Trump, the parties assumed two mortgages on the property, bringing the total
purchase price for the General Motors Building to approximately 878 Million Dollars.

53.     Upon information and belief, one of the mortgages on the property was for
the original principal sum of 500 Million Dollars from Secore Mortgage, and the other
from Lehman Brothers Holdings, Inc. in the original principal sum of 200 Million
Dollars.

54.     At the Closing of the purchase of the General Motors Building the parties
assumed the mortgages on the property and, on July 31, 1998, Conseco paid 212.7
Million Dollars through its newly-created subsidiary Carmel Fifth, and Donald J. Trump
paid 11.2 Million Dollars, through his newly-created vehicle, 767 Manager.

[12]

David H. Relkin, Esq.

55.     Carmel Fifth and 767 Manager entered into a Limited Liability Operating Agreement to reflect the terms of their joint ownership of the Building and became members of an entity called 767, LLC which was the sole owner of Trump 767 Manager, which held the title to the General Motors Building.

56.     Upon information and belief, the capital used by Carmel Fifth for the purchase by of the General Motors Building, and the oversight of its operations, came directly from Conseco and made Conseco the true owner of the General Motors Building through its subsidiary Carmel Fifth.

57.     Although Conseco stated on its financial statements that the capital invested by Carmel Fifth in the purchase of the General Motors Building was an investment of approximately 212.7 Million Dollars *by Conseco* in Carmel Fifth, Carmel Fifth was purported to be a wholly-owned subsidiary of four insurance companies, so as to make Carmel Fifth isolated from Conseco's general operations.[1]

58.     Upon information and belief, the four insurance companies which were the alleged owners of Carmel, invested little or no capital in Carmel Fifth, and therefore did not actually own Carmel Fifth.

59.     Upon information and belief, Conseco booked its interest in Carmel Fifth on its financial statements as an investment *by Conseco* of 212.7 Million Dollars.  (See Exhibit "**G**" in the accompanying Compendium of Exhibits.)

---

[1] The insurance companies were Bankers Life and Casualty Co., Washington National Life Insurance Co., Conseco Senior Health Insurance Co., and Conseco Annuity Assurance Co.

[13]

David H. Relkin, Esq.

60.     Had it become public in the Conseco Bankruptcy proceeding that the investment in the General Motors Building was made by Conseco, the investment would have been part of the Conseco Bankruptcy Estate and would have been available to the creditors for distribution in that Case.[2]

61.     The knowing participation of Conseco and Kirkland & Ellis to commit predicate acts of failing to bring this information to the attention of the Bankruptcy Court and their knowledge that such acts constituted racketeering activity were part of the conspiracy of the RICO Enterprise to commit Bankruptcy Fraud.

**The Documented SEC Violations**
**By Conseco to Inflate Its Earnings**

62.     From March 1999 through February 2000, Conseco and its wholly-owned subsidiary Conseco Finance, made false and misleading public statements about their earnings, overstating their profits by hundreds of millions of dollars.

63.     This massive overstatement occurred with the knowledge and participation of Conseco, its Chief Financial Officer and Conseco Finance's Chief Accounting Officer.

64.     The fraudulent and hidden scheme of Conseco manipulated earnings by avoiding huge write downs of certain assets held by Conseco Finance known as interest-only securities. During this same period, Conseco and Conseco Finance also made a number of unsupported and improper adjustments ("top-side adjustments") to the books and records of Conseco and Conseco Finance.

---

[2]  Conseco filed for Bankruptcy protection on December 17, 2002 in the Northern District of Illinois, Eastern Division.

David H. Relkin, Esq.

65.     Through these top-side adjustments, Conseco and Conseco Finance fabricated increased earnings.

66.     As part of its business, Conseco Finance originated, purchased, sold and serviced consumer and commercial loans. Conseco Finance put its loans into groups (called "pools"), and sold the pools to a special purpose entity (the "SPE"). The SPE, in turn, sold bonds to the public backed by the principal and interest payments due from the loans making up the pools.

67.     The SPE transferred to Conseco Finance the proceeds from the bond sales, and an interest-only security that represented the right to receive any remaining proceeds flowing from the pool after all the other bondholders and servicing fees were paid.

68.     Conseco Finance recorded the interest-only securities on its books as assets and was required by law to adjust them to their fair value each quarter.

69.     Conseco Finance purportedly determined the fair value of the interest only securities each quarter by estimating the cash flows expected to flow from each interest-only security and discounting them to their actual value.

70.     The Conseco Finance accounting department determined these cash flows using computer models that were based on fraudulent assumptions made by Conseco and Conseco Finance.

71.     Following Conseco's acquisition of Conseco Finance, Conseco's senior management touted its new subsidiary as its new growth engine, and repeatedly and

[15]

David H. Relkin, Esq.

falsely represented to the public that Conseco Finance was contributing to Conseco's aggressive financial targets exactly according to plan.

72.     From January 1999 to March of 2000, neither Conseco nor Conseco Finance disclosed any problems, accounting changes, or similar issues relating to their accounting for Conseco Finance's interest-only securities.

73.      In March of 2000, while conducting the 1999 year-end audit, Conseco and Conseco Finance's auditors, PricewaterhouseCoopers, L.L.P. ("PricewaterhouseCoopers"), discovered Conseco's and Conseco Finance's fraudulent activities with respect to the interest-only securities.

74.     PricewaterhouseCoopers also discovered the fraudulent topside adjustments to the income of Conseco and Conseco Finance.

75.     On March 31, 2000, Conseco and Conseco Finance announced that they were reviewing the value of their interest-only securities and expected to record a charge to earnings, estimated at 350 Million Dollars after taxes, to write-down the carrying value of the interest-only securities. Conseco's stock fell more than 16% that day.

76.     On April 1, 2000, Conseco publicly announced that it would sell Conseco Finance.

77.     Due to the inability of Conseco to identify purchasers willing to pay what Conseco asked for Conseco Finance, Conseco changed its tune and tried to make it appear to the market that Conseco Finance was actually an asset to the company.

David H. Relkin, Esq.

78.     On April 14, 2000, Conseco and Conseco Finance filed restated results for the first three quarters of 1999, and revised results for the fourth quarter and full-year 1999.

79.     Specifically, Conseco was forced to publicly admit that it had overstated its net income for the first three quarters of 1999 by $9.3 million (3.2%), $84.2 million (39.5%) and $37.8 million (24.3%), respectively, and inflated its publicly announced net income for the fourth quarter and full-year 1999 by $236.3 million (383%) and $367 million (61.7%) respectively.

80.     Conseco Finance also admitted that it had overstated net income for the first three quarters of 1999 by $7.5 million (5.8%), $56.1 million (49.9%) and $14.8 million (26.2%), respectively, and inflated its publicly announced operating income for the fourth quarter and year-end 1999 by $378.3 million (112.9%) and $562.6 million (1654.7%), respectively. Conseco's stock price fell more than 10% following these disclosures.

81.     Rollin S. Dick and James S. Adams, formerly Chief Financial Officer and Chief Accounting Officer of Conseco and then its wholly-owned subsidiary Conseco Finance kept their fraudulent activities hidden until at least the fourth quarter of 2003.

82.     On or about March 10, 2004, the Securities and Exchange Commission filed civil fraud charges against Rollin S. Dick and James S. Adams for their fraudulent manipulations with respect to the interest-only securities and the fraudulent topside adjustments to the income of Conseco and Conseco Finance.  (See Exhibit "**H**" in the accompanying Compendium of Exhibits.)

[17]

David H. Relkin, Esq.

83.     Once the fraudulent overstatement of Conseco Finance's earnings became public, in or about the first week of May 2000, Stephen H. Hilbert, Conseco's Chairman and Chief Executive Officer and founder resigned.

**Gary C. Wendt Attempts
<u>To Reduce Conseco's Debt</u>**

84.     On or about March 31, 2000, Conseco retained Lehman Brothers Investment Bank ("Lehman Brothers") to obtain a purchaser for Conseco Finance.

85.     On or about May 5, 2000, Conseco agreed to sell 1.5 Billion Dollars of consumer loans to Lehman Brothers.

86.     Conseco announced that it would use up to 500 Million Dollars to repay debt owed by Conseco Finance to Conseco.

87.     On June 29, 2000, Conseco announced that it had appointed Gary C. Wendt, former CEO of GE Capital Services, to the position of CEO and Chairman of the Board of Conseco.

88.     Upon information and belief, Gary C. Wendt received a signing bonus of 45 Million Dollars as well as 3.2 million shares of stock, then worth approximately 31.2 Million Dollars.  In addition, he received options to purchase an additional 10,000,000 shares of stock. Wendt was also entitled to receive a bonus of 50 Million Dollars if the stock price rose from the price of $5.80 per share to $20.00 per share, or $38.00 less than Conseco's share price when it purchased Green Tree Financial.

[18]

David H. Relkin, Esq.

89.     Wendt was brought into Conseco to reduce its enormous debt and to maximize the assets of Conseco by selling-off pieces of the Conseco Empire to focus Conseco back on its core business of insurance.

90.     Initially, in July 2000, Wendt announced that Conseco was again in the process of selling Conseco Finance, but later flip-flopped and announced he was more interested in operating it.

91.     By October, 2000 Gary C. Wendt had been cutting costs but Conseco nevertheless continued to hemorrhage quarterly losses in the hundreds of Millions of Dollars.

**The Orchestrated Dispute
Regarding The
General Motors
Building Between Conseco
<u>And Donald J. Trump</u>**

92.     The Limited Liability Company Agreement of 767 LLC between Carmel Fifth and 767 Manager, the indirect owners of the General Motors Building, provided that on or after the third anniversary of the purchase of the General Motors Building, July 31, 1998, or July 31, 2001, either party could exercise a buy/sell right pursuant to which Carmel Fifth could be bought out or purchase the interest of 767 Manager, and vice versa, at certain predetermined prices.  (See Exhibit "**I**," in the accompanying Compendium of Exhibits.)

93.     Pursuant to the Limited Liability Company Agreement of 767 LLC, if Carmel Fifth sold its interest to 767 Manager, or if 767 sold its interest to Carmel Fifth,

[19]

they were each entitled to receive an amount pursuant to a formula contained in the

Operating Agreement.  (See Exhibit "**I**" in the accompanying Compendium of Exhibits at

¶9.6.)

94.     In March 2001, Conseco continued Gary C. Wendt's cost cutting

endeavors to keep Conseco afloat by allegedly liquidating what were represented as "non-

core" assets of Conseco.

95.     One of the most valuable assets of Conseco at that time was its substantial

interest in the General Motors Building.

96.     Notwithstanding this fact, Gary C. Wendt took no steps to monetize

Conseco's interest in the General Motors Building.

97.     Upon information and belief, this was because, at or about the beginning

of March 2001, the mastermind of the RICO Enterprise, George Soros, had contacted,

among others to be found in discovery, Gary C. Wendt and Donald J. Trump to contrive a

Money Laundering scheme to launder money through the sale of the General Motors

Building by Conseco, a co-conspirator, through a pattern of racketeering activity.

98.     Upon information and belief, Conseco was well-aware of the value of its

interest in the General Motors Building at this time since, in or about July and August

2001, Conseco had received bids from interested buyers at a price of 1.15 Billion Dollars.

99.     Upon information and belief, in March 2001, Donald J. Trump offered to

purchase Carmel Fifth's interest in the General Motors Building for 295 Million Dollars.

David H. Relkin, Esq.

100.    As part of his proposal, Trump agreed to issue certain debt obligations, including a note in the amount of 250 Million Dollars.

101.    In order to provide the necessary liquidity for the note, Conseco indicated that it would only consider the offer if Trump provided a Guaranty or Letter of Credit to collateralize the debt obligations of Trump.

102.    Upon information and belief, Conseco requested this Guaranty to securitize the note to allow it to immediately sell the note into the financial markets.

103.    On March 21, 2001, Conseco and Donald J. Trump signed a letter of intent which provided that Trump had to provide Conseco a Guaranty from a third party of the 250 Million Dollar Note from Trump to securitize the note.

104.    Upon information and belief, "Guaranty" was defined in the letter of intent as a Letter of Credit or other security acceptable to Conseco, in its "sole discretion."

105.    Pursuant to the letter of intent, upon information and belief, Trump had three months to provide the guaranty and was required to close no later than June 30, 2001.

106.    Upon information and belief, on May 16, 2001, Trump obtained a non-binding proposal from Deutsche Bank through Alex Brown, Inc. to refinance the debt on the General Motors Building (the "Deutsche Bank Proposal") and to provide Conseco with "limited credit protection" in form of a "standby commitment," pursuant to which Trump could borrow up to 225 Million Dollars which could be used to pay principal and interest to Conseco.

[21]

David H. Relkin, Esq.

107.    The Deutsche Bank Proposal also provided that the purchase price was 250 Million Dollars, or 45 Million Dollars less than Trump had originally agreed to pay under the letter of intent. This proposal was doomed to be rejected as insufficient by Conseco.

108.    Upon information and belief, on May 22, 2001, Conseco rejected the May 16, 2001 proposal and standby commitment by Trump as unacceptable and urged Trump to provide a letter of credit or guaranty sufficient to meet Conseco's needs as described in the letter of intent.

109.    Since Trump assured Conseco that he was close to obtaining the necessary guaranty, on July 3, 2001 (the "July 3 Agreement") Conseco agreed with Trump that Conseco would sell its interest in 767 LLC for the sum of 295 Million Dollars subject to certain conditions.  (See Exhibit "**J**" in the accompanying Compendium of Exhibits.)

110.    Conseco's July 3 Agreement supported the position that *Conseco* actually owned the General Motors Building; but it also left open the possibility that *Carmel Fifth*, a wholly owned subsidiary of four insurance companies, which could not file bankruptcy, owned 50% of the General Motors Building and that therefore the Conseco investment of approximately 212 Million Dollars tied up in the General Motors Building would not be part of any Conseco Bankruptcy Estate.

111.    One thing is clear from the July 3 Agreement, it provided both sides with an argument regarding the ownership of the General Motors Building: either it was owned by Conseco (as suggested by the July 3 Agreement and the Conseco Financial

[22]

David H. Relkin, Esq.

Statements), or it was owned by Carmel Fifth as a subsidiary of four insurance companies.

112.    Conseco would later argue in its Bankruptcy proceedings both that it owned the General Motors Building and that therefore the Bankruptcy Court had core jurisdiction over the dispute with Trump when it sought the Bankruptcy Court to confirm the Arbitration Award against Trump; and then argued that it did not own the General Motors Building when it allegedly up-streamed the profits from the sale of the General Motors Building solely to the four insurance companies which allegedly owned it and not to the creditors of Conseco.

113.    Trump would later argue both that the General Motors Building was part of the Conseco Bankruptcy Estate by suing Conseco, and later argued that the Building was outside the jurisdiction of the Bankruptcy Court when Trump moved to dismiss post-arbitration proceedings before the Bankruptcy Court to confirm an arbitration award regarding the sale of the Building.

114.    Since nothing accrued to the benefit of the creditors of Conseco by the ultimate sale of the General Motors Building, one must presume that this entire transaction, the March letter of intent, the July 3 Agreement and the months and months of negotiations regarding the proper form of the guaranty, were an obvious delay tactic and ruse by members of the Enterprise, Soros and  Trump and RICO conspirators Conseco, Kirkland & Ellis and Conseco solely to delay the resolution of the ownership of the General Motors Building for the benefit of the RICO Enterprise.

[23]

David H. Relkin, Esq.

115.     Pursuant to the July 3 Agreement, the purchase price was to be paid to Conseco in debt obligations of Trump, subject to certain conditions, including that the loan and interest payments on the Trump obligations "shall be guaranteed by Lender in a form acceptable to Conseco, in its sole discretion."

116.     The third anniversary of the purchase of the General Motors Building was July 31, 2001.  As of that date, pursuant to the terms of the Limited Liability Agreement of 767 LLC, Conseco's wholly-owned subsidiary, Carmel Fifth, could exercise a Buy/Sell option and either be bought out for approximately 500 Million Dollars or buy Trump's 50% interest, held by his wholly-owned entity, 767 Manager, for the comparatively paltry sum of approximately 15 Million Dollars.  (See Exhibit "I" in the accompanying Compendium of Exhibits at ¶¶9.6.)

117.     Given Conseco's knowledge that potential purchasers were willing to pay approximately 1.2 Billion Dollars for the General Motors Building, Conseco had a strong interest in exercising its right to purchase 767 Manager's interest or to be bought out for 200 Million Dollars more than Trump had offered to pay in the March letter of intent or the July 3 Agreement.

118.     Nevertheless, contrary to sound, or even rational business practices, Conseco continued to refrain from exercising the Buy/Sell option under the 767 LLC Operating Agreement and continued to negotiate with Trump to resolve the ownership pursuant to the July 3 Agreement.

119.     Instead of waiting to exercise the Buy/Sell provision in the 767 LLC Limited Liability Agreement until July 31, 2001, which would have maximized

[24]

David H. Relkin, Esq.

Conseco's assets, on or about July 3, 2001, Conseco—at the behest of George Soros and other co-conspirators in furtherance of the Enterprise—entered into the totally irrational July 3 Agreement with Trump, in which Conseco agreed to be bought out of the General Motors Building for the mere sum of 295 Million Dollars provided that Trump could guaranty the sum of Trump's 250 Million Dollar Note by a form of security acceptable to Conseco in its sole discretion.

120.   The fact that Conseco was a party to the July 3 Agreement and that Conseco carried its interest in Carmel Fifth as an investment of Conseco demonstrate that the General Motors Building was, at least according to Conseco, owned by Conseco—not Carmel Fifth—and that Conseco's later arguments to keep the ownership and value of the General Motors Building out of Conseco's later Bankruptcy proceeding would constitute Bankruptcy Fraud.

121.   Pursuant to the July 3 Agreement, Conseco was entitled to receive, at the minimum, approximately *205 Million Dollars less than it would have received had it waited a mere twenty-eight days* to exercise the Buy/Sell agreement and the sixty days during which Trump would have the election to buy or sell his interest in the Building.

122.   In the event that Trump exercised his sell option, he would have received approximately a mere 15 Million Dollars, and Conseco could have owned the General Motors Building which was reasonably valued at that time at the sum of 1.2 Billion Dollars, and Conseco *would have received approximately 500 Million Dollars after payment of the Mortgages*.

David H. Relkin, Esq.

123.    On the other hand, in the event that Trump exercised his buy option, Conseco would also be paid *approximately 500 Million Dollars*.

124.    The July 3, 2001 Agreement provided that Conseco could terminate the Agreement at any time after July 20, 2001 if Trump did not provide the guaranty sought by Conseco.

125.    The July 3 Agreement also provided that it would terminate automatically if Trump did not close on the transaction by September 15, 2001.  (See Exhibit "**J**" in the accompanying Compendium of Exhibits at p.1.)

126.    On or about July 10, 2001, Trump publicly announced that he was buying Conseco's interest in the General Motors Building for 295 Million Dollars pursuant to the July 3 Agreement.

127.    Upon information and belief, Trump was fully able to provide the security sought by Conseco, but, at various times in furtherance of the pattern of racketeering activity of the Enterprise engineered by Soros and in conspiracy with Trump and Conseco, Trump refused to provide the guaranty and at other times Conseco refused the guaranty provided by Trump.

128.    Soros, Conseco or another member of the RICO conspiracy directed Conseco to repeatedly provide unwarranted extensions of the date for Trump to purchase Conseco's interest for a substantially discounted price, since it bestowed an advantage in delaying the resolution of the ownership of the General Motors Building for the benefit of the RICO Enterprise.

[26]

David H. Relkin, Esq.

129.    By keeping the General Motors Building in play, the members of the RICO Enterprise were seeking to control the purchase of the Building so as to launder as much money as possible.  This it did by dead-locking the sale of the Building by having Trump not provide the guarantee, which Soros could certainly have provided, and by having Conseco repeatedly refuse the guaranty.

130.    As part of the pattern of racketeering activity, Trump failed to provide the required guaranty prior to July 20, 2001.

131.    In August 2001, Gary C. Wendt held a conference call with market analysts and tried to stave off rumors that Conseco was still in the process of "cooking its books" as it had done in 1999 and 2000.

132.    On August 6, 2001, Trump again, in furtherance of the pattern of racketeering activity, provided Conseco with a Guaranty that was not acceptable to Conseco.

133.    Upon information and belief, in August, 2001, defendant Vornado Realty Trust proposed to Conseco to purchase the General Motors Building for 1.15 Billion Dollars, which Conseco rejected.

134.    On August 24, 2001, Conseco provided a copy of a Guaranty to Trump that it would find acceptable.

135.    Trump rejected Conseco's proposal.

[27]

David H. Relkin, Esq.

136.     Trump did not close on the General Motors Building prior to September 15, 2001, as required by the July 3 Agreement.

137.     Accordingly, by letter dated October 4, 2001, Conseco formally advised Trump that the July 3 Agreement "was null and void and of no further effect." (See Exhibit "**K**" in the accompanying Compendium of Exhibits.)

138.     Upon information and belief, according to Charles H. Cremens' agreement with Conseco, Cremens would receive a 1 Million Dollar bonus if the General Motors Building was sold for more than 1 Billion Dollars.[3]

139.     In September 2001, William J. Shea was appointed Chief Operating Officer and President of Conseco, while Gary C. Wendt remained Chairman of the Board of Directors.

140.     Nevertheless, despite its urgent cash needs, in furtherance of the RICO Enterprise, and despite its contention that the July 3 Agreement was "null and void," Conseco continued to do nothing to monetize the General Motors Building; and, during the next three months Carmel inexplicably failed to exercise its matured, legitimate right to exercise its Buy/Sell agreement with Trump.

141.     On or about January 5, 2002, Bruce A. Chrittenden resigned as President of Conseco Finance and Charles H. Cremens replaced him.

---

[3]   Charles H. Cremens was Gary C. Wendt's right-hand man who handled both the sale of Conseco Finance and the sale of the General Motors Building.

[28]

David H. Relkin, Esq.

142.     After Trump repeatedly failed to provide the Guaranty under terms satisfactory to Conseco, and despite numerous irrational extensions granted by Conseco, which it was under no obligation to give, ninety days later, or on or about January 15, 2002, Conseco finally advised Trump by correspondence of that date, that it was no longer willing to sell at the discounted price, and Carmel Fifth was exercising its Buy/Sell option contained in the Limited Liability Agreement of 767 LLC giving 767 Manager sixty (60) days to exercise its option to either buy out Conseco for 499.4 Million Dollars, or be bought out by Conseco for 15.5 Million Dollars.  (See Exhibit "**L**" in the accompanying Compendium of Exhibits.)

143.     These amounts in the Buy/Sell notice were based on a formula contained in the 767 LLC Operating Agreement,[4] and a market value of the General Motors Building of 1.215 Billion Dollars.

144.     In response, on or about February 7, 2002, Trump sued Carmel Fifth in New York Supreme Court for One Billion Dollars for breach of contract and sought to have Carmel Fifth transfer the General Motors Building to him by asserting that the July 3 Agreement superseded and cancelled Carmel Fifth's Buy/Sell right.

145.     On or about February 8, 2002, Donald J. Trump, through his counsel, advised Conseco that it would sue anyone even negotiating with Conseco to buy out Trump's interest in 767 LLC.

---

[4] See Exhibit "**I**" in the accompanying Compendium of Exhibits.

[29]

David H. Relkin, Esq.

146.    Upon information and belief, on or about February 12, 2002, Trump, through its counsel threatened a potential purchaser directly with interference with contractual relations.

147.    Under the cloud of Trump's tactics, no one in the financial arena appeared to be willing to participate in any purchase or refinance of the General Motors Building.

148.    In February 2002, Conseco agreed to pay 120 Million Dollars to settle a class-action lawsuit filed by shareholders who accused the company of producing false and misleading financial results through its 1999 fiscal year.

149.    Instead of responding to the Buy/Sell notice within sixty days, as required by the Operating Agreement of 767 LLC, on March 13, 2002, Trump responded to Conseco's Buy/Sell offer by alleging that the July 3 Agreement precluded Conseco from exercising the Buy/Sell right even though, according to Conseco, the July 3 Agreement had expired by its own terms on September 15, 2001, and that Trump was still allowed to purchase the General Motors Building for the sum of 295 Million Dollars.  (See Exhibit "**M**" in the accompanying Compendium of Exhibits.)

150.    Upon information and belief, during this period, Trump, through its attorneys, again notified Conseco and other parties that it would sue anyone who proposed to buy or even negotiate to buy the General Motors Building from Carmel Fifth or Conseco.

151.    In or about March 2002, Bill Shea, the President of Conseco also became the Chief Financial Officer of Conseco.

[30]

David H. Relkin, Esq.

152.    Upon information and belief, Trump knew that the New York Supreme Court had no jurisdiction to hear the dispute because of the arbitration provision in the Limited Liability Agreement of 767 LLC, thus, this action could only have been filed to delay the resolution of the ownership of the General Motors Building so as to enable the RICO Enterprise to acquire it at a price to enable it to launder the greatest amount of money and under terms it could control.[5]

153.    Upon information and belief, Conseco notified Trump by letter dated March 22, 2002 that, since 767 Manager had not made an election under the Buy/Sell provision of the 767 LLC Operating Agreement, Trump was deemed to have offered to sell his interest in the General Motors Building for 15.5 Million Dollars and further notified Trump that Conseco was prepared to immediately purchase Trump's interest in the General Motors Building.  (See Exhibit "**N**" in the accompanying Compendium of Exhibits.)

154.    In furtherance of its position that Trump had exercised the sell option of the Operating Agreement, on or about March 26, 2002, Carmel Fifth (not Conseco) instituted arbitration proceedings against 767 Manager (not Trump), before the American Arbitration Association, as required by the Operating Agreement, and requested an Award purchasing 767 Manager's interest in the General Motors Building for the price of 15.5 Million Dollars.  (See Exhibit "**O**" in the accompanying Compendium of Exhibits.)

---

[5] Despite Trump's allegation that the buy/sell provision was no longer valid, under well-settled law, the parties would still have had to arbitrate the dispute because of the arbitration provision in the 767 Operating Agreement.

[31]

David H. Relkin, Esq.

155.    Pursuant to the Operating Agreement of 767 LLC, the arbitration had to be conducted before a Panel of three arbitrators, one selected by each of the parties, with a third arbitrator, required to be a former Judge, selected by the two party-appointed arbitrators.

156.    Upon information and belief, in April 2002, Conseco Medical Insurance Co. agreed to pay at least 1.3 Million Dollars in restitution and fines in Texas for failure to promptly pay health care claims in mid-2001.

157.    In conspiracy with the RICO Enterprise, Trump continued his racketeering activity to delay and derail the Arbitration.

158.    Upon information and belief, on or about April 9, 2002, Trump sent a letter to Conseco that it would sue Conseco or any third parties who attempted to purchase the General Motors Building for tortious interference.

159.    Despite the arbitration agreement in the 767 LLC Operating Agreement, on or about April 15, 2002, hoping to further delay the dispute, Trump moved for a stay of the Arbitration proceedings in New York State Supreme Court, claiming that the July 3 Agreement between him and Conseco abrogated the arbitration provision  in the 767 LLC Operating Agreement.

160.    Oral argument on the motion to stay the Arbitration took place before Justice Moskowitz of the New York State Supreme Court on May 2, 2002.

161.    By Order dated May 2, 2002, entered May 7, 2002, the New York State Supreme Court denied Trump's motion for a stay of the arbitration before the American

[32]

David H. Relkin, Esq.

Arbitration Association (per Moskowitz, J.).  (See Exhibit "**P**" in the accompanying

Compendium of Exhibits.)

162.    In response, on May 31, 2002, Trump appealed the Decision of Justice

Moskowitz to the Appellate Division First Department, and then, in another about-face,

after further delaying the resolution of the ownership of the General Motors Building, on

June 12, 2002, Trump stipulated to stay his state court action and advance his arguments

against Conseco and Carmel Fifth before the American Arbitration Association.

### BEHIND THE SCENES
### OF THE GENERAL MOTORS DISPUTE GEORGE SOROS
### AND CONSECO IMPLEMENT THE RICO ACTIVITY

163.    Upon information and belief, on June 7, 2002 Conseco retained Lazard to

assist it with its grave financial difficulties.  Lazard would later participate in the RICO

conspiracy to analyze the value of Conseco Finance and provide such information to the

RICO Enterprise including, Fortress Financial, to enable the RICO Enterprise to acquire

and maintain an interest in Conseco's affiliate Conseco Finance.

164.    Upon information and belief, at or about this time, the head of the

Enterprise, George Soros, or someone else acting on behalf of the Enterprise, began

implementing the pattern of racketeering activities which could be accomplished by

having Conseco file for Bankruptcy protection under Chapter 11 of the Bankruptcy Code,

so as to acquire Conseco's assets at a discount price, including Conseco Finance and the

General Motors Building and launder money through these entities.

[33]

David H. Relkin, Esq.

165.    During secret negotiations that ensued between the members of the RICO Enterprise and its co-conspirators, George Soros, SFM Management, Soros Fund Management, Fortress Investment Group, Harry Macklowe, Vornado, Donald J. Trump, Cerberus Capital Management, the RICO Enterprise engaged in a pattern of racketeering activity involving interstate commerce to acquire an interest in Conseco, to invest proceeds of a pattern of racketeering activities in Conseco, and to conduct the affairs of Conseco through a pattern of racketeering, through Money Laundering, Bankruptcy Fraud and Bid Rigging.

166.    The racketeering activity of the RICO Enterprise involved in the Bankruptcy Fraud included Fortress Financial and Cerberus who acquired an interest in Conseco in two ways: (a) by purchasing Conseco Finance, and (b) by obtaining the Debtor in Possession Financing (the "DIP Financing") of Conseco through racketeering activities constituting Money Laundering and Bankruptcy Fraud to control the Conseco Bankruptcy from the inside.

167.    The next maneuver in the pattern of racketeering, orchestrated by Soros and the other members of the Enterprise, was to use the RICO Enterprise to ensure the sale of the General Motors Building was to the co-conspirator designee of the Enterprise, Harry Macklowe, so that Soros and the Enterprise could launder money through the rigged sale of General Motors Building.

168.    The acquisition of the General Motors Building was also an act of Bid Rigging by the members and conspirators of the RICO Enterprise.

[34]

David H. Relkin, Esq.

169.    Upon information and belief, Wendt was promised a kickback by the RICO Enterprise if he participated in the unlawful Money Laundering, Bankruptcy Fraud and Bid Rigging activities engineered, and later carried out by George Soros with other defendants.

170.    Upon information and belief, in connection with the General Motors scheme, the plan of the Enterprise was to cause Conseco to file for bankruptcy so that Donald J. Trump and Conseco would keep the title to the General Motors Building tied up in litigation and arbitration until after Conseco's Bankruptcy proceedings were concluded to allow the Enterprise to engage in racketeering activity in interstate commerce by Money Laundering and Bid Rigging of the General Motors Building to direct the sale of the General Motors Building to the RICO Enterprise's designated straw-man buyer Harry Macklowe without the oversight of the Conseco Bankruptcy Court and to launder substantially larger amounts of money than could have been laundered had the July 3 Agreement or the buy/sell agreement went through.

171.    In addition, George Soros' and the other members of the Enterprise employed Money Laundering to purchase the General Motors Building in the name of Harry Macklowe, which laundered proceeds flowed thereafter into a real estate venture of Donald J. Trump's in Chicago, named Trump International Hotel & Tower.[6]

---

[6] Among the other investors in Trump International Hotel & Tower are virtually the same defendants in this action: Deutsche Bank, AG, Blackacre Institutional Capital Management, LLC, which is the real estate affiliate of Cerberus Capital Management, LP, Grove Capital, LLP, which manages Soros Fund Management, Fortress Investment Group, LLC, which is a partner of Mapeley Holdings, Ltd., one of George Soros' companies, and George Soros. (See Exhibit "**Q**" in the accompanying Compendium of Exhibits.)

[35]

David H. Relkin, Esq.

172.    Upon information and belief, immediately thereafter, the parties began implementing the racketeering and conspiratorial activities to commit Money Laundering, Bankruptcy Fraud and Bid Rigging.

**George Soros And**
**His Pattern of Money**
**Laundering Activities**
**<u>In Interstate Commerce</u>**

173.    Upon information and belief, George Soros is the Chairman of Soros Fund Management, a private investment management firm that serves as a principal advisor to the Quantum Group of Funds, based in the tax free Caribbean Country of Curaçao, a Caribbean tax haven, and a possession of the Netherlands Antilles, which protects the identity of investors from disclosure.

174.    Upon information and belief, the Netherland Antilles has repeatedly been cited by the Task Force on Money Laundering of the Organization for Economic Cooperation and Development as one of the world's most important centers for laundering illegal proceeds of Latin American cocaine and other drug traffic.

175.    Upon information and belief, in 1979, Soros entered into a consent decree with the Securities and Exchange Commission in a case involving stock manipulation.

176.    Upon information and belief, according to the New Yorker Magazine, in 1986 Soros was fined 75 thousand dollars by the Commodity Futures Trading Commission "for having held positions in excess of speculative limits."

[36]

David H. Relkin, Esq.

177.    In August of 1990, according to Reuters News Agency, the US Drug Enforcement Agency agents claimed that Banco de Columbia and other banks were conduits for Latin American drug money.

178.    In or about August 1994, according to Reuters, Soros acquired a nine percent interest in Banco de Columbia.

179.    According to the BBC, Soros was found guilty of felony criminal insider trading in France on January 29, 2002, and from profiting from inside knowledge of a 1998 takeover bid for Societé Generale, a French Bank, and was fined 2.9 Million Dollars, which felony conviction was upheld by the French Court of Appeals, the Cour de Cassation, France's highest Court, on June 14, 2006.

**George Soros Manipulates
The Conseco Bankruptcy
To Maximize The Acquisitions
Of the RICO Enterprise
To Launder Money and
<u>To Engage In Bid Rigging</u>**

180.    Lazard and Conseco entered into a second engagement letter dated August 12, 2002, which was amended by a letter agreement dated October 21, 2002, and further amended December 16, 2002, one day prior to the Conseco Bankruptcy (the "Engagement Letter" annexed as Exhibit "**R**" to the accompanying Compendium of Exhibits).

181.    Pursuant to the Engagement Letter, Lazard was entitled to the sum of 250 Thousand Dollars per month, 11 Million Dollars upon restructuring of Conseco, and 5 Million Dollars for the restructuring of Conseco Finance. Upon information and belief,

[37]

David H. Relkin, Esq.

these huge sums were paid to Lazard in furtherance of Lazard's conspiracy with the RICO Enterprise.

182.    Upon information and belief, from June 2002 to December 2002, the six month period prior to the planned Bankruptcy filing of Conseco, the Enterprise engaged in a pattern of racketeering activity with Soros, SFM Management, Soros Fund Management, Fortress Investment Group, Cerberus, Conseco, Lazard, Kirkland & Ellis, Fried Frank Harris Shriver & Jacobson, to prepare the Conseco bankruptcy proceeding to allow George Soros and the RICO Enterprise to Launder Money through the Conseco Bankruptcy using the purchase of Conseco Finance and the Debtor in Possession Financing to gain complete control of the Bankruptcy proceeding, and ultimately allowing Soros and the Enterprise to purchase the General Motors Building, to launder money through its sale.

183.    During this period from July 2002 to December 2002, upon information and belief, in furtherance of its pattern of RICO activity and conspiracy to commit Bankruptcy Fraud and Money Laundering derived from illegal activities, Conseco and the RICO Enterprise enlisted Lazard, Kirkland & Ellis and Fried Frank Harris Shriver & Jacobson to make it appear to the financial markets that Conseco was serious about non-judicial reorganization and to avoid an involuntary bankruptcy which would frustrate the abilities of the RICO Enterprise to put the necessary pieces in place to further the conspiracy.

David H. Relkin, Esq.

184.    In July 2002, the price of Conseco stock fell below $1 for the first time in more than 12 years and the company was delisted from the Standard & Poors 500 of the New York Stock Exchange.

185.    On or about August 9, 2002, Gary C. Wendt, Chairman and Chief Executive Officer of Conseco, publicly announced the retention by Conseco of Lazard and Kirkland & Ellis to allow the RICO Enterprise time to lay the ground work to gain control of Conseco through a pattern of racketeering activity.

186.    Upon information and belief, this announcement was an act in furtherance of the RICO Enterprise of misdirection to prevent the creditors of Conseco from filing an Involuntary Petition in Bankruptcy against Conseco.

187.    During this four month period, upon information and belief, George Soros' Enterprise set up the RICO conspiracy to commit Money Laundering, Bankruptcy Fraud and Bid Rigging in the Conseco Bankruptcy.

188.    The first step of the Enterprise involved creating CFN Holdings, LLC ("CFN Holdings") as the instrumentality to acquire Conseco Finance[7] through Money Laundering, which was formed August 15, 2002.  (See Exhibit "**S**" annexed to the accompanying Compendium of Exhibits.)

189.    Upon information and belief, the members of CFN Holdings were Cerberus Capital Management, Fortress Investment Group, and J.C. Flowers & Co.

[39]

David H. Relkin, Esq.

190.    Upon information and belief, the RICO Enterprise also set up FPS DIP, LLC ("FPS DIP") to obtain the valuable position of Debtor in Possession financier to Conseco to Launder Money in the Conseco Bankruptcy.

191.    Upon information and belief, FPS DIP was also controlled by Fortress Investment Group and George Soros, who had been, and, upon information and belief, remain co-conspirators in Money Laundering through partnerships they maintain in Curaçao, N.A.

192.    These racketeering activities were being prepared for a pre-packaged Bankruptcy Fraud to overwhelm the other creditors of Conseco and take control the outcome of the sale of Conseco Finance and to put in place their own Debtor in Possession Financier.

193.    On August 12, 2002 and October 21, 2002, once the RICO Enterprise was ready to file the Petition in Bankruptcy of defendant Conseco, Conseco restated its retention agreement with defendant Lazard under extremely lucrative terms.

194.    On or about October 3, 2002, Gary C. Wendt resigned as Chief Executive of Conseco but remained on as Chairman of the Board in the meantime.

195.    Upon information and belief, Wendt did this to provide him with deniability regarding the Money Laundering, Bankruptcy Fraud and Bid Rigging planned by Soros and the co-conspirators of the Enterprise perpetrated on Conseco's creditors.

---

[7] The motion of Conseco to approve bidding procedures for Conseco Finance only identifies the purchaser as "Fortress/Flowers," an affiliate of FPS DIP.  FPS DIP was only identified as having

[40]

David H. Relkin, Esq.

196.    As a result of Wendt's resignation, William J. Shea, President and Chief Operating Officer of Conseco since September 2001, took over most of Wendt's responsibilities.

197.    In or about and between August 2002 and December 17, 2002, Lazard, a long-time financial adviser to George Soros and Conseco continued to engage in a pattern of racketeering during the Bankruptcy of Conseco to (a) obtain a pre-arranged highly discounted sale of Conseco Finance to CFN Holdings, and (b) to provide the lucrative position of Debtor in Possession Financing to Conseco employing FPS DIP, an affiliate of CFN Holdings, to acquire, maintain or conduct the affairs of Conseco through a pattern of racketeering activity affecting interstate commerce by obtaining virtually complete control of the Conseco Bankruptcy proceeding.

198.    Accordingly, on or about December 16, 2002, upon the advice and with the assistance of Lazard and Conseco's general counsel Kirkland & Ellis, Conseco signed an asset purchase agreement with CFN Holdings to acquire Conseco Finance (the "Asset Purchase Agreement") for the amount of Conseco Finance Corporation's debt to Conseco.

199.    In order to exercise even greater control over the operations of Conseco in Bankruptcy, and to profit at the expense of Conseco's creditors, FPS DIP, identified in the Conseco Bankruptcy as "an affiliate of CFN," contracted with Conseco to become Conseco's DIP financer and obtained security interests in highly valuable assets of Conseco to protect the interests of FPS DIP.  Upon information and belief, this purported "arms-length" agreement was actually arranged in furtherance of the pattern of

---

an address "c/o Fortress Investment Group."

[41]

David H. Relkin, Esq.

racketeering, since Conseco offered to sell to CFN Holdings Conseco Finance at a below-fire-sales price and involved Bankruptcy Fraud as to the true value of Conseco Finance.

200.     The representation of CFN Holdings by Kirkland & Ellis, who represented Conseco in its Bankruptcy proceedings, was in direct conflict with the interests of Conseco, and was in furtherance of the racketeering conspiracy to defraud the creditors of Conseco in furtherance of the RICO Enterprise.

## THE RICO ENTERPRISE TAKES CONTROL OF
## THE CONSECO BANKRUPTCY

201.     On the very next day, December 17, 2002, with the CFN Holdings Asset Purchase Agreement and the FPS DIP agreements in hand, Kirkland & Ellis caused Conseco, Conseco Finance, and the other holding companies of Conseco, CIHC, Inc., CTIHC, Inc., Partners Health Group, Inc., Conseco Finance Servicing Corp. (collectively, the "Holding Company Debtors") to file Bankruptcy petitions for relief under Chapter 11 of the Bankruptcy Code in the Northern District of Illinois, Eastern Division.

202.     The Bankruptcy filing of Conseco was the third largest Bankruptcy proceeding, smaller only than Enron and WorldCom.

203.     Key to the success of the RICO Enterprise was to flood the Bankruptcy Court with motions to approve the FPS DIP financing and the CFN Holdings Asset Purchase Agreement prior to the appointment of the Official Committees, by making emergency motions on short notice and to litigate every objection raised by the creditors to restrict the security which FPS, DIP would receive for the DIP financing and to restrict the

[42]

David H. Relkin, Esq.

Creditors from discovering information regarding the purchase of Conseco Finance by CFN Holdings.[8]

204.    Upon information and belief, since the members of CFN Holdings had been reviewing the assets of Conseco Finance since at least July 2002, only CFN Holdings and the RICO Enterprise, George Soros, Fortress Investment Group, Conseco and Lazard knew the true worth of Conseco Finance, which facts were never disclosed by CFN Holdings or Conseco to the third parties who attempted to bid on the purchase of Conseco Finance.

205.    Upon information and belief, such activities were part of the scheme to conduct the activities of, and control and maintain an interest in Conseco through a pattern of racketeering by defrauding the Bankruptcy Court and for the purpose of Money Laundering.

206.    In order to protect the disclosure of their underhanded pre-bankruptcy agreements, by emergency motion dated December 19, 2002, Kirkland & Ellis, counsel for Conseco, falsely represented to the Bankruptcy Court that "there was no other place to obtain DIP financing other than from FPS" and that if the Court did not authorize the retention of FPS DIP, the consequence for Conseco would be "immediate liquidation."[9]

---

[8] See, e.g., Emergency motion of Unsecured Creditors for Disclosure from CFN Holdings as to the assets of Conseco Finance, dated February 6, 2003, which motion was denied

[9] In connection therewith, Conseco, by its counsel, Kirkland & Ellis, represented that the DIP Credit Agreement was the result of "arms-length negotiations between the CFC Debtors and the DIP Lenders." (See Page 8 of Emergency motion for interim and Final Order Authorizing, *inter alia*, the CFC Debtors to obtain post-petition financing annexed to the accompanying Compendium of Exhibits as Exhibit "**T**.")

[43]

David H. Relkin, Esq.

**The RICO Enterprise
Commences The Flood of
Motions To Take Control of
The Bankruptcy of Conseco**

207.    On the date of Conseco's Bankruptcy filing, December 17, 2002, Conseco made the following motions:

  a.  For an order authorizing the retention and employment of Lazard[10] as Conseco's investment bankers, upon the affidavit of Frank Savage;[11] and

  b.  For an order authorizing the employment and retention of Kirkland & Ellis as attorneys for debtors.

208.    On December 19, 2002, Conseco made an emergency motion for an Order seeking to allow FPS DIP and U.S. Bank to act as the Debtor in Possession financers of Conseco to approve the Secured Super-Priority Debtor in Possession Credit Agreement dated December 19, 2002 between Conseco Finance and FPS DIP to obtain secured post-petition financing up to the principal amount of 125 Million from FPS DIP.

---

[10]   Conseco acknowledges in this application that it has previously paid Lazard the sum of $2,500,000, plus expenses of $123,934.08 for pre-petition expenses and an advance of $4,000,000. The December 16, 2002 Retention letter annexed to the application indicates that Lazard was retained as early as June 7, 2002, that the initial retention letter was revised on August 12, 2002 and again on October 21, 2002.  The engagement letter provides that Lazard shall be paid $250,000 per month, plus $11,000,000 upon a restructuring, and $1,000,000 plus 0.75% of the purchase price of Conseco Finance Corporation. (See Exhibit "**U**" annexed to the accompanying Compendium of Exhibits.)

[11] In or about February 2004 Frank Savage, an officer of Lazard, Ltd. was indicted in connection with an investigation of Enron by the U.S. Department of Labor for mismanaging the Enron Pension Plans.  (See Exhibit "**V**" annexed to the accompanying Compendium of Exhibits.)

David H. Relkin, Esq.

209.    On December 19, 2002, Conseco made the additional following motions:

a.   For a perfected first priority priming lien in favor of FPS DIP on the stock of Mill Creek Bank, Green Tree Retail Services Bank, Inc. and Rice Park Properties Corporation, three of the most valuable assets of Conseco, Inc.;

b.   For authority to borrow up to 87 Million Dollars under the FPS DIP Credit Agreement pending the final hearing on the DIP financing motion;

c.   For an order providing FPS DIP with a lien against all unencumbered prepetition and post-petition property of the Holding Company Debtors;

d.   For an order providing that the proceeds of any asset sales of Conseco, Inc. would pay down the FPS DIP Revolving loan;

e.   For an Order scheduling a final hearing thereon;

210.    In connection with the aforesaid motions, Conseco, by its counsel, Kirkland & Ellis, represented that it Fortress/Flowers as the potential purchaser of Conseco Finance[12] but that without the approval of the FPS DIP financing order, Conseco "will not be able to continue operations for more than a few days, and will not allow them

---

[12] Fortress Investment Group LLC and J.C. Flowers & Co, LLC would later act through their limited liability company named "CFN Holdings LLC" in which Cerberus Capital Management, LP was also a member.

[45]

David H. Relkin, Esq.

to fund the completion of their restructuring process." (See Exhibit "**T**" annexed to the accompanying Compendium of Exhibits.)

211.    In addition, Conseco's motion provided that FPS DIP was an affiliate of the potential purchaser of Conseco Finance, "Fortress/Flowers, the "stalking horse" purchaser of substantially all of the assets of the CFC Debtors…"  Conseco also disclosed in connection with this motion that Fortress Investment Group[13]  and J.C. Flowers & Co., the proposed buyers of Conseco Finance, had previously issued a term sheet to Conseco in "late November 2002."

212.    On December 19, 2002, Conseco Finance entered into a restated asset purchase agreement with CFN Holdings to purchase substantially all of the assets of Conseco Finance.

213.    In this connection, Conseco made the following additional motions on December 19, 2002:

> a.  For an order to approve the Asset Purchase Agreement between
>
>     Conseco Finance and CFN Holdings entered on December 19, 2003;

---

[13] On January 11, 2006, the SEC filed a complaint against Fortress Financial Corp. and its President Jeffrey A. Richie, alleging that between March 2000 and April 2001, Fortress raised approximately $2.9 million through the sales of shares of preferred stock to approximately 85 investors in a purported private placement. Richie and Fortress made material misrepresentations and omissions to investors relating to (1) financial projections, (2) undisclosed liabilities in excess of $1 million, (3) plans to conduct an IPO, and (4) representations that Fortress would not spend any of the offering proceeds until it raised $2 million. (See Exhibit "**W**" annexed to the accompanying Compendium of Exhibits.)

David H. Relkin, Esq.

b.  For an order establishing bidding procedures in connection with the sale of substantially all of the assets of Conseco Finance to CFN Holdings including certain buyer protections;

c.  For an order approving the form and manner of notices;

d.  For an order approving the form of the Asset Purchase Agreement; and

e.  For an order setting a sale hearing;

f.  For an order approving the sale of the Conseco Finance's assets free and clear of all liens, claims and encumbrances to the successful bidder

g.  For an order allowing CFN Holdings to purchase all or substantially all of the assets of Conseco Finance with certain conditions to protect CFN Holdings, including:

   i.  A "break-up fee" of 30 Million Dollars;

   ii.  An expense reimbursement of 5 Million Dollars;

   iii.  A 10 Million Dollar overbid protection; plus

   iv.  The right to exclude any assets of Conseco Finance from its purchase;

   v.  Potential purchasers of the Conseco Finance assets had to "offer to purchase all or substantially all of CFC's assets upon the same terms and conditions" as CFN Holdings;

[47]

David H. Relkin, Esq.

      vi.   Allowing CFN Holdings to "exclude any assets, properties, contracts, and rights from the purchased assets [of Conseco Finance] in CFN Holdings' sole discretion; and

      vii.   Setting the purchase price for CFN Holdings of Conseco Finance for no cash component—only assumption of debt.

214.    On December 20, 2002, the Bankruptcy Court approved the break-up fee, "as defined in the Asset Purchase Agreement [with CFN Holdings], and under the terms and conditions set forth therein."  The other relief described in the Order was deferred to a Hearing on January 6, 2003.

215.    On the same date the Bankruptcy Court appointed FPS DIP as the main DIP Financer of Conseco.

216.    This constituted the acquisition or maintenance of an interest and an investment of income and money laundering from racketeering activities in an Enterprise through a pattern of racketeering activities in interstate commerce.

217.    This also constituted the conduct of the affairs of an Enterprise affecting interstate commerce through a pattern of racketeering activity.

218.    On December 22, 2002, in furtherance of the Enterprise, Wilkie, Farr and Gallagher served a Notice of Appearance on behalf of J.C. Flowers & Co. and Fortress Investment Group, the members of CFN Holdings.  (See Exhibit "**X**" annexed to the accompanying Compendium of Exhibits.)

[48]

David H. Relkin, Esq.

219.    On or about January 6, 2003, Conseco made the following motions:

    a.    For an order authorizing the Holding Company Debtors to reject certain non-residential real property leases;

    b.    For an order allowing the Holding Company Debtors to abandon certain de minimus assets by debtors and debtors-in-possession.

220.    On or about and between December 27, 2002 and January 7, 2003, US Bank, the Unofficial Ad Hoc Committee of B2 Class Guaranty Holders, the United States Trustee and the Unofficial Committee of Noteholders objected to certain of the conditions of the Asset Purchase Agreement.

221.    On January 3, 2003, Conseco filed its Schedules of Assets and Liabilities.

**The Illegal Acquisition of
Conseco Finance By
The Soros RICO Enterprise**

222.    On January 6, 2003, the Bankruptcy Court approved the bidding procedures for the purchase of Conseco Finance pursuant to 11 USC §363 by CFN Holdings in substantially the same form as requested by co-conspirators Kirkland & Ellis and Conseco, and scheduled a sale Hearing for March 5, 2003.  This Order further provided that any other bidders must submit their bids no later than February 24, 2003.

223.    On January 10, 2003, the Committee of Unsecured Creditors of Conseco Finance objected to the terms of the sale of Conseco Finance to CFN Holdings.

[49]

David H. Relkin, Esq.

224.    On January 13, 2003, Conseco, through its counsel, Kirkland & Ellis, responded to the objections of the Committee of Unsecured Creditors of Conseco Finance by, *inter alia*, by falsely representing that the CFN Holdings Asset Purchase Agreement was entered into "at arms' length," which constituted Bankruptcy Fraud.

225.    On January 14, 2003, the Bankruptcy Court authorized and approved the DIP facility with FPS DIP.

226.    On January 27, 2003, Counsel for the Official Committee of Conseco Finance served a subpoena for a Rule 2004 examination of CFN Holdings, Fortress Investment Group and Cerberus.

227.    By letter dated February 3, 2003, Cerberus objected to the subpoena on the grounds that it sought confidential research, development and commercial information as well as other privileged or protected matter.

228.    On February 8, 2003, the Unsecured Creditors' Committee by Fried Frank Harris Shriver & Jacobson, in an effort to obtain information on the Asset Purchase Agreement between Conseco and CFN Holdings, requested the Bankruptcy Court to allow discovery of CFN Holdings, since, it argued, if the Asset Purchase Agreement were approved, and CFN Holdings would be allowed to purchase the assets of Conseco Finance, among other things the Asset Purchase Agreement would cancel $250 Million of guarantees by CIHC of loans to the Conseco Debtors.

229.    On February 11, 2003, CFN Holdings, by Willkie Farr & Gallagher, objected to the discovery of the CFN Holdings Asset Purchase Agreement on the basis that

[50]

David H. Relkin, Esq.

there was public information available to the Committee and what was not public was privileged.

230.    Upon information and belief, Fried Frank Harris Shriver & Jacobson argued that CFN Holdings had acquired proprietary information during the six months prior to the Conseco Bankruptcy from Conseco, Kirkland & Ellis, and Lazard in conspiracy with each other which gave CFN Holdings an advantage in bidding for the assets of Conseco Finance.

231.    The motion of Fried Frank Harris Shriver & Jacobson was denied by the Bankruptcy Court.

232.    On February 14, 2003, Conseco filed its final sale order of the assets of Conseco Finance, with objections to be filed no later than February 24, 2003.

233.    On February 18, 2003, Conseco issued a press release that it would be selling the General Motors Building pursuant to, and "in furtherance of the Conseco, Inc. Plan of Reorganization."

234.    Despite the fact that only CFN Holdings had the necessary information on Conseco Finance to make an appropriate offer for Conseco Finance, on February 28 through March 3, 2003, the bidding process for the sale of Conseco Finance took place under the guise that it was a fair process when, in fact, it involved Bankruptcy Fraud.

235.    Since CFN Holdings had assessed the true value of Conseco Finance before the Bankruptcy, and since the Bankruptcy Court had granted CFN Holdings certain

[51]

David H. Relkin, Esq.

protections in connection with the purchase of Conseco Finance, only CFN Holdings had a realistic chance of acquiring Conseco Finance, on behalf of the RICO Enterprise.

236.    Upon information and belief, CFN Holding's acquisition of Conseco Finance was part of the defendants' racketeering activities and Bankruptcy Fraud on the bankruptcy court and the creditors of Conseco.

237.    On March 5, 2003, CFN Holdings won the bidding to acquire most of Conseco Finance for 772 Million Dollars.  This constituted an investment of income derived by racketeering activities and to invest such income in the acquisition of an enterprise affecting in interstate commerce.

238.    This acquisition was also to acquire an interest in an enterprise through a pattern of racketeering.

239.    This acquisition was also the result of conduct of Conseco Finance through a pattern of racketeering.

240.    CFN Holdings also acquired the right to sell Mill Creek Bank to GE Capital for 323 Million Dollars, reducing the true purchase price of Conseco Finance by 270 Million Dollars.

[52]

David H. Relkin, Esq.

**The Machinations of Trump**
**And Conseco to Confuse and**
**Delay the Bankruptcy Court's**
**Resolution of The**
**Ownership of the**
**General Motors Building**
**In Furtherance**
**Of the RICO Enterprise**

241.    Upon information and belief, as part of the racketeering activity

engineered by the RICO Enterprise, Soros or someone else on behalf on behalf of the

RICO Enterprise approached Trump with a proposal to use Bankruptcy Fraud to acquire

the General Motors Building and, once acquired by the Enterprise, Soros and the other

individuals associated in fact with Soros, including Trump, to engage in a Money

Laundering scheme through which they could launder money through the General Motors

Building sale.

242.    As part of the pattern of Racketeering, Conseco continued to fight about

the ownership of the General Motors Building, with Trump suing in State Court in

violation of the Arbitration Agreement in the Operating Agreement with Carmel Fifth,

intentionally halting the arbitration, making motion after motion, applying to the

Bankruptcy Court to resolve the dispute, arguing that the Bankruptcy Court had

jurisdiction to hear the dispute and then arguing that the Bankruptcy Court did not have

jurisdiction, resuming hearings before the AAA, then returning to the Bankruptcy Court to

confirm the Award, then stipulating to dismiss the Bankruptcy action, fighting in the State

Court to confirm the Award, removing the action to Federal Court, then resuming State

Court proceedings to confirm the Award of the arbitrators and then, finally, resolving their

[53]

David H. Relkin, Esq.

alleged "disputes" in a confidential agreement to hide the racketeering activities of the Enterprise.

243.    On August 20, 2002, Carmel Fifth and Trump held their Preliminary Conference before the American Arbitration Association.

244.    By Order dated August 26, 2002, Hon. George C. Pratt provided for seven days of Hearing during September and October 2002.

245.    Initially, after most of the Hearings, Trump sought to disqualify Conseco's party-appointed arbitrator, Kenneth Feinberg,[14] and to force the parties to start the Arbitration again.

246.    The American Arbitration Association denied Trump's request and ordered the parties to complete the Arbitration.

247.    After at least five days of hearing, submission of pre- and post-Hearing Memoranda of Law, in late November, 2002, on the eve of the Award of the Arbitrators, and a month before the RICO Enterprise planned to file the Bankruptcy Petition on behalf of Conseco, 767 Manager moved to dismiss the neutral Arbitrator, former Second Circuit Judge George A. Pratt, for allegedly failing to disclose a potential conflict.

248.    On December 13, 2002, after Trump challenged the impartiality of the neutral arbitrator former Second Circuit Judge Hon. George C. Pratt, and the Administrator of the case before the American Arbitration Association disqualified Judge Pratt.

[54]

David H. Relkin, Esq.

249.     Upon information and belief, while no actual conflict existed, the American Arbitration Association administrator of the case nevertheless disqualified Judge Pratt.

250.     Upon information and belief, in furtherance of the RICO conspiracy to delay the ultimate resolution of who owned the General Motors Building, Carmel Fifth failed to adequately or appropriately object to the disqualification.

251.     According to the rules of the Operating Agreement of 767 LLC, the two party arbitrators were to appoint a third, who was to act as a neutral.

252.     Instead, on a conference call with the remaining two arbitrators, on January 13, 2003, Trump's arbitrator Howard Lorber refused to appoint a mutually acceptable retired Judge as the third arbitrator because, he claimed, 767 Manager was unwilling to proceed before a new third arbitrator and that the Arbitration should begin anew.

253.     In furtherance of the defendants' scheme to keep the General Motors Building in arbitration, on or about January 13, 2003, Trump objected to the appointment of a new neutral arbitrator to complete the Hearings.

254.     By letter dated January 22, 2003, Carmel Fifth attempted to have the American Arbitration Association appoint the third arbitrator pursuant to the Commercial Rules, but the American Arbitration Association refused.  (See Exhibit "**Y**" annexed to the accompanying Compendium of Exhibits.)

---

[14] Kenneth Feinberg was the special master of the September 11th Victim's Compensation Fund.

David H. Relkin, Esq.

255.    On February 1, 2003, Conseco filed its first reorganization Plan.  The Plan provided for the extinguishment of over 5 Billion Dollars in debt and provided that the sale of the General Motors Building was to be "in furtherance of and pursuant to the Conseco, Inc. Plan of Reorganization."

256.    On February 3, 2003, most of Conseco's subsidiaries filed a voluntary petition in Bankruptcy.  Carmel Fifth did file for Bankruptcy in furtherance of the RICO conspiracy.

257.    On February 3, 2003, Trump met with Andrew Hubregsen, to discuss the refinancing of the General Motors Building.

258.    By letters dated February 4, 2003, February 7, 2003 and March 6, 2003, Carmel Fifth attempted to have the other two party arbitrators appoint a third, neutral arbitrator, or, in the alternative to have the American Arbitration Association appoint a neutral.  (See Exhibit "**Z**" annexed to the accompanying Compendium of Exhibits.)

259.    Again, the American Arbitration Association refused to act.

260.    In order to intimidate the American Arbitration Association, between February 4, 2003 and February 7, 2003, 767 Manager threatened legal action against the American Arbitration Association to refuse to appoint a new arbitrator and again challenged the continued appointment of Carmel Fifth's Arbitrator Kenneth Feinberg.

261.    Then, precipitously, at Trump's urging, on February 5, 2003, 767 Manager's Arbitrator, Howard Lorber, resigned, putting a complete halt to the arbitration proceedings.

[56]

262.     Upon information and belief, on or about February 8, 2003, Trump caused a letter to be sent to Conseco to the effect that Trump would sue anyone who made an offer on the General Motors Building for tortuous interference with contractual relations.

263.     Upon information and belief, on or about February 12, 2003, Trump sent a letter to a prospective buyer of the General Motors Building that if he pursued the deal he would be sued.

264.     On or about February 25, 2003, 767 Trump proposed an offer to refinance the Mortgages on the General Motors Building by a mortgage from Column Financial Inc., a wholly owned subsidiary of Credit Suisse First Boston, and provided Carmel Fifth with a Term Sheet, which proposal Carmel Fifth rejected.

265.     On February 21, 2003, Trump filed a 1 Billion Dollar Proof of Claim with the Conseco Bankruptcy Court.

266.     On February 25, 2003, Trump provided Conseco with a refinancing proposal for the two mortgages on the General Motors Building but required Conseco to approve the proposal (and the 250 Thousand Dollar commitment fee) within two days.

267.     Accordingly, in an about-face, on March 3, 2003, Conseco and Carmel Fifth commenced an adversary proceeding against Donald J. Trump and 767 Manager and Trump 767 Management in the Bankruptcy Court.  (See Exhibit "**AA**" annexed to the accompanying Compendium of Exhibits.)

268.     In connection with such motion, Conseco represented to the Bankruptcy Court that the proceeds of the sale of the General Motors Building were "necessary to the

[57]

David H. Relkin, Esq.

successful reorganization of Conseco, Inc," and that the Bankruptcy Court had core jurisdiction over the dispute.

269.    On March 5, 2003, Conseco then made a motion for an Order granting Conseco authority to sell the General Motors Building, establish bidding procedures, establishing the date and time of the auction and Hearing to sell the property, and for authority to enter into a contract including a break-up fee.  (See Exhibit "**BB**" annexed to the accompanying Compendium of Exhibits.)

270.    On or about March 5, 2003, Conseco made an Emergency motion for an Expedited Hearing on the Complaint and filed a Memorandum of Law in support of emergency relief against Trump.

271.    In this Memorandum, Conseco argued to the Bankruptcy Court that its proceeding involved resolution of claims against the Bankruptcy Estate and that the Bankruptcy Court had "core jurisdiction" over the dispute pursuant to 11 USC §157 (b) (2). (See Exhibit "**BB**" annexed to the accompanying Compendium of Exhibits.)

272.    Conseco further requested that Trump be removed as the manager of the General Motors Building and supply copies of his records so that Conseco could avoid the default under the two mortgages on the General Motors Building, which came due on July 31, 2003, to allow Conseco to refinance the Building.

273.    Conseco also requested that the Bankruptcy Court make a determination of the parties' rights based on the Transcripts and documentary evidence submitted at the Arbitration Hearings.

David H. Relkin, Esq.

274.    However, at least according to the Consolidated Financial Statements of Conseco, Carmel Fifth, the wholly-owned subsidiary of Conseco which held its ownership in the General Motors Building was actually part of the Conseco Bankruptcy Estate.

275.    Notwithstanding its prior claim that the General Motors Building could not be part of the Conseco Estate, in direct contradiction of its earlier representations to the Bankruptcy Court, and in furtherance of its fraudulent misdirection, Conseco also moved on March 5, 2003 for authority to sell the General Motors Building free and clear of any liens, pursuant to Section 363 of the Bankruptcy Code, to establish bidding procedures, fixing the date, time and place of the sale.

276.    Conseco's motion provided that the Ownership Dispute between it and Trump would attach to the proceeds of the sale of the General Motors Building.

277.    Conseco proposed an auction date of June 2, 2003 at the offices of Kirkland & Ellis.  Qualified bidders would be allowed to raise their bid at the auction.

278.    In addition, by motion dated March 5, 2003, returnable on May 7, 2003, Conseco moved the Court to approve Conseco's exclusive real estate agent agreement with Eastdil Realty, a real estate company in New York.  (See Exhibit "**CC**" annexed to the accompanying Compendium of Exhibits.)

279.    Pursuant to the Eastdil Realty motion by Conseco, which was part of and in furtherance of the racketeering Enterprise, Eastdil Reality was to receive an advisory fee of 55 Thousand Dollars per month, plus 0.175% of the amount in the first contract signed—even if Conseco did not close with that purchaser—plus 0.175% of the final

[59]

purchase price up to One Billion Dollars, 0.5% of the purchase price between One Billion

Dollars and One Billion One Hundred Million Dollars, and 2.5% of the purchase price in

excess of One Billion One Hundred Million Dollars.  (See Exhibit "**CC**" annexed to the

accompanying Compendium of Exhibits.)

280.    Upon information and belief, this motion was in furtherance of the

Bankruptcy Fraud perpetrated by George Soros and Trump, and the pattern of

Racketeering activity of the RICO Enterprise, in order to deceive the Conseco creditors

that the General Motors building would return a substantial yield to the creditors of

Conseco.

281.    On March 6, 2003, the Bankruptcy Court adjourned the Hearing on the

sale of the General Motors Building and the retention of Eastdil to March 17, 2003.

282.    On March 11, 2003, at the request of the Trump entities, the American

Arbitration Association appointed former United States District Judge Nicholas Politan to

the Panel and issued new ruling to allow the arbitration to proceed.

283.    On March 12, 2003, Conseco filed its First Amended Disclosure

Statement for the Debtor's Joint Plan of Reorganization Pursuant to Chapter 11 of the

United States Bankruptcy Code (the "Plan").

284.    While Conseco argued to the Bankruptcy Court in its March 5, 2003

motion to sell the General Motors Building that the sale was necessary to the

reorganization of Conseco, Conseco did not mention the General Motors Building in the

Plan and did not represent in the Plan that the sale of the General Motors Building was a

[60]

David H. Relkin, Esq.

condition precedent to the confirmation of a Plan and that none of the proceeds from the sale of the General Motors Building would be distributed to Conseco creditors.

285.    On March 12, 2003, Trump made a motion to the Bankruptcy Court to dismiss the Adversary Proceeding between Trump and Carmel Fifth based on the allegation that, although Conseco owned the General Motors Building through various subsidiaries, Carmel Fifth, a subsidiary of four non-debtor insurance companies was a non-debtor subsidiary and therefore not under the jurisdiction of the Bankruptcy Court.

286.    As a consequence, with the assistance of the RICO conspirators of the racketeering Enterprise, Trump argued that the Bankruptcy Court had no subject matter jurisdiction over the dispute with Trump and the matter should instead be arbitrated since Conseco had no property interest in the outcome of the Arbitration between Carmel Fifth and 767 Manager.

287.    Trump also pointed out that Conseco never listed the General Motors Building on its statement of assets.

288.    However, on Conseco's Financial Statement, Conseco listed an investment in Carmel Fifth of approximately 212.7 Million Dollars. (See Exhibit "**G**" annexed to the accompanying Compendium of Exhibits.)

289.    Trump also argued that Conseco and Carmel Fifth were alter egos of each other.

[61]

David H. Relkin, Esq.

290.     According to Conseco, Trump had to make this argument because his only possible claim to Carmel's stake in the Building was the July 3 Agreement, to which Conseco was a party.

291.     Trump's position in the Arbitration was that Conseco was bound by the July 3 Agreement to modify the LLC Agreement of 767 LLC and defer the Buy/Sell provision. These representations were made to further delay and confuse the Bankruptcy Court and the Conseco creditors as to the true ownership of the General Motors Building.

292.     On or about March 12, 2003, the Official Committee of Trust Preferred Debt Holders argued to the Bankruptcy Court that the Conseco/Trump dispute was a core proceeding because: "it affects the amount of property available for distribution or the allocation of such property among creditors."  It further stated that "the General Motors Building was an important asset of the Bankruptcy Estate."

293.     On or about March 12, 2003, Fried Frank Harris Shriver & Jacobson, counsel to the Unsecured Creditors' Committee, also made a motion for an Order determining that Carmel Fifth was no more than a shell company to hold Conseco's ownership interest in the General Motors Building and that the Court should exercise jurisdiction over the dispute to strengthen the insurance business core of Conseco and that, absent Bankruptcy Court intervention, the Building would go into foreclosure.

294.     On March 12, 2003, Conseco filed a Memorandum in further support of its motion to sell the General Motors Building free and clear of all liens.  In this motion, Conseco argued that "Carmel was organized by Conseco solely to hold Conseco's interest in the General Motors Building."  (See Exhibit "**BB**" annexed hereto.)

[62]

David H. Relkin, Esq.

295.    On or about March 13, 2003, with a few modifications requested by other creditors of Conseco, the Bankruptcy Court approved the CFN Holdings Asset Purchase Agreement free and clear of any liens.

296.    This constituted the acquisition or maintenance of an interest and an investment of income from racketeering activities in an RICO Enterprise through a pattern of racketeering activities.

297.    This also constituted the conduct of the affairs of an Enterprise affecting interstate commerce through a pattern of racketeering activity.

298.    Among the direct beneficiaries of the sale of Conseco Finance was the RICO Enterprise and Chuck Cremens, the former CEO of Conseco Finance, who received 1.5 Million Dollars for consummating the Asset Purchase Agreement, and Lazard, which received 5 Million Dollars for the pre-arranged sale of Conseco Finance.

299.    On March 14, 2003, the Bankruptcy Court made a preliminary decision that it had core jurisdiction to hear all aspects of the Verified Amended Adversary Complaint and Counterclaims and to decide the rights of the parties with respect to the July 3 Agreement, the issues raised in the Trump One Billion Dollar Proof of Claim and the basic contract dispute issues regarding the Buy/Sell agreement in the 767 LLC Operating Agreement.

300.    On March 14, 2003, the Bankruptcy Court approved the CFN Holdings and General Electric Asset Purchase Agreement for certain assets of Conseco Finance, which Agreement the Bankruptcy Court approved free and clear of liens for 1,110 Million

David H. Relkin, Esq.

Dollars and 200 Million Dollars in assumed liabilities which was to close on June 23, 2003.

301.    Thereafter, CFN Holdings sold Mill Creek Bank to GE for $310 Million, further reducing the true price it was paying for Conseco Finance.

302.    On March 17, 2003, Eastdil Realty submitted an affidavit, by its attorneys Kirkland & Ellis, in support of its motion to be retained to sell by Conseco the General Motors Building.

303.    This motion was in furtherance of the racketeering activity of George Soros on behalf of the Enterprise, including Trump, to deceive the creditors of the Conseco bankruptcy as to the ownership of the General Motors Building.

304.    Also, on March 17, 2003, the Bankruptcy Court ordered (on consent) Trump, 767 Manager and 767 Management, LLC to immediately allow Conseco access to all books and records of 767 LLC.

305.    On March 18, 2003, the Debtor issued its Second Amended Disclosure Statement for Reorganizing Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Second Plan"), drafted by Kirkland & Ellis.

306.    The Second Plan states that "the sale or transfer of the GM Building (or entities owning the GM Building or interests therein) pursuant to or consistent with an Order of the Bankruptcy Court shall be deemed a transfer under, pursuant and in furtherance of the Plan."

David H. Relkin, Esq.

307.    On March 18, 2003, the Bankruptcy Court approved the Second Amended Disclosure Statement.

308.    On March 20, 2003, the Bankruptcy Court ordered the parties in the *Conseco, Inc. and Carmel Fifth, LLC v. Donald J. Trump, 767 Manager, LLC and Trump 776 Management, LLC* action to file a joint Pretrial Statement no later than April 8, 2003 providing all witnesses, stipulated facts, material facts in dispute and set Trial Dates for April 10, 11, 14, 15, 21 and 22, 2003.

309.    On March 21, 2003, in furtherance of the RICO conspiracy, Trump filed a Verified Statement and Memorandum in Opposition to the Retention of Eastdil Realty. In the application, Trump argued that the General Motors Building should be sold to him pursuant to the July 3 Agreement, which would save on transfer taxes and the Eastdil Realty Brokerage fees, which he claimed were "double" what is commercially reasonable. He also argued that he had retained Credit Suisse First Boston to refinance the Building, which would save 15.5 Million Dollars of interest per year.   However, Trump argued, if Eastdil Realty were to be retained no substantial lender would spend the time on the refinancing.  (See Exhibit "**DD**" annexed to the accompanying Compendium of Exhibits.)

310.    Trump further argued against the retention of Eastdil Realty since the General Motors Building was not part of the Conseco Bankruptcy Estate because Conseco did not own the property.  In furtherance of this position, Trump argued that, even if the Court had subject matter jurisdiction over the dispute between Carmel and 767 Manager, it lacked authority under Section 363 of the Bankruptcy Code to conduct a sale of the Property. (See Exhibit "**DD**" annexed to the accompanying Compendium of Exhibits.)

[65]

David H. Relkin, Esq.

311.     Finally, Trump argued that he was ready, willing and able to pay 995 Million Dollars for the General Motors Building which Eastdil Realty estimated would sell by early 2004 for approximately 1.05 Billion Dollars.  "After deductions for commissions," Trump argued, transfer taxes and other fees, these prices are virtually identical." Thus, argued Trump, the debtors have not demonstrated that Eastdil Realty could provide a significant improvement to the Trump offer.

312.     On March 31, 2003, Conseco and Carmel Fifth made an emergency motion to add a request for damages against Trump and 767 Manager caused by their refusal to convey the General Motors Building.

313.     On March 31, 2003, Trump made an emergency motion to the Bankruptcy Court to stay the trial in the adversary proceeding between Trump and Carmel Fifth based on lack of subject matter jurisdiction by the Bankruptcy Court over the dispute since, he claimed, regardless of who succeeded, there would be no recovery to Conseco or any other debtor entity. (See Exhibit "**EE**" annexed to the accompanying Compendium of Exhibits.)

314.     Notably, Kirkland & Ellis, counsel for Conseco, in furtherance of the RICO Enterprise did not contest Trump's motion.

315.     On April 3, 2003, the Bankruptcy Court agreed with Trump and dismissed the claims between Carmel Fifth and Trump regarding the sale of the General Motors Building for lack of jurisdiction and lifted the automatic stay to the extent necessary to allow the parties to participate in the arbitration process.

[66]

David H. Relkin, Esq.

316.    In furtherance of the RICO conspiracy of the RICO Enterprise, on April 14, 2003, Eastdil Realty withdrew its application to be retained by Conseco as the seller's agent of the General Motors Building since Eastdil Realty, in its conspiracy with Conseco, George Soros and Donald J. Trump, knew that the General Motors Building would never be sold under the jurisdiction of the Bankruptcy Court.

317.    On April 14, 2003, the Bankruptcy Court entered an Order authorizing certain amendments to the FPS DIP facility.

318.    On April 22, 2003, by stipulated Order Donald J. Trump and Conseco were directed to proceed to arbitration before the AAA.

319.    On May 28, 2003, the Arbitrators rendered an Award in *Carmel Fifth, LLC and Conseco v. Donald J. Trump, 767 Manager, and 767 Management LLC.*  (See Exhibit "**FF**" annexed to the accompanying Compendium of Exhibits.)

320.    The Award directed 767 Manager, LLC to transfer all of its right, title and interest to 767, LLC, which owned the General Motors Building, for the sum of $15,588,025.00.

321.    Despite the fact that the Bankruptcy Court had previously declined jurisdiction over the dispute or the transfer of the General Motors Building, in furtherance of the Bankruptcy fraud on the Conseco creditors and the Bankruptcy Court, by motion dated May 28, 2003, Kirkland & Ellis irrationally applied to the Bankruptcy Court to confirm the Award of the Arbitrators. (See Exhibit "**GG**" annexed to the accompanying Compendium of Exhibits.)

[67]

David H. Relkin, Esq.

322.    Upon information and belief, this application by Kirkland & Ellis was a further act of the RICO conspiracy in connection with the sale of the General Motors Building to keep the building in a type of three-card Monty game until the General Motors Building could be sold outside of the Bankruptcy Court's scrutiny since there was no basis to apply to the Bankruptcy court for such confirmation.

323.    In furtherance of the racketeering Enterprise of defendants, on May 29, 2003, Donald J. Trump filed a proceeding with the New York State Supreme Court to vacate the Arbitration Award.  (See Memorandum of Law, Exhibit "**HH**" annexed to the accompanying Compendium of Exhibits.)

324.    On the same date, Kirkland & Ellis, on behalf of Conseco, removed the vacatur motion by Donald J. Trump to the United States District Court for the Southern District of New York, despite the fact that the District Court clearly had no jurisdiction over the confirmation of the Award under the Federal Arbitration Act, which the District Court remanded to the New York State Supreme Court.

325.    On May 30, 2003, Donald J. Trump submitted his opposition to the Bankruptcy Court to Conseco's motion to confirm the Award based on lack of jurisdiction.

326.    On June 2, 2003, the Bankruptcy Court found that Trump had violated the automatic stay by commencing the petition to confirm the Award and naming Conseco. Nevertheless, the Bankruptcy Court allowed the Petition to Vacate the Arbitration Award to proceed in State Court with the proviso that Conseco was dropped from the Petition to Vacate.

David H. Relkin, Esq.

327.    By Order dated June 12, 2003, entered June 17, 2003, New York Supreme Court Justice Karla Moskowitz denied the Trump motion to vacate the Award and confirmed the Award of the Arbitrators.  (See Exhibit "**II**" annexed to the accompanying Compendium of Exhibits.)

328.    In furtherance of the RICO conspiracy, Donald J. Trump fraudulently publicly stated that he would appeal the Decision.

329.    In June 2003, in furtherance of the RICO conspiracy, Conseco, through its counsel Kirkland & Ellis, fraudulently claimed that it would use the proceeds of the sale of the General Motors Building to pay back creditors of Conseco.

330.    On June 23, 2003, the sale of Conseco Finance to CFN Holdings and GE Capital closed, and concluded one part of the racketeering activity of defendants' RICO Enterprise.

**THE MONEY LAUNDERING
IS SET IN PLACE BY THE CREATION
OF EPHEMERAL ENTITIES
AND ILLUSORY OBLIGATIONS**

331.    Despite the fact that Carmel Fifth could have entered judgment upon the Arbitration Award against Donald J. Trump which would have netted Trump approximately only 15 Million Dollars, and created a massive windfall for Conseco and Carmel Fifth, on or about June 24, 2003, in furtherance of the racketeering activity of the Enterprise, Carmel Fifth and 767 Manager and Donald J. Trump instead agreed to dismiss the state court proceeding to confirm the Arbitration Award with prejudice and entered

[69]

into "a confidential agreement." (See Exhibit "**JJ**" annexed to the accompanying Compendium of Exhibits.)

332.    Upon information and belief, the confidential agreement concerned the division of the proceeds of the sale of the General Motors Building by paying Trump 275 Million Dollars.

333.    This confidential agreement was in furtherance of the pattern of racketeering to launder money through the sale of the General Motors Building.

334.    In fact, the essence of the acquisition of the General Motors Building was to launder money through the purchase of the building and the steps that were taken by the Enterprise to control the bidding and designate its straw-man purchaser was simply an extension of this pattern of racketeering activity to launder money.

335.    After the confidential agreement was executed, Trump and Conseco agreed to dismiss the adversary proceeding in the Bankruptcy Court and the case was closed.

336.    Upon information and belief, this confidential agreement was in furtherance of the racketeering activity, and fraudulently transferred 275 Million Dollars in assets to Donald J. Trump, far in excess of what Trump was entitled to receive under the Arbitration Award, namely 15 Million Dollars, and in furtherance of the Bankruptcy Fraud of the Enterprise to launder money into a construction project of Donald J. Trump in Chicago, Illinois named Trump International Hotel & Tower.

[70]

David H. Relkin, Esq.

337.    On June 24, 2003, Trump withdrew his 1 Billion Dollar Proof of Claim from the Conseco Bankruptcy proceeding.  (See Exhibit "**KK**" annexed to the accompanying Compendium of Exhibits.)

338.    On July 16, 2003, Conseco filed its Fourth Amended Joint Liquidating Plan of Reorganization.  Nothing in the Plan mentions the sale of the General Motors Building.

339.    On July 16, 2003, Conseco retained Eastdil Realty to sell the General Motors Building outside the purview of the Bankruptcy Court, in furtherance of the RICO Enterprise.

340.    The racketeering Enterprise already decided to whom the General Motors building was to be sold, namely Harry Macklowe as a proxy for George Soros, and the racketeering Enterprise for the purpose of consummating the Money Laundering activities of the Enterprise.

341.    On July 22, 2003, Eastdil Realty published the outline of the bid requirements for the purchase of the General Motors Building.

342.    Soros as the head of the racketeering Enterprise used Harry Macklowe as the front man for the purchase of the General Motors Building in order to further the intent of the Enterprise to launder money through the sale and to conceal the RICO Enterprise Money Laundering scheme.

343.    Upon information and belief, George Soros, Donald J. Trump, Conseco, Harry Macklowe, Kirkland & Ellis, Fried Frank Harris Shriver & Jacobson, Vornado

[71]

David H. Relkin, Esq.

Realty Trust, German American Bank and Deutsche Bank all knew that the bidding process was merely a dumb-show, and that the winner of the bidding was going to be Harry Macklowe, and conspired to achieve this goal for the purpose of Money Laundering.

344.    In July 2003, the RICO Enterprise through its conspirator Eastdil Realty, circulated an informational memorandum regarding the General Motors Building, a memorandum inviting bids, and a confidentiality agreement to prospective bidders which had to be executed before conducting initial due diligence.

345.    Upon information and belief, the implications that the bidding process was going to take place in good faith were false and were intended for plaintiffs to rely thereupon to their detriment.

346.    Eastdil Reality, George Soros, Harry Macklowe, Conseco and Kirkland & Ellis failed to conduct the auction in good faith or in a fair or consistent way pursuant to the terms of the bidding agreements which were relied upon by plaintiffs.

347.    On July 24, 2003, the Bankruptcy Court approved the Fourth Amended Joint Liquidating Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code. There is no mention of Carmel Fifth, the General Motors Building or the interest of Conseco therein.

348.    On July 31, 2003, the Lehman Brothers Holdings and Secore Mortgages on the General Motors Building came due but neither mortgagee took any efforts to foreclose on their mortgages in conspiracy with the racketeering activity of the RICO Enterprise.

[72]

David H. Relkin, Esq.

349.    On August 11, 2003, the first bids on the General Motors Building were opened and Eastdil Reality narrowed the group which could take part in the second bid.

350.    Unknown to plaintiffs, the racketeering Enterprise never intended to adhere to the bidding procedure or the rules of the bidding process and never intended to sell the General Motors Building to plaintiff, who was the highest and best bidder on the General Motors Building.

351.    On August 13, 2003, Eastdil Realty scheduled the final bid for August 27, 2003 at 5:00 p.m.

352.    On August 27, 2003, despite the fact that plaintiffs' bid was the highest and best, and the fact that Macklowe's bid was below other bidders, was untimely submitted and as part of the commission of Bid Rigging by defendants Conseco, Soros, Vornado, and Kirkland & Ellis, Harry Macklowe was privately allowed to increase his bid to appear to have won the auction.

353.    This bidding process was rigged by Soros, Conseco, Vornado, Fortress and Eastdil, Kirkland & Ellis and Fried Frank Harris Shriver & Jacobson and was rife with fraud, bad faith and in violation of the rule of law that every contract contains an obligation of good faith and in violation of RICO by reason of the Money Laundering purpose of the sale and of the Sherman Act by being in restraint of trade.

354.    It was the direct and primary goal of this aspect of the RICO Enterprise to launder money through the General Motors Building, which the Enterprise already controlled by means of the unlawful acquisition and RICO conspiracy.

[73]

David H. Relkin, Esq.

355.    Upon information and belief, Harry Macklowe was present at the opening of the bids in the presence of certain attorneys of Kirkland & Ellis to allow Macklowe to beat any bid received by Eastdil despite the fact that the opening of the bids was represented to be private and the winner based on Conseco's own criteria.

356.    Moreover, the premier goal of the RICO Enterprise and George Soros' unlawful intent was to use the General Motors Building for the purpose of Money Laundering.

357.    In fact, the racketeering Enterprise never had an intention to hold a free and fair bidding process of selling the General Motors Building to plaintiffs or anyone else; and, in fact, after the bidding show took place, a Soros proxy told plaintiffs that it would never sell the property to plaintiffs, no matter what they bid.

358.    The RICO Enterprise acted as a combination or conspiracy and its conduct resulted in a restraint on interstate commerce and caused injury to the plaintiffs' business or property.

359.    Such restraint of trade was a *per se* violation of 15 USC 1 *et seq.*

360.    In the alternative such restraint of trade violated the rule of reason.

361.    This conduct was in furtherance of the RICO conspiracy of Soros, Trump and Conseco, German American Bank, Fortress Investment Group and Vornado Realty Trust and involved the conspiratorial participation of Macklowe, Eastdil Realty, Kirkland & Ellis, and Fried Frank Harris Shriver & Jacobson to launder money.

[74]

David H. Relkin, Esq.

362.    This constituted the acquisition or maintenance of an interest and an investment of income from racketeering activities in an Enterprise through a pattern of racketeering activities.

363.    This also constituted the conduct of the affairs of an Enterprise affecting interstate commerce through a pattern of racketeering activity.

364.    Plaintiffs properly submitted a bid for the General Motors Building that was highest and best since it was 1.5 Billion Dollars, required no due diligence and put up a 50 Million Dollars deposit.

365.    Upon information and belief, on the morning after the final bid, Eastdil Realty contacted George Soros and/or Harry Macklowe and told them that if they would raise the bid to 1.4 Billion Dollars, they would be considered the winner of the bidding process.

366.    Harry Macklowe agreed to raise his bid to $1.4 Billion and was a benefit to the Enterprise since it allowed the RICO Enterprise to launder additional money.

367.    As a result, Harry Macklowe, the straw man of the Enterprise, was announced by The New York Times as the winner of the rigged auction.

368.    Defendants' racketeering activity and Bid Rigging was a sham auction in restraint of trade and violated plaintiffs' right to a fair auction and violated Conseco and Eastdil Realty's own bidding procedures.

[75]

David H. Relkin, Esq.

369.     Plaintiffs' offer was unconditional, as is, no due diligence and had the firm commitments of Plaintiffs' equity and debt financing.

370.     Upon information and belief, while Harry Macklowe represented that he had secured the "requisite approvals" from its proposed lender, Wachovia Bank, and that "no additional approvals were required to close," as required by the Bidding Procedures of Conseco, Wachovia's approval for financing ***was conditional*** on conducting additional due diligence on the General Motors Building.

371.     The terms of the confidentiality agreement were a sham and never intended to be followed by the racketeering defendants.

372.     On August 30, 2003, the New York Times reported that Harry Macklowe won the bid to purchase the General Motors Building for 1.4 Billion Dollars.

373.     The closing was scheduled for twenty-eight days later, or September 27, 2003, eighteen days after the Conseco Bankruptcy proceeding was closed on September 9, 2003.

David H. Relkin, Esq.

**The Structuring of the Money
Laundering Transactions
Of Soros, Trump, Conseco,
Macklowe, Fortress, Vornado and
German American Bank In
Connection With The
Purchase of the General Motors Building**[15]

374.    During the twenty-eight days between the announcement that Macklowe

had won the bidding and the closing date, Soros with the other members of the

racketeering Enterprise and conspirators therewith engineered the creation of shell entities

and various illusory obligations and transactions which would make it appear that

Macklowe was buying the General Motors Building instead of the actual purpose of

Money Laundering.

375.    In fact, it was George Soros, together with the assistance of the other

members and co-conspirators of the RICO Enterprise, who purchased the General Motors

Building with monies laundered through numerous ephemeral entities formed exclusively

for the illegal purpose of Money Laundering.

376.    On September 3, 2003, Fried Frank Harris Shriver & Jacobson, in conflict

with its former representation of the unsecured creditors in the Conseco Bankruptcy Case,

made an emergency application to the Bankruptcy Court to represent Macklowe in

conspiracy with the racketeering Enterprise to engineer a closing which would disguise the

true owner of the General Motors Building.  (See Exhibit "**MM**" annexed to the

accompanying Compendium of Exhibits.)

---

[15] A chart of these activities in annexed hereto as Exhibit "**LL**" annexed to the accompanying
Compendium of Exhibits.

[77]

David H. Relkin, Esq.

377.     Upon information and belief, Fried Frank Harris Shriver & Jacobson's representation of Macklowe was in conspiracy with the racketeering Enterprise and in furtherance of the Bankruptcy Fraud, perpetrated against plaintiffs, Conseco creditors and the Bankruptcy Court.

378.     On September 4, 2003, Macklowe formed Fifth Avenue 58/59 Acquisition Co., as a Delaware Limited Liability Company and received authorization to do business in New York.  (See Exhibit "**A**" annexed to the accompanying Compendium of Exhibits.)

379.     Fifth Avenue 58/59 Acquisition Co. was specifically formed to acquire the General Motors Building, to launder money on behalf of the RICO Enterprise.

380.     On September 9, 2003, the Bankruptcy Court approved Conseco's Sixth Amended Joint Liquidating Plan pursuant to Chapter 11 of the Bankruptcy Code and, one day later, Conseco emerged from Chapter 11 Protection with R. Glenn Hillard replacing Gary Wendt as Chairman of the Board of Directors.

381.     On the same day, the Bankruptcy Court approved Fried Frank Harris Shriver & Jacobson's application to represent Harry Macklowe in connection with his purported purchase of the General Motors Building.

382.     The scheme of the RICO Enterprise was to engage in racketeering activity of Money Laundering to make it appear that Macklowe acquired the General Motors Building, when, in fact, Soros, Soros Fund Management, SFM Capital Management and Macklowe, together with the unlawful and knowing assistance of Conseco, Vornado Realty Trust, German American Capital Corp., and in conspiracy with Deutsche Bank,

[78]

David H. Relkin, Esq.

Fried Frank Harris Shriver & Jacobson, and Kirkland & Ellis, and other presently

unknown defendants, and numerous entities which are no longer existing, contrived a

massive fraud to use various shell entities and instrumentalities to use the General Motors

Building for Money Laundering.

383.    On September 23, 2003, Vornado Real Estate Trust formed Vornado

General Motors III, LLC ("Vornado General Motors III") at the behest of George Soros,

SFM Management and/or Soros Fund Management and other members of the Enterprise,

and in collusion with them, with the promise of a side deal to sell prime 250 Million

Dollars of mezzanine debt on the General Motors Building to Vornado Real Estate Trust

after the closing.  (See Exhibit "**D**" annexed to the accompanying Compendium of

Exhibits.)

384.    On September 23, 2003, Soros, SFM Management or Soros Fund

Management formed Soros Credit Funding II, which entered into a joint venture with the

shell entity Vornado General Motors III.  (See Exhibit "**LL**" annexed to the accompanying

Compendium of Exhibits.)

385.    On that date Soros Credit Funding II and Vornado General Motors III each

*loaned* 25 Million Dollars to German American Capital Corp.

386.    Upon information and belief, the capital infused into Soros Credit Funding

II came from Soros, Soros Financial Management or SFM Management, which received

such capital derived from illegal activities of Soros, Soros Fund Management or SFM

Management.

[79]

David H. Relkin, Esq.

387.    Soros Credit Funding II was a vehicle of Money Laundering by Soros, Soros Financial Management or SFM Management.

388.    Upon information and belief, Soros Credit Funding II did not create a receivable on its books for this loan and such loan was an attempt to hide the true source of the nature, location, source, ownership or control of the proceeds of unlawful activity.

389.    On September 23, 2003, George Soros in furtherance of the racketeering activities of the Enterprise formed Fifth Avenue 58/59 Mezzanine Fourth.  (See Exhibit "**C**" annexed to the accompanying Compendium of Exhibits.)

390.    Upon information and belief, on September 23, 2003, in furtherance of the Money Laundering scheme of the RICO Enterprise, German American Capital then funneled the aforesaid 50 Million Dollar *loan* from Soros Credit Funding II and Vornado General Motors III *as a loan* to Fifth Avenue Mezzanine Fourth, an entity owned or controlled by Soros or other members of the Enterprise.

391.    Upon information and belief, the 50 Million Dollar loan to German American Bank was never repaid and was merely an attempt to hide the true source of the nature, location, source, ownership or control of the proceeds of unlawful activity.

392.    Upon information and belief, such activity was a hidden quid pro quo for Deutsche Bank getting the first mortgage on the General Motors Building in violation of 15 USC §1 *et seq.*

David H. Relkin, Esq.

393.    On the same date, upon information and belief, Soros directed Fifth Avenue Mezzanine Fourth to funnel the aforesaid "dirty money transfers" into Fifth Avenue Acquisition as an "investment."

394.    Upon information and belief, since the laundered money came into Fifth Avenue Acquisition as an investment it should have made Mezzanine Fourth a partner or member of Acquisition, which it did not.

395.    On September 25, 2003, Soros formed Soros Credit Funding I. (See Exhibit "**NN**" annexed to the accompanying Compendium of Exhibits.)

396.    Upon information and belief, on September 25, 2003, Soros then funneled the sum of $250 Million as a bogus loan into Soros Credit Funding I.  (See Exhibit "**LL**" annexed to the accompanying Compendium of Exhibits.)

397.    On the same date, upon information and belief, when Soros created Credit Funding I he funneled the aforesaid 250 Million Dollars as a bogus loan to Fifth Avenue 58/59 Junior Mezzanine, LLC ("Junior Mezzanine"), a company owned by Soros, SFM or Soros Fund Management. (See Exhibit "**B**" annexed to the accompanying Compendium of Exhibits.)

398.    Upon information and belief, such "loan" was never paid back and Credit Funding I was dissolved after it served the purpose of hiding the true source of the nature, location, source, ownership or control of the proceeds of unlawful activity.

399.    In order to conceal their activities, once the purpose for which George Soros had created Soros Credit Funding I, namely to conceal the illegal Money Laundering

[81]

David H. Relkin, Esq.

he had performed, it was dissolved.  (See Exhibit "**NN**" annexed to the accompanying Compendium of Exhibits.)

400.     On the same date, George Soros on behalf of the Enterprise laundered the aforesaid 250 Million Dollars of Soros' loans through Junior Mezzanine into Fifth Avenue 58/59 Acquisition Co. as an *investment*.  (See Exhibit "**LL**" annexed hereto.)

401.     Upon information and belief, since the 250 Million Dollars of laundered money derived from unlawful activity came into Acquisition as an investment by Junior Mezzanine, this should have made Junior Mezzanine a partner or member of Fifth Avenue 58/59 Acquisition Co., which it did not.

402.     Such act constituted money laundering since the laundered money into Fifth Avenue 58/59 Acquisition Co. was never disclosed or revealed and was made to hide the true source of the nature, location, source, ownership or control of Soros' proceeds of unlawful activity

403.     Upon information and belief, at the end of funneling his illicitly derived funds through a byzantine structure of shell entities, Soros had funneled the sum of 300 Million Dollars through Vornado, German American Bank, Soros Credit Funding I, and Junior Mezzanine into Fifth Avenue 58/59 Acquisition Co. as investments.

404.     Each of these money transfers were made to hide the true source of the nature, location, source, ownership or control of Soros' proceeds of unlawful activity.

405.     The cumulative appearance of such transactions was that Macklowe had invested 300 Million Dollars into Fifth Avenue 58/59 Acquisition Co., in effect,

[82]

David H. Relkin, Esq.

controlling Fifth Avenue 58/59 Acquisition Co., when, in fact, the source of the money

was entirely from the RICO Enterprise, Soros, Soros Fund Management and/or SFM

Capital Management, as part of their Money Laundering activities.

406.    Fried Frank Harris Shriver & Jacobson and Kirkland & Ellis conspired to

facilitate these activities by the racketeering Enterprise by fraudulently documenting the

transaction as an acquisition by Macklowe.

407.    Upon information and belief, Macklowe guaranteed the loan from Soros

Credit Funding I and Junior Mezzanine.

408.    As "payment" for the bogus loan made by German American Capital of 50

Million Dollars to Mezzanine Fourth of the laundered money coming from Soros, upon

information and belief, the RICO Enterprise arranged for German American Capital

Corporation, to have a first position mortgage on the General Motors Building in the sum

of 1.14 Billion Dollars.

409.    Upon the sale of the General Motors Building, Bill Shea, then the CEO of

Conseco announced that 380 Million Dollars, the amount that Conseco purportedly

realized on the sale, was upstreamed by Conseco to the owners of Carmel Fifth, Bankers

Life Insurance, Conseco Senior Health, Washington National Insurance Company and

Conseco Annuity Assurance.

410.    Since the price paid for the General Motors building was 1.4 Billion

Dollars, and Conseco's subsidiary insurance companies realized 380 Million Dollars, and

there was a payment to Lehman Brothers Holdings to pay off their mortgage of 500

[83]

David H. Relkin, Esq.

Million Dollars, and to Secore Mortgage to pay off its 200 Million Dollar Mortgage, this left approximately 310 Million Dollars.

411.     Eastdil Realty, who had sold the building, was paid a commission of 2.5%, or 35 Million Dollars.

412.     Thus, after payment of the broker's fee, there remained another 275 Million Dollars which was unaccounted for.

413.     Upon information and belief, despite the fact that the Arbitration Award between Carmel Fifth and Trump obligated Carmel Fifth to pay to Trump 15.6 Million Dollars, this 275 Million Dollars unaccounted for proceeds from the sale of the General Motors Building was paid to Trump as part of Conseco's "confidential settlement" of the arbitration between Carmel Fifth and Trump.

414.     This payment was in furtherance of the Soros racketeering Enterprises of SFM Management's and Soros Fund Management's and the racketeering Enterprise's plan to launder money into the pockets of Trump so that the money could be funneled into Trump International Hotel & Tower being built in Chicago, Illinois ("Trump Illinois").

415.     The other investors in Trump Illinois were Blackacre Institutional Capital Management LLC, an affiliate of Cerberus, which was a member of CFN; Grove Capital LLP, which manages Soros Fund Management; Deutsche Bank, whose subsidiary German American Capital was granted a mortgage to Macklowe of 1.14 Billion Dollars in connection with Macklowe's apparent purchase of the General Motors Building, which provided a 650 Million Dollar construction loan to Trump; and Fortress Investment Group,

[84]

David H. Relkin, Esq.

a member of CFN Holdings, which provided 160 Million Dollars of mezzanine financing to Trump Illinois.

416.    These acts by defendants constituted a pattern of racketeering activity and demonstrated a continuity of the RICO Enterprise and a continuing threat of continuity of the Enterprise.

**The Soros RICO Enterprise**
**Continues as Macklowe Purchases**
**Seven Buildings And**
**Uses the General Motors**
**Building As Collateral**

417.    In 2007, Macklowe purchased seven office buildings from Blackstone through Eastdil Realty in New York City, upon information and belief, for approximately 7 Billion Dollars with only 50 Million Dollars of equity.

418.    He borrowed 5.8 Billion Dollars from Deutsche Bank and as security for the loan Macklowe pledged 49% of his ownership in the General Motors Building.

419.    In this transaction, Harry Macklowe also borrowed 1.2 Billion Dollars of equity from Fortress Investment Group and eventually grew to an outstanding indebtedness of approximately 1.4 Billion Dollars.

420.    Deutsche Bank then bought 25 percent of the equity from Fortress Investment Group.

421.    Vornado Realty Trust also holds a stake in four of the seven office Buildings.

[85]

David H. Relkin, Esq.

422.     As a result of Macklowe's inability to generate sufficient cash to carry the loans on the seven office buildings, Macklowe was forced to sell the General Motors Building.

423.     On or about May 22, 2008, the General Motors Building was sold by Harry Macklowe, or an entity controlled by Soros, for the sum of 2.8 Billion Dollars, or a 1.4 Billion Dollar profit.

424.     Upon information and belief, these highly leveraged transactions were in furtherance of the RICO Enterprise to launder proceeds of a pattern of racketeering by disguising the source, origin, ownership or control of the proceeds of unlawful activity.

425.     According to the New York Times, George Soros has been linked to money laundering operations involving Global Telesystems, based in McLean, Virginia, doing business in Russia.  "Federal Investigators, who thought they had a possible case of money laundering, were dismayed.  The case was not aggressively pursued, said one senior law enforcement official.  An investigator from another Federal Agency said that the case had been prematurely closed."  (See Exhibit "**OO**" annexed to the accompanying Compendium of Exhibits.)

David H. Relkin, Esq.

**COUNT I**

**(RICO)**

426.     Plaintiffs repeat and reallege allegations "1" through "425" as if fully set forth herein.

427.     Any person injured in his business or property by reason of a violation of 18 USCS § 1962, may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

428.     Pursuant to 18 USC §1962 (a), it is unlawful:

> "for any person who has received any income . . . from a pattern of racketeering activity . . . to use . . . any part of such income" in the "operation of . . . any enterprise which is engaged in, or the activities of which affect, interstate . . . commerce"

429.     Upon information and belief, George Soros, SFM Management and Soros Fund Management, Fortress Investment Group, Vornado Realty Trust, German American Capital and Donald J. Trump received income from a pattern of racketeering activity and used such income in connection with investments and purchases from Conseco in interstate commerce.

430.     Bankruptcy Fraud under RICO is defined as "any offense involving fraud connected with a case under Title 11."

431.     By violating 18 USC §1956, Soros, SFM Management and Soros Fund Management, Fortress Investment Group, Vornado Realty Trust, German American

[87]

David H. Relkin, Esq.

Capital and Donald J. Trump violated 18 USC §1961 by concealing, disguising the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity or by disguising the source, ownership or control of the proceeds of unlawful activity in or to acquire, maintain or operate an enterprise affecting interstate commerce in violation of 18 USC §1962 (a).

432.    These defendants through racketeering activity made fraudulent representations to the Bankruptcy Court of the Northern District of Illinois and committed such acts to maintain, or operate an enterprise to acquire assets of Conseco, including the General Motors Building.

433.    These defendants committed the numerous RICO predicate transactions identified herein over a period of at least six years, which conduct constitutes a pattern of racketeering activity, causing damages to plaintiffs by acquiring assets of Conseco including the General Motors Building.

434.    Accordingly, Soros, SFM Management and Soros Fund Management, Fortress Investment Group, Vornado Realty Trust, German American Capital and Donald J. Trump have violated 18 USC §1962 (a) and are liable to plaintiffs, who were injured in their business or property, for treble damages, jointly and severally for 4.2 Billion Dollars, plus attorneys' fees.

[88]

David H. Relkin, Esq.

## COUNT II

## (RICO)

435.    Plaintiffs repeat and reallege allegations "1" through "434" as if fully set forth herein.

436.    Pursuant to 18 USC §1962 (b) , it is unlawful:

"for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or any control of any [such] enterprise."

437.    Soros, SFM Management and Soros Fund Management, Conseco, Lazard, Vornado Realty Trust, German American Capital Corp., Deutsche Bank, Fortress Investment Group, Fried Frank Harris Shriver & Jacobson, Kirkland & Ellis, Eastdil Realty, Harry Macklowe, Carmel Fifth, 767 Manager and Donald J. Trump acquired or maintained, directly or indirectly an interest in various assets of the Conseco Bankruptcy through a pattern of racketeering including Bankruptcy Fraud regarding Conseco Finance, and Money Laundering regarding the General Motors Building.

438.    Such conduct by such defendants involved numerous predicate acts of RICO, which acts constituted a pattern of racketeering.

439.    Plaintiffs were directly damaged by the unlawful and illicit activities of such defendants.

440.    The acts perpetrated by defendants were in an ongoing organization, formal or informal, and constituted by their acts, a continuing unit.

[89]

David H. Relkin, Esq.

441.     They also shared a common purpose, had a continuity of structure and each were distinct structure.

442.     Accordingly, the aforesaid defendants are jointly and severally liable to plaintiffs in the sum of 1.4 Billion Dollars, trebled by the RICO statute to 4.2 Billion Dollars, plus attorneys' fees.

## COUNT III

## (RICO)

443.     Plaintiffs repeat and reallege allegations "1" through "442" as if fully set forth herein.

444.     Pursuant to 18 USC §1962 (c), it is unlawful (c) "for any person employed by or associated with any [such] enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

445.     The racketeering activity of Soros, SFM Management and Soros Fund Management, Conseco, Lazard, Vornado Realty Trust, German American Capital Corp., Deutsche Bank, Fortress Investment Group, Fried Frank Harris Shriver & Jacobson, Kirkland & Ellis, Eastdil Realty, Harry Macklowe, Carmel Fifth, 767 Manager and Donald J. Trump, involved numerous predicate acts of RICO, including Bankruptcy Fraud and Money Laundering which acts constituted a pattern of racketeering that injured the interests and property of plaintiffs.

[90]

David H. Relkin, Esq.

446.    Defendants committed predicate acts of Money Laundering and Bankruptcy Fraud, and knew that those acts were part of a pattern of racketeering activity in interstate commerce.

447.    Such acts constitute predicate acts under 18 USC §1961 in that they were in furtherance of RICO racketeering activities, and in conspiracy with a racketeering enterprise and damaged plaintiffs.

448.    Accordingly, such are liable to plaintiffs jointly and severally in the amount of 1.4 Billion Dollars, to be trebled under the RICO statute to 4.2 Billion Dollars, plus attorneys' fees.

**COUNT IV**

**(RICO CONSPIRACY)**

449.    Plaintiffs repeat and reallege allegations "1" through "448" as if fully set forth herein.

450.    Pursuant to 18 USC §1962 (d) "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section [1962].

451.    In connection with the sale of the General Motors Building, Soros, SFM Management and Soros Fund Management, Conseco, Lazard, Vornado Realty Trust, German American Capital Corp., Deutsche Bank, Fortress Investment Group, Fried Frank Harris Shriver & Jacobson, Kirkland & Ellis, Eastdil Realty, Harry Macklowe, Carmel

[91]

David H. Relkin, Esq.

Fifth, 767 Manager and Donald J. Trump, conspired to launder money through such sale to the injury of plaintiffs and their interests.

452.    Plaintiffs were directly damaged by the unlawful and illicit Racketeering activities these defendants, and each of them, perpetrated by themselves and in connection with other conspirators.

453.    Accordingly, each of these defendants is jointly and severally liable to plaintiffs in the sum of 1.4 Billion Dollars, trebled to the sum of 4.2 Billion Dollars, plus attorneys' fees.

## COUNT V

## (ANTI-TRUST)

454.    Plaintiffs repeat and reallege allegations "1" through "453" as if fully set forth herein.

455.    Pursuant to 15 USC §§1 and 15, the contracts entered into by Soros, SFM Management, Soros Fund Management, Conseco, Vornado Realty Trust, German American Capital, Deutsche Bank, Eastdil, Harry Macklowe, Fortress Investment Group, Cerberus, Lazard, Kirkland & Ellis, Fried Frank Harris Shriver & Jacobson, Carmel Fifth, 767 Manager and Donald J. Trump which directed the sale of the General Motors Building to a pre-arranged buyer, Harry Macklowe, and acquired such building in violations of 15 USC §§1 and 15 were in restraint of trade or commerce in interstate commerce and directly harmed plaintiffs interests and rights.

David H. Relkin, Esq.

456.    Defendants perpetrated violations of the Sherman Anti-Trust Act in that they predetermined who would win the purportedly open bid, namely Macklowe, to further their money laundering activities to the detriment of plaintiffs' rights.

457.    Pursuant to 15 USC §1, such transfer in restraint of trade is void and violates §1 of the Sherman Anti-Trust Act.

458.    By reason of the foregoing, such defendants are liable to plaintiffs for 1.4 Billion Dollars trebled to 4.2 Billion Dollars, plus attorneys' fees.

**WHEREFORE,** plaintiffs Leslie Dick Worldwide, Ltd. and Leslie Dick hereby request this Court to enter an Order and Judgment finding:

(a)    Defendants George Soros, SFM Management and Soros Fund Management, Fortress Investment Group, Vornado Realty Trust, German American Capital and Donald J. Trump jointly and severally liable to plaintiff for RICO damages in the sum of 4.2 Billion Dollars, plus attorneys' fees;

(b)    Defendants Soros, SFM Management and Soros Fund Management, Conseco, Lazard, Vornado Realty Trust, German American Capital Corp., Deutsche Bank, Fortress Investment Group, Fried Frank Harris Shriver & Jacobson, Kirkland & Ellis, Eastdil Realty, Harry Macklowe, Carmel Fifth, 767 Manager and Donald J. Trump, jointly and severally liable to plaintiff for RICO damages in the sum of 4.2 Billion Dollars, plus attorneys' fees;

(c)    Defendants George Soros, SFM Management and Soros Fund Management, Conseco, Lazard, Vornado Realty Trust, German American Capital Corp.,

[93]

David H. Relkin, Esq.

Deutsche Bank, Fortress Investment Group, Fried Frank Harris Shriver & Jacobson, Kirkland & Ellis, Eastdil Realty, Harry Macklowe, Carmel Fifth, 767 Manager and Donald J. Trump, jointly and severally liable to plaintiffs, for RICO damages in the sum of 4.2 Billion Dollars, plus attorneys' fees;

(d)     Defendants George Soros, SFM Management and Soros Management in connection with Conseco, Vornado Realty Trust, German American Capital Corp., Deutsche Bank, Eastdil Realty, Fortress Investment Group, Harry Macklowe, Cerberus Capital Management, Lazard, Kirkland & Ellis, Fried, Frank Harris, Shriver & Jacobson and Donald J. Trump, all participated in a conspiracy to commit violations under 18 USC § 1962 through a pattern of racketeering and are jointly and severally liable to plaintiffs, for RICO damages in the sum of 4.2 Billion Dollars, plus attorneys' fees;

(e)     Defendants Soros, SFM Management and Soros Fund Management, Conseco, Lazard, Vornado Realty Trust, German American Capital Corp., Deutsche Bank, Fortress Investment Group, Fried Frank Harris Shriver & Jacobson, Kirkland & Ellis, Eastdil Realty, Harry Macklowe, Carmel Fifth, 767 Manager and Donald J. Trump for bid rigging in violation of the Sherman Anti-Trust Act, in the sum of 4.2 Billion Dollars, plus attorneys' fees;

[94]

David H. Relkin, Esq.

(f)      All together with the costs and disbursements of this action and such other,

further and different relief as this Court may deem just and proper.


Dated: New York, New York
           September 8, 2008

                                            DAVID H. RELKIN, ESQ.
                                            Attorney for Plaintiffs


                                            S/DHR
                                            _____
                                            David H. Relkin, Esq. (DHR-1049)
                                            575 Eighth Avenue, Ste. 1706
                                            New York, NY 10018
                                            212-244-8722

David H. Relkin, Esq.