UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

............................................................................ x

LESLIE DICK WORLDWIDE, LTD. AND
LESLIE DICK,

                    *Plaintiffs,*

        -against-

GEORGE SOROS, SOROS FUND
MANAGEMENT, LLC, SFM
MANAGEMENT, LLC, CONSECO, INC.,
VORNADO REALTY TRUST, GERMAN
AMERICAN CAPITAL CORP., DEUTSCHE
BANK AG., EASTDIL SECURED, LLC,
HARRY MACKLOWE, FIG, LLC,
CERBERUS CAPITAL MANAGEMENT, LP,
LAZARD FRERES & CO., LLC, KIRKLAND
& ELLIS, LLP, FRIED, FRANK, HARRIS,
SHRIVER & JACOBSON LLP, CARMEL
FIFTH, LLC, 767 MANAGER, LLC,
DONALD J. TRUMP AND JOHN DOES "1"
THROUGH "10,"

                    *Defendants.*

............................................................................ x

Hon. Barbara S. Jones

No. 08 CV 7900 (BSJ)(THK)

ECF Case

## BRIEF IN SUPPORT OF THE SOROS DEFENDANTS' MOTION TO DISMISS

WILLKIE FARR & GALLAGHER LLP
Benito Romano
John R. Oller
Deirdre N. Hykal
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Attorneys for George Soros and Soros Fund
Management, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 4

I.      OVERVIEW ............................................................................................. 4

II.     THE PRIOR STATE COURT ACTION ..................................................... 5

III.    THE PRESENT ACTION ......................................................................... 7

IV.     PLAINTIFFS' FIVE-YEAR DELAY IN ASSERTING THEIR RICO AND
        ANTITRUST CLAIMS. ........................................................................... 14

ARGUMENT ........................................................................................................... 15

I.      STANDARD OF REVIEW ...................................................................... 15

II.     PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED. ........................ 17

        A.      PLAINTIFFS' RICO CLAIMS ARE BARRED BY RES JUDICATA ......... 17

        B.      PLAINTIFFS' RICO CLAIMS ARE BARRED BY THE STATUTE OF
                LIMITATIONS. ............................................................................. 22

        C.      PLAINTIFFS FAIL TO ALLEGE A VIOLATION OF THE RICO
                STATUTE. .................................................................................... 25

                1.      Plaintiffs lack standing to assert claims based on their money
                        laundering and bankruptcy fraud allegations. ........................... 25

                2.      Plaintiffs fail to allege a violation of section 1962(c). ............... 26

                        a.      Plaintiffs fail to allege a cognizable RICO enterprise. ......... 26

                        b.      Plaintiffs fail to allege the requisite predicate acts. ............ 30

                                i.      Bid rigging is not a RICO predicate act. ................... 30

                                ii.     Plaintiffs fail to allege bankruptcy fraud. ................. 31

                                iii.    Plaintiffs fail to allege money laundering. ................. 33

                        c.      Plaintiffs fail to allege a continuous "pattern of racketeering
                                activity." ...................................................................... 34

                3.      Plaintiffs fail to allege a violation of sections 1962(a) and (b). ........ 38

                4.      Plaintiffs fail to allege a RICO conspiracy under section 1962(d). ...... 39

III.    PLAINTIFFS' SHERMAN ANTITRUST ACT CLAIM SHOULD BE DISMISSED ... 40

        A.      THE ANTITRUST CLAIM IS TIME-BARRED. ................................... 40

        B.      THE COMPLAINT DOES NOT STATE AN ANTITRUST CLAIM. ......... 41

IV.     THE COURT SHOULD STRIKE CERTAIN IMMATERIAL AND SCANDALOUS
        ALLEGATIONS IN THE COMPLAINT. ..................................................... 44

V.      THE CLAIMS SHOULD BE DISMISSED WITH PREJUDICE BECAUSE
        AMENDMENT WOULD BE FUTILE..........................................................................46

CONCLUSION.............................................................................................................................47

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

*Adler v. Berg Harmon Assocs.*,
    790 F. Supp. 1222 (S.D.N.Y. 1992) ...................................................................40

*Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.*,
    801 F. Supp. 1450 (E.D. Pa. 1992).............................................................42, 43

*Allen v. New World Coffee, Inc.*,
    No. 00-CV-2610, 2002 WL 432685 (S.D.N.Y. Mar. 19, 2002) ...........................39

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) .................................................................................16

*Aventis Envtl. Sci. USA LP v. Scotts Co.*,
    383 F. Supp. 2d 488 (S.D.N.Y. 2005) ................................................................42

*Balaklaw v. Lovell*,
    14 F.3d 793 (2d Cir. 1994) .................................................................................42

*Bankers Trust Co. v. Rhoades*,
    859 F.2d 1096 (2d Cir. 1988) ................................................................22, 24, 26

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007) .................................................................................16, 40

*Bennett v. United States Trust Co.*,
    770 F.2d 308 (2d Cir. 1985) ...............................................................................27

*Bernstein v. Misk*,
    948 F. Supp. 228 (E.D.N.Y. 1997)...........................................................33, 35, 38

*Bingham v. Zolt*,
    66 F.3d 553 (2d Cir. 1995) ..........................................................................24, 25

*Bowles v. New York City Transit Auth.*,
    No. 03-CV-3073, 2004 WL 548021 (S.D.N.Y. Mar. 18, 2004) ...........................45

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ...........................................................................................42

*Capital Imaging Assoc. v. Mohawk Valley Med. Assoc., Inc.*,
    996 F.2d 537 (2d Cir. 1993)...............................................................................42

iii

*China Trust Bank of N.Y. v. Standard Chartered Bank, PLC,*
  981 F. Supp. 282 (S.D.N.Y. 1997) ......................................................................35

*Chrysler Capital Corp. v. Century Power Corp.,*
  778 F. Supp. 1260 (S.D.N.Y. 1991) ....................................................................31

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.,*
  187 F.3d 229 (2d Cir. 1999) ...............................................................................35

*Coleman v. B.G. Sulzle, Inc.,*
  402 F. Supp. 2d 403 (N.D.N.Y. 2005) ...............................................................15

*Crown Heights Jewish Cmty. Council, Inc. v. Fischer,*
  63 F. Supp. 2d 231 (E.D.N.Y. 1999) ..................................................................33

*DeFalco v. Bernas,*
  244 F.3d 286  (2d Cir. 2001) .........................................................................35, 36

*DiVittorio v. Equidyne Extractive Indus., Inc.,*
  822 F.2d 1242 (2d Cir. 1987) .............................................................................33

*Discon, Inc. v. NYNEX Corp.,*
  93 F.3d 1055 (2d Cir. 1996) ..........................................................................38, 39

*Dongelewicz v. ONC Bank Nat'l Assoc.,*
  104 F. App'x 811 (3d Cir. 2004) .........................................................................40

*Donovan v. Lewnowski,*
  No. 03-CV-2985, 2005 WL 2095739 (E.D.N.Y. Aug. 30, 2005) ....................18, 19, 20, 22

*Doron Precision Sys., Inc. v. FAAC, Inc.,*
  423 F. Supp. 2d 173 (S.D.N.Y. 2006) ............................................................42, 44

*Dubai Islamic Bank v. Citibank, N.A.,*
  256 F. Supp. 2d 158 (S.D.N.Y. 2003) .................................................................16

*Expert Elec., Inc. v. Levine,*
  554 F.2d 1227 (2d Cir. 1977) .........................................................................19, 20

*Ezra Charitable Trust v. Frontier Ins. Group,*
  No. 00-CV-5361, 2002 WL 87723 (S.D.N.Y. Jan. 23, 2002) ........................15, 23

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,*
  385 F.3d 159 (2d Cir. 2004) .......................................................16, 28, 29, 31, 39

*Gant v. Wallingford Bd. of Educ.,*
  69 F.3d 669 (2d Cir. 1995) .................................................................................15

iv

*Giannone v. York Tape & Label, Inc.*,
    -- F.3d. --, 2008 WL 5061801 (2d Cir. Dec. 2, 2008) ........................................................18

*GICC Capital Corp. v. Tech. Fin. Group*,
    67 F.3d 463 (2d Cir. 1995) ........................................................34, 35

*G-I Holdings, Inc. v. Baron & Budd*,
    238 F. Supp. 2d 521 (S.D.N.Y. 2002) ........................................................36, 45

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989) ........................................................34, 35

*Higgins v. New York Stock Exch. Inc.*,
    942 F.2d 829 (2d Cir. 1991) ........................................................41

*Holmes v. Sec. Investor Prot. Corp.*,
    503 U.S. 258 (1992) ........................................................26

*In re Ins. Brokerage Antitrust Litig.*,
    Nos. 04-CV-5184, 04-CV-1079, 2007 WL 1062980 (D.N.J. Apr. 5, 2007) ........................28

*In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*,
    815 F. Supp. 620 (S.D.N.Y. 1993) ........................................................22

*Int'l Paint Co., Inc. v. Grow Group, Inc.*,
    648 F. Supp. 729 (S.D.N.Y. 1986) ........................................................29

*In re Investors Life Ins. Co. Annuity Mktg. and Sales Practices Litig.*,
    Nos. 04-CV-3329, 04-CV-3799, 2006 WL 1531152 (E.D. Pa. June 2, 2006) ...................28

*Iwachiw v. N.Y.C. Bd. of Educ.*,
    194 F. Supp. 2d 194 (E.D.N.Y. 2002) ........................................................15

*Kasada, Inc. v. Access Capital, Inc.*,
    No. 01-CV-8893, 2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004) ........................................42

*Katzman v. Victoria's Secret Catalogue*,
    167 F.R.D. 649 (S.D.N.Y. 1996) ........................................................17

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ........................................................25, 40

*Kunzweiler v. Zero.Net, Inc.*,
    No. Civ.A.3:00-CV-2553-P, 2002 WL 1461732 (N.D. Tex. July 3, 2002) ........................31

*LC Capital Partners v. Frontier Ins. Group*,
    318 F.3d 148 (2d Cir. 2003) ........................................................15

*Leeds v. Meltz,*
    85 F.3d 51 (2d Cir. 1996) ................................................................................15

*Lipsky v. Commonwealth United Corp.,*
    551 F.2d 887 (2d Cir. 1976) .............................................................................46

*Mathon v. Marine Midland Bank, N.A.,*
    875 F. Supp. 986 (E.D.N.Y. 1995) ...................................................................36

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
    218 F.R.D. 76 (S.D.N.Y. 2003) ........................................................................46

*In re Merrill Lynch Ltd. P'ships Litig.,*
    154 F.3d 56 (2d Cir. 1998) ...............................................................................22

*Migra v. Warren City Sch. Dist. Bd. of Educ.,*
    465 U.S. 75 (1984) ............................................................................................18

*Moore v. PaineWebber, Inc.,*
    189 F.3d 165 (2d Cir. 1999) .............................................................................32

*Morin v. Trupin,*
    711 F. Supp. 97 (S.D.N.Y. 1989) .....................................................................40

*Morse v. Weingarten,*
    777 F. Supp. 312 (S.D.N.Y. 1991) ...................................................................46

*Moss v. Morgan Stanley Inc.,*
    719 F.2d 5 (2d Cir. 1983) .................................................................................26

*Mount v. Ormand,*
    No. 91-CV-125, 1991 WL 191228 (S.D.N.Y. Sept. 18, 1991) .........................30

*In re Nine West Shoes Antitrust Litig.,*
    80 F. Supp. 2d 181 (S.D.N.Y. 2000) ...............................................................41

*Official Publ'ns, Inc. v. Kable News Co.,*
    811 F. Supp. 143 (S.D.N.Y. 1993) ..............................................................20, 22

*Ouaknine v. MacFarlane,*
    897 F.2d 75 (2d Cir. 1990) ..........................................................................38, 39

*Pier Connection, Inc. v. Lakhani,*
    907 F. Supp. 72 (S.D.N.Y. 1995) .....................................................................37

*Printing Mart-Morristown, Inc. v. Rosenthal,*
    650 F. Supp. 1444 (D.N.J. 1987) ...................................................................20, 21

*Procapui-Productores de Camaroes de Icapui Ltda. v. Layani*,
    No. 07-CV-6627, 2008 WL 3338199 (S.D.N.Y. Jan. 11, 2008)......................................16, 33

*Procapui-Productores de Camaroes de Icapui Ltda. v. G.F. Higgins, Inc.*,
    No. 07-CV-6627, 2008 WL 3338200 (S.D.N.Y. Aug. 8, 2008) ...........................................28

*Qualis Care, L.P. v. Hall*,
    No. 95-CV-4955, 1999 WL 683564 (S.D.N.Y. Sept. 1, 1999) ......................................34, 36

*Ray Larsen Assocs., Inc. v. Nikko Am., Inc.*,
    No. 89-CV-2809, 1996 WL 442799 (S.D.N.Y. Aug. 6, 1996) ................................36, 37, 38

*Richmond v. Nationwide Cassel, L.P.*,
    52 F.3d 640 (7th Cir. 1995)...............................................................................................28

*Roberto's Fruit Market, Inc. v. Schaffer*,
    13 F. Supp. 2d 390 (E.D.N.Y. 1998).............................................................................45, 46

*Salinger v. Projectavision, Inc.*,
    972 F. Supp. 222 (S.D.N.Y. 1997) .....................................................................................22

*Saud v. Bank of New York*,
    929 F.2d 916 (2d Cir. 1991) .........................................................................................19, 20

*Schwartz v. Hosp. of Univ. of Pa.*,
    No. 88-4865, 1993 WL 153810 (E.D. Pa. May 7, 1993) .....................................................31

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985) ...........................................................................................................26

*Shaw v. United States*,
    371 F. Supp. 2d 265 (E.D.N.Y. 2005).................................................................................44

*Simon v. Mfrs. Hanover Trust Co.*,
    849 F. Supp. 880 (S.D.N.Y. 1994) ................................................................................44, 45

*Singh v. Parnes*,
    199 F. Supp. 2d 152 (S.D.N.Y. 2002) .......................................................15, 18, 20, 29, 47

*Sitkin Smelting & Refining Co. v. FMC Corp.*,
    575 F.2d 440 (3d Cir. 1978) ...............................................................................................43

*Solow v. Conseco*,
    No. 06-CV-5988, 2008 U.S. Dist. LEXIS 9234 (S.D.N.Y. Jan. 11, 2008)...........................17

*Spool v. World Child Int'l Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008) ...................................................................................16, 36, 37

*Stachon v. United Consumers Club, Inc.*,
229 F.3d 673 (7th Cir. 2000) ............................................................................30

*Stolow v. Greg Manning Auctions Inc.*,
258 F. Supp. 2d 236 (S.D.N.Y. 2003) ......................................................38, 39, 40

*Stolow v. Greg Manning Auctions Inc.*,
No. 03-7259, 2003 WL 22717684 (2d Cir. Nov. 17, 2003) ....................38, 41, 42

*Tafflin v. Levitt*,
493 U.S. 455 (1990) ...............................................................................21, 22

*Taggart v. Rutledge*,
657 F. Supp. 1420 (D. Mont. 1987) ....................................................................43

*Takeuchi v. Sakhai*,
No. 06-CV-0818, 2007 WL 2028892 (2d Cir. Jul. 12, 2007) .............................24

*Team Obsolete Ltd. v. A.H.R.M.A. Ltd.*,
No. 01-CV-1574, 2002 WL 719471 (E.D.N.Y. Mar. 1, 2002) ......................30, 31

*Tenamee v. Schmukler*,
438 F. Supp. 2d 438 (S.D.N.Y. 2006) .........................................................27, 28

*United States v. Aulicino*,
44 F.3d 1102 (2d Cir. 1995) ..............................................................................35

*United States v. Int'l Longshoremen's Ass'n*,
518 F. Supp. 2d 422 (E.D.N.Y. 2007) ........................................................27, 29, 30

*United States v. Portsmouth Paving Corp.*,
694 F.2d 312 (4th Cir. 1982) .............................................................................44

*United States v. Turkette*,
452 U.S. 576 (1981) ........................................................................27, 28, 29

*United States v. Union Gas Co.*,
743 F. Supp. 1144 (E.D. Pa. 1990) .....................................................................45

*Vemco, Inc. v. Camardella*,
23 F.3d 129 (6th Cir. 1994) ...............................................................................37

*In re Verestar, Inc.*,
343 B.R. 444 (Bankr. S.D.N.Y. 2006) ................................................................31

*W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*,
No. 03-CV-8606, 2004 WL 2187069 (S.D.N.Y. Sept. 29, 2004) ....................33, 34

viii

*Wittich v. Wittich*,
   No. 06-CV-1635, 2006 WL 3437407 (E.D.N.Y. Nov. 29, 2006) .........................................46

*Wright v. Rivera*,
   No. 06-CV-1725, 2007 WL 4264547 (E.D.N.Y. Nov. 30, 2007) .........................................47

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   401 U.S. 321 (1971) .........................................41

## STATE CASES

*Feigen v. Advance Capital Mgmt. Corp.*,
   536 N.Y.S.2d 786 (1st Dep't 1989) .........................................21

*Flynn v. Sinclair Oil Corp.*,
   246 N.Y.S.2d 360 (1st Dep't 1964*)* .........................................21

*Leslie Dick Worldwide, Ltd. v. Macklowe Props., Inc.*,
   857 N.Y.S.2d 86 (1st Dep't 2008) .........................................7

*Leslie Dick Worldwide, Ltd. v. Macklowe Props., Inc.*,
   11 N.Y.3d 702 (2008) .........................................7

*Sandhu v. Mercy Med. Ctr.*,
   864 N.Y.S.2d 124 (2d Dep't 2008) .........................................18

*Santiago ex rel. Garcia v. Bd. of Health*,
   779 N.Y.S.2d 474 (1st Dep't 2004) .........................................19, 22

*Schwartzreich v. E.P.C. Carting Co., Inc.*,
   668 N.Y.S.2d (1st Dep't 1998) .........................................19

*Simpson Elec. Corp. v. Leucadia, Inc.*,
   72 N.Y.2d 450 (1988) .........................................22

*Smith v. Russell Sage Coll.*,
   54 N.Y.2d 185 (1981) .........................................18. 19

*Spitzer v. Applied Card Sys., Inc.*,
   11 N.Y.3d 105 (2008) .........................................18, 19

*Strange v. Montefiore Hosp. and Med. Ctr.*,
   59 N.Y.2d 737 (1983) .........................................21

*Yonkers Contracting Co. v. Port Auth.*,
   93 N.Y.2d 375 (1999) .........................................21

## STATUTES

15 U.S.C. §§ 1-7, 15 (2008)................................................................................40

18 U.S.C. § 152 (2008)........................................................................................31

18 U.S.C. § 1957 (2008)................................................................................33, 34

18 U.S.C. § 1961 (2008)................................................................................26, 30

18 U.S.C. § 1962 (2008)..................................................................24, 26, 38, 39

18 U.S.C. § 1964 (2008)......................................................................................26

Fed R. Civ. P. 8(a) ........................................................................................1, 16

Fed R. Civ. P. 9(b) ............................................................................1, 16, 31, 32

Fed R. Civ. P. 12(b)(6)....................................................................................1, 15

Fed R. Civ. P. 12(f)........................................................................3, 44, 45, 46, 47

## OTHER AUTHORITIES

5C Charles Alan Wright & Arthur R. Miller,
   *Federal Practice and Procedure* § 1382 (3d. ed. 2004).......................................45

Defendants George Soros and Soros Fund Management, LLC (together, the "Soros Defendants"),[1] by and through their counsel, respectfully submit this brief in support of their motion to dismiss the complaint ("Complaint" or "Cplt.") brought by Leslie Dick Worldwide Ltd. and Leslie Dick ("Plaintiffs") in the above-captioned action (the "Action"), pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6).  To minimize duplication and burden on the Court, this brief covers common issues and arguments affecting all Defendants, a number of whom are joining in this brief or incorporating portions of it by cross-reference in their separate motions to dismiss addressing arguments particular to them.

## INTRODUCTION

The Complaint in this Action alleges a fantastic, worldwide RICO and antitrust conspiracy between the Soros Defendants; Donald Trump; the law firms of Fried Frank and Kirkland & Ellis; Deutsche Bank; the Conseco insurance company; the Lazard investment bank; the private investment firm Cerberus Capital Management, LP; and assorted others (collectively, "Defendants").  The Complaint contains an incomprehensible jumble of groundless allegations, including that a dispute and litigation between Conseco and Trump was "fabricated" so that George Soros, the "mastermind" of the alleged racketeering enterprise (the "Enterprise"), could "launder money" through the sale of the General Motors Building (the "GM Building" or "the Building") to a "front man," Harry Macklowe.  Sprinkled throughout the Complaint are wholly irrelevant allegations ranging from Latin American cocaine and drug trafficking, to alleged failures by Conseco to pay health care claims, to unrelated accounting frauds, financial restatements and SEC charges, and executive signing bonuses and compensation.

---

[1]     SFM Management, LLC, also named as a Defendant, is unrelated to the Soros Defendants and is apparently an entity on Long Island that Plaintiffs have mistakenly named in this lawsuit.

Yet, while Plaintiffs have managed to manufacture 95 pages and 458 paragraphs of spurious and slanderous allegations, they omit one fundamental truth:  Plaintiffs have already litigated their claims – and lost – in New York Supreme Court.  Plaintiffs' final appeal of the court's decision was denied just days before they filed their Complaint in this Court.

In an attempt to resurrect their groundless state case, Plaintiffs have simply recast their claims as ones under RICO and the Sherman Antitrust Act.  But despite their resort to different legal theories, Plaintiffs cannot escape the fact that the claims they assert in this Action are based on the same transaction or series of transactions as those asserted in the prior state court action.  The gravamen of the Complaint, though discussion of it is postponed until page 71, is that Plaintiffs were defrauded out of the opportunity to successfully bid on the sale of the GM Building in 2003, which they contend was sold in a "sham auction."  (*See* Cplt. ¶¶ 339-73.)  That is the very same claim that Plaintiffs sued on, and lost, in the New York State Court.  The decision by the state court is *res judicata* in this Action.

Separately, Plaintiffs' RICO and antitrust claims are barred by the statute of limitations.  Again, while somewhat obscured by the lengthy muddle that precedes it, the Complaint ultimately reveals that the only RICO and antitrust injury allegedly sustained by Plaintiffs was suffered at the time of the sale of the GM Building in 2003 – five years before the Complaint in this Action was filed.  Indeed, right after the sale, in November 2003, Mr. Dick threatened the Soros Defendants and other Defendants here with RICO and Sherman Act claims based on what he contended was bid rigging in connection with the sale.  Because RICO and the Sherman Act claims are subject to a four-year statute of limitations, and because Plaintiffs' claims accrued more than four years ago, the Complaint here is time-barred on its face.

While *res judicata* and the statute of limitations alone compel dismissal of the Complaint with prejudice, Plaintiffs' claims are also deficient on the merits.  With regard to RICO, Plaintiffs

2

fail to plead a cognizable "enterprise."  Indeed, in a fatal omission, Plaintiffs never even identify the alleged Enterprise:  at times they say it is all Defendants; elsewhere they say it consists of some but not all Defendants; and in places they suggest the Enterprise is Defendant Conseco.  Whatever the alleged Enterprise, Plaintiffs do not and cannot explain how the disparate cast of characters named as Defendants in this Action functioned as a single, continuing unit, or how the alleged Enterprise was structured and organized.  Under the decisions of this Court and law of this Circuit, that failure requires dismissal.

Plaintiffs also cannot establish a RICO "pattern" because the only alleged predicate offense that caused them injury – the alleged "sham auction" of the GM Building – was a one-time event.  As a result, and under settled Second Circuit law, the Complaint is insufficient to satisfy the RICO "continuity" factor.

The RICO claims suffer from other infirmities, discussed in greater detail below, including lack of standing; failure adequately to plead the alleged predicate acts; and insufficient allegations of conspiracy.

The Sherman Antitrust claim, in addition to being time-barred, is defective because Plaintiffs have not alleged "antitrust injury."  The "bid rigging" they allege in connection with the sale of the GM Building was not between competitors and did not affect consumers.  That Plaintiff Leslie Dick, as a competing bidder, was purportedly harmed by not acquiring the property, does not establish harm to *competition* in a relevant market, a requisite of an antitrust claim.  Whatever else this may be, it simply is not an antitrust case.

Finally, certain of Plaintiffs' allegations are so inflammatory and scandalous that they should be stricken under Federal Rule of Civil Procedure 12(f).

In sum, the Complaint should be dismissed with prejudice because the claims are precluded by *res judicata*, are time-barred, fail to state a claim as a matter of law, and violate well-established pleading rules.

## STATEMENT OF FACTS

### I.    OVERVIEW

Plaintiffs filed the instant Complaint on September 10, 2008, alleging RICO and antitrust claims based on the apparent harm suffered when Plaintiffs "lost" their bid to purchase the GM Building in 2003.  Amidst a tangle of convoluted conclusions of law masquerading as facts, Plaintiffs appear to allege that Soros "masterminded" a RICO Enterprise and conspiracy to bid rig the 2003 sale process (which Soros did not even conduct) in order to have the property sold to Soros' "straw man," Harry Macklowe, for the ultimate purpose of laundering money into an investment in Trump International Hotel in Chicago, Illinois.  This conspiracy allegedly was carried out through the predicate acts of money laundering, bankruptcy fraud and bid rigging, though the allegations are hopelessly opaque and conclusory as to who did what, how, and for what purpose.  Of the hundreds of allegations, none of them makes clear how the members of the alleged Enterprise came to be a part of a continuing unit, who among the co-conspirators agreed to what or when, or how the myriad allegations of bankruptcy fraud and money laundering relate to any injury suffered by Plaintiffs.

Putting aside their inherent implausibility, incoherency and total lack of factual support, one thing is clear:  the claims in the present Action are based on the same factual grouping as the prior state court action – the sale of the GM Building.  We summarize below the allegations and claims in both actions.

## II.    THE PRIOR STATE COURT ACTION

In 2006, two and half years after the sale of the GM Building, Plaintiffs commenced an action in New York Supreme Court claiming that Plaintiffs had been defrauded and wrongfully denied an opportunity to successfully bid on the sale of the Building in 2003. *Leslie Dick Worldwide Ltd. v. Macklowe Props., Inc., et al*, Index No. 06/600222 (Moskowitz, J.) (the "State Action"). The defendants in the State Action included several of the very same Defendants named in the present Action, including George Soros, Soros Fund Management, LLC, Eastdil Realty Company, LLC,[2] Harry Macklowe, Conseco, Inc., and its affiliate Carmel Fifth, LLC, as well as certain parties who are affiliates of various Defendants in this Action. Plaintiffs in the State Action alleged claims of fraud, aiding and abetting fraud, promissory estoppel and tortious interference with prospective business advantage.

The gravamen of the State Action was that defendants conspired to bid rig the 2003 sale of the GM Building through a "sham auction." Specifically, Plaintiffs alleged in their amended complaint in the State Action ("State Cplt."), among other things, that:

> Despite having been told that the Building would go to the highest bidder at auction, and the fact that Plaintiffs were the highest bidders . . . the defendants engaged in bid rigging and fraud by conspiring to have Plaintiffs' August 27, 2003 bid rejected and, instead, to have the building sold to Fifth Avenue 58/59 Acquisition Co., LP, the limited partnership specifically formed and designated by Harry Macklowe, George Soros and the other defendants to take ownership of Conseco's ownership share in the Building.

(State Cplt. ¶ 5, attached as Ex. A to the Declaration of John R. Oller in Support of the Soros Defendants' Motion to Dismiss, dated December 19, 2008 ("Oller Decl.").)

---

[2]    Now known as Eastdil Secured, LLC. (*See* Cplt. ¶ 29.)

By decision and order dated November 29, 2006, Justice Moskowitz granted the motions to dismiss of the non-Soros Defendants pursuant to CPLR § 3211(a)(1) (documentary proof) and (a)(7) (failure to state a claim).  (*See* Oller Decl. Ex. B (Nov. 29, 2006 Order).)  The clerk entered judgment in their favor on December 20, 2006.  (*See* Oller Decl. Ex. C (Dec. 20, 2006 Judgment).)

In her opinion, Justice Moskowitz found that, among other things, Plaintiffs did not, "as a matter of law," reasonably rely on defendants' alleged oral statements that the GM Building would go to the highest bidder in light of an agreement and written outline of bidding procedures provided by Eastdil (the agent retained by Carmel Fifth to market the property) in advance of the final bid.  (Oller Decl. Ex. B (Nov. 29, 2006 Order) at 9-10.)  The agreement signed by Plaintiffs acknowledged, among other things, that the sellers were "expressly reserv[ing] the right, in [their] sole discretion, to terminate, at any time with or without notice and without liability, any discussions with any party regarding a possible sale of the property."  (*Id.* at 8.)  Plaintiffs also were advised that the sellers were "reserv[ing]the right, in [their] sole discretion, to accept or reject any offer for any reason," and that factors in addition to price would be considered in selecting a purchaser, including level of due diligence, closing capacity and credibility, and earnest money deposit.  (*Id.*)

Justice Moskowitz also held that, because these documents authorized defendants' conduct, defendants were not liable under a theory of tortious interference.  (*Id.* at 11-12.)  The declaratory judgment and constructive trust claims were dismissed on the ground of laches, in light of Plaintiffs' two and a half year delay in commencing the State Action.  (*Id.* at 13-14.)

On January 18, 2007, Justice Moskowitz held a hearing and granted the Soros Defendants' motion to dismiss on the same grounds as the non-Soros Defendants' motion to dismiss (the

motions had proceeded on separate tracks).[3]  Justice Moskowitz signed an order, marked "Final

Disposition," directing the clerk to enter a judgment dismissing the action against the Soros

Defendants "with prejudice."  (*See* Oller Decl. Ex. E (Jan. 18, 2007 Order).)  On February 2, 2007,

the clerk entered a final judgment dismissing the claims against the Soros Defendants "with

prejudice."  (*See* Oller Decl. Ex. F (Feb. 2, 2007 Judgment).)

On April 29, 2008, the Appellate Division affirmed all of the Supreme Court orders and

judgments with regard to all defendants (including the November 29 and January 18 orders and

the December 20 and February 2 judgments).  857 N.Y.S.2d 86 (1st Dep't 2008).  The Appellate

Division held that "plaintiffs do not have a cause of action for fraud . . . or promissory estoppel,"

and that the court below had "considered plaintiffs' other claims and [found] them without merit."

*Id.*

On September 2, 2008, the New York Court of Appeals denied Plaintiffs' request for leave

to appeal.  11 N.Y.3d 702 (2008).

## III.   **THE PRESENT ACTION**

On September 10, 2008, days after the New York Court of Appeals denied their request for

leave to appeal, Plaintiffs filed the present Action.  Once again, the crux of Plaintiffs' Complaint is

that Defendants conspired to bid rig the 2003 sale of the GM Building.

---

[3]     At the hearing on the Soros Defendants' motion to dismiss, Justice Moskowitz noted that Plaintiffs
were simply trying to reargue her earlier decision to dismiss the other defendants:

> You are not arguing anything different about the Soros Defendants. . . .
> There is nothing particular about the Soros Defendants.  In fact, there is
> even less as to the Soros Defendants, because they are not the ones that
> were running this auction.  So, therefore, I don't see any reason why my
> decision, on the motion to dismiss by the Soros Defendants, should be any
> different.  And it is actually controlled by my decision as to the other
> defendants.

(Oller Decl. Ex. D (Jan. 18, 2007 Hearing Tr.) at 7-8.)

By way of background, as alleged in the Complaint, Conseco and Donald J. Trump ("Trump") jointly purchased the GM Building in 1998. (Cplt. ¶ 49.) According to Plaintiffs, Conseco and Trump began to "orchestrate" a dispute regarding ownership of the Building starting sometime in 2001, initiated a sham arbitration in 2002 to resolve the dispute, and caused Conseco to file for bankruptcy in December 2002 "so as to acquire Conseco's assets at a discount price," including the GM Building, and to "keep the title to the [GM] Building tied up in litigation and arbitration until after Conseco's Bankruptcy proceedings were concluded." (Cplt. ¶¶ 152, 164, 170.) Having allegedly conspired to put the Building *into* bankruptcy for whatever reason, the conspirators then allegedly maneuvered to place jurisdiction over the GM Building *outside* the Bankruptcy Court. Plaintiffs allege that this conspiracy involved motions to disqualify party-appointed arbitrators when "no actual conflict existed," and other procedural machinations, including applications to the Bankruptcy Court to confirm the arbitration award, and a fraudulent statement of intention by Trump to appeal from a New York Supreme Court decision declining to vacate the award. (Cplt. ¶¶ 245, 249, 321, 328.) All of this was done, say Plaintiffs, as part of a "scheme to keep the General Motors Building in arbitration" in "a type of three-card Monty game until the [Building] could be sold outside the Bankruptcy Court's scrutiny" to Harry Macklowe as a "front man" for George Soros, and the proceeds then "laundered" into a construction project of Trump in Chicago named Trump International Hotel and Tower. (Cplt. ¶¶ 253, 322, 342, 171.) As Plaintiffs summarize their theory, the plan was:

> [T]o cause Conseco to file for bankruptcy [in December 2002] so that Donald Trump and Conseco would keep the title to the General Motors Building tied up in litigation and arbitration until after Conseco's Bankruptcy proceedings were concluded to allow the Enterprise to engage in racketeering activity in interstate commerce

> by Money Laundering and Bid Rigging of the General Motors
> Building to direct the sale of the General Motors Building to the
> RICO Enterprise's designated straw-man buyer Harry Macklowe
> without the oversight of the Conseco Bankruptcy Court and to
> launder substantially larger amounts of money than could have been
> laundered had the July 3 Agreement or the buy/sell agreement
> [between Trump and Conseco] went through.

(Cplt. ¶ 170.)

The Complaint alleges that this grand conspiracy and RICO Enterprise was "masterminded" by Soros (exactly how, or why, is never explained), and that it included, in addition to Conseco, Trump and Macklowe, numerous other unrelated Enterprise members and/or co-conspirators such as Fried Frank; Kirkland & Ellis; Eastdil Realty; Cerberus; Lazard Frères; Vornado Realty Trust; Fortress Investment Group;[4] J.C. Flowers & Co.; Deutsche Bank; and John Does #1-10.  (Cplt. ¶¶ 13-16, 24, 27-42.)  Again, exactly what role any of these parties played in the conspiracy, or what was allegedly in it for them, is left entirely to conjecture.

Although they proclaim Soros the "mastermind" of the RICO Enterprise, the best Plaintiffs can allege, in terms of when the alleged RICO racketeering activity commenced, is that "on information and belief," at or around June 2002, "the head of the Enterprise, George Soros, *or someone else acting on behalf of the Enterprise*, began implementing the pattern of racketeering activities" through the Conseco Chapter 11 filing.  (Cplt. ¶ 164 (emphasis added).)  During a four-month period beginning around August 2002, Soros is alleged to have "set up the RICO conspiracy," with the "first step of the Enterprise" supposedly being to create CFN Holdings, LLC ("CFN Holdings") in August 2002 to acquire Conseco Finance, one of the Conseco Chapter 11 debtor entities.  (Cplt. ¶¶ 187-88.)  How Soros was able to accomplish this is unclear, since the

---

[4]     Although Plaintiffs repeatedly refer in the Complaint to "Fortress Investment Group," they have named FIG LLC, an indirect subsidiary of Fortress Investment Group LLC, as a defendant in this action.

members of CFN Holdings allegedly were Cerberus, Fortress Investment Group, and J.C. Flowers (not Soros). In any event, totally missing from the Complaint are any *facts* indicating how the acquisition of Conseco Finance by CFN Holdings furthered the goals of the Enterprise, or even more basic facts such as how the members came together as an Enterprise, or the rationale behind the supposed activities of the Enterprise.

Plaintiffs spend pages and pages of the Complaint discussing the alleged co-conspirators' supposedly fraudulent procedural maneuvers, in and out of Bankruptcy Court, to set up the eventual "sham auction" of the General Motors Building. Ironically, though Soros was the alleged mastermind of the conspiracy, the Soros Defendants are not alleged to have been a party to the Conseco bankruptcy, or to have filed a single piece of paper in the bankruptcy case, or to have participated in the bankruptcy proceedings in any way. Nor are the Soros Defendants alleged to have been parties to the arbitration or any of the related court proceedings involving Trump and Conseco and their affiliates. And as the State Court judge noted, the Soros Defendants did not even conduct the auction or have anything to do with it.[5] Yet magically, somehow, Soros allegedly made the whole nefarious scheme work, and was assisted in that effort by such reputable law firms as Fried Frank and Kirkland & Ellis, as well as the other Defendants.

Tellingly, none of the conduct alleged by Plaintiffs regarding the Conseco bankruptcy action, or any of the ancillary litigation proceedings cited by Plaintiffs, suggests on its face any fraudulent scheme or intent whatsoever. Rather, Plaintiffs point to routine and legitimate bankruptcy procedures and court approvals, such as approving debtor in possession financing, selling assets of the debtor, approving the debtor's retention of professionals, and litigating

---

[5]  *See* Oller Decl. Ex. D (Jan. 18, 2007 Hearing Tr.) at 2, 8 (the Soros Defendants "are even more removed from the transaction than the defendants for which I [previously] granted dismissals" and "are not the ones running this auction").

disputes relating to proofs of claims and adversary proceedings. (*See, e.g.,* Cplt. ¶¶ 197-99, 203, 207-13.) With no factual basis at all, Plaintiffs merely append the conclusory label "bankruptcy fraud" or "money laundering" to all such activity. It is all a complete invention.[6]

After about 70 pages of this, Plaintiffs finally come to the crux of their Complaint: the 2003 sale of the GM Building. (*See* Cplt. ¶¶ 339-73.) A comparison of Plaintiffs' claims in the State Action and Plaintiffs' claims in this Action confirms that both actions are based on the allegedly fraudulent sale of that Building.

For example, Plaintiffs allege in this case that the sellers of the GM Building "never intended to sell the General Motors Building to plaintiff[.]" (Cplt. ¶ 350.) They further allege that the "bidding process was *rigged*" by the Defendants, "and was rife with *fraud*, and in violation of the rule of law that every contract contains an obligation of good faith[.]" (*Id.* ¶ 353 (emphasis added).) These two paragraphs recapitulate the entire substantive basis for their failed State Action. As Plaintiffs' State Complaint alleged: "Conseco and the other defendants . . . conspired to manipulate and fix the 'bidding' process so that their designees, the Macklowe Defendants, would obtain title to the building[.]" (State Cplt. ¶ 27.)

As an additional example, Plaintiffs' Complaint here alleges that "Defendants' racketeering activity and Bid Rigging was a *sham auction* in restraint of trade and violated plaintiffs' right to a *fair auction* and violated Conseco and Eastdil Realty's own bidding procedures." (Cplt. ¶ 368 (emphasis added).) Virtually identical allegations formed the basis of

---

[6]    Mr. Dick's imagination is nothing if not vivid. In the State Action, he filed an affidavit asserting that Mr. Soros was personally spying on him at a bar at Grand Central Terminal. In a prior, equally spurious RICO suit against American Express in this Court (No. 92 Civ. 7753), which also was filed after Mr. Dick lost the same claim in prior state and federal court actions, Mr. Dick submitted an affidavit alleging that Judge Thomas Griesa was involved in a conspiracy of "corruption and obstruction of justice" along with American Express, apparently involving Richard Nixon, Gerald Ford, Henry Kissinger, as well as Mr. Dick's former lawyer and the Clerk of the Southern District.

Plaintiffs' prior promissory estoppel claim.  (*See, e.g.,* State Cplt. ¶ 81 (sale was not conducted

"fairly and equitably"); *id.* ¶ 93 ([t]he Eastdil Defendants improperly allowed the Macklowe

Defendants to submit a late bid, which was deemed 'accepted' as part of the Defendants' bid-

rigging").)

The following chart further illustrates the substantial identity between the allegations in the

State Action and the present Action:

| Amended State Complaint (June 21, 2006) | Present Complaint (Sept. 10, 2008) |
|---|---|
| "[D]espite the fact that Plaintiffs were the **highest bidder** on both the First and Second Rounds of biding . . . defendants improperly disclosed to the Macklowe Defendants the specifics of Plaintiffs' bid and other bids submitted on August 27th and **improperly permitted the Macklowe Defendants to resubmit their bid after the announced closing of the time period for submission.**" (¶ 73.) | "[D]espite the fact that plaintiffs' bid was **the highest and best**, and the fact that Macklowe's bid was below other bidders, was untimely submitted and as part of the commission of Bid Rigging by defendants Conseco, Soros, Vornado, and Kirkland & Ellis, **Harry Macklowe was privately allowed to increase his bid to appear to have won the auction.**"  (¶ 352.) |
| "[D]efendants entered into a scheme and artifice to defraud by designing a "Bid and Acquisition" procedure that gave the appearance of an impartial 'open bid' system when, in truth and in fact, **it was a total sham** with the outcome fixed and predetermined. **Defendants never intended** to award the contract of sale to anyone other than the Macklowe defendants, as nominees of the Soros Defendants, no matter who was the highest bidder." (¶ 70.) | "The terms of the confidentiality agreement were **a sham** and **never intended to be followed** by the racketeering defendants." (¶ 371.) |
| "**Soros** had, indeed, **masterminded** the bid-rigging scheme for the GM Building." (¶ 60.) | "[T]he **mastermind** of the RICO Enterprise, George **Soros**." (¶ 97.) |
| "On or about August 30, 2003, a news article in the New York Times disclosed that defendant **Harry Macklowe was the bid winner** . . . ." (¶ 54.) | "On August 30, 2003, the New York Times reported that **Harry Macklowe won the bid** to purchase the General Motors Building for 1.4 Billion Dollars." (¶ 372.) |
| "On September 30, 2003, Peter Slatin (The Slatin Report) wrote an article disclosing that | "The **cumulative appearance of such transactions was that Macklowe had** |

| | |
|---|---|
| the Soros Defendants had taken an equity interest in the transaction of $350 Million (including the $50 Million deposit made by Macklowe), essentially making Soros the real purchaser of the Building. In addition, the article disclosed Vornado Realty Trust had acquired the mezzanine debt, valued at close to $250 Million." (¶ 56.) | invested 300 Million Dollars into Fifth Avenue 58/59 Acquisition Co., in effect, controlling Fifth Avenue 58/59 Acquisition Co., when, in fact, the source of the money was entirely from the RICO Enterprise, Soros, Soros Fund Management, and/or SFM Capital Management, as part of their Money Laundering activities." (¶ 405.) |
| "Upon information and belief, the modus operendi of Soros Defendants was and is to acquire controlling interests in real estate and various companies through a maze of nominee companies . . ." (¶ 7.) | "Upon information and belief, at the end of funneling his illicitly derived funds through a byzantine structure of shell entities, Soros had funneled the sum of 300 Million Dollars through Vornado, German American Bank, Soros Credit Funding I, and Junior Mezzanine into Fifth Avenue 58/59 Acquisition Co. as investments." (¶ 403.) |

In addition to the similarity of pleadings in the State Action and the present Action relating to the core complaint of Plaintiffs' unsuccessful bid for the GM Building, the peripheral allegations in the State Complaint relating to the Conseco bankruptcy proceedings are repeated and re-cast in the present Action as "bankruptcy fraud." For example:

| Amended State Complaint (June 21, 2006) | Present Complaint (Sept. 10, 2008) |
|---|---|
| "On April 23, 2003, Conseco withdrew its application to employ Eastdil as a Realtor while, at the same time, failing to disclose to the Bankruptcy Court that it intended for Eastdil to continue to play a key role in the transaction." (¶ 20.) | "In furtherance of the RICO conspiracy of the RICO Enterprise, on April 14, 2003, Eastdil Realty withdrew its application to be retained by Conseco as the seller's agent of the General Motors Building since Eastdil Realty, in its conspiracy with Conseco, George Soros and Donald J. Trump, knew that the General Motors Building would never be sold under the jurisdiction of the Bankruptcy Court." (¶ 316.) |
| "Eastdil was instrumental in the bid-rigging conspiracy, and orchestrated an unauthorized and fraudulent 'bidding' process that bore little if any relationship to the auction process described in Bankruptcy Court filings." (¶ 20.) | "Conseco retained Eastdil Realty to sell the General Motors Building outside the purview of the Bankruptcy Court, in furtherance of the RICO Enterprise." (¶ 339.) |
| "[T]he Soros Defendants obtained effective | "The racketeering activity of the RICO |

| | |
|---|---|
| **control over the assets of Conseco Finance** Corp. ("CFC") through CFN Investment Holdings, LLC, a joint venture led by Fortress Investment Group LLC . . ." (¶ 7.) | Enterprise involved in the Bankruptcy Fraud included Fortress Financial and Cerberus, who **acquired an interest in Conseco** in two ways: (a) **by purchasing Conseco Finance**, and (b) by obtaining Debtor in Possession Financing of Conseco through racketeering activities constituting Money Laundering and Bankruptcy Fraud **to control the Conseco Bankruptcy** from the inside."  (¶ 166.) |
| "**Fortress** Investment Group LLC, the same **Soros**-controlled entity that provided Conseco, Inc. with debtor in possession financing through and affiliate (**FPS DIP** LLC). . . ." (¶ 7.) | "**FPS DIP** was also controlled by **Fortress** Investment Group and George **Soros** . . ." (¶ 191.) |

## IV.     PLAINTIFFS' FIVE-YEAR DELAY IN ASSERTING THEIR RICO AND ANTITRUST CLAIMS.

On November 24, 2003, shortly after the closing of the GM Building sale to Macklowe, Leslie Dick sent a letter to Eastdil, copied to Soros, Macklowe and others, alleging that there was "*no reasonable explanation other than bid rigging*" for why Plaintiffs' bid on the GM Building was not accepted.  (*See* Oller Decl. Ex. G (Nov. 24, 2003 Ltr.) at 2 (emphasis added).)  In the letter, Dick asserted that he had claims against Soros and others under various state and federal laws, *including RICO and the Sherman Act.*  He further stated his "opinion that Mr. George Soros masterminded the alleged crime from the very beginning . . . ." (*Id.* at 4.)

More than two years later, Dick chose to sue the Soros Defendants and others, including Macklowe, Eastdil and Conseco, in New York Supreme Court.  He did not assert any RICO claims in the State Action, despite his statement in the November 2003 letter that he had RICO claims.  After Plaintiffs' State Action was dismissed with prejudice in February 2007 and they had exhausted the appellate process, Plaintiffs asserted the RICO and Sherman Act claims that Dick had alluded to in his November 2003 letter on September 10, 2008 – nearly five years later.

14

**ARGUMENT**

**I.      STANDARD OF REVIEW**

In considering the defense of *res judicata*, the Court "may judicially notice prior pleadings,

orders, judgment, and other items appearing in the court records of prior litigation that are related

to the case before it." *Coleman v. B.G. Sulzle, Inc.*, 402 F. Supp. 2d 403, 418 (N.D.N.Y. 2005)

(internal quotations omitted); *see also Iwachiw v. N.Y.C. Bd. of Educ.*, 194 F. Supp. 2d 194, 201

(E.D.N.Y. 2002) (Court may refer to matters of which judicial notice may be taken, including

"transcripts of various hearings, letters and decisions from the plaintiff's state court action" in

support of motion to dismiss on *res judicata* grounds, without converting motion to one for

summary judgment); *Singh v. Parnes*, 199 F. Supp. 2d 152, 156-58 (S.D.N.Y. 2002) (taking note

of prior state actions to apply *res judicata*).

Similarly, with regard to the statute of limitations, when the facts as pleaded, as well as

those in the public domain, make clear that a plaintiff's claims are time-barred, dismissal as a

matter of law pursuant to Rule 12(b)(6) is appropriate.  *See Ezra Charitable Trust v. Frontier Ins.*

*Group*, No. 00-CV-5361, 2002 WL 87723 (S.D.N.Y. Jan. 23, 2002) (taking judicial notice of a

document with a statement from defendant that was filed in an earlier legal proceeding and

dismissing claims as time-barred); *LC Capital Partners v. Frontier Ins. Group*, 318 F.3d 148, 156

(2d Cir. 2003) ("Where . . . the facts needed for determination of when a reasonable [person] of

ordinary intelligence would have been aware of the existence of fraud can be gleaned from the

complaint and papers . . . integral to the complaint, resolution of the issue on a motion to dismiss

is appropriate.") (internal quotations omitted).

With regard to a plaintiff's factual assertions, the Court must accept material facts as

alleged and construe reasonable inferences in the plaintiff's favor. *See Leeds v. Meltz*, 85 F.3d 51,

53 (2d Cir. 1996); *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995).  However,

15

"bald assertions and conclusions of law will not suffice." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (internal quotations omitted). As the Supreme Court recently held in *Bell Atlantic Corp. v. Twombly*, "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions and a formulaic recitation of the elements of a cause of action will not do." 127 S. Ct. 1955, 1964-65 (2007) (citations and internal quotations omitted). "The pleadings must create the possibility of a right to relief that is more than speculative." *Spool*, 520 F.3d at 183 (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). Further, as the Supreme Court held in *Twombly*, claims of conspiracy require "allegations plausibly suggesting (not merely consistent with) agreement," to meet the "threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" *Twombly*, 127 S. Ct. at 1966.

In addition, when, as here, a RICO plaintiff alleges that one of the predicate acts is fraud, the predicate acts must be pleaded with particularity in accordance with Federal Rule of Civil Procedure 9(b). *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) (holding that heightened pleading requirements apply to a complaint alleging bankruptcy fraud as a predicate act in a RICO case); *Procapui-Productores de Camaroes de Icapui Ltda. v. Layani (Procapui I)*, No. 07-CV-6627, 2008 WL 3338199, at *3 (S.D.N.Y. Jan. 11, 2008) (Jones, J.) ("It is well settled that when a RICO plaintiff alleges that one of the predicate acts is fraud . . . the predicate acts must be pled with particularity.").

Finally, this Court has properly and consistently recognized that "[c]ivil RICO is an unusually potent weapon – the litigation equivalent of a thermonuclear device." *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 163 (S.D.N.Y. 2003) (citation omitted). Because the "mere assertion of a RICO claim . . . has [an] almost inevitable stigmatizing effect on those

16

named as defendants . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (internal quotations omitted).

Applying the above pleading standards and the applicable law, Plaintiffs' Complaint should be dismissed with prejudice.[7]

## II.   PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED.

Plaintiffs' RICO claims fail because (a) they are barred by *res judicata*; (b) they are barred by the statute of limitations; and (c) they do not adequately plead a RICO claim.

### A.   PLAINTIFFS' RICO CLAIMS ARE BARRED BY *RES JUDICATA*.

The heart of Plaintiffs' claims in this Action – and the only basis for a claim of injury to Plaintiffs – is the rejection of their offer to purchase the GM Building.  Plaintiffs' RICO claims are based on wholly made-up allegations that Harry Macklowe was the pre-selected purchaser of the GM Building.  (Cplt. ¶¶ 350-57.)  Apart from their lack of merit, these claims are nothing more than a reincarnation of Plaintiffs' dismissed State Action, which also was based on the same

---

[7]   This Court's recent decision in *Solow v. Conseco, Inc.*, No. 06-CV-5988, 2008 U.S. Dist. LEXIS 9234 (S.D.N.Y. Jan. 11, 2008) does not control the outcome of Defendants' motion in this case. This Court in *Solow* denied in part a motion to dismiss plaintiff Sheldon Solow's claims against Conseco and Carmel Fifth, the only defendants in that action, relating to the GM Building sale, holding that the sellers' reservation of rights was not dispositive of Mr. Solow's fraud and promissory estoppel claims because "at this stage in the litigation, [] a court must accept all allegations in the Complaint as true and construe all reasonable inferences in Plaintiff's favor." *Id.* Here, however, Defendants' *res judicata* and statute of limitations arguments implicate a different standard of review inasmuch as they raise no disputed inferences of fact.  To illustrate, Defendants are not asking this Court to find that the sellers' reservation of rights bars Plaintiffs' claims, but rather to assess whether the prior decision on the merits in the State Action is *res judicata* on Plaintiffs' claims in this Action.  The latter requires consideration of only undisputed facts and matters in the record, such as Plaintiffs' allegations in both actions.  Likewise, Defendants' statute of limitations arguments are based on undisputed facts alleged in Plaintiffs' own Complaint. Finally, the Court's decision in *Solow* does not bear on the inadequacy, as a matter of law, of the Complaint's RICO allegations concerning pattern, enterprise and other elements, or the legal insufficiency of the antitrust claim.

allegations that the GM Building sale was "rigged" in Harry Macklowe's favor.  The dismissal of Plaintiffs' state claims is *res judicata* on their RICO claims in this case.

As a federal court, this Court is required to give full faith and credit to the decisions in the State Action to the same extent that New York courts would credit those decisions.  *See Migra v. Waren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 80 (1984); *Singh*, 199 F. Supp. 2d at 158; *see also Donovan v. Lewnowski*, No. 03-CV-2985, 2005 WL 2095739, at *3 (E.D.N.Y. Aug. 30, 2005) ("New York law will determine the preclusive effect of the [New York] state court action on the instant matter.").  And under New York law, *res judicata* bars Plaintiffs' RICO claims against the Soros Defendants and others here because those claims arise from the same factual matrix as the claims adjudicated to a final judgment on the merits in the prior State Action, are between the same parties or those in privity with them, and could have been brought in the State Action.  *See Sandhu v. Mercy Med. Ctr.*, 864 N.Y.S.2d 124, 124 (2d Dep't 2008); *see also Spitzer v. Applied Card Sys., Inc.*, 11 N.Y.3d 105, 122 (2008) ("In New York, res judicata, or claim preclusion, bars successive litigation based on the 'same transaction or series of connected transactions' if: (i) there is a judgment on the merits rendered by a court of competent jurisdiction, and (ii) the party against whom the doctrine is invoked was a party to the previous action, or in privity with a party who was.") (internal citations omitted).

New York courts follow a transactional approach to *res judicata* and give preclusive effect to prior decisions based on the "same transaction" test, such that any final decision on the merits bars all subsequent claims arising from the same transaction or series of transactions, even if based on different legal theories.  *See Smith v. Russell Sage Coll.*, 54 N.Y.2d 185, 192-93 (1981); *see also Giannone v. York Tape & Label, Inc.*, -- F.3d --, 2008 WL 5061801, at *3 (2d Cir. Dec. 2, 2008).  In addition, *res judicata* applies so long as the party sought to be precluded (here, Leslie Dick and Leslie Dick Worldwide) is the same party, or in privity with the parties, who were

18

unsuccessful in the prior action.  *See Applied Card Sys.*, 11 N.Y.3d at 122.  And the doctrine

applies "both to claims asserted and claims that could have been asserted in the prior action so

long as the party to be precluded had a full and fair opportunity to litigate those claims."

*Donovan,* 2005 WL 2095739, at *3; *see also Santiago ex rel. Garcia v. Bd. of Health*, 779

N.Y.S.2d 474, 476 (1st Dep't 2004) ("What matters is that the latter claims could have been

asserted in the first action and [plaintiff] had a full and fair opportunity to litigate those claims in

that action"); *Schwartzreich v. E.P.C. Carting Co., Inc.*, 668 N.Y.S.2d 370, 372 (1st Dep't 1998)

("If the party against whom res judicata is invoked had a full and fair opportunity to litigate the

claim in a prior proceeding based on the same transaction, but did not raise it therein, he will be

barred from raising it in a subsequent action.").

     All of the elements of *res judicata* are satisfied here.  First, the "same transaction" test is

clearly met.  Though the present Complaint is more convoluted and perplexing, the gravamen of

the wrong alleged in both the State Action and the present Action is the same:  Plaintiffs were

injured when they participated in an alleged "sham auction" where the winner of the bid was fixed

in advance, contrary to the terms of the bidding process set forth in the relevant documents.  (*See,*

*e.g.*, State Cplt. ¶ 70; Cplt. ¶ 353.)  The 2003 sale is the sole cause of the alleged harm to Plaintiffs

in both actions, and the hundreds of allegations added to the present Complaint – essentially

irrelevant to Plaintiffs' alleged injury – do not serve to change the fundamental basis of Plaintiffs'

claims.  *See, e.g., Smith*, 54 N.Y.2d at 193 (finding second action precluded by *res judicata*

because, "Though embellished by later events, both originate from the identical agreement.").

     Although the present Action now invokes legal theories of RICO and antitrust, that does

not preclude the application of *res judicata* because Plaintiffs rely on the same core set of facts as

they did in the State Action to make their claims.  *See Saud v. Bank of New York*, 929 F.2d 916,

919 (2d Cir. 1991) ("it does not matter that a RICO claim was not expressly asserted in the [prior

state court] Action, '[f]or it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies'") (quoting *Expert Elec., Inc. v. Levine*, 554 F.2d 1227, 1234 (2d Cir. 1977)); *see also Singh*, 199 F. Supp. 2d at 158 ("a party cannot avoid the preclusive effect of *res judicata* or collateral estoppel by recasting allegations of fraud adjudicated in [a] prior litigation as a federal RICO action").

Here, the facts surrounding the transactions in both actions are essentially the same.  Both actions allege, among other things, that:  Plaintiffs submitted the highest and best bid (State Cplt. ¶ 49; Cplt. ¶ 352); Soros, Macklowe, Conseco, Eastdil and others rigged the bids to have Macklowe prevail as the winning bidder (State Cplt. ¶ 70; Cplt. ¶ 353); Plaintiffs were damaged when the bidding procedures were not followed (State Cplt. ¶¶ 44, 81; Cplt. ¶¶ 341, 344, 346); the Soros Defendants took effective control of the GM Building despite the fact that it was conveyed to Macklowe (State Cplt. ¶ 7; Cplt. ¶ 375); and Soros-related entities and other participants in the GM Building purchase also invested in the Trump International Building in Chicago (State Cplt. ¶ 57; Cplt. ¶ 415).

Furthermore, the harm alleged in both actions – that Plaintiffs were defrauded out of the GM Building – is the same.  Thus, the factual predicate underlying both actions is substantially the same, regardless of the different legal theories asserted. *See, e.g., Singh*, 199 F. Supp. 2d at 158 (dismissing federal RICO claims based on "same transaction" as prior dismissed state actions claiming fraud in connection with the sale of a building); *Donovan*, 2005 WL 2095739, at *5 (dismissing federal RICO claim on *res judicata* grounds based on prior state court dismissal of state law claims that were factually related); *Official Publ'ns, Inc. v. Kable News Co.*, 811 F. Supp. 143, 146-47 (S.D.N.Y. 1993) (stipulation of dismissal with prejudice in state court action barred subsequent RICO claim in federal court arising out of same transaction); *Printing Mart-Morristown, Inc. v. Rosenthal*, 650 F. Supp. 1444 (D.N.J. 1987) (applying "transaction based" test

for *res judicata* to bar later RICO suit based on alleged bid rigging scheme where earlier state court action dismissed claim for tortious interference based on same alleged scheme; notwithstanding allegations in the federal complaint of RICO predicate acts committed subsequent to state court dismissal).

The "identity of parties" test is also met. The Plaintiffs in this action (Leslie Dick Worldwide and Leslie Dick) are identical to those who were unsuccessful in the State Action. Moreover, the Soros Defendants (George Soros and Soros Fund Management, LLC) were both defendants in the State Action.[8]

Next, the prior dismissal of all claims in the State Action against the Soros Defendants "with prejudice" constitutes a final adjudication on the merits. *See Yonkers Contracting Co. v. Port Auth.*, 93 N.Y.2d 375, 380 (1999) (the phrases "with prejudice" and "on the merits" are interchangeable because "A dismissal 'with prejudice' generally signifies that the court intended to dismiss the action 'on the merits,' that is, to bring the action to a final conclusion against the plaintiff").[9]

Finally, it is well-settled that the RICO claims could have been brought in the prior State Action. *See Tafflin v. Levitt*, 493 U.S. 455 (1990) (federal and state courts have concurrent

---

[8] The separate briefs of the non-Soros Defendants explain why *res judicata,* as well as issue preclusion, bar Plaintiffs' claims against those Defendants as well.

[9] The November 29, 2006 opinion and order and corresponding judgment entered on December 20, 2006 in favor of the non-Soros Defendants in the State Action also constitutes a final judgment on the merits as to those Defendants. The New York Supreme Court's dismissal of Plaintiffs' claims as to those Defendants pursuant to CPLR § 3211(a)(1) and (a)(7) constituted a dismissal on the merits. *See Feigen v. Advance Capital Mgmt. Corp.*, 536 N.Y.S.2d 786, 788 (1st Dep't 1989) (dismissal of a complaint based on documentary evidence is a disposition on the merits for *res judicata* purposes); *Flynn v. Sinclair Oil Corp.*, 246 N.Y.S.2d 360, 361 (1st Dep't 1964) (second action barred by *res judicata* when the complaint is virtually identical to the one previously dismissed for failure to state a cause of action and no appeal was taken of that dismissal); *see also Strange v. Montefiore Hosp. and Med. Ctr.*, 59 N.Y.2d 737, 738 (1983) (judgment need not contain the "precise words 'on the merits' in order to be given *res judicata* effect") (internal citations omitted).

jurisdiction over RICO claims); *Official Publ'ns*, 811 F. Supp. at 147 (citing *Simpson Elec. Corp. v. Leucadia, Inc.*, 72 N.Y.2d 450 (1988)) (same). That Plaintiffs chose not to assert RICO claims in the State Action does not matter for purposes of *res judicata* because they could have brought those claims in the State Action. *Official Publ'ns*, 811 F. Supp. at 147; *Donovan*, 2005 WL 2095739 at *5; *Santiago*, 779 N.Y.S.2d at 476.

In sum, because the RICO claims asserted in the present Action are based on the same factual grouping as the claims previously brought to a final adjudication on the merits in the State Action, are brought by the same Plaintiffs against the same Soros Defendants as in the State Action, and could have been brought in the State Action, they are barred by the doctrine of *res judicata.*

**B.  PLAINTIFFS' RICO CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.**

Civil RICO claims are subject to a four-year statute of limitations, which begins to run once a plaintiff "discovers or should have discovered the RICO injury." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 58 (2d Cir. 1998); *see also Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir. 1988) *cert. denied*, 490 U.S. 1007 (1989) (same). The RICO statute of limitations test "is an objective one, to wit, when a reasonable person should have discovered the RICO injury, the RICO statute of limitations will start to run." *In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*, 850 F. Supp. 1105, 1118 (S.D.N.Y. 1993); *see also Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402, 1408 (S.D.N.Y. 1996) ("the test is an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings").

The undisputed and objective record here demonstrates that Plaintiffs discovered their alleged RICO injury more than four years before filing the September 10, 2008 Complaint

asserting RICO claims.  There is no question that Plaintiffs discovered, or should have discovered, their alleged RICO injury when they "lost" the bidding contest for the GM Building on August 27, 2003.  No later than August 30, 2003, when the *New York Times* published an article stating that Macklowe "won the bid to purchase the General Motors Building for 1.4 Billon Dollars," Plaintiffs – who claim their $1.5 billion bid was the "highest and best" – knew that the GM Building was not, in fact, awarded to the so-called highest bidder.  (Cplt. ¶¶ 372, 364, 350.)  These undisputed facts, coupled with Plaintiffs' allegations that the sale did not "adhere to the bidding procedure or the rules of the bidding process" which "were relied upon plaintiff" (*id.* ¶¶ 350, 346), and that they were previously assured that the property would go to the highest bidder (State Cplt. ¶ 85), were sufficient to apprise Plaintiffs of their injury.

Lest there be any doubt about this, Plaintiffs' November 24, 2003 letter to certain Defendants shows that Plaintiffs discovered their injury – at the very latest – nearly five years before filing the Complaint.  In the letter to Eastdil, copied to Soros, Macklowe, and others, Plaintiffs alleged that there was "*no reasonable explanation other than bid rigging*" for why Plaintiffs' bid on the GM Building was not accepted, and asserted that Plaintiffs had claims *under RICO and the Sherman Act.*[10]  Because, in November 2003, Plaintiffs not only "suspected," but affirmatively *asserted*, that they had suffered RICO injuries in connection with the GM Building sale, their failure to bring the RICO claims until September 10, 2008, nearly five years later, bars the RICO claims.

---

[10]      *See* Oller Decl. Ex. G (Nov. 24, 2003 Ltr.) at 2 (emphasis added).  Because the letter is part of the public record in the State Action (Oller Decl. Ex. G), and is being used not to prove the truth of its contents but instead for the fact of what it said, the Court may take judicial notice of the letter in considering a motion to dismiss the federal court action without converting the motion to one for summary judgment.  *See Ezra Charitable Trust*, 2002 WL 87723, at *3 n.1.

It does not matter that Plaintiffs may not have been able to quantify the full extent of their alleged injury until Macklowe sold the GM Building in 2008 "for the sum of $2.8 Billion Dollars, or a 1.4 Billion Dollar profit." (Cplt. ¶ 423.)[11]  Because Plaintiffs were on notice of their injury (and claims of fraud) in 2003, the statute of limitations began to run then and was not tolled pending quantification of their actual injury. *See Takeuchi v. Sakhai*, No. 06-CV-0818, 2007 WL 2028892, at *1 (2d Cir. Jul. 12, 2007) ("plaintiffs' 'actual injury' argument is unavailing" since plaintiffs were on inquiry notice as to any possible injury when they were put on notice of possible misrepresentations much earlier).

Nor do allegations concerning conduct by the Defendants post-2003 save Plaintiffs' time-barred RICO claims.  For example, Plaintiffs allege that in 2007, Macklowe purchased seven other office buildings in "highly leveraged transactions" that were "in furtherance of the RICO Enterprise." (Cplt. ¶ 424.)  But these transactions (none of which is alleged to have involved Soros) are not alleged to have caused any injury to Plaintiffs, and therefore cannot support Plaintiffs' RICO claims. *See, e.g.*, *Bankers Trust*, 859 F.2d at 1103 ("[C]ongress tied the right to sue for damages under § 1964(c) . . . to the time when plaintiff suffers injury to '*his business or property*' from the violation.") (emphasis added).

It is true that "each time a plaintiff suffers an injury caused by a violation of 18 U.S.C. § 1962, a cause of action to recover damages based on *that injury* accrues to plaintiff at the time he discovered or should have discovered the injury." *Bankers Trust*, 859 F.2d at 1103 (emphasis added).  However, "[a] necessary corollary of the separate accrual rule is that plaintiff may only recover for injuries discovered or discoverable within four years of the time the suit is brought."

---

[11]     Plaintiffs apparently use the $1.4 billion profit figure, trebled, to come up with their damages claim of $4.2 billion.  (Cplt. ¶ 448.)  It is not clear why Plaintiffs do not use $1.3 billion ($2.8 billion less Plaintiffs' own alleged "high bid" of $1.5 billion), but like much in the Complaint, it makes little sense and matters even less.

*See Bingham v. Zolt*, 66 F.3d 553, 559-60 (2d Cir. 1995). That is, a plaintiff "cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997).

Thus, even if the 2007 and 2008 transactions alleged by Plaintiffs constituted new predicate acts – and they do not – they neither harmed Plaintiffs nor serve to extend the statute of limitations for the RICO injury allegedly suffered by Plaintiffs in 2003 upon the sale of the GM Building.

In short, because Plaintiffs' only alleged RICO injury was both caused and discovered in 2003 upon their unsuccessful bid for the GM Building, Plaintiffs' 2008 RICO claims are barred by the four-year statute of limitations.

### C.   PLAINTIFFS FAIL TO ALLEGE A VIOLATION OF THE RICO STATUTE.

#### 1.   Plaintiffs lack standing to assert claims based on their money laundering and bankruptcy fraud allegations.

As a threshold matter, Plaintiffs lack standing to assert RICO claims based on most of the events and occurrences alleged in the Complaint. Plaintiffs' only alleged injury stems from the 2003 sale of the GM Building. However, having already litigated and lost their claims stemming from the alleged "sham auction" of the GM Building, Plaintiffs now fill their new Complaint with allegations concerning events and transactions to which they are strangers, and from which they allege no injury, including allegations of bankruptcy fraud, money laundering and other sundry alleged misdeeds. Under established law, Plaintiffs lack standing to bring a RICO claim based upon activities that did not cause them harm.

For purposes of a civil RICO claim, "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property *by the conduct*

*constituting the [RICO] violation.*"  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)

(emphasis added); *see also* 18 U.S.C. § 1964(c); *Holmes v. Securities Investor Protection Corp.*,

503 U.S. 258, 268 (1992); *Bankers Trust*,  859 F.2d at 1100.  The only injury Plaintiffs have or

can articulate is the alleged denial of an opportunity to purchase the GM Building in 2003.

Plaintiffs allege no injury based on the acts that pre-dated that sale, or from any post-sale events

(in fact, Plaintiffs do not even allege any contact with Defendants after August 2003).  As a result,

Plaintiffs have no standing to assert RICO claims based on alleged acts other than the sale of the

GM Building.

In any event, as discussed below, none of Plaintiffs' allegations, including those based on

the GM Building and all of the other assorted matters, is sufficient to allege a violation of RICO

sections 1962(a), (b), (c) or (d), the RICO sections on which Plaintiffs rely.

### 2.    Plaintiffs fail to allege a violation of section 1962(c).

To state a civil claim for damages under section 1962(c), a plaintiff must allege (1) that the

defendant (2) through the commission of two or more predicate acts (3) constituting a "pattern"

(4) of "racketeering activity" (5) directly or indirectly participates in (6) an "enterprise" (7) the

activities of which affect interstate or foreign commerce.  *See Moss v. Morgan Stanley Inc.*, 719

F.2d 5, 17 (2d Cir. 1983); 18 U.S.C. § 1962(c).  Plaintiffs have not adequately pleaded several of

these elements, including at least (a) an *enterprise*; (b) *predicate acts*; and (c) a *pattern*.

### a.    Plaintiffs fail to allege a cognizable RICO enterprise.

The Complaint must be dismissed because Plaintiffs fail to allege a cognizable RICO

enterprise.  "'Enterprise' is defined to 'include[] any individual, partnership, corporation,

association, or other legal entity, and any union or group of individuals associated in fact although

not a legal entity.'"  *Bankers Trust*, 741 F.2d at 515 (quoting 18 U.S.C. § 1961(4)).  The Supreme

Court has explained that a RICO enterprise is "a group of persons associated together for a

26

common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an *ongoing organization*, formal or informal, and by evidence that the various associates function as a *continuing unit*." *United States v. Turkette*, 452 U.S. 576, 583 (1981) (emphasis added); *see also Tenamee v. Schmukler*, 438 F. Supp. 2d 438, 448 (S.D.N.Y. 2006) (RICO plaintiff must allege that enterprise members "functioned as an integrated unit").

Here, Plaintiffs never even identify the alleged "Enterprise." At times, they say it is an "association in fact" Enterprise involving all Defendants. (Cplt. ¶ 42.) Elsewhere, they claim that the Soros Defendants, Vornado, German American, Fortress Investment Group and Trump are "Enterprise members," and the rest of the Defendants are merely "RICO co-conspirators." (*Id.* ¶¶ 13-41.) And, in places, they even suggest the Enterprise is Defendant Conseco, through which other Defendants allegedly "conduct[ed] the affairs . . . through a pattern of racketeering activity." (*Id.* ¶¶ 165-66.) Adding to the confusion, the Complaint never explains what criteria distinguish a Defendant that is a member of the Enterprise from one that is not. *See United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 475 (E.D.N.Y. 2007) (finding no enterprise where the complaint failed to detail the membership of the enterprise, and the criteria that distinguish members from non-members).

Plaintiffs also appear unsure whether the alleged Enterprise is active or passive. In some places, they seem to allege that the Enterprise is a conduit for the allegedly illegal actions of the various Defendants, consistent with the proposition that "the enterprise itself is often a passive instrument or victim of the racketeering activity." *Bennett v. United States Trust Co.*, 770 F.2d 308, 315 (2d Cir. 1985). (*See, e.g.*, Cplt. ¶¶ 165-67.) Yet, elsewhere, they suggest that the Enterprise is not a vehicle, but itself is the actor committing the predicate acts. (*See, e.g.*, Cplt. ¶¶ 61, 166, 182, 183, 187, 188, 190, 241, 247.)

27

Plaintiffs apparently rely on this Court to make sense of the Complaint and divine an Enterprise somewhere. However, leaving the definition of the Enterprise to guesswork simply will not do. A RICO plaintiff "has to allege an actual enterprise rather than to express willingness to assert whatever enterprise the court approves." *In re Ins. Brokerage Antitrust Litig.*, Nos. 04-CV-5184, 04-CV-1079, 2007 WL 1062980, at *27 (D.N.J. Apr. 5, 2007).

Even assuming Plaintiffs intend to define the Enterprise as an "association in fact" consisting of "all Defendants," such an alleged Enterprise is hopelessly vague and overbroad. "Such a nebulous, open-ended description of the enterprise does not sufficiently identify this essential element of a RICO offense." *Richmond v. Nationwide Cassel, L.P.*, 52 F.3d 640, 645 (7th Cir. 1995); s*ee also First Capital*, 385 F.3d at 175 ("Plaintiffs' conclusory naming of a string of entities does not adequately allege an enterprise") (internal quotation marks omitted); *In re Investors Life Ins. Co. Annuity Mktg. and Sales Practices Litig.*, Nos. 04-CV-3329, 04-CV-3799, 2006 WL 1531152, at *9 (E.D. Pa. June 2, 2006) ("When it comes to associations in fact . . . there is a greater risk that the RICO statute might be improperly employed to string together predicate acts by unconnected defendants") (internal quotation marks omitted).

Moreover, the RICO claim fails because the Complaint never explains how this far-reaching enterprise (whatever its members) functioned as a single, "continuing unit" (*see Turkette*, 452 U.S. at 583), or as an "integrated unit" (*see Tenamee*, 438 F. Supp. 2d at 448). The Complaint does not, as it must, "present specific details of any hierarchy, organization, or unity" among the Defendants, or "any solid information regarding the hierarchy, organization, and activities of [the] alleged association-in-fact enterprise from which [the court] could fairly conclude that its members functioned as a unit." *See Procapui-Productores de Camaroes de Icapui Ltda. v. G.F. Higgins, Inc. (Procapui II)*, No. 07-CV-6627, 2008 WL 3338200, at *3 (S.D.N.Y. Aug. 8, 2008) (Jones, J.) (internal quotation marks omitted). It likewise does not indicate that in carrying out the

28

alleged predicate acts, the Defendants "were carrying out the affairs of an unlawful enterprise as defined by the statute, rather than their own affairs or those of their institutional employers, principals or partners." *Singh*, 199 F. Supp. 2d at 163.  Instead, the Complaint "leaves a plethora of unanswered questions regarding the membership, purpose, and structure of that entity." *See Longshoremen's*, 518 F. Supp. 2d at 475 ; *see also First Capital*, 385 F.3d at 175 (dismissing RICO claim alleging association-in-fact enterprise where the plaintiffs' "indifferent attempts to plead the existence of an enterprise fall short of their goal in that they frustrate assiduous efforts to identify its membership, its structure (formal or informal) or its functional unity") (internal quotations omitted).

For example, what is the decision-making structure of the Enterprise?  Who holds what positions?  How are instructions conveyed between its members?  How does one become a member of, or terminate membership in, the Enterprise?  What common purpose or goal did all members share?  The Complaint provides no answers, and Plaintiffs cannot get by with a conclusory assertion that all of these Defendants (or whatever group of them Plaintiffs chooses) constituted an enterprise. *See Int'l Paint Co., Inc. v. Grow Group, Inc.*, 648 F. Supp. 729, 731 (S.D.N.Y. 1986) ("A general assertion that a group of defendants constituted an 'enterprise' does not suffice.").

Finally, the Complaint fails to allege that the alleged Enterprise is anything more than the alleged conspiracy by Defendants to commit predicate acts of racketeering.  A RICO enterprise must have some existence separate and apart from the acts of racketeering it is alleged to have committed.  As the Supreme Court held in *Turkette*, "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." 452 U.S. at 583; *see also Longshoremen's*, 518 F. Supp. 2d at 468-74 (RICO enterprise must be distinct from predicate acts).  "Although a pattern of racketeering activity may be the

29

means through which the enterprise interacts with society, it is not itself the enterprise, for an enterprise is defined by what it *is*, not what it *does*." *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 (7th Cir. 2000) (emphasis added). Here, at most, Plaintiffs allege what Defendants did – conspire to rig the sale process for the GM Building – but they have not identified what the alleged Enterprise is, separate and apart from the alleged conspiracy to commit predicate acts. The alleged Enterprise "is simply an incoherent aggregation of the various predicate acts alleged and arranged in an ad hoc manner," thereby "rendering the question of its empirical existence simply unintelligible." *Longshoremen's*, 518 F. Supp. 2d at 475. Accordingly, the RICO claims fail for this reason as well.

### b.      Plaintiffs fail to allege the requisite predicate acts.

Plaintiffs' RICO claims also fail to sufficiently allege the commission of predicate acts of racketeering activity. The alleged predicate acts are (i) bid rigging; (ii) bankruptcy fraud; and (iii) money laundering. The first, bid rigging, is not even a RICO predicate act. As for the other two alleged predicate acts – money laundering and bankruptcy fraud – they do not support a RICO claim here, either. As discussed above, Plaintiffs do not have standing to bring RICO claims based on these alleged activities, because they were not injured by this alleged conduct. And as discussed below, these predicate are not adequately pleaded in any event.

### i.      Bid rigging is not a RICO predicate act.

The RICO statute defines "racketeering activity" as consisting of specific enumerated crimes. 18 U.S.C. § 1961(1)(B). Bid rigging, while potentially an antitrust violation, is not on this enumerated list, and thus cannot be a predicate act under RICO. *See Mount v. Ormand*, No. 91-CV-125, 1991 WL 191228, at *2 (S.D.N.Y. Sept. 18, 1991) ("violations of the anti-trust laws" are not RICO predicate acts); *Team Obsolete Ltd. v. A.H.R.M.A. Ltd.*, No. 01-CV-1574, 2002 WL 719471, at *7 (E.D.N.Y. Mar. 1, 2002) ("the alleged Sherman Act violations . . . [do not]

30

constitute predicate acts under RICO"); *Schwartz v. Hosp. of Univ. of Pa.*, No. 88-CV-4865, 1993

WL 153810, at *7 (E.D. Pa. May 7, 1993) ("Courts have consistently held that an antitrust

violation is not a RICO predicate act.") (citing cases).

### ii.    Plaintiffs fail to allege bankruptcy fraud.

Although bankruptcy fraud can constitute a RICO predicate act, Plaintiffs fail to

adequately plead it.  A claim of bankruptcy fraud, like any fraud claim, is subject to the

particularity requirements of Federal Rule of Civil Procedure 9(b).  *See First Capital*, 385 F.3d at

178 (holding that heightened pleading requirements apply to a complaint alleging bankruptcy

fraud as a predicate act in a RICO case).  The Complaint fails to meet this standard.

To begin with, Plaintiffs do not even specify which of the nine subsections of 18 U.S.C.

§ 152 the Soros Defendants, or other Defendants, are alleged to have violated.[12]  For this reason

alone, the Complaint fails to allege bankruptcy fraud with sufficient particularity.  *See In re*

*Verestar, Inc.*, 343 B.R. 444, 470-71 (Bankr. S.D.N.Y. 2006) ("although a complaint ordinarily

does not have to specify the statute relied on, the requirement that claims subject to the standards

of Rule 9(b) be pleaded with particularity has been construed to require particularity in pleading

the statutory basis for a claim"); *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp.

1260, 1270 n.12 (S.D.N.Y. 1991) (dismissing fraud claim under Rule 9(b) because plaintiffs failed

to indicate the state statutes under which they sought relief); *Kunzweiler v. Zero.Net, Inc.*, No.

---

[12]    The elements of claims under these various subsections can differ widely, from subsection 152(1) ("knowingly and fraudulently conceal[ing] from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor") to subsection 152(2) ("knowingly and fraudulently mak[ing] a false declaration, certificate, verification, or statement under penalty of perjury . . . in or in relation to any case under title 11") to subsection 152(8) ("knowingly and fraudulently conceal[ing], destroy[ing], mutilat[ing], falsif[ying], or mak[ing] a false entry in any recorded information . . . relating to property or financial affairs of a debtor").  18 U.S.C. § 152(1)-(9).

CIV.A.3:00-CV-2553-P, 2002 WL 1461732, at *15 n.18 (N.D. Tex. July 3, 2002) ("When claims are statutory in nature and require some showing of fraud, Rule 9(b) requires the plaintiff to identify in the complaint the specific statute upon which relief is sought.").

The "factual" allegations of bankruptcy fraud also lack particularity. Nowhere does the Complaint allege that the Soros Defendants were a party to or participated in the Conseco bankruptcy proceedings. Indeed, the Soros Defendants filed no motions or papers in conjunction with these proceedings. All the Complaint contains are conclusory statements that George Soros masterminded the bankruptcy fraud (Cplt. ¶ 241), "controlled" Conseco's DIP financier (*id.* ¶ 191), and encouraged the dispute between Trump and Conseco over the ownership of the GM Building (*id.* ¶ 128). There are no particularized allegations to supply the requisite who, what, when, where, and how of the fraud allegations. *See Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999) ("In the RICO context, Rule 9(b) calls for the complaint to specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.") (internal quotation marks omitted). Plaintiffs' conclusory statements are patently insufficient under Rule 9(b).

Furthermore, at numerous points in the Complaint, Plaintiffs lump all Defendants together, failing to detail their precise roles. For example, the Complaint alleges: "[T]he Enterprise engaged in a pattern of racketeering activity with Soros, SFM Management, Soros Fund Management, Fortress Investment Group, Cerberus, Conseco, Lazard, Kirkland & Ellis, [and] Fried Frank Harris Shriver & Jacobson, to prepare the Conseco bankruptcy proceeding to allow . . . the RICO Enterprise to Launder Money through the Conseco Bankruptcy. . . ." (Cplt. ¶ 182.) To the extent that Plaintiffs try to "lump" the Soros Defendants with the other Defendants, and vice versa, the allegations fail under Rule 9(b). "Where there are multiple defendants, as in the instant

32

case, a court may reject, for want of particularity, complaints that group defendant together or fail to particularize the wrongful acts attributable to each defendant." *Procapui I*, 2008 WL 3338199, at *2-3 (Jones, J.) (citing *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247-48 (2d Cir. 1987)).

Thus, Plaintiffs' generalized claims of bankruptcy fraud as a predicate act fail as a matter of law.

### iii.    Plaintiffs fail to allege money laundering.

Plaintiffs also fail to allege money laundering.  To plead money laundering, Plaintiffs must allege that (1) Defendants knowingly conducted a monetary transaction in criminally derived property; (2) the property had a value greater than $10,000; and (3) the property was in fact derived from "specified unlawful activity." *See* 18 U.S.C. § 1957(a); *Crown Heights Jewish Cmty. Council, Inc. v. Fischer*, 63 F. Supp. 2d 231, 239 (E.D.N.Y. 1999); *Bernstein v. Misk*, 948 F. Supp. 228, 236 n.2 (E.D.N.Y. 1997) (plaintiff must allege that defendant conducted a financial transaction in interstate commerce "with knowledge that the property involved in the transaction represented some form of unlawful activity" and "with the transaction in fact involving the proceeds of specified unlawful activity").  Conclusory assertions that Defendants laundered funds for the Enterprise are insufficient.  *See Bernstein*, 948 F. Supp. at 228.

Here, Plaintiffs' assertions that Soros or the other Defendants laundered funds for the Enterprise are wholly conclusory.  While the Complaint contains sporadic and vague references to "illegal activities" of the Soros Defendants (Cplt. ¶ 386), "proceeds of unlawful activity" (*id.* ¶¶ 388, 390, 398), "illicitly derived funds" (*id.* ¶ 403), and "dirty money transfers" (*id.* ¶ 393), the Complaint contains no allegations detailing what "specified unlawful activity" supplied the "criminally derived property." *See, e.g., W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*, No. 03-CV-8606, 2004 WL 2187069, at *9 (S.D.N.Y. Sept. 29, 2004) ("[I]n the absence

of allegations concerning a 'specified unlawful activity,' no claim for money laundering may withstand a motion to dismiss.").[13]  Thus, the Complaint does not adequately allege money laundering as a RICO predicate act.

**c.      Plaintiffs fail to allege a continuous "pattern of racketeering activity."**

Finally, Plaintiffs' section 1962(c) claims fail because Plaintiffs have not adequately alleged the "pattern" element.  As the Supreme Court has cautioned, a "pattern of racketeering activity" means at least two predicate acts that "are related and that amount to or pose a threat of continued criminal activity."  *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  To allege a "pattern," Plaintiffs either must plead "open-ended" continuity (*i.e.,* past criminal conduct combined with a threat of continued criminal conduct) or "closed-ended" continuity (*i.e.,* past criminal conduct extending over a substantial period of time).  *See GICC Capital Corp. v. Tech. Fin. Group*, 67 F.3d 463, 466-67 (2d Cir. 1995).  Plaintiffs fail to allege either type of continuity.

To plead open-ended continuity, Plaintiffs must allege "that the nature of the enterprise itself gave rise to a threat of continuity, or must point to other external factors which evidence a threat of continued criminal conduct."  *Qualis Care, L.P. v. Hall*, No. 95-CV-4955, 1999 WL 683564, at *6 (S.D.N.Y. Sept. 1, 1999) (Jones, J.).  "When a plaintiff cannot allege the scheme at issue is a regular aspect of defendants' business, or that there is a likelihood of repetition of the alleged predicate acts, plaintiff has failed to establish open-ended continuity."  *Id.*

Here, the Complaint does not allege that the predicate acts were a regular aspect of the Defendants' various businesses; instead, it alleges that all the predicate acts were committed in

---

[13]     Plaintiffs appear to contend that the use of "shell entities" to make investments somehow is tantamount to "money laundering."  (*See, e.g.,* Cplt. ¶¶ 395-404.)  But the creation and use of shell entities does not in and of itself constitute money laundering.  Indeed, the use of shell entities is only illegal if they are set up to disguise "criminally derived property."  *See* 18 U.S.C. § 1957(a). No "criminally derived property" is identified here.

34

connection with the singular goal of laundering money through the sale of the GM Building in 2003. (*See* Cplt. ¶ 170.)  As the Second Circuit observed in *United States v. Aulicino*, the threat of continuity is not present in a situation where "a defendant had a piece of property the sale of which, even if by fraudulent means, provided a natural end to his project." 44 F.3d 1102, 1113 (2d Cir. 1995); s*ee also Bernstein*, 948 F. Supp. at 237 (alleged acts of mail and wire fraud committed in connection with an isolated real estate venture which has been, or will be terminated, were inherently terminable and posed no threat of continued criminal conduct).

Nowhere does the Complaint allege that Defendants' conduct posed a threat of future "sham auctions."  Nor does the Complaint suggest any basis to believe that Defendants will commit bankruptcy fraud and money laundering to acquire new properties and launder additional money.  Thus, Defendants' scheme was "inherently terminable" upon the 2003 sale of the GM Building, and posed no threat of continued criminal conduct.  *See GICC*, 67 F.3d at 466; *China Trust Bank of N.Y. v. Standard Chartered Bank, PLC*, 981 F. Supp. 282, 287 (S.D.N.Y. 1997) (holding that alleged fraud on a single account was inherently terminable and insufficient to support a threat of open-ended continuity).

Plaintiffs also do not allege closed-ended continuity.  "To satisfy closed-ended continuity, the plaintiff must prove 'a series of related predicates extending over a substantial period of time.'"  *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (quoting *H.J. Inc.*, 492 U.S. at 242).  "Since the Supreme Court decided *H.J., Inc.*, [the Second Circuit has] never held a period of less than two years to constitute a substantial period of time."

35

*Spool*, 520 F.3d at 184 (internal quotations omitted); *see also DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001) (same).[14]

The relevant period for measuring duration is the time "during which the RICO predicate activity [that harmed Plaintiffs] occurred, not the time during which the underlying scheme operated or the underlying dispute took place." *Spool*, 520 F.3d at 184 (citing *DeFalco*, 244 F.3d at 321). Here, the relevant period spanned less than two years. The predicate activity that supposedly harmed Plaintiffs – the alleged bid rigging – was a one-shot deal that lasted, at most, about two months, from the July 22, 2003 publication of the outline of the bid requirements for the purchase of the GM Building to the September 27, 2003 closing. (*See* Cplt. ¶¶ 341, 373.) This does not come close to satisfying the "continuity" factor.

Even if the relevant period were viewed as having started when the alleged Enterprise "began implementing the pattern of racketeering activities" in June 2002 (Cplt. ¶ 164), or when the Enterprise took what Plaintiffs refer to as its "first step" (the creation of CFN Holdings, LLC on August 15, 2002 (*id.* ¶ 188)), the alleged scheme still lasted only thirteen or fifteen months. As a matter of law, either time frame is insufficient to establish closed-ended continuity. *See e.g.*, *Qualis Care*, 1999 WL 683564, at *6 (Jones, J.) (holding that a nineteen month scheme, involving one group of perpetrators, one victim, and a single goal did not constitute closed-ended continuity); *Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 998-99 (E.D.N.Y. 1995) (holding that a single real estate transaction involving one alleged victim, a limited goal and criminal conduct which lasted approximately fifteen months is not sufficient "continuity"); *see also Spool*, 520 F.3d at 185 (sixteen months insufficient); *Ray Larsen Assocs., Inc. v. Nikko Am.*,

---

[14]    Although several external factors may be considered in addition to the temporal element, such as the number of victims or perpetrators, the length of time over which the predicate acts occurred is "dispositive" if the scheme lasts less than two years. *See G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521, 543 (S.D.N.Y. 2002).

*Inc.*, No. 89-CV-2809, 1996 WL 442799, at *7 (S.D.N.Y. Aug. 6, 1996) (Jones, J.) (seventeen months insufficient).

While the Complaint contains a few conclusory allegations relating to alleged activities that occurred slightly more than two years before the 2003 sale (*e.g.*, that Soros allegedly contacted Trump and Conseco in March 2001 to "contrive" a money laundering scheme (Cplt. ¶ 97)), alleged RICO predicate activity that pre-dated the 2003 sale does not serve to extend the duration of the scheme. As this Court has held, only actions related to the predicate acts which *allegedly injured plaintiff* can be considered as part of the activity to extend the scope of the "pattern." *See Ray Larsen*, 1996 WL 442799, at *7; *Spool*, 520 F.3d at 184. Thus, the pre-2003 clutter and "background noise" alleged by Plaintiffs, concerning initial contacts, alleged machinations in the Bankruptcy Court, and other allegedly contrived legal wrangling, none of which directly affected Plaintiffs, cannot be considered as establishing the requisite "pattern."

The same goes for alleged activities that occurred after September 2003 – for example, Macklowe's sale of the GM Building in May 2008. (Cplt. ¶¶ 423-24.) That Macklowe allegedly profited from the sale in 2008 is not a predicate act that serves to extend the pattern of racketeering activities. While it may have benefited Macklowe, the 2008 sale did not injure Plaintiffs, and thus does not extend the duration of the alleged scheme. *See Pier Connection, Inc. v. Lakhani*, 907 F. Supp. 72, 76 (S.D.N.Y. 1995) (noting that "continuing to reap . . . benefits [from RICO fraud] is not itself a predicate act; it is only an effect of the alleged acts of wire fraud"); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994) ("[Defendant's] conduct in sending out billing notices from 1991 through 1992 pursuant to an allegedly fraudulent contract cannot be cited by plaintiffs to extend the duration of the fraudulent scheme."). Plaintiffs have merely appended

37

these conclusory allegations of post-2003 activity as an "afterthought" in a futile effort to extend the duration of the alleged scheme. *See Ray Larsen*, 1996 WL 442799, at *7.[15]

Because the relevant conduct spanned less than two years, and involved a single real estate transaction, a limited number of perpetrators and victims, and a limited goal, Plaintiffs fail to allege a continuous pattern of racketeering activity. This alone is fatal to Plaintiffs' section 1962(c) claim.

### 3.   Plaintiffs fail to allege a violation of sections 1962(a) and (b).

The failure to adequately allege an enterprise, the requisite predicate acts, and a pattern of racketeering activity is fatal to *all* of Plaintiffs' RICO claims. *See Bernstein*, 948 F. Supp. at 241. However, Plaintiffs' section 1962(a) and (b) allegations suffer from additional infirmities.

"Section 1962(a) prohibits any person who derived income from a pattern of racketeering activity from investing that income in an 'enterprise', as defined by the statute."[16] *Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236, 245 (S.D.N.Y. 2003) ("*Stolow I*"), *aff'd*, No. 03-7759, 2003 WL 22717684 (2d Cir. Nov. 17, 2003). Because the "essence" of a violation of section 1962(a) is "investment of racketeering income," Plaintiffs must allege injury "by reason of" Defendants' investment of racketeering income in an enterprise to recover under section 1962(a). *Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d. Cir. 1990); *see also Discon, Inc.*

---

[15]   Even more desperate are Plaintiffs' counsel's recent letters to the Court suggesting that Defendants' request for an extension of time to answer or move, and alleged conflicts of interest on the part of various defense counsel, are a "continuation" or "extension" of the alleged RICO enterprise. *See* letters from David H. Relkin dated October 14, October 31, November 6 and December 8, 2008.

[16]   18 U.S.C. § 1962(a) provides:

It shall be unlawful for any person who has received income derived, directly or indirectly, from a pattern of racketeering activity . . . to invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment of, any enterprise which is engaged in. or the activities of which affect, interstate or foreign commerce.

*v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128

(1998) (for section 1962(a) claim, "the plaintiff [must] allege a 'use or investment' injury that is

*distinct* from the injuries resulting from predicate acts").  Here, Plaintiffs do not allege that the

Soros Defendants received any money from a pattern of racketeering activity, much less invested

it in the Enterprise.  Nor do Plaintiffs plead how they were distinctly injured by the use or

investment of alleged racketeering income.  *See Ouaknine*, 897 F.2d at 83; *Stolow I*, 258 F. Supp.

2d at 245 (alleged injury from bid rigging scheme was "not a separate and distinct injury caused

by the acquisition or maintenance of an alleged enterprise").

Likewise, Plaintiffs do not allege a violation of section 1962(b).  Section 1962(b) makes it

unlawful for "any person through a pattern of racketeering activity . . .  to acquire or maintain . . .

any interest in or control of any enterprise. . . ."  18 U.S.C. § 1962(b).  "The purpose of this statute

is to prohibit the takeover of a legitimate business through racketeering, typically extortion or

loansharking."  *Stolow I*, 258 F. Supp. 2d at 246 (internal quotation marks omitted).  Similar to the

investment injury requirement of section 1962(a), a plaintiff must allege a distinct acquisition or

maintenance injury to have standing to sue under section 1962(b).  *See Discon*, 93 F.3d at 1063.

But Plaintiffs do not allege how they were injured by the "acquisition or maintenance" of an

interest in the alleged Enterprise, by the Soros Defendants or any other Defendants.

### 4.    Plaintiffs fail to allege a RICO conspiracy under section 1962(d).

For the reasons discussed above, Plaintiffs fail to allege an underlying section 1962 (a), (b)

or (c) violation of the RICO statute.  Where no underlying section 1962 (a), (b) or (c) claim has

been stated, no section 1962(d) claim can be sustained.  *See First Capital*, 385 F.3d at 182;

*Discon*, 93 F.3d at 1064; *Allen v. New World Coffee, Inc.*, No. 00-CV-2610, 2002 WL 432685, at

*6 (S.D.N.Y. Mar. 19, 2002) ("The dismissal of all of plaintiffs' RICO claims leaves the

conspiracy cause of action without a leg to stand on.").

Separately, there are no specific factual allegations to support the existence of the conspiracy under the pleading standards set forth by the Supreme Court in *Twombly*. Plaintiffs offer nothing more than "bare allegations of 'conspiracy,'" which are "insufficient to support a civil RICO claim." *Morin v. Trupin*, 711 F. Supp. 97, 111 (S.D.N.Y. 1989) (citation omitted). Rather, Plaintiffs "must show that the defendants understood the scope of the enterprise and knowingly agreed to further its affairs through the commission of various offenses." *Id*. Plaintiffs have not done so here. Missing from the Complaint are, for example, indications of how Defendants reached agreement on entry into a conspiracy, or whether they knew that they had done so. *See, e.g., Adler v. Berg Harmon Assocs.*, 790 F. Supp. 1222, 1234 (S.D.N.Y. 1992) (dismissing conspiracy claim where the complaint lacked "factual allegations supporting an inference that the various defendants consciously agreed to become part of a RICO conspiracy"); *see also Dongelewicz v. ONC Bank Nat'l Assoc.*, 104 F. App'x 811, 818 (3d Cir. 2004) ("[T]he fact that First Eastern provided financing to CBG in no way gives rise to an inference (i) that First Eastern agreed to commit predicate acts; or (ii) that First Eastern knew that the predicate acts were part of racketeering activity, two necessary elements of a RICO conspiracy.").

## III.   PLAINTIFFS' SHERMAN ANTITRUST ACT CLAIM SHOULD BE DISMISSED.

Count V of the Complaint, alleging an antitrust violation under the Sherman Act, 15 U.S.C. § 1, should be dismissed for two reasons. First, like the RICO claim, the antitrust claim is barred by the statute of limitations. Second, Plaintiffs have not alleged "antitrust injury," *i.e.*, injury of the type the antitrust laws were intended to prevent.

### A.   THE ANTITRUST CLAIM IS TIME-BARRED.

Like the RICO statute, the Sherman Act provides a four-year statute of limitations. *See Klehr*, 521 U.S. at 190; 15 U.S.C. §§ 1-7, 15; *Stolow I*, 258 F. Supp. 2d at 251. Antitrust actions accrue, regardless of discovery, when a defendant commits an act that injures plaintiff's business

in violation of the antitrust statutes. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). The antitrust statute of limitations "has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Higgins v. New York Stock Exch. Inc.*, 942 F.2d 829, 832 (2d Cir. 1991). However, "the commission of a 'separate new overt act' will not permit the plaintiff to recover for the injury caused by old overt acts that do not fall within the limitations period." *In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000).

The injury Plaintiffs claim on account of the alleged "bid rigging" in connection with the sale of the GM Building occurred in August 2003 – more than five years before the Complaint in this action was filed. That is when Harry Macklowe won what Plaintiffs allege was a "sham auction", thereby allegedly injuring Plaintiffs by depriving them of an opportunity to acquire the property. At the very latest, Plaintiffs' antitrust claims indisputably accrued by November 2003 – nearly five years before the Complaint was filed – when Plaintiffs began threatening Defendants with antitrust claims. (*See* Oller Decl. Ex. G (Nov. 23, 2003 Ltr.).) Thus, because the alleged antitrust injuries Plaintiffs suffered occurred more than four years before the present lawsuit was brought, the antitrust claims are barred by the statute of limitations. *See Stolow v. Greg Manning Auctions Inc.*, No. 03-7259, 2003 WL 22717684, at *3 (2d Cir. Nov. 17, 2003) ("*Stolow II*") (antitrust bid rigging claims brought more than four years after alleged injury were barred by statute of limitations).

## B.   THE COMPLAINT DOES NOT STATE AN ANTITRUST CLAIM.

Nor does the Complaint state a cognizable claim under the antitrust laws. The Second Circuit has stated clearly that "[i]n order to plead an antitrust action, a plaintiff must prove that he or she suffered 'antitrust injury,' meaning 'injury of the type the antitrust laws were intended to

prevent and that flows from that which makes defendants' acts unlawful.'" *Stolow II*, 2003 WL 22717684, at *3 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws . . . were enacted for 'the protection of competition not competitors.'") (citation omitted)).  As a result, to state an antitrust claim, a plaintiff must allege that the challenged conduct "had an actual adverse effect on competition as a whole in the relevant market," not just on plaintiff as a competitor.  *Capital Imaging Assoc. v. Mohawk Valley Med. Assoc., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993); *Kasada, Inc. v. Access Capital, Inc.*, No. 01-CV-8893, 2004 WL 2903776, at *7 (S.D.N.Y. Dec. 14, 2004) (same); *see also Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 181 (S.D.N.Y. 2006) ("The antitrust laws are not concerned with [a plaintiff's] loss of profits at the hands of its competitor; as long as [the defendant's] conduct did not harm consumers there is no violation of the Sherman Act"); *id.* at 182 ("To survive a motion to dismiss, an antitrust plaintiff must also plead facts establishing that the defendants acted in restraint of trade, *i.e.*, in a manner that robbed the consumer of its choice of product.").[17]

Plaintiffs have not alleged any antitrust injury.  Plaintiffs allege a "bid rigging" conspiracy, not between competitors in some market, but instead between the seller of the GM Building (Carmel Fifth) and an allegedly "preferred" bidder (Macklowe), who ultimately became the buyer. (Cplt. ¶¶ 367-68.)  Because the alleged conspiracy is not between firms that are actual or potential competitors in any identified market, it is not an antitrust violation.  *See Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.*, 801 F. Supp. 1450, 1463 (E.D. Pa. 1992) ("agreements to rig bids among

---

[17]     Under the Second Circuit's two-pronged test, to maintain standing to sue, Plaintiffs must also demonstrate, in addition to antitrust injury, that they are "proper" antitrust plaintiffs.  *See Balaklaw v. Lovell*, 14 F.3d 793, 797 n.9 (2d Cir. 1994); *Aventis Envtl. Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 497 (S.D.N.Y. 2005).  However, given that Plaintiffs fail to allege antitrust injury, the Court need not consider the second prong.

persons who are not actual or potential competitors are 'meaningless for Sherman Act purposes' because they have no market impact").

A nearly identical antitrust claim was rejected in *Sitkin Smelting & Ref. Co. v. FMC Corp.*, 575 F.2d 440 (3d Cir. 1978). There, the defendant manufacturer put out scrap metal for bid, reserving the right to reject any and all bids but promising to accept the highest bid without giving anyone an opportunity to revise their bids. Plaintiffs claimed they were the highest bidder but that another bidder (Krentzman) was secretly allowed a final opportunity to put in a revised, matching bid that the defendant eventually accepted. The court stated that:

> We believe the jury was entitled under the evidence to conclude that defendants secretly agreed with Krentzman in advance of the 1973 bidding to give Krentzman the opportunity to match the highest bid received in the bidding process and, if Krentzman matched such bid, to award Krentzman the contract. While such an agreement can be said to have made a sham of the bidding, it is clear we are not talking about sham bidding in the common parlance, where a bidder drives up the sale price without any intention of buying. We understand plaintiffs to be referring to sham bidding in the sense that one bidder is preordained to obtain the contract if that bidder would match the high bid submitted.

*Id*. at 445. However, the court found that this was not an antitrust violation. The allegedly collusive agreement was between two non-competing contracting parties, not an agreement between competitors to fix the price to be charged in transactions with consumers or other third parties. As the court stated, the Sherman Act prohibits "an agreement to fix the price to be charged in transactions with third parties, not between the contracting parties themselves." *Id*. at 446. The seller's secret agreement gave a preference to Krentzman, making the bidding a "sham," but a seller is free to choose its customers and its "right to exercise this free choice is not limited because of the 'sham' and the 'sham' does not render the exercise of the choice a violation of the Sherman Act." *Id*. at 447; *see also Taggart v. Rutledge*, 657 F. Supp. 1420 (D. Mont. 1987).

43

Plaintiffs here allege the same thing, namely, that allegedly in contravention of the bidding procedures, Macklowe was preordained to win the "auction," making the bidding a "sham." But a "sham bidding" conspiracy, as alleged here, is at most an agreement to fix prices between two non-competing parties. That Leslie Dick Worldwide allegedly suffered harm as a competitor of Macklowe in the bidding process does not establish injury to competition affecting third-party consumers. *See Doron*, 423 F. Supp. 2d at 184-85 ("A violation of the letter or spirit of a competitive bid statute, unaccompanied by anticompetitive factors bearing upon the choice of product, does not create an antitrust problem.") (internal quotations omitted).[18]  Accordingly, Plaintiffs' Sherman Act claim fails to state a cause of action and should be dismissed.

## IV.   THE COURT SHOULD STRIKE CERTAIN IMMATERIAL AND SCANDALOUS ALLEGATIONS IN THE COMPLAINT.

The Soros Defendants also move the Court to strike certain immaterial and scandalous matter in the Complaint that has nothing whatsoever to do with the dispute at issue and was obviously inserted only to prejudice the reader. Pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, the court may strike any "redundant, immaterial, impertinent, or scandalous matter" contained in a pleading. Fed. R. Civ. P. 12(f). Motions to strike "serve a useful purpose by . . . saving the time and expense which would otherwise be spent in litigating issues that would

---

[18]   To be distinguished are bid-rigging cases where, for example, government contractors secretly agree on the bids to be submitted to government agencies for road paving contracts and, unbeknownst to the government, agree to rotate or allocate contracts among themselves. *See, e.g., United States v. Portsmouth Paving Corp.*, 694 F.2d 312 (4th Cir. 1982). In such cases, "[t]he undisputed effect is to force the contracting government entities [as consumers] to pay more for the goods and services sought than they would 'had there been free competition in the open market.'" *Id.* at 317. Likewise, where bidders at an auction "set a pre-determined price at which one designated individual was to bid on the auctioned property on the group's behalf instead of each member of the group bidding competitively against each other," there is an antitrust violation since "if the co-conspirators had legitimately bid against each other . . . the sale price would presumably have been higher." *Shaw v. United States*, 371 F. Supp. 2d 265, 267-68 272 (E.D.N.Y. 2005). Here, by contrast, the alleged bid rigging conspiracy was not between ostensibly competing bidders who denied a competitive price to a third party consumer, but instead between one bidder and the seller itself, who was not secretly denied a market price for the property being sold.

not affect the outcome of the case." *Simon v. Mfrs. Hanover Trust Co.*, 849 F. Supp. 880, 882 (S.D.N.Y. 1994) (citing *United States v. Union Gas Co.*, 743 F. Supp. 1144, 1150 (E.D. Pa. 1990)); *see also Bowles v. New York City Transit Auth.*, No. 03-CV-3073, 2004 WL 548021, at *3 (S.D.N.Y. Mar. 18, 2004) (Jones, J.) (citing the role of Rule 12(f) in striking pleadings); 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382 (3d. ed. 2004) (noting that scandalous matter "often will be stricken from the pleadings in order to purge the court's files and protect the subject of the allegations"). The Complaint suffers from the ills that Rule 12(f) aims to cure.

First, the Complaint contains scandalous allegations that involve patently immaterial and grossly inflammatory language regarding the Soros Defendants' legitimate business operations. For example, the Complaint makes vague references to the Netherlands Antilles as a center for money laundering of "illegal proceeds of Latin American cocaine and other drug traffic" and also states that Quantum Group funds, overseen by Soros Fund Management, are based in Curacao, suggesting geographic guilt by association. (Cplt. ¶¶ 173-74; *see also id.* ¶ 425 (making similar unsubstantiated allegations that Soros has "links" to the subject of a dead-end federal investigation about alleged money laundering in Russia, based only on a passing reference to him in a newspaper article); *id.* ¶¶ 177-78.) Such allegations should be stricken. *See, e.g., Roberto's Fruit Market, Inc. v. Schaffer*, 13 F. Supp. 2d 390, 396 (E.D.N.Y. 1998) (granting Rule 12(f) motion to strike where complaint contained unnecessary and inflammatory language "in the nature of trash-talking," such as allegations "upon information and belief" that defendants were identified in a Justice Department Report as "having ties to organized crime"); *G-I Holdings*, 238 F. Supp. at 555 (noting that allegations may be stricken if they have no real bearing on the case, will likely prejudice the movant, or where they have criminal overtones).

45

Second, the Complaint is peppered with allegations about prior alleged investigations and legal proceedings involving Soros that are completely irrelevant to this case. (*See, e.g.*, Cplt. ¶¶ 175-76, 179.)[19] None of these matters is alleged to constitute predicate acts for purposes of Plaintiffs' RICO claims, and thus they "have no place in the Complaint." *Roberto's Fruit*, 13 F. Supp. 2d at 396; *see also Morse v. Weingarten*, 777 F. Supp. 312, 319 (S.D.N.Y. 1991) (granting motion to strike under Rule 12(f); references to Michael Milken's criminal conviction were immaterial and impertinent and potentially "scandalous"; such references "serve no purpose except to inflame the reader"); *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892-94 (2d Cir. 1976) (finding a consent decree and the SEC complaint that preceded it both immaterial under Rule 12(f)); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76 (S.D.N.Y. 2003) ("Second Circuit case law makes it clear that references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f).").

Accordingly, the Soros Defendants respectfully request the Court to strike the allegations in the following paragraphs from the Complaint: ¶¶ 173-179, 191, and 425.

## V.   THE CLAIMS SHOULD BE DISMISSED WITH PREJUDICE BECAUSE AMENDMENT WOULD BE FUTILE.

The Court should dismiss the Complaint with prejudice because amendment would be futile. Not only are the claims time-barred and untenable as a matter of law, but Plaintiffs are precluded from asserting them by *res judicata*. *See Wright v. Rivera*, No. 06-CV-1725, 2007 WL 4264547, at *2 (E.D.N.Y. Nov. 30, 2007) (denying leave to amend where claim was time-barred);

---

[19]     In one of the matters, involving a proceeding in France, Mr. Soros has appealed to the European Court of Human Rights based on the 14-year delay in bringing the matter to trial interfering with his right to fair hearing. The appeal is pending. This illustrates the hazards of permitting immaterial and prejudicial allegations to remain in a complaint, divorced from the context and other facts and circumstances.

*Wittich v. Wittich*, No. 06-CV-1635, 2006 WL 3437407, at *7 (E.D.N.Y. Nov. 29, 2006) (denying

leave to amend where *res judicata* precluded plaintiff from asserting its claims).

## CONCLUSION

For the reasons stated above, Plaintiffs have failed to adequately plead any RICO or

antitrust claims and the Court should dismiss the Complaint with prejudice, and grant such other

and further relief as the Court determines is appropriate.[20]


Dated: December 22, 2008

WILLKIE FARR & GALLAGHER LLP

By: _____

Benito Romano
bromano@willkie.com
John R. Oller
joller@willkie.com
Deirdre N. Hykal
dhykal@willkie.com
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000

*Attorneys for George Soros and Soros Fund
Management, LLC*

---

[20]   Given Plaintiffs' history of filing serial lawsuits relating to the sale of the GM Building, an order enjoining Plaintiffs from filing, without leave of this Court, further actions in federal courts in New York against any Defendant named in this action, and any other parties or their counsel in privity with them, arising out of or relating to the 2003 sale of the GM Building, is both within the Court's inherent power to protect parties from vexatious litigation and is entirely warranted in these circumstances. *See Singh*, 199 F. Supp. 2d at 165-66 (granting similar order).