UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

..................................................................... x
                                         :

LESLIE DICK WORLDWIDE, LTD. AND       :
LESLIE DICK,                                    :
                                          :
                *Plaintiffs*,          :
                                          :
                -against-            :
                                          :    Hon. Barbara S. Jones

GEORGE SOROS, SOROS FUND         :
MANAGEMENT, LLC, FIG, LLC,         :    No. 08 CV 7900 (BSJ)(THK)
VORNADO REALTY TRUST, GERMAN     :
AMERICAN CAPITAL CORP., EASTDIL    :    ECF Case
SECURED, LLC, HARRY MACKLOWE,     :
CONSECO, INC., KIRKLAND & ELLIS, LLP,   :
DONALD J. TRUMP AND JOHN DOES "1"    :
THROUGH "10,"                           :
                                          :
                *Defendants*.        :
                                          :

..................................................................... x


## BRIEF IN SUPPORT OF THE SOROS DEFENDANTS' <br> MOTION TO DISMISS THE AMENDED COMPLAINT


WILLKIE FARR & GALLAGHER LLP
John R. Oller
Deirdre N. Hykal
Caren E. Lerner
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000

FRESHFIELDS BRUCKHAUS DERINGER
Benito Romano
520 Madison Avenue, 34th floor
New York, New York 10022
Tel: (212) 277-4000

*Attorneys for George Soros and Soros Fund
Management, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 4

I.     THE PRIOR STATE COURT ACTION ........................................................... 4

II.    THE PRESENT ACTION ................................................................................. 7

III.   PLAINTIFFS' FIVE-YEAR DELAY IN ASSERTING THEIR RICO CLAIMS ........... 14

ARGUMENT ..................................................................................................................... 15

I.     STANDARD OF REVIEW ............................................................................. 15

II.    PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED. ........................... 17

     A.    PLAINTIFFS' RICO CLAIMS ARE BARRED BY RES JUDICATA. .............. 17

     B.    PLAINTIFFS LACK RICO STANDING BECAUSE THEY FAIL TO ALLEGE AN INJURY PROXIMATELY CAUSED BY A RICO VIOLATION. ......................................................................................... 24

          1.    Plaintiffs lack standing to assert their RICO claims based on predicate acts of bankruptcy fraud, money laundering, and wire fraud. ................... 25

          2.    Plaintiffs lack standing to assert RICO claims based on the 2003 sale. ..... 26

     C.    IF PLAINTIFFS SUFFERED ANY RICO INJURY THE RICO CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS. .................................. 30

     D.    PLAINTIFFS FAIL TO ALLEGE A SUBSTANTIVE VIOLATION OF THE RICO STATUTE. ................................................................................. 35

          1.    Plaintiffs fail to allege a violation of section 1962(c). ............................. 35

               a.    Plaintiffs fail to allege a cognizable RICO enterprise. ................. 35

               b.    Plaintiffs fail to allege the requisite predicate acts. ...................... 38

                    i.    Plaintiffs fail to allege bankruptcy fraud. .......................... 38

                    ii.    Plaintiffs fail to allege money laundering. ......................... 40

                    iii.   Plaintiffs fail to allege wire fraud. .................................... 41

                c.    Plaintiffs fail to allege a continuous "pattern of racketeering activity." .................................................................................. 43

          2.    Plaintiffs fail to allege a violation of sections 1962(a) and (b). ............... 46

          3.    Plaintiffs fail to allege a RICO conspiracy under section 1962(d). .......... 48

III.   THE CLAIMS SHOULD BE DISMISSED WITH PREJUDICE BECAUSE AMENDMENT WOULD BE FUTILE. .......................................................... 49

CONCLUSION .................................................................................................................. 50

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page(s)

*Adler v. Berg Harmon Assocs.*,
  790 F. Supp. 1222 (S.D.N.Y. 1992)................................................................49

*Allen v. New World Coffee, Inc.*,
  No. 00-CV-2610, 2002 WL 432685 (S.D.N.Y. Mar. 19, 2002)............................48

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)................................................................................24, 25

*Bankers Trust Co. v. Rhoades*,
  859 F.2d 1096 (2d Cir. 1988)..............................................................24, 30, 32, 35

*Bell Atlantic Corp. v. Twombly*,
  127 S. Ct. 1955 (2007)............................................................................16, 17

*Bernstein v. Misk*,
  948 F. Supp. 228 (E.D.N.Y. 1997) ........................................................40, 41, 43

*Bonavitacola Elec. Contractor, Inc. v. Boro Developers, Inc.*,
  No. 01-CV-5508, 2003 WL 329145 (E.D. Pa. Feb. 12, 2003) ................................29

*Butala v. Agashiwala*,
  916 F. Supp. 314 (S.D.N.Y. 1996)...........................................................33, 34

*China Trust Bank of N.Y. v. Standard Chartered Bank, PLC*,
  981 F. Supp. 282 (S.D.N.Y. 1997)...............................................................44

*City of New York v. Cyco.Net, Inc.*,
  383 F. Supp. 2d 526 (S.D.N.Y. 2005)...........................................................41

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
  187 F.3d 229 (2d Cir. 1999)....................................................................44

*Coleman v. B.G. Sulzle, Inc.*,
  402 F. Supp. 2d 403 (N.D.N.Y. 2005) ..........................................................15

*Crown Heights Jewish Cmty. Council, Inc. v. Fischer*,
  63 F. Supp. 2d 231 (E.D.N.Y. 1999) ............................................................40

*DeFalco v. Bernas*,
  244 F.3d 286 (2d Cir. 2001)....................................................................44

*Discon, Inc. v. NYNEX Corp.*,
  93 F.3d 1055 (2d Cir. 1996)................................................................47, 48

*Dongelewicz v. ONC Bank National Ass'n*,
  104 F. App'x 811 (3d Cir. 2004) ...........................................................49

*Donovan v. Lewnowski*,
  No. 03-CV-2985, 2005 WL 2095739 (E.D.N.Y. Aug. 30, 2005)................17, 18, 19

*Ezra Charitable Trust v. Frontier Ins. Group*,
  No. 00-CV-5361, 2002 WL 87723 (S.D.N.Y. Jan. 23, 2002) ...........................16, 31

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
  385 F.3d 159 (2d Cir. 2004)................................................................37, 38, 48

*First Nationwide Bank v. Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994)................................................................32

*Giannone v. York Tape & Label, Inc.*,
  548 F.3d 191 (2d Cir. 2008)................................................................18

*GICC Capital Corp. v. Tech. Fin. Group*,
  67 F.3d 463 (2d Cir. 1995)................................................................43, 44

*H.J., Inc. v. Northwestern Bell Tel. Co.*,
  492 U.S. 229 (1989)................................................................43, 44

*In re Ins. Brokerage Antitrust Litig.*,
  Nos. 04-CV-5184, 05-CV-1079, 2007 WL 1062980 (D.N.J. Apr. 5, 2007) ...........................36

*In re Integrated Resource Real Estate Ltd. P'ships Sec. Litig.*,
  850 F. Supp. 1105 (S.D.N.Y. 1993)................................................................30

*Int'l Paint Co. v. Grow Group, Inc.*,
  648 F. Supp. 729 (S.D.N.Y. 1986)................................................................38

*In re Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*,
  Nos. 04-CV-3329, 04-CV-3799, 2006 WL 1531152 (E.D. Pa. June 2, 2006) ...........................37

*Iwachiw v. N.Y.C. Bd. of Educ.*,
  194 F. Supp. 2d 194 (E.D.N.Y. 2002) ................................................................15, 32, 49

*James Cape & Sons Co. v. PCC Constr. Co.*,
  453 F.3d 396 (7th Cir. 2006) ...........................................................29

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997)........................................................................34

*LC Capital Partners v. Frontier Ins. Group*,
  318 F.3d 148 (2d Cir. 2003)..........................................................16

*Leeds v. Meltz*,
  85 F.3d 51 (2d Cir. 1996) ..............................................................16

*Lerner v. Fleet Bank, N.A.*,
  318 F.3d 113 (2d Cir. 2003)..........................................................26

*L-Tec Elecs. Corp. v. Cougar Elec. Org., Inc.*,
  198 F.3d 85 (2d Cir. 1999).............................................................24

*Mathon v. Marine Midland Bank, N.A.*,
  875 F. Supp. 986 (E.D.N.Y. 1995) ...............................................45

*McLaughlin v. American Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008)..........................................................24

*In re Merrill Lynch Ltd. P'ships Litig.*,
  7 F. Supp. 2d 256, 264 (S.D.N.Y. 1997)......................................32

*In re Merrill Lynch Ltd. P'ships Litig.*,
  154 F.3d 56 (2d Cir. 1998).............................................30, 32, 33

*Migra v. Waren City Sch. Dist. Bd. of Educ.*,
  465 U.S. 75 (1984).........................................................................17

*Moore v. PaineWebber, Inc.*,
  189 F.3d 165 (2d Cir. 1999)..........................................................39

*Morin v. Trupin*,
  711 F. Supp. 97 (S.D.N.Y. 1989)..................................................49

*Moss v. Morgan Stanley Inc.*,
  719 F.2d 5 (2d Cir. 1983) ..............................................................35

*Official Publ'ns, Inc. v. Kable News Co.*,
  811 F. Supp. 143 (S.D.N.Y. 1993)...........................................20, 21

*Old Republic Ins. Co. v. Hansa World Cargo Service, Inc.*,
  170 F.R.D. 361 (S.D.N.Y. 1997) ..................................................33

*Ouaknine v. MacFarlane*,
    897 F.2d 75 (2d. Cir. 1990)..................................................................47

*Pier Connection, Inc. v. Lakhani*,
    907 F. Supp. 72 (S.D.N.Y. 1995).........................................................46

*Printing Mart-Morristown, Inc. v. Rosenthal*,
    650 F. Supp. 1444 (D.N.J. 1987) .........................................................19

*Procapui-Productores de Camaroes de Icapui Ltda. v. Layani*,
    No. 07-CV-6627, 2008 WL 3338199 (S.D.N.Y. Jan. 11, 2008) .....................................39, 42

*Procapui-Productores de Camaroes de Icapui Ltda. v. G.F. Higgins, Inc.*,
    No. 07-CV-6627, 2008 3338200 (S.D.N.Y. Aug. 8, 2008)....................................37

*Qualis Care, L.P. v. Hall*,
    No. 95-CV-4955, 1999 WL 683564 (S.D.N.Y. Sept. 1, 1999)........................................43, 45

*Ray Larsen Assocs., Inc. v. Nikko America, Inc.*,
    No. 89-CV-2809, 1996 WL 442799 (S.D.N.Y. Aug. 6, 1996)........................................45, 46

*Republic of Colombia v. Diageo North America Inc.*,
    531 F. Supp. 2d 365 (E.D.N.Y. 2007) .................................................40

*Richmond v. Nationwide Cassel, L.P.*,
    52 F.3d 640 (7th Cir. 1995) ................................................................37

*Salinger v. Projectavision, Inc.*,
    934 F. Supp. 1402 (S.D.N.Y. 1996)......................................................30

*Sassower v. Abrams*,
    833 F. Supp. 253 (S.D.N.Y. 1993).................................................15, 16

*Saud v. Bank of New York*,
    734 F. Supp 628 (S.D.N.Y. 1990).................................................22, 23

*Saud v. Bank of New York*,
    929 F.2d 916 (2d Cir. 1991)................................................21, 22, 23, 24

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985).............................................................................24

*Singh v. Parnes*,
    199 F. Supp. 2d 152 (S.D.N.Y. 2002)............................................15, 17, 19, 37, 50

*Spool v. World Child Int'l Adoption Agency*,
   520 F.3d 178 (2d Cir. 2008)................................................................16, 44, 45

*Solow v. Conseco, Inc.*,
   No. 06-CV-5988, 2008 U.S. Dist. LEXIS 9234 (S.D.N.Y. Jan. 11, 2008) ...........................27

*Southern States Imports, Inc. v. Subaru of America, Inc.*,
   No. 5:05-CV-752, 2008 WL 2234625 (E.D.N.C. May 30, 2008) ........................................29

*S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*,
   84 F.3d 629 (2d Cir. 1996)................................................................................42

*Stolow v. Greg Manning Auctions Inc.*,
   258 F. Supp. 2d 236 (S.D.N.Y. 2003)..............................................................46, 47

*Strates Shows, Inc. v. Amusements of America, Inc.*,
   379 F. Supp. 2d 817 (E.D.N.C. 2005)..........................................................28, 29, 42

*Sutton v. Wachovia Secs., LLC*,
   208 F. App'x 27 (2d Cir. 2006) ..........................................................................27

*Tafflin v. Levitt*,
   493 U.S. 455 (1990)..........................................................................................20

*Takeuchi v. Sakhai*,
   No. 06-CV-0818, 2007 WL 2028892 (2d Cir. Jul. 12, 2007)..............................................32

*United States v. Aulicino*,
   44 F.3d 1102 (2d Cir. 1995)................................................................................43

*United States v. Autuori*,
   212 F.3d 105 (2d Cir. 2000)..........................................................................41, 42

*United States v. Dinome*,
   86 F.3d 277 (2d Cir. 1996)................................................................................42

*United States v. Int'l Longshoremen's Ass'n*,
   518 F. Supp. 2d 422 (E.D.N.Y. 2007) ............................................................36, 37

*United States v. Turkette*,
   452 U.S. 576 (1981)....................................................................................36, 37

*United States v. Walker*,
   191 F.3d 326 (2d Cir. 1999)................................................................................41

*Tenamee v. Schmukler*,
    438 F. Supp. 2d 438 (S.D.N.Y. 2006).............................................................36, 37

*Vemco, Inc. v. Camardella*,
    23 F.3d 129 (6th Cir. 1994) ...............................................................................46

*W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*,
    No. 03-CV-8606, 2004 WL 2187069 (S.D.N.Y. Sept. 29, 2004)........................40

*Wittich v. Wittich*,
    No. 06-CV-1635, 2006 WL 3437407 (E.D.N.Y. Nov. 29, 2006).........................49

*World Wrestling Entm't, Inc. v. Jakks Pacific, Inc.*,
    530 F. Supp. 2d 486 (S.D.N.Y. 2007)................................................................29

## STATE CASES

*Buechel v. Bain*,
    97 N.Y.2d 295 (2001) .......................................................................................28

*Feigen v. Advance Capital Mgmt. Corp.*,
    536 N.Y.S.2d 786 (1st Dep't 1989) ...................................................................20

*Flynn v. Sinclair Oil Corp.*,
    246 N.Y.S.2d 360 (1st Dep't 1964) ...................................................................20

*Leslie Dick Worldwide Ltd. v. Macklowe Props., Inc.*,
    857 N.Y.S.2d 86 (1st Dep't 2008) .......................................................................6

*Leslie Dick Worldwide Ltd. v. Macklowe Props., Inc.*,
    11 N.Y.3d 702 (2008) .........................................................................................6

*Sandhu v. Mercy Med. Ctr.*,
    864 N.Y.S.2d 124 (2d Dep't 2008)....................................................................18

*Santiago ex rel. Garcia v. Bd. of Health*,
    779 N.Y.S.2d 474 (1st Dep't 2004) ..............................................................18, 21

*Schwartzreich v. E.P.C. Carting Co., Inc.*,
    668 N.Y.S.2d 370 (1st Dep't 1998) ...................................................................18

*Smith v. Russell Sage College*,
    54 N.Y.2d 185 (1981) ..............................................................................18, 19, 21

*Spitzer v. Applied Card Sys., Inc.*,
    11 N.Y.3d 105 (2008) ................................................................................18

*Strange v. Montefiore Hosp. & Med. Ctr.*,
    59 N.Y.2d 737 (1983) ...............................................................................20

*Yonkers Contracting Co. v. Port Auth.*,
    93 N.Y.2d 375 (1999) ...............................................................................20

## STATUTES

18 U.S.C. § 1343 ..........................................................................................41

18 U.S.C. § 1952 ..........................................................................................14

18 U.S.C. § 1956 .....................................................................................40, 47

18 U.S.C. § 1957 .................................................................................14, 40, 47

18 U.S.C. § 1961(4) ......................................................................................35

18 U.S.C. § 1962 .................................................................14, 35, 43, 46, 47, 48

18 U.S.C. § 1964(c) ......................................................................................24

Fed. R. Civ. P. 9(b) ...........................................................................1, 34, 38, 39, 42

Fed. R. Civ. P. 12(b)(6) ...............................................................................1, 16

## OTHER AUTHORITIES

The Hon. Jed S. Rakoff & Howard W. Goldstein,
    *RICO Civil and Criminal Law and Strategy* § 2.02[3][C] (2008) ..........................................25

Defendants George Soros and Soros Fund Management, LLC (together, the "Soros Defendants") by and through their counsel, respectfully submit this brief in support of their motion to dismiss the "Amended RICO Complaint [corrected]" ("Amended Complaint" or "Am. Cplt.") brought by Leslie Dick Worldwide Ltd. and Leslie Dick ("Plaintiffs") in the above-captioned action (the "Action"), pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).  (A copy of the Amended Complaint is attached as Exhibit A to the Declaration of John R. Oller ("Oller Decl."), executed April 20, 2009, submitted herewith.)[1]  To minimize duplication and burden on the Court, this brief covers common issues and arguments affecting all Defendants, a number of whom are joining in this brief or incorporating portions of it by cross-reference in their separate motions to dismiss addressing arguments particular to them.

## <u>INTRODUCTION</u>

The Amended Complaint in this Action alleges a fantastic, worldwide RICO conspiracy between the Soros Defendants; Donald Trump; the realty companies Vornado and Eastdil; the law firm of Kirkland & Ellis; German American Capital; the Conseco insurance company; and assorted others (collectively, "Defendants").  The Amended Complaint contains an incomprehensible jumble of groundless allegations, including that a dispute and litigation between Conseco and Trump was "fabricated" so that George Soros, the "mastermind" of the alleged racketeering enterprise, could "launder money" through the 2003 sale of the General Motors Building (the "GM Building" or "the Building") to a "front man," Harry Macklowe.  Sprinkled throughout the Amended Complaint are scurrilous and irrelevant allegations ranging from "Narco

---

[1]     In a Notice of Filing on April 14, 2009 (Document No. 126), Plaintiffs indicated they had filed an Amended RICO Complaint amending an earlier Amended Complaint (Document No. 121), but the electronic Notice of Filing contained no attachment.  For the convenience of the Court, the "corrected" Amended RICO Complaint that is the subject of this motion to dismiss is attached to the Oller Declaration as Exhibit A.

Drug Trafficking" and "Prostitution slave trading" to alleged failures by Conseco to pay health care claims, to unrelated accounting frauds, financial restatements and SEC charges, and executive signing bonuses and compensation.

Yet, while Plaintiffs have managed to manufacture 154 pages and 600 paragraphs of spurious allegations, they omit one fundamental truth:  Plaintiffs have already litigated their claims – and lost – in New York Supreme Court.  Plaintiffs' final appeal of the court's decision was denied just days before they filed their original complaint in this Court.

In an attempt to resurrect their groundless state case, Plaintiffs have simply recast their claims as ones under RICO.  But despite their resort to different legal theories and embellished fact allegations, Plaintiffs cannot escape the fact that the claims they assert in this Action are based on the same transaction or series of transactions as those asserted in the prior state court action.  The gravamen of the Amended Complaint, though discussion of it is postponed until page 97, is that Plaintiffs were defrauded out of the opportunity to successfully bid on the sale of the GM Building in 2003, which they contend was sold in a "rigged auction" and "dumb-show" bidding process.  (Am. Cplt. ¶¶ 411-436.)  That is the very same claim that Plaintiffs sued on, and lost, in the New York State Court.  The decision by the state court is *res judicata* in this Action.

Plaintiffs also are precluded from proceeding with their alleged claims because they suffered no RICO injury proximately caused by defendants' conduct, and therefore they lack standing.  The allegations make clear that Plaintiffs were not injured "by reason of" (*i.e.*, as a proximate result of) any of the alleged predicate acts of bankruptcy fraud, money laundering, or wire fraud.  Nor do Plaintiffs' allegations of a "rigged auction" establish proximate cause.  The alleged "rigged auction," though it is the sole source of Plaintiffs' alleged injury, is not even alleged to be part of the pattern of racketeering activity.  And even if it were, proximate cause is lacking because, as the State Court held, there was absolute discretion as to whom to award the bid

2

and no guarantee that Plaintiffs would have won the bid over other, "legitimate," competing bidders.

Even if Plaintiffs had cognizable claims of RICO injury, they would be barred by the statute of limitations. Again, while somewhat obscured by the lengthy muddle that precedes it, the Amended Complaint ultimately reveals that the only RICO injury allegedly sustained by Plaintiffs was suffered at the time of the sale of the GM Building in 2003 – nearly five years before the original complaint in this Action was filed in September 2008. Indeed, right after the sale, in November 2003, Mr. Dick threatened the Soros Defendants and other Defendants here with RICO claims based on what he contended was bid rigging, RICO violations and money laundering in connection with the sale. Because RICO claims are subject to a four-year statute of limitations, and because Plaintiffs' purported claims accrued more than four years ago, the Amended Complaint is time-barred on its face.

Plaintiffs' RICO claims are also deficient for failure to plead adequately numerous substantive elements. First, Plaintiffs fail to plead a cognizable RICO "enterprise." Indeed, in a fatal omission, Plaintiffs never even identify the alleged enterprise: at times they say it is all Defendants; elsewhere they say it consists of some but not all Defendants; and in places they suggest the enterprise is Defendant Conseco. Whatever the alleged enterprise, Plaintiffs do not and cannot explain how the disparate cast of characters named as Defendants in this Action functioned as a single, continuing unit, or how the alleged enterprise was structured and organized. Under the decisions of this Court and law of this Circuit, that failure requires dismissal.

Plaintiffs also cannot establish a RICO "pattern" because the only alleged offense that conceivably caused them injury – the alleged "rigged" sale of the GM Building – was a one-time event. As a result, and under settled Second Circuit law, the Amended Complaint is insufficient to satisfy the RICO "continuity" factor.

3

The RICO claims suffer from other infirmities, discussed in greater detail below, including failure adequately to plead the alleged predicate acts and insufficient allegations of conspiracy.

In sum, the Amended Complaint should be dismissed with prejudice because the claims are precluded by *res judicata*, Plaintiffs lack standing, and the claims are time-barred, fail to state a claim as a matter of law, and violate well-established pleading rules.

## STATEMENT OF FACTS

## I.      THE PRIOR STATE COURT ACTION

In 2006, two and a half years after the sale of the GM Building, Plaintiffs commenced an action in New York Supreme Court claiming that Plaintiffs had been defrauded and wrongfully denied an opportunity to successfully bid on the sale of the Building in 2003.  *Leslie Dick Worldwide Ltd. v. Macklowe Props., Inc., et al*, Index No. 06/600222 (Moskowitz, J.) (the "State Action").  The defendants in the State Action included several of the very same Defendants named in the present Action, including George Soros, Soros Fund Management, LLC, Eastdil Realty Company, LLC,[2] Harry Macklowe, and Conseco, Inc., as well as certain parties who are affiliates of certain Defendants in this Action.  Plaintiffs in the State Action alleged claims of fraud, aiding and abetting fraud, promissory estoppel and tortious interference with prospective business advantage.

The gravamen of the State Action was that defendants conspired to bid rig the 2003 sale of the GM Building through a "sham auction."  Specifically, Plaintiffs alleged in their amended complaint in the State Action ("State Cplt."), among other things, that:

> Despite having been told that the Building would go to the highest bidder at auction, and the fact that Plaintiffs were the highest bidders . . . the defendants engaged in bid rigging and fraud by conspiring to have Plaintiffs' August 27, 2003 bid rejected and, instead, to have the building sold to Fifth Avenue 58/59

---

[2]      Now known as Eastdil Secured, LLC.  (*See* Am. Cplt. ¶ 115.)

> Acquisition Co., LP, the limited partnership specifically formed and designated by Harry Macklowe, George Soros and the other defendants to take ownership of Conseco's ownership share in the Building.

(State Cplt. ¶ 1, attached as Exhibit B to the Oller Decl.)

By decision and order dated November 29, 2006, Justice Moskowitz granted the motions to dismiss of the non-Soros Defendants pursuant to CPLR § 3211(a)(1) (documentary proof) and (a)(7) (failure to state a claim).  (*See* Oller Decl. Ex. C (Nov. 29, 2006 Order).)  The clerk entered judgment in their favor on December 20, 2006.  (*See* Oller Decl. Ex. D (Dec. 20, 2006 Judgment).)

In her opinion, Justice Moskowitz found that, among other things, Plaintiffs did not, "as a matter of law," reasonably rely on defendants' alleged oral statements that the GM Building would go to the highest bidder in light of an agreement and written outline of bidding procedures provided by Eastdil (the agent retained by Carmel Fifth to market the property) in advance of the final bid.  (Oller Decl. Ex. C (Nov. 29, 2006 Order) at 9-10.)  The agreement signed by Plaintiffs acknowledged, among other things, that the sellers were "expressly reserv[ing] the right, in [their] sole discretion, to terminate, at any time with or without notice and without liability, any discussions with any party regarding a possible sale of the property."  (*Id*. at 8.)  Plaintiffs also were advised that the sellers were "reserv[ing]the right, in [their] sole discretion, to accept or reject any offer for any reason," and that factors in addition to price would be considered in selecting a purchaser, including level of due diligence, closing capacity and credibility, and earnest money deposit.  (*Id*.)

Justice Moskowitz also held that, because these documents authorized defendants' conduct, defendants were not liable under a theory of tortious interference.  (*Id*. at 11-12.)  The declaratory judgment and constructive trust claims were dismissed on the ground of laches, in light of Plaintiffs' two-and-a-half year delay in commencing the State Action.  (*Id*. at 13-14.)

5

On January 18, 2007, Justice Moskowitz held a hearing and granted the Soros Defendants' motion to dismiss on the same grounds as the non-Soros Defendants' motion to dismiss (the motions had proceeded on separate tracks).[3]  Justice Moskowitz signed an order, marked "Final Disposition," directing the clerk to enter a judgment dismissing the action against the Soros Defendants "with prejudice."  (*See* Oller Decl. Ex. F (Jan. 18, 2007 Order).)  On February 2, 2007, the clerk entered a final judgment dismissing the claims against the Soros Defendants "with prejudice."  (*See* Oller Decl. Ex. G (Feb. 2, 2007 Judgment).)

On April 29, 2008, the Appellate Division affirmed all of the Supreme Court orders and judgments with regard to all defendants (including the November 29 and January 18 orders and the December 20 and February 2 judgments).  857 N.Y.S.2d 86 (1st Dep't 2008).  The Appellate Division held that "plaintiffs do not have a cause of action for fraud . . . or promissory estoppel," and that the court below had "considered plaintiffs' other claims and [found] them without merit."  *Id*.

On September 2, 2008, the New York Court of Appeals denied Plaintiffs' request for leave to appeal.  11 N.Y.3d 702 (2008).

---

[3]     At the hearing on the Soros Defendants' motion to dismiss, Justice Moskowitz noted that Plaintiffs were simply trying to reargue her earlier decision to dismiss the other defendants:

> You are not arguing anything different about the Soros Defendants. . . .
> There is nothing particular about the Soros Defendants.  In fact, there
> is even less as to the Soros Defendants, because they are not the ones
> that were running this auction.  So, therefore, I don't see any reason
> why my decision, on the motion to dismiss by the Soros Defendants,
> should be any different.  And it is actually controlled by my decision
> as to the other defendants.

(Oller Decl. Ex. E (Jan. 18, 2007 Hearing Tr.) at 7-8.)

II.    **THE PRESENT ACTION**

On September 10, 2008, days after the New York Court of Appeals denied their request for leave to appeal, Plaintiffs filed the present Action.  All Defendants filed motions to dismiss on December 22, 2008.  In response to the motions to dismiss, Plaintiffs filed their amended complaint on February 23, 2009 and filed their corrected Amended Complaint on April 14, 2009. Once again, the crux of Plaintiffs' Amended Complaint is that Defendants conspired to bid rig the 2003 sale of the GM Building – the only conduct that is alleged to have caused Plaintiffs any injury.

By way of background, as alleged in the Amended Complaint, Conseco and Donald J. Trump ("Trump") jointly purchased the GM Building in 1998.  (Am. Cplt. ¶ 134.)  According to Plaintiffs, Conseco and Trump "orchestrated" a dispute regarding ownership of the Building starting sometime in 2001 (Am. Cplt. ¶¶ 177-240), and initiated a sham arbitration in 2002 to resolve the dispute (Am. Cplt. ¶¶ 241-42, 244-248).  Kirkland & Ellis then caused Conseco to file for bankruptcy in December 2002 so that others could "acquire Conseco's assets at a discount price," including the GM Building, and to "keep[] the GM Building tied up in litigation until after the Conseco Bankruptcy was closed."  (Am. Cplt. ¶¶ 283, 250, 39.)

Having allegedly conspired to put the Building *into* bankruptcy for whatever reason, the conspirators then allegedly maneuvered to place jurisdiction over the GM Building *outside* the Bankruptcy Court.  Plaintiffs allege that this conspiracy involved motions to disqualify party-appointed arbitrators when "no actual conflict existed," and other procedural machinations, including applications to the Bankruptcy Court to confirm the arbitration award, and a fraudulent statement of intention by Trump to appeal from a New York Supreme Court decision declining to vacate the award.  (Am. Cplt. ¶¶ 324-329, 392, 399.)

All of this was done, say Plaintiffs, as part of a "scheme to keep the General Motors Building in arbitration" in "a type of three-card Monty game until the [Building] could be sold outside the Bankruptcy Court's scrutiny" to Harry Macklowe as a "front man" for George Soros, and the proceeds then "laundered" into a construction project of Trump in Chicago named Trump International Hotel and Tower.  (Am. Cplt. ¶¶ 332, 393, 413, 256-57.)

The Amended Complaint alleges that this grand conspiracy and RICO Enterprise was "masterminded" by Soros (exactly how, or why, is never explained), and that it included, in addition to Conseco, Trump and Macklowe, numerous other unrelated Enterprise members and/or co-conspirators such as Kirkland & Ellis; Eastdil Realty; Vornado Realty Trust; German American Capital Corp., Fortress Investment Group;[4] John Does #1-10, and numerous other named companies and individuals "likely to be identified herein as a 'John Doe' defendant."  (Am. Cplt. ¶¶ 99-129.)  Again, exactly what role any of these parties played in the conspiracy, or what was allegedly in it for them, is left entirely to conjecture.

Although they proclaim Soros the "mastermind" of the RICO Enterprise, the best Plaintiffs can allege, in terms of when the alleged RICO racketeering activity commenced, is that "upon information and belief," in or around June 2002, "George Soros, *or someone else to be identified acting on behalf of the Enterprise*, began implementing the pattern of racketeering activities" through the Conseco Chapter 11 filing "to act as the Debtor-in-possession financier, acquire Conseco's assets at a discount price, including Conseco Finance and the GM Building, and launder illegally derived finds through these entities in furtherance of the RICO Enterprise and in conspiracy therewith."  (Am. Cplt. ¶ 250 (emphasis added).)  How Soros was able to accomplish

---

[4]     Although Plaintiffs repeatedly refer in the Amended Complaint to "Fortress Investment Group, LLC" they have named FIG LLC, an indirect subsidiary of Fortress Investment Group LLC, as a defendant in this action.

this is not explained.  For example, Conseco Finance was acquired by CFN Holdings, LLC ("CFN Holdings"), the members of which allegedly were Cerberus, Fortress Investment Group, and J.C. Flowers (not Soros).  (Am. Cplt. ¶ 273.)  And the GM Building allegedly was controlled either by Conseco or Trump and their affiliates (not Soros).  In any event, totally missing from the Amended Complaint are any *facts* indicating how the members came together as an Enterprise, or the rationale behind the supposed activities of the Enterprise.

Plaintiffs spend pages and pages of the Amended Complaint discussing the alleged co-conspirators' supposedly fraudulent procedural maneuvers, in and out of Bankruptcy Court, to set up the eventual "rigged auction" of the General Motors Building.  Ironically, though Soros was the alleged mastermind of the conspiracy, the Soros Defendants are not alleged to have been a party to the Conseco bankruptcy, or to have filed a single piece of paper in the bankruptcy case, or to have participated in the bankruptcy proceedings in any way.  Nor are the Soros Defendants alleged to have been parties to the arbitration or any of the related court proceedings involving Trump and Conseco and their affiliates.  And as the State Court judge noted, the Soros Defendants did not even conduct the auction or have anything to do with it.[5]  Yet magically, somehow, Soros allegedly made the whole nefarious scheme work, and was assisted in that effort by such reputable law firms as Fried Frank and Kirkland & Ellis, as well as the other Defendants.

Tellingly, none of the conduct alleged by Plaintiffs regarding the Conseco bankruptcy action, or any of the ancillary litigation proceedings cited by Plaintiffs, suggests on its face any fraudulent scheme or intent whatsoever.  Rather, Plaintiffs point to routine and legitimate bankruptcy procedures and court approvals, such as approving debtor-in-possession financing,

---

[5]   *See* Oller Decl. Ex. E (Jan. 18, 2007 Hearing Tr.) at 2, 8 (the Soros Defendants "are even more removed from the transaction than the defendants for which I [previously] granted dismissals" and "are not the ones running this auction").

selling assets of the debtor, approving the debtor's retention of professionals, and litigating

disputes relating to proofs of claims and adversary proceedings.  (*See, e.g.*, Am. Cplt. ¶¶ 279, 281,

283, 284, 295-297.)  With no factual basis at all, Plaintiffs merely append the conclusory label

"bankruptcy fraud" to all such activity.  Similarly, Plaintiffs describe a customary lending

structure for a complex real estate transaction and declare it to be "money laundering" and "wire

fraud."  (*See, e.g.*, Am. Cplt. ¶¶447-475.)  It is all a complete invention.[6]

     After nearly 100 pages of this, Plaintiffs finally come to the crux of their Amended

Complaint:  the 2003 sale of the GM Building.  (*See, e.g.,* Am. Cplt. ¶¶ 404-436.)  A comparison

of Plaintiffs' claims in the State Action and Plaintiffs' claims in this Action confirms that both

actions are based on the allegedly fraudulent sale of that Building.

     For example, Plaintiffs allege in this case that the sellers of the GM Building "never

intended to sell the GM Building to plaintiff[.]"  (Am. Cplt. ¶ 421.)  They further allege that the

"bidding process was manipulated" by the Defendants in a "conspiracy" that was "rife with fraud,

bad faith and in violation of the rule of law that every contract contains an obligation of good

faith[,]" and which constituted a "rigged auction."  (*Id.* ¶¶ 424, 430.)  These allegations

recapitulate the entire substantive basis for their failed State Action.  As Plaintiffs' State

Complaint alleged:  "Conseco and the other defendants . . . conspired to manipulate and fix the

---

[6]    Mr. Dick's imagination is nothing if not vivid.  In the State Action, he filed an affidavit
asserting that Mr. Soros was personally spying on him at a bar at Grand Central Terminal.
In a prior, equally spurious RICO suit against American Express in this Court (No. 92 Civ.
7753), which also was filed after Mr. Dick lost the same claim in prior state and federal
court actions, Mr. Dick submitted an affidavit alleging that Judge Thomas Griesa was
involved in a conspiracy of "corruption and obstruction of justice" along with American
Express, apparently involving Richard Nixon, Gerald Ford, Henry Kissinger, as well as
Mr. Dick's former lawyer and the Clerk of the Southern District.

'bidding' process so that their designees, the Macklowe Defendants, would obtain title to the Building[.]"  (State Cplt. ¶ 27.)

As an additional example, Plaintiffs' Amended Complaint here alleges that "Defendants' pattern of racketeering and manipulation of the auction was in violation of plaintiffs' right to a fair auction and violated Conseco's and Eastdil's published auction procedures."  (Am. Cplt. ¶ 432.) Virtually identical allegations formed the basis of Plaintiffs' prior promissory estoppel claim. (*See, e.g.,* State Cplt. ¶ 81 (sale was not conducted "fairly and equitably"); *id.* ¶ 93 ([t]he Eastdil Defendants improperly allowed the Macklowe Defendants to submit a late bid, which was deemed 'accepted' as part of the Defendants' bid-rigging").)

The following chart further illustrates the substantial identity between the bid rigging allegations in the State Action and the present Action:

| Amended State Complaint (June 21, 2006) | Amended RICO Complaint (April 14, 2009) |
|---|---|
| "**Despite the fact that Plaintiffs were the highest bidder** on both the First and Second Rounds of bidding . . . defendants improperly disclosed to the Macklowe Defendants the specifics of Plaintiffs' bid and other bids submitted on August 27[th] and **improperly permitted the Macklowe Defendants to resubmit their bid after the announced closing of the time period for submission.**" (¶ 73.) | "**[D]espite the fact that plaintiffs' bid was the highest and best**, and the fact that Macklowe's bid was well below other bidders, was untimely submitted and as part of the criminal conspiracy, plan and scheme by defendants Conseco, Soros, Fortress, German American and Vornado, **Macklowe was privately allowed to increase his bid to appear to have won the fraudulent auction.**" (¶ 423.) |
| "[D]efendants entered into a scheme and artifice to defraud by designing a "Bid and Acquisition" procedure that gave the appearance of an impartial 'open bid' system when, in truth and in fact, **it was a total sham** with the **outcome fixed and predetermined. Defendants never intended** to award the contract of sale to anyone other than the **Macklowe defendants, as nominees of the Soros Defendants**, no matter who was the highest bidder."  (¶ 70.) | "The terms of the confidentiality agreement were **a sham** and **never intended to be followed** by the racketeering defendants." (¶ 435.)<br><br>"[T]hese auction procedures were **no more than a scam** by the Enterprise since **defendants had already decided** that the GM Building would be purchased by defendant **Macklowe, the 'straw man' for the Enterprise.**"  (¶ 57.) |

11

| | |
|---|---|
| "**Eastdil** was instrumental in the bid-rigging conspiracy, and **orchestrated an unauthorized and fraudulent 'bidding' process** that bore little if any relationship to the auction process described in Bankruptcy Court filings." (¶ 20.) | "**Eastdil**, Soros, Macklowe, Conseco and Kirkland & Ellis **failed to conduct the auction in good faith or in a fair or consistent way** pursuant to the terms of the bidding agreements which were relied upon by plaintiffs." (¶ 417.) |
| "**[E]astdil** improperly **disclosed to Macklowe** on the night that the Second Bids were submitted that Solow's bid was $1.4 billion, and improperly gave Macklowe a chance to **increase his bid** in order to match Solow's **$1.4 billion** second highest bid, whereupon he was declared the '**winning bidder**.'" (¶ 58.) | "Upon information and belief, on the morning after the final bid, **Eastdil Realty contacted** George Soros and/or **Harry Macklowe** and told them that if they would **raise the bid** to **1.4 Billion** Dollars, they would be considered the **winner of the bidding process**." (¶ 428.) |
| "On or about August 30, 2003, a news article in the New York Times disclosed that defendant **Harry Macklowe was the bid winner** . . . ." (¶ 54.) | "On August 30, 2003, the New York Times reported that **Harry Macklowe won the bid** to purchase the General Motors Building for 1.4 Billion Dollars. . . ." (¶ 436.) <br><br> "As a result, **Harry Macklowe, the straw man** of the Enterprise, was announced by The New York Times as the **winner of the rigged auction**." (¶ 430.) |

The two complaints also mirror each other in respect of Plaintiffs' contention that the "rigged auction" was accomplished through shell companies and disguised sources of financing by Soros and others, now labeled by Plaintiffs as "money laundering":

| **Amended State Complaint (June 21, 2006)** | **Amended RICO Complaint (April 14, 2009)** |
|---|---|
| "[T]he **GM Building** [is] **controlled by** the **Soros** Defendants **through** various other Soros-controlled entities, such as Fortress Investment Group LLC, and **Mapeley Holdings LTD** (a 50% **partner of Fortress** Investment Group LLC)." (¶ 6.) | "[D]efendant **Soros**, and the other conspirators, **conceived of a plan to acquire . . . the GM Building . . . with funds** that derived **from** Mapeley, Ltd., a Bermuda corporation which is a **partnership between** George **Soros** and/or one of the **Fortress** entities and their principals . . . ." (¶ 27.) |
| "Upon information and belief, the **Soros** Defendants obtained a **controlling interest in the GM Building** at the time of the closing on the property on August 27, 2003 . . . ." (¶ 6.) | "[T]he GM Building [] was, in fact **owned by Soros** and/or Fortress." (¶ 479.) |
| "**Upon information and belief, the modus operandi** [sic] of [the] Soros Defendants was | "The **modus operandi** of the RICO Enterprise involved **creating shell entities** through which |

| | |
|---|---|
| and is to acquire controlling interests in real estate and various companies through a **maze of nominee companies so that their investments are largely shielded from public scrutiny** . . . ."  (¶ 7.) | to launder money, pay off the conspirators with business opportunities and assets and then dissolve these ephemeral shell entities **to conceal the unlawful purposes** and acquisitions of the Enterprise . . . ."  (¶ 6.)<br><br>"**Upon information and belief**, at the end of funneling the illicitly derived funds through a **byzantine structure of shell entities**, Soros and Fortress had funneled the sum of 300 Million Dollars by means of wire fraud through Soros Credit II, Vornado, German American, Soros Credit I and Junior Mezzanine into Acquisition Co. as investments."  (¶ 465.) |

Finally, both complaints contain allegations of manipulations of the Conseco bankruptcy process and Conseco-related entities as part of the alleged scheme to keep the GM Building "in play," which Plaintiffs now characterize as "bankruptcy fraud":

| **Amended State Complaint (June 21, 2006)** | **Amended RICO Complaint (April 14, 2009)** |
|---|---|
| "The **Conseco Bankruptcy filing** was the **third largest** in U.S. history, trailing only those of Enron and WorldCom."  (¶ 12.) | "The **Bankruptcy filing of Conseco** was the **third largest** Bankruptcy proceeding, smaller only than Enron and WorldCom."  (¶ 283.) |
| "Just prior to its bankruptcy filing, **Conseco announced** in **October 2002** that it had **hired Lazard** to find buyers for certain of Conseco's assets."  (¶ 15.) | "On . . . **October 21, 2002**, once the RICO Enterprise was ready to file the voluntary Petition in Bankruptcy of defendant Conseco, **Conseco restated its retention agreement with defendant Lazard** . . . ."  (¶ 277.) |
| "On April 23, 2003, **Conseco withdrew its application to employ Eastdil as a Realtor** while, at the same time, failing to disclose to the Bankruptcy Court that it intended for Eastdil to continue to play a key role in the transaction." (¶ 20.) | "In furtherance of the RICO conspiracy, on April 14, 2003, **Eastdil Realty withdrew its application to be retained by Conseco as the seller's agent of the GM Building** since Eastdil Realty, in its conspiracy with Conseco, George Soros and Donald J. Trump, were all attempting to keep the GM Building in play so that it could not be sold under the jurisdiction of the Bankruptcy Court[.]"  (¶ 388.) |
| "Conseco . . . admitted that, **despite** the **absence of Bankruptcy Court approval, 'Eastdil was the exclusive real estate advisor** | "Conseco retained **Eastdil Realty to sell the GM Building *outside the purview of the Bankruptcy Court,*** in furtherance of the RICO |

13

| | |
|---|---|
| **[for the sale of the GM Building]**.'" (¶ 21.) | Enterprise." (¶ 410.) |
| "**[T]he Soros Defendant**s obtained effective **control over the assets of Conseco Finance** Corp. ("CFC") through CFN Investment Holdings, LLC, a joint venture led by Fortress Investment Group LLC . . . ." (¶ 7.) | "Fortress, Vornado, Trump, Soros, SFM and others, **acquired or maintained, directly or indirectly, an interest in, or control of Conseco,** an enterprise which was engaged in, or the activities of which affected, interstate or foreign commerce in two ways:  (a) **by purchasing Conseco Finance** with laundered money deriving from illegal sources, and (b) by obtaining the Debtor in Possession Financing of Conseco through racketeering activities." (¶ 252.) |
| "**Fortress** Investment Group LLC, the same **Soros**-controlled entity that provided Conseco, Inc. with debtor in possession financing through and affiliate (**FPS DIP** LLC). . . ." (¶ 7.) | "**FPS DIP** was controlled by **Fortress** and **Soros** . . . ." (¶ 274.) [7] |

## III.    PLAINTIFFS' FIVE-YEAR DELAY IN ASSERTING THEIR RICO CLAIMS.

On November 24, 2003, shortly after the closing of the GM Building sale to Macklowe, Leslie Dick sent a letter to Eastdil, copied to Soros, Macklowe and others, alleging that there was "*no reasonable explanation [] other than Bid Rigging*" for why Plaintiffs' bid on the GM Building was not accepted.  (*See* Oller Decl. Ex. H (Nov. 24, 2003 Ltr.) at 2 (emphasis added); *see id.* ("the fix was in to allow Harry Macklowe to put in a bid of 1.4 Billion – less than my initial bid . . .").)  In the letter, written five years before bringing the present RICO suit, Mr. Dick asserted that he had claims against Soros and others under various state and federal laws, *including RICO and money laundering*, with specific citation to 18 U.S.C. §§ 1952, 1957 and 1962, all of which are

---

[7]    *Compare also* Amended State Complaint ¶ 17 (Conseco plan to sell GM Building as part of bankruptcy) *with* Amended RICO Complaint ¶ 359 (same); Amended State Complaint ¶ 18 (application to retain Eastdil to sell GM Building) *with* Amended RICO Complaint ¶ 375 (same); Amended State Complaint ¶ 20 (withdrawal of Eastdil application allegedly without disclosing that Eastdil would continue to play key role in bid-rigging conspiracy) *with* Amended RICO Complaint ¶ 388 (withdrawal of Eastdil application "in furtherance of the RICO conspiracy" and to "keep the GM Building in play").

alleged in the present Action.  (*Id.* at 3; *see* Am. Cplt. ¶¶ 560-600.)  The letter further alleged the use of "criminally derived property" in furtherance of "specified unlawful activity," a clear reference to the elements of money laundering.  (*See* Oller Decl. Ex. H (Nov. 24, 2003 Ltr.) at 4.)  In concluding his 2003 letter, Mr. Dick stated his "opinion that Mr. George Soros masterminded the alleged crime from the very beginning . . . ."  (*Id.*)

More than two years later, Mr. Dick chose to sue the Soros Defendants and others, including Macklowe, Eastdil and Conseco, in New York Supreme Court.  He did not assert any RICO claims in the State Action, despite his statement in the November 2003 letter that he had RICO claims based on, among other things, money laundering.  After Plaintiffs' State Action was dismissed with prejudice in February 2007 and they had exhausted the appeals process, Plaintiffs asserted the RICO claims that Mr. Dick had alluded to in his November 2003 letter on September 10, 2008 – nearly five years later.  Plaintiff re-stated the RICO claims in the present Amended RICO Complaint filed on April 14, 2009.

## ARGUMENT

### I.   STANDARD OF REVIEW

In considering the defense of *res judicata*, the Court "may judicially notice prior pleadings, orders, judgment, and other items appearing in the court records of prior litigation that are related to the case before it."  *Coleman v. B.G. Sulzle, Inc.*, 402 F. Supp. 2d 403, 418 (N.D.N.Y. 2005) (internal quotations omitted); *see also Iwachiw v. N.Y.C. Bd. of Educ.*, 194 F. Supp. 2d 194, 201 (E.D.N.Y. 2002) (Court may refer to matters of which judicial notice may be taken, including "transcripts of various hearings, letters and decisions from the plaintiff's state court action" in support of motion to dismiss on *res judicata* grounds, without converting motion to one for summary judgment); *Singh v. Parnes*, 199 F. Supp. 2d 152, 156-58 (S.D.N.Y. 2002) (taking note of prior state actions to apply *res judicata*); *Sassower v. Abrams*, 833 F. Supp. 253, 264 n.18

(S.D.N.Y. 1993) ("it is well settled that a court may dismiss a claim on res judicata or collateral estoppel grounds on a Rule 12(b)(6) motion").

Similarly, with regard to the statute of limitations, when the facts as pleaded, as well as those in the public domain, make clear that a plaintiff's claims are time-barred, dismissal as a matter of law pursuant to Rule 12(b)(6) is appropriate.  *See Ezra Charitable Trust v. Frontier Ins. Group*, No. 00-CV-5361, 2002 WL 87723 (S.D.N.Y. Jan. 23, 2002) (taking judicial notice of a document with a statement from defendant that was filed in an earlier legal proceeding and dismissing claims as time-barred); *LC Capital Partners v. Frontier Ins. Group*, 318 F.3d 148, 156 (2d Cir. 2003) ("Where . . . the facts needed for determination of when a reasonable [person] of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint, resolution of the issue on a motion to dismiss is appropriate.") (internal quotations omitted).

With regard to a plaintiff's factual assertions, the Court must accept material facts as alleged and construe reasonable inferences in the plaintiff's favor.  *See Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).  However, "bald assertions and conclusions of law will not suffice."  *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (internal quotations omitted).  As the Supreme Court recently held in *Bell Atlantic Corp. v. Twombly*, "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions and a formulaic recitation of the elements of a cause of action will not do."  127 S. Ct. 1955, 1964-65 (2007) (citations and internal quotations omitted).  "The pleadings must create the possibility of a right to relief that is more than speculative."  *Spool*, 520 F.3d at 183 (citations omitted).  Further, as the Supreme Court held in *Twombly*, claims of conspiracy require "allegations plausibly suggesting (not merely consistent with) agreement," to meet the "threshold

16

requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'"  127 S. Ct. at 1966.

Applying the above pleading standards and the applicable law, Plaintiffs' Amended Complaint should be dismissed with prejudice.

## II.   PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED.

Plaintiffs' RICO claims fail because (a) they are barred by *res judicata*; (b) they fail to allege a RICO injury; (c) they are barred by the statute of limitations; and (d) they do not adequately plead a substantive RICO claim.

### A.   PLAINTIFFS' RICO CLAIMS ARE BARRED BY *RES JUDICATA*.

The heart of Plaintiffs' claims in this Action – and the only arguable basis for a claim of injury to Plaintiffs – is the rejection of their offer to purchase the GM Building.  Plaintiffs' RICO claims are based on allegations that Harry Macklowe was the pre-selected, "straw man" purchaser of the GM Building.  (Am. Cplt. ¶¶ 411-36.)  Apart from their lack of merit, these claims are nothing more than a reincarnation of Plaintiffs' dismissed State Action, which also was based on the same allegations that the GM Building sale was "rigged" in Harry Macklowe's favor.  The dismissal of Plaintiffs' state claims is *res judicata* with respect to their RICO claims in this case.

As a federal court, this Court is required to give full faith and credit to the decisions in the State Action to the same extent that New York courts would credit those decisions.  *See Migra v. Waren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 80 (1984); *Singh*, 199 F. Supp. 2d at 158; *see also Donovan v. Lewnowski*, No. 03-CV-2985, 2005 WL 2095739, at *3 (E.D.N.Y. Aug. 30, 2005) ("New York law will determine the preclusive effect of the [New York] state court action on the instant matter.").  And under New York law, *res judicata* bars Plaintiffs' RICO claims against the Soros Defendants and others here because those claims arise from the same factual matrix as the claims adjudicated to a final judgment on the merits in the prior State Action, are

17

between the same parties or those in privity with them, and could have been brought in the State

Action.  *See Sandhu v. Mercy Med. Ctr.*, 864 N.Y.S.2d 124, 124 (2d Dep't 2008); *see also Spitzer*

*v. Applied Card Sys., Inc.*, 11 N.Y.3d 105, 122 (2008) ("In New York, res judicata, or claim

preclusion, bars successive litigation based upon the 'same transaction or series of connected

transactions' if: (i) there is a judgment on the merits rendered by a court of competent jurisdiction,

and (ii) the party against whom the doctrine is invoked was a party to the previous action, or in

privity with a party who was.") (internal citations omitted).

New York courts follow a transactional approach to *res judicata*, such that any final

decision on the merits bars all subsequent claims arising from the same transaction or series of

transactions, even if based on different legal theories.  *See Smith v. Russell Sage Coll.*, 54 N.Y.2d

185, 192-93 (1981); *see also Giannone v. York Tape & Label, Inc.*, 548 F.3d 191, 194 (2d Cir.

2008) (affirming dismissal of federal action that alleged different legal theories than prior

dismissed state action but was based on the same underlying transaction).  In addition, *res judicata*

applies so long as the party sought to be precluded (here, Leslie Dick and Leslie Dick Worldwide)

is the same party, or in privity with the parties, who were unsuccessful in the prior action.  *See*

*Applied Card Sys.*, 11 N.Y.3d at 122.  And the doctrine applies "both to claims asserted and

claims that could have been asserted in the prior action so long as the party to be precluded had a

full and fair opportunity to litigate those claims."  *Donovan*, 2005 WL 2095739, at *3; *see also*

*Santiago ex rel. Garcia v. Bd. of Health*, 779 N.Y.S.2d 474, 476 (1st Dep't 2004) ("What matters

is that the latter claims could have been asserted in the first action and [plaintiff] had a full and fair

opportunity to litigate those claims in that action"); *Schwartzreich v. E.P.C. Carting Co., Inc.*, 668

N.Y.S.2d 370, 372 (1st Dep't 1998) ("If the party against whom res judicata is invoked had a full

and fair opportunity to litigate the claim in a prior proceeding based on the same transaction, but

did not raise it therein, he will be barred from raising it in a subsequent action.").

All of the elements of *res judicata* are satisfied here. First, the "same transaction" test is clearly met. Though the present Amended Complaint is more convoluted, the gravamen of the wrong alleged in both the State Action and the present Action is the same: Plaintiffs were injured when they participated in an alleged "sham auction" where the winner of the bid was fixed in advance, contrary to the terms of the bidding process set forth in the relevant documents. (*See, e.g.*, State Cplt. ¶ 70; Am. Cplt. ¶¶ 414, 421, 432.) The 2003 sale of the GM Building is the alleged harm in both actions, and the hundreds of allegations added to the present Amended RICO Complaint do not serve to change the fundamental basis of Plaintiffs' claims. *See, e.g.*, *Smith*, 54 N.Y.2d at 193 (finding second action precluded by *res judicata* because, "Though embellished by later events, both originate from the identical agreement."). Indeed, Plaintiffs themselves have recently represented to this Court (in letters seeking to disqualify Trump's counsel), that the State Action involved "the same subject matter, facts and circumstances as the instant action." (*See* Oller Decl. Ex. I (Dec. 10, 2008 Ltr.) at 1 (emphasis in original).)

Although the present Action, unlike the State Action, now explicitly invokes RICO as a legal theory for the alleged harm, that does not matter for *res judicata* purposes. *See Singh*, 199 F. Supp. 2d at 159 (dismissing federal RICO claims based on "same transaction" as prior dismissed state actions claiming fraud in connection with the sale of a building, because "a party cannot avoid the preclusive effect of *res judicata* or collateral estoppel by recasting allegations of fraud adjudicated in [a] prior litigation as a federal RICO action"); *Donovan*, 2005 WL 2095739, at *5 (dismissing federal RICO claim on *res judicata* grounds based on prior state court dismissal of state law claims that were factually related); *Printing Mart-Morristown, Inc. v. Rosenthal*, 650 F. Supp. 1444 (D.N.J. 1987) (applying "transaction based" test for *res judicata* to bar later RICO suit based on alleged bid rigging scheme where earlier state court action dismissed claim for tortious

interference based on same alleged scheme; notwithstanding allegations in the federal complaint of RICO predicate acts committed subsequent to state court dismissal).

The "identity of parties" test is also met.  The Plaintiffs in this action (Leslie Dick Worldwide and Leslie Dick) are identical to those who were unsuccessful in the State Action. Moreover, the Soros Defendants (George Soros and Soros Fund Management, LLC) were both defendants in the State Action.[8]

Next, the prior dismissal of all claims in the State Action against the Soros Defendants "with prejudice" constitutes a final adjudication on the merits.  *See Yonkers Contracting Co. v. Port Auth*., 93 N.Y.2d 375, 380 (1999) (the phrases "with prejudice" and "on the merits" are interchangeable because "A dismissal 'with prejudice' generally signifies that the court intended to dismiss the action 'on the merits,' that is, to bring the action to a final conclusion against the plaintiff").[9]

Finally, it is well-settled that the RICO claims could have been brought in the prior State Action.  *See Tafflin v. Levitt*, 493 U.S. 455 (1990) (federal and state courts have concurrent jurisdiction over RICO claims); *Official Publ'ns, Inc. v. Kable News Co.*, 811 F. Supp. 143, 146-

---

[8]     The separate briefs of the non-Soros Defendants explain why *res judicata* and/or collateral estoppel bar Plaintiffs' claims against those Defendants as well.

[9]     The New York Supreme Court's November 29, 2006 opinion and order and corresponding judgment entered on December 20, 2006 in favor of the non-Soros Defendants in the State Action, dismissing Plaintiffs' claims as to those Defendants pursuant to CPLR § 3211(a)(1) and (a)(7), also constitutes a final judgment on the merits as to those Defendants.  *See Feigen v. Advance Capital Mgmt. Corp.*,  536 N.Y.S.2d 786, 788 (1st Dep't 1989) (dismissal of a complaint based on documentary evidence is a disposition on the merits for *res judicata* purposes); *Flynn v. Sinclair Oil Corp.*, 246 N.Y.S.2d 360, 361 (1st Dep't 1964) (second action barred by *res judicata* when the complaint is virtually identical to the one previously dismissed for failure to state a cause of action and no appeal was taken of that dismissal); *see also Strange v. Montefiore Hosp. & Med. Ctr.*, 59 N.Y. 2d 737, 739 (1983) (judgment need not contain the "precise words 'on the merits' in order to be given *res judicata* effect") (internal citations omitted).

47 (S.D.N.Y. 1993) (stipulation of dismissal with prejudice in state court action barred subsequent RICO claim in federal court arising out of same transaction) (citations omitted) (same).  Because Plaintiffs had an opportunity to bring their RICO claims in the State Action (but chose not to), they are now barred from doing so here.  *See Santiago*, 779 N.Y.S.2d at 476.

In an apparent, but misguided, effort to plead around *res judicata*, Plaintiffs assert that *res judicata* "only" applies when "the same evidence is needed to support both claims, and when the facts essential to the second action were present in the first action."  (Am. Cplt. ¶ 74.)  Plaintiffs then assert that the evidence needed to support the instant action "was not present" in the State Action, and that they did not know and were not able to discover in the State Action the facts and documents alleged in the present Action.  (*Id.* ¶¶ 74-78.)  These contentions are unavailing.

Plaintiffs' "different evidence/different documents" argument is apparently based on language lifted out of context from *Saud v. Bank of New York*, 929 F.2d 916 (2d Cir. 1991), and other cases following it, which apply federal *res judicata* law.  Of course, as discussed above, it is New York law that governs here, and New York applies the "same transaction" test for *res judicata*, without regard to whether the "evidence" or "documents" needed to support the claims are the same in both actions.  As explained by the New York Court of Appeals in *Smith v. Russell Sage*, the leading *res judicata* case in New York, the test is a "pragmatic," not mechanical, one:

> [E]ven if there are variations in the facts alleged, or different relief is sought,
> the separately stated 'causes of action' may nevertheless be grounded on the
> same gravamen of the wrong upon which the action is brought.  This holds
> true even when several legal theories depend on different shadings of the facts
> or would emphasize different elements of the facts or would call for different
> measures of liability or different kinds of relief.

54 N.Y.2d at 192; *see id.* at 193 (*res judicata* looks to whether both actions involve the same "factual grouping").  As set forth above, the essential facts alleged in both the State Action and the

present action are in many respects identical, and in any event are part of the same basic factual matrix.  Under New York law, there is no doubt that *res judicata* applies.

Even under the *Saud* test, *res judicata* would apply.  The pertinent language from *Saud* that Plaintiffs have selectively quoted from is as follows:

> *The Second Circuit has adopted a broad view of what constitutes the same cause of action* [in determining whether res judicata applies].  *Actions need not be identical; they only need be integrally related.*  In assessing claims, the Court considers several related factors, *not one of which is necessarily dispositive,* including:  (1) whether the same transaction or connected series of transactions is at issue; (2) whether the same evidence is needed to support both claims; and (3) whether the facts essential to the second action were present in the first.

*Saud v. Bank of New York*, 734 F. Supp 628, 632 (S.D.N.Y. 1990), *aff'd*, 929 F.2d 916 (2d Cir. 1991) (emphasis added).  Thus, Plaintiffs' assertion that *res judicata* "only applies" when the second and third *Saud* factors are present is a misstatement not only of New York but Second Circuit law.

In any event, all three *Saud* factors are met here.  The same transaction or series of transactions is at issue (as Plaintiffs themselves concede).  The same evidence *is* needed to support both claims, since Plaintiffs cannot recover in this Action absent proof of the bid rigging they allege in connection with the 2003 sale, which they also alleged in the State Action.  And the "essential" facts in this Action – the claimed bid rigging  – were present in the State Action.

*Saud* itself makes clear that *res judicata* applies here.  In rejecting the plaintiff's efforts to avoid *res judicata* by artful pleading of a RICO claim, both the district court and Second Circuit in that case stated that *res judicata* does not require complete identity of facts and evidence in the two actions, or knowledge by plaintiff in the earlier action of the full extent of the misdeeds alleged in the later action or the evidence needed to support the later claims.  Rather, it is enough that the plaintiff in the first action is "aware of the essential facts which surround the fraud

allegations" in the later action.  734 F. Supp. at 635; *see* 929 F.2d at 920.  Significantly, in *Saud*, similar to Leslie Dick's November 2003 letter here, plaintiff had stated in an earlier letter that he had "long suspected" wrongdoing on the part of defendants and that "[i]t would appear that there has been a conspiracy."  929 F.2d at 921.  The Second Circuit held that these statements made plaintiff "chargeable with full knowledge of the fraud" even if, in the first action, he did not actually discover the full extent of the fraud and evidence supporting his later action.  *Id*. at 922.

Plaintiffs' allegation that in the State Action they did not and could not discover the facts alleged in the present Action is wrong in any event.  With respect to the core allegations of a fraudulent sale of the GM Building, Plaintiffs knew all of the essential facts in 2003, and certainly in 2006, when they expressly alleged a fraudulent, sham auction in the State Action.  The 2006 Action alleged that the Soros Defendants, as their "modus operandi," used of "a maze of nominee companies so that their investments are largely shielded from public scrutiny."  (State Cplt. ¶ 7.) That is the gist of the money laundering and wire fraud claims in the present action.  (*See supra* pp. 12-13 and *infra* Points II.D.1.b.ii-iii.)  Moreover, the 2003 Leslie Dick letter, which accused Soros of being the "mastermind" of the conspiracy, specifically cited the money laundering statute and its elements.  (*See supra* pp. 14-15.)  And the bankruptcy fraud allegations in the present action, which are merely embellishments on the bankruptcy allegations in the 2006 Amended State Complaint, are all based on public filings in the bankruptcy court that were available then. Indeed, all but one of the 41 exhibits cited throughout the Amended Complaint that Plaintiffs point to as evidence of money laundering, bankruptcy fraud and wire fraud are *public documents* that were available *prior to* the filing of the State Action.[10]  Whether Plaintiffs actually reviewed those

---

[10]     The lone exhibit to the Amended Complaint that may not have been publicly available prior to the filing of the State Action is an undated chart apparently created by Plaintiffs or their counsel.  (Am. Cplt. Ex. LL.)

documents earlier is irrelevant; the fact is that they were available, with or without formal

discovery, and could have been discovered.  Thus, the contention that Plaintiffs "were not able to

discover the facts alleged herein" (Am. Cplt. ¶ 75) does not withstand scrutiny and provides no

basis for avoiding *res judicata.  See L-Tec Elecs. Corp. v. Cougar Elec. Org., Inc.*, 198 F.3d 85,

87-88 (2d Cir. 1999) ("newly discovered evidence" not grounds to avoid *res judicata* where the

evidence "could have been discovered with due diligence") (citing *Saud*, 929 F.2d at 920).

In sum, because the RICO claims asserted in the present Action are based on the same

factual grouping as the claims previously brought to a final adjudication on the merits in the State

Action, are brought by the same Plaintiffs against the same defendants or their privies as in the

State Action, and could have been brought in the State Action, they are barred by the doctrine of

*res judicata*.

### B.  PLAINTIFFS LACK RICO STANDING BECAUSE THEY FAIL TO ALLEGE AN INJURY PROXIMATELY CAUSED BY A RICO VIOLATION.

Plaintiffs lack standing to bring their RICO claims.  The RICO statute limits private

actions to those by "[a]ny person injured in his business or property *by reason of* a violation of

[the RICO Act's substantive provisions]."  18 U.S.C. § 1964(c) (emphasis added).  Thus, for

purposes of a civil RICO claim, "the plaintiff only has standing if, and can only recover to the

extent that, he has been injured in his business or property *by the conduct constituting the [RICO]

violation*."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (emphasis added); *see also*

18 U.S.C. § 1964(c); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1100 (2d Cir. 1988), *cert.*

*denied*, 490 U.S. 1007 (1989).  To make this showing, a plaintiff must show "'that the defendant's

violation not only was a 'but for' cause of his injury, but was the proximate cause as well.'"

*McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008) (quoting *Holmes v. Sec.*

*Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).  *See generally Anza v. Ideal Steel Supply*

24

*Corp.*, 547 U.S. 451, 458 (2006) (finding no standing because plaintiff's injuries were not caused by the alleged RICO violation).  Plaintiffs cannot make the necessary showing here.

      **1.**      **Plaintiffs lack standing to assert their RICO claims based on predicate acts of bankruptcy fraud, money laundering, and wire fraud.**

Having already litigated and lost their claims stemming from the alleged "rigged" sale of the GM Building, Plaintiffs now fill their Amended Complaint with allegations of bankruptcy fraud, money laundering, and wire fraud.  Plaintiffs, however, are strangers to all of the events and transactions underlying these allegations and do not allege any injury caused by these alleged acts. Consequently, none of Plaintiffs' allegations of bankruptcy fraud, money laundering, or wire fraud provides a basis for a claim of injury "by reason of" a RICO violation.

The alleged "bankruptcy fraud" is not and could not be alleged to have been the proximate cause of any injury to Plaintiffs.  Plaintiffs do not allege to have participated in the bankruptcy in any way, nor to have been creditors of Conseco.  In fact, despite attaching numerous pleadings from Conseco's bankruptcy proceedings, not one of these pleadings pertains to Plaintiffs, who therefore lack standing under RICO.[11]  Likewise, Plaintiffs have not claimed, nor could they, that the alleged wiring of monies into "shell" companies, whether characterized as wire fraud, money laundering or both (*see, e.g.*, Am. Cplt. ¶¶ 446-67), was the proximate cause of their alleged harm. The same is true of the investment by the alleged Enterprise in Trump International Hotel in Chicago in 2004 (Am. Cplt. ¶¶ 65, 475).

Apparently recognizing that they have alleged no injury resulting from the hundreds of allegations of bankruptcy fraud, money laundering, and wire fraud, Plaintiffs offer a highly

---

[11]    *See* The Hon. Jed S. Rakoff & Howard W. Goldstein, *RICO Civil and Criminal Law and Strategy* § 2.02[3][C] (2008) ("Those for whom injury is only indirect, such as creditors' creditors, are also foreclosed from maintaining [a RICO action based on bankruptcy fraud] because they lack standing.") (citing cases).

attenuated theory that "but for" these alleged predicate acts, the fraudulent sale of the GM Building could not have been carried out. However, "but for" causation is not enough to state a RICO claim. Plaintiffs must allege a direct and proximate injury caused by the conduct constituting the RICO violation. Plaintiffs' conspiracy theories fall short of this standard. Plaintiffs simply have no standing to assert RICO claims based on the alleged predicate acts of bankruptcy fraud, money laundering, and/or wire fraud.

### 2. Plaintiffs lack standing to assert RICO claims based on the 2003 sale.

Plaintiffs also lack standing to assert RICO claims based on the alleged "rigged" sale of the GM Building itself. In the first place, that alleged "rigged" sale is not even alleged to be a predicate act that is part of the pattern of racketeering activity, and for that reason alone cannot form the basis of a RICO claim. *See Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 122-23 (2d Cir. 2003) (plaintiff has no standing where the alleged harm was not caused directly by the racketeering activity, but rather some non-RICO violations committed by the defendants). And even if the "rigged" sale had been pleaded as a predicate act, Plaintiffs cannot demonstrate that the alleged fraudulent sale was the proximate cause of Plaintiffs' injury.

Plaintiffs' alleged injury from this sale relates to the profits they claim they could have achieved had they purchased the Building. Putting aside the speculative nature of the damages claim, Plaintiffs' RICO claim presumes that the seller would have accepted their bid but for the alleged conspiracy. But there were a host of intervening factors making it impossible to conclude that Plaintiffs would have been awarded the contract for the GM Building even if the conspiracy alleged by Plaintiffs did not exist. These factors included the subjective and absolutely discretionary process of the bid selection procedure, the lack of a defined bid selection process, and the presence of other bidders for the GM Building that Leslie Dick concedes were not part of any alleged conspiracy. (*See* Oller Decl. Ex. C (Nov. 29, 2006 Order) at 9-10; Ex. H (Nov. 24,

26

2003 Ltr.) at 2.)[12]  In the State Action, Mr. Dick himself acknowledged that "[t]here were Thirty

(30) bidders who participated in the Eastdil Auction . . ." (Oller Decl. Ex. H (Dick State Ct. Aff.)

at ¶ 11), including at least one (Sheldon Solow) who also sued claiming to have submitted the best

bid.  (*See* State Cplt. ¶¶ 58-66.)[13]

For these reasons, Plaintiffs' claim that they would have been awarded the bid absent the

claimed conspiracy was already adjudicated against them in the State Action.  As Justice

Moskowitz held, "[Plaintiffs] can [not] allege that . . . 'but for' the conduct of [defendants], it

would have been the successful bidder."  (Oller Decl. Ex. C (Nov. 29, 2006 Order) at 12.)  That

---

[12]     "It is well established that a district court may rely on matters of public record in deciding
a motion to dismiss under rule 12(b)(6)."  *Sutton v. Wachovia Securities, LLC*, 208
F. App'x 27, 29 (2d Cir. 2006) (internal quotations omitted) (pleadings filed in a state
court and the orders of that state court are "undisputably matters of public record.").
Moreover, Plaintiffs cite to and rely on Justice Moskowitz' decision in the State Action in
their Amended RICO Complaint (*see* Am. Cplt. ¶¶ 70-73), and also expressly refer to the
relevant bid procedure documents that explained the totally discretionary nature of the
process (*see, e.g., id*. ¶ 415 (referring to informational memorandum, memorandum
inviting bids, and confidentiality agreement)).

[13]     *See also Solow v. Conseco, Inc.*, No. 06-CV-5988, 2008 U.S. Dist. LEXIS 9234, at *4-5.
(S.D.N.Y. Jan. 11, 2008) ("Solow alleges that while its Final Bid was the 'best and highest
credible bid,' the Building was sold to entities controlled by Harry Macklowe").  Although
it involved the 2003 sale of the GM Building, this Court's recent decision in the *Solow*
case (which involved only state law claims, not RICO claims) does not control the
outcome of Defendants' motion in this case.  This Court in *Solow* denied in part a motion
to dismiss plaintiff Sheldon Solow's complaint against Conseco and Carmel Fifth, the only
defendants in that action, holding that the sellers' reservation of rights was not dispositive
of Mr. Solow's fraud and promissory estoppel claims because "at this stage in the
litigation, [] a court must accept all allegations in the Complaint as true and construe all
reasonable inferences in Plaintiff's favor."  *Id.*  Here, however, Defendants are not asking
this Court to hold that the sellers' reservation of rights precludes a finding of reasonable
reliance by Mr. Dick; Justice Moskowitz, in a decision entitled to full faith and credit,
already so held in dismissing the State Action.  Rather, Defendants are asking this Court to
apply *res judicata* and the statute of limitations based on the State Action and matters of
record that raise no disputed inferences of fact.  Further, the decision in *Solow* does not
bear on the inadequacy, as a matter of law, of the Amended Complaint's allegations
concerning RICO standing, injury, pattern, enterprise and other elements.

finding binds Plaintiffs in this action.[14]  Plaintiffs thus cannot demonstrate that Defendants'
alleged fraud in conducting the sale of the GM Building was the cause of any injury Plaintiffs
suffered.  Much less can Plaintiffs establish proximate cause under RICO.

In analogous circumstances, courts have denied RICO standing to disappointed bidders
where factors other than defendants' alleged misconduct controlled the outcome of the bid.
*Strates Shows, Inc. v. Amusements of America, Inc.*, 379 F. Supp. 2d 817 (E.D.N.C. 2005), for
example, is virtually on point.  In that case, a carnival midway operator, Strates Shows, which had
operated the midway for the North Carolina State Fair for a number of years, submitted what it
claimed was the "superior financial offer" for the 2002 State Fair contract, in the form of the
lowest bid.  *Id*. at 829.  Another vendor, Amusements of America, however, had orchestrated a
conspiracy to secure the contract for itself.  Amusements of America was awarded the contract,
and Strates Shows filed a RICO action in federal court.  Strates Shows argued that, as the low
bidder, it would have been awarded the midway contract but for the unlawful conduct of the
defendants.  *Id.* at 826.  However, the court held that plaintiff had not alleged an injury
proximately caused by defendants' illegal activity.

As the court found, there were a number of intervening factors, such as the presence of
other bidders not involved in the alleged conspiracy, the lack of a set procedure or criteria for
award of the midway contract, and administrative discretion, which all weighed against a finding
of proximate causation.  *Id.* at 828.  The court stated, "Although plaintiff alleges that it would have
been awarded the [contract] because it submitted a 'superior financial offer,' . . . the court need not
credit plaintiff's conclusory allegation."  *Id.* at 829.  Because North Carolina had administrative

---

[14]     *See Buechel v. Bain*, 97 N.Y.2d 295, 303 (2001) ("Collateral estoppel precludes a party
         from relitigating in a subsequent action or proceeding an issue raised in a prior action or
         proceeding and decided against that party or those in privity.").

discretion, it was impossible to predict who would have been awarded the contract absent defendants' illegal conduct.  *Id.* at 832;[15] *see also World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 530 F. Supp. 2d 486, 523 (S.D.N.Y. 2007) (alleged injury failed to establish RICO standing because "Plaintiff does not have a crystal ball or any plausible way to allege facts that would establish the outcome of the bidding process . . . there is no way to predict what would have happened if [there had been] a full and fair bidding process."); *James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 403 (7th Cir. 2006) (no proximate causation because "[a] court could never be certain whether Cape would have won any of the contracts that were the subject of the conspiracy for any number of reasons unconnected to the asserted pattern of fraud" (internal quotations omitted)); *Bonavitacola Elec. Contractor, Inc. v. Boro Developers, Inc.*, No. 01-CV-5508, 2003 WL 329145, at *12 (E.D. Pa. Feb. 12, 2003) (plaintiff failed to allege RICO injury from fraudulent bidding process because "it does not necessarily follow that Plaintiff . . .  would have been awarded the contract if Defendant . . . had not bid, or had not been the low bidder, just because it was the next lower bidder"), *aff'd*, 87 F. App'x 227 (3d Cir. 2003); *Southern States Imports, Inc. v. Subaru of America, Inc.*, No. 5:05-CV-752, 2008 WL 2234625, at *10 (E.D.N.C. May 30, 2008) ("Just as in *Strates Shows*, Plaintiffs here cannot establish proximate cause because of a host of other intervening factors, including the existence of other potential dealers and the subjective nature of Subaru's selection process.").

The same reasoning is fully applicable here.  As Justice Moskowitz specifically noted in her decision dismissing the State Action:  "Conseco, in its sole discretion, was entitled to sell the

---

[15]     The district court in *Strates Shows* also denied RICO standing on the alternative ground that plaintiff had a mere expectancy interest in the midway contract, and "[s]uch alleged injury to mere expectancy interests or to an intangible property interest is not sufficient to confer RICO standing."  379 F. Supp. 2d at 825, *see id*. at 826-28.  The same reasoning applies here, as Plaintiffs had a mere expectancy interest in the GM Building.

GM Building to any bidder or no bidder and . . . Conseco [c]ould consider several factors other than price when making it decision."  (Oller Decl. Ex. C (Nov. 29, 2006 Order) at 9.) Additionally, Justice Moskowitz stated that Conseco never promised that it would hold an "auction without reserve where the highest dollar bid is the sole consideration."  (*Id.*)  And there were numerous bidders, besides Plaintiffs, not involved in the alleged conspiracy.  Plaintiffs cannot establish that absent the alleged conspiracy they would have won the bid, and therefore cannot establish that their alleged injury was proximately caused by the alleged bid rigging scheme.

## C.    IF PLAINTIFFS SUFFERED ANY RICO INJURY THE RICO CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

Even if Plaintiffs could establish an injury proximately caused by a RICO violation, their RICO claims would still fail because they are time-barred.  Civil RICO claims are subject to a four-year statute of limitations, which begins to run once a plaintiff "discovers or should have discovered the RICO injury."  *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 58 (2d Cir. 1998); *Bankers Trust*, 859 F.2d at 1102 (same).  The RICO statute of limitations test "is an objective one, to wit, when a reasonable person should have discovered the RICO injury, the RICO statute of limitations will start to run."  *In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*, 850 F. Supp. 1105, 1118 (S.D.N.Y. 1993); s*ee also Salinger v. Projectavision, Inc*., 934 F. Supp. 1402, 1408 (S.D.N.Y. 1996) ("the test is an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings and the public disclosures themselves").

The undisputed and objective record here demonstrates that Plaintiffs discovered their alleged injury more than four years before filing the September 10, 2008 Complaint asserting RICO claims.  There is no question that Plaintiffs discovered, or should have discovered, their

alleged RICO injury when they "lost" the bidding contest for the GM Building on August 27, 2003. No later than August 30, 2003, when the *New York Times* published an article stating that Macklowe "won the bid to purchase the General Motors Building for 1.4 Billon Dollars," Plaintiffs – who claim their $1.5 billion bid was the "highest and best" – knew that the GM Building was not, in fact, awarded to the so-called highest bidder. (Am. Cplt. ¶¶ 432, 436.) These undisputed facts, coupled with Plaintiffs' allegations that the sale did not "adhere to the bidding procedure or the rules of the bidding process" which "were relied upon plaintiff" (*id.* ¶¶ 417, 421), and that they were previously assured that the property would go to the highest bidder (State Cplt. ¶ 85), were sufficient to apprise Plaintiffs of their supposed injury.

Lest there be any doubt about this, Plaintiffs' November 24, 2003 letter to certain Defendants shows that Plaintiffs discovered their alleged RICO injury – at the very latest – nearly five years before filing the Complaint. In the letter to Eastdil, copied to Soros, Macklowe, and others, Plaintiffs alleged that there was "no reasonable explanation [] other than Bid Rigging" for why Plaintiffs' bid on the GM Building was not accepted, and asserted that Plaintiffs had claims *under RICO*, based on predicate acts of money laundering, among others.[16] In fact, Plaintiffs concede in their Amended Complaint that they "suspected that they were harmed in connection with the bidding process for the purchase of the GM Building in 2003." (Am. Cplt. ¶ 87.) Because, in November 2003, Plaintiffs not only "suspected," but affirmatively *asserted*, that they had suffered RICO injuries in connection with the GM Building sale, their failure to bring the RICO claims until September 10, 2008, nearly five years later, bars any RICO claims. *See*

---

[16]     *See* Oller Decl. Ex. H (Nov. 24, 2003 Ltr.) at 2-4. Because the letter is part of the public record in the State Action, and is being used not to prove the truth of its contents but instead for the fact of what it said, the Court may take judicial notice of the letter in considering a motion to dismiss the federal court action without converting the motion to one for summary judgment. *See Ezra Charitable Trust*, 2002 WL 87723, at *3 n.1.

*Iwachiw*, 194 F. Supp. 2d at 198, 204 (putative civil RICO claim "arising from the plaintiff's suspicion of bid rigging" was barred by statute of limitations because plaintiff's cause of action, based on assertion that he was "fraudulently eliminated . . . as a successful bidder" on contract, accrued "when [defendants] committed the alleged bid rigging" more than four years before plaintiff brought RICO claims); *Takeuchi v. Sakhai*, No. 06-CV-0818, 2007 WL 2028892, at *1 (2d Cir. Jul. 12, 2007) (plaintiffs were on inquiry notice as to any possible RICO injury when they were put on notice of possible misrepresentations).

     As with *res judicata*, Plaintiffs try to plead around the statute of limitations, but with no more success.  Plaintiffs allege that their injuries were speculative, "future injuries" that did not become "concrete and measurable" until the GM Building was sold by Macklowe in 2008, and that the statute of limitations therefore did not accrue until 2008.  (Am. Cplt. ¶¶ 80-82.)  Again, Plaintiffs appear to be taking out of context certain language from Second Circuit opinions for the proposition that a RICO injury "does not become ripe until 'the amount of damages becomes clear and definite.'"  *See, e.g.*, *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir. 1994) (citing *Bankers Trust*, 741 F.2d at 1102).  But that proposition has no application here, as it merely reflects the familiar rule that a cause of action must be ripe before it accrues and can be sued on.  As later explained by the district court in the *Merrill Lynch* case, affirmed by the Second Circuit, the language now relied on by Plaintiffs "was dictum, and cannot be interpreted to mean that the exact amount of damages must be certain before the action is ripe.  *First Nationwide* cited *Bankers Trust* in support of this statement, and that case . . . stands for the proposition that the injury cannot be speculative, not that the amount of damages must be certain for the action to be ripe."  *In re Merrill Lynch Ltd. P'ships Litig.*, 7 F. Supp. 2d 256, 264 (S.D.N.Y. 1997), *aff'd*, 154

F.3d 56 (2d Cir. 1998).[17]  *See also Old Republic Ins. Co. v. Hansa World Cargo Service, Inc.*, 170

F.R.D. 361, 378 (S.D.N.Y. 1997) ("[A] RICO injury need not be precisely calculable in order to

be sufficiently definite and nonspeculative for a civil RICO cause of action to accrue."); *Butala v.

Agashiwala*, 916 F. Supp. 314, 317 (S.D.N.Y. 1996) ("The plaintiffs' argument that their cause of

action did not accrue until their damages were ascertainable is premised on a misunderstanding of

the difference between when an injury occurs and when the damages resulting from that injury are

fully quantifiable.").

To be sure, Plaintiffs' claims in 2003 were "speculative" in the sense that numerous

intervening factors, as discussed above, preclude a finding of proximate cause.  But that does not

mean that the claim was "unripe" in 2003 in a timing sense.  For if (contrary to the argument and

law discussed above), Plaintiffs could plead an injury proximately caused by a "rigged auction,"

then Plaintiffs knew about it, and could sue about it, long before 2008.  In fact, by suing in State

Court in 2006, two years before the Macklowe re-sale, Plaintiffs themselves obviously believed

that their claims based on the 2003 sale were already ripe.

Plaintiffs further attempt to avoid the statute of limitations based on the contention that

they could not have discovered their injuries through diligent efforts until 2008.  Until then,

Plaintiffs claim, the facts constituting the injuries were "uniquely in the hands of defendants, who

actively concealed such facts," and Plaintiffs were "unable to file a complaint that would comply

---

[17]    The Second Circuit in *Merrill Lynch* distinguished *First Nationwide* and similar cases as
being limited to the situation where a creditor alleges he has been defrauded and
"contractual or other legal remedies remain which hold out a real possibility that the debt,
and therefore the injury, may be eliminated or significantly reduced."  154 F.3d at 59.
Here, as in *Merrill Lynch*, and unlike in the cases it distinguished, Plaintiffs had no
"contractual or other legal remedies which could assuage the injury," and their injuries, to
the extent they are cognizable RICO injuries, were suffered at the time of the alleged bid
rigging in 2003.

with the requirements of the Federal Rules of Civil Procedure until 2008." (Am. Cplt. ¶¶ 87-90.) Again, Plaintiffs do not explain how they were able to file a complaint in good faith in State Court in 2006, but be that as it may, these contentions do not suffice to avoid the statute of limitations.

Plaintiffs never explain which facts they were only recently able to discover. All of the essential facts on which Plaintiffs rely for their present claims of bid rigging, bankruptcy fraud, money laundering and wire fraud were available to Plaintiffs more than four years ago, as evidenced by the exhibits to the Amended Complaint – almost all of which were publicly available four years ago or earlier.[18] These public facts were not uniquely in defendants' hands and could hardly have been "concealed" by them. And any attempted "concealment" obviously did not work, since Plaintiffs not only were on inquiry notice in 2003, but actually believed they had been defrauded, and publicly said so. In any event, wholly conclusory allegations of fraudulent concealment, which is all these are, do not toll the statute of limitations because they fail to satisfy Rule 9(b). *See*, *e.g*., *Butala*, 916 F. Supp. at 319 (citing cases).

Finally, allegations concerning conduct by the Defendants post-2003 do not save Plaintiffs' time-barred RICO claims. For example, Plaintiffs allege that in 2007, Macklowe purchased seven other office buildings in "highly leveraged transactions" that were "in furtherance of the RICO Enterprise." (Am. Cplt. ¶ 478.) But these transactions (none of which is alleged to have involved Soros) are not alleged to have caused any injury to Plaintiffs, and therefore cannot support Plaintiffs' RICO claims. *See, e.g.*, *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997) (a

---

[18]   Other than the undated exhibit created by Plaintiffs or their counsel (*see supra* n.10), only two of the 41 exhibits to the Amended Complaint may not have been publicly available more than four years before the filing of this Action and neither has any relevance to Plaintiffs' ability to discover their claims. (*See* Am. Cplt. Ex. Q (website about Trump International Hotel); Ex. W (SEC litigation release regarding a securities offering by an entity called "Fortress Financial Group").

plaintiff "cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period").  Thus, even if the 2007 and 2008 transactions alleged by Plaintiffs constituted new predicate acts – and they do not – they neither harmed Plaintiffs nor serve to extend the statute of limitations for the RICO injury allegedly suffered by Plaintiffs in 2003 upon the sale of the GM Building.

### D.    PLAINTIFFS FAIL TO ALLEGE A SUBSTANTIVE VIOLATION OF THE RICO STATUTE.

Even if Plaintiffs' RICO claims could survive *res judicata*, lack of standing, and the statute of limitations, they still would be deficient for failure to plead any number of substantive RICO elements.

#### 1.    Plaintiffs fail to allege a violation of section 1962(c).

To state a civil claim for damages under section 1962(c), a plaintiff must allege (1) that the defendant (2) through the commission of two or more predicate acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.  *See Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983); 18 U.S.C. § 1962(c).  Plaintiffs have not adequately pleaded several of these elements, including at least (a) an *enterprise*; (b) *predicate acts*; and (c) a *pattern*.

##### a.    Plaintiffs fail to allege a cognizable RICO enterprise.

The Amended Complaint must be dismissed because Plaintiffs fail to allege a cognizable RICO enterprise.  "'Enterprise' is defined to 'include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'"  *Bankers Trust*, 741 F.2d at 515 (quoting 18 U.S.C. § 1961(4)).  The Supreme Court has explained that a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by

evidence of an *ongoing organization*, formal or informal, and by evidence that the various associates function as a *continuing unit*." *United States v. Turkette*, 452 U.S. 576, 583 (1981) (emphasis added); s*ee also Tenamee v. Schmukler*, 438 F. Supp. 2d 438, 448 (S.D.N.Y. 2006) (RICO plaintiff must allege that enterprise members "functioned as an integrated unit").

Here, Plaintiffs never even identify the alleged "Enterprise."  At times, they say it is an "association in fact" Enterprise involving all Defendants.  (Am. Cplt. ¶ 128.)  Elsewhere, they claim that the Soros Defendants, Vornado, German American, Fortress Investment Group, Conseco, Inc., and Trump are "Enterprise members," and the rest of the Defendants are merely "RICO co-conspirators."  (*Id.* ¶ 586.)  And, in places, they even suggest the Enterprise is Defendant Conseco, through which other Defendants allegedly "conduct[ed] the affairs . . . through a pattern of racketeering activity." (*Id.* ¶ 251; *see also id.* ¶ 252.)  Adding to the confusion, the Amended Complaint never explains what criteria distinguish a Defendant that is a member of the Enterprise from one that is not.  *See United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 475 (E.D.N.Y. 2007) (finding no enterprise where the complaint failed to detail the membership of the enterprise, and the criteria that distinguish members from non-members).

Plaintiffs apparently rely on this Court to make sense of the Amended Complaint and divine an Enterprise somewhere.  However, leaving the definition of the Enterprise to guesswork simply will not do.  A RICO plaintiff "has to allege an actual enterprise rather than to express willingness to assert whatever enterprise the court approves."  *In re Ins. Brokerage Antitrust Litig*., Nos. 04-CV-5184, 05-CV-1079, 2007 WL 1062980, at *27 (D.N.J. Apr. 5, 2007).

Even assuming Plaintiffs intend to define the Enterprise as an "association in fact" consisting of "all Defendants," such an alleged Enterprise is hopelessly vague and overbroad. "Such a nebulous, open-ended description of the enterprise does not sufficiently identify this

essential element of a RICO offense." *Richmond v. Nationwide Cassel, L.P.*, 52 F.3d 640, 645

(7th Cir. 1995); s*ee also First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 175 (2d

Cir. 2004) ("Plaintiffs' conclusory naming of a string of entities does not adequately allege an

enterprise") (internal quotation marks omitted); *In re Investors Life Ins. Co. Annuity Mktg. & Sales*

*Practices Litig.*, Nos. 04-CV-3329, 04-CV-3799, 2006 WL 1531152, at *9 (E.D. Pa. June 2, 2006)

("When it comes to associations in fact . . . there is a greater risk that the RICO statute might be

improperly employed to string together predicate acts by unconnected defendants") (internal

quotation marks omitted).

Moreover, the RICO claim fails because the Amended Complaint never explains how this

far-reaching Enterprise (whatever its members) functioned as a single, "continuing unit" (*see*

*Turkette*, 452 U.S. at 583), or as an "integrated unit" (*see Tenamee*, 438 F. Supp. 2d at 448).  The

Amended Complaint does not, as it must, "present specific details of any hierarchy, organization,

or unity" among the Defendants, or "any solid information regarding the hierarchy, organization,

and activities of [the] alleged association-in-fact enterprise from which [the court] could fairly

conclude that its members functioned as a unit."  *See Procapui-Productores de Camaroes de*

*Icapui Ltda. v. G.F. Higgins, Inc. (Procapui II)*, No. 07-CV-6627, 2008 WL 3338200, at *3

(S.D.N.Y. Aug. 8, 2008) (Jones, J.) (internal quotation marks omitted).  It likewise does not

indicate that in carrying out the alleged predicate acts, the Defendants "were carrying out the

affairs of an unlawful enterprise as defined by the statute, rather than their own affairs or those of

their institutional employers, principals or partners."  *Singh*, 199 F. Supp. 2d at 163.  Instead, the

Amended Complaint "leaves a plethora of unanswered questions regarding the membership,

purpose, and structure of that entity."  *See Longshoremen's*, 518 F. Supp. 2d at 475; s*ee also First*

*Capital*, 385 F.3d at 175 (dismissing RICO claim alleging association-in-fact enterprise where the

plaintiffs' "indifferent attempts to plead the existence of an enterprise fall short of their goal in that

they frustrate assiduous efforts to identify its membership, its structure (formal or informal) or its functional unity") (internal quotations omitted).

For example, what is the decision-making structure of the Enterprise?  Who holds what positions?  How are instructions conveyed between its members?  How does one become a member of, or terminate membership in, the Enterprise?  What common purpose or goal did all members share?  The Amended Complaint provides no answers, and Plaintiffs cannot get by with a conclusory assertion that all of these Defendants (or whatever group of them Plaintiffs chooses) constituted an enterprise.  *See Int'l Paint Co. v. Grow Group, Inc*., 648 F. Supp. 729, 731 (S.D.N.Y. 1986) ("A general assertion that a group of defendants constituted an 'enterprise' does not suffice.").

**b.**      **Plaintiffs fail to allege the requisite predicate acts.**

Plaintiffs' RICO claims also fail to sufficiently allege the commission of predicate acts of racketeering activity.  The alleged predicate acts are (i) bankruptcy fraud; (ii) money laundering; and (iii) wire fraud.  None of these predicate acts is adequately pleaded.

**i.**      **Plaintiffs fail to allege bankruptcy fraud.**

A claim of bankruptcy fraud, like any fraud claim, is subject to the particularity requirements of Federal Rule of Civil Procedure 9(b).  *See First Capital*, 385 F.3d at 178 (holding that heightened pleading requirements apply to a complaint alleging bankruptcy fraud as a predicate act in a RICO case).  The Amended Complaint fails to meet this standard.

The "factual" allegations of bankruptcy fraud lack particularity.  Nowhere does the Amended Complaint allege that the Soros Defendants were a party to or participated in the Conseco bankruptcy proceedings.  The Soros Defendants filed no motions or papers in conjunction with these proceedings.  With respect to the Soros Defendants, the Amended Complaint merely contains conclusory statements like the following:  "Soros, and the other

38

conspirators, conceived of a plan to acquire the prime assets of Conseco, including Conseco

Finance Corp. ("Conseco Finance"), at less than fair value, and the General Motors Building (the

"GM Building"), through Bankruptcy Fraud and money laundering."  (Am. Cplt. ¶ 27.)  There are

no particularized allegations to supply the requisite who, what, when, where, and how of the fraud

allegations.  *See Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999) ("In the RICO

context, Rule 9(b) calls for the complaint to specify the statements it claims were false or

misleading, give particulars as to the respect in which plaintiffs contend the statements were

fraudulent, state when and where the statements were made, and identify those responsible for the

statements.") (internal quotation marks omitted).  Such vague and conclusory statements are

patently insufficient under Rule 9(b).

Furthermore, at numerous points in the Amended Complaint, Plaintiffs lump all

Defendants together, failing to detail their precise roles.  For example, the Amended Complaint

alleges:  "[R]acketeering activities were implemented and executed for a pre-packaged

Bankruptcy Fraud in a conspiracy by the defendants to overwhelm the other creditors of Conseco

and take control of the sale of Conseco Finance to CFN (Fortress and Cerberus) and to put in place

their own Debtor in Possession Financier, FPS DIP . . . ."  (Am. Cplt. ¶ 276.)  To the extent that

Plaintiffs try to "lump" the Soros Defendants with the other Defendants, and vice versa, the

allegations fail under Rule 9(b).  "Where there are multiple defendants, as in the instant case, a

court may reject, for want of particularity, complaints that group defendants together or fail to

particularize the wrongful acts attributable to each defendant."  *Procapui-Productores de

Camaroes De Icapui Ltda. v. Layani (Procapui I)*, No. 07-CV-6627, 2008 WL 3338199, at *2-3

(S.D.N.Y. Jan. 11, 2008) (Jones, J.) (citing *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822

F.2d 1242, 1247-48 (2d Cir. 1987)).

Thus, Plaintiffs' claims of bankruptcy fraud as a predicate act fail as a matter of law.

### ii.      Plaintiffs fail to allege money laundering.

Plaintiffs also fail to allege money laundering under sections 1956 and 1957.  Both

sections require, among other things, pleading that defendants knowingly conducted a monetary

transaction involving "criminally derived property" from "specified unlawful activity."  *See*

*Republic of Colombia v. Diageo North America Inc.*, 531 F. Supp. 2d 365, 438-39 (E.D.N.Y.

2007) (quoting *Bernstein v. Misk*, 948 F. Supp. 228, 236 n.2 (E.D.N.Y. 1997)); *Crown Heights*

*Jewish Cmty. Council, Inc. v. Fischer*, 63 F. Supp. 2d 231, 239 (E.D.N.Y. 1999).  Plaintiffs' vague

and conclusory assertions that Soros or the other Defendants laundered funds for the Enterprise are

insufficient under either section.

The Amended Complaint contains no allegations detailing what "specified unlawful

activity" supplied the "criminally derived property."  *See, e.g., W. 79th St. Corp. v. Congregation*

*Kahl Minchas Chinuch*, No. 03-CV-8606, 2004 WL 2187069, at *9 (S.D.N.Y. Sept. 29, 2004)

("[I]n the absence of allegations concerning a 'specified unlawful activity,' no claim for money

laundering may withstand a motion to dismiss.").  It only contains repeated vague references to

"illegal activities" (Am. Cplt. ¶¶ 27, 33, 36, 52, 54, 268), "proceeds of unlawful activity" (*id.*

¶¶ 461-62, 464, 466, 485), "illicitly derived funds" (*id.* ¶ 117, 465), and "dirty money transfers"

(*id.* ¶ 456).

Plaintiffs' only attempt to provide any details regarding the supposed "unlawful activities"

that supplied the alleged "criminally derived property" is the following:  "*Upon information and*

*belief*, the presently unknown sources of the funds, *believed to be* from Mapeley and/or Quantum,

derive from illegal sources which conduct unlawful activities, including, but are not limited to,

Narco Drug Trafficking, Black Market Arms Dealers, Prostitution slave trading and Organized

Crime." (Am. Cplt. ¶ 66 (emphasis added); *see also id.* ¶ 489.)  Apparently, Plaintiffs' syllogistic

argument is that (1) Quantum (a potential "John Doe" defendant) is based in Curacao in the

Netherlands Antilles, (2) the Netherlands Antilles is an "important" center for laundering illegal money derived from drug trafficking, therefore (3) Quantum's funds must be derived from "illegal sources which conduct unlawful activities.  (Am. Cplt. ¶¶ 66, 259.)  The proposition is absurd on its face.[19]  Nor does the Amended Complaint explain how Mapeley, a Bermuda corporation that plaintiffs allege is "likely to be identified" as another John Doe defendant, allegedly derived funds from "illegal sources which conduct unlawful activities."  Plaintiffs' allegations cannot be credited and do not come close to detailing what "specified unlawful activity" supplied the "criminally derived property."  *See Bernstein*, 948 F. Supp. at 236 n.2 (dismissing money laundering claims because the complaint failed to "describe which defendants or transactions violated this statute or what funds were derived from criminal activity.").

Thus, the Amended Complaint does not adequately allege money laundering.

### iii.        Plaintiffs fail to allege wire fraud.

The elements of wire or mail fraud are: "(1) a scheme to defraud victims of (2) money or property, through the (3) use of the mails [or wires]."  *United States v. Walker*, 191 F.3d 326, 334 (2d Cir. 1999); *see* 18 U.S.C. § 1343.  A plaintiff must establish, among other things, scienter (specific intent to defraud the victims of the scheme), and material misrepresentations that caused concrete harm to his money or property.  *See United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); *Walker*, 191 F.3d at 334-35; *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 552 (S.D.N.Y. 2005).  A claim of wire fraud is subject to the particularity requirements of Rule

---

[19]     Plaintiffs also ask the Court to draw the equally nonsensical inference that because in August 1990, almost twenty years ago, U.S. Drug Enforcement Agency agents claimed that Banco Columbia was a "conduit for Latin American drug money," and because Soros acquired a nine percent interest in Banco de Columbia in 1994, Soros somehow derived money from "illegal sources" that were used to conduct unlawful activities in 2003.  (Am. Cplt. ¶¶ 262-63.)

9(b).  *See S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 634-36 (2d Cir.

1996) (applying heightened pleading standards of Rule 9(b) to RICO wire fraud claims).

Plaintiffs do not adequately plead scienter, which requires specific allegations that

Defendants "had a conscious knowing intent to defraud . . . [and] that the defendant contemplated

or intended some harm to the property rights of [Plaintiffs]."  *Autuori*, 212 F.3d at 116.  Nowhere

do Plaintiffs allege that the wiring of cash into various "shell entities," or the investment of

proceeds in the Trump International Hotel in Chicago in 2004 (Am. Cplt. ¶¶ 65, 449-466), was

consciously intended to defraud *Plaintiffs* of any money or property.  Nor do Plaintiffs plead, with

the requisite specificity, that Defendants made any material misrepresentations in connection with

these wire transfers.  "To satisfy Rule 9(b), a RICO complaint [alleging mail or wire fraud] should

include: the identities of the actors, the precise actions taken or statements made, the time, place,

and methods of communication including dates of telephone calls or mailings, and the precise

effects of the fraudulent activity."  *Procapui I*, 2008 WL 3338199, at *3 (Jones, J.).  None of that

is alleged here.

Finally, the wire fraud statute is "limited in scope to the protection of property rights."

*United States v. Dinome*, 86 F.3d 277, 283 n.5 (2d Cir. 1996) (internal citations and quotations

omitted)).  Plaintiffs' only alleged injury is Conseco's rejection of their bid for the GM Building,

but they had no property interest in that building.  *See Strates Shows*, 379 F. Supp. 2d at 826-28

(holding that plaintiff had no property interest in a contract by virtue of its submission of the

"superior" bid; it merely had an "expectancy interest.").

Thus, Plaintiffs' conclusory allegations of wire fraud as predicate acts fail as well.

c.      **Plaintiffs fail to allege a continuous "pattern of racketeering activity."**

Plaintiffs' section 1962(c) claims also fail because Plaintiffs have not adequately alleged the "pattern" element.  As the Supreme Court has cautioned, a "pattern of racketeering activity" means at least two predicate acts that "are related and that . . . amount to or pose a threat of continued criminal activity."  *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  To allege a "pattern," Plaintiffs either must plead "open-ended" continuity (*i.e.,* past criminal conduct combined with a threat of continued criminal conduct) or "closed-ended" continuity (*i.e.,* past criminal conduct extending over a substantial period of time)  *See GICC Capital Corp. v. Tech. Fin. Group*, 67 F.3d 463, 466-67 (2d Cir. 1995).  Plaintiffs fail to allege either type of continuity.

To plead open-ended continuity, Plaintiffs must allege "that the nature of the enterprise itself gave rise to a threat of continuity, or must point to other external factors which evidence a threat of continued criminal conduct."  *Qualis Care, L.P. v. Hall*, No. 95-CV-4955, 1999 WL 683564, at *6 (S.D.N.Y. Sept. 1, 1999) (Jones, J.).  "When a plaintiff cannot allege the scheme at issue is a regular aspect of defendants' business, or that there is a likelihood of repetition of the alleged predicate acts, plaintiff has failed to establish open-ended continuity."  *Id.*

Here, the Amended Complaint does not allege that the predicate acts were a regular aspect of the Defendants' various businesses; instead, it alleges that all the predicate acts were committed in connection with the singular goal of laundering money through the sale of the GM Building in 2003.  (*See* Am. Cplt. ¶ 250.)  As the Second Circuit observed in *United States v. Aulicino*, the threat of continuity is not present in a situation where "a defendant had a piece of property the sale of which, even if by fraudulent means, provided a natural end to his project."  44 F.3d 1102, 1113 (2d Cir. 1995); s*ee also Bernstein*, 948 F. Supp. at 237 (alleged acts of mail and wire fraud

committed in connection with an isolated real estate venture which has been, or will be terminated, were inherently terminable and posed no threat of continued criminal conduct).

Nowhere does the Amended Complaint allege that Defendants' conduct posed a threat of future "rigged auctions."  Nor does the Amended Complaint suggest any basis to believe that Defendants will commit bankruptcy fraud, money laundering, or wire fraud to acquire new properties and launder additional money.  Thus, Defendants' scheme was "inherently terminable" upon the 2003 sale of the GM Building, and poses no threat of continued criminal conduct.  *See GICC*, 67 F.3d at 466; *China Trust Bank of N.Y. v. Standard Chartered Bank, PLC*, 981 F. Supp. 282, 287 (S.D.N.Y. 1997) (holding that alleged fraud on a single account was inherently terminable and insufficient to support a threat of open-ended continuity).

Plaintiffs also do not allege closed-ended continuity.  "To satisfy closed-ended continuity, the plaintiff must prove 'a series of related predicates extending over a substantial period of time.'"  *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (quoting *H.J. Inc.*, 492 U.S. at 242).  Although several external factors may be considered in addition to the temporal element, such as the number of victims or perpetrators, the Second Circuit has "never held a period of less than two years to constitute a substantial period of time." *Spool*, 520 F.3d at 184 (internal quotations omitted); s*ee also DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001) (same).

The relevant period for measuring duration is the time "during which the RICO predicate activity [that harmed Plaintiffs] occurred, not the time during which the underlying scheme operated or the underlying dispute took place."  *Spool*, 520 F.3d at 184 (citing *DeFalco*, 244 F.3d at 321).  Here, the relevant period spanned less than two years.  The predicate activity that supposedly harmed Plaintiffs – the alleged bid rigging – was a one-shot deal that lasted, at most, about two months, from the July 22, 2003 publication of the outline of the bid requirements for the

44

purchase of the GM Building to the September 26, 2003 closing.  (*See* Am. Cplt. ¶¶ 65, 412.)  This does not come close to satisfying the "continuity" factor.

Even if the relevant period were viewed as having started when the alleged Enterprise "began implementing the pattern of racketeering activities" in June 2002 (Am. Cplt. ¶ 250), or when the Enterprise took what Plaintiffs refer to as "[o]ne of the first affirmative acts" (the creation of CFN Holdings, LLC on August 15, 2002 (*id.* ¶ 273)), the alleged scheme still lasted only thirteen or fifteen months.  As a matter of law, either time frame is insufficient to establish closed-ended continuity.  *See e.g., Qualis Care*, 1999 WL 683564, at \*6 (Jones, J.) (holding that a nineteen month scheme, involving one group of perpetrators, one victim, and a single goal did not constitute closed-ended continuity); *Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 998-99 (E.D.N.Y. 1995) (holding that a single real estate transaction involving one alleged victim, a limited goal and criminal conduct which lasted approximately fifteen months is not sufficient "continuity"); *see also Spool*, 520 F.3d at 185 (sixteen months insufficient); *Ray Larsen Assocs., Inc. v. Nikko Am., Inc.*, No. 89-CV-2809, 1996 WL 442799, at \*7 (S.D.N.Y. Aug. 6, 1996) (Jones, J.) (seventeen months insufficient).

While the Amended Complaint contains a few conclusory allegations relating to alleged activities that occurred slightly more than two years before the 2003 sale (*e.g.*, that Soros allegedly contacted Trump and Conseco in March 2001 to purchase the GM Building in order to launder money (Am. Cplt. ¶ 180)), any alleged RICO predicate activity that pre-dated the 2003 sale does not serve to extend the duration of the scheme.  As this Court has held, only actions related to the predicate acts which *allegedly injured plaintiff* can be considered as part of the activity to extend the scope of the "pattern."  *See Ray Larsen*, 1996 WL 442799, at \*7; *Spool*, 520 F.3d at 184.  Thus, the pre-2003 clutter and "background noise" alleged by Plaintiffs, concerning initial contacts, alleged machinations in the Bankruptcy Court, and other allegedly contrived legal

45

wrangling, none of which directly affected Plaintiffs, cannot be considered as establishing the requisite "pattern."

The same goes for alleged activities that occurred after September 2003 (*e.g.,* Macklowe's sale of the GM Building in May 2008 (Am. Cplt. ¶ 484)).  That Macklowe allegedly profited from the sale in 2008 is not a predicate act that serves to extend the pattern of racketeering activities.  While it may have benefited Macklowe, the 2008 sale did not injure Plaintiffs, and thus does not extend the duration of the alleged scheme.  *See Pier Connection, Inc. v. Lakhani*, 907 F. Supp. 72, 76 (S.D.N.Y. 1995) (noting that "continuing to reap . . . benefits [from RICO fraud] is not itself a predicate act; it is only an effect of the alleged acts of wire fraud"); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994) ("[Defendant's] conduct in sending out billing notices from 1991 through 1992 pursuant to an allegedly fraudulent contract cannot be cited by plaintiffs to extend the duration of the fraudulent scheme.").  Plaintiffs have merely appended these conclusory allegations of post-2003 activity as an "afterthought" in a futile effort to extend the duration of the alleged scheme.  *See Ray Larsen*, 1996 WL 442799, at *7.

Because the relevant conduct spanned less than two years, and involved a single real estate transaction, a limited number of perpetrators and victims, and a limited goal, Plaintiffs fail to allege a continuous pattern of racketeering activity.  This alone is fatal to Plaintiffs' section 1962(c) claim.

### 2.      Plaintiffs fail to allege a violation of sections 1962(a) and (b).

Plaintiffs' section 1962(a) and (b) allegations suffer from additional infirmities.

"Section 1962(a) prohibits any person who derived income from a pattern of racketeering activity from investing that income in an 'enterprise', as defined by the statute."  *Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236, 245 (S.D.N.Y. 2003) ("*Stolow I*"), *aff'd*, No. 03-7759, 2003 WL 22717684 (2d Cir. Nov. 17, 2003).  Because the "essence" of a violation of

section 1962(a) is "investment of racketeering income," Plaintiffs must allege injury "by reason of" Defendants' investment of racketeering income in an enterprise to recover under section 1962(a).  *Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d. Cir. 1990).  This "use or investment" injury "must be *distinct* from the injuries resulting from predicate acts."  *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998) *see also Ouaknine*, 897 F.2d at 83; *Stolow I*, 258 F. Supp. 2d at 246 (alleged injury from bid rigging scheme was "not a separate and distinct injury caused by the acquisition or maintenance of an alleged enterprise").

Here, Plaintiffs merely allege that Soros violated section 1962(a) "by forming numerous shell entities, on or about and between September 1, 2003 and September 23, 2003, with no officers, directors or shareholders, offices or assets, to invest or use, directly or indirectly, a part of such income or the proceeds of such income, by laundering such funds derived from illegal activities in violation of 18 U.S.C. §§1956 and 1957, by funneling 300 Million Dollars into a limited liability company, 5th Avenue 58/59 Acquisition Co., to acquire an interest in an enterprise controlled by the defendants, in violation of 18 U.S.C. § 1962 (a)."  (Am. Cplt. ¶ 491.)  Nowhere do Plaintiffs explain how the infusion of cash into various shell entities injured Plaintiffs.  Thus, Plaintiffs fail to plead how they were distinctly injured by the use or investment of alleged racketeering income.

Likewise, Plaintiffs do not allege a violation of section 1962(b).  Section 1962(b) makes it unlawful for "any person through a pattern of racketeering activity . . . to acquire or maintain  . . . any interest in or control of any enterprise. . . ."  18 U.S.C. § 1962(b).  "The purpose of this statute is to prohibit the takeover of a legitimate business through racketeering, typically extortion or loansharking."  *Stolow I*, 258 F. Supp. 2d at 246 (internal quotation marks omitted).  Similar to the

investment injury requirement of section 1962(a), a plaintiff must allege a distinct acquisition or maintenance injury to have standing to sue under section 1962(b).  *See Discon*, 93 F.3d at 1063.

Here, Plaintiffs allege that the Soros Defendants violated section 1962(b) by acquiring or maintaining "directly or indirectly, an interest in, or control of Conseco, an enterprise . . . [by] (a) [] purchasing Conseco Finance with laundered money deriving from illegal source, and (b) [] obtaining the . . . DIP Financing . . . of Conseco through racketeering activities." (Am. Cplt. ¶ 252.)  Plaintiffs also allege that the Bankruptcy Court's approval of the CFN Holdings Asset Purchase Agreement (Am. Cplt. ¶¶ 369-70) and the New York Times announcement that Macklowe won the auction for the GM Building (Am. Cplt. ¶¶ 430-31) somehow "constituted the acquisition or maintenance of an interest and an investment of income from racketeering activities in an Enterprise through a pattern of racketeering activities."  But Plaintiffs do not explain how they were injured by Soros' alleged acquisition or maintenance of an interest in Conseco or the GM Building as distinct from the predicate acts.  Moreover, the Amended Complaint never clearly alleges that either Conseco or the GM Building is the "Enterprise," thus any supposed investment in Conseco or the GM Building would not constitute acquiring or maintaining an interest in the enterprise.  Thus, Plaintiffs' section 1962(b) claims fail.

### 3.    Plaintiffs fail to allege a RICO conspiracy under section 1962(d).

For the reasons discussed above, Plaintiffs fail to allege an underlying section 1962 (a), (b) or (c) violation of the RICO statute.  Where no underlying section 1962 (a), (b) or (c) claim has been stated, no section 1962(d) claim can be sustained.  *See First Capital*, 385 F.3d at 182; *Discon*, 93 F.3d at 1064; *Allen v. New World Coffee, Inc.*, No. 00-CV-2610, 2002 WL 432685, at *6 (S.D.N.Y. Mar. 19, 2002) ("The dismissal of all of plaintiffs' RICO claims leaves the conspiracy cause of action without a leg to stand on.").

Separately, there are no specific factual allegations to support the existence of the conspiracy under the pleading standards set forth by the Supreme Court in *Twombly*.  Plaintiffs offer nothing more than "bare allegations of 'conspiracy,'" which are "insufficient to support a civil RICO claim."  *Morin v. Trupin*, 711 F. Supp. 97, 111 (S.D.N.Y. 1989) (citation omitted). Rather, Plaintiffs "must show that the defendants understood the scope of the enterprise and knowingly agreed to further its affairs through the commission of various offenses."  *Id.*  Plaintiffs have not done so here.  Missing from the Amended Complaint are, for example, indications of how Defendants reached agreement on entry into a conspiracy, or whether they knew that they had done so.  *See, e.g.*, *Adler v. Berg Harmon Assocs.*, 790 F. Supp. 1222, 1234 (S.D.N.Y. 1992) (dismissing conspiracy claim where the complaint lacked "factual allegations supporting an inference that the various defendants consciously agreed to become part of a RICO conspiracy"); *see also Dongelewicz v. ONC Bank Nat'l Ass'n*, 104 F. App'x 811, 818 (3d Cir. 2004) ("[T]he fact that First Eastern provided financing to CBG in no way gives rise to an inference (i) that First Eastern agreed to commit predicate acts; or (ii) that First Eastern knew that the predicate acts were part of racketeering activity, two necessary elements of a RICO conspiracy.").

## III.   THE CLAIMS SHOULD BE DISMISSED WITH PREJUDICE BECAUSE AMENDMENT WOULD BE FUTILE.

The Court should dismiss the Amended Complaint with prejudice because further amendment would be futile.  Neither the *res judicata* nor statute of limitations problems with the Amended Complaint can be cured.  *See Wittich v. Wittich*, No. 06-CV-1635, 2006 WL 3437407, at *7 (E.D.N.Y. Nov. 29, 2006) (denying leave to amend where *res judicata* precluded plaintiff from asserting its claims); *Iwachiw*, 194 F. Supp. 2d at  206 (denying leave to file a second amended complaint where claim was time-barred).  Plaintiffs have now also had two opportunities to plead

a substantive RICO claim, one of which came after reviewing Defendants' initial motions to dismiss, and it is clear that they cannot and never will be able to do so.

## CONCLUSION

For the reasons stated above, the Court should dismiss the Amended Complaint with prejudice, and grant such other and further relief as the Court determines is appropriate.[20]

Dated: April 24, 2009

WILLKIE FARR & GALLAGHER LLP

By: _____

John R. Oller
Deirdre N. Hykal
Caren E. Lerner
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000
joller@willkie.com

FRESHFIELDS BRUCKHAUS DERINGER
Benito Romano
520 Madison Avenue, 34th floor
New York, New York 10022
Tel: (212) 277-4000
benito.romano@freshfields.com

*Attorneys for George Soros and Soros Fund Management, LLC*

---

[20] Given Plaintiffs' history of filing serial lawsuits relating to the sale of the GM Building, an order enjoining Plaintiffs from filing, without leave of this Court, further actions in federal courts in New York against any Defendant named in this action, and any other parties or their counsel in privity with them, arising out of or relating to the 2003 sale of the GM Building, is both within the Court's inherent power to protect parties from vexatious litigation and is entirely warranted in these circumstances. *See Singh*, 199 F. Supp. 2d at 165-66 (granting similar order).