# EXHIBIT A

**Law Offices of**
**DAVID H. RELKIN**
**David H. Relkin, Esq. (DHR-1049)**
**575 Eighth Avenue**
**Suite 1706**
**New York, New York 10018**
**212-244-8722**

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **LESLIE DICK WORLDWIDE, LTD. and LESLIE DICK**, | Case No. |
| _Plaintiffs_, | **08 CIV. 7900** |
| -against- | **(BSJ)(THK)ECF** |
| **GEORGE SOROS, SOROS FUND MANAGEMENT LLC, FIG, LLC, VORNADO REALTY TRUST, GERMAN AMERICAN CAPITAL CORP., EASTDIL SECURED, LLC, HARRY MACKLOWE, CONSECO, INC., KIRKLAND & ELLIS, LLP, DONALD J. TRUMP, and John Does "1" through "10,"** | **AMENDED RICO COMPLAINT** [corrected] |
| _Defendants_. | **JURY TRIAL DEMANDED** |

    Plaintiff Leslie Dick Worldwide, Ltd. and Leslie Dick, by their attorneys, The

Law Offices of David H. Relkin, Esq., as and for their Amended Complaint herein, allege

as follows:

David H. Relkin, Esq.

# I.    <u>NATURE OF ACTION</u>

1.      In this action plaintiffs seek to recover damages proximately caused by an ongoing, RICO Enterprise involving the transfer of monies in interstate and international commerce in which defendants conducted their business by engaging in a pattern of racketeering by means of money laundering to conceal the illegal origin, nature and source of such funds.

2.      This complaint describes the defendants' infiltration of the Conseco, Inc.'s Bankruptcy proceedings by means of illicit conspiracies and Bankruptcy Fraud so that the RICO Enterprise could launder money to acquire the most valuable assets of Conseco, Inc.

3.      Specifically, the RICO Enterprise disguised their money laundering activities by employing ephemeral shell entities and conspirators to acquire assets of Conseco by making invisible investments, some of which they disguised as "loans," and then compensated their conspirators by allowing them to appear to legitimately participate in such acquisitions for their profit and then dissolved the shell entities to hide their unlawful conduct.

4.      The bogus "loans" and other money transfers and the invisible acquisition of the assets and property of Conseco, Inc. involved interstate and international commerce and fraudulent conduct designed to conceal the origin of the funds derived from illegal sources and to derive profit therefrom.

David H. Relkin, Esq.

5.      Defendants committed the aforesaid crimes, together with others who were aware of, and acted in furtherance of, and participated in one another's actions in a sophisticated scheme to engage in money laundering in the Conseco, Inc. Bankruptcy proceedings to acquire assets of Conseco, Inc. for profit to the detriment of plaintiffs and numerous other third parties.

6.      The modus operandi of the RICO Enterprise involved creating shell entities through which to launder money, pay off the conspirators with business opportunities and assets and then dissolve these ephemeral shell entities to conceal the unlawful purposes and acquisitions of the Enterprise, as they did in connection with the acquisition of Conseco, Inc. property.

7.      The RICO Enterprise was an association in fact of the defendants to invest in, operate, and acquire control of Conseco, Inc.'s prime assets, the General Motors Building and Conseco Finance Corporation through unlawful means, including but not limited to Money Laundering, Bankruptcy Fraud and Wire Fraud violations, and thereafter actively concealed their illicit activities, which illicit activities are continuing in nature and will not be stopped without this Court's intervention.

8.      As a result of the illegal activities of the defendants alleged in this complaint, defendants proximately caused substantial damages to the property and business of plaintiffs and many others.

David H. Relkin, Esq.

## II.    <u>THE RELEVANT STATUTES</u>

9.    The relevant statutes involved in this action involve:

    A.    The Racketeering Influenced and Corrupt Organizations Act, 18 USC §§1961—1968 ("RICO"), involving the predicate acts of :

        i.    Money Laundering, 18 USC §§1956 and 1957; and

        ii.    Bankruptcy Fraud, 18 USC §152 (1), (2), (3) and (9);

        iii.    Wire Fraud, 18 U.S.C. §1343; and

        iv.    Wire Fraud, 18 U.S.C. §1952 (a) (3).

    B.    Violation of 18 USC §2 (a), (b) and 18 USC §371.

10.    Due to the extraordinary sophistication of defendants' surreptitious and conspiratorial conduct of racketeering and their active concealment thereof, plaintiffs expect to expose additional defendants, information, statutory violations and illicit conduct during the pre-trial discovery in this action.

## III.    JURISDICTION<br><u>AND VENUE</u>

11.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § § 1331 and 1957, because plaintiffs bring claims under the federal statutes referred to herein.

12.    Venue is proper in this District pursuant to the provisions of 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b), (2) since this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of

[4]

David H. Relkin, Esq.

property that is the subject of the action is situated, and (3) this is a judicial district in which all the defendant are present.

## IV.    THE RICO ENTERPRISE

13.     This action arises out of a criminal conspiracy, plan and scheme by and among some of New York's most powerful real estate moguls, including George Soros, Fortress Investment Group, LLC, now known as FIG, LLC and Donald J. Trump, involving numerous other conspirators, and who fraudulently and unlawfully operated a vast, multi-billion dollar criminal RICO enterprise through a pattern of racketeering involving money laundering, bankruptcy fraud and wire fraud for profit.

14.     As Conseco's financial troubles surfaced, George Soros, in mid-2002, the leader and mastermind of the RICO Enterprise described herein, saw the opportunity to manipulate and gain control of the Conseco, Inc. Bankruptcy.

15.     In conspiracy with, and with the unlawful assistance and participation of Conseco, Inc., Conseco, Inc.'s attorneys, Kirkland & Ellis, LLP, Eastdil Secured, LLC, Harry Macklowe, German American Capital Corp. and Vornado Realty Trust, the defendants conspired and conceived a criminal enterprise, plan and scheme to acquire prime assets of Conseco, Inc. and to reap enormous profits by acquiring Conseco Finance Corp. and the General Motors Building by means of invisibly laundering money through Conseco, Inc. for profit.

[5]

David H. Relkin, Esq.

16.     The goal of the RICO Enterprise was to commit Money Laundering to acquire these assets and property, including the General Motors Building, which was purchased by Harry Macklowe in name only.

17.     Thereafter the RICO defendants continued to launder the proceeds from the sale of the General Motors Building into Donald J. Trump's real estate venture in Chicago, the Trump International Hotel & Tower, Chicago.

18.     This criminal enterprise succeeded in distributing huge sums of money and property to the RICO defendants who conspired in executing the pattern of racketeering of the RICO Enterprise.

19.     These unlawful profits derived by the enterprise were to be realized through the defrauding of creditors Conseco, Inc.'s Bankruptcy Estate and conspiratorially masterminding a fraudulent and pre-determined auction to obtain ownership of one of the world's most prized pieces of real estate, the General Motors Building by means of money laundering.

20.     The RICO Defendants of this vast and far reaching RICO Enterprise set their sights not only on the aforementioned results, but also brazenly set out to launder funds derived from illegal sources while fraudulently misrepresenting material facts to the United States Bankruptcy Court overseeing the Conseco, Inc. Bankruptcy through a series of staged legal battles, behind the scenes agreements, and smoke and mirrors designed to camouflage the crimes being committed right under the nose of the Bankruptcy Court, the legitimate bidders for the General Motors Building and the creditors of Conseco, Inc.

[6]

David H. Relkin, Esq.

21.     The RICO defendants regularly, routinely and repeatedly employ this illegal and fraudulent pattern of racketeering activity to advance their criminal goals while injuring innocent, unsuspecting victims.

22.     The defendants are each engaged in activities and conduct that affect federal interstate and foreign commerce. The defendants are each a "person," as that term is defined pursuant to § 1961(3) of RICO.

23.     Plaintiffs allege that each and every defendant is liable as a principal pursuant to 18 U.S.C. §§ 2(a)-(b) and that each and every defendant is liable as a co-conspirator pursuant to 18 U.S.C. § 371.

24.     Plaintiffs further allege that the acts, conduct, activities, and/or omissions committed by any one defendant are attributable to all of the other defendants.

25.     Plaintiffs allege that at all times material herein, the activities, conduct, and/or omissions committed and/or engaged in by the defendants herein give rise to this action being instituted within this federal district court inasmuch as plaintiffs are citizens of the City and State of New York, and the events that give rise to the illegal activities under RICO are predicated under the RICO co-conspiracy theory of venue and co-conspiracy theory of personal jurisdiction, by and through employment of instrumentalities of federal interstate commerce.

26.     Plaintiffs further allege that the defendants, each of whom are engaged in business activities within the City and State of New York, engaged in continuous, concerted, and systematic activities against plaintiffs within this district, proximately

[7]

David H. Relkin, Esq.

causing reasonably foreseeable and proximate injury to plaintiffs' respective interests in their business and property, pursuant to RICO § 1964 (a), (b), (c) and (d).

## V.    SUMMARY OF FACTS

27.    From on or about June 20, 2002, prior to the voluntary Bankruptcy filing by Conseco, Inc. ("Conseco") on December 17, 2002, Lazard Freres & Co., Inc. ("Lazard") was retained by Conseco to act as its financial advisor.  During this period, defendant Soros, and the other conspirators, conceived of a plan to acquire the prime assets of Conseco, including Conseco Finance Corp. ("Conseco Finance"), at less than fair value, and the General Motors Building (the "GM Building"), through Bankruptcy Fraud and money laundering, with funds that derived from Mapeley, Ltd., a Bermuda corporation which is a partnership between George Soros and/or one of the Fortress entities and their principals ("Mapeley") and/or Quantum Fund, N.V. ("Quantum") from illegal activities in order to conceal the origin and nature of such funds.

28.    In order to achieve these illegal goals, from on or about June 20, 2002 through September 25, 2003, defendants George Soros, Soros Fund Management, LLC ("SFM"), Fortress Investment Group, LLC, now known as FIG, LLC, or one of its affiliates, ("Fortress"), Vornado Realty Trust ("Vornado"), German American Capital Corp. ("German American"), Conseco, Harry Macklowe, Eastdil Secured, LLC ("Eastdil"), Donald J. Trump, and Kirkland & Ellis, LLP ("Kirkland & Ellis") and other third parties, including but not limited to Mapeley and Quantum, each agreed to, and did conspire with each other to conduct and participate in a pattern of racketeering activity

[8]

David H. Relkin, Esq.

involved in acquiring the Conseco assets in order to illegally launder money through such transactions and for profit.

29.     In order to acquire Conseco Finance, Fortress, J.C. Flowers & Co., Inc. and Cerberus Capital Management, LP formed CFN Investment Holdings, LLC ("CFN") on July 11, 2002 and applied for and was granted authority to do business in the State of New York on August 15, 2002.

30.     With proprietary information concerning the valuation of Conseco Finance provided by Conseco and Lazard to CFN, the defendants conspired to enter into an agreement with Conseco, dated December 16, 2002, to acquire the valuable assets of Conseco Finance for less than fair value.[1]

31.     In furtherance of the pattern of racketeering activity of the RICO Enterprise, despite numerous attempts by potential third party bidders to attempt to ascertain the nature and value of the Conseco Finance assets being purchased by CFN, CFN, Conseco and Kirkland & Ellis conspired and participated in an agreement to refuse to reveal this essential information to the Bankruptcy Court, the creditors of Conseco and the other potential bidders for Conseco Finance, and did repeatedly do so.

32.     As a consequence, due to false, misleading and repeatedly fraudulent statements made by CFN, Kirkland & Ellis and Conseco to the Bankruptcy Court, as further elaborated herein, the creditors of Conseco and the potential bidders for Conseco Finance regarding the assets CFN was purchasing, CFN, after signing a confidentiality

---

[1] This was one day prior to when Conseco filed its voluntary Petition for Bankruptcy.

[9]

David H. Relkin, Esq.

agreement with Conseco, was able to acquire Conseco Finance to the detriment of the creditors of Conseco, for a fraction of its reasonable and fair value.

33.     Upon information and belief, the source of the funds CFN paid for Conseco Finance derived from Soros, SFM, Mapeley, and/or Quantum, and were proceeds of illegal activities and defendants concealed the origin and nature of such unlawful funds in furtherance of the RICO Enterprise.

34.     In tandem with the goal of purchasing Conseco Finance by means of criminal money laundering, Soros, Fortress, and other parties concealed by defendants, formed FPS DIP, LLC ("FPS"), "an affiliate of CFN," to act as Conseco's debtor-in-possession financier in order to launder additional illegally derived funds and to conceal their nature and origin.

35.     One day after Conseco filed for bankruptcy on December 17, 2002, FPS entered into a written agreement with Conseco dated December 18, 2002 (the "DIP Facility") to accomplish such financing.

36.     In furtherance of the pattern of racketeering and the goals of the enterprise, the defendants also engineered a plan involving the participation and involvement of Soros, SFM, Fortress, and Trump to purchase the GM Building from Conseco in order launder funds derived from illegal activities to conceal their true origin and nature.

37.     In furtherance of the goal of purchasing the GM Building by the RICO Enterprise, the defendants, including Conseco and Kirkland & Ellis falsely represented to the Bankruptcy Court and to the creditors of Conseco in Conseco's Disclosure Statements

[10]

David H. Relkin, Esq.

and in other papers submitted to the Bankruptcy Court that the sale of the GM Building would produce proceeds for the Conseco creditors which were "essential to the reorganization of Conseco."

38.    To conceal the pattern of racketeering involving Money Laundering through the sale of the GM Building, Conseco and Trump, in conspiracy with Kirkland & Ellis, structured and participated in a staged dispute involving vexatious litigation about the ownership of the GM Building and participated in numerous acts in furtherance of this alleged dispute in order to transfer the ownership of the GM Building to the defendants and to profit by such acquisition by removing the sale of the GM Building from the purview of the Bankruptcy Court.

39.    Under the LLC agreement regarding the ownership of the GM Building, Trump would only receive approximately 15 Million Dollars if Conseco chose to sell the building, and, in fact, Trump ultimately received 275 Million Dollars for his participation in the Enterprise's pattern of racketeering of keeping the GM Building tied up in litigation until after the Conseco Bankruptcy was closed.

40.    To conceal the unlawful origin the funds employed in connection with the purchase of the GM Building, within the week prior to purchasing the GM Building, in conspiracy with German American, Macklowe, Mapeley, and Quantum, Soros, Fortress and Vornado formed at least five ephemeral shell entities, which had no officers, directors or capital, in order to control the funneling of the illegally derived funds by wire fraud into the limited liability company which bought the building, 5th Avenue 58/59 Acquisition Co., LLC ("Acquisition").

[11]

David H. Relkin, Esq.

41.     Upon information and belief, the illegal source of the funds to purchase the GM Building were derived from entities jointly managed or controlled by Soros, SFM, Fortress, Vornado, Mapeley and/or Quantum.

42.     To accomplish the scheme and theft of the GM Building in order to launder money, Soros and/or Fortress conspired to and did funnel by wire fraud 25 Million Dollars from illegal sources as a purported "loan" to the first ephemeral shell entity, Soros Credit Funding II, LLC ("Soros Credit II"), formed on or about September 23, 2003, three days before the sale of the GM Building.

43.     Soros and/or Fortress then caused Soros Credit II to funnel by wire fraud this 25 Million Dollars into German American as a purported "loan."

44.     Simultaneously, Vornado, or another defendant, created another ephemeral shell company named Vornado GM III, LLC ("Vornado GM"), and Soros and/or Fortress funneled by wire fraud another 25 Million Dollars from illegal sources as a purported "loan" into Vornado GM.

45.     Then Soros and/or Fortress caused Soros Credit II and Vornado GM each to funnel by wire fraud 25 Million Dollars into German American, also as a purported "loan."  (For Vornado's participation in this laundering scheme, the Enterprise allowed Vornado to acquire a prized piece of 250 Million Dollars of prime mezzanine debt of the GM Building which earned interest at a percentage far above the reasonable rates of interest charged for secured mezzanine financing.)

[12]

David H. Relkin, Esq.

46.     In furtherance of the conspiracy, German American then funneled by wire fraud the 50 Million Dollars it had received from the two shell companies created by Soros, Fortress and Vornado into another ephemeral shell company, Fifth Avenue 58/59 Mezzanine Fourth, LLC ("Mezzanine Fourth") also as a purported "loan."  (In consideration therefor, and as a quid pro quo for laundering the Soros/Fortress funds to Mezzanine, the Enterprise agreed to give the 1.1 Billion Dollar mortgage on the GM Building to German American.)

47.     Soros and/or Fortress then caused Mezzanine Fourth to funnel by wire fraud the 50 Million Dollars into Acquisition as "an investment."

48.     While this was happening, on or about September 23, 2003, Soros and/or Fortress created another ephemeral shell entity, Soros Credit Funding I, LLC ("Soros Credit I") under the laws of New York, and funneled by wire fraud 250 Million Dollars into Soros Credit I again as a purported "loan."

49.     On or about September 23, 2003, Soros and/or Fortress created another ephemeral shell entity, 5th Avenue 58/59 Junior Mezzanine, LLC ("Junior Mezzanine") under the laws of New York.

50.     Upon information and belief, Soros and/or Fortress caused Soros Credit I to funnel by wire fraud the 250 Million Dollars it received from Soros and/or Fortress into Junior Mezzanine as a purported "loan."

51.     Soros and/or Fortress then caused Junior Mezzanine to funnel by wire fraud such 250 Million Dollars as an "investment" into Acquisition.

[13]

David H. Relkin, Esq.

52.     In sum, with the knowledge, participation and in conspiracy of the other defendants, Soros and Fortress capitalized Acquisition with 300 Million Dollars derived from illegal activities or sources, to disguise and conceal the true nature and source of the funds and to make the funds appear to be those of Harry Macklowe, the purported "owner" of Acquisition.

53.     Upon information and belief, the alleged "loans" from the shell entities and German American were never paid back to the alleged ephemeral "lenders."

54.     In order to further conceal the source and nature of the 300 Million Dollars of capital derived from illegal activities or sources, the defendants put up Macklowe as a straw-man allegedly controlling Acquisition, the purchaser of the GM Building.

55.     Conseco, Kirkland & Ellis and Eastdil conspired to and established a bidding process to make the sale of the GM Building appear legitimate.

56.     To further the scheme, Conseco, Kirkland & Ellis and Eastdil issued auction procedures to mislead the bidders into believing that the ultimate purchaser of the building was yet to be decided, including the false representation that bids were closed, namely, and that no one had the advantage of knowing the bids of third parties.

57.     In actual fact, these auction procedures were no more than a scam by the Enterprise since defendants had already decided that the GM Building would be purchased by defendant Macklowe, the "straw man" for the Enterprise.

58.     To further the pattern of racketeering involving money laundering, Conseco, Kirkland & Ellis and Eastdil reviewed the other bids for the GM Building and

[14]

David H. Relkin, Esq.

conspired with Macklowe in order to make it appear to plaintiffs, the public and third party bidders that he had won the auction.

59.     In connection with the acquisition of the GM Building by defendants, Macklowe was required by his co-conspirators Conseco and Eastdil to pay a "non-refundable" 50 Million Dollar deposit as the down payment for the purchase of the Building.

60.     Macklowe was also required by the terms of the auction to have "firm financing" in place to close on the building, which is financing not subject to any further conditions. Conseco, Eastdil and Macklowe all made fraudulent statements to plaintiffs and the public that Macklowe had such funding in place, which he did not.

61.     Macklowe's "deposit," believed to be 50 Million Dollars, was actually refunded to Macklowe at the Closing of the sale of the GM Building and Macklowe received an additional 25,808,000.36 Dollars from the Enterprise, specifically by German American, for his participation in the racketeering activities.

62.     Immediately after the sale, defendants Conseco, Macklowe, and Eastdil fraudulently represented to plaintiffs, the other bidders and to the public through news sources that Macklowe was the winner of the auction and the "purchaser of the GM Building."

63.     In this connection and in furtherance of the RICO conspiracy, defendants Conseco, Eastdil and Macklowe made false and fraudulent representations to plaintiffs, the press and the third party bidders that Macklowe had firm financing, requiring no

[15]

David H. Relkin, Esq.

contingencies and that his bid was "superior" to the other bidders in that it was the only bid having a non-refundable deposit.

64.    In truth and fact, defendants knew these representations were false and were made in furtherance of the pattern of racketeering to conceal the true illicit source of the capital used by defendants to purchase the GM Building.

65.    As of and after the closing of the sale of the GM Building to Acquisition, on September 26, 2003, the Enterprise funneled by wire fraud approximately 275 Million Dollars into a real estate development run and controlled by Trump, commonly known as Trump International Hotel and Tower, Chicago, in October, 2004.

66.    Upon information and belief, the presently unknown sources of the funds, believed to be from Mapeley and/or Quantum, derive from illegal sources which conduct unlawful activities, including, but are not limited to, Narco Drug Trafficking, Black Market Arms Dealers, Prostitution slave trading and Organized Crime.

67.    Upon information and belief, Mapeley and/or Quantum commingle the illegal funds into other investment funds and then funnel the commingled funds into various investments, such as Conseco Finance and the GM Building.

68.    Once the money is taken out of such investments, the "clean" money which derives from such investments is distributed to affiliates of the illegal sources of such unlawful proceeds.

[16]

David H. Relkin, Esq.

69.     Upon information and belief, Soros and Fortress control, manage or participate in the affairs of Mapeley and/or Quantum and receive a pre-arranged fee from the sources of the illegal proceeds.

## VI.     RES JUDICATA
## DOES NOT BAR THIS ACTION

70.     The action previously commenced by plaintiffs in the Supreme Court of the State and County of New York entitled: *Leslie Dick Worldwide, Ltd. and Leslie Dick v. Macklowe Properties, Inc., Fifth Avenue 58/59 Acquisition Co., LP, Harry Macklowe, Eastdil Realty Company LLC, Benjamin V. Lambert, Wayne L. Maggin, George Soros, Soros Fund Management, LLC, Conseco, Inc., Carmel Fifth LLC, 767 Intermediate, LLC, 767 Fifth Avenue, LLC and Chuck Cremens*, Index No. 600222/06 (the "Fraudulent Bid Action") does not bar this action by the application of the legal principle of Res Judicata.

71.     The Fraudulent Bid Action was based on the plaintiffs' allegations that the representations made to plaintiffs prior to the bidding process to sell the GM Building were fraudulent.

72.     The Fraudulent Bid Action was dismissed based on the terms of a document plaintiffs signed which the Court found to bar any oral representations prior to the bidding process.

73.     In connection with the dismissal of the Fraudulent Bid Action, the New York Supreme Court, by Justice K. Moskowitz, explicitly excluded from her jurisdiction and Decision any issues related to the Conseco Bankruptcy.

[17]

David H. Relkin, Esq.

74.     Res Judicata only applies when the same evidence is needed to support both claims, and when the facts essential to the second action were present in the first action.  The evidence needed to support the instant action was not present in the Fraudulent Bid action.

75.     Plaintiffs were unable to conduct any discovery in the Fraudulent Bid Action, and thus were not able to discover the facts alleged herein.

76.     The evidence alleged and to be adduced in this action through discovery in this action were not alleged or known to plaintiffs in the Fraudulent Bid Action.

77.     The acts complained of in the Fraudulent Bid Action were different, the material facts alleged herein are not the same, nor were they available to plaintiffs in the Fraudulent Bid Action, and the witnesses and documentation to establish plaintiffs' injuries herein are not the same as in the Fraudulent Bid Action.

78.     The factual predicates forming the basis of the instant RICO action, and the evidence required to prove the claims in this action, namely money laundering, bankruptcy fraud and wire fraud violations are entirely different from the discrete contract and fraud issues involved in the Fraudulent Bid Action.

79.     Accordingly, the instant action is not barred by the application of the principle of Res Judicata.

[18]

David H. Relkin, Esq.

## VII.   TOLLING
## AND THE STATUTE OF LIMITATIONS

80.     RICO actions to recover "future injuries" may be filed by a plaintiff only within four years of when the "future injuries" become concrete and measurable.

81.     Plaintiffs' injury to their business and property did not accrue until the GM Building was sold by Macklowe in 2008 because, prior to such sale, the damage to plaintiffs' business and property was "speculative."

82.     Under well-established law, since plaintiffs claim for the injuries described herein were speculative until the GM Building was sold by Macklowe, the statute of limitations did not accrue until the injuries occurred upon the sale, even though the acts that caused them had taken place more than four years earlier.

83.     Under the "injury discovery" rule of this and other Circuit Courts of Appeal, the statute of limitations does not accrue until plaintiffs are reasonably able to discover the essential facts necessary to file suit herein.

84.     Plaintiffs had no discovery in the Fraudulent Bid Action since the complaint was dismissed for failure to state a cause of action.

85.     Plaintiffs exercised due diligence to discover the actionable facts alleged in this action by analysis of subsequent transactions of the Enterprise and other information obtained from public and non-public sources.

[19]

David H. Relkin, Esq.

86.     Plaintiffs were unable to discover sufficient facts to allege the factual basis of their injuries caused by the Enterprise until 2008.

87.     While plaintiffs suspected that they were harmed in connection with the bidding process for the purchase of the GM Building in 2003, despite reasonable efforts at discovery, they did not discover an actionable injury of their legally protected interests until 2008.

88.     Since the facts constituting plaintiffs' injuries were uniquely in the hands of the defendants herein, who actively concealed such facts, no amount of plaintiffs' reasonable efforts could produce the necessary information to file suit until this action was commenced.

89.     Under the "injury discovery" rule, since plaintiffs were unable despite due diligence and reasonable efforts, to discover the facts establishing and constituting plaintiffs' injury, plaintiffs were unable to file a complaint that would comply with the requirements of the Federal Rules of Civil Procedure until 2008.

90.     Plaintiffs were unable, despite due diligence, to discover the facts of plaintiffs' injuries and the identities of who committed them until 2008.

91.     Under the "injury discovery" rule, the time when plaintiffs were "on notice" of their "actionable injury" is a question of fact.

92.     Plaintiffs' knowledge of their "actionable injury" did not surface until 2008.

[20]

David H. Relkin, Esq.

93.     Under principles of equitable tolling, due to the defendants' extraordinarily sophisticated course of deception and fraudulent concealment of money laundering and wire fraud, the circumstances and facts involving the injury to plaintiffs which were necessary to file this suit, as discussed further herein, were concealed from plaintiffs until 2008.

94.     Defendants wrongfully concealed their acts of money laundering and bankruptcy fraud which prevented plaintiffs' discovery of the nature of the claim within the limitations period, despite their exercise of due diligence in pursuing the discovery of the claim.

95.     Because the RICO conspiracy statute does not require proof of an overt act, the crime of RICO conspiracy is not complete until the purposes of the conspiracy either were accomplished or abandoned.

96.     The purposes of the RICO conspiracy were not accomplished or abandoned until the money laundering activities of the Enterprise which concluded in 2008 upon the sale of the GM Building.

### VIII.   <u>PARTIES</u>

97.     Plaintiff Leslie Dick Worldwide, Ltd. ("Worldwide") is a corporation organized under the laws of the State of New York, with an office in the City and State of New York.  Worldwide is in the business of real estate acquisition and was injured in its business and property by the predicate acts of the Enterprise.

[21]

David H. Relkin, Esq.

98.     Plaintiff Leslie Dick is the President and Chief Executive Officer of Worldwide and resides in the City and State of New York.  As the Chairman of Worldwide he was injured in his business and property by the predicate acts of the Enterprise.

99.     Upon information and belief, defendant George Soros is a resident of the City and State of New York and has performed unlawful activities within this district subjecting him to this Court's jurisdiction.

100.     Upon information and belief, defendant SFM was at all relevant times a Delaware Limited Liability Company authorized to do business in the State of New York and has performed unlawful activities within this district subjecting it to this Court's jurisdiction.

101.     Upon information and belief, Mapeley  is a Bermuda corporation jointly owned and/or managed by Soros and Fortress and is likely to be identified herein as a "John Doe" defendant.  The monies wired by Mapeley into the United States, and specifically into this District subject it to this Court's jurisdiction.

102.     Upon information and belief, Quantum is a hedge fund chartered under the laws of the Netherlands Antilles, Curacao and is likely to be identified herein as a "John Doe" defendant.  Soros is a founder and principal advisor to Quantum and, as founder, has knowledge of the identities of the investors and the source of their funds.  The monies

[22]

wired by Quantum into the United States, and specifically into this District subject it to this Court's jurisdiction.

103.    Upon information and belief, Conseco was a conspirator with, and/or a participant in the RICO Enterprise, and was at all relevant times an Indiana corporation authorized to do business in the State of New York.

104.    Upon information and belief, Acquisition, was at all relevant times a shell company affiliated with, or under the control of defendants Soros and/or Fortress and the RICO Enterprise to facilitate laundering money by the Enterprise and the defendants, and was at all relevant times a Delaware Limited Liability Company authorized to do business under the laws of the State of New York, having an address at 875 Avenue of the Americas, New York, New York.  Upon information and belief, Acquisition is likely to be identified herein as a "John Doe" defendant.

105.    Upon information and belief, once the unlawful purposes for which it had been created were accomplished, namely to launder money through the purchase and sale of the GM Building, Acquisition was dissolved to cover-up such wrongdoing.  (See Exhibit "**A**" in the accompanying Compendium of Exhibits.)

106.    Upon information and belief, Junior Mezzanine was at all relevant times under the control of, an affiliate of, or under the control of defendants and the RICO Enterprise, including but not limited to, defendants George Soros, SFM and/or Fortress.

David H. Relkin, Esq.

107.     Upon information and belief, once the unlawful purposes for which it had been created were accomplished, namely to acquire and launder money through the purchase of the GM Building, Junior Mezzanine was dissolved in an attempt to cover-up such wrongdoing.  (See Exhibit "**B**" in the accompanying Compendium of Exhibits.)

108.     Upon information and belief, Mezzanine Fourth was at all relevant times an affiliate of, or under the control of defendants, and the RICO Enterprise including defendants George Soros, SFM and/or Fortress.

109.     Upon information and belief, once the unlawful purposes for which it had been created were accomplished, namely to launder money through the purchase of the GM Building, Mezzanine Fourth was dissolved to attempt to cover-up such wrongdoing. (See Exhibit "**C**" in the accompanying Compendium of Exhibits.)

110.     Upon information and belief, defendant Vornado, was a participant with, member of, and a conspirator with, the RICO Enterprise, was at all relevant times a Maryland limited liability company authorized to do business in the State of New York and formed and employed Vornado GM through which it conducted unlawful activities of money laundering.

111.     Upon information and belief, Vornado GM was at all relevant times a Delaware Limited Liability Company with an office in the City and State of New York, under the control of Soros, Fortress or Vornado, and was a conspirator with the Enterprise.

[24]

David H. Relkin, Esq.

112.    Upon information and belief, once the unlawful purposes for which it had been created were accomplished, namely to commit Money Laundering through the purchase of the GM Building, Vornado GM was dissolved to cover up such wrongdoing. (See Exhibit "**D**" in the accompanying Compendium of Exhibits.)

113.    Upon information and belief, defendant German American Capital, was a conspirator with the RICO Enterprise, was at all relevant times a Maryland Corporation authorized to do business in the State of New York and is a wholly owned subsidiary of Deutsche Bank AG.

114.    Upon information and belief, defendant Deutsche Bank AG was at all relevant times a foreign bank authorized to do business in the State of New York.

115.    Upon information and belief, defendant Eastdil was at all relevant times a New York limited liability company, a RICO conspirator and was previously named Eastdil Realty Company, LLC ("Eastdil Realty"). (See Exhibit "**E**" in the accompanying Compendium of Exhibits.)

116.    Upon information and belief, defendant Harry Macklowe, is a person and a conspirator with the RICO Enterprise, and is a resident of the City and State of New York.

117.    Upon information and belief, FIG LLC, was at all relevant times a limited liability company organized under the laws of the State of Delaware, authorized to do

[25]

David H. Relkin, Esq.

business in the State of New York, was a person and a controlling member of the RICO

Enterprise, was involved and participated in knowingly laundering illicitly derived funds

for its benefit to acquire Conseco Finance and the GM Building for its benefit.  FIG LLC

was known at all relevant times herein as Fortress Investment Group, LLC ("Fortress").

(See Exhibit "**F**" in the accompanying Compendium of Exhibits.)

118.     Upon information and belief, Cerberus, was a limited partnership

organized and existing under the laws of the State of Delaware, was authorized to do

business in the State of New York.

119.     Upon information and belief, J.C. Flowers & Co., LLC ("J.C. Flowers &

Co.") was at all relevant times a Delaware Limited Liability Company authorized to do

business in the State of New York.

120.     Upon information and belief, Lazard, who may become a John Doe

defendant after further discovery herein, was a person and conspirator with the RICO

Enterprise, was, at all relevant times, a limited liability company organized under the laws

of the State of New York and acted as financial advisor to Conseco.

121.     Upon information and belief, defendant Kirkland & Ellis, was a

conspirator with the RICO Enterprise in that it helped enable, devise and manage the

predicate acts described herein, including, but not limited to devising and forming the

chain of shell entities to disguise and conceal the origin and nature of the laundered

[26]

David H. Relkin, Esq.

money, and was at all relevant times a limited liability partnership organized and existing

under the laws of the State of New York and was a legal advisor to Conseco.

122.    Upon information and belief, Fried, Frank, Harris, Shriver & Jacobson,

LLP, was at all relevant times a limited liability partnership organized and existing under

the laws of the State of New York and acted as legal advisor to Harry Macklowe in the

GM sale and co-counsel to the unsecured creditors of the Conseco Bankruptcy.

123.    Upon information and belief, Carmel Fifth, was a subsidiary of Conseco,

and was at all relevant times a Delaware limited liability company authorized to do

business in the State of New York.

124.    Upon information and belief, 767 Manager, LLC ("767 Manager"), was

affiliated with a company or corporation controlled by defendant Trump, and was at all

relevant times a Delaware limited liability company authorized to do business in the State

of New York.

125.    Upon information and belief, Trump 767 Manager, LLC ("Trump

Manager") was a wholly-owned subsidiary of 767 LLC, and was the actual owner of the

GM Building from July 1998 to September 2003.

126.    Upon information and belief, defendant Donald J. Trump is an individual

residing in the City and State of New York.

[27]

David H. Relkin, Esq.

127.    The foregoing defendants satisfy the definition of a "person" provided for in 18 USC §1964 (1) in that they are one or more of the following: an individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

128.    The defendants also constitute a RICO association-in-fact Enterprise by evidence of their ongoing organization, formal or informal, and by evidence that the various associates agreed to function as a continuing unit.

129.    Plaintiffs are informed and believe that at all times referred to herein, John Does "1" to "10" were agents, consultants, partners, subsidiaries, parent corporations, conspirators with or affiliates of the defendants and were acting within the scope of that agency or relationship at all times with defendants and their actions were in conspiracy with, in participation with, and such actions were ratified by the defendants herein, and each of them.

## IX.    FACTUAL BACKROUND: THE EVENTS LEADING UP TO THE CONSECO BANKRUPTCY

130.    In 1998, Conseco, one of the largest conglomerate insurance companies in America, was on a buying spree, accumulating 19 insurance and insurance financing companies since 1992.

**Conseco's Purchase of
Green Tree Financial**

[28]

David H. Relkin, Esq.

131.    On or about April 6, 1998, Conseco bought Green Tree Financial, Inc. ("Green Tree"), a Minnesota mobile home lender for 6.2 Billion Dollars of stock in Conseco.  Conseco thereafter changed Green Tree's name to Conseco Finance.

132.    The main business of Green Tree was to make loans, then package them and sell the loans to other investors in a process Wall Street calls securitization creating collateralized debt obligations.

133.    When the loans were sold, Green Tree would make certain assumptions regarding the profits it would earn; if it made incorrect assumptions, such as how soon borrowers would pay off their loans, those gains would prove illusory.

**Conseco's Purchase of
The GM Building
<u>With Donald J. Trump</u>**

134.    In or about May 1998, Conseco and Donald J. Trump entered into a contract to purchase the GM Building in New York City, located at 767 Fifth Avenue between 57th and 58th Street, across the street from the Plaza Hotel.

135.    The GM Building is considered to this day as a "trophy" property and one of New York's finest and most lucrative commercial real estate locations in New York.

136.    The unlawful Money Laundering through the purchase of the GM Building, orchestrated and carried out by the defendants through a pattern of racketeering,

[29]

David H. Relkin, Esq.

including Soros, SFM, Fortress, Vornado, German American, Conseco, Trump, Eastdil, Macklowe, Kirkland & Ellis, and, upon information and belief, other co-conspirators, operated an enterprise involving Money Laundering, Bankruptcy Fraud and wire fraud.

137.    When the GM Building was purchased by Conseco and Donald J. Trump, the parties assumed two mortgages on the property, in the approximate amount of 590 Million Dollars, bringing the total purchase price for the GM Building to approximately 814.6 Million Dollars.

138.    At the Closing of the purchase of the General Motors Building the parties assumed the mortgages on the property and, on July 31, 1998, Conseco paid 212.7 Million Dollars through its shell entity Carmel Fifth, and Donald J. Trump paid 11.2 Million Dollars, through a shell entity, 767 Manager.

139.    Carmel Fifth and 767 Manager entered into a Limited Liability Operating Agreement to reflect the terms of their joint ownership of the Building and became members of an entity called 767, LLC, which was the sole owner of Trump 767 Manager, which held the title to the General Motors Building.

140.    Upon information and belief, the capital used by Carmel Fifth for the purchase of the GM Building, and the oversight of its operations, came directly from Conseco and made Conseco the true owner of the GM Building through its wholly-owned subsidiary, Carmel Fifth.

[30]

David H. Relkin, Esq.

141.    Upon information and belief, Carmel Fifth had no officers or directors and the entire consideration Conseco paid for the GM Building came directly from Conseco.

142.    Conseco stated on its financial statements that the capital invested by Carmel Fifth in the purchase of the General Motors Building was an investment of approximately 212.7 Million Dollars by the shell entity, Carmel Fifth. (See Exhibit "**G**" in the accompanying Compendium of Exhibits.)

143.    Kirkland & Ellis fraudulently represented in the Conseco bankruptcy that Carmel Fifth was not an asset of Conseco and that Conseco had no interest therein, so as to make Carmel Fifth isolated from Conseco's general operations and appear to be bankruptcy remote.[2]  This constituted Bankruptcy Fraud pursuant to 18 U.S.C. § 152 (2) and (3).

144.    Upon information and belief, the four insurance companies which were the alleged owners of Carmel, invested no capital in Carmel Fifth, and therefore did not actually own Carmel Fifth.

145.    Kirkland & Ellis repeatedly claimed in the Conseco Disclosure Statements to the Conseco creditors that the sale of the GM Building was essential for the reorganization of the Bankruptcy Estate when, in conspiracy with the defendants, it later

---

[2] The insurance companies were Bankers Life and Casualty Co., Washington National Life Insurance Co., Conseco Senior Health Insurance Co., and Conseco Annuity Assurance Co.

David H. Relkin, Esq.

represented to the Conseco creditors that the GM Building was not an asset of Conseco in violation of 18 U.S.C. § 152 (2) and (3).[3]

**The Documented SEC Violations**
**By Conseco to Inflate Its Earnings**

146.    From March 1999 through February 2000, Conseco and its wholly-owned subsidiary Conseco Finance, made false and misleading public statements about their earnings, overstating their profits by hundreds of millions of dollars.

147.    This massive overstatement occurred with the knowledge and participation of Conseco, its Chief Financial Officer and Conseco Finance's Chief Accounting Officer.

148.    The fraudulent and hidden scheme of Conseco manipulated earnings by avoiding huge write downs of certain assets held by Conseco Finance known as interest-only securities. During this same period, Conseco and Conseco Finance also made a number of unsupported and improper adjustments ("top-side adjustments") to the books and records of Conseco and Conseco Finance.

149.    Through these top-side adjustments, Conseco and Conseco Finance fabricated increased earnings.

150.    As part of its business, Conseco Finance originated, purchased, sold and serviced consumer and commercial loans. Conseco Finance put its loans into groups

---

[3]  Conseco filed for Bankruptcy protection on December 17, 2002 in the Northern District of

David H. Relkin, Esq.

(called "pools"), and sold the pools to a special purpose entity (the "SPE"). The SPE, in turn, sold bonds to the public backed by the principal and interest payments due from the loans making up the pools.

151.    The SPE transferred to Conseco Finance the proceeds from the bond sales and an interest-only security that represented the right to receive any remaining proceeds flowing from the pool after all the other bondholders and servicing fees were paid.

152.    Conseco Finance recorded the interest-only securities on its books as assets and was required by law to adjust them to their fair value each quarter.

153.    Conseco Finance purportedly determined the fair value of the interest only securities each quarter by estimating the cash flows expected to flow from each interest-only security and discounting them to their actual value.

154.    The Conseco Finance accounting department determined these cash flows using computer models that were based on intentionally fraudulent assumptions made by Conseco and Conseco Finance.

155.    Such conduct violated Section 17(a) of the Securities Act of 1933.

156.    Following Conseco's acquisition of Conseco Finance, Conseco's senior management touted its new subsidiary as its new growth engine, and repeatedly and

Illinois, Eastern Division.

[33]

David H. Relkin, Esq.

falsely represented to the public that Conseco Finance was contributing to Conseco's aggressive financial targets exactly according to plan.

157.    From January 1999 to March of 2000, neither Conseco nor Conseco Finance disclosed any problems, accounting changes, or similar issues relating to their accounting for Conseco Finance's interest-only securities.

158.    In March of 2000, while conducting the 1999 year-end audit, Conseco and Conseco Finance's auditors, PricewaterhouseCoopers, L.L.P. ("Pricewaterhouse"), discovered Conseco's and Conseco Finance's fraudulent activities with respect to the interest-only securities.

159.    Pricewaterhouse also discovered the fraudulent topside adjustments to the income of Conseco and Conseco Finance.

160.    On March 31, 2000, Conseco and Conseco Finance announced that they were reviewing the value of their interest-only securities and expected to record a charge to earnings, estimated at 350 Million Dollars after taxes, to write-down the carrying value of the interest-only securities. Conseco's stock fell more than 16% that day.

161.    On April 1, 2000, Conseco publicly announced that it would sell Conseco Finance.

[34]

David H. Relkin, Esq.

162.   Due to the inability of Conseco to identify purchasers willing to pay what Conseco asked for Conseco Finance, Conseco changed its tune and tried to make it appear to the market that Conseco Finance was actually an asset to the company.

163.   On April 14, 2000, Conseco and Conseco Finance filed restated results for the first three quarters of 1999, and revised results for the fourth quarter and full-year 1999.

164.   Specifically, Conseco was forced to publicly admit that it had overstated its net income for the first three quarters of 1999 by $9.3 million (3.2%), $84.2 million (39.5%) and $37.8 million (24.3%), respectively, and inflated its publicly announced net income for the fourth quarter and full-year 1999 by $236.3 million (383%) and $367 million (61.7%) respectively.

165.   Conseco Finance also admitted that it had overstated net income for the first three quarters of 1999 by $7.5 million (5.8%), $56.1 million (49.9%) and $14.8 million (26.2%), respectively, and inflated its publicly announced operating income for the fourth quarter and year-end 1999 by $378.3 million (112.9%) and $562.6 million (1654.7%), respectively. Conseco's stock price fell more than 10% following these disclosures.

166.   Rollin S. Dick and James S. Adams, formerly Chief Financial Officer and Chief Accounting Officer of Conseco and then its wholly-owned subsidiary Conseco

[35]

David H. Relkin, Esq.

Finance kept their fraudulent activities hidden until at least the fourth quarter of 2003, after Conseco had already filed for Bankruptcy.

167.    On or about March 10, 2004, the Securities and Exchange Commission filed civil fraud charges pursuant to Sections 17 (a) of the Securities Act and 10 (b) and 13 of the Exchange Act against Rollin S. Dick and James S. Adams for their fraudulent manipulations with respect to the interest-only securities and the fraudulent topside adjustments to the income of Conseco and Conseco Finance.  (See Exhibit "**H**" in the accompanying Compendium of Exhibits.)

168.    Once the fraudulent overstatement of Conseco Finance's earnings became public, in or about the first week of May 2000, Stephen H. Hilbert, Conseco's Chairman and Chief Executive Officer and founder resigned.

**Gary C. Wendt Attempts**
**To Reduce Conseco's Debt**

169.    On or about March 31, 2000, Conseco retained Lehman Brothers Investment Bank ("Lehman Brothers") to obtain a purchaser for Conseco Finance.

170.    On or about May 5, 2000, Conseco agreed to sell 1.5 Billion Dollars of consumer loans to Lehman Brothers.

171.    Conseco announced that it would use up to 500 Million Dollars to repay debt owed by Conseco Finance to Conseco.

[36]

David H. Relkin, Esq.

172.     On June 29, 2000, Conseco announced that it had appointed Gary C. Wendt, former CEO of GE Capital Services, to the position of CEO and Chairman of the Board of Conseco.

173.     Upon information and belief, Gary C. Wendt received a signing bonus of 45 Million Dollars as well as 3.2 million shares of stock, then worth approximately 31.2 Million Dollars.  In addition, he received options to purchase an additional 10,000,000 shares of stock. Wendt was also entitled to receive a bonus of 50 Million Dollars if the stock price rose from the price of $5.80 per share to $20.00 per share, or $38.00 less than Conseco's share price when it purchased Green Tree Financial.

174.     Conseco announced that Wendt was brought into Conseco to reduce its enormous debt and to maximize the assets of Conseco by selling-off pieces of the Conseco Empire to focus Conseco back on its core business of insurance.

175.     Initially, in July 2000, Wendt announced that Conseco was again in the process of selling Conseco Finance, but later flip-flopped and announced he was more interested in operating it.

176.     By October, 2000, Gary C. Wendt had been cutting costs but Conseco announced that it nevertheless continued to hemorrhage quarterly losses in the hundreds of Millions of Dollars.

[37]

David H. Relkin, Esq.

**The Orchestrated Dispute**
**Regarding The GM**
**Building Between Conseco**
**And Donald J. Trump**

177.    The Limited Liability Company Agreement of 767 LLC between Carmel

Fifth and 767 Manager, the indirect owners of the General Motors Building, provided that

on or after the third anniversary of the purchase of the General Motors Building, July 31,

1998, or on or after July 31, 2001, either party could exercise a buy/sell right pursuant to

which Carmel Fifth could be bought out or purchase the interest of 767 Manager, and

vice versa, at certain predetermined prices.  (See Exhibit "**I**," in the accompanying

Compendium of Exhibits.)

178.    Pursuant to the Limited Liability Company Agreement of 767 LLC, if

Carmel Fifth sold its interest to 767 Manager, or if 767 Manager sold its interest to

Carmel Fifth, they were each entitled to receive an amount pursuant to a formula

contained in the Operating Agreement.  (See Exhibit "**I**" in the accompanying

Compendium of Exhibits at ¶9.6.)

179.    In March 2001, Conseco continued Gary C. Wendt's cost cutting

endeavors to keep Conseco afloat by allegedly liquidating what were represented as "non-

core" assets of Conseco.  One of the most valuable assets of Conseco at that time was its

substantial interest in the GM Building, which for an insurance company like Conseco,

was certainly not a "core asset" of Conseco.  Notwithstanding this fact, and contrary to

[38]

David H. Relkin, Esq.

rational business practices, Gary C. Wendt took no steps to monetize Conseco's interest in the GM Building.

180.    Upon information and belief, this was because, at or about the beginning of March 2001, while Conseco was hemorrhaging money, George Soros, the mastermind of the RICO Enterprise, had contacted, among others to be found in discovery, Wendt and Trump to purchase the GM Building outside the Conseco Bankruptcy in order for Soros and/or Fortress to launder money.

181.    Upon information and belief, Conseco was well-aware of the value of its interest in the GM Building at this time since, in or about July and August 2001, Conseco had received bids from interested buyers at a price of 1.15 Billion Dollars.

182.    Upon information and belief, in March 2001, Donald J. Trump offered to purchase Conseco's interest in the General Motors Building for 295 Million Dollars.

183.    As part of his proposal, Trump agreed to issue certain debt obligations to Conseco, including a note in the amount of 250 Million Dollars.

184.    In order to provide the necessary liquidity for the note, Conseco through Wendt told Trump that Conseco would only consider Trump's offer if he provided a Guaranty or Letter of Credit to collateralize the debt obligations of Trump.

[39]

David H. Relkin, Esq.

185.     Upon information and belief, Conseco by Wendt requested this Guaranty in order for Conseco to securitize the note to allow it to immediately sell the note into the financial markets.

186.     On March 21, 2001, *Conseco* and *Trump* signed a letter of intent which provided that Trump had to provide *Conseco* a Guaranty from a third party of the 250 Million Dollar Note from *Trump* to securitize the note.  (The "Letter of Intent.")

187.     "Guaranty" was defined in the Letter of Intent as a Letter of Credit or other security acceptable to Conseco, in its "sole discretion."

188.     Pursuant to the Letter of Intent, upon information and belief, Trump had three months to provide the guaranty and was required to close no later than June 30, 2001.

189.     The Letter of Intent demonstrated that both Conseco and Trump knew that Conseco—not Carmel Fifth—was the part owner in fact of the GM Building.  In the alternative, Trump entered the agreement with Conseco as part of the defendants' pattern of racketeering to lay the groundwork for the allegations, later made by Trump, that Conseco was the true one-half owner of the GM Building.

190.     Upon information and belief, on May 16, 2001, Trump obtained a non-binding proposal from Deutsche Bank, A.G. to refinance the debt on the GM Building (the "Deutsche Bank Proposal"), to provide Conseco with "limited credit protection" in

[40]

David H. Relkin, Esq.

form of a "standby commitment," pursuant to which Trump could borrow up to 225

Million Dollars which could be used to pay principal and interest to Conseco.

191.    The Deutsche Bank Proposal also provided that the purchase price was

250 Million Dollars, or 45 Million Dollars less than Trump had originally agreed to pay

under the Letter of Intent.

192.    Upon information and belief, on May 22, 2001, *Conseco* rejected the May

16, 2001 proposal and standby commitment by Trump as unacceptable and urged Trump

to provide a letter of credit or guaranty sufficient to meet Conseco's needs as described in

the Letter of Intent.

193.    The third anniversary of the purchase of the GM Building was July 31,

2001.  As of that date, pursuant to the terms of the Limited Liability Agreement of 767

LLC, Conseco's wholly-owned indirect subsidiary, Carmel Fifth, could exercise a

Buy/Sell option and either be bought out for approximately 700 Million Dollars or buy

Trump's interest, held by his wholly-owned entity, 767 Manager, for the comparatively

paltry sum of approximately 15 Million Dollars.  (See Exhibit "**I**" in the accompanying

Compendium of Exhibits at ¶¶9.6.)

194.    Given Conseco's knowledge that potential purchasers were willing to pay

approximately 1.2 Billion Dollars for the GM Building, Conseco had a strong interest in

exercising its right to purchase its interest in the Building or to be bought out for

[41]

David H. Relkin, Esq.

approximately 400 Million Dollars more than Trump had offered to pay in the March
Letter of Intent or the July 3 Agreement.

195.    Nevertheless, contrary to sound, or even rational business practices,
Conseco refrained from exercising the Buy/Sell option under the 767 LLC Operating
Agreement and continued to appear to negotiate with Trump to resolve the ownership
pursuant to the July 3 Agreement.

196.    Since Trump assured Conseco that he was close to obtaining the necessary
guaranty, on July 3, 2001 (the "July 3 Agreement") *Conseco* agreed with Trump that
*Conseco* would sell its interest in 767 LLC for the sum of 295 Million Dollars subject to
certain conditions.  Conseco's Chief Financial Officer signed the July 3 Agreement on
behalf of Conseco.  (See Exhibit "**J**" in the accompanying Compendium of Exhibits.)

197.    Conseco's July 3 Agreement demonstrated that Conseco was the true one-
half owner of the GM Building.

198.    Nevertheless, as discussed further herein in the Predicate Acts, Section
XIII, in connection with the Conseco Bankruptcy, Conseco and its counsel Kirkland &
Ellis falsely represented to the bankruptcy court that  Conseco owned 50% of the GM
Building and that therefore the Conseco investment of approximately 212 Million Dollars
in the GM Building would accrue to the benefit of the creditors in the Conseco
Bankruptcy.

[42]

David H. Relkin, Esq.

199.    One thing is clear from the July 3 Agreement, it provided both sides with the ability to argue or change their arguments at will as to the true owner of the GM Building: either it was owned by Conseco (as demonstrated by the March 21, 2001 Letter of Intent, the July 3, 2001 sale Agreement, and the Conseco Financial Statements), or it was owned by Carmel Fifth as a subsidiary of four insurance companies.

200.    As further described hereinafter, in conspiracy with the RICO Enterprise, Conseco would later argue in its Bankruptcy proceedings both that it owned the GM Building and that therefore the Bankruptcy Court had core jurisdiction over the dispute with Trump when it applied to the Bankruptcy Court to confirm the Arbitration Award it later obtained against Trump; and then argued that it did not own the GM Building and the creditors could not receive any benefit from the sale of the GM Building in violation of 18 U.S.C. §152 (2), (3) and (9).

201.    In conspiracy with the RICO Enterprise, Trump would later argue both that the GM Building *was part of the Conseco Bankruptcy Estate by suing Conseco*, and later argued that the GM Building was *outside* the jurisdiction of the Bankruptcy Court when Trump moved to dismiss Conseco's attempt to hold the "arbitration proceedings" before the Bankruptcy Court and when Conseco attempted to have the Bankruptcy Court confirm the arbitration award regarding the ownership of the GM Building.

202.    Throughout the Conseco Bankruptcy, Conseco and Kirkland & Ellis by James H. M. Sprayregen, Esq. repeatedly and falsely represented to the Bankruptcy Court that the GM Building was an asset of Conseco and that "the sale or transfer of the GM

[43]

David H. Relkin, Esq.

Building or interests therein, pursuant to, or consistent with an Order of the Bankruptcy Court shall be deemed a transfer under and pursuant to, and in furtherance of the [Bankruptcy] Plan."

203.    However, in connection with the dispute with Trump Conseco repeatedly took the position that the GM Building *was not an asset of Conseco* so that the Bankruptcy Court could not exercise jurisdiction over the sale of the GM Building so that the sale of the Building could be accomplished by the RICO Enterprise without any scrutiny by the Bankruptcy Court.

204.    Such false representations were part of the pattern of racketeering activity of the RICO Enterprise and constituted Bankruptcy Fraud.

205.    Since nothing accrued to the benefit of the creditors of Conseco by the ultimate sale of the GM Building despite Conseco's and Kirkland & Ellis' repeated claims to the Conseco creditors that the monetization of the GM Building would accrue to the benefit of the creditors and was "essential" to the reorganization of Conseco, one must presume that this entire transaction, the March letter of intent, the July 3 Agreement and the months and months of negotiations regarding the proper form of the guaranty Trump was to provide to Conseco, were part of a conspiracy between Conseco, Kirkland & Ellis and Trump to delay the resolution of the ownership of the GM Building, in furtherance of the RICO Enterprise, until after the Conseco Bankruptcy was closed in violation of 18 U.S.C.§152 (9) since the ultimate beneficiary of the sale of the GM Building was new Conseco.

[44]

David H. Relkin, Esq.

206.    Pursuant to the July 3 Agreement, the purchase price was to be paid to Conseco in debt obligations of Trump, subject to certain conditions, including that the loan and interest payments on the Trump obligations "shall be guaranteed by Lender in a form acceptable to Conseco, in its sole discretion."

207.    Instead of waiting to exercise the Buy/Sell provision in the 767 LLC Limited Liability Agreement until July 31, 2001, which would have maximized Conseco's assets, on or about July 3, 2001, Conseco conspired with Trump to enter into the totally irrational July 3 Agreement with Trump, in which Conseco agreed to be bought out of the GM Building for the mere sum of 295 Million Dollars provided that Trump could guaranty the sum of Trump's 250 Million Dollar Note by a form of security acceptable to Conseco in its sole discretion.

208.    The fact that *Conseco—not Carmel Fifth*—was a party to the July 3 Agreement and that the capital for the purchase of the GM Building actually came from Conseco, demonstrate that the GM Building was, at least according to Conseco, actually owned by Conseco—not Carmel Fifth—and that Conseco's later arguments to the Bankruptcy Court through Kirkland & Ellis to keep the ownership and value of the GM Building out of Conseco Bankruptcy proceedings were in furtherance of the pattern of racketeering of the RICO conspiracy and constituted Bankruptcy Fraud pursuant to 18 U.S.C. §152 (2) and (3), as more fully described herein at Section XIII.

209.    Pursuant to the July 3 Agreement, Conseco was entitled to receive, at the minimum, approximately *200 Million Dollars less than it would have received had it*

[45]

David H. Relkin, Esq.

*waited a mere twenty-eight days* to exercise the Buy/Sell agreement and the sixty days during which Trump would have the election to buy or sell his interest in the GM Building.

210.     In the event that Trump exercised his sell option, he would have received approximately a mere 15 Million Dollars, and Conseco could have owned the GM Building which was reasonably valued at that time at the sum of 1.2 Billion Dollars, and Conseco *would have received approximately 500 Million Dollars after payment of the Mortgages*.

211.     In the event that Trump exercised his buy option, Conseco would also be paid *approximately 500 Million Dollars*.

212.     Thus, the July 3, 2001 Agreement, which was irrational in light of Conseco's stated interest in maximizing its assets, was clearly an obvious ruse by Conseco in conspiracy with the defendants.

213.     The July 3, 2001 Agreement provided that Conseco could terminate the Agreement at any time after July 20, 2001 if Trump did not provide the guaranty sought by Conseco.

214.     The July 3 Agreement also provided that it would terminate automatically if Trump did not close on the transaction by September 15, 2001.  (See Exhibit "**J**" in the accompanying Compendium of Exhibits at p.1.)

David H. Relkin, Esq.

215.    On or about July 10, 2001, Trump publicly announced that he was buying *Conseco's* interest in the GM Building for 295 Million Dollars pursuant to the July 3 Agreement. Upon information and belief, Trump was fully able to provide the security sought by Conseco, but, at various times in furtherance of the pattern of racketeering activity of the Enterprise in conspiracy with Trump and Conseco, Trump refused to provide the guaranty and at other times Conseco refused the guaranty provided by Trump.

216.    Conseco in conspiracy with Trump repeatedly provided additional irrational and unwarranted extensions of the date by which Trump had to purchase Conseco's interest for a substantially discounted price, since it delayed the resolution of the ownership of the GM Building for the benefit of the RICO Enterprise.

217.    The conspiracy, plan and scheme of the RICO Enterprise was to keep the ownership of the GM Building in play to ensure that the defendants could purchase the GM Building outside the Conseco Bankruptcy in order to engage in money laundering.  It was able to accomplish this end by the conspiratorial agreement between Conseco and Trump to cause confusion and delay, for example, providing Trump with additional time to provide the guarantee, and then repeatedly refusing the guarantee.

218.    As part of the pattern of racketeering activity, Trump failed to provide the required guaranty prior to July 20, 2001.

219.    In August 2001, to provide cover for the conspiratorial agreement between Conseco and Trump, Gary C. Wendt, who may later be discovered to be a John Doe

[47]

David H. Relkin, Esq.

defendant herein, held a conference call with market analysts and tried to stave off rumors that Conseco was still in the process of "cooking its books" as it had done in 1999 and 2000.

220.     On August 6, 2001, after the Buy/Sell Agreement had matured enabling Conseco to receive an additional 210 Million Dollars over what Trump was offering in the July 3 Agreement, Trump again, in furtherance of the pattern of racketeering activity, provided Conseco with a Guaranty that Conseco rejected in furtherance of the racketeering activity.

221.     Upon information and belief, in August, 2001, defendant Vornado proposed to Conseco to purchase the General Motors Building for 1.15 Billion Dollars, which Conseco rejected.

222.     On August 24, 2001, in furtherance of the conspiracy, Conseco provided a copy of a Guaranty to Trump that it would find acceptable. Trump again rejected Conseco's proposal.

223.     Trump did not close on the GM Building prior to September 15, 2001, as required by the July 3 Agreement.

224.     On September 25, 2001, Conseco continued the pattern of racketeering by allowing Trump yet another opportunity to purchase Conseco's interest in the GM

David H. Relkin, Esq.

Building at the discounted price. Trump failed to provide the necessary documentation and security requested by Conseco by September 25, 2001.

225.    Accordingly, by letter dated October 4, 2001, Conseco by its Chief Financial Officer, formally advised Trump that the July 3 Agreement "was null and void and of no further effect." (See Exhibit "**K**" in the accompanying Compendium of Exhibits.)

226.    Upon information and belief, according to an agreement between Charles H. Cremens and Conseco, Cremens would receive a 1 Million Dollar bonus if the GM Building was sold for more than 1 Billion Dollars.  Charles H. Cremens handled both the sale of Conseco Finance to CFN Holdings, and the sale of the GM Building to Macklowe. Upon information and belief, Charles H. Cremens and/or CFN Holdings may be later identified in discovery as a John Doe defendants herein.

227.    Nevertheless, despite its urgent cash needs, in furtherance of the RICO Enterprise, and despite its contention that the July 3 Agreement was "null and void," Conseco continued to do nothing to monetize its interest in the GM Building; and, during the next three months Carmel/Conseco failed to exercise its matured, legitimate right to exercise its Buy/Sell agreement with Trump in conspiracy with the Enterprise.

228.    On or about January 5, 2002, Bruce A. Chrittenden resigned as President of Conseco Finance and Charles H. Cremens replaced him.

[49]

David H. Relkin, Esq.

229.     After Trump repeatedly failed to provide the Guaranty under terms satisfactory to Conseco, and despite numerous extensions granted by Conseco to Trump in furtherance of the RICO Enterprise, which Conseco was under no obligation to give, ninety days later, or on or about January 15, 2002, Conseco finally advised Trump by correspondence of that date, that it was no longer willing to sell its interest in the GM Building at the discounted price, and that Carmel Fifth was exercising its Buy/Sell option contained in the Limited Liability Agreement of 767 LLC, giving 767 Manager sixty (60) days to exercise its option to either buy out Conseco's interest for 499.4 Million Dollars, or be bought out by Conseco for 15.5 Million Dollars.  (See Exhibit "**L**" in the accompanying Compendium of Exhibits.)

230.     These amounts in the Buy/Sell notice were based on a formula contained in the 767 LLC Operating Agreement,[5] and a market value of the GM Building of 1.215 Billion Dollars.

231.     In response, on or about February 7, 2002, in furtherance of the conspiracy to launder money through the GM Building, Trump sued Conseco in New York Supreme Court for One Billion Dollars for breach of contract and sought to have Conseco transfer the GM Building to him by asserting that the July 3 Agreement superseded and cancelled Carmel Fifth's Buy/Sell right.

---

[5] See Exhibit "**I**" in the accompanying Compendium of Exhibits.

David H. Relkin, Esq.

232.     On or about February 8, 2002, Donald J. Trump, through his counsel, advised Conseco that it would sue anyone even negotiating with Conseco to buy out Trump's interest in the GM Building.

233.     Upon information and belief, on or about February 12, 2002, Trump, through its counsel threatened a potential purchaser directly with interference with contractual relations.

234.     Under the cloud of Trump's tactics, no one in the financial arena appeared to be willing to participate in any purchase or refinancing of the General Motors Building.

235.     In February 2002, Conseco agreed to pay 120 Million Dollars to settle a class-action lawsuit filed by shareholders who accused the company of producing false and misleading financial results through its 1999 fiscal year.

236.     Instead of responding to the Buy/Sell notice within sixty days, as required by the Operating Agreement of 767 LLC, on March 13, 2002, Trump responded to Conseco's Buy/Sell offer by alleging that the July 3 Agreement precluded Carmel Fifth from exercising the Buy/Sell right even though, according to Conseco, the July 3 Agreement had expired by its own terms on September 15, 2001, and that Trump was still allowed to purchase the General Motors Building for the sum of 295 Million Dollars. (See Exhibit "**M**" in the accompanying Compendium of Exhibits.)

David H. Relkin, Esq.

237.    Upon information and belief, during this period, Trump, through his attorneys, again notified Conseco and other parties that it would sue anyone who proposed to buy or even negotiate to buy the GM Building from Conseco.

238.    In or about March 2002, Bill Shea, the President of Conseco also became the Chief Financial Officer of Conseco.

239.    Upon information and belief, Trump knew that the New York Supreme Court had no jurisdiction to hear the dispute because of the arbitration provision in the Limited Liability Agreement of 767 LLC, thus, this action could only have been filed to delay the resolution of the ownership of the General Motors Building so as to enable the RICO Enterprise to acquire it in furtherance of the predicate act of laundering money through the purchase of the GM Building.[6]

240.    Upon information and belief, Conseco notified Trump by letter dated March 22, 2002 that, since 767 Manager had not made an election under the Buy/Sell provision of the 767 LLC Operating Agreement, it was deemed to have offered to sell its interest in the GM Building for 15.5 Million Dollars and further notified 767 Manager that Carmel Fifth was prepared to immediately purchase 767 Manager's interest in the GM Building.  (See Exhibit "**N**" in the accompanying Compendium of Exhibits.)

---

[6] Despite Trump's allegation that the buy/sell provision was no longer valid, under well-settled law, the parties would still have had to arbitrate the dispute because the arbitration provision in the 767, LLC Operating Agreement provided that "if any dispute arises between the Members [767 Manager and Carmel Fifth], or between the Company [767 LLC—which owned the building] and any member, including any dispute arising out of or relating to this agreement…such dispute shall be submitted to arbitration.)

[52]

David H. Relkin, Esq.

241.    In furtherance of its position that 767 Manager had exercised the sell option of the Operating Agreement, on or about March 26, 2002, Carmel Fifth  instituted arbitration proceedings against 767 Manager, before the American Arbitration Association (the "AAA"), as required by the Operating Agreement, and requested an Award purchasing 767 Manager's interest in the GM Building for the price of 15.5 Million Dollars.  (See Exhibit "**O**" in the accompanying Compendium of Exhibits.)

242.    Pursuant to the Operating Agreement of 767 LLC, the arbitration had to be conducted before a Panel of three arbitrators, one selected by each of the parties, with a third arbitrator, required to be a former Judge, selected by the two party-appointed arbitrators.

243.    Upon information and belief, in April 2002, Conseco Medical Insurance Co. agreed to pay at least 1.3 Million Dollars in restitution and fines in Texas for failure to promptly pay health care claims in mid-2001.

244.    In conspiracy with the RICO Enterprise, Trump continued the pattern of racketeering by delaying the Arbitration.

245.    Upon information and belief, on or about April 9, 2002, Trump sent a letter to Conseco that it would sue Conseco or any third parties who attempted to purchase the GM Building for tortious interference.

[53]

David H. Relkin, Esq.

246.     Despite the arbitration agreement in the 767 LLC Operating Agreement, on or about April 15, 2002, hoping to further delay the resolution of the dispute, Trump moved for a stay of the Arbitration proceedings in New York State Supreme Court, claiming that the July 3 Agreement between him and Conseco abrogated the arbitration provision  in the 767 LLC Operating Agreement.

247.     Oral argument on the motion to stay the Arbitration took place before Justice Moskowitz of the New York State Supreme Court, New York County on May 2, 2002.  By Order dated May 2, 2002, entered May 7, 2002, the New York State Supreme Court denied Trump's motion for a stay of the arbitration before the American Arbitration Association (per Moskowitz, J.).  (See Exhibit "**P**" in the accompanying Compendium of Exhibits.)

248.     In response, on May 31, 2002, Trump appealed the Decision of Justice Moskowitz to the Appellate Division First Department, and then, in another about-face, after further delaying the resolution of the ownership of the General Motors Building, on June 12, 2002, Trump stipulated to stay his state court action and advance his arguments against Conseco and Carmel Fifth before the American Arbitration Association.

### X.     BEHIND THE SCENES OF THE GM DISPUTE THE RICO ENTERPRISE IMPLEMENTS THE RICO ACTIVITY

249.     Upon information and belief, on June 7, 2002 Conseco retained Lazard to assist it with its financial difficulties.  Lazard analyzed the value of Conseco Finance and

[54]

David H. Relkin, Esq.

provide such information to the RICO Enterprise including, Fortress Financial and Soros to enable the RICO Enterprise to acquire and maintain an interest in Conseco's affiliate Conseco Finance and to secure the Debtor-in-possession financing of Conseco to launder money.

250.    Upon information and belief, at or about this time, George Soros, or someone else to be identified acting on behalf of the Enterprise, began implementing the pattern of racketeering activities which could be accomplished by having Conseco file for Bankruptcy protection under Chapter 11 of the Bankruptcy Code, to act as the Debtor-in-possession financier, acquire Conseco's assets at a discount price, including Conseco Finance and the GM Building, and launder illegally derived funds through these entities in furtherance of the RICO Enterprise and in conspiracy therewith.

251.    These activities by Soros, SFM, Fortress, Macklowe, Vornado, and Trump, constituted a pattern of racketeering activity involving interstate commerce to acquire an interest in Conseco, to invest proceeds of a pattern of racketeering activities in Conseco, and to conduct the affairs of Conseco through a pattern of racketeering, through Money Laundering and Bankruptcy Fraud.

252.    Fortress, Vornado, Trump, Soros, SFM and others, acquired or maintained, directly or indirectly, an interest in, or control of Conseco, an enterprise which was engaged in, or the activities of which affected, interstate or foreign commerce in two ways: (a) by purchasing Conseco Finance with laundered money deriving from

[55]

David H. Relkin, Esq.

illegal sources, and (b) by obtaining the Debtor in Possession Financing (the "DIP Financing") of Conseco through racketeering activities.

253.    To secure their control over Conseco, Conseco, in furtherance of the racketeering conspiracy, agreed that the amount paid by CFN (Fortress and Cerberus) for Conseco Finance would go to pay down the FPS DIP financing, controlled by Fortress and Soros.

254.    The other target of the RICO Enterprise of was to ensure the sale of the GM Building to defendant Macklowe in conspiracy with the other defendants of the Enterprise, so that Soros, SFM, Fortress, Mapeley, Quantum, and Trump, could launder money through the purchase and eventual sale of the GM Building.

255.    Upon information and belief, Wendt, or other officers or directors of Conseco were promised a substantial consideration by the RICO Enterprise if they participated in the unlawful Money Laundering and Bankruptcy Fraud activities engineered, and later carried out by the RICO Enterprise and the conspirators therewith.

256.    Upon information and belief, in connection with the GM Building scheme, the plan of the RICO Enterprise was to perpetuate the dispute as to the ownership of the GM Building between Trump and Conseco until after Conseco's Bankruptcy proceedings were concluded to allow the RICO Enterprise to purchase and sell the General Motors Building to the RICO Enterprise's designated straw-man buyer Harry Macklowe without the oversight of the Conseco Bankruptcy Court to engage in money laundering.

[56]

David H. Relkin, Esq.

257.    The RICO Enterprise employed money laundering to purchase the GM Building in the name of Harry Macklowe, who paid no consideration therefor, to launder money into the purchase, and to thereafter continue the RICO Enterprise to launder proceeds of the sale into a real estate venture of Trump in Chicago, named Trump International Hotel & Tower, Chicago ("Trump Chicago"),  which broke ground May 17, 2005.[7]

**George Soros And
His History of Illegal
Monetary Activities**

258.    Upon information and belief, George Soros is the Chairman of SFM, a private investment management firm, managed by Grove Capital, LLP, and serves as a principal advisor to Quantum, based in the tax free Caribbean Country of Curaçao, a Caribbean tax haven, and a possession of the Netherlands Antilles, which protects the identity of investors from disclosure.

259.    Upon information and belief, the Netherland Antilles has repeatedly been cited by the Task Force on Money Laundering of the Organization for Economic Cooperation and Development as one of the world's most important centers for laundering illegal proceeds of Latin American cocaine and other drug traffic.

---

[7] Among the other investors in Trump International Hotel & Tower are virtually the same defendants in this action: **Deutsche Bank, AG,** the parent company of German American, Blackacre Institutional Capital Management, LLC, which is the real estate affiliate of **Cerberus Capital Management, LP** (which is not presently a defendant in this action), **Grove Capital, LLP, which manages Soros Fund Management**, and **Fortress Investment Group, LLC**,

[57]

David H. Relkin, Esq.

260.    Upon information and belief, in 1979, Soros entered into a consent decree with the Securities and Exchange Commission in a case involving stock manipulation.

261.    Upon information and belief, according to the New Yorker Magazine, in 1986 Soros was fined 75 thousand dollars by the Commodity Futures Trading Commission "for having held positions in excess of speculative limits."

262.    In August of 1990, according to Reuters News Agency, the US Drug Enforcement Agency agents claimed that Banco de Columbia and other banks were conduits for Latin American drug money.

263.    In or about August 1994, according to Reuters, Soros acquired a nine percent interest in Banco de Columbia.

264.    According to the BBC, Soros was found guilty of felony criminal insider trading in France on January 29, 2002, and from profiting from inside knowledge of a 1998 takeover bid for Societé Generale, a French Bank, and was fined 2.9 Million Dollars, which felony conviction was upheld by the French Court of Appeals, the Cour de Cassation, France's highest Court, on June 14, 2006.

---

which is a partner of **Mapeley Holdings, Ltd**., one of George Soros' companies, **and George Soros**. (See Exhibit "**Q**" in the accompanying Compendium of Exhibits.)

David H. Relkin, Esq.

**The RICO Enterprise Puts in
Place the Elements Necessary
To Launder Money and To Engage
In Bankruptcy and Wire Fraud**

265.    Lazard and Conseco entered into a second engagement letter dated August

12, 2002, which was amended by a letter agreement dated October 21, 2002, and further

amended December 16, 2002, one day prior to the Conseco Bankruptcy (the "Engagement

Letter," annexed as Exhibit "**R**" to the accompanying Compendium of Exhibits).

266.    Pursuant to the Engagement Letter, Lazard was entitled to the sum of 250

Thousand Dollars per month, 11 Million Dollars upon restructuring of Conseco, and 5

Million Dollars for the restructuring of Conseco Finance. Upon information and belief,

these huge sums may have been paid, upon information and belief to Lazard, Bruce

Wasserstein and Frank Savage, by Conseco, a RICO conspirator, in furtherance of

conspiracy with the RICO Enterprise involving Conseco, or an individual controlling

Conseco.

267.    Upon information and belief, from June 2002 to December 2002, the six

month period prior to the Bankruptcy filing of Conseco, the defendants in furtherance of

the pattern of racketeering of the Enterprise, including Soros, SFM, Fortress, Vornado,

Conseco, and Kirkland & Ellis entered into various conspiratorial agreements to facilitate

the goals and purposes of the Enterprise to launder money through the Conseco

Bankruptcy using the acquisition of Conseco Finance, which was a violation of 18 U.S.C.

1962 (a), and the DIP Financing by FPS, LLC, which was a violation of 18 U.S.C. §1962

[59]

David H. Relkin, Esq.

(c), and ultimately allowing the defendants through a pattern of racketeering to purchase the GM Building, to launder money through its sale, and thereafter into Trump Chicago.

268.     Upon information and belief, from July 2002 to December 2002, in furtherance of its pattern of RICO activity to commit Bankruptcy Fraud and money laundering derived from illegal activities, Conseco entered into a conspiratorial agreement with Kirkland & Ellis to make it appear to the financial markets and to defraud Conseco's creditors, that Conseco was serious about non-judicial reorganization and to avoid an *involuntary* bankruptcy by creditors which would frustrate the abilities of the RICO Enterprise to put the necessary pieces in place to further the conspiracy.

269.     Upon information and belief, Fried Frank was engaged by the unsecured creditors of Conseco, but failed to take any steps to investigate or any affirmative steps against Conseco in furtherance of its conspiracy with Conseco and the other defendants.

270.     In July 2002, the price of Conseco stock fell below $1 for the first time in more than 12 years and the company was delisted from the Standard & Poors 500 of the New York Stock Exchange to the detriment of the shareholders of Conseco.

271.     On or about August 9, 2002, Gary C. Wendt, Chairman and Chief Executive Officer of Conseco, publicly announced the retention by Conseco of Lazard and Kirkland & Ellis to allow the RICO Enterprise time to lay the ground work to gain control of Conseco through a pattern of racketeering activity.

[60]

David H. Relkin, Esq.

272.    Upon information and belief, this announcement was an act in furtherance of the conspiracy of the defendants of misdirection to prevent the creditors of Conseco from filing an Involuntary Petition in Bankruptcy against Conseco.

273.    From August to December 2002, upon information and belief, the RICO Enterprise structured the elements of the criminal conspiracy, plan and pattern of racketeering.  One of the first affirmative acts of the RICO Enterprise involved creating CFN on or about July 11, 2002, in Delaware and then applied for authority to do business in the State of New York on August 15, 2002, as the instrumentality to acquire Conseco Finance[8] through a pattern of racketeering involving money laundering.  (See Exhibit "**S**" annexed to the accompanying Compendium of Exhibits.) The members of CFN were Cerberus, Fortress, and J.C. Flowers & Co.[9]

274.    Upon information and belief, the RICO Enterprise also set up FPS DIP to obtain the valuable position of Debtor-in-Possession financier to Conseco to launder money in the Conseco Bankruptcy.  Upon information and belief, FPS DIP was controlled by Fortress and Soros, who have been, and, upon information and belief, remain co-conspirators in Money Laundering through partnerships they maintain in Curaçao, N.A. and Bermuda.

---

[8] The motion of Conseco to approve bidding procedures for Conseco Finance only identifies the purchaser as "Fortress/Flowers," "an affiliate of FPS DIP."  FPS DIP was only identified as having an address "c/o Fortress Investment Group" but was actually a company whose members included Soros.

[9] Interestingly, there was no creation or registration of CFN Investments Holdings LLC to do business in Illinois or New York.

[61]

David H. Relkin, Esq.

275.    Upon information and belief, Quantum and Mapeley were the sources of the illegally derived funds that were funneled into the acquisition of Conseco Finance by defendant Fortress and by Soros and/or Fortress with the assistance of German American and Vornado into the GM Building on behalf of the RICO Enterprise.

276.    These racketeering activities were implemented and executed for a pre-packaged Bankruptcy Fraud in a conspiracy by the defendants to overwhelm the other creditors of Conseco and take control of the sale of Conseco Finance to CFN (Fortress and Cerberus) and to put in place their own Debtor in Possession Financier, FPS DIP (only identified as c/o Fortress, but believed to include Soros or SFM).

277.    On August 12, 2002 and October 21, 2002, once the RICO Enterprise was ready to file the voluntary Petition in Bankruptcy of defendant Conseco, Conseco restated its retention agreement with defendant Lazard under extremely lucrative terms.

278.    On or about October 3, 2002, Gary C. Wendt resigned as Chief Executive of Conseco but remained on as Chairman of the Board in the meantime.  Upon information and belief, Wendt did this to provide him with plausible deniability regarding the Money Laundering and Bankruptcy Fraud planned by Soros and the members and co-conspirators of the Enterprise perpetrated on Conseco's creditors, the bidders for Conseco Finance and the bidders for GM Building.

279.    In or about and between August 2002 and December 17, 2002, Frank Savage of Lazard, a long-time financial adviser to George Soros and Conseco negotiated a

[62]

David H. Relkin, Esq.

pre-arranged highly discounted sale of Conseco Finance to CFN and provided the lucrative

position of Debtor in Possession Financing to Conseco to FPS DIP, an affiliate of CFN

Holdings, to acquire an interest in, and maintain and conduct the affairs of Conseco by

obtaining virtually complete control of the Conseco Bankruptcy proceeding.  Upon

information and belief, Frank Savage and or Lazard may appear in discovery to be one of

the John Doe defendants.


280.    Thus, the RICO Enterprise was now in a position to use the Conseco

bankruptcy to launder money through the DIP facility and through the acquisition of

Conseco Finance to hide the illegal source and origin of such funds.

### XI.    THE RICO ENTERPRISE TAKES CONTROL OF <u>THE CONSECO BANKRUPTCY</u>


281.    Accordingly, on December 16, 2002, the day before Conseco filed for

bankruptcy, upon the advice and with the assistance of Lazard and Conseco's counsel

Kirkland & Ellis, Conseco signed an asset purchase agreement with CFN Holdings to

acquire Conseco Finance (the "Asset Purchase Agreement") for the amount of Conseco

Finance's debt to Conseco.

282.    Upon information and belief, since the members of CFN had been

reviewing the assets of Conseco Finance since at least July 2002, only the members of

CFN, Fortress and Cerberus, Soros, Conseco, Kirkland & Ellis and Lazard knew the true

worth of Conseco Finance, which facts were never disclosed by CFN, Conseco, Lazard or

[63]

David H. Relkin, Esq.

Kirkland & Ellis to the creditors' committee or third parties who attempted to bid on the purchase of Conseco Finance.

283.     On the very next day, December 17, 2002, with the CFN Holdings Asset Purchase Agreement and the FPS DIP agreements in hand, Kirkland & Ellis caused Conseco, Conseco Finance, and the other holding companies of Conseco, CIHC, Inc., CTIHC, Inc., Partners Health Group, Inc., Conseco Finance Servicing Corp. (collectively, the "Holding Company Debtors") to file Bankruptcy petitions for relief under Chapter 11 of the Bankruptcy Code in the Northern District of Illinois, Eastern Division, case no. 02-B-49672 (CAD). The Bankruptcy filing of Conseco was the third largest Bankruptcy proceeding, smaller only than Enron and WorldCom.

284.     In order to exercise even greater control over the operations of Conseco in Bankruptcy, and to profit at the expense of Conseco's creditors, Conseco entered a financing agreement with FPS DIP to become Conseco's DIP financer and Kirkland & Ellis in conspiracy with Conseco and the other defendants applied on December 17, 2002 to have the bankruptcy court approve such financing.

285.     Kirkland & Ellis by James H.M. Sprayregen, Esq. represented to the bankruptcy court in connection with the aforesaid motion that a Priming Lien allowing FPS to take a senior position on most of Conseco's valuable assets was made "after a reasonable effort to obtain financing from other sources." These representations constituted Bankruptcy Fraud within the meaning of 18 USC § 152 (2) and/or (3).

[64]

David H. Relkin, Esq.

286.    In its application to the bankruptcy court to authorize the FPS DIP facility,

dated December 17, 2002, Kirkland & Ellis by James H.M. Sprayregen, Esq. and Richard

L. Wynne, Esq. falsely represented that the DIP facility with FPS was negotiated "at

arm's length," that Kirkland & Ellis was a "disinterested person" as defined under section

101 (14) of the bankruptcy code, and that, absent this financing "Conseco would be

unable to continue its operations and a liquidation would be the inevitable result."  These

representations constituted Bankruptcy Fraud within the meaning of 18 USC § 152 (2)

and/or (3).


287.    In order to protect the disclosure of their underhanded pre-bankruptcy

agreements, by emergency motion dated December 19, 2002, Kirkland & Ellis, counsel

for Conseco, falsely represented to the Bankruptcy Court that "there was no other place to

obtain DIP financing other than from FPS" and that if the Court did not authorize the

retention of FPS DIP, the consequence for Conseco would be "immediate liquidation."[10]

These representations constituted Bankruptcy Fraud within the meaning of 18 USC § 152

(2) and/or (3).


288.    In fact, at least thirty other bidders applied for the position of DIP financier

in October 2002, and Conseco chose FPS as the financier not because it was the best, but

to allow the Enterprise to infiltrate the bankruptcy.  In furtherance of this pattern of

---

[10] In connection therewith, Conseco, by its counsel, Kirkland & Ellis, represented that the DIP
Credit Agreement was the result of "arms-length negotiations between the CFC Debtors and the
DIP Lenders."  This representation constitutes Bankruptcy Fraud within the meaning of 18 USC
§ 152 (2) and/or (3). (See Page 8 of Emergency motion for interim and Final Order Authorizing,
*inter alia*, the CFC Debtors to obtain post-petition financing annexed to the accompanying
Compendium of Exhibits as Exhibit "**T**.")

David H. Relkin, Esq.

racketeering, on December 19, 2002, Conseco requested the Court to approve the Secured
Super-Priority Debtor in Possession Credit Agreement dated December 19, 2002 between
Conseco Finance and FPS DIP to obtain secured post-petition financing up to the
principal amount of 125 Million from FPS DIP.

289.    In connection with the application for the FPS DIP facility Conseco agreed
to provide a perfected first priority priming lien in favor of FPS DIP on the stock of Mill
Creek Bank, Green Tree Retail Services Bank, Inc. and Rice Park Properties Corporation,
three of the most valuable assets of Conseco, Inc.; for authority to borrow up to 87
Million Dollars under the FPS DIP Credit Agreement pending the final hearing on the
DIP financing motion; for an order providing FPS DIP with a lien against all
unencumbered prepetition and post-petition property of the Holding Company Debtors;
and, most significantly, for an order providing that *the proceeds of any asset sales by
Conseco to CFN, the affiliate of FPS, would pay down the FPS DIP Revolving loan.*
Thus, any money paid by Fortress for Conseco Finance would be paid to FPS, owned by
Fortress and Soros in a clear example of the conspiracy of Conseco with the Enterprise.

290.    In connection with the aforesaid motion, Conseco, by its counsel, Kirkland
& Ellis, represented to the Bankruptcy Court that CFN was the potential purchaser of
Conseco Finance[11] but that without the approval of the FPS DIP financing order, Conseco
"will not be able to continue operations for more than a few days, and will not allow them

---

[11] Fortress Investment Group LLC would later act the limited liability company named "CFN
Holdings LLC" in which Cerberus Capital Management, LP was also a member.

[66]

David H. Relkin, Esq.

to fund the completion of their restructuring process." (See Exhibit "**T**" annexed to the accompanying Compendium of Exhibits.)

291.    Conseco's motion by Kirkland & Ellis to approve financing by FPS that it was an affiliate of the potential purchaser of Conseco Finance, CFN, described by Conseco as "Fortress/Flowers, the "stalking horse" purchaser of substantially all of the assets of the CFC Debtors…" was alleged to have been negotiated by Conseco "at arms' length."  This was false and known to be false and constituted Bankruptcy Fraud within the meaning of 18 USC § 152 (2) and/or (3).

292.    Conseco also disclosed in connection with this motion that Fortress,[12] Cerberus and J.C. Flowers & Co., the proposed buyers of Conseco Finance, had previously issued a term sheet to Conseco in "late November 2002." Conseco never made the term sheet available to the creditors of Conseco.

293.    On December 19, 2002, Conseco Finance entered into a restated asset purchase agreement with CFN Holdings to purchase substantially all of the assets of Conseco Finance for the benefit of the RICO Enterprise.

---

[12] On January 11, 2006, the SEC filed a complaint against Fortress Financial Corp. and its President Jeffrey A. Richie, alleging that between March 2000 and April 2001, Fortress raised approximately $2.9 million through the sales of shares of preferred stock to approximately 85 investors in a purported private placement. Richie and Fortress made material misrepresentations and omissions to investors relating to (1) financial projections, (2) undisclosed liabilities in excess of $1 million, (3) plans to conduct an IPO, and (4) representations that Fortress would not spend any of the offering proceeds until it raised $2 million. (See Exhibit "**W**" annexed to the accompanying Compendium of Exhibits.)

David H. Relkin, Esq.

294.    On January 14, 2003, Kirkland & Ellis, applied for an order allowing Conseco to retain Kirkland & Ellis as counsel for Conseco as of the date of the Bankruptcy Petition.  In this application, Kirkland & Ellis represented that it had no conflicts of interest in representing the entire Conseco Bankruptcy Estate, including subsidiaries having obligations to Conseco and was "a disinterested person" under the bankruptcy code. These representations constituted Bankruptcy Fraud within the meaning of 18 USC § 152 (2) and/or (3).

**The Racketeering Enterprise
Commences Its Flood of Motions
To Overwhelm the Creditors**

295.    Key to the success of the RICO Enterprise was to flood the Bankruptcy Court with motions to approve the FPS DIP financing and the CFN Holdings Asset Purchase Agreement prior to the appointment of the Official Committees, by making emergency motions on short notice and to litigate every objection raised by the creditors to restrict the security which FPS, DIP would receive for the DIP financing and to restrict the Creditors from discovering information regarding the purchase of Conseco Finance by CFN.[13]

296.    Upon information and belief, these acts were part of the scheme to conduct the activities of, and control and maintain an interest in Conseco through a pattern of racketeering by defrauding the Bankruptcy Court and in furtherance of the RICO Enterprise's illegal transactions.

[68]

David H. Relkin, Esq.

297.   On the date of Conseco's Bankruptcy filing, December 17, 2002, Conseco made motions for an order authorizing the retention and employment of Lazard[16] as Conseco's investment bankers, upon the affidavit of Frank Savage,[18] and for an order authorizing the employment and retention of Kirkland & Ellis, as attorneys for debtors. Thus, the RICO Enterprise had its key conspirators in place to manipulate and control the Conseco Bankruptcy for the benefit of the RICO Enterprise.  In this connection, two days after it filed for Bankruptcy under Chapter 11, Conseco made the following additional motions on December 19, 2002:

    a.   for an order to approve the Asset Purchase Agreement between Conseco Finance and CFN Holdings entered on December 19, 2003;

    b.   or an order establishing bidding procedures in connection with the sale of substantially all of the assets of Conseco Finance to CFN Holdings including certain buyer protections;

---

[13] See, e.g., Emergency motion of Unsecured Creditors for Disclosure from CFN Holdings as to the assets of Conseco Finance, dated February 6, 2003, which motion was denied.

[16] Conseco acknowledged in this application that it previously paid Lazard the sum of $2,500,000, plus expenses of $123,934.08 for pre-petition expenses and an advance of $4,000,000. The December 16, 2002 Retention letter annexed to the application indicates that Lazard was retained as early as June 7, 2002, that the initial retention letter was revised on August 12, 2002 and again on October 21, 2002.  The engagement letter provided that Lazard would be paid $250,000 per month, plus $11,000,000 upon a restructuring, and $1,000,000 plus 0.75% of the purchase price of Conseco Finance. (See Exhibit "**U**" annexed to the accompanying Compendium of Exhibits.)

David H. Relkin, Esq.

c.   For an order approving the form and manner of notices;

d.   For an order approving the form of the Asset Purchase Agreement;

e.   For an order setting a sale hearing;

f.   For an order approving the sale of the Conseco Finance's assets free and clear of all liens, claims and encumbrances to the successful bidder;

g.   For an order allowing CFN Holdings to purchase all or substantially all of the assets of Conseco Finance with certain conditions to protect CFN Holdings, including:

h.   A "break-up fee" of 30 Million Dollars;

i.   An expense reimbursement of 5 Million Dollars;

j.   A 10 Million Dollar overbid protection;

k.   The right of CFN to exclude any assets of Conseco Finance from its purchase;

---

[18] In or about February 2004 Frank Savage, an officer of Lazard, Ltd. was indicted in connection with an investigation of Enron by the U.S. Department of Labor for mismanaging the Enron Pension Plans.  (See Exhibit "**V**" annexed to the accompanying Compendium of Exhibits.)

[70]

David H. Relkin, Esq.

l.        Potential purchasers of the Conseco Finance assets had to "offer to purchase all or substantially all of Conseco Finance's assets upon the same terms and conditions" as CFN;

m.      The right of CFN to "exclude any assets, properties, contracts, and rights from the purchased assets [of Conseco Finance] in CFN's sole discretion; and

n.       Setting the purchase price for CFN to purchase Conseco Finance for no cash component—only assumption of debt.

298.    On December 20, 2002, the Bankruptcy Court approved the break-up fee, "as defined in the Asset Purchase Agreement [with CFN Holdings], and under the terms and conditions set forth therein."  The other relief described in the Order was deferred to a Hearing on January 6, 2003.

299.    On December 22, 2002, Willkie, Farr filed a Notice of Appearance on behalf of J.C. Flowers & Co., LLC and Fortress Investors Group, LLC, the members of CFN Holdings.  (See Exhibit "**X**" annexed to the accompanying Compendium of Exhibits.)

300.    On December 27, 2002, US Bank made a motion to the Bankruptcy Court for clarification and reconsideration of Conseco's emergency motion for relief, specifically, the basis for the 30 Million Dollar break-up fee and requested the court to reconsider the "terms and conditions" of the break-up fee.

[71]

David H. Relkin, Esq.

301.    On December 30, 2000, the Unofficial ad hoc Committee of B2 class guaranty holders made a motion to the Bankruptcy court to reconsider the terms and conditions of CFN's 30 Million Dollar break-up fee.

302.    On January 6, 2003, the Unsecured Creditors' Committee objected to the 30 Million Dollar break-up fee provided to CFN in its role as the stalking horse bidder of Conseco Finance.  Its motion was denied.

303.    On the same date the Bankruptcy Court appointed FPS DIP as the main DIP Financer of Conseco.

304.    All of these motions by Kirkland & Ellis, and the actions taken prior to the Bankruptcy of Conseco, support the conclusion that Kirkland & Ellis was involved in conspiracy with the operation and management of the RICO Enterprise. This constituted an agreement to conspire with the Enterprise through a pattern of racketeering activities in interstate commerce.

305.    On or about January 6, 2003, Conseco made motions for an order authorizing the Holding Company Debtors to reject certain non-residential real property leases and for an order allowing the Holding Company Debtors to abandon certain de minimus assets by debtors and debtors-in-possession.

306.    On or about and between December 27, 2002 and January 7, 2003, US Bank, the Unofficial Ad Hoc Committee of B2 Class Guaranty Holders, the United States

[72]

David H. Relkin, Esq.

Trustee and the Unofficial Committee of Noteholders objected to certain of the conditions of the Asset Purchase Agreement between Conseco and CFN.

307.    On January 21, 2003, the Committee of Unsecured Creditors objected to the CFN asset purchase agreement of Conseco Finance.  According to the Committee, the CFN Asset Purchase Agreement of Conseco Finance didn't contain a definitive or fair purchase price and that the terms and conditions that did exist were vague, ambiguous and wholly in the discretion of CFN so as to be "illusory."

**The Acquisition of
Conseco Finance By
<u>The RICO Enterprise</u>**

308.    On January 20, 2003, after the Bankruptcy Court approved the bidding procedures for the purchase of Conseco Finance pursuant to 11 USC §363 by CFN Holdings in substantially the same form as requested by co-conspirators Kirkland & Ellis and Conseco, the bankruptcy court scheduled a sale Hearing for March 5, 2003.  This Order further provided that any other bidders must submit their bids no later than February 24, 2003.

309.    On January 27, 2003, Counsel for the Official Committee of Con*seco Finan*ce served a subpoena for a Rule 2004 examination of CFN, whose members were Fortress, Cerberus and J.C. Flowers & Co, LLC.

[73]

David H. Relkin, Esq.

310.    By *letter da*ted February 3, 2003, Cerberus objected to the subpoena on the grounds that it sought confidential research, development and commercial information as well as other privileged or protected matter.

311.    On February 8, 2003, the Unsecured Creditors' Committee by Fried Frank, in an effort to obtain information on the Asset Purchase Agreement between Conseco and CFN Holdings, also requested the bankruptcy court to allow discovery of CFN Holdings, since, it argued, if the Asset Purchase Agreement were approved, and CFN Holdings would be allowed to purchase the assets of Conseco Finance, among other things, the Asset Purchase Agreement would cancel $250 Million of guarantees by CIHC of loans to the Conseco Debtors.

312.    On February 11, 2003, CFN Holdings, by Willkie Farr, objected to the discovery of the CFN Holdings Asset Purchase Agreement on the basis that there was public information available to the Committee and what was not public was privileged.

313.    Upon information and belief, this representation by Willkie Farr, by Steven Wilamowsky, may have been in furtherance of the criminal conspiracy, plan and scheme of the RICO Enterprise to conceal material financial information provided by Conseco and Lazard to CFN prior to the Bankruptcy filing of Conseco. Willkie Farr and/or Steven Wilamowsky may later be discovered in this case to be defendants' John Doe.

[74]

David H. Relkin, Esq.

314.    Upon information and belief, Fried Frank argued that CFN Holdings had acquired proprietary information during the six months prior to the Conseco Bankruptcy from Conseco, Kirkland & Ellis, and Lazard which gave CFN Holdings an advantage in bidding for the assets of Conseco Finance.

315.    In response to these motions, Kirkland & Ellis repeatedly submitted opposition to the aforesaid motions so as to keep material financial information provided to CFN from the Bankruptcy Court, the potential bidders on Conseco Finance and the creditors of Conseco, which opposition was repeatedly upheld by the Bankruptcy Court. The affidavits or declarations of Kirkland & Ellis were in furtherance of the RICO Enterprise to conceal the true value of the assets.  These acts were taken in response to the instructions of Conseco, or certain officers thereof and may have been violations of 18 U.S.C. §152.

316.    On February 14, 2003, Conseco filed its final sale order of the assets of Conseco Finance, with the court setting the time for objections to be filed no later than February 24, 2003.

317.    On February 18, 2003, Conseco issued a press release that it would be selling the GM Building pursuant to, and "in furtherance of the Conseco, Inc. Plan of Reorganization."

318.    Despite the fact that only CFN had the necessary information on Conseco Finance to make an appropriate offer for Conseco Finance, on February 28 through

[75]

David H. Relkin, Esq.

March 3, 2003, the bidding process for the sale of Conseco Finance took place under the guise that it was a fair process.

319.    Since CFN had received proprietary information from Lazard, Conseco and Kirkland & Ellis prior to the Bankruptcy to assess the true value of Conseco Finance, and since the bankruptcy court had granted CFN certain protections in connection with the purchase of Conseco Finance, only CFN had a realistic chance of acquiring Conseco Finance, on behalf of the RICO Enterprise, to allow Fortress to launder money through the Conseco Finance purchase.  Upon information and belief, CFN's acquisition of Conseco Finance was in furtherance of defendants' racketeering activities and Bankruptcy Fraud on the bankruptcy court, the creditors of Conseco and others.

320.    On March 5, 2003, CFN won the bidding to acquire most of Conseco Finance for 772 Million Dollars.  Upon information and belief, this constituted an investment of income derived by racketeering activities of money laundering in the acquisition of an enterprise affecting interstate commerce in violation of 18 U.S.C. §1956 and 1957, as more fully described in Section XIII, Predicate Acts.

321.    CFN Holdings also acquired the right to sell Mill Creek Bank to GE Capital for 323 Million Dollars, reducing the true purchase price it paid for Conseco Finance by 270 Million Dollars.

David H. Relkin, Esq.

**The Machinations of Trump
And Conseco to Confuse and
Delay Resolution of The
Ownership of the
<u>General Motors Building</u>**

323.    Upon information and belief, as part of the criminal conspiracy, plan and scheme by the RICO Enterprise in or about mid-2002, Soros, Fortress or someone else acting on behalf of them approached Trump with a proposal to use money laundering to acquire the GM Building and, once acquired by the Enterprise, Soros and the other individuals associated in fact with Soros, Fortress, Vornado, Harry Macklowe, Trump, Eastdil and German American to engage in a Money Laundering scheme through which they could launder money through the sale of the GM Building into a Trump real estate property.  All of the aforesaid parties agreed to engage in the conspiracy.

324.    In furtherance of the conspiracy pattern of Racketeering, to lay the groundwork for the money laundering through the sale of the GM Building, Conseco continued to fight about the ownership of the GM Building, with Trump suing in State Court in violation of the Arbitration Agreement in the Operating Agreement with Carmel Fifth, intentionally halting the arbitration, making motion after motion to the Bankruptcy Court, applying to the Bankruptcy Court to resolve the dispute, arguing that the Bankruptcy Court had jurisdiction to hear the dispute, and then arguing that the Bankruptcy Court did not have jurisdiction, resuming hearings before the American Arbitration Association (the "AAA"), then returning to the Bankruptcy Court to vacate the Award, then stipulating to dismiss the Bankruptcy action, fighting in the State Court

[77]

to vacate the Award, removing the action to Federal Court, then resuming State Court proceedings to confirm the Award of the arbitrators and then, finally, resolving their alleged "disputes" in a "confidential agreement" to hide the racketeering activities of the Enterprise which funneled approximately 275 Million Dollars derived from illegal sources into the hands of Trump to invest in Trump, Chicago to conceal the origin and nature of such funds.

325.    On August 20, 2002, Carmel Fifth and Trump held their Preliminary Conference before the AAA.  By Order dated August 26, 2002, Hon. George C. Pratt provided for seven days of Hearing during September and October 2002.

326.    After most of the Hearings, in or about November 2002, Trump sought to disqualify Conseco's party-appointed arbitrator, Kenneth Feinberg,[21] and to force the parties to start the Arbitration again.  The AAA denied Trump's request and ordered the parties to complete the Arbitration.

327.    After at least five days of hearing, submission of pre- and post-Hearing Memoranda of Law, in late November, 2002, on the eve of the Award of the Arbitrators, and a month before the RICO Enterprise planned to file the Bankruptcy Petition on behalf of Conseco, Trump through 767 Manager moved to dismiss the neutral Arbitrator, former Second Circuit Judge George A. Pratt, for allegedly failing to disclose a potential conflict.

---

[21] Kenneth Feinberg was the special master of the September 11th Victim's Compensation Fund.

David H. Relkin, Esq.

328.     On December 13, 2002, after Trump challenged the impartiality of the neutral arbitrator, former Second Circuit Judge Hon. George C. Pratt, the AAA disqualified Judge Pratt.

329.     Upon information and belief, while no actual conflict existed, the AAA nevertheless disqualified Judge Pratt based upon false allegations by Trump as to Judge Pratt's conflict of interest.

330.     According to the rules of the Operating Agreement of 767 LLC, the two party arbitrators were to appoint a third, who was to act as a neutral.

331.     Instead, on a conference call with the remaining two arbitrators, on January 13, 2003, Trump instructed his arbitrator Howard Lorber in furtherance of the RICO Enterprise to refuse to appoint another arbitrator as the third arbitrator because, he claimed, 767 Manager was unwilling to continue the almost-finished hearings before a new third arbitrator and that the Arbitration should begin anew.

332.     In furtherance of the defendants' scheme to keep the ownership of the GM Building in dispute in furtherance of the pattern of racketeering, on or about January 13, 2003, Trump objected to the appointment of a new neutral arbitrator proposed by the AAA to complete the Hearings.

333.     By letter dated January 22, 2003, Carmel Fifth attempted to have the AAA appoint the third arbitrator pursuant to the Commercial Rules, but the AAA refused due

[79]

David H. Relkin, Esq.

to Trump's refusal to consent.  (See Exhibit "**Y**" annexed to the accompanying Compendium of Exhibits.)

334.    On February 1, 2003, Conseco filed its first reorganization Plan.  The Plan provided for the extinguishment of over 5 Billion Dollars in debt and provided that the sale of the GM Building was to be "in furtherance of and pursuant to the Conseco, Inc. Plan of Reorganization."  This representation constituted Bankruptcy Fraud by Kirkland & Ellis since the principals of Conseco, Soros, Fortress, Vornado, German American, Eastdil and Trump had made sure that the GM Building would be sold to a front-man: Harry Macklowe.

335.    On February 3, 2003, most of Conseco's subsidiaries filed voluntary petitions in Bankruptcy.  However, Conseco did not file for Bankruptcy on behalf of Carmel Fifth in furtherance of the RICO conspiracy to keep the GM Building outside the purview and control of the Bankruptcy Court.

336.    On February 3, 2003, Trump met with Andrew Hubregsen, to discuss the refinancing of the GM Building. By letters dated February 4, 2003, February 7, 2003 and March 6, 2003, Carmel Fifth's counsel wrote to the AAA in an attempt to have the other two party arbitrators appoint a third, neutral arbitrator, or, in the alternative to have the AAA appoint a new neutral arbitrator.  (See Exhibit "**Z**" annexed to the accompanying Compendium of Exhibits.)   Based on Trump's refusal to agree with these procedures, in furtherance of the pattern of racketeering, the AAA refused to act.

[80]

David H. Relkin, Esq.

337.     In order to intimidate the AAA, between February 4, 2003 and February 7, 2003, Trump through 767 Manager threatened legal action against the AAA to intimidate it form appointing a new arbitrator and again challenged the continued appointment of Carmel Fifth's Arbitrator Kenneth Feinberg.

338.     Then, precipitously, at Trump's urging and in furtherance of the conspiracy, on February 5, 2003, 767 Manager instructed its Arbitrator, Howard Lorber to resign, putting a complete halt to the arbitration proceedings.

339.     Upon information and belief, on or about February 8, 2003, in furtherance of the conspiracy, Trump caused a letter to be sent to Conseco to the effect that Trump would sue anyone who made an offer on the GM Building for tortuous interference with contractual relations.

340.     Upon information and belief, on or about February 12, 2003, Trump sent a letter to a prospective buyer of the GM Building that if he pursued the deal was Conseco he would be sued.

341.     On February 21, 2003, Trump filed a 1 Billion Dollar Proof of Claim with the Conseco Bankruptcy Court in furtherance of the criminal conspiracy, plan and scheme of the RICO Enterprise.

342.     Then, on or about February 25, 2003, in furtherance of the conspiracy, Trump proposed an offer to refinance the Mortgages on the GM Building by a mortgage

[81]

David H. Relkin, Esq.

from Column Financial Inc., a wholly owned subsidiary of Credit Suisse First Boston, and provided Conseco with a Term Sheet, but required Conseco to approve the proposal (and the 250 Thousand Dollar commitment fee) within two days, which proposal Conseco again rejected.

343.    Accordingly, in an about-face, on March 3, 2003, Conseco and Carmel Fifth commenced an adversary proceeding against Donald J. Trump and 767 Manager and Trump 767 Management in the Bankruptcy Court, tacitly admitting that the Bankruptcy Court had jurisdiction over the GM Building.  (See Exhibit "**AA**" annexed to the accompanying Compendium of Exhibits.)  These acts were taken in response to the instructions of Conseco, or certain officers thereof, was a violation of 18 U.S.C. §152 (2).

344.    In connection with such motion, Conseco represented to the Bankruptcy Court that the proceeds of the sale of the General Motors Building were "necessary to the successful reorganization of Conseco, Inc," and that the Bankruptcy Court had core jurisdiction over the dispute.  These statements by Kirkland & Ellis acts were taken in response to the instructions of Conseco, or certain officers thereof, in conspiracy therewith and was a violation of 18 U.S.C. §152 (2).

345.    On March 5, 2003, Conseco then made a motion for an Order granting Conseco authority to sell the General Motors Building, establish bidding procedures, establishing the date and time of the auction and Hearing to sell the property, and for authority to enter into a contract including a break-up fee.  (See Exhibit "**BB**" annexed to the accompanying Compendium of Exhibits.)

[82]

David H. Relkin, Esq.

346.    On or about March 5, 2003, Conseco made an Emergency motion for an Expedited Hearing on the Complaint and filed a Memorandum of Law in support of emergency relief against Trump.

347.    In this Memorandum, Conseco argued to the Bankruptcy Court that its proceeding involved resolution of claims against the Bankruptcy Estate and that the Bankruptcy Court had "core jurisdiction" over the dispute pursuant to 11 USC §157 (b) (2). (See Exhibit "**BB**" annexed to the accompanying Compendium of Exhibits.)  Either this declaration was an instance of Bankruptcy Fraud pursuant to 18 U.S.C. §157 (2), or the prior claim by Conseco that the GM Building was not an asset of the Estate was bankruptcy fraud.

348.    Conseco further requested that Trump be removed as the manager of the GM Building and supply copies of his records so that Conseco could avoid the default under the two mortgages on the GM Building, which came due on July 31, 2003, to allow Conseco to refinance the Building.

349.    Conseco also requested that the Bankruptcy Court make a determination of the parties' rights based on the Transcripts and documentary evidence submitted at the Arbitration Hearings.  Either this request by Kirkland & Ellis was an instance of Bankruptcy Fraud pursuant to 18 U.S.C. §157 (2) by asserting that the dispute was a core proceeding, or the prior claim by Conseco that the GM Building was *not an asset of the Estate* was bankruptcy fraud.

David H. Relkin, Esq.

350.     Notwithstanding its prior claim that the General Motors Building could not be part of the Conseco Estate, in direct contradiction of its earlier representations to the Bankruptcy Court, and in furtherance of its fraudulent misdirection, Conseco instructed its counsel Kirkland & Ellis moved on March 5, 2003 for authority to sell the GM Building free and clear of any liens, pursuant to Section 363 of the Bankruptcy Code, to establish bidding procedures, fixing the date, time and place of the sale.

351.     In this motion Conseco represented to the Bankruptcy Court and the creditors that the Ownership Dispute between it and Trump would attach to the proceeds of the sale of the GM Building, to the detriment of the creditors whom they knew would receive nothing in furtherance of the conspiracy, plan and scheme of the RICO Enterprise. This request by Kirkland & Ellis was an instance of Bankruptcy Fraud pursuant to 18 U.S.C. §157 (2) by asserting that the GM Building was property of the Estate.

352.     Conseco proposed an auction date of June 2, 2003 at the offices of Kirkland & Ellis.  Conseco provided that qualified bidders would be allowed to raise their bid at the auction, however, no auction was held, and it is now known and apparent that this caused direct and proximate injury to plaintiffs quantifiable in 2008.

353.     In addition, by motion dated March 5, 2003, returnable on May 7, 2003, Conseco moved the Court to approve Conseco's exclusive real estate agent agreement with Eastdil Realty, a real estate company in New York.  (See Exhibit "**CC**" annexed to the accompanying Compendium of Exhibits.)

[84]

David H. Relkin, Esq.

354.     Pursuant to the Eastdil Realty motion by Conseco, which was part of and in furtherance of the racketeering Enterprise, Eastdil Reality was to receive an advisory fee of 55 Thousand Dollars per month, plus 0.175% of the amount in the first contract signed—even if Conseco did not close with that purchaser—plus 0.175% of the final purchase price up to One Billion Dollars, 0.5% of the purchase price between One Billion Dollars and One Billion One Hundred Million Dollars, and 2.5% of the purchase price in excess of One Billion One Hundred Million Dollars.  (See Exhibit "**CC**" annexed to the accompanying Compendium of Exhibits.)

355.     Upon information and belief, this motion was in furtherance of the Bankruptcy Fraud perpetrated by George Soros and Trump, and the pattern of Racketeering activity of the RICO Enterprise, in order to deceive the Conseco creditors that the GM Building would return a substantial yield to the creditors of Conseco.

356.     On March 6, 2003, the Bankruptcy Court adjourned the Hearing on the sale of the General Motors Building and the retention of Eastdil to March 17, 2003.

357.     On March 11, 2003, at the request of the Trump entities, the American Arbitration Association appointed former United States District Judge Nicholas Politan to the Panel and issued new ruling to allow the arbitration to proceed.

358.     On March 12, 2003, Conseco filed its First Amended Disclosure Statement for the Debtor's Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan").

David H. Relkin, Esq.

359.     Conseco argued to the Bankruptcy Court in its March 5, 2003 motion to sell the General Motors Building that the sale was necessary to the reorganization of Conseco, in departure from its prior position, and represented in the Plan on March 8, 2003, that the sale of the General Motors Building was a condition precedent to the confirmation of a Plan and that the proceeds from the sale of the GM Building would be distributed to Conseco creditors.

360.     On March 12, 2003, Trump made a motion to the Bankruptcy Court to dismiss the Adversary Proceeding between Trump and Carmel Fifth based on the allegation that, although Conseco owned the GM Building through various subsidiaries, Carmel Fifth, a subsidiary of four non-debtor insurance companies was a non-debtor subsidiary and therefore not under the jurisdiction of the Bankruptcy Court.

361.     As a consequence, with the assistance of the RICO conspirators of the racketeering Enterprise, Trump argued that the Bankruptcy Court had no subject matter jurisdiction over the dispute with Trump and the matter should instead be arbitrated since Conseco had no property interest in the outcome of the Arbitration between Carmel Fifth and 767 Manager.

362.     Trump also pointed out that Conseco never listed the General Motors Building on its statement of assets.  However, on Conseco's Financial Statement, Conseco listed an investment in Carmel Fifth of approximately 212.7 Million Dollars. (See Exhibit "**G**" annexed to the accompanying Compendium of Exhibits.)

[86]

David H. Relkin, Esq.

363.    This allegation by Trump was bankruptcy fraud since Trump had previously argued to the Court that Conseco and Carmel Fifth were alter egos of each other.

364.    According to Conseco, Trump had to make this argument because his only possible claim to Carmel's stake in the Building was the July 3 Agreement, to which Conseco was a party.

365.    Trump's position in the Arbitration was that Conseco was bound by the July 3 Agreement to modify the LLC Agreement of 767 LLC and defer the Buy/Sell provision.  These representations were made by Trump to further delay and confuse the Bankruptcy Court and the Conseco creditors as to the true ownership of the GM Building.

366.    On or about March 12, 2003, the Official Committee of Trust Preferred Debt Holders argued to the Bankruptcy Court that the Conseco/Trump dispute was a core proceeding because: "it affects the amount of property available for distribution or the allocation of such property among creditors."  It further stated that "the General Motors Building was an important asset of the Bankruptcy Estate."

367.    On or about March 12, 2003, Fried Frank Harris Shriver & Jacobson, counsel to the Unsecured Creditors' Committee, also made a motion for an Order determining that Carmel Fifth was no more than a shell company to hold Conseco's ownership interest in the GM Building and that the Court should exercise jurisdiction

[87]

David H. Relkin, Esq.

over the dispute to strengthen the insurance business core of Conseco and that, absent

Bankruptcy Court intervention, the Building would go into foreclosure.

368.    On March 12, 2003, Conseco filed a Memorandum in further support of its

motion to sell the GM Building free and clear of all liens.  In this motion, Conseco argued

that "Carmel was organized by Conseco solely to hold Conseco's interest in the General

Motors Building."  (See Exhibit "**BB**" annexed hereto.)  This claim was in direct

opposition to its prior position that it owned no real estate and that the GM Building was

owned by four non-debtor subsidiaries.

369.    On or about March 13, 2003, with a few modifications requested by other

creditors of Conseco, the Bankruptcy Court approved the CFN Holdings Asset Purchase

Agreement free and clear of any liens.

370.    This constituted the acquisition or maintenance of an interest and an

investment of income from racketeering activities in an RICO Enterprise through a

pattern of racketeering activities.  This also constituted the conduct of the affairs of an

Enterprise affecting interstate commerce through a pattern of racketeering activity.

371.    Among the direct beneficiaries of the sale of Conseco Finance was the

RICO Enterprise and Chuck Cremens, the former CEO of Conseco Finance, who

received 1.5 Million Dollars for consummating the Asset Purchase Agreement, and

Lazard, which received 5 Million Dollars for the pre-arranged sale of Conseco Finance.

[88]

David H. Relkin, Esq.

372.     On March 14, 2003, the Bankruptcy Court made a preliminary decision that it had core jurisdiction to hear all aspects of the Verified Amended Adversary Complaint and Counterclaims and to decide the rights of the parties with respect to the July 3 Agreement, the issues raised in the Trump One Billion Dollar Proof of Claim and the basic contract dispute issues regarding the Buy/Sell agreement in the 767 LLC Operating Agreement.

373.     On March 14, 2003, the Bankruptcy Court approved the CFN Holdings and General Electric Asset Purchase Agreement for certain assets of Conseco Finance, which Agreement the Bankruptcy Court approved free and clear of liens for 1.110 Million Dollars and 200 Million Dollars in assumed liabilities which was to close on June 23, 2003.

374.     Thereafter, CFN Holdings sold Mill Creek Bank to GE for 310 Million Dollars, further reducing the true price it was paying for Conseco Finance.

375.     On March 17, 2003, Eastdil Realty submitted an affidavit, by its attorneys Kirkland & Ellis, in support of its motion to be retained to sell by Conseco the GM Building.  This submission by Kirkland & Ellis was in conflict of interest to its duties to Conseco which had previously maintained that the GM Building was not owned by Conseco and may have constituted bankruptcy fraud.

[89]

376.     This motion was in furtherance of the racketeering activity of George Soros on behalf of the Enterprise, including Trump and Fortress, to deceive the creditors of the Conseco bankruptcy as to the ownership of the GM Building.

377.     Also, on March 17, 2003, the Bankruptcy Court ordered (on consent) Trump, 767 Manager and 767 Management, LLC to immediately allow Conseco access to all books and records of 767 LLC.

378.     On March 18, 2003, the Debtor issued its Second Amended Disclosure Statement for Reorganizing Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Second Plan"), drafted by Kirkland & Ellis.

379.     The Second Plan states that "the sale or transfer of the GM Building (or entities owning the GM Building or interests therein) pursuant to or consistent with an Order of the Bankruptcy Court shall be deemed a transfer under, pursuant and in furtherance of the Plan."

380.     On March 18, 2003, the Bankruptcy Court approved the Second Amended Disclosure Statement.

381.     On March 20, 2003, the Bankruptcy Court ordered the parties in the *Conseco, Inc. and Carmel Fifth, LLC v. Donald J. Trump, 767 Manager, LLC and Trump 776 Management, LLC* action to file a joint Pretrial Statement no later than April 8, 2003

[90]

David H. Relkin, Esq.

providing all witnesses, stipulated facts, material facts in dispute and set Trial Dates for April 10, 11, 14, 15, 21 and 22, 2003.

382.    On March 21, 2003, in furtherance of the RICO conspiracy, Trump filed a Verified Statement and Memorandum in Opposition to the Retention of Eastdil Realty. In the application, Trump argued that the General Motors Building should be sold to him pursuant to the July 3 Agreement, which would save on transfer taxes and the Eastdil Realty Brokerage fees, which he claimed were "double" what is commercially reasonable. He also argued that he had retained Credit Suisse First Boston to refinance the Building, which would save 15.5 Million Dollars of interest per year.   However, Trump argued, if Eastdil Realty were to be retained, no substantial lender would spend the time on the refinancing.  (See Exhibit "**DD**" annexed to the accompanying Compendium of Exhibits.)

383.    Trump further argued against the retention of Eastdil Realty since, he argued consistently with Conseco earlier in the bankruptcy that the GM Building was not part of the Conseco Bankruptcy Estate because Conseco did not own the property.  In furtherance of this position, Trump argued that, even if the Court had subject matter jurisdiction over the dispute between Carmel and 767 Manager, it lacked authority under Section 363 of the Bankruptcy Code to conduct a sale of the Property. (See Exhibit "**DD**" annexed to the accompanying Compendium of Exhibits.)

384.    Finally, Trump argued that he was ready, willing and able to pay 995 Million Dollars for the GM Building which Eastdil Realty estimated would sell by early 2004 for approximately 1.05 Billion Dollars.  "After deductions for commissions,"

[91]

David H. Relkin, Esq.

Trump argued, transfer taxes and other fees, these prices are virtually identical." Thus, argued Trump, the debtors could not demonstrate that Eastdil Realty could provide a significant improvement to the Trump offer.

385.    On March 31, 2003, Conseco and Carmel Fifth—which was not in bankruptcy and thus had no standing to make such motion—made an emergency motion to add a request for damages against Trump and 767 Manager caused by their refusal to convey the GM Building.

386.    On March 31, 2003, Trump made an emergency motion to the Bankruptcy Court to stay the trial in the adversary proceeding between Trump and Carmel Fifth based on lack of subject matter jurisdiction by the Bankruptcy Court over the dispute since, he claimed, regardless of who succeeded, there would be no recovery to Conseco or any other debtor entity. (See Exhibit "**EE**" annexed to the accompanying Compendium of Exhibits.)  Notably, Kirkland & Ellis, counsel for Conseco, in furtherance of the RICO Enterprise did not contest Trump's motion.

387.    On April 3, 2003, the Bankruptcy Court agreed with Trump and dismissed the claims between Carmel Fifth and Trump regarding the sale of the GM Building for lack of jurisdiction and lifted the automatic stay to the extent necessary to allow the parties to participate in the arbitration process.

388.    In furtherance of the RICO conspiracy, on April 14, 2003, Eastdil Realty withdrew its application to be retained by Conseco as the seller's agent of the GM

David H. Relkin, Esq.

Building since Eastdil Realty, in its conspiracy with Conseco, George Soros and Donald

J. Trump, were all attempting to keep the GM Building in play so that it could not be sold

under the jurisdiction of the Bankruptcy Court to advance the pattern of racketeering to

launder money through the sale of the Building.

389.    On April 22, 2003, by stipulated Order Donald J. Trump and Conseco

proceeded back to arbitration before the AAA.

390.    On May 28, 2003, the Arbitrators rendered an Award in *Carmel Fifth,*

*LLC and Conseco v. Donald J. Trump, 767 Manager, and 767 Management LL*C.  (See

Exhibit "**FF**" annexed to the accompanying Compendium of Exhibits.)

391.    The Award directed 767 Manager, LLC to transfer all of its right, title and

interest to 767, LLC, which owned the General Motors Building, for the sum of

$15,588,025.00.

392.    Despite the fact that the Bankruptcy Court had previously declined

jurisdiction over the dispute or the transfer of the GM Building, in furtherance of the

Bankruptcy fraud on the Conseco creditors and the Bankruptcy Court, by motion dated

May 28, 2003, Kirkland & Ellis applied to the Bankruptcy Court to confirm the Award of

the Arbitrators in direct contradiction of the Court's prior order that the Building was not

part of the Estate. (See Exhibit "**GG**" annexed to the accompanying Compendium of

Exhibits.)

[93]

David H. Relkin, Esq.

393.     Upon information and belief, this application by Kirkland & Ellis was a further act of the RICO conspiracy in connection with the sale of the GM Building to keep the building in a type of three-card Monty game until the GM Building could be sold outside of the Bankruptcy Court's scrutiny since there was no basis to apply to the Bankruptcy court for such confirmation.

394.     In furtherance of the racketeering Enterprise of defendants, on May 29, 2003, Donald J. Trump filed a proceeding with the New York State Supreme Court to vacate the Arbitration Award.  (See Memorandum of Law, Exhibit "**HH**" annexed to the accompanying Compendium of Exhibits.)

395.     On the same date, Kirkland & Ellis, on behalf of Conseco, removed the vacatur motion by Donald J. Trump to the United States District Court for the Southern District of New York, despite the fact that the District Court clearly had no jurisdiction over the confirmation of the Award under the Federal Arbitration Act in contradiction to its prior position.

396.     On May 30, 2003, Donald J. Trump submitted his opposition to the Bankruptcy Court to Conseco's motion to confirm the Award based on lack of jurisdiction.

397.     On June 2, 2003, the Bankruptcy Court found that Trump had violated the automatic stay by commencing the petition to confirm the Award and naming Conseco. Nevertheless, the Bankruptcy Court allowed the Petition to Vacate the Arbitration Award

[94]

David H. Relkin, Esq.

to proceed in State Court with the proviso that Conseco was dropped from the Petition to Vacate.

398.    By Order dated June 12, 2003, entered June 17, 2003, New York Supreme Court Justice Karla Moskowitz denied the Trump motion to vacate the Award and confirmed the Award of the Arbitrators.  (See Exhibit "**II**" annexed to the accompanying Compendium of Exhibits.)

399.    In furtherance of the RICO conspiracy, Donald J. Trump fraudulently publicly stated that he would appeal the Decision, but never did.

400.    In June 2003, in furtherance of the RICO conspiracy, Conseco, through its counsel Kirkland & Ellis, fraudulently claimed that it would use the proceeds of the sale of the General Motors Building to pay back creditors of Conseco.

401.    On June 23, 2003, the sale of Conseco Finance to CFN Holdings and GE Capital closed, and concluded one part of the racketeering activity of defendants' RICO Enterprise.

**XII.    THE MONEY LAUNDERING
IS SET IN PLACE BY THE CREATION
OF EPHEMERAL ENTITIES
<u>AND ILLUSORY OBLIGATIONS</u>**

402.    Despite the fact that Carmel Fifth could have entered judgment upon the Arbitration Award against Donald J. Trump which would have netted Trump

[95]

David H. Relkin, Esq.

approximately only 15 Million Dollars, and created a massive windfall for Conseco and

Carmel Fifth, on or about June 24, 2003, in furtherance of the racketeering activity of the

Enterprise, Conseco and Trump instead agreed to dismiss the state court proceeding to

confirm the Arbitration Award with prejudice and entered into "a confidential

agreement." (See Exhibit "**JJ**" annexed to the accompanying Compendium of Exhibits.)


403.    Upon information and belief, the confidential agreement concerned the

division of the proceeds of the sale of the GM Building by paying Trump 275 Million

Dollars as an investment in Trump, Chicago for the benefit of the Enterprise.


404.    This confidential agreement was in furtherance of the pattern of

racketeering to launder money through the sale of the GM Building.


405.    In fact, the essence of the acquisition of the GM Building was to launder

money through the purchase of the building and the steps that were taken by the

Enterprise to control the bidding and designate its straw-man purchaser was simply an

extension of this pattern of racketeering activity to launder money.


406.    After the confidential agreement was executed, Trump and Conseco

agreed to dismiss the adversary proceeding in the Bankruptcy Court and the case was

closed.


407.    Upon information and belief, this confidential agreement was in

furtherance of the racketeering activity, and fraudulently transferred 275 Million Dollars

[96]

in assets to Donald J. Trump, far in excess of what Trump was entitled to receive under the Arbitration Award, namely 15 Million Dollars, and in furtherance of the Money Laundering predicate of the Enterprise to launder money into a construction project of Donald J. Trump in Chicago, Illinois named Trump International Hotel & Tower.

408.    On June 24, 2003, Trump withdrew his 1 Billion Dollar Proof of Claim from the Conseco Bankruptcy proceeding.  (See Exhibit "**KK**" annexed to the accompanying Compendium of Exhibits.)

409.    On July 16, 2003, Conseco filed its Fourth Amended Joint Liquidating Plan of Reorganization.  Nothing in the Plan mentions the sale of the GM Building.

410.    On July 16, 2003, Conseco retained Eastdil Realty to sell the GM Building *outside the purview of the Bankruptcy Court*, in furtherance of the RICO Enterprise.

411.    The racketeering Enterprise already decided to whom the General Motors building was to be sold, namely Harry Macklowe as a proxy for George Soros, and in furtherance of the racketeering Enterprise for the purpose of consummating the Money Laundering activities of the Enterprise.

412.    On July 22, 2003, Eastdil Realty published the outline of the bid requirements for the purchase of the GM Building.

[97]

David H. Relkin, Esq.

413.   Soros as the head of the racketeering Enterprise used Harry Macklowe as the front man for the purchase of the GM Building in order to further the intent of the Enterprise to launder money through the sale and to conceal the criminal conspiracy, plan and scheme of the RICO Enterprise.

414.   Upon information and belief, defendants Soros, Fortress, Trump, Conseco, Macklowe, Kirkland & Ellis, Vornado, Eastdil and German American all knew that the bidding process was merely a dumb-show, and that the winner of the bidding was going to be Harry Macklowe, and conspired to achieve this result for the purpose of Money Laundering.

415.   In July 2003, the RICO Enterprise through its conspirator Eastdil Realty, circulated an informational memorandum regarding the GM Building, a memorandum inviting bids, and a confidentiality agreement to prospective bidders which had to be executed before conducting initial due diligence.

416.   Upon information and belief, the implications that the bidding process was going to take place in good faith were false and were intended for plaintiffs to rely thereupon to their detriment.

417.   Eastdil, Soros, Macklowe, Conseco and Kirkland & Ellis failed to conduct the auction in good faith or in a fair or consistent way pursuant to the terms of the bidding agreements which were relied upon by plaintiffs.

[98]

David H. Relkin, Esq.

418.     On July 24, 2003, the Bankruptcy Court approved the Fourth Amended

Joint Liquidating Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code.

There is no mention of Carmel Fifth, the GM Building or the interest of Conseco therein.

419.     On July 31, 2003, the Lehman Brothers Holdings and Secore Mortgages

on the General Motors Building came due but neither mortgagee took any efforts to

foreclose on their mortgages in possible conspiracy with the racketeering activity of the

RICO Enterprise.

420.     On August 11, 2003, the first bids on the GM Building were opened and

Eastdil narrowed the group which could take part in the second bid.

421.     Unknown to plaintiffs, the racketeering Enterprise never intended to

adhere to the bidding procedure or the rules of the bidding process and never intended to

sell the GM Building to plaintiff, who was the highest and best bidder for the GM

Building.

422.     On August 13, 2003, Eastdil scheduled the final bid for August 27, 2003 at

5:00 p.m.

423.     On August 27, 2003, despite the fact that plaintiffs' bid was the highest

and best, and the fact that Macklowe's bid was well below other bidders, was untimely

submitted and as part of the criminal conspiracy, plan and scheme by defendants

David H. Relkin, Esq.

Conseco, Soros, Fortress, Eastdil, German American and Vornado, Macklowe was privately allowed to increase his bid to appear to have won the fraudulent auction.

424.    This bidding process was manipulated by Conseco, Kirkland & Ellis, and Eastdil, in conspiracy with Soros and Fortress, and was rife with fraud, bad faith and in violation of the rule of law that every contract contains an obligation of good faith and in violation of RICO by reason of the Money Laundering purpose of the sale.

425.    Upon information and belief, Harry Macklowe was present at the opening of the bids in the presence of certain attorneys of Kirkland & Ellis to allow Macklowe to beat any bid received by Eastdil despite the fact that the opening of the bids was represented to be private and the winner based on Conseco's own criteria.

426.    Moreover, the criminal conspiracy, scheme and goal of the RICO Enterprise and Fortress' and George Soros' unlawful intent was to use the GM Building for the purpose of Money Laundering.

427.    In fact, the racketeering Enterprise never had an intention to hold a free and fair bidding process of selling the GM Building to plaintiffs or anyone else; and, in fact, after the bidding show took place, a Soros proxy told plaintiffs that it would never sell the property to plaintiffs, no matter what they bid.

428.    Upon information and belief, on the morning after the final bid, Eastdil Realty contacted George Soros and/or Harry Macklowe and told them that if they would

[100]

David H. Relkin, Esq.

raise the bid to 1.4 Billion Dollars, they would be considered the winner of the bidding process.

429.    With the approval of Soros, Harry Macklowe agreed to raise his bid to $1.4 Billion and was a benefit to the Enterprise since it allowed the RICO Enterprise to launder additional money.

430.    As a result, Harry Macklowe, the straw man of the Enterprise, was announced by The New York Times as the winner of the rigged auction.

431.    This constituted the acquisition or maintenance of an interest and an investment of income from racketeering activities in an Enterprise through a pattern of racketeering activities.  This also constituted the conduct of the affairs of an Enterprise affecting interstate commerce through a pattern of racketeering activity.

432.    Plaintiffs properly submitted a bid for the General Motors Building that was highest and best since it was 1.5 Billion Dollars, required no due diligence and put up a 50 Million Dollars deposit.  Defendants' pattern of racketeering  and manipulation of the auction was in violation of plaintiffs' right to a fair auction and violated Conseco's and Eastdil's published auction procedures.

433.    Plaintiffs' offer was unconditional, as is, no due diligence and had the firm commitments of Plaintiffs' equity and debt financing.

[101]

434.    Upon information and belief, while Harry Macklowe represented that he had secured the "requisite approvals" from its proposed lender, Wachovia Bank, and that "no additional approvals were required to close," as required by the Bidding Procedures of Conseco, in truth, Wachovia's approval for financing *was conditional* on conducting additional due diligence on the General Motors Building.

435.    The terms of the confidentiality agreement were a sham and never intended to be followed by the racketeering defendants.

436.    On August 30, 2003, the New York Times reported that Harry Macklowe won the bid to purchase the General Motors Building for 1.4 Billion Dollars—100 Million Dollars less than plaintiffs' offer.

437.    The closing of the GM Building was scheduled for twenty-eight days later, or September 27, 2003, eighteen days after the Conseco Bankruptcy proceeding was closed on September 9, 2003.  Accordingly, the proceeds of the sale never reached pre-bankruptcy Conseco; rather, the beneficiary of the proceeds of the sale was New Conseco.

**The Structuring of the Money
Laundering Transactions
In Connection With The
Purchase of the GM Building**[22]

---

[22] A chart of these activities in annexed hereto as Exhibit "**LL**" annexed to the accompanying Compendium of Exhibits.

David H. Relkin, Esq.

438.     During the twenty-eight days between the announcement that Macklowe had won the bidding and the closing date, Soros with the other RICO defendants of the racketeering Enterprise and conspirators therewith engineered the creation of shell entities and various illusory obligations and transactions which would make it appear that Macklowe was buying the GM Building instead of Soros to accomplish the actual purpose of Money Laundering.

439.     In fact, it was George Soros, together with the assistance of the other members and co-conspirators of the RICO Enterprise, who purchased the General Motors Building with monies laundered through numerous ephemeral entities formed exclusively for the illegal purpose of Money Laundering.

440.     On September 3, 2003, Fried Frank Harris Shriver & Jacobson, in conflict with its former representation of the unsecured creditors in the Conseco Bankruptcy Case, made an emergency application to the Bankruptcy Court to represent Macklowe in the purchase of the General Motors Building.  (See Exhibit "**MM**" annexed to the accompanying Compendium of Exhibits.)

441.     Upon information and belief, Fried Frank Harris Shriver & Jacobson's representation of Macklowe may have been in conspiracy with the racketeering Enterprise and in furtherance of the Bankruptcy Fraud, perpetrated against plaintiffs, Conseco creditors and the Bankruptcy Court and such firm may be later identified as a John Doe defendant.

[103]

David H. Relkin, Esq.

442.     On September 4, 2003, Macklowe formed Acquisition as a Delaware Limited Liability Company and received authorization to do business in New York.  (See Exhibit "**A**" annexed to the accompanying Compendium of Exhibits.)

443.     Acquisition was specifically formed to acquire the GM Building and to launder money on behalf of the RICO Enterprise.

444.     On September 9, 2003, the Bankruptcy Court approved Conseco's Sixth Amended Joint Liquidating Plan pursuant to Chapter 11 of the Bankruptcy Code and, one day later, Conseco emerged from Chapter 11 Protection with R. Glenn Hillard replacing Gary Wendt as Chairman of the Board of Directors.

445.     On the same day, the Bankruptcy Court approved Fried Frank Harris Shriver & Jacobson's application to represent Harry Macklowe in connection with his purported purchase of the GM Building.

446.     The scheme of the RICO Enterprise was to engage in racketeering activity of Money Laundering to make it appear that Macklowe acquired the GM Building, when, in fact, Soros, SFM, Fortress, Mapeley, Quantum and Macklowe, together with the unlawful and knowing conspiracy of Conseco, Vornado, Eastdil, German American, and other presently unknown defendants, and numerous entities which are no longer existing, contrived a massive fraud to use various shell entities and instrumentalities to use the purchase of the GM Building for Money Laundering.

[104]

David H. Relkin, Esq.

447.    On September 23, 2003, Vornado formed Vornado GM III, at the behest of George Soros, SFM, and other members of the Enterprise, and in collusion with them, with the promise of a side deal to sell prime 250 Million Dollars of mezzanine debt on the GM Building to Vornado after the closing.  (See Exhibit "**D**" annexed to the accompanying Compendium of Exhibits.)

448.    On September 23, 2003, Soros, or someone acting in conspiracy with him, formed the shell entity Soros Credit II, which entered into a joint venture with the shell entity Vornado GM III.  (See Exhibit "**LL**" annexed to the accompanying Compendium of Exhibits.)

449.    Upon information and belief, Soros, SFM, Mapeley or Quantum, by means of wire fraud, infused Soros Credit II with 25 Million Dollars which derived from illegal activities.

450.    Upon information and belief, Soros, SFM, Mapeley or Quantum, by means of wire fraud, infused Vornado GM III with 25 Million Dollars, which capital derived from illegal sources.

451.    On the next day, Soros Credit II and Vornado GM III each *loaned* 25 Million Dollars to German American by the use of wire fraud.   Upon information and belief, these purported loans were never repaid to German American and were merely an attempt to hide the true source of the nature, location, source, ownership or control of the proceeds of unlawful activity.

David H. Relkin, Esq.

452.     Upon information and belief, neither Soros Credit II nor Vornado GM III created a receivable on its books for this loan since the loans were made to hide the true source of the nature, location, source, ownership or control of the proceeds of unlawful activity.

453.     On September 23, 2003, in furtherance of the racketeering activities of the Enterprise Soros formed a shell entity Mezzanine Fourth.  (See Exhibit "**C**" annexed to the accompanying Compendium of Exhibits.)

454.     Upon information and belief, on September 23, 2003, in furtherance of the Money Laundering scheme of the RICO Enterprise, by means of wire fraud, German American funneled the aforesaid 50 Million Dollar *loans* from Soros Credit II and Vornado GM III *as a loan* to Mezzanine Fourth, an entity owned or controlled by Soros or other members of the Enterprise.

455.     Upon information and belief, such criminal activity was a hidden quid pro quo for German American getting the first mortgage on the GM Building in furtherance of the conspiracy, scheme and plan of the RICO Enterprise.

456.     On the same date, upon information and belief, Soros directed Mezzanine Fourth to funnel the aforesaid "dirty money transfers" by wire fraud into Acquisition as an "investment."

[106]

David H. Relkin, Esq.

457.     Upon information and belief, since the laundered money came into Acquisition as an "investment" it should have made Mezzanine Fourth a partner or member of Acquisition, which it did not.

458.     On September 25, 2003, Soros, or someone acting on his behalf, formed Soros Credit I. (See Exhibit "**NN**" annexed to the accompanying Compendium of Exhibits.)

459.     Upon information and belief, on September 25, 2003, by means of wire fraud, Soros then funneled the sum of 250 Million Dollars as a bogus "loan" into Soros Credit I.  (See Exhibit "**LL**" annexed to the accompanying Compendium of Exhibits.)

460.     On the same date Soros created Credit Funding I he funneled by means of wire fraud the aforesaid 250 Million Dollars as a bogus "loan" to Junior Mezzanine, a shell company owned by Soros, SFM or Fortress. (See Exhibit "**B**" annexed to the accompanying Compendium of Exhibits.)

461.     Upon information and belief, such "loans" were never paid back to Soros Credit I or Junior Mezzanine and such ephemeral entities were dissolved immediately after they served the purpose of hiding the true source of the nature, location, source, ownership or control of the proceeds of unlawful activity. (See Exhibit "**NN**" annexed to the accompanying Compendium of Exhibits.)

David H. Relkin, Esq.

462.    On the same date, George Soros on behalf of the Enterprise laundered the aforesaid 250 Million Dollars through Junior Mezzanine into Acquisition as an *investment*.  (See Exhibit "**LL**" annexed hereto.)

463.    Upon information and belief, since the 250 Million Dollars of laundered money derived from unlawful activity came into Acquisition as an investment by Junior Mezzanine, this should have made Junior Mezzanine a partner or member of Acquisition Co., which it did not.

464.    Such act constituted money laundering since it was made to hide the true source of the nature, location, source, ownership or control of Soros' proceeds of unlawful activity and derived from Soros, SFM, Fortress, Mapeley or Quantum.

465.    Upon information and belief, at the end of funneling the illicitly derived funds through a byzantine structure of shell entities, Soros and Fortress had funneled the sum of 300 Million Dollars by means of wire fraud through Soros Credit II, Vornado, German American, Soros Credit I and Junior Mezzanine into Acquisition Co. as investments.

466.    In reality each of these money transfers were made by means of wire fraud to hide the true source of the nature, location, source, ownership or control of Soros' and Fortress' proceeds of unlawful activity.

David H. Relkin, Esq.

467.     The cumulative appearance of such transactions was that Macklowe had invested 300 Million Dollars into Acquisition, in effect, controlling Acquisition, when, in fact, the source of the money was entirely from the RICO Enterprise, Soros, SFM, Fortress, Mapeley or Quantum, as part of their Money Laundering activities.

468.     Upon information and belief, Kirkland & Ellis and others, conspired to facilitate these activities by the racketeering Enterprise by fraudulently documenting the transaction as an acquisition by Macklowe.

469.     As "payment" for the bogus loan made by German American of 50 Million Dollars to Mezzanine Fourth of the laundered money coming from Soros, upon information and belief, the RICO Enterprise arranged for German American to have a first position mortgage on the General Motors Building in the sum of 1.14 Billion Dollars.

470.     Upon the sale of the GM Building, Bill Shea, then the CEO of Conseco announced that 380 Million Dollars, the amount that Conseco purportedly realized on the sale, was upstreamed to Conseco, not the four insurance companies which purportedly owned Carmel Fifth.

471.     Since the price paid for the General Motors building was 1.4 Billion Dollars, and Conseco's subsidiary insurance companies realized 380 Million Dollars, and there was a payment to Lehman Brothers Holdings to pay off their mortgage of 500

[109]

David H. Relkin, Esq.

Million Dollars, and to Secore Mortgage to pay off its 200 Million Dollar Mortgage, this left approximately 310 Million Dollars.

472.     Eastdil, who had sold the GM Building as an agent, was paid a commission of 2.5%, or 35 Million Dollars.

473.     Thus, after payment of the broker's fee, there remained another 275 Million Dollars which was unaccounted for.

474.     Upon information and belief, despite the fact that the Arbitration Award between Carmel Fifth and Trump obligated Carmel Fifth to pay to Trump only the sum of 15.6 Million Dollars, these unaccounted-for proceeds from the sale of the GM Building were paid to Trump as part of Conseco's "confidential settlement" of the arbitration between it and Trump

475.     This payment was in furtherance of the pattern of racketeering to launder money by the Enterprise into the pockets of Trump so that the money could be funneled into Trump International Hotel & Tower being built in Chicago, Illinois ("Trump Illinois").

476.     The other investors in Trump Illinois were Blackacre Institutional Capital Management LLC, an affiliate of Cerberus, which was a member of CFN; Grove Capital LLP, which manages Soros Fund Management; Deutsche Bank, whose subsidiary German American was granted a mortgage originated by Deutsche Bank, A.G. to

[110]

David H. Relkin, Esq.

Macklowe of 1.14 Billion Dollars in connection with Macklowe's apparent purchase of the GM Building, and which provided a 650 Million Dollar construction loan to Trump; and Fortress, a member of CFN Holdings, which provided 160 Million Dollars of mezzanine financing to Trump Illinois.

477.    These acts by defendants constituted a pattern of racketeering activity and demonstrated a continuity of the RICO Enterprise and a continuing threat of continuity of the Enterprise.

**The RICO Enterprise
Continues as Macklowe Purchases
Seven Buildings And
Uses the General Motors
<u>Building As Collateral</u>**

478.    The criminal conspiracy, plan and scheme continued to launder money on behalf of the RICO Enterprise through property acquisition when, in 2007, Macklowe purchased seven office buildings from Blackstone through Eastdil Realty in New York City, for approximately 7 Billion Dollars with only 50 Million Dollars of equity from Macklowe.

479.    Macklowe borrowed 5.8 Billion Dollars from Deutsche Bank and, as security for the loan, Macklowe pledged 49% of his purported ownership interest in the GM Building, which was, in fact owned by Soros and/or Fortress.

[111]

David H. Relkin, Esq.

480.	In this illegal transaction, Harry Macklowe also borrowed 1.2 Billion Dollars in furtherance of the criminal conspiracy, plan and scheme from Fortress which eventually grew to an outstanding indebtedness of approximately 1.4 Billion Dollars.

481.	Deutsche Bank then bought 25 percent of the equity from Fortress in order to launder this money through the acquisition of other property interests.

482.	Vornado also holds a stake in four of the seven office Buildings purchased by Macklowe.  Thus the Enterprise is continuing in nature since the same parties who laundered 300 Million Dollars through the GM acquisition continued their pattern of racketeering.

483.	As a result of Macklowe's inability to generate sufficient cash to carry the loans on the seven office buildings, Macklowe was forced to sell the GM Building to avoid foreclosure proceedings.

484.	On or about May 22, 2008, the GM Building was sold by Harry Macklowe, on behalf of the Enterprise controlled by Soros, for the sum of 2.8 Billion Dollars, or a 1.4 Billion Dollar profit, the exact amount of Macklowe's indebtedness to Fortress.

485.	Upon information and belief, these highly leveraged transactions were in furtherance of the RICO Enterprise to launder proceeds of a pattern of racketeering by disguising the source, origin, ownership or control of the proceeds of unlawful activity.

[112]

David H. Relkin, Esq.

486.     According to the New York Times, George Soros has been linked to money laundering operations involving Global Telesystems, based in McLean, Virginia, doing business in Russia.  "Federal Investigators, who thought they had a possible case of money laundering, were dismayed.  The case was not aggressively pursued, said one senior law enforcement official.  An investigator from another Federal Agency said that the case had been prematurely closed."  (See Exhibit "**OO**" annexed to the accompanying Compendium of Exhibits.)

### XIII.   THE RICO PREDICATE ACTS

487.     The defendants and each of them are individuals, partnerships, corporations, associations or other legal entities associated in fact although not a legal entity for the common purpose of engaging in a course of conduct and functioning as a continuing unit in perpetrating their criminal conduct and conspiracy of acquiring assets through and by means of money laundering and bankruptcy and wire fraud for profit.  In connection with, and in furtherance of their pattern of racketeering, the defendants acquired Conseco Finance and the GM Building through and by means of illegal conduct and conspiracies, including bankruptcy and wire fraud, for the purpose of laundering money through such acquisitions for profit.

488.     The defendants, and each of them, associated, participated and conspired with the Enterprise in the conduct of the Enterprise's affairs through a pattern of racketeering, in and affecting interstate and international commerce, and which pattern of racketeering activity involved two or more criminal acts committed by each defendant, proximately causing damage to plaintiffs' business and property, which damage was a

David H. Relkin, Esq.

foreseeable result and proximate cause of such conduct, constituting violations of the

Racketeering Influenced and Corrupt Organization Act, 18 U.S.C. §1962, *et seq*. Such

criminal acts are described herein, including, but not limited to the following criminal

acts.

489.    Upon information and belief, the unknown sources of the money

laundering from illegal activities include, but are not limited to, Narco Drug Trafficking,

Black market arms dealing, prostitution slave trading and Organized Crime syndicates.

490.    With respect to defendant **George Soros**, the said defendant violated the

provisions of 18 U.S.C. §1962 (a), (b), (c), (d), in that the said defendant conducted

and/or participated in the conduct of the affairs of the criminal enterprise through a

pattern of racketeering activity involving at least two acts, and conspired with the other

members of the enterprise to do so in interstate and international commerce.  In

connection therewith, the said defendant has, among other things, engaged in the

following criminal acts.

491.    The said defendant **George Soros**, received income derived, directly or

indirectly, from a pattern of racketeering activity and used or invested, directly or

indirectly, a part of such income or the proceeds of such income, in acquisition of an

interest in, or the establishment or operation of any enterprise, engaged in, or the

activities of which affected interstate and international commerce, by forming numerous

shell entities, on or about and between September 1, 2003 and September 23, 2003, with

David H. Relkin, Esq.

no officers, directors or shareholders, offices or assets, to invest or use, directly or indirectly, a part of such income or the proceeds of such income, by laundering such funds derived from illegal activities in violation of 18 U.S.C. §§1956 and 1957, by funneling 300 Million Dollars into a limited liability company, 5th Avenue 58/59 Acquisition Co., to acquire an interest in an enterprise controlled by the defendants, in violation of 18 U.S.C. § 1962 (a).

492.    The said defendant, **George Soros**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affect interstate or foreign commerce, including money laundering derived from, or the proceeds of unlawful activity, including but not limited to, Organized Crime activities in violation of 18 U.S.C. §§1956 and 1957, in association with, and in control of the RICO Enterprise, on or about and between June 2002 and the present , did acquire, maintain, directly or indirectly an interest in, and the control of the RICO Enterprise in violation of 18 U.S.C. §1962 (b).

493.    The said defendant, **George Soros**, directly and indirectly in association with, in the conduct of, and in participation in, directly and indirectly, and control the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, through a pattern of racketeering in violation 18 U.S.C. § 1962 (c).  Such conduct by Soros was furtherance of a scheme to profit from laundering money derived from illegal activities in violation of 18 U.S.C. §1956 and 1957, including but not limited to Organized Crime activities, from, on or about and between June 2002 and the present, through the Conseco Bankruptcy involving the purchase of Conseco Finance through

[115]

David H. Relkin, Esq.

CFN, the financing of Conseco through FPS, the acquisition of the GM Building and the investment of proceeds therefrom into Trump, Chicago in violation of 18 U.S.C. §1962 (c).

494.     The said defendant, **George Soros**, in furtherance of, and in association with the illegal conduct and pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, and in conspiracy with, and the participation of the defendants, including Harry Macklowe, FIG, Vornado and German American, formed numerous ephemeral shell entities, on or about and between September 1, 2003 and September 25, 2003, with no officers, directors, shareholders, offices or assets, to funnel 300 Million Dollars derived from illegal activities in violation of 18 U.S.C. §1956 and 1957, including, but not limited to, Organized Crime activities, and to conceal and disguise their true illegal nature and origin for profit, by falsely representing to, and deceiving others, including plaintiffs, that said limited liability company, and the assets thereof was controlled by defendant Harry Macklowe, which funds derived from SFM, FIG, Mapeley, Quantum, or from other entities uniquely known to George Soros, into a limited liability company 5th Avenue 58/59 Acquisition Co. controlled by Soros and/or the said defendants, in violation of 18 U.S.C. § 1962 (c).

495.     The said defendant, **George Soros**, in furtherance of the conduct, and in association, participation, and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, in order to profit by laundering funds derived from illegal activities and to

[116]

David H. Relkin, Esq.

conceal and disguise their true illegal nature and origin for profit in violation of 18 U.S.C. §§1956 and 1957, specifically funneled 25 Million Dollars of illegally derived funds from SFM, FIG, Mapeley, Quantum, or from other criminal entities uniquely known to George Soros, as a "loan" to an ephemeral, shell entity, Soros Credit Funding II, formed on or about September 23, 2003, controlled by Soros and/or the other defendants, in violation of 18 U.S.C. § 1962 (c).

496.    The said defendant, **George Soros**, in furtherance of the conduct, and in association, participation, and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, in order to profit from laundering funds derived from illegal activities and to conceal and disguise their true illegal nature and origin for profit in violation of 18 U.S.C. §§1956 and 1957, specifically funneled 25 Million Dollars of illegally derived funds from SFM, FIG, Mapeley, Quantum, or from other criminal entities uniquely known to George Soros, as a "loan" to German American Capital,  in violation of 18 U.S.C. § 1962 (c).

497.    The said defendant, **George Soros**, in furtherance of, in association with, and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, in order to profit from laundering funds derived from illegal activities and to conceal and disguise their true illegal nature and origin in violation of 18 U.S.C. §§1956 and 1957, by funneling 250 Million Dollars of such illegally derived funds from SFM, FIG, Mapeley, Quantum, or from other entities uniquely known to George Soros, as a "loan" to an ephemeral, shell

[117]

David H. Relkin, Esq.

entity, Soros Credit Funding I, formed on or about September 22, 2003, controlled by Soros and/or the other defendants, in violation of 18 U.S.C. § 1962 (c).

498.    The said defendant, **George Soros**, in furtherance of, in association with, and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, in order to profit from laundering funds derived from illegal activities and to conceal and disguise their true illegal nature and origin in violation of 18 U.S.C. §§1956 and 1957, by funneling 250 Million Dollars of such illegally derived funds from SFM, FIG, Mapeley, Quantum, or from other entities uniquely known to George Soros, as a "loan" from an ephemeral, shell entity, Soros Credit Funding I, controlled by Soros and/or the other defendants, into 58/59 Junior Mezzanine, LLC, another ephemeral, shell entity, formed on or about September 22, 2003, controlled by Soros and/or the other defendants as a "loan" from Soros Credit Funding I, in violation of 18 U.S.C. § 1962 (c).

499.    The said defendant, **George Soros**, in furtherance of, in association with, and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, in order to profit from laundering funds derived from illegal activities and to conceal and disguise their true illegal nature and origin in violation of 18 U.S.C. §§1956 and 1957, by funneling 250 Million Dollars of such illegally derived funds from SFM, FIG, Mapeley, Quantum, or from other entities uniquely known to George Soros, as an "investment" from 58/59 Junior Mezzanine, LLC, an ephemeral, shell entity, formed on or about September 22,

David H. Relkin, Esq.

2003, as an "investment" into a limited liability company 5th Avenue 58/59 Acquisition

Co. controlled by Soros and/or the said defendants  in violation of 18 U.S.C. § 1962 (c).

500.    The said defendant, **George Soros**, conspired to directly and indirectly

associate with, and control the RICO Enterprise, engaged in, or the activities of which

affect interstate or international commerce, through a pattern of racketeering, on or about

and between June 2002 and September 2007, in conspiracy with FIG, Fortress Investment

Holdings, Mapeley, Quantum, Conseco, Carmel Fifth, Trump, German American,

Vornado, Macklowe, Eastdil, and Kirkland & Ellis to violate 18 U.S.C. 1962 (a), (b) and

(c) through bankruptcy fraud perpetrated by such conspirators in violation of 18 U.S.C.

§152 (1), (2), and (3), involving the acquisition of Conseco Finance, and to control and

manipulate the bidding process for the GM Building in order to profit by laundering

money derived from illegal sources into the acquisition of the GM Building and to

conceal and disguise their true illegal nature and origin of such laundered money for

profit in violation of 18 U.S.C. §1956 and 1957, including, but not limited to, Organized

Crime activities, in violation of 18 U.S.C. §1962 (d).

501.    The said defendant, **George Soros**, conspired to directly and indirectly

associate with, and control the RICO Enterprise, engaged in, or the activities of which

affect interstate or international commerce, through a pattern of racketeering, on or about

and between June 2002 and September 2007, in conspiracy with Fortress Mapeley,

Quantum, to violate 18 U.S.C. §1343 and 18 U.S.C. §1952(a)(3) by illegally using an

interstate telecommunications device to funnel monies into Vornado GM III, Soros Credit

[119]

David H. Relkin, Esq.

II, German American, Mezzanine Fourth, Soros Credit I, Junior Mezzanine and

ultimately into Acquisition in violation of 18 U.S.C. §1962 (c) and (d).

502.    With respect to defendant **Soros Fund Management**, the said defendant

violated the provisions of 18 U.S.C. §1962 (c) and (d), in that the said defendant

conducted and/or participated in the conduct of the affairs of the criminal enterprise

through a pattern of racketeering activity involving at least two acts, and conspired with

the other members of the enterprise to do so in interstate and international commerce.  In

connection therewith, the said defendant has, among other things, engaged in the

following criminal acts.

503.    The said defendant **Soros Fund Management**, received income derived,

directly or indirectly, from a pattern of racketeering activity and used or invested, directly

or indirectly, a part of such income or the proceeds of such income, in acquisition of an

interest in, or the establishment or operation of any enterprise, engaged in, or the

activities of which affected interstate and international commerce, by forming numerous

shell entities, on or about and between September 1, 2003 and September 23, 2003, with

no officers, directors or shareholders, offices or assets, to invest or use, directly or

indirectly, a part of such income or the proceeds of such income, by laundering such

funds derived from illegal activities in violation of 18 U.S.C. §§1956 and 1957, by

funneling 300 Million Dollars into a limited liability company, 5th Avenue 58/59

Acquisition Co., to acquire an interest in an enterprise controlled by the defendants, in

violation of  18 U.S.C. § 1962 (a).

[120]

David H. Relkin, Esq.

504.    The said defendant, **Soros Fund Management**, in furtherance of, in association with, and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conducted and participated in, directly or indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering, in order to profit from laundering funds derived from illegal activities and conceal their true illegal nature and origin for profit in violation of 18 U.S.C. §§1956 and 1957, by funneling 250 Million Dollars of such illegally derived funds from Fortress, Mapeley, Quantum, or from other entities uniquely known to George Soros, Soros Fund Management or FIG, as a "loan" to an ephemeral, shell entity, Soros Credit Funding I, formed on or about September 22, 2003, controlled by Soros Fund Management or the other defendants, in violation of 18 U.S.C. § 1962 (c).

505.    The said defendant, **Soros Fund Management**, in furtherance of, in association with, and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conducted and participated in, directly or indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering, in order to profit from laundering funds derived from illegal activities and conceal their true illegal nature and origin for profit in violation of 18 U.S.C. §§1956 and 1957, by funneling 250 Million Dollars of such illegally derived funds from Fortress, Mapeley, Quantum, or from other entities uniquely known to George Soros, Soros Fund Management or FIG, from an ephemeral, shell entity, Soros Credit Funding I, formed on or about September 22, 2003, as a "loan" to another ephemeral, shell entity, 58/59 Junior Mezzanine, LLC, formed on or about

[121]

David H. Relkin, Esq.

September 22, 2003, controlled by Soros Fund Management or the other defendants, in violation of 18 U.S.C. § 1962 (c).

506.    The said defendant, **Soros Fund Management**, in furtherance of, in association with, and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, in order to profit from laundering funds derived from illegal activities and to conceal and disguise their true illegal nature and origin in violation of 18 U.S.C. §§1956 and 1957, by funneling 250 Million Dollars of such illegally derived funds from SFM, FIG, Mapeley, Quantum, or from other entities uniquely known to George Soros, Soros Fund Management and/or FIG, as an "investment" from 58/59 Junior Mezzanine, LLC, an ephemeral, shell entity, formed on or about September 22, 2003, into a limited liability company 5th Avenue 58/59 Acquisition Co. controlled by Soros and/or the said defendants  in violation of 18 U.S.C. § 1962 (c).

507.    The said defendant **Soros Fund Management**, in furtherance of, in association with, and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conducted and participated in, directly or indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering, on or about September 23, 2003, in order to profit by illegally laundering money derived from illegal sources, including but not limited to Organized Crime activities in violation of 18 U.S.C. §§1956 and 1957 by funneling 25 Million Dollars from Mapeley, Quantum, or through other entities in the unique knowledge of defendants Soros, Soros Fund Management and/or FIG , as a "loan"

[122]

David H. Relkin, Esq.

to an ephemeral shell entity, Soros Credit Funding II, formed on or about September 22, 2003, in furtherance of a pattern of racketeering for the purpose of concealing the origin and nature of such funds in violation of 18 U.S.C. §1962 (c).

508.    The said defendant **Soros Fund Management**, in furtherance of the illegal business of, and the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conducted and participated in, directly or indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering, on or about September 23, 2003, in order to profit by illegally laundering money derived from illegal sources, including but not limited to Organized Crime activities and affecting interstate commerce as described herein in violation of 18 U.S.C. §§1956 and 1957 through German American Capital into 58/59 Mezzanine Fourth, LLC, an ephemeral, shell entity to conceal the source and nature thereof in violation of 18 U.S.C. §1962 (c).

509.    The said defendant, **Soros Fund Management**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in, or the activities of which affected interstate and international commerce, conducted and participated in, directly or indirectly in the conduct of the affairs of the enterprise, in order to profit from laundering funds derived from illegal activities and conceal their origin in violation of 18 U.S.C. §§1956 and 1957, funneled 25 Million Dollars on or about September 25, 2003 into 5th Avenue 58/59 Acquisition in order to conceal the true source and nature of such funds in violation of 18 U.S.C. §1962 (c).

[123]

David H. Relkin, Esq.

510.     The said defendant, **Soros Fund Management**, in furtherance of the
pattern of racketeering of the RICO Enterprise, engaged in, or the activities of which
affected interstate and international commerce, conducted and participated in, directly or
indirectly in the conduct of the affairs of the enterprise, in order to profit from laundering
funds derived from illegal activities and conceal their origin in violation of 18 U.S.C.
§§1956 and 1957, in or about June 2003, and numerous other dates, believed to be
provided by Fortress, Mapeley, Quantum, or another entity in the exclusive knowledge of
Soros, Soros Fund Management or FIG, to purchase Conseco Finance in furtherance of a
pattern of racketeering in violation of 18 U.S.C. §§ 1962 (c).

511.     The said defendant **Soros Fund Management**, violated the provisions of
18 U.S.C. §1962 (d), in that the said defendant engaged in a conspiracy with defendants
to conduct and/or participate in the conduct of the affairs of the RICO enterprise
described herein through a pattern of racketeering activity, in interstate or international
commerce, and conspired with the other members of the enterprise to do so.

512.     In connection therewith, the said defendant **Soros Fund Management**, in
furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the
activities of which affect interstate or foreign commerce, including money laundering
derived from, or the proceeds of unlawful activity, including but not limited to, Organized
Crime activities in violation of 18 U.S.C. §§1956 and 1957, in order to profit by
concealing the origin or nature of such funds, from on or about and between June 2002 to
the present, by, among other things, engaging in a conspiracy with Fortress, CFN

[124]

David H. Relkin, Esq.

Investment Holdings, and FPS DIP, on or about and beginning October 2002 and

continuing through September 2008 in violation of 18 U.S.C. §1962 (d).

513.    The said defendant **Soros Fund Management**, in furtherance of the

pattern of racketeering of the RICO Enterprise, affecting interstate or international

commerce by initiating and participating in a criminal conspiracy, plan and scheme

involving the participation and conduct of Mapeley, Quantum, Conseco, Carmel Fifth,

Kirkland & Ellis, Trump, 767 Manager, German American, Vornado, Macklowe and

Eastdil to purchase the GM Building from Conseco in order to launder money for profit

and conceal the origin and nature of such funds, in violation of 18 U.S.C. §1962 (d).

514.    The said defendant **Soros Fund Management**, in furtherance of the

pattern of racketeering of the RICO Enterprise, affecting interstate or international

commerce by initiating and participating in a criminal conspiracy, plan and scheme

involving the participation and conduct of Soros, Fortress, Mapeley, Quantum, Trump,

German American, and Vornado to illegally use an interstate telecommunications device

in violation of 18 U.S.C. §1343 and 18 U.S.C. §1952(a)(3) to purchase the GM Building

from Conseco in order to launder money for profit and conceal the origin and nature of

such funds, in violation of 18 U.S.C. §1962 (c) and (d).

515.    With respect to defendant **FIG**, the said defendant violated the provisions

of 18 U.S.C. §1962 (c) and (d), in that the said defendant conducted and/or participated in

the conduct of the affairs of the criminal enterprise through a pattern of racketeering

activity involving at least two acts, and conspired with the other members of the

[125]

David H. Relkin, Esq.

enterprise to do so in interstate and international commerce.  In connection therewith, the said defendant has, among other things, engaged in the following criminal acts.

516.    The said defendant **FIG**, received income derived, directly or indirectly, from a pattern of racketeering activity and used or invested, directly or indirectly, a part of such income or the proceeds of such income, in acquisition of an interest in, or the establishment or operation of any enterprise, engaged in, or the activities of which affected interstate and international commerce, by forming numerous shell entities, on or about and between September 1, 2003 and September 23, 2003, with no officers, directors or shareholders, offices or assets, to invest or use, directly or indirectly, a part of such income or the proceeds of such income, by laundering such funds derived from illegal activities in violation of 18 U.S.C. §§1956 and 1957, by funneling 300 Million Dollars into a limited liability company, 5th Avenue 58/59 Acquisition Co., in the acquisition of an interest in an enterprise controlled by the defendants, in violation of  18 U.S.C. § 1962 (a).

517.    The said defendant, **FIG**, directly and indirectly in association with, in the conduct of, and in participation in, directly and indirectly, the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, in furtherance of a scheme to profit from laundering money derived from illegal activities in violation of 18 U.S.C. §1956 and 1957, including but not limited to Organized Crime activities, from, on or about and between June 2002 and September 2003, through the Conseco Bankruptcy in order to purchase of Conseco Finance through CFN, the financing of Conseco through FPS, the acquisition of the GM Building and the investment of

[126]

David H. Relkin, Esq.

proceeds therefrom into Trump, Chicago in October 16, 2004 in violation of 18 U.S.C. §1962 (c).

518.    The said defendant, **FIG**, directly and indirectly in association with, in the conduct of, and in participation in, directly and indirectly, the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, in furtherance of a scheme to profit from laundering money derived from illegal activities in violation of 18 U.S.C. §1956 and 1957, including but not limited to Organized Crime activities, from, on or about and between June 2002 and September 2003, through the Conseco Bankruptcy in order to purchase of the GM Building and the investment of proceeds therefrom into Trump, Chicago in October 16, 2004 to illegally use an interstate telecommunications device in violation of 18 U.S.C. §1343 and 18 U.S.C. §1952(a)(3), which acts are in violation of 18 U.S.C. §1962 (c) and (d).

519.    With respect to defendant **Conseco, Inc.**, the said defendant violated the provisions of 18 U.S.C. §1962 (c) and (d), in that the said defendant conducted and/or participated in the conduct of the affairs of the criminal enterprise through a pattern of racketeering activity involving at least two acts, and conspired with the other members of the enterprise to do so in interstate and international commerce.  In connection therewith, the said defendant has, among other things, engaged in the following criminal acts.

520.    With respect to defendant **Conseco, Inc.,** the said defendant has violated the provisions of 18 U.S.C. §1962 (c) and (d), in that the said defendant has conducted and/or participated in the conduct of the affairs of the criminal enterprise which affects interstate and international commerce through a pattern of racketeering activity, by and

[127]

David H. Relkin, Esq.

between July 2001 and September 2003, participated in a conspiracy with defendant

Trump, among other defendants to launder money for profit derived from illegal sources,

including but not limited to, Organized Crime activities, in violation of 18 U.S.C. §§1962

(c).

521.     The said defendant, **Conseco**, **Inc.**, in furtherance of the pattern of

racketeering of the RICO Enterprise, engaged in or the activities of which affect interstate

or international commerce, on or about and between December 17, 2002, and September

2003, illegally, knowingly and intentionally conspired with CFN, FIG and Kirkland &

Ellis to misrepresent material facts to the United States Bankruptcy Court and the

creditors of Conseco in numerous bankruptcy documents, including but not limited to

Conseco's Disclosure Statements and motions to adjudicate Conseco's dispute with

Trump, in violation of 18 U.S.C. §152 (1), (2), and (3), that the GM Building was part of

the Conseco Estate and that the sale of the GM Building would produce proceeds for the

Conseco creditors and which proceeds were "essential to the reorganization of Conseco,"

in violation of 18 U.S.C. §1962 (c).

522.     The said defendant, **Conseco, Inc.**, in furtherance of the pattern of

racketeering of the RICO Enterprise, engaged in, or the activities of which affect

interstate or international commerce, and pursuant to, and in conspiracy with the

defendants, specifically Trump, Soros and/or Soros Fund Management and/or FIG, and

their fraudulent and illegal scheme set forth herein, on or about and between July 2001

and August  2003, illegally, knowingly and intentionally conspired to conceal that the

[128]

David H. Relkin, Esq.

purpose of the sale of the GM Building was to commit money laundering for profit through bankruptcy fraud in violation of 18 U.S.C. §1962 (d).

523.    The said defendant, **Conseco**, **Inc.**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affect interstate or foreign commerce, including money laundering derived from, or the proceeds of unlawful activity, including but not limited to, Organized Crime activities in violation of 18 U.S.C. §§1956 and 1957, in order to profit by concealing the origin or nature of such funds, and in furtherance of, and in conspiracy with the pattern of racketeering of the RICO Enterprise, and specifically in conspiracy with Soros, Soros Fund Management, CFN and/or FIG, on or about and between December 2002 and September 2003, agreed to, and did agree to and did conspire to conduct or participate, directly or indirectly in knowingly and intentionally misrepresenting material facts to the United States Bankruptcy Court and the creditors thereof in violation of 18 U.S.C. §152 (1), (2) and (3), as to the value and worth of Conseco Finance, to conceal such value from the which constitutes a violation of 18 U.S.C. §1962 (d).

524.    The said defendant, **Conseco, Inc.**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, beginning on or about June 2001 through September 2003, conspired with the defendants, specifically CFN, FIG, Trump, Soros and/or Soros Fund Management, to illegally, knowingly and intentionally omit, and fail to disclose to the Bankruptcy Court, the creditors of Conseco and others, including plaintiffs, in

[129]

David H. Relkin, Esq.

violation of 18 U.S.C. §152 (1), (2) and (3), that Conseco actually owned Carmel Fifth and the GM Building, which is a violation of 18 U.S.C.§ 1962 (d).

525.   The said defendant, **Conseco, Inc.**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, participated in the conduct of the enterprise, on or about June 2003, by illegally, knowingly and intentionally misrepresenting and by making material omissions to the United States Bankruptcy Court, plaintiffs and the creditors thereof in violation of 18 U.S.C. §152 (1), (2) and (3),that the resolution of the ownership of the GM Building would benefit the creditors of Conseco in violation of 18 U.S.C. 1962 (d).

526.   The said defendant, **Conseco, Inc.**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, participated in the conduct of the enterprise, on or about June 2003, by illegally, knowingly and intentionally misrepresenting and by making material omissions to the United States Bankruptcy Court, plaintiffs and the creditors thereof in violation of 18 U.S.C. §152 (1), (2), (3) and (9), that the resolution of the ownership of the GM Building in fact involved a transfer of the property of Conseco in excess of 270 bankruptcy assets to defendant Trump in violation of 18 U.S.C. §1962 (c).

527.   The said defendant, **Conseco, Inc.**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, on or about and between July 2001 and August 2003, conspired with defendants Soros, SFM, FIG, Kirkland & Ellis, and Trump to

[130]

David H. Relkin, Esq.

manipulate the ownership of the GM Building in order for the enterprise to launder money for profit in violation of 18 U.S.C. §§1956 and 1957 through the sale of the GM Building for the purpose of concealing the origin and nature of illegal such funds in violation of 18 U.S.C. §1962 (d).

528.    The said defendant, **Conseco, Inc.**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, and in conspiracy with the defendants' fraudulent and illegal scheme set forth herein, on or about and between December 2002 and June 2003, illegally, knowingly and intentionally misrepresented and omitted material facts regarding the value of the assets of Conseco Finance purchased by CFN to the United States Bankruptcy Court, the creditors of Conseco, the plaintiffs and other potential bidders for Conseco Finance in violation of 18 U.S.C. §152 (1), (2) and (3) and 18 U.S.C. §1962 (d).

529.    With respect to **Vornado**, the said defendant violated the provisions of 18 U.S.C. §1962 (c) and (d), in that the said defendant was employed by, associated with or in conspiracy with the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, and conducted and/or participated in the conduct of the affairs of the criminal enterprise through a pattern of racketeering activity, and conspired with the other members of the enterprise to do so. In connection therewith, the said defendant has, among other things, engaged in the following criminal acts.

530.    The said defendant, **Vornado**, in furtherance of, and in association with the RICO Enterprise, which was engaged in or the activities of which affected interstate

[131]

David H. Relkin, Esq.

and international commerce, conducted and participated in, directly or indirectly, the conduct of the affairs of the RICO Enterprise, through a pattern of racketeering, in order to launder funds derived from illegal activities and conceal their origin in violation of 18 U.S.C. §§1956 and 1957 from Fortress, Mapeley, Quantum, or from other entities uniquely known to Vornado, formed Vornado GM III, which had no officers, directors or capital and funneled 25 Million Dollars of illegally derived funds into such shell entity in violation of 18 U.S.C. §1962 (c).

531.    The said defendant, **Vornado**, in furtherance of, and in association with the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conducted and participated in, directly or indirectly, the conduct of the affairs of the RICO Enterprise, through a pattern of racketeering, in order to launder funds derived from illegal activities and conceal their illegal origin and nature in violation of 18 U.S.C. §§1956 and 1957, funneled 25 Million Dollars from Fortress, Mapeley, Quantum, or from other entities uniquely known to Vornado, Soros, Soros Fund Management or FIG, directly or indirectly funneled 25 Million Dollars as a "loan" into German American Bank in violation of 18 U.S.C. § 1962 (c).

532.    The said defendant, **Vornado**, in furtherance of, and in association with the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conducted and participated in, directly or indirectly, the conduct of the affairs of the RICO Enterprise, through a pattern of racketeering, in order to launder funds derived from illegal activities by the illegal use of an interstate telecommunications device in violation of 18 U.S.C. §1343 and 18 U.S.C. §1952(a)(3) to

[132]

David H. Relkin, Esq.

purchase the GM Building from Conseco with funneled money into the purchase of the GM Building in violation of 18 U.S.C. § §1962 (c).

533.    The said defendant, **Vornado**, in furtherance of, and in association with the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conspired and agreed with defendants to launder funds derived from illegal activities and conceal their origin in violation of 18 U.S.C. §§1956 and 1957, so as to profit from the affairs of the enterprise to obtain a valuable interest of 250 Million Dollars of mezzanine debt in the GM Building in violation of by 18 U.S.C. § §1962 (c).

534.    The said defendant, **Vornado**, in furtherance of, and in association with the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conspired and agreed with defendants to launder funds derived from illegal activities and conceal their origin in violation of 18 U.S.C. §§1956 and 1957, so as to profit from the affairs of the enterprise to obtain a valuable interest of 250 Million Dollars of mezzanine debt in the GM Building in violation of by 18 U.S.C. § §1962 (d).

535.    The said defendant, **Vornado**, in furtherance of, and in association with the RICO Enterprise, which was engaged in or the activities of which affected interstate and international commerce, conducted and participated in, directly or indirectly, the conduct of the affairs of the RICO Enterprise, through a pattern of racketeering, in order to launder funds derived from illegal activities and conceal their origin in violation of 18 U.S.C. §§1956 and 1957 from Fortress, Mapeley, Quantum, or from other entities

[133]

David H. Relkin, Esq.

uniquely known to Vornado, and funneled 25 Million Dollars of illegally derived funds into such shell entity in violation of 18 U.S.C. §1962 (c).

536.    With respect to defendant, **German American Capital,** the said defendant violated the provisions of 18 U.S.C. §1962 (c) and (d), in that the said defendant conducted and/or participated in the conduct of the affairs of the criminal enterprise through a pattern of racketeering activity, and conspired with the other members of the enterprise to do so. In connection therewith, the said defendant has, among other things, engaged in the following criminal acts.

537.    The said defendant, **German American Capital,** in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, on or about September 2003, in association with the enterprise to conduct or participate, directly or indirectly in the conduct of the enterprise by illegally laundering money in the sum of 50 Million Dollars derived from unlawful sources including but not limited to, Organized Crime activities, into 58/59 Mezzanine Fourth, LLC, originating from Fortress, Mapeley, Quantum, or from other entities uniquely known to Vornado, Soros, Soros Fund Management or FIG, which it received from two shell entities, Soros Credit Funding II, and Vornado GM III, in violation of 18 U.S.C. § §1962 (c).

538.    The said defendant, **German American Capital**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, on or about September 24, 2003, illegally laundered money derived from unlawful activity, including, but not limited to, Organized

[134]

David H. Relkin, Esq.

Crime activities and affecting interstate and international commerce as described herein by funneling 25 Million Dollars it received from Soros Credit Funding I, a shell company created by Soros, SFM, or Fortress, and/or 25 Million Dollars from another ephemeral shell company created by Vornado, Vornado GM III, into Fifth Avenue 58/59 Mezzanine Fourth, LLC as a "loan" in violation of 18 U.S.C. § §1962 (c).

539.    The said defendant, **German American Capital**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, on or about September 24, 2003, illegally laundered money derived from unlawful activity, including, but not limited to, Organized Crime activities and affecting interstate and international commerce as described herein by funneling 25 Million Dollars it received from Soros Credit Funding I, a shell company created by Soros, SFM, or Fortress, and/or 25 Million Dollars from another ephemeral shell company created by Vornado, Vornado GM III, into Fifth Avenue 58/59 Mezzanine Fourth, LLC as a "loan" by the illegal use of an interstate telecommunications device in violation of 18 U.S.C. §1343 and 18 U.S.C. §1952(a)(3) to purchase the GM Building from Conseco with funneled money into the purchase of the GM Building in violation of 18 U.S.C. § §1962 (c).

540.    As a quid pro quo for conspiring to and laundering the unlawful funds for the benefit of the Enterprise, for the purpose of concealing the origin and nature of such funds, in violation of 18 U.S.C. §§1956 and 1957, and in furtherance of, and in conspiracy with the pattern of racketeering of the Enterprise, engaged in or the activities of which affected interstate and international commerce, defendant **German American**

David H. Relkin, Esq.

**Capital** obtained a 1.1 Million Dollar mortgage on the GM Building, from conspiring with and participating directly or indirectly in the conduct of the enterprise, which violates 18 U.S.C. §1962 (c).

541.    As a quid pro quo for conspiring to and laundering the unlawful funds for the benefit of the Enterprise, for the purpose of concealing the origin and nature of such funds, in violation of 18 U.S.C. §§1956 and 1957, and in furtherance of, and in conspiracy with the pattern of racketeering of the Enterprise, engaged in or the activities of which affected interstate and international commerce, defendant **German American Capital** conspired with and participated directly or indirectly in the conduct of the enterprise, which violates 18 U.S.C. §1962 (d).

542.    With respect to defendant, **Eastdil Secured, LLC**, the said defendant violated the provisions of 18 U.S.C. §1962 (d), in that the said defendant conspired to conduct and/or participate in the conduct of the affairs of the criminal enterprise engaged in or the activities of which affected interstate and international commerce through a pattern of racketeering activity.  In connection therewith, the said defendant has, among other things, engaged in the following criminal acts.

543.    The said defendant, **Eastdil Secured, LLC**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, on or about and between March and September 2003, in conspiracy with the fraudulent and illegal schemes of the enterprise conducted by the defendants, set forth herein, to illegally launder money for profit through the sale

[136]

David H. Relkin, Esq.

of the GM Building, derived from unlawful sources, including but not limited to

Organized Crime activities, in violation of 18 U.S.C. §§1956 and 1957, engaged in bid

rigging activities to ensure that defendant Harry Macklowe obtained the GM Building in

violation of 18 U.S.C. §1962 (d).

544.    The said defendant, **Eastdil Secured, LLC**, in furtherance of the pattern

of racketeering of the RICO Enterprise, engaged in or the activities of which affected

interstate and international commerce, in conspiracy with the fraudulent and illegal

schemes of defendants, in conspiracy with the fraudulent and illegal schemes of the

enterprise conducted by the defendants, set forth herein, to illegally launder money for

profit through the sale of the GM Building, derived from unlawful sources, including but

not limited to Organized Crime activities, in violation of 18 U.S.C. §§1956 and 1957, set

forth herein, in or about July and August 2003, illegally, knowingly and intentionally

misrepresented to the bidders for the GM Building that the sale was to be a legitimate and

fair process, while in reality misleading the bidders by concealing that Harry Macklowe

was the pre-selected winner of the bid, in furtherance of the conspiracy to launder money

for profit and to conceal the illegal origin thereof in violation of 18 U.S.C. §1956, 1957

and 1962 (d).

545.    The said defendant, **Eastdil Secured, LLC**, in furtherance of the pattern

of racketeering of the RICO Enterprise, engaged in or the activities of which affected

interstate and international commerce, conspired with and agreed to participate in the

conduct of the enterprise to illegally launder money for profit through the sale of the GM

Building, derived from unlawful sources, including but not limited to Organized Crime

[137]

David H. Relkin, Esq.

activities, and to conceal the origin and nature of such funds in violation of 18 U.S.C. §§1956 and 1957, by conspiring to, and agreeing to make fraudulent representations, including representations to the news media to deceive plaintiffs and third parties that the bidding process for the GM Building was fair and did not involve a conspiracy between the enterprise and defendant Harry Macklowe in violation of 18 U.S.C. § 1962 (d).

546.    With respect to defendant, **Harry Macklowe,** the said defendant violated the provisions of 18 U.S.C. §1962 (c) and (d), in that the said defendant conducted and/or participated in the conduct of the affairs of the criminal enterprise through a pattern of racketeering activity, and conspired with the other defendants to do so.  In connection therewith, the said defendant, among other things, engaged in the following criminal acts.

547.    The said defendant, **Harry Macklowe**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conspired with and agreed to participate, and did participate in the conduct of the enterprise to illegally launder money for profit through the sale of the GM Building, derived from unlawful sources, including but not limited to Organized Crime activities, and to conceal the origin and nature of such funds in violation of 18 U.S.C. §§1956 and 1957, on or about and between September and October 2008 to funnel the proceeds of the sale of the GM Building in the sum of 1.4 Billion Dollars back to the enterprise in violation of  18 U.S.C. §1962 (c).

548.    The said defendant, **Harry Macklowe**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conspired with and agreed to participate in the

David H. Relkin, Esq.

conduct of the enterprise to illegally launder money for profit through the sale of the GM

Building, derived from unlawful sources, including but not limited to Organized Crime

activities, and to conceal the origin and nature of such funds in violation of 18 U.S.C.

§§1956 and 1957, by conspiring to, and agreeing to make fraudulent representations that

he was the buyer of the GM Building in violation of 18 U.S.C. §1962 (d).

549.    With respect to defendant, **Kirkland & Ellis, LLP,** the said defendant

violated the provisions of 18 U.S.C. §1962 (d), in that the said defendant conspired with

the affairs of the criminal enterprise through a pattern of racketeering activity, and

conspired with the other members of the enterprise to do so.  In connection therewith, the

said defendant , among other things, engaged in the following criminal acts.

550.    The said defendant, **Kirkland & Ellis**, **LLP**, in furtherance of the illegal

business of the RICO Enterprise, engaged in or the activities of which affected interstate

and international commerce, and in conspiracy with the defendants' pattern of

racketeering, on or about and between July 2001 and September 2003, conspired and

agreed with defendants to engage in a bogus dispute with Trump regarding the ownership

of the GM Building misrepresent the ownership of the GM Building in violation of 18

U.S.C. §152 (1), (2) and (3), arguing to the Bankruptcy Court in March 2003 that the GM

Building was owned by Conseco, and then, in April 2003, took the position that the GM

Building was not owned by Conseco to allow the enterprise to acquire the GM Building

outside of the jurisdiction of the Bankruptcy Court in order to illegally launder funds for

profit, derived from illegal sources, including but not limited to, Organized Crime

[139]

David H. Relkin, Esq.

activities, affecting interstate and international commerce as described herein in violation of 18 U.S.C. §§1956 and 1957.  This was a violation of 18 U.S.C. §1962 (d).

551.    The said defendant, **Kirkland & Ellis**, **LLP**, in furtherance of the illegal business of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, and in conspiracy with the defendants' pattern of racketeering to illegally launder funds for profit, derived from illegal sources, including but not limited to, Organized Crime activities, affecting interstate and international commerce as described herein in violation of 18 U.S.C. §§1956 and 1957, on or about and between December 17, 2002 and September 2003, conspired with the defendants to knowingly and intentionally misrepresent material facts to the United States Bankruptcy Court, plaintiffs and the creditors of Conseco and third parties that the sale of the GM Building would produce proceeds for the Conseco creditors which were "essential to the reorganization of Conseco" in violation of 18 U.S.C. §152 (1), (2) and (3) and, in their motion dated March 5, 2003, and their declaration by attorney James H. M. Sprayregen on March 6, 2003, that the proceeds of the sale of the GM Building were assets of the Conseco Bankruptcy Estate and would be sold as a 363 sale pursuant to the Bankruptcy code and on March 8, 2003 in the Debtor's Second Disclosure Statement,[23] and, by attorney Sprayregen, on May 26, 2003 that the proceeds of the sale of the GM Building were part of Conseco's Bankruptcy Estate in violation of 18 U.S.C. §1962 (d).

---

[23] "The sale or transfer of the GM Building for entities owning the GM Building (or interests therein, pursuant to or consistent with an Order of the Bankruptcy Court shall be deemed a transfer under, pursuant to, and in furtherance of the Plan."

[140]

David H. Relkin, Esq.

552.     The said defendant, **Kirkland & Ellis**, **LLC**, in furtherance of the illegal business of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, and in conspiracy with the defendants' pattern of racketeering to illegally launder funds for profit, derived from illegal sources, including but not limited to, Organized Crime activities, affecting interstate and international commerce as described herein in violation of 18 U.S.C. §§1956 and 1957, knowingly and intentionally misrepresented to the United States Bankruptcy Court that Carmel Fifth was not under the control of Conseco and omitted crucial information that Carmel Fifth was capitalized by Conseco, in violation of 18 U.S.C. §152 (1), (2) and (3).  This was a violation of 18 U.S.C. §1962 (d).

553.     With respect to defendant, **Donald J. Trump**, the said defendant violated the provisions of 18 U.S.C. §1962 (a), (c) and (d), in that the said defendant acquired an interest in the enterprise by using the income from the pattern of racketeering activity, conducted and/or participated in the conduct of the affairs of the criminal enterprise through a pattern of racketeering activity, and has conspired with the other members of the enterprise to do so.  In connection therewith, the said defendant has, among other things, engaged in the following criminal acts.

554.     The said defendant, **Donald J. Trump**, received income derived, directly or indirectly, from a pattern of racketeering activity and used or invested, directly or indirectly, a part of such income or the proceeds of such income, in acquisition of an interest in, or the establishment or operation of any enterprise, engaged in, or the activities of which affected interstate and international commerce, by forming numerous

[141]

David H. Relkin, Esq.

shell entities, on or about and between September 1, 2003 and September 23, 2003, with no officers, directors or shareholders, offices or assets, to invest or use, directly or indirectly, a part of such income or the proceeds of such income, by laundering such funds derived from illegal activities in violation of 18 U.S.C. §§1956 and 1957, by funneling 300 Million Dollars into a limited liability company, 5th Avenue 58/59 Acquisition Co., in the acquisition of an interest in an enterprise controlled by the defendants, in violation of  18 U.S.C. § 1962 (a).

555.    The said defendant, **Donald J. Trump**, in furtherance of the illegal business of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, and in conspiracy with the defendants' pattern of racketeering to illegally launder funds for profit, derived from illegal sources, including but not limited to, Organized Crime activities, affecting interstate and international commerce as described herein in violation of 18 U.S.C. §§1956 and 1957, received income derived from the pattern of racketeering activity of the enterprise and used such income in acquisition of an interest in, or establishment or operation of the defendants'

enterprise through the sale of the GM Building and the funneling of such proceeds into Trump, Chicago, affecting interstate and international commerce as described herein in violation of 18 U.S.C. §1962 (c).

556.    The said defendant, **Donald J. Trump**, in furtherance of the illegal business of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, and in furtherance and in conspiracy with the defendants' pattern of racketeering to illegally launder funds for profit, derived from illegal sources,

[142]

including but not limited to, Organized Crime activities, affecting interstate and international commerce as described herein in violation of 18 U.S.C. §§1956 and 1957, in connection with the sale of the GM Building to Conseco, received approximately 275 Million Dollars in a confidential agreement entered into on or about April 23, 2003 between Conseco and Trump in violation of 18 U.S.C. §1962 (c).

557.    With respect to defendant, **Conseco, Inc.—post bankruptcy**, the said defendant violated the provisions of 18 U.S.C. §1962 (c) and (d), in that the said defendant conducted and/or participated in the conduct of the affairs of the criminal enterprise through a pattern of racketeering activity, and conspired with the other members of the enterprise to do so.  In connection therewith, the said defendant has, among other things, engaged in the following criminal acts.

558.    The said defendant, **Conseco, Inc.—post bankruptcy**, in furtherance of the illegal business of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, and in furtherance and in conspiracy with the defendants' pattern of racketeering to illegally launder funds for profit, derived from illegal sources, including but not limited to, Organized Crime activities, affecting interstate and international commerce as described herein in violation of 18 U.S.C. §§1956 and 1957, in or about September 25, 2003, conspired with the RICO defendants by knowingly and intentionally acquiring the proceeds of the sale of the GM Building in violation of 18 U.S.C. §1962 (c).

559.    The said defendant, **Conseco, Inc.—post bankruptcy**, in furtherance of the illegal business of the RICO Enterprise, engaged in or the activities of which affected

[143]

David H. Relkin, Esq.

interstate and international commerce, and in furtherance and in conspiracy with the

defendants' pattern of racketeering to illegally launder funds for profit, derived from

illegal sources, including but not limited to, Organized Crime activities, affecting

interstate and international commerce as described herein in violation of 18 U.S.C.

§§1956 and 1957, in or about September 25, 2003, conspired with defendants Soros,

SFM, FIG and/or Trump, to illegally launder money through the sale of the GM Building

in violation of 18 U.S.C. §1962 (d).


**COUNT I**

**Violation of Chapter 96, Part I of Title 18: RICO**
**[18 U.S.C. §1962 (a)]**
**Money Laundering**
**18 U.S.C. §§ 1956 and 1957**

560.    Plaintiffs repeat and reallege allegations "1" through "559" as if fully set

forth herein.


561.    Any person injured in his business or property by reason of a violation of

18 U.S.C. § 1962, may sue therefor in any appropriate United States District Court and

shall recover threefold the damages he sustains and the cost of the suit, including a

reasonable attorney's fee.  Plaintiffs were the foreseeable victims of such conduct and

have been proximately injured in their business and property by reason of violation by

defendants of 18 U.S.C. §1962.


562.    Pursuant to 18 U.S.C. §1962 (a), it is unlawful:

David H. Relkin, Esq.

"for any person who has received any income . . . from a pattern of racketeering activity . . . to use . . . any part of such income" in the "operation of . . . any enterprise which is engaged in, or the activities of which affect, interstate . . . commerce"

563.    Upon information and belief, George Soros, Soros Fund Management, LLC, FIG, LLC and Donald J. Trump received income derived, directly or indirectly from a pattern of racketeering activity and used or invested such income in the acquisition of an interest in, or the establishment or operation of an enterprise which affects interstate or international commerce.

564.    The enterprise did not cause damages to plaintiffs until the GM Building was sold and the illegally derived proceeds became ascertainable.

565.    Money Laundering is defined a predicate act under RICO pursuant to 18 U.S.C. § 1961.

566.    A person, company or corporation violates 18 U.S.C. § 1956 if, knowing that the property involved in a transaction represents the proceeds of some form of illegal activity, conducts or attempts to conduct, such financial transaction which involves the proceeds of such unlawful activity to conceal or disguise the nature, location, the source, the ownership, or the control of the proceeds of such unlawful activity in interstate or international commerce.

[145]

David H. Relkin, Esq.

567.     A person, company or corporation violates 18 U.S.C. § 1957 if he engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than 10 Thousand Dollars and is derived from unlawful activity if such transaction takes place in the United States, or the defendant is in the United States, a citizen of the United States or a sole proprietorship, partnership, company, or association composed principally of nationals or permanent resident aliens of the United States or a corporation organized under the laws of the United States, any State, the District of Columbia, or any territory or possession of the United States, and a foreign subsidiary of such corporation.

568.     Each of the defendants identified in this Count violated 18 U.S.C. §§1956 and 1957.

569.     Each defendant is both a RICO person and, together, constitutes an Enterprise that is distinct from each of them.

570.     Each of the defendants participated directly or indirectly in the conduct of the Enterprise's affairs, including the control, operation and management thereof.

571.     The acts perpetrated by defendants were in an ongoing organization, formal or informal, and constituted by their acts, a continuing unit or an association in fact.

572.     The Enterprise shared a common purpose and a distinctiveness of structure.

[146]

David H. Relkin, Esq.

573.     Defendants George Soros, Soros Fund Management, LLC, FIG, LLC, and Donald J. Trump violated 18 U.S.C. §§1956 and 1957, in order to acquire, maintain or operate an enterprise affecting interstate commerce in violation of 18 U.S.C. §1962 (a).

574.     These defendants committed the RICO predicate transactions identified herein over a period of at least six years, which conduct constitutes a pattern of racketeering activity, causing damages to plaintiffs' person and property by acquiring assets of Conseco including Conseco Finance and the GM Building for the purpose of laundering money for profit.

575.     Accordingly, Soros, Soros Fund Management, FIG, LLC, and Donald J. Trump have violated 18 USC §1962 (a), and are liable to plaintiffs, who were injured in their business or property, trebled by 18 U.S.C. §1962 to 4.2 Billion Dollars, plus attorneys' fees.

### COUNT II

**Violation of Chapter 96, Part I of Title 18: RICO**
**[18 U.S.C. §1962 (b)]**
**Money Laundering**
**18 U.S.C. §§ 1956 and 1957**

576.     Plaintiffs repeat and reallege allegations "1" through "575" as if fully set forth herein.

577.     Pursuant to 18 U.S.C. §1962 (b) , it is unlawful:

[147]

David H. Relkin, Esq.

"for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or any control of any [such] enterprise."

578.    Soros, and FIG, LLC, acquired or maintained, directly or indirectly an interest in, or control of an enterprise through a pattern of racketeering which is engaged in, or the activities of which affect, interstate or international commerce.

579.    Such conduct by such defendants involved numerous predicate acts of RICO, including, but not limited to 18 U.S.C. §1956, 1957.

580.    Plaintiffs were the reasonably expected victims of defendants' conduct which proximately caused damage to their person and business by the unlawful and illicit activities of such defendants in carrying out their pattern of racketeering.

581.    The acts perpetrated by defendants were in an ongoing organization, formal or informal, and constituted by their acts and association in fact, a continuing unit.

582.    The defendants also shared a common purpose and had a continuity of structure.

583.    Accordingly, the aforesaid defendants are jointly and severally liable to plaintiffs in the sum of 1.4 Billion Dollars, trebled by 18 U.S.C. §1962 to 4.2 Billion Dollars, plus attorneys' fees.

[148]

David H. Relkin, Esq.

## COUNT III

**Violation of Chapter 96, Part I of Title 18: RICO**
**[18 U.S.C. §1962 (c)]**
**Money Laundering**
**18 U.S.C. §§ 1956 and 1957**

584.     Plaintiffs repeat and reallege allegations "1" through "583" as if fully set forth herein.

585.     Pursuant to 18 USC §1962 (c), it is unlawful "for any person
employed by or associated with any [such] enterprise . . . to
conduct or participate, directly or indirectly, in the conduct of such
enterprise's affairs through a pattern of racketeering activity."

586.     The racketeering activity of Soros, Soros Fund Management, LLC, FIG, LLC, Vornado Realty Trust, German American Capital Corp., Conseco, Inc., Conseco, Inc. post bankruptcy, and Donald J. Trump involved numerous predicate acts of RICO, pursuant to 11 USC 1962 (c), which acts constituted a pattern of racketeering that injured the interests and property of plaintiffs.

587.     Defendants committed predicate acts pursuant to 18 U.S.C. §§1956 and 1957, and 18 U.S.C. §157 (1), (2) and (3), and Conseco—post bankruptcy committed the additional offense of 18 U.S.C. §157 (9), and such acts were part of a pattern of racketeering activity in interstate and international commerce.

[149]

David H. Relkin, Esq.

588.     Such acts constitute predicate acts under 18 USC §1961 in that they were in furtherance of RICO racketeering activities, and in conspiracy with a racketeering enterprise and damaged plaintiffs.

589.     Accordingly, such are liable to plaintiffs jointly and severally in the amount of 1.4 Billion Dollars, trebled by 18 U.S.C. §1962 to 4.2 Billion Dollars, plus attorneys' fees.

**COUNT IV**

**Violation of Chapter 96, Part I of Title 18: RICO**
**[18 U.S.C. §1962 (d)]**
**Money Laundering 18 U.S.C. §§ 1956 and 1957**

590.     Plaintiffs repeat and reallege allegations "1" through "589" as if fully set forth herein.

591.     Pursuant to 18 USC §1962 (d) "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section [1962].

592.     In connection with the purchase of Conseco Finance, the DIP facility and the purchase and sale of the GM Building, George Soros, Soros Fund Management, LLC, Conseco, Inc., Conseco, Inc.—Post Bankruptcy, Vornado Realty Trust, German American Capital Corp., Kirkland & Ellis, LLP, Eastdil Secured, LLC, Harry Macklowe, and Donald J. Trump, conspired to violate 18 U.S.C. 1962 (a), (b) and (c) to the injury of

[150]

David H. Relkin, Esq.

plaintiffs, their property and business by committing money laundering pursuant to 18 U.S.C.§§ 1956 and 1957.

593.     Defendants proximately caused damages to, plaintiffs' property and business, and plaintiffs' damages to their property and business were the reasonably foreseeable consequences of defendants' conduct, and each of them, perpetrated by themselves and in connection with the other conspirators.

594.     Accordingly, each of these defendants is jointly and severally liable to plaintiffs in the sum of 1.4 Billion Dollars, trebled by 18 U.S.C. §1964 to the sum of 4.2 Billion Dollars, plus attorneys' fees.

## COUNT V

### Violation of Chapter 96, Part I of Title 18: RICO
### [18 U.S.C. §1962 (d)]
### Wire Fraud 18 U.S.C. §§1343 and 1952

595.     Plaintiffs repeat and reallege allegations "1" through "594" as if fully set forth herein.

596.     Pursuant to 18 USC §1962 (d), "it is unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section [1962].

597.     Mapeley, Quantum, George Soros, Soros Fund Management, LLC, Fortress, Vornado Realty Trust, German American Capital and Donald J. Trump agreed to conspire with, and participate in the pattern of racketeering conducted by the Enterprise

[151]

David H. Relkin, Esq.

and the defendants in violating 18 U.S.C. §1343, 18 U.S.C. §1952 (a) (3) by illegally

using interstate and international telecommunications devices to launder money from

Mapeley, Quantum, Soros, SFM, or Fortress to ephemeral shell entities described

hereinabove, in violation of 18 U.S.C. §1956 and 1957.

598.    The plaintiffs were the reasonably foreseeable victims of the foregoing

acts and conspiracy by defendants, which were also the proximate cause of damage to

plaintiffs' property and business.

599.    Such acts constitute predicate acts under 18 USC §1961 in that they were

in furtherance of RICO racketeering activities, and in conspiracy with a racketeering

enterprise and damaged plaintiffs.

600.    Accordingly, such defendants are liable to plaintiffs jointly and severally

in the amount of 1.4 Billion Dollars, trebled by 18 U.S.C. §1962 to 4.2 Billion Dollars,

plus attorneys' fees.

**WHEREFORE,** plaintiffs Leslie Dick Worldwide, Ltd. and Leslie Dick hereby

request this Court to enter an Order and Judgment finding:

(a)    On the first Count, defendants George Soros, Soros Fund Management,

LLC, FIG, LLC and Donald J. Trump jointly and severally liable to plaintiffs for RICO

damages pursuant to 18 U.S.C. §1964 in the sum of 4.2 Billion Dollars, plus attorneys'

fees;

[152]

David H. Relkin, Esq.

(b)      On the second Count, defendants George Soros and FIG, LLC, jointly and severally liable to plaintiffs, for RICO damages pursuant to 18 U.S.C. §1962 (b) and 18 U.S.C. §1964 in the sum of 4.2 Billion Dollars, plus attorneys' fees;

(c)      On the third Count, defendants George Soros, SFM Management and Soros Fund Management, FIG, LLC, Conseco, Inc., Conseco, Inc.—post bankruptcy, Vornado Realty Trust, German American Capital Corp., and Donald J. Trump, jointly and severally liable to plaintiffs, for RICO damages pursuant to 18 U.S.C. §1962 (c) and 18 U.S.C. §1964 in the sum of 4.2 Billion Dollars, plus attorneys' fees;

(d)      On the fourth Count, defendants George Soros, Soros Fund Management, LLC, FIG, LLC, Conseco, Inc., Conseco Inc.—post bankruptcy, Vornado Realty Trust, German American Capital Corp., Eastdil Secured, LLC, Harry Macklowe, Kirkland & Ellis, LLP, and Donald J. Trump, for RICO damages pursuant to 18 U.S.C. §1962 (d) and 18 U.S.C. §1964 in the sum of 4.2 Billion Dollars, plus attorneys' fees;

(e)      On the fifth Count, defendants George Soros, Soros Fund Management, LLC, Fortress, Vornado Realty Trust and German American Capital and Donald J. Trump, for RICO damages in violation of 18 U.S.C. §1343, 18 U.S.C. §1952 (a) (3), and pursuant to 18 U.S.C. §1962 (d) and 18 U.S.C. §1964 in the sum of 4.2 Billion Dollars, plus attorneys' fees;

[153]

David H. Relkin, Esq.

All together with the costs and disbursements of this action and such other, further and different relief as this Court may deem just and proper.

Dated: New York, New York
      February 22, 2009
      [corrected for typographical errors
      On March 11, 2009]

                                    LAW OFFICES OF
                                    DAVID H. RELKIN, ESQ.
                                    Attorneys for Plaintiffs


                                    By:_____
                                    David H. Relkin, Esq. (DHR-1049)
                                    575 Eighth Avenue, Ste. 1706
                                    New York, NY 10018
                                    212-244-8722
                                    *David@RelkinLaw.com*

                                                    [154]

David H. Relkin, Esq.