# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

LESLIE DICK WORLDWIDE INC., and LESLIE DICK,

PLAINTIFFS,

- v –

MACKLOWE PROPERTIES, INC., FIFTH AVENUE 58/59
ACQUISITION CO., LP., HARRY MACKLOWE, EASTDIL
REALTY COMPANY, LLC, BENJAMIN V. LAMBERT,
WAYNE L. MAGGIN, GEORGE SOROS, SOROS FUND
MANAGEMENT LLC, CONSECO, INC., CARMEL FIFTH
LLC, 767 INTERMEDIATE LLC, 767 FIFTH AVENUE LLC,
CHUCK CREMENS, and JOHN DOES #1 THROUGH 10,

DEFENDANTS.

INDEX NO.: 06/600222

**VERIFIED
AMENDED COMPLAINT**

Jury Trial Demanded

Plaintiffs, Leslie Dick Worldwide, LTD. and Leslie Dick, by and through their attorneys,

McCallion & Associates LLP, for their amended complaint against the above-captioned defendants, allege

as follow:

## NATURE OF THE CASE

1.     This is an action for business fraud and conspiracy relating to the solicitation of bids,

purchase and sale of the General Motors Building, 767 Fifth Avenue, New York, New York ("the GM

Building" or "The Building"). Despite having been told that the Building would go to the highest bidder at

auction, and the fact that Plaintiffs were the highest bidders on both the first and second (final) bid relating

to Conseco's ownership share of the Building, the defendants engaged in bid rigging and fraud by

conspiring to have Plaintiffs' August 27, 2003 bid rejected and, instead, to have the Building sold Fifth

Avenue 58/59 Acquisition Co., LP, the limited partnership specifically formed and designated by

Harry Macklowe, George Soros and the other defendants to take ownership of Conseco's ownership

share in the Building.

## JURISDICTION AND VENUE

2.       Jurisdiction and Venue are proper in this County in that most of the events forming the basis for this lawsuit occurred in this County, and both the Plaintiffs and Defendants do business here.

## PARTIES

3.       Plaintiff Leslie Dick Worldwide Ltd. ("LDWL") is an international real estate investment company incorporated in New York, with principal offices located in Manhattan. Plaintiff Leslie Dick, the President and CEO of LDWL, has been in the real estate business since 1977, first in Michigan and later in New York and elsewhere.

4.       Defendant Macklowe Properties, Inc. is a real estate and real estate management company with its principal offices located in Manhattan. Macklowe Properties Inc. has title to the GM Building through a limited partnership known as Fifth Avenue 58/59 Acquisition Co. L.P., a Delaware Limited Partnership. Defendant Harry Macklowe is the Chairman and CEO of Macklowe Properties, Inc. These three defendants, which are collectively referred to as "the Macklowe Defendants," have engaged in numerous unlawful activities in the real estate area, and are perhaps best known for tearing down two single-room occupancy hotels on West 44th Street in 1985 during the night without first turning off the gas or obtaining permits. One of Macklowe's executive pleaded guilty to criminal misdemeanor charges relating to that incident.

5.       Defendant Eastdil Realty, Company LLC ("Eastdil"), a New York corporation, is a real estate investment banking company based in Manhattan. Defendant Benjamin V. Lambert

("Lambert") is the Chairman of Eastdil. Defendant Wayne L. Maggin ("Maggin") is a Managing Director of Eastdil. These three defendants are collectively referred to as the "Eastdil Defendants."

6.    Defendant George Soros ("Soros") is an investor and President of Defendant Soros Fund Management LLC ("Soros Fund") (collectively referred to as "the Soros Defendants"), with principal offices located in Manhattan. Upon information and belief, the Soros Fund has approximately $13 billion under management, most or all of which is managed by Grove Capital LLP. ("Grove Capital"). Grove Capital and numerous other companies and real estate holdings, including the GM Building, are controlled by the Soros Defendants through various other Soros-controlled entities, such as Fortress Investment Group LLC, and Mapeley Holdings LTD (a 50% partner of Fortress Investment Group LLC). Upon information and belief, the Soros Defendants obtained a controlling interest in the GM Building at the time of the closing on the property on August 27, 2003 by raising between $300 and $350 million in equity through various entities as part of the Acquisition Financing. Deutsche Bank providing $1.140 billion in debt financing for the acquisition of the GM Building and, upon information and belief, the Marklowe Defendants providing nothing despite the fact that the title was transferred to an entity (Fifth Avenue 58/59 Acquisition Co., LLC) that was nominally owned by them.

7.    Upon information and belief, the modus operendi of Soros Defendants was and is to acquire controlling interests in real estate and various companies through a maze of nominee companies so that their investments are largely shielded from public scrutiny. For example, the Soros Defendants have effective control over the GM Building, despite the fact that actual title was conveyed to Macklowe Defendants. Similarly, in December, 2002, the Soros Defendant obtained effective control over the assets of Conseco Finance Corp. ("CFC") through CFN Investment Holdings, LLC, a joint venture led by Fortress Investment Group LLC, the same Soros-controlled

3

entity that provided much of the Acquisition Financing for the purchase of the GM Building in August-September 2003. Fortress Investment Group LLC and the Soros Defendants also purchased Inland Revenue on September 24, 2002, three months prior to the Conseco Bankruptcy filing.

8.     Defendant Soros, along with Prince Al Wahlid bin Talel ("Al Wahlid") of Saudi Arabia, is also a major investor in Carlyle Investors, a Washington DC based group. Al Wahlid is also one of the major shareholders in Citigroup, which is the Fund Administrator for Soro's Quantum Fund. As described in greater detail herein, the Soros Defendants used their influence with Al Wahlid to try to deter both him and other Saudi investors from investing with Plaintiffs.

9.     The Soros Defendants have acted in close concert with the investment company, Lazard Freres ("Lazard") for many years. In May of 1999, Lazard was a co-financial advisor of the Soros-owned Delancey Estates LLP in their bid for Greycourt PLC. On March 25, 2000, Soros was the lead investor of a consortium under Cycle & Carriage Ltd. (CCL), which won the winning bid of PT Astra International Tbk (under the Control of the Indonesian Banking Restructuring Agency (IBRA)) after Lazard abandoned an independent consortium bid for the same asset and joined the Soros controlled CCL consortium two days (March 23, 2000) before CCL submitted its winning bid.

10.     Conseco, Inc. ("Conseco") is a publicly traded Delaware corporation with principal offices located in Carmel, Indiana. Conseco owns a majority interest in the GM Building through limited partnerships defendants Cannel Fifth, LLC; 767 Intermediate, LLC; and 767 Fifth Avenue (collectively referred to as "the Conseco Defendants"). Defendant Chuck Cremens, the CEO of Conseco Finance Inc., a Conseco affiliate, represented Conseco in the sale of Conseco's interest in the Building.  These defendants are collectively referred to as "the Conseco Defendants." In March 2004, Conseco settled SEC charges that, throughout 1999, Conseco and Conseco Financial had made

4

"materially false and misleading statements," resulting in an overstatement of "hundreds of millions of dollars."

11.     Defendants John Does #1 – 10 include such persons who aided, abetted, assisted or conspired with the named defendants in committing the acts alleged herein, but whose identities are presently unknown.

## RELEVANT FACTS

### The Conseco Bankruptcy

12.     On December 18, 2002, Conseco filed a Voluntary Chapter 11 Bankruptcy Petition in United States Bankruptcy Court, Northern District of Illinois, Eastern Division. The Conseco Bankruptcy filing was the third largest in U.S history, trailing only those of Enron and WorldCom.

13.     As part of Conseco's bankruptcy filing, Frank A. Savage ("Savage") of Lazard, who is closely associated with Soros and has been involved in numerous Soros-controlled deals, was named as Debtor's (Conseco's) Financial Advisor.

14.     On December 18, 2002, Conseco issued a press release, stating, among other things, that "[i]n conjunction with the Chapter 11 filing and as required under Section 363 of the Bankruptcy Code, Conseco Finance Corp will file a motion seeking to establish bidding procedures for an auction that will allow other qualified bidders to submit higher and better offers to purchase the company's assets."

15.     Just prior to its bankruptcy filing, Conseco announced in October 2002 that it had hired Lazard to find buyers for certain of Conseco's assets.

16.     Prior to the Bankruptcy filing on December 17, 2002, the law firm of Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank") became involved in negotiations with Conseco on behalf

of an Ad Hoc committee of Conseco note holders. Subsequently, Fried Frank was appointed by the U.S. Trustee as legal advisor to represent Conseco creditors.[1]

17.     On March 3, 2003, Conseco filed its First Amended Joint Plan and Disclosure Statement, in Bankruptcy Court, stating that it intended to sell their interest in the GM building as part of the Plan.

18.     On or about March 18, 2003, the Debtors (Conseco) sought the Bankruptcy Court's authority to employ Eastdil as exclusive real estate agent for the marketing and potential sale of the 767 Fifth Avenue (the GM Building). Despite the fact that Eastdil had a prior relationship with Trump 767, the fee owner of the Property, and had been retained by Trump to actively market the Property in May 2000, Eastdil contended that this prior relationship did not prohibit Eastdil's current representation of Conseco.

19.     Conseco further represented to the Bankruptcy Court that it would conduct an auction to sell the GM Building since "its monetization [sale] presents a unique opportunity to provide capital."

20.     On April 23, 2003, Conseco withdrew its application to employ Eastdil as a Realtor while, at the same time, failing to disclose to the Bankruptcy Court that it intended for Eastdil to continue to play a key role in the transaction. As discussed in greater detail below, Eastdil was instrumental in the bid-rigging conspiracy, and orchestrated an unauthorized and fraudulent "bidding" process that bore little if any relationship to the auction process described in Bankruptcy Court filings.

---

[1] Fried Frank, which represents the Macklowe Defendants in this action, and in the purchase of the GM Building, also represented Soros Fund Management in litigation matters during 2003-2004. It also represented Deutsche Bank (which provided debt financing for the GM Building), and Vornado Realty Trust (which provided mezzanine financing for the Macklowe Defendants acquisition of the GM Building).

21.     Indeed, when Conseco finally announced on September 26, 2003 that the GM Building being sold for $1.4 billion, it admitted that, despite the absence of Bankruptcy Court approval, "Eastdil was the exclusive real estate advisor."

**Plaintiffs' Are the Highest Bidders for the GM Building**

22.     On March 6, 2002, Plaintiffs wrote a letter to Mr. Gary C. Wendt, Chairman and CEO of defendant Conseco, advising that they represented a private group of foreign investors and that they intended to purchase Conseco's interest in the Building. According to news articles at the time, Conseco's total interest in the Building was worth approximately $ 500 Million.

23.     Plaintiffs followed up with a letter dated March 14, 2002, offering to purchase Conseco's interest in the building for up to $500 Million, which with the assumption of the $700 million mortgage debt held by Lehman Brothers, brought the gross purchase price to $1.2 billion.

24.     On March 21, 2002, Plaintiffs received a response to their March 14th letter from Gary C. Wendt of Conseco, stating that "it is unlikely that [Conseco] will find your proposal acceptable in that we do intend to utilize an open auction once we have achieved control of the situation".

25.     Approximately two weeks later, Plaintiffs discussed the bid process with defendant Chuck Cremens ("Cremens") of Conseco, who confirmed Conseco's purported intention of obtaining the highest price possible through an "open bid policy" once the pending litigation with Trump regarding the Building was completed. However, Cremens refused to give Plaintiffs even the basic financial information on the Building.

26.     At no time did Wendt, Cremens or anyone else affiliated with Conseco advise Plaintiffs that Conseco would consider any factor other than price in determining the party to whom the Building would be sold.

27.     Upon information and belief, Conseco and the other defendants at the time secretly intended that factors other than price would be considered in determining the purchaser for the Building, and conspired to manipulate and fix the "bidding" process so that their designees, the Macklowe Defendants, would obtain title to the Building, even though the Macklowe Defendants' bid was more than $100 million less than Plaintiffs' $1.5 billion bid.

28.     Thereafter, in reliance on Conseco's statements that the Building would go to the highest bidder, Plaintiffs invested significant time and expense in marshaling investors, including Al Wahlid, in an effort to submit the winning bid.

29.     In July of 2002, Plaintiff Leslie Dick spoke to an associate of Thomas Lee Partners, a secured creditor of Conseco, who stated that Plaintiffs should send their offer directly to Dan Murphy, Senior V.P. of Conseco. As instructed, Plaintiffs forwarded their Letter of Intent under a cover letter dated August 1, 2002.

30.     Shortly thereafter, Plaintiff Leslie Dick spoke to Dan Murphy, who confirmed that Plaintiffs' letter of intent would be given "serious consideration" by Conseco once the litigation with Trump was finalized.

31.     In approximately May of 2003, Plaintiffs learned from a newspaper article that Conseco was planning to retain defendant Wayne L. Maggin of Eastdil to handle the sale of Conseco's interest in the Building.

32.     In June 2003, Plaintiff Leslie Dick met with defendant Maggin and Jon B. Schneiderman, also of Eastdil, to discuss Plaintiffs' Letter of Intent.

33.     Maggin and Schneiderman falsely confirmed what Conseco had previously misrepresented to Plaintiffs, namely, that Eastdil planned to hold an "open auction" for the Building, and that the Building would be sold to the "highest bidder." At this meeting, Maggins and

8

Schneiderman failed to disclose to Plaintiffs that Eastdil had never actually been employed by Conseco as a Realtor for the sale of the Building, and that Eastdil had not been approved by the Bankruptcy Court to handle the sale.

34.     Upon information and belief, Eastdil knew at the time of this conversation with Plaintiffs that the auction would not be "open," and that the defendants were conspiring to rig and fix the bidding process so that the Building would be nominally sold to the Macklowe Defendants, while in fact being controlled by the Soros Defendants.

35.     Despite the June 2003 meeting with Eastdil, and despite Plaintiffs' two prior offers to purchase the Building, Plaintiffs were not informed by Eastdil or anyone else that a sham "auction" was being held at the law offices of Kirkland & Ellis, Conseco's counsel, on June 2, 2003.

36.     After speaking to Maggin and Schneiderman, Plaintiffs continued their efforts, at significant time and expense, to raise the money necessary for what they correctly believed would be the highest bid for the Building.

37.     On June 16, 2003, Plaintiffs were advised for the first time at a meeting with Conseco representatives that Conseco was subject to the U.S. Bankruptcy Court for the Northern District of Illinois and that the Bankruptcy Court would have to approve any sale transaction relating to the Building.

38.     On June 23, 2003, Plaintiffs made and Acquisition Proposal to Carmel Fifth, LLC c/o Wayne L. Maggin, with a proposed purchase price of $1.25 billion, no due diligence required, and a $25 million deposit upon signing of the Purchase Agreement. The offer was rejected by Maggin, who stated that Conseco was "committed" to an "open auction."

39.     On July 15, 2003, Plaintiffs received a fax letter from Defendant Maggin of Eastdil, which including a "Broker and Registered Potential Purchaser Confidentiality and Registration

Agreement." Upon receipt of the July 15, 2003 Agreement, Plaintiffs informed Eastdil that they had

sent the wrong version of the Agreement, whereupon on July 16, 2003 Eastdil sent Plaintiffs a

document mistitled, "Principal Confidentiality Statement."

40.      The cover letter of said "Principal Confidentiality Statement" falsely represented that

"Eastdil has been retained by 767 Fifth Avenue, LLC ("the Owner"), a bankruptcy remote subsidiary

of Conseco, Inc., with respect to the sale of its 100% fee simple ownership" in the GM Building. At

no time did Eastdil disclose that it did not have authority to sell the Building, or that neither Conseco

nor any of its subsidiaries had complete ownership in the Building as of that date (July 16, 2003).

41.      Further, the "Principal Confidentiality Statement" was false and misleading in that it

contained certain language having nothing to do with "confidentiality." Rather, the defendants,

knowing that the bid process had already been pre-rigged, and that such rigging had not been

disclosed to Plaintiffs or any other legitimate bidders, inserted a clause into the "Principal

Confidentiality Statement" to the effect that "the owner expressly reserves the right at its sole

discretion to terminate, at any time with or without notice and without liability, any discussions with

a party regarding a possible sale of the property." Unaware at the time that the defendants were not

acting in good faith, that the "winning bidder" had already been pre-determined, and that the

defendants had already secretly agreed not to consider either Plaintiffs' bid or that of any other

legitimate bidder, the Plaintiffs signed the "Confidentiality Statement" and faxed it back to Eastdil.

42.      Plaintiffs were "accepted" by Eastdil to bid on the Building, and on or about July 17,

2003, Plaintiffs received a letter from Jon B. Schneiderman of Eastdil, enclosing the "confidential

Offering Memorandum" for the Building. Plaintiffs were unaware at the time that defendants' sole

intention in sending them these documents was to induce Plaintiffs to submit a bid, which would

give the bidding process the appearance of legitimacy.

43. The Offering Memorandum prepared by Eastdil describes the GM Building as "New York City's signature trophy office property" and "one of the most recognizable landmarks of the Manhattan skyline, and the world."

44. On or about July 22, 2003, Plaintiffs received a letter from Eastdil outlining the requirements which were to be submitted with the initial acquisition proposals due to be submitted on Monday, August 11, 2003, prior to 6:00 pm.

45. On August 11, 2003, Plaintiffs delivered their Initial Bid and Acquisition proposal to Eastdil, setting forth all the requisite information necessary to participate in the bid process. The proposal was for a $ 1.4 Billion, all cash purchase price, plus payment of the mortgage transfer tax (4% for N.Y. State), bringing the total bid to $1.456 billion.

46. After Plaintiffs submitted their first bid proposal, Plaintiffs were informed by one of their financing agents that certain of the defendants were attempting to interfere with their sources of financing. Plaintiffs later learned that, in fact, Soros had used his Citibank connections to contact Al Wahlid and to try to persuade him and other Saudi investors to withdraw from participation in the financing of Plaintiffs' acquisition of the GM Building.

47. Shortly thereafter, Defendant Maggin telephoned Plaintiffs to advise that there would be a second round of bidding from bidders selected from the first round of bidders, but that Conseco was "not interested" in Plaintiffs' bid because it included "foreign investors," and that all the other bidders had U.S. sources of financing.

48. Plaintiffs complained that Conseco and Eastdil had previously represented that the Building was to be sold to the bidder who bid the highest price, and that Plaintiffs were never before told that the source of their financing would be an issue.

11

49.     Upon information and belief, Plaintiffs had submitted the highest bid for the Building among all the other bidders who participated in the auction, although defendant Maggin refused to inform Plaintiffs whether or not they had been the highest bidder in the first round. Nor did Maggin tell Plaintiffs that the "winner" of the "bidding" process had already been pre-determined.

50.     Notwithstanding Maggin's statement that Conseco was "not interested" in Plaintiff's bid, Plaintiff Leslie Dick insisted that Plaintiffs be permitted to participate in the Second Bid if they were among the highest bidders from the First Round, implying that Plaintiffs intended to protect their legal rights in court if necessary if they were excluded from the Second Round.

51.     On or about August 13, 2003, Plaintiffs received a letter from Eastdil stating that they could submit a "final acquisition proposal" on August 27, 2003, before 5:00 pm.

52.     On August 27, 2003, Plaintiffs had a Second Bid of $ 1.5 billion delivered to Eastdil, which included (a) an all cash purchase price of $1.5 billion, (b) no due diligence required, (c) a guarantee of a closing within 30 days of contract signing; and (d) a deposit of $50 million upon execution of the contract.

53.     On or about August 29, 2003, when Plaintiff Leslie Dick telephoned defendant Maggin to find out who won the Second Round of bidding, Maggin indicated that Plaintiffs were not the winner, but refused to divulge the amount of the winning bid, or the identity of the winning bidder.

54.     On or about August 30, 2003, a news article in the New York Times disclosed that defendant Harry Macklowe was the bid winner, that Macklowe's bid "was distinguished from all other bids" because he was willing to commit $50 million.

55.     Upon information and belief, the bid submitted by Macklowe was less than Plaintiffs' bid, and Plaintiffs' bid was superior to Macklowe's bid in every material respect. Moreover, the

12

commitment to make a deposit of $50 million upon contract signing had been included in Plaintiffs' Second Round bid.

56.     On September 30, 2003, Peter Slatin (The Slatin Report) wrote an article disclosing that the Soros Defendants had taken an equity interest in the transaction of $350 Million (including the $50 Million deposit made by Macklowe), essentially making Soros the real purchaser of the Building. In addition, the article disclosed Vorando Realty Trust had acquired the mezzanine debt, valued at close to $250 Million.

57.     Other Soros-related companies were also identified in a Chicago Tribune article published on October 28, 2004, entitled, "Big Names Back Trump Tower; Soros, Deutsche Bank said to be in on 90 Story Building." The following participants in the purchase of the GM building were identified:

- Grove Capital LLP, which, upon information and belief, manages most of the $13 billion Soros Fund Management.
- Fortress Investment Group, LLC, which, upon information and belief, provided $160 million in financing, and is partially owned (50%) by Mapeley Holdings Ltd., another Soros-controlled company.

58.     Upon information and belief, the acceptance of Macklowe's bid as the winning bidder was improper in that, among other things: (a) Macklowe did not participate in the first bid in a timely manner, since his bid was submitted after 6:00 pm and was only for $ 1.365 Billion; (b) Sheldon Solow and Plaintiff both submitted higher bids in the Second Round than Macklowe (Solow Building Corp. submitted a bid for $1.4 billion, and Plaintiffs' bid was for $1.5 billion) and both were submitted in a timely fashion; (c) Eastdil improperly disclosed to Macklowe on the night that the Second Bids were submitted that Solow's bid was $1.4 billion, and improperly gave Macklowe a

13

chance to increase his bid in order to match Solow's $1.4 billion second highest bid, whereupon he was declared the "winning bidder".

## Post-Bidding Events

59.     Subsequent to the Second and Final Bid of August 27, 2003 and the closing of September 26, 2003, Plaintiffs were approached by an attorney and close associate of the Macklowe Defendants, who proposed that Plaintiffs receive a ten percent (10%) interest in the GM Building if the Plaintiffs did not litigate or otherwise "interfere" with the closing on the Building.

60.     Plaintiffs were also approached by a representative of Marsh and McClellan, who confirmed that (a) Soros had, indeed, masterminded the bid-rigging scheme for the GM Building, (b) that there was no way that the defendants would permit non-New Yorkers, such as Plaintiffs, to purchase the GM Building; and (c) that if Plaintiffs persisted in their attempts to uncover the bid-rigging scheme, they would be blackballed from any deal of consequence in the New York market.

## The Solow Lawsuit

61.     On or about September 12, 2003, Solow Building Corporation ("Solow") filed a complaint in the Chancery Court of Delaware against Carmel Fifth, LLC and various Conseco entities for breach of the duty to hold a fair auction, fraud and promissory estoppel. Solow also sought injunctive relief, which was denied, but the Delaware court ruled that the three causes of action could proceed to trial. The case was eventually dismissed by Solow itself on or about October 9, 2003.

62.     In the Solow lawsuit, Conseco failed to inform the Delaware court that, inter alia; (a) Conseco had represented to Plaintiff Leslie Dick by letter of March 21, 2002 that an "open auction" process would be utilized, (b) that a sham auction had been held on June 2, 2003 at the offices of Kirkland & Ellis, Debtor's law firm, or (c) that Eastdil had been retained by Conseco as an advisor,

14

not as a Realtor, and had been granted no authority by the Bankruptcy Court to sell any of the Debtor's assets, including the GM Building.

63.     Moreover, in Defendants' Memorandum In Opposition to Plaintiff's Motion for Preliminary Injunction (page 9, ¶2) the Defendants in the Solow lawsuit falsely represented that "a "$1.5 billion offer (including a $50 million refundable deposit) from LD International, an organization [that] could not be confirmed by Eastdil." In truth and in fact, Plaintiffs' bid was made by Leslie Dick Worldwide Ltd. (not "LD International"), and nowhere in Plaintiffs' offer does it represent that the deposit would be "refundable."

64.     Conseco and the other defendants in the Solow lawsuit further represented by affidavits submitted to the Delaware court that "the GM Building is critical to Conseco's post-reorganization success," when in fact Conseco had already represented to the Bankruptcy Court in Chicago that "the property is not essential to Conseco's opertions...."

65.     It was further not revealed to the Delaware court that the Macklowe Defendants did not have any written financing agreement in place more than three weeks after the "Macklowe bid" was accepted; that Donald J. Trump was still a partner in the Building, or that the Soros-arranged financing was not disclosed until one week before the September 26, 2003 closing.

66.     It was further misrepresented in Defendants opposition to the Solow lawsuit that the Macklowe Defendants had made a $1.38 billion Second Bid on August 27, 2003 "with $50 million hard money," when in truth and in fact, the Macklowe Defendants did not offer a $50 million hard money proposal on August 27, 2003, but only did so the following day (August 28th) after being tipped-off by the Conseco and Eastdil Defendants that they would have to match Solow's $50 million hard money offer in order to keep their fraudulent bid-rigging scheme from being disclosed.

15

**The Value of the GM Building**

67.     The GM Building was purchased in 1998 for $814.6 million by Trump and Conseco,

and sold for $1.4 billion in September 2003, for an increase in value of approximately $585 million,

or approximately $117 million per year. The purchase of the Building by the Macklowe Defendants

(as the frontmen for the Soros Defendants) for $1.45 billion (total cost) as of January 10, 2005 (with

an appraised value of $1.7 billion) represents an increase of $125 million per year for the two year

period.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Fraud and Aiding and Abetting Fraud)

68.     Plaintiffs restate and reiterate the foregoing allegations of the Complaint as if fully set

forth herein.

69.     The entire bidding and contract award process engaged in by the defendants was

improper, unlawful and permeated with fraud.

70.     Upon information and belief, defendants entered into a scheme and artifice to defraud

by designing a "Bid and Acquisition" procedure that gave the appearance of an impartial "open bid"

system when, in truth and in fact, it was a total sham with the outcome fixed and predetermined.

Defendants never intended to award the contract of sale to anyone other than the Macklowe

defendants, as nominees of the Soros Defendants, no matter who was the highest bidder.

71.     The Conseco Defendants and the Eastdil Defendants, individually and collectively on

behalf of themselves and on behalf of all other defendants, misrepresented to Plaintiffs that the

Building would be sold to the highest bidder in an "open auction."

72.     Defendants' misrepresentations were made knowingly, falsely and/or in reckless

disregard of the truth.

16

73.    Despite the fact that Plaintiffs were the highest bidder on both the First and Second Rounds of bidding, held respectively on August 11, 2003 and August 27, 2003, defendants improperly disclosed to the Macklowe Defendants the specifics of Plaintiffs bid and the other bids submitted on August 27th, and improperly permitted the Macklowe Defendants to resubmit their bid after the announced closing of the time period for submission (August 27th at 6 P.M.).

74.    Plaintiffs relied to their detriment upon misrepresentations by the Defendants and the that the bidding process would be fair and impartial and had a reasonable expectation that the contract would be awarded to the highest bidder. Among other things, Plaintiff relied on defendants' statements and representations by investing significant time and expense in raising the necessary capital to bid on the Building, including the solicitation and obtaining of commitments from foreign investors.

75.    By wrongfully obtaining information about Plaintiffs' bid from the Conseco Defendants Eastdil, the Macklowe Defendants, on behalf of themselves and the Soros Defendants, aided and abetted the efforts of the Conseco and Eastdil Defendants to prevent Plaintiffs from acquiring the Building.

76.    Plaintiffs seek to recover damages resulting from defendants' fraudulent conduct in an amount to be determined at trial, but in no event less than $750 million.

77.    Defendants' wanton, reckless and egregious conduct also entitles Plaintiffs to an award of punitive damages in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Declaratory Judgment)

78.    Plaintiffs restate and reiterate the foregoing allegations of the Complaint as if fully set forth herein.

17

79.     Plaintiffs seek an order declaring that the bidding process engaged in by defendants was a fraud and a sham; that the award of the contract to the Macklowe Defendants should be declared as null and void; and that a Special Master be appointed to oversee and supervise a transfer of title to the Building to Plaintiffs, with the difference of the $100 million between Plaintiffs' bid and that of the Macklowe Defendants going to Conseco's creditors.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Promissory Estoppel)

80.     Plaintiffs restate and reiterate the foregoing allegations of the Complaint as if fully set forth herein.

81.     Defendants breached their promise to conduct the bidding process fairly and equitably, and plaintiffs relied upon defendants' false promises and representations, to their detriment.

82.     Plaintiffs were injured as a result of defendant's breach, and whose nonperformance was unconscionable, in an amount to be determined at trial, but in no event less than $750 million..

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Promissory Estoppel Against the Conseco Defendants and the Eastdil Defendants)

83.     Plaintiffs restate and reiterate the foregoing allegations of the Complaint as if fully set forth herein.

84.     This claim is brought against the Conseco Defendants and the Eastdil Defendants only.

85.     Plaintiffs were clearly and unambiguously advised by the Conseco Defendants and the Eastdil Defendants that the Building would go to the high bidder without regard to any other factor.

86.     In detrimental reliance on these statements by the Conseco Defendants and the Eastdil Defendants, Plaintiffs incurred time and money to assemble their bid for the Building.

18

87.     The Conseco and Eastdil Defendants are liable to Plaintiffs for damages suffered equal to the amounts Plaintiffs incurred in raising capital to bid on the Building, and other expenses incurred during the course of the bidding process, in an amount to be determined at trial.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Interference with Prospective Business Advantage Against the**
**Macklowe, Eastdil and Soros Defendants)**

88.     Plaintiffs restate and reiterate the foregoing allegations of the Complaint as if fully set forth herein.

89.     This claim is brought against the Macklowe Defendants, the Eastdil Defendants and the Soros Defendants only.

90.     At the time Plaintiffs were preparing to submit their bid for the Building, they were told that the Building would be sold via an "open" auction.

91.     When Plaintiffs submitted the high bid in both the first and second rounds of bidding for the Building, they had a reasonable expectation that they would be awarded the right to purchase the Building, obtaining the inherent and unique benefit thereof.

92.     After the bidding was closed, the Macklowe Defendants unfairly and improperly obtained the terms of plaintiffs' bid, which was supposed to have been submitted under seal, in order to submit a comparable bid that was lower than Plaintiffs' bid, but equivalent to the second highest (Solow) bid.

93.     The Eastdil Defendants improperly allowed the Macklowe Defendants to submit a late bid, which was deemed "accepted" as part of the defendants' bid-rigging.

94.     At the time the Macklowe Defendants made their late bid, the Macklowe Defendants and the Eastdil Defendants were aware that Plaintiffs were prepared to execute a formal written agreement for the transfer of Conseco's interest in the Building.

19

95.     As a result of defendants' interference with, and manipulation of, the bidding process, defendants substantially interfered with Plaintiffs' prospective business advantage.

96.     As a result of said interference, Plaintiff suffered damages in an amount to be determined at trial, but in no event less than $750 million.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**(Constructive Trust)**

97.     Plaintiffs restate and reiterate the foregoing allegations of the complaint as if fully set forth herein.

98.     Defendants prevented Plaintiffs from legally acquiring the property through their fraudulent bid-rigging scheme.

99.     Plaintiffs have suffered financial losses and damages caused by Defendants illegal acquisition and current illegal ownership of the GM Building

100.    Defendants' ownership interests in the GM Building should be subject to a Constructive Trust, pending a final order or Judgment by this Court on behalf of Plaintiffs.

**Demand for Jury Trial**

101.    Plaintiffs demand a trial by jury on all claims and issues so triable.

WHEREFORE, plaintiffs demand judgment against the defendants as follows:

      (a)     On Plaintiffs' First Cause of Action for Fraud and Aiding and Abetting Fraud, compensatory and punitive damages in an amount to be determined at trial, but in no event less than $750 million;

20

(b)     On Plaintiffs' Second Cause of Action, a Declaratory Judgment that the bidding process engaged in by defendants was improper, unlawful and fraudulent;

(d)     On Plaintiffs' Third and Fourth Causes of Action for Promissory Estoppel, compensatory and punitive damages in an amount to be determined at trial, but in no event less than $750 million;

(e)     On Plaintiffs' Fifth Cause of Action for Interference with Prospective Business Advantage, compensatory and punitive damages in an amount to be determined at trial, but in no event less than $750 million;

(f)     On Plaintiffs' Sixth Cause of Action, for an Order imposing a Constructive Trust;

(g)     On all Causes of Action, cost and expenses, including reasonable attorneys' fees; and

(h)     For such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       May 30, 2006

McCALLION & ASSOCIATES LLP

By: _____
    Kenneth F. McCallion
    24 West 40th Street
    New York, New York 10018
    646-366-0880
    Attorneys for Plaintiffs

21

## INDIVIDUAL VERIFICATION

STATE OF NEW YORK    )

COUNTY OF NEW-YORK  )


      LESLIE DICK, being duly sworn, depose and say:

      That deponent is the plaintiff in the within action; and deponent has read the

foregoing Verified Amended Complaint and knows the contents thereof; that the same is

true except as to those matters therein stated to be alleged upon information and belief,

and as to those matters, deponent believes them to be true.

                                 LESLIE DICK

SWORN TO BEFORE ME THIS

30th DAY OF MAY, 2006

---

NOTARY PUBLIC, State of New York

KENNETH F McCALLION
Notary Public, State of New York
No. 02MC4951204
Qualified in New York County
Commission Expires July 16, 2007

22