# Exhibit B

**Law Offices of**
**DAVID H. RELKIN**
**David H. Relkin, Esq. (DHR-1049)**
**575 Eighth Avenue**
**Suite 1706**
**New York, New York 10018**
**212-244-8722**

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **LESLIE DICK WORLDWIDE, LTD. and LESLIE DICK,**<br>*Plaintiffs,*<br>-against-<br>**GEORGE SOROS, SOROS FUND MANAGEMENT LLC, FIG, LLC, VORNADO REALTY TRUST, GERMAN AMERICAN CAPITAL CORP., EASTDIL SECURED, LLC, HARRY MACKLOWE, CONSECO, INC., KIRKLAND & ELLIS, LLP, DONALD J. TRUMP, and John Does "1" through "10,"**<br>*Defendants.* | Case No.<br>**08 CIV. 7900 (BSJ)(THK)ECF**<br><br>**AMENDED RICO COMPLAINT**<br>**[corrected]**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Leslie Dick Worldwide, Ltd. and Leslie Dick, by their attorneys, The Law Offices of David H. Relkin, Esq., as and for their Amended Complaint herein, allege as follows:

## I. NATURE OF ACTION

1. In this action plaintiffs seek to recover damages proximately caused by an ongoing, RICO Enterprise involving the transfer of monies in interstate and international commerce in which defendants conducted their business by engaging in a pattern of racketeering by means of money laundering to conceal the illegal origin, nature and source of such funds.

2. This complaint describes the defendants' infiltration of the Conseco, Inc.'s Bankruptcy proceedings by means of illicit conspiracies and Bankruptcy Fraud so that the RICO Enterprise could launder money to acquire the most valuable assets of Conseco, Inc.

3. Specifically, the RICO Enterprise disguised their money laundering activities by employing ephemeral shell entities and conspirators to acquire assets of Conseco by making invisible investments, some of which they disguised as "loans," and then compensated their conspirators by allowing them to appear to legitimately participate in such acquisitions for their profit and then dissolved the shell entities to hide their unlawful conduct.

4. The bogus "loans" and other money transfers and the invisible acquisition of the assets and property of Conseco, Inc. involved interstate and international commerce and fraudulent conduct designed to conceal the origin of the funds derived from illegal sources and to derive profit therefrom.

5. Defendants committed the aforesaid crimes, together with others who were aware of, and acted in furtherance of, and participated in one another's actions in a sophisticated scheme to engage in money laundering in the Conseco, Inc. Bankruptcy proceedings to acquire assets of Conseco, Inc. for profit to the detriment of plaintiffs and numerous other third parties.

6. The modus operandi of the RICO Enterprise involved creating shell entities through which to launder money, pay off the conspirators with business opportunities and assets and then dissolve these ephemeral shell entities to conceal the unlawful purposes and acquisitions of the Enterprise, as they did in connection with the acquisition of Conseco, Inc. property.

7. The RICO Enterprise was an association in fact of the defendants to invest in, operate, and acquire control of Conseco, Inc.'s prime assets, the General Motors Building and Conseco Finance Corporation through unlawful means, including but not limited to Money Laundering, Bankruptcy Fraud and Wire Fraud violations, and thereafter actively concealed their illicit activities, which illicit activities are continuing in nature and will not be stopped without this Court's intervention.

8. As a result of the illegal activities of the defendants alleged in this complaint, defendants proximately caused substantial damages to the property and business of plaintiffs and many others.

## II. THE RELEVANT STATUTES

9. The relevant statutes involved in this action involve:

A. The Racketeering Influenced and Corrupt Organizations Act, 18 USC §§1961—1968 ("RICO"), involving the predicate acts of :

i. Money Laundering, 18 USC §§1956 and 1957; and

ii. Bankruptcy Fraud, 18 USC §152 (1), (2), (3) and (9);

iii. Wire Fraud, 18 U.S.C. §1343; and

iv. Wire Fraud, 18 U.S.C. §1952 (a) (3).

B. Violation of 18 USC §2 (a), (b) and 18 USC §371.

10. Due to the extraordinary sophistication of defendants' surreptitious and conspiratorial conduct of racketeering and their active concealment thereof, plaintiffs expect to expose additional defendants, information, statutory violations and illicit conduct during the pre-trial discovery in this action.

## III. JURISDICTION AND VENUE

11. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § § 1331 and 1957, because plaintiffs bring claims under the federal statutes referred to herein.

12. Venue is proper in this District pursuant to the provisions of 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b), (2) since this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of

property that is the subject of the action is situated, and (3) this is a judicial district in which all the defendant are present.

## IV. THE RICO ENTERPRISE

13. This action arises out of a criminal conspiracy, plan and scheme by and among some of New York's most powerful real estate moguls, including George Soros, Fortress Investment Group, LLC, now known as FIG, LLC and Donald J. Trump, involving numerous other conspirators, and who fraudulently and unlawfully operated a vast, multi-billion dollar criminal RICO enterprise through a pattern of racketeering involving money laundering, bankruptcy fraud and wire fraud for profit.

14. As Conseco's financial troubles surfaced, George Soros, in mid-2002, the leader and mastermind of the RICO Enterprise described herein, saw the opportunity to manipulate and gain control of the Conseco, Inc. Bankruptcy.

15. In conspiracy with, and with the unlawful assistance and participation of Conseco, Inc., Conseco, Inc.'s attorneys, Kirkland & Ellis, LLP, Eastdil Secured, LLC, Harry Macklowe, German American Capital Corp. and Vornado Realty Trust, the defendants conspired and conceived a criminal enterprise, plan and scheme to acquire prime assets of Conseco, Inc. and to reap enormous profits by acquiring Conseco Finance Corp. and the General Motors Building by means of invisibly laundering money through Conseco, Inc. for profit.

16. The goal of the RICO Enterprise was to commit Money Laundering to acquire these assets and property, including the General Motors Building, which was purchased by Harry Macklowe in name only.

17. Thereafter the RICO defendants continued to launder the proceeds from the sale of the General Motors Building into Donald J. Trump's real estate venture in Chicago, the Trump International Hotel & Tower, Chicago.

18. This criminal enterprise succeeded in distributing huge sums of money and property to the RICO defendants who conspired in executing the pattern of racketeering of the RICO Enterprise.

19. These unlawful profits derived by the enterprise were to be realized through the defrauding of creditors Conseco, Inc.'s Bankruptcy Estate and conspiratorially masterminding a fraudulent and pre-determined auction to obtain ownership of one of the world's most prized pieces of real estate, the General Motors Building by means of money laundering.

20. The RICO Defendants of this vast and far reaching RICO Enterprise set their sights not only on the aforementioned results, but also brazenly set out to launder funds derived from illegal sources while fraudulently misrepresenting material facts to the United States Bankruptcy Court overseeing the Conseco, Inc. Bankruptcy through a series of staged legal battles, behind the scenes agreements, and smoke and mirrors designed to camouflage the crimes being committed right under the nose of the Bankruptcy Court, the legitimate bidders for the General Motors Building and the creditors of Conseco, Inc.

21. The RICO defendants regularly, routinely and repeatedly employ this illegal and fraudulent pattern of racketeering activity to advance their criminal goals while injuring innocent, unsuspecting victims.

22. The defendants are each engaged in activities and conduct that affect federal interstate and foreign commerce. The defendants are each a "person," as that term is defined pursuant to § 1961(3) of RICO.

23. Plaintiffs allege that each and every defendant is liable as a principal pursuant to 18 U.S.C. §§ 2(a)-(b) and that each and every defendant is liable as a co-conspirator pursuant to 18 U.S.C. § 371.

24. Plaintiffs further allege that the acts, conduct, activities, and/or omissions committed by any one defendant are attributable to all of the other defendants.

25. Plaintiffs allege that at all times material herein, the activities, conduct, and/or omissions committed and/or engaged in by the defendants herein give rise to this action being instituted within this federal district court inasmuch as plaintiffs are citizens of the City and State of New York, and the events that give rise to the illegal activities under RICO are predicated under the RICO co-conspiracy theory of venue and co-conspiracy theory of personal jurisdiction, by and through employment of instrumentalities of federal interstate commerce.

26. Plaintiffs further allege that the defendants, each of whom are engaged in business activities within the City and State of New York, engaged in continuous, concerted, and systematic activities against plaintiffs within this district, proximately

causing reasonably foreseeable and proximate injury to plaintiffs' respective interests in their business and property, pursuant to RICO § 1964 (a), (b), (c) and (d).

## V. SUMMARY OF FACTS

27. From on or about June 20, 2002, prior to the voluntary Bankruptcy filing by Conseco, Inc. ("Conseco") on December 17, 2002, Lazard Freres & Co., Inc. ("Lazard") was retained by Conseco to act as its financial advisor. During this period, defendant Soros, and the other conspirators, conceived of a plan to acquire the prime assets of Conseco, including Conseco Finance Corp. ("Conseco Finance"), at less than fair value, and the General Motors Building (the "GM Building"), through Bankruptcy Fraud and money laundering, with funds that derived from Mapeley, Ltd., a Bermuda corporation which is a partnership between George Soros and/or one of the Fortress entities and their principals ("Mapeley") and/or Quantum Fund, N.V. ("Quantum") from illegal activities in order to conceal the origin and nature of such funds.

28. In order to achieve these illegal goals, from on or about June 20, 2002 through September 25, 2003, defendants George Soros, Soros Fund Management, LLC ("SFM"), Fortress Investment Group, LLC, now known as FIG, LLC, or one of its affiliates, ("Fortress"), Vornado Realty Trust ("Vornado"), German American Capital Corp. ("German American"), Conseco, Harry Macklowe, Eastdil Secured, LLC ("Eastdil"), Donald J. Trump, and Kirkland & Ellis, LLP ("Kirkland & Ellis") and other third parties, including but not limited to Mapeley and Quantum, each agreed to, and did conspire with each other to conduct and participate in a pattern of racketeering activity

involved in acquiring the Conseco assets in order to illegally launder money through such transactions and for profit.

29. In order to acquire Conseco Finance, Fortress, J.C. Flowers & Co., Inc. and Cerberus Capital Management, LP formed CFN Investment Holdings, LLC ("CFN") on July 11, 2002 and applied for and was granted authority to do business in the State of New York on August 15, 2002.

30. With proprietary information concerning the valuation of Conseco Finance provided by Conseco and Lazard to CFN, the defendants conspired to enter into an agreement with Conseco, dated December 16, 2002, to acquire the valuable assets of Conseco Finance for less than fair value.[1]

31. In furtherance of the pattern of racketeering activity of the RICO Enterprise, despite numerous attempts by potential third party bidders to attempt to ascertain the nature and value of the Conseco Finance assets being purchased by CFN, CFN, Conseco and Kirkland & Ellis conspired and participated in an agreement to refuse to reveal this essential information to the Bankruptcy Court, the creditors of Conseco and the other potential bidders for Conseco Finance, and did repeatedly do so.

32. As a consequence, due to false, misleading and repeatedly fraudulent statements made by CFN, Kirkland & Ellis and Conseco to the Bankruptcy Court, as further elaborated herein, the creditors of Conseco and the potential bidders for Conseco Finance regarding the assets CFN was purchasing, CFN, after signing a confidentiality

[1] This was one day prior to when Conseco filed its voluntary Petition for Bankruptcy.

agreement with Conseco, was able to acquire Conseco Finance to the detriment of the creditors of Conseco, for a fraction of its reasonable and fair value.

33. Upon information and belief, the source of the funds CFN paid for Conseco Finance derived from Soros, SFM, Mapeley, and/or Quantum, and were proceeds of illegal activities and defendants concealed the origin and nature of such unlawful funds in furtherance of the RICO Enterprise.

34. In tandem with the goal of purchasing Conseco Finance by means of criminal money laundering, Soros, Fortress, and other parties concealed by defendants, formed FPS DIP, LLC ("FPS"), "an affiliate of CFN," to act as Conseco's debtor-in-possession financier in order to launder additional illegally derived funds and to conceal their nature and origin.

35. One day after Conseco filed for bankruptcy on December 17, 2002, FPS entered into a written agreement with Conseco dated December 18, 2002 (the "DIP Facility") to accomplish such financing.

36. In furtherance of the pattern of racketeering and the goals of the enterprise, the defendants also engineered a plan involving the participation and involvement of Soros, SFM, Fortress, and Trump to purchase the GM Building from Conseco in order launder funds derived from illegal activities to conceal their true origin and nature.

37. In furtherance of the goal of purchasing the GM Building by the RICO Enterprise, the defendants, including Conseco and Kirkland & Ellis falsely represented to the Bankruptcy Court and to the creditors of Conseco in Conseco's Disclosure Statements

and in other papers submitted to the Bankruptcy Court that the sale of the GM Building would produce proceeds for the Conseco creditors which were "essential to the reorganization of Conseco."

38. To conceal the pattern of racketeering involving Money Laundering through the sale of the GM Building, Conseco and Trump, in conspiracy with Kirkland & Ellis, structured and participated in a staged dispute involving vexatious litigation about the ownership of the GM Building and participated in numerous acts in furtherance of this alleged dispute in order to transfer the ownership of the GM Building to the defendants and to profit by such acquisition by removing the sale of the GM Building from the purview of the Bankruptcy Court.

39. Under the LLC agreement regarding the ownership of the GM Building, Trump would only receive approximately 15 Million Dollars if Conseco chose to sell the building, and, in fact, Trump ultimately received 275 Million Dollars for his participation in the Enterprise's pattern of racketeering of keeping the GM Building tied up in litigation until after the Conseco Bankruptcy was closed.

40. To conceal the unlawful origin the funds employed in connection with the purchase of the GM Building, within the week prior to purchasing the GM Building, in conspiracy with German American, Macklowe, Mapeley, and Quantum, Soros, Fortress and Vornado formed at least five ephemeral shell entities, which had no officers, directors or capital, in order to control the funneling of the illegally derived funds by wire fraud into the limited liability company which bought the building, 5th Avenue 58/59 Acquisition Co., LLC ("Acquisition").

41. Upon information and belief, the illegal source of the funds to purchase the GM Building were derived from entities jointly managed or controlled by Soros, SFM, Fortress, Vornado, Mapeley and/or Quantum.

42. To accomplish the scheme and theft of the GM Building in order to launder money, Soros and/or Fortress conspired to and did funnel by wire fraud 25 Million Dollars from illegal sources as a purported "loan" to the first ephemeral shell entity, Soros Credit Funding II, LLC ("Soros Credit II"), formed on or about September 23, 2003, three days before the sale of the GM Building.

43. Soros and/or Fortress then caused Soros Credit II to funnel by wire fraud this 25 Million Dollars into German American as a purported "loan."

44. Simultaneously, Vornado, or another defendant, created another ephemeral shell company named Vornado GM III, LLC ("Vornado GM"), and Soros and/or Fortress funneled by wire fraud another 25 Million Dollars from illegal sources as a purported "loan" into Vornado GM.

45. Then Soros and/or Fortress caused Soros Credit II and Vornado GM each to funnel by wire fraud 25 Million Dollars into German American, also as a purported "loan." (For Vornado's participation in this laundering scheme, the Enterprise allowed Vornado to acquire a prized piece of 250 Million Dollars of prime mezzanine debt of the GM Building which earned interest at a percentage far above the reasonable rates of interest charged for secured mezzanine financing.)

46. In furtherance of the conspiracy, German American then funneled by wire fraud the 50 Million Dollars it had received from the two shell companies created by Soros, Fortress and Vornado into another ephemeral shell company, Fifth Avenue 58/59 Mezzanine Fourth, LLC ("Mezzanine Fourth") also as a purported "loan." (In consideration therefor, and as a quid pro quo for laundering the Soros/Fortress funds to Mezzanine, the Enterprise agreed to give the 1.1 Billion Dollar mortgage on the GM Building to German American.)

47. Soros and/or Fortress then caused Mezzanine Fourth to funnel by wire fraud the 50 Million Dollars into Acquisition as "an investment."

48. While this was happening, on or about September 23, 2003, Soros and/or Fortress created another ephemeral shell entity, Soros Credit Funding I, LLC ("Soros Credit I") under the laws of New York, and funneled by wire fraud 250 Million Dollars into Soros Credit I again as a purported "loan."

49. On or about September 23, 2003, Soros and/or Fortress created another ephemeral shell entity, 5th Avenue 58/59 Junior Mezzanine, LLC ("Junior Mezzanine") under the laws of New York.

50. Upon information and belief, Soros and/or Fortress caused Soros Credit I to funnel by wire fraud the 250 Million Dollars it received from Soros and/or Fortress into Junior Mezzanine as a purported "loan."

51. Soros and/or Fortress then caused Junior Mezzanine to funnel by wire fraud such 250 Million Dollars as an "investment" into Acquisition.

52. In sum, with the knowledge, participation and in conspiracy of the other defendants, Soros and Fortress capitalized Acquisition with 300 Million Dollars derived from illegal activities or sources, to disguise and conceal the true nature and source of the funds and to make the funds appear to be those of Harry Macklowe, the purported "owner" of Acquisition.

53. Upon information and belief, the alleged "loans" from the shell entities and German American were never paid back to the alleged ephemeral "lenders."

54. In order to further conceal the source and nature of the 300 Million Dollars of capital derived from illegal activities or sources, the defendants put up Macklowe as a straw-man allegedly controlling Acquisition, the purchaser of the GM Building.

55. Conseco, Kirkland & Ellis and Eastdil conspired to and established a bidding process to make the sale of the GM Building appear legitimate.

56. To further the scheme, Conseco, Kirkland & Ellis and Eastdil issued auction procedures to mislead the bidders into believing that the ultimate purchaser of the building was yet to be decided, including the false representation that bids were closed, namely, and that no one had the advantage of knowing the bids of third parties.

57. In actual fact, these auction procedures were no more than a scam by the Enterprise since defendants had already decided that the GM Building would be purchased by defendant Macklowe, the "straw man" for the Enterprise.

58. To further the pattern of racketeering involving money laundering, Conseco, Kirkland & Ellis and Eastdil reviewed the other bids for the GM Building and

conspired with Macklowe in order to make it appear to plaintiffs, the public and third party bidders that he had won the auction.

59. In connection with the acquisition of the GM Building by defendants, Macklowe was required by his co-conspirators Conseco and Eastdil to pay a "non-refundable" 50 Million Dollar deposit as the down payment for the purchase of the Building.

60. Macklowe was also required by the terms of the auction to have "firm financing" in place to close on the building, which is financing not subject to any further conditions. Conseco, Eastdil and Macklowe all made fraudulent statements to plaintiffs and the public that Macklowe had such funding in place, which he did not.

61. Macklowe's "deposit," believed to be 50 Million Dollars, was actually refunded to Macklowe at the Closing of the sale of the GM Building and Macklowe received an additional 25,808,000.36 Dollars from the Enterprise, specifically by German American, for his participation in the racketeering activities.

62. Immediately after the sale, defendants Conseco, Macklowe, and Eastdil fraudulently represented to plaintiffs, the other bidders and to the public through news sources that Macklowe was the winner of the auction and the "purchaser of the GM Building."

63. In this connection and in furtherance of the RICO conspiracy, defendants Conseco, Eastdil and Macklowe made false and fraudulent representations to plaintiffs, the press and the third party bidders that Macklowe had firm financing, requiring no

contingencies and that his bid was "superior" to the other bidders in that it was the only bid having a non-refundable deposit.

64. In truth and fact, defendants knew these representations were false and were made in furtherance of the pattern of racketeering to conceal the true illicit source of the capital used by defendants to purchase the GM Building.

65. As of and after the closing of the sale of the GM Building to Acquisition, on September 26, 2003, the Enterprise funneled by wire fraud approximately 275 Million Dollars into a real estate development run and controlled by Trump, commonly known as Trump International Hotel and Tower, Chicago, in October, 2004.

66. Upon information and belief, the presently unknown sources of the funds, believed to be from Mapeley and/or Quantum, derive from illegal sources which conduct unlawful activities, including, but are not limited to, Narco Drug Trafficking, Black Market Arms Dealers, Prostitution slave trading and Organized Crime.

67. Upon information and belief, Mapeley and/or Quantum commingle the illegal funds into other investment funds and then funnel the commingled funds into various investments, such as Conseco Finance and the GM Building.

68. Once the money is taken out of such investments, the "clean" money which derives from such investments is distributed to affiliates of the illegal sources of such unlawful proceeds.

69. Upon information and belief, Soros and Fortress control, manage or participate in the affairs of Mapeley and/or Quantum and receive a pre-arranged fee from the sources of the illegal proceeds.

## VI. RES JUDICATA DOES NOT BAR THIS ACTION

70. The action previously commenced by plaintiffs in the Supreme Court of the State and County of New York entitled: *Leslie Dick Worldwide, Ltd. and Leslie Dick v. Macklowe Properties, Inc., Fifth Avenue 58/59 Acquisition Co., LP, Harry Macklowe, Eastdil Realty Company LLC, Benjamin V. Lambert, Wayne L. Maggin, George Soros, Soros Fund Management, LLC, Conseco, Inc., Carmel Fifth LLC, 767 Intermediate, LLC, 767 Fifth Avenue, LLC and Chuck Cremens*, Index No. 600222/06 (the "Fraudulent Bid Action") does not bar this action by the application of the legal principle of Res Judicata.

71. The Fraudulent Bid Action was based on the plaintiffs' allegations that the representations made to plaintiffs prior to the bidding process to sell the GM Building were fraudulent.

72. The Fraudulent Bid Action was dismissed based on the terms of a document plaintiffs signed which the Court found to bar any oral representations prior to the bidding process.

73. In connection with the dismissal of the Fraudulent Bid Action, the New York Supreme Court, by Justice K. Moskowitz, explicitly excluded from her jurisdiction and Decision any issues related to the Conseco Bankruptcy.

74. Res Judicata only applies when the same evidence is needed to support both claims, and when the facts essential to the second action were present in the first action. The evidence needed to support the instant action was not present in the Fraudulent Bid action.

75. Plaintiffs were unable to conduct any discovery in the Fraudulent Bid Action, and thus were not able to discover the facts alleged herein.

76. The evidence alleged and to be adduced in this action through discovery in this action were not alleged or known to plaintiffs in the Fraudulent Bid Action.

77. The acts complained of in the Fraudulent Bid Action were different, the material facts alleged herein are not the same, nor were they available to plaintiffs in the Fraudulent Bid Action, and the witnesses and documentation to establish plaintiffs' injuries herein are not the same as in the Fraudulent Bid Action.

78. The factual predicates forming the basis of the instant RICO action, and the evidence required to prove the claims in this action, namely money laundering, bankruptcy fraud and wire fraud violations are entirely different from the discrete contract and fraud issues involved in the Fraudulent Bid Action.

79. Accordingly, the instant action is not barred by the application of the principle of Res Judicata.

## VII. TOLLING AND THE STATUTE OF LIMITATIONS

80. RICO actions to recover "future injuries" may be filed by a plaintiff only within four years of when the "future injuries" become concrete and measurable.

81. Plaintiffs' injury to their business and property did not accrue until the GM Building was sold by Macklowe in 2008 because, prior to such sale, the damage to plaintiffs' business and property was "speculative."

82. Under well-established law, since plaintiffs claim for the injuries described herein were speculative until the GM Building was sold by Macklowe, the statute of limitations did not accrue until the injuries occurred upon the sale, even though the acts that caused them had taken place more than four years earlier.

83. Under the "injury discovery" rule of this and other Circuit Courts of Appeal, the statute of limitations does not accrue until plaintiffs are reasonably able to discover the essential facts necessary to file suit herein.

84. Plaintiffs had no discovery in the Fraudulent Bid Action since the complaint was dismissed for failure to state a cause of action.

85. Plaintiffs exercised due diligence to discover the actionable facts alleged in this action by analysis of subsequent transactions of the Enterprise and other information obtained from public and non-public sources.

86. Plaintiffs were unable to discover sufficient facts to allege the factual basis of their injuries caused by the Enterprise until 2008.

87. While plaintiffs suspected that they were harmed in connection with the bidding process for the purchase of the GM Building in 2003, despite reasonable efforts at discovery, they did not discover an actionable injury of their legally protected interests until 2008.

88. Since the facts constituting plaintiffs' injuries were uniquely in the hands of the defendants herein, who actively concealed such facts, no amount of plaintiffs' reasonable efforts could produce the necessary information to file suit until this action was commenced.

89. Under the "injury discovery" rule, since plaintiffs were unable despite due diligence and reasonable efforts, to discover the facts establishing and constituting plaintiffs' injury, plaintiffs were unable to file a complaint that would comply with the requirements of the Federal Rules of Civil Procedure until 2008.

90. Plaintiffs were unable, despite due diligence, to discover the facts of plaintiffs' injuries and the identities of who committed them until 2008.

91. Under the "injury discovery" rule, the time when plaintiffs were "on notice" of their "actionable injury" is a question of fact.

92. Plaintiffs' knowledge of their "actionable injury" did not surface until 2008.

93. Under principles of equitable tolling, due to the defendants' extraordinarily sophisticated course of deception and fraudulent concealment of money laundering and wire fraud, the circumstances and facts involving the injury to plaintiffs which were necessary to file this suit, as discussed further herein, were concealed from plaintiffs until 2008.

94. Defendants wrongfully concealed their acts of money laundering and bankruptcy fraud which prevented plaintiffs' discovery of the nature of the claim within the limitations period, despite their exercise of due diligence in pursuing the discovery of the claim.

95. Because the RICO conspiracy statute does not require proof of an overt act, the crime of RICO conspiracy is not complete until the purposes of the conspiracy either were accomplished or abandoned.

96. The purposes of the RICO conspiracy were not accomplished or abandoned until the money laundering activities of the Enterprise which concluded in 2008 upon the sale of the GM Building.

## VIII. PARTIES

97. Plaintiff Leslie Dick Worldwide, Ltd. ("Worldwide") is a corporation organized under the laws of the State of New York, with an office in the City and State of New York. Worldwide is in the business of real estate acquisition and was injured in its business and property by the predicate acts of the Enterprise.

98. Plaintiff Leslie Dick is the President and Chief Executive Officer of Worldwide and resides in the City and State of New York. As the Chairman of Worldwide he was injured in his business and property by the predicate acts of the Enterprise.

99. Upon information and belief, defendant George Soros is a resident of the City and State of New York and has performed unlawful activities within this district subjecting him to this Court's jurisdiction.

100. Upon information and belief, defendant SFM was at all relevant times a Delaware Limited Liability Company authorized to do business in the State of New York and has performed unlawful activities within this district subjecting it to this Court's jurisdiction.

101. Upon information and belief, Mapeley is a Bermuda corporation jointly owned and/or managed by Soros and Fortress and is likely to be identified herein as a "John Doe" defendant. The monies wired by Mapeley into the United States, and specifically into this District subject it to this Court's jurisdiction.

102. Upon information and belief, Quantum is a hedge fund chartered under the laws of the Netherlands Antilles, Curacao and is likely to be identified herein as a "John Doe" defendant. Soros is a founder and principal advisor to Quantum and, as founder, has knowledge of the identities of the investors and the source of their funds. The monies

wired by Quantum into the United States, and specifically into this District subject it to this Court's jurisdiction.

103. Upon information and belief, Conseco was a conspirator with, and/or a participant in the RICO Enterprise, and was at all relevant times an Indiana corporation authorized to do business in the State of New York.

104. Upon information and belief, Acquisition, was at all relevant times a shell company affiliated with, or under the control of defendants Soros and/or Fortress and the RICO Enterprise to facilitate laundering money by the Enterprise and the defendants, and was at all relevant times a Delaware Limited Liability Company authorized to do business under the laws of the State of New York, having an address at 875 Avenue of the Americas, New York, New York. Upon information and belief, Acquisition is likely to be identified herein as a "John Doe" defendant.

105. Upon information and belief, once the unlawful purposes for which it had been created were accomplished, namely to launder money through the purchase and sale of the GM Building, Acquisition was dissolved to cover-up such wrongdoing. (See Exhibit "A" in the accompanying Compendium of Exhibits.)

106. Upon information and belief, Junior Mezzanine was at all relevant times under the control of, an affiliate of, or under the control of defendants and the RICO Enterprise, including but not limited to, defendants George Soros, SFM and/or Fortress.

107. Upon information and belief, once the unlawful purposes for which it had been created were accomplished, namely to acquire and launder money through the purchase of the GM Building, Junior Mezzanine was dissolved in an attempt to cover-up such wrongdoing. (See Exhibit "B" in the accompanying Compendium of Exhibits.)

108. Upon information and belief, Mezzanine Fourth was at all relevant times an affiliate of, or under the control of defendants, and the RICO Enterprise including defendants George Soros, SFM and/or Fortress.

109. Upon information and belief, once the unlawful purposes for which it had been created were accomplished, namely to launder money through the purchase of the GM Building, Mezzanine Fourth was dissolved to attempt to cover-up such wrongdoing. (See Exhibit "C" in the accompanying Compendium of Exhibits.)

110. Upon information and belief, defendant Vornado, was a participant with, member of, and a conspirator with, the RICO Enterprise, was at all relevant times a Maryland limited liability company authorized to do business in the State of New York and formed and employed Vornado GM through which it conducted unlawful activities of money laundering.

111. Upon information and belief, Vornado GM was at all relevant times a Delaware Limited Liability Company with an office in the City and State of New York, under the control of Soros, Fortress or Vornado, and was a conspirator with the Enterprise.

112. Upon information and belief, once the unlawful purposes for which it had been created were accomplished, namely to commit Money Laundering through the purchase of the GM Building, Vornado GM was dissolved to cover up such wrongdoing. (See Exhibit "**D**" in the accompanying Compendium of Exhibits.)

113. Upon information and belief, defendant German American Capital, was a conspirator with the RICO Enterprise, was at all relevant times a Maryland Corporation authorized to do business in the State of New York and is a wholly owned subsidiary of Deutsche Bank AG.

114. Upon information and belief, defendant Deutsche Bank AG was at all relevant times a foreign bank authorized to do business in the State of New York.

115. Upon information and belief, defendant Eastdil was at all relevant times a New York limited liability company, a RICO conspirator and was previously named Eastdil Realty Company, LLC ("Eastdil Realty"). (See Exhibit "**E**" in the accompanying Compendium of Exhibits.)

116. Upon information and belief, defendant Harry Macklowe, is a person and a conspirator with the RICO Enterprise, and is a resident of the City and State of New York.

117. Upon information and belief, FIG LLC, was at all relevant times a limited liability company organized under the laws of the State of Delaware, authorized to do

business in the State of New York, was a person and a controlling member of the RICO Enterprise, was involved and participated in knowingly laundering illicitly derived funds for its benefit to acquire Conseco Finance and the GM Building for its benefit. FIG LLC was known at all relevant times herein as Fortress Investment Group, LLC ("Fortress"). (See Exhibit "F" in the accompanying Compendium of Exhibits.)

118. Upon information and belief, Cerberus, was a limited partnership organized and existing under the laws of the State of Delaware, was authorized to do business in the State of New York.

119. Upon information and belief, J.C. Flowers & Co., LLC ("J.C. Flowers & Co.") was at all relevant times a Delaware Limited Liability Company authorized to do business in the State of New York.

120. Upon information and belief, Lazard, who may become a John Doe defendant after further discovery herein, was a person and conspirator with the RICO Enterprise, was, at all relevant times, a limited liability company organized under the laws of the State of New York and acted as financial advisor to Conseco.

121. Upon information and belief, defendant Kirkland & Ellis, was a conspirator with the RICO Enterprise in that it helped enable, devise and manage the predicate acts described herein, including, but not limited to devising and forming the chain of shell entities to disguise and conceal the origin and nature of the laundered

money, and was at all relevant times a limited liability partnership organized and existing under the laws of the State of New York and was a legal advisor to Conseco.

122. Upon information and belief, Fried, Frank, Harris, Shriver & Jacobson, LLP, was at all relevant times a limited liability partnership organized and existing under the laws of the State of New York and acted as legal advisor to Harry Macklowe in the GM sale and co-counsel to the unsecured creditors of the Conseco Bankruptcy.

123. Upon information and belief, Carmel Fifth, was a subsidiary of Conseco, and was at all relevant times a Delaware limited liability company authorized to do business in the State of New York.

124. Upon information and belief, 767 Manager, LLC ("767 Manager"), was affiliated with a company or corporation controlled by defendant Trump, and was at all relevant times a Delaware limited liability company authorized to do business in the State of New York.

125. Upon information and belief, Trump 767 Manager, LLC ("Trump Manager") was a wholly-owned subsidiary of 767 LLC, and was the actual owner of the GM Building from July 1998 to September 2003.

126. Upon information and belief, defendant Donald J. Trump is an individual residing in the City and State of New York.

127. The foregoing defendants satisfy the definition of a "person" provided for in 18 USC §1964 (1) in that they are one or more of the following: an individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

128. The defendants also constitute a RICO association-in-fact Enterprise by evidence of their ongoing organization, formal or informal, and by evidence that the various associates agreed to function as a continuing unit.

129. Plaintiffs are informed and believe that at all times referred to herein, John Does "1" to "10" were agents, consultants, partners, subsidiaries, parent corporations, conspirators with or affiliates of the defendants and were acting within the scope of that agency or relationship at all times with defendants and their actions were in conspiracy with, in participation with, and such actions were ratified by the defendants herein, and each of them.

## IX. FACTUAL BACKROUND: THE EVENTS LEADING UP TO THE CONSECO BANKRUPTCY

130. In 1998, Conseco, one of the largest conglomerate insurance companies in America, was on a buying spree, accumulating 19 insurance and insurance financing companies since 1992.

### Conseco's Purchase of Green Tree Financial

131. On or about April 6, 1998, Conseco bought Green Tree Financial, Inc. ("Green Tree"), a Minnesota mobile home lender for 6.2 Billion Dollars of stock in Conseco. Conseco thereafter changed Green Tree's name to Conseco Finance.

132. The main business of Green Tree was to make loans, then package them and sell the loans to other investors in a process Wall Street calls securitization creating collateralized debt obligations.

133. When the loans were sold, Green Tree would make certain assumptions regarding the profits it would earn; if it made incorrect assumptions, such as how soon borrowers would pay off their loans, those gains would prove illusory.

**Conseco's Purchase of**
**The GM Building**
**With Donald J. Trump**

134. In or about May 1998, Conseco and Donald J. Trump entered into a contract to purchase the GM Building in New York City, located at 767 Fifth Avenue between 57th and 58th Street, across the street from the Plaza Hotel.

135. The GM Building is considered to this day as a "trophy" property and one of New York's finest and most lucrative commercial real estate locations in New York.

136. The unlawful Money Laundering through the purchase of the GM Building, orchestrated and carried out by the defendants through a pattern of racketeering,

including Soros, SFM, Fortress, Vornado, German American, Conseco, Trump, Eastdil, Macklowe, Kirkland & Ellis, and, upon information and belief, other co-conspirators, operated an enterprise involving Money Laundering, Bankruptcy Fraud and wire fraud.

137. When the GM Building was purchased by Conseco and Donald J. Trump, the parties assumed two mortgages on the property, in the approximate amount of 590 Million Dollars, bringing the total purchase price for the GM Building to approximately 814.6 Million Dollars.

138. At the Closing of the purchase of the General Motors Building the parties assumed the mortgages on the property and, on July 31, 1998, Conseco paid 212.7 Million Dollars through its shell entity Carmel Fifth, and Donald J. Trump paid 11.2 Million Dollars, through a shell entity, 767 Manager.

139. Carmel Fifth and 767 Manager entered into a Limited Liability Operating Agreement to reflect the terms of their joint ownership of the Building and became members of an entity called 767, LLC, which was the sole owner of Trump 767 Manager, which held the title to the General Motors Building.

140. Upon information and belief, the capital used by Carmel Fifth for the purchase of the GM Building, and the oversight of its operations, came directly from Conseco and made Conseco the true owner of the GM Building through its wholly-owned subsidiary, Carmel Fifth.

141. Upon information and belief, Carmel Fifth had no officers or directors and the entire consideration Conseco paid for the GM Building came directly from Conseco.

142. Conseco stated on its financial statements that the capital invested by Carmel Fifth in the purchase of the General Motors Building was an investment of approximately 212.7 Million Dollars by the shell entity, Carmel Fifth. (See Exhibit "G" in the accompanying Compendium of Exhibits.)

143. Kirkland & Ellis fraudulently represented in the Conseco bankruptcy that Carmel Fifth was not an asset of Conseco and that Conseco had no interest therein, so as to make Carmel Fifth isolated from Conseco's general operations and appear to be bankruptcy remote.[2] This constituted Bankruptcy Fraud pursuant to 18 U.S.C. § 152 (2) and (3).

144. Upon information and belief, the four insurance companies which were the alleged owners of Carmel, invested no capital in Carmel Fifth, and therefore did not actually own Carmel Fifth.

145. Kirkland & Ellis repeatedly claimed in the Conseco Disclosure Statements to the Conseco creditors that the sale of the GM Building was essential for the reorganization of the Bankruptcy Estate when, in conspiracy with the defendants, it later

---

[2] The insurance companies were Bankers Life and Casualty Co., Washington National Life Insurance Co., Conseco Senior Health Insurance Co., and Conseco Annuity Assurance Co.

represented to the Conseco creditors that the GM Building was not an asset of Conseco in violation of 18 U.S.C. § 152 (2) and (3).[3]

**The Documented SEC Violations**
**<u>By Conseco to Inflate Its Earnings</u>**

146. From March 1999 through February 2000, Conseco and its wholly-owned subsidiary Conseco Finance, made false and misleading public statements about their earnings, overstating their profits by hundreds of millions of dollars.

147. This massive overstatement occurred with the knowledge and participation of Conseco, its Chief Financial Officer and Conseco Finance's Chief Accounting Officer.

148. The fraudulent and hidden scheme of Conseco manipulated earnings by avoiding huge write downs of certain assets held by Conseco Finance known as interest-only securities. During this same period, Conseco and Conseco Finance also made a number of unsupported and improper adjustments ("top-side adjustments") to the books and records of Conseco and Conseco Finance.

149. Through these top-side adjustments, Conseco and Conseco Finance fabricated increased earnings.

150. As part of its business, Conseco Finance originated, purchased, sold and serviced consumer and commercial loans. Conseco Finance put its loans into groups

[3] Conseco filed for Bankruptcy protection on December 17, 2002 in the Northern District of

(called "pools"), and sold the pools to a special purpose entity (the "SPE"). The SPE, in turn, sold bonds to the public backed by the principal and interest payments due from the loans making up the pools.

151. The SPE transferred to Conseco Finance the proceeds from the bond sales and an interest-only security that represented the right to receive any remaining proceeds flowing from the pool after all the other bondholders and servicing fees were paid.

152. Conseco Finance recorded the interest-only securities on its books as assets and was required by law to adjust them to their fair value each quarter.

153. Conseco Finance purportedly determined the fair value of the interest only securities each quarter by estimating the cash flows expected to flow from each interest-only security and discounting them to their actual value.

154. The Conseco Finance accounting department determined these cash flows using computer models that were based on intentionally fraudulent assumptions made by Conseco and Conseco Finance.

155. Such conduct violated Section 17(a) of the Securities Act of 1933.

156. Following Conseco's acquisition of Conseco Finance, Conseco's senior management touted its new subsidiary as its new growth engine, and repeatedly and

---

Illinois, Eastern Division.

falsely represented to the public that Conseco Finance was contributing to Conseco's aggressive financial targets exactly according to plan.

157. From January 1999 to March of 2000, neither Conseco nor Conseco Finance disclosed any problems, accounting changes, or similar issues relating to their accounting for Conseco Finance's interest-only securities.

158. In March of 2000, while conducting the 1999 year-end audit, Conseco and Conseco Finance's auditors, PricewaterhouseCoopers, L.L.P. ("Pricewaterhouse"), discovered Conseco's and Conseco Finance's fraudulent activities with respect to the interest-only securities.

159. Pricewaterhouse also discovered the fraudulent topside adjustments to the income of Conseco and Conseco Finance.

160. On March 31, 2000, Conseco and Conseco Finance announced that they were reviewing the value of their interest-only securities and expected to record a charge to earnings, estimated at 350 Million Dollars after taxes, to write-down the carrying value of the interest-only securities. Conseco's stock fell more than 16% that day.

161. On April 1, 2000, Conseco publicly announced that it would sell Conseco Finance.

162. Due to the inability of Conseco to identify purchasers willing to pay what Conseco asked for Conseco Finance, Conseco changed its tune and tried to make it appear to the market that Conseco Finance was actually an asset to the company.

163. On April 14, 2000, Conseco and Conseco Finance filed restated results for the first three quarters of 1999, and revised results for the fourth quarter and full-year 1999.

164. Specifically, Conseco was forced to publicly admit that it had overstated its net income for the first three quarters of 1999 by $9.3 million (3.2%), $84.2 million (39.5%) and $37.8 million (24.3%), respectively, and inflated its publicly announced net income for the fourth quarter and full-year 1999 by $236.3 million (383%) and $367 million (61.7%) respectively.

165. Conseco Finance also admitted that it had overstated net income for the first three quarters of 1999 by $7.5 million (5.8%), $56.1 million (49.9%) and $14.8 million (26.2%), respectively, and inflated its publicly announced operating income for the fourth quarter and year-end 1999 by $378.3 million (112.9%) and $562.6 million (1654.7%), respectively. Conseco's stock price fell more than 10% following these disclosures.

166. Rollin S. Dick and James S. Adams, formerly Chief Financial Officer and Chief Accounting Officer of Conseco and then its wholly-owned subsidiary Conseco

Finance kept their fraudulent activities hidden until at least the fourth quarter of 2003, after Conseco had already filed for Bankruptcy.

167. On or about March 10, 2004, the Securities and Exchange Commission filed civil fraud charges pursuant to Sections 17 (a) of the Securities Act and 10 (b) and 13 of the Exchange Act against Rollin S. Dick and James S. Adams for their fraudulent manipulations with respect to the interest-only securities and the fraudulent topside adjustments to the income of Conseco and Conseco Finance. (See Exhibit "**H**" in the accompanying Compendium of Exhibits.)

168. Once the fraudulent overstatement of Conseco Finance's earnings became public, in or about the first week of May 2000, Stephen H. Hilbert, Conseco's Chairman and Chief Executive Officer and founder resigned.

**Gary C. Wendt Attempts**
**<u>To Reduce Conseco's Debt</u>**

169. On or about March 31, 2000, Conseco retained Lehman Brothers Investment Bank ("Lehman Brothers") to obtain a purchaser for Conseco Finance.

170. On or about May 5, 2000, Conseco agreed to sell 1.5 Billion Dollars of consumer loans to Lehman Brothers.

171. Conseco announced that it would use up to 500 Million Dollars to repay debt owed by Conseco Finance to Conseco.

172. On June 29, 2000, Conseco announced that it had appointed Gary C. Wendt, former CEO of GE Capital Services, to the position of CEO and Chairman of the Board of Conseco.

173. Upon information and belief, Gary C. Wendt received a signing bonus of 45 Million Dollars as well as 3.2 million shares of stock, then worth approximately 31.2 Million Dollars. In addition, he received options to purchase an additional 10,000,000 shares of stock. Wendt was also entitled to receive a bonus of 50 Million Dollars if the stock price rose from the price of $5.80 per share to $20.00 per share, or $38.00 less than Conseco's share price when it purchased Green Tree Financial.

174. Conseco announced that Wendt was brought into Conseco to reduce its enormous debt and to maximize the assets of Conseco by selling-off pieces of the Conseco Empire to focus Conseco back on its core business of insurance.

175. Initially, in July 2000, Wendt announced that Conseco was again in the process of selling Conseco Finance, but later flip-flopped and announced he was more interested in operating it.

176. By October, 2000, Gary C. Wendt had been cutting costs but Conseco announced that it nevertheless continued to hemorrhage quarterly losses in the hundreds of Millions of Dollars.

**The Orchestrated Dispute Regarding The GM Building Between Conseco <u>And Donald J. Trump</u>**

177. The Limited Liability Company Agreement of 767 LLC between Carmel Fifth and 767 Manager, the indirect owners of the General Motors Building, provided that on or after the third anniversary of the purchase of the General Motors Building, July 31, 1998, or on or after July 31, 2001, either party could exercise a buy/sell right pursuant to which Carmel Fifth could be bought out or purchase the interest of 767 Manager, and vice versa, at certain predetermined prices. (See Exhibit "I," in the accompanying Compendium of Exhibits.)

178. Pursuant to the Limited Liability Company Agreement of 767 LLC, if Carmel Fifth sold its interest to 767 Manager, or if 767 Manager sold its interest to Carmel Fifth, they were each entitled to receive an amount pursuant to a formula contained in the Operating Agreement. (See Exhibit "I" in the accompanying Compendium of Exhibits at ¶9.6.)

179. In March 2001, Conseco continued Gary C. Wendt's cost cutting endeavors to keep Conseco afloat by allegedly liquidating what were represented as "non-core" assets of Conseco. One of the most valuable assets of Conseco at that time was its substantial interest in the GM Building, which for an insurance company like Conseco, was certainly not a "core asset" of Conseco. Notwithstanding this fact, and contrary to

rational business practices, Gary C. Wendt took no steps to monetize Conseco's interest in the GM Building.

180. Upon information and belief, this was because, at or about the beginning of March 2001, while Conseco was hemorrhaging money, George Soros, the mastermind of the RICO Enterprise, had contacted, among others to be found in discovery, Wendt and Trump to purchase the GM Building outside the Conseco Bankruptcy in order for Soros and/or Fortress to launder money.

181. Upon information and belief, Conseco was well-aware of the value of its interest in the GM Building at this time since, in or about July and August 2001, Conseco had received bids from interested buyers at a price of 1.15 Billion Dollars.

182. Upon information and belief, in March 2001, Donald J. Trump offered to purchase Conseco's interest in the General Motors Building for 295 Million Dollars.

183. As part of his proposal, Trump agreed to issue certain debt obligations to Conseco, including a note in the amount of 250 Million Dollars.

184. In order to provide the necessary liquidity for the note, Conseco through Wendt told Trump that Conseco would only consider Trump's offer if he provided a Guaranty or Letter of Credit to collateralize the debt obligations of Trump.

185. Upon information and belief, Conseco by Wendt requested this Guaranty in order for Conseco to securitize the note to allow it to immediately sell the note into the financial markets.

186. On March 21, 2001, *Conseco* and *Trump* signed a letter of intent which provided that Trump had to provide *Conseco* a Guaranty from a third party of the 250 Million Dollar Note from *Trump* to securitize the note. (The "Letter of Intent.")

187. "Guaranty" was defined in the Letter of Intent as a Letter of Credit or other security acceptable to Conseco, in its "sole discretion."

188. Pursuant to the Letter of Intent, upon information and belief, Trump had three months to provide the guaranty and was required to close no later than June 30, 2001.

189. The Letter of Intent demonstrated that both Conseco and Trump knew that Conseco—not Carmel Fifth—was the part owner in fact of the GM Building. In the alternative, Trump entered the agreement with Conseco as part of the defendants' pattern of racketeering to lay the groundwork for the allegations, later made by Trump, that Conseco was the true one-half owner of the GM Building.

190. Upon information and belief, on May 16, 2001, Trump obtained a non-binding proposal from Deutsche Bank, A.G. to refinance the debt on the GM Building (the "Deutsche Bank Proposal"), to provide Conseco with "limited credit protection" in

form of a "standby commitment," pursuant to which Trump could borrow up to 225 Million Dollars which could be used to pay principal and interest to Conseco.

191. The Deutsche Bank Proposal also provided that the purchase price was 250 Million Dollars, or 45 Million Dollars less than Trump had originally agreed to pay under the Letter of Intent.

192. Upon information and belief, on May 22, 2001, *Conseco* rejected the May 16, 2001 proposal and standby commitment by Trump as unacceptable and urged Trump to provide a letter of credit or guaranty sufficient to meet Conseco's needs as described in the Letter of Intent.

193. The third anniversary of the purchase of the GM Building was July 31, 2001. As of that date, pursuant to the terms of the Limited Liability Agreement of 767 LLC, Conseco's wholly-owned indirect subsidiary, Carmel Fifth, could exercise a Buy/Sell option and either be bought out for approximately 700 Million Dollars or buy Trump's interest, held by his wholly-owned entity, 767 Manager, for the comparatively paltry sum of approximately 15 Million Dollars. (See Exhibit "**I**" in the accompanying Compendium of Exhibits at ¶¶9.6.)

194. Given Conseco's knowledge that potential purchasers were willing to pay approximately 1.2 Billion Dollars for the GM Building, Conseco had a strong interest in exercising its right to purchase its interest in the Building or to be bought out for

approximately 400 Million Dollars more than Trump had offered to pay in the March Letter of Intent or the July 3 Agreement.

195. Nevertheless, contrary to sound, or even rational business practices, Conseco refrained from exercising the Buy/Sell option under the 767 LLC Operating Agreement and continued to appear to negotiate with Trump to resolve the ownership pursuant to the July 3 Agreement.

196. Since Trump assured Conseco that he was close to obtaining the necessary guaranty, on July 3, 2001 (the "July 3 Agreement") *Conseco* agreed with Trump that *Conseco* would sell its interest in 767 LLC for the sum of 295 Million Dollars subject to certain conditions. Conseco's Chief Financial Officer signed the July 3 Agreement on behalf of Conseco. (See Exhibit "J" in the accompanying Compendium of Exhibits.)

197. Conseco's July 3 Agreement demonstrated that Conseco was the true one-half owner of the GM Building.

198. Nevertheless, as discussed further herein in the Predicate Acts, Section XIII, in connection with the Conseco Bankruptcy, Conseco and its counsel Kirkland & Ellis falsely represented to the bankruptcy court that Conseco owned 50% of the GM Building and that therefore the Conseco investment of approximately 212 Million Dollars in the GM Building would accrue to the benefit of the creditors in the Conseco Bankruptcy.

199. One thing is clear from the July 3 Agreement, it provided both sides with the ability to argue or change their arguments at will as to the true owner of the GM Building: either it was owned by Conseco (as demonstrated by the March 21, 2001 Letter of Intent, the July 3, 2001 sale Agreement, and the Conseco Financial Statements), or it was owned by Carmel Fifth as a subsidiary of four insurance companies.

200. As further described hereinafter, in conspiracy with the RICO Enterprise, Conseco would later argue in its Bankruptcy proceedings <u>both</u> that it owned the GM Building and that therefore the Bankruptcy Court had core jurisdiction over the dispute with Trump when it applied to the Bankruptcy Court to confirm the Arbitration Award it later obtained against Trump; <u>and then argued</u> that it did not own the GM Building and the creditors could not receive any benefit from the sale of the GM Building in violation of 18 U.S.C. §152 (2), (3) and (9).

201. In conspiracy with the RICO Enterprise, Trump would later argue both that the GM Building *was part of the Conseco Bankruptcy Estate by suing Conseco*, and later argued that the GM Building was *outside* the jurisdiction of the Bankruptcy Court when Trump moved to dismiss Conseco's attempt to hold the "arbitration proceedings" before the Bankruptcy Court and when Conseco attempted to have the Bankruptcy Court confirm the arbitration award regarding the ownership of the GM Building.

202. Throughout the Conseco Bankruptcy, Conseco and Kirkland & Ellis by James H. M. Sprayregen, Esq. repeatedly and falsely represented to the Bankruptcy Court that the GM Building was an asset of Conseco and that "the sale or transfer of the GM

Building or interests therein, pursuant to, or consistent with an Order of the Bankruptcy Court shall be deemed a transfer under and pursuant to, and in furtherance of the [Bankruptcy] Plan."

203. However, in connection with the dispute with Trump Conseco repeatedly took the position that the GM Building *was not an asset of Conseco* so that the Bankruptcy Court could not exercise jurisdiction over the sale of the GM Building so that the sale of the Building could be accomplished by the RICO Enterprise without any scrutiny by the Bankruptcy Court.

204. Such false representations were part of the pattern of racketeering activity of the RICO Enterprise and constituted Bankruptcy Fraud.

205. Since nothing accrued to the benefit of the creditors of Conseco by the ultimate sale of the GM Building despite Conseco's and Kirkland & Ellis' repeated claims to the Conseco creditors that the monetization of the GM Building would accrue to the benefit of the creditors and was "essential" to the reorganization of Conseco, one must presume that this entire transaction, the March letter of intent, the July 3 Agreement and the months and months of negotiations regarding the proper form of the guaranty Trump was to provide to Conseco, were part of a conspiracy between Conseco, Kirkland & Ellis and Trump to delay the resolution of the ownership of the GM Building, in furtherance of the RICO Enterprise, until after the Conseco Bankruptcy was closed in violation of 18 U.S.C.§152 (9) since the ultimate beneficiary of the sale of the GM Building was new Conseco.

206. Pursuant to the July 3 Agreement, the purchase price was to be paid to Conseco in debt obligations of Trump, subject to certain conditions, including that the loan and interest payments on the Trump obligations "shall be guaranteed by Lender in a form acceptable to Conseco, in its sole discretion."

207. Instead of waiting to exercise the Buy/Sell provision in the 767 LLC Limited Liability Agreement until July 31, 2001, which would have maximized Conseco's assets, on or about July 3, 2001, Conseco conspired with Trump to enter into the totally irrational July 3 Agreement with Trump, in which Conseco agreed to be bought out of the GM Building for the mere sum of 295 Million Dollars provided that Trump could guaranty the sum of Trump's 250 Million Dollar Note by a form of security acceptable to Conseco in its sole discretion.

208. The fact that *Conseco—not Carmel Fifth*—was a party to the July 3 Agreement and that the capital for the purchase of the GM Building actually came from Conseco, demonstrate that the GM Building was, at least according to Conseco, actually owned by Conseco—not Carmel Fifth—and that Conseco's later arguments to the Bankruptcy Court through Kirkland & Ellis to keep the ownership and value of the GM Building out of Conseco Bankruptcy proceedings were in furtherance of the pattern of racketeering of the RICO conspiracy and constituted Bankruptcy Fraud pursuant to 18 U.S.C. §152 (2) and (3), as more fully described herein at Section XIII.

209. Pursuant to the July 3 Agreement, Conseco was entitled to receive, at the minimum, approximately *200 Million Dollars less than it would have received had it*

*waited a mere twenty-eight days* to exercise the Buy/Sell agreement and the sixty days during which Trump would have the election to buy or sell his interest in the GM Building.

210. In the event that Trump exercised his sell option, he would have received approximately a mere 15 Million Dollars, and Conseco could have owned the GM Building which was reasonably valued at that time at the sum of 1.2 Billion Dollars, and Conseco *would have received approximately 500 Million Dollars after payment of the Mortgages*.

211. In the event that Trump exercised his buy option, Conseco would also be paid *approximately 500 Million Dollars*.

212. Thus, the July 3, 2001 Agreement, which was irrational in light of Conseco's stated interest in maximizing its assets, was clearly an obvious ruse by Conseco in conspiracy with the defendants.

213. The July 3, 2001 Agreement provided that Conseco could terminate the Agreement at any time after July 20, 2001 if Trump did not provide the guaranty sought by Conseco.

214. The July 3 Agreement also provided that it would terminate automatically if Trump did not close on the transaction by September 15, 2001. (See Exhibit "J" in the accompanying Compendium of Exhibits at p.1.)

215. On or about July 10, 2001, Trump publicly announced that he was buying *Conseco's* interest in the GM Building for 295 Million Dollars pursuant to the July 3 Agreement. Upon information and belief, Trump was fully able to provide the security sought by Conseco, but, at various times in furtherance of the pattern of racketeering activity of the Enterprise in conspiracy with Trump and Conseco, Trump refused to provide the guaranty and at other times Conseco refused the guaranty provided by Trump.

216. Conseco in conspiracy with Trump repeatedly provided additional irrational and unwarranted extensions of the date by which Trump had to purchase Conseco's interest for a substantially discounted price, since it delayed the resolution of the ownership of the GM Building for the benefit of the RICO Enterprise.

217. The conspiracy, plan and scheme of the RICO Enterprise was to keep the ownership of the GM Building in play to ensure that the defendants could purchase the GM Building outside the Conseco Bankruptcy in order to engage in money laundering. It was able to accomplish this end by the conspiratorial agreement between Conseco and Trump to cause confusion and delay, for example, providing Trump with additional time to provide the guarantee, and then repeatedly refusing the guarantee.

218. As part of the pattern of racketeering activity, Trump failed to provide the required guaranty prior to July 20, 2001.

219. In August 2001, to provide cover for the conspiratorial agreement between Conseco and Trump, Gary C. Wendt, who may later be discovered to be a John Doe

defendant herein, held a conference call with market analysts and tried to stave off rumors that Conseco was still in the process of "cooking its books" as it had done in 1999 and 2000.

220. On August 6, 2001, after the Buy/Sell Agreement had matured enabling Conseco to receive an additional 210 Million Dollars over what Trump was offering in the July 3 Agreement, Trump again, in furtherance of the pattern of racketeering activity, provided Conseco with a Guaranty that Conseco rejected in furtherance of the racketeering activity.

221. Upon information and belief, in August, 2001, defendant Vornado proposed to Conseco to purchase the General Motors Building for 1.15 Billion Dollars, which Conseco rejected.

222. On August 24, 2001, in furtherance of the conspiracy, Conseco provided a copy of a Guaranty to Trump that it would find acceptable. Trump again rejected Conseco's proposal.

223. Trump did not close on the GM Building prior to September 15, 2001, as required by the July 3 Agreement.

224. On September 25, 2001, Conseco continued the pattern of racketeering by allowing Trump yet another opportunity to purchase Conseco's interest in the GM

Building at the discounted price. Trump failed to provide the necessary documentation and security requested by Conseco by September 25, 2001.

225. Accordingly, by letter dated October 4, 2001, Conseco by its Chief Financial Officer, formally advised Trump that the July 3 Agreement "was null and void and of no further effect." (See Exhibit "**K**" in the accompanying Compendium of Exhibits.)

226. Upon information and belief, according to an agreement between Charles H. Cremens and Conseco, Cremens would receive a 1 Million Dollar bonus if the GM Building was sold for more than 1 Billion Dollars. Charles H. Cremens handled both the sale of Conseco Finance to CFN Holdings, and the sale of the GM Building to Macklowe. Upon information and belief, Charles H. Cremens and/or CFN Holdings may be later identified in discovery as a John Doe defendants herein.

227. Nevertheless, despite its urgent cash needs, in furtherance of the RICO Enterprise, and despite its contention that the July 3 Agreement was "null and void," Conseco continued to do nothing to monetize its interest in the GM Building; and, during the next three months Carmel/Conseco failed to exercise its matured, legitimate right to exercise its Buy/Sell agreement with Trump in conspiracy with the Enterprise.

228. On or about January 5, 2002, Bruce A. Chrittenden resigned as President of Conseco Finance and Charles H. Cremens replaced him.

229. After Trump repeatedly failed to provide the Guaranty under terms satisfactory to Conseco, and despite numerous extensions granted by Conseco to Trump in furtherance of the RICO Enterprise, which Conseco was under no obligation to give, ninety days later, or on or about January 15, 2002, Conseco finally advised Trump by correspondence of that date, that it was no longer willing to sell its interest in the GM Building at the discounted price, and that Carmel Fifth was exercising its Buy/Sell option contained in the Limited Liability Agreement of 767 LLC, giving 767 Manager sixty (60) days to exercise its option to either buy out Conseco's interest for 499.4 Million Dollars, or be bought out by Conseco for 15.5 Million Dollars. (See Exhibit "**L**" in the accompanying Compendium of Exhibits.)

230. These amounts in the Buy/Sell notice were based on a formula contained in the 767 LLC Operating Agreement,[5] and a market value of the GM Building of 1.215 Billion Dollars.

231. In response, on or about February 7, 2002, in furtherance of the conspiracy to launder money through the GM Building, Trump sued Conseco in New York Supreme Court for One Billion Dollars for breach of contract and sought to have Conseco transfer the GM Building to him by asserting that the July 3 Agreement superseded and cancelled Carmel Fifth's Buy/Sell right.

[5] See Exhibit "I" in the accompanying Compendium of Exhibits.

232. On or about February 8, 2002, Donald J. Trump, through his counsel, advised Conseco that it would sue anyone even negotiating with Conseco to buy out Trump's interest in the GM Building.

233. Upon information and belief, on or about February 12, 2002, Trump, through its counsel threatened a potential purchaser directly with interference with contractual relations.

234. Under the cloud of Trump's tactics, no one in the financial arena appeared to be willing to participate in any purchase or refinancing of the General Motors Building.

235. In February 2002, Conseco agreed to pay 120 Million Dollars to settle a class-action lawsuit filed by shareholders who accused the company of producing false and misleading financial results through its 1999 fiscal year.

236. Instead of responding to the Buy/Sell notice within sixty days, as required by the Operating Agreement of 767 LLC, on March 13, 2002, Trump responded to Conseco's Buy/Sell offer by alleging that the July 3 Agreement precluded Carmel Fifth from exercising the Buy/Sell right even though, according to Conseco, the July 3 Agreement had expired by its own terms on September 15, 2001, and that Trump was still allowed to purchase the General Motors Building for the sum of 295 Million Dollars. (See Exhibit "**M**" in the accompanying Compendium of Exhibits.)

237. Upon information and belief, during this period, Trump, through his attorneys, again notified Conseco and other parties that it would sue anyone who proposed to buy or even negotiate to buy the GM Building from Conseco.

238. In or about March 2002, Bill Shea, the President of Conseco also became the Chief Financial Officer of Conseco.

239. Upon information and belief, Trump knew that the New York Supreme Court had no jurisdiction to hear the dispute because of the arbitration provision in the Limited Liability Agreement of 767 LLC, thus, this action could only have been filed to delay the resolution of the ownership of the General Motors Building so as to enable the RICO Enterprise to acquire it in furtherance of the predicate act of laundering money through the purchase of the GM Building.[6]

240. Upon information and belief, Conseco notified Trump by letter dated March 22, 2002 that, since 767 Manager had not made an election under the Buy/Sell provision of the 767 LLC Operating Agreement, it was deemed to have offered to sell its interest in the GM Building for 15.5 Million Dollars and further notified 767 Manager that Carmel Fifth was prepared to immediately purchase 767 Manager's interest in the GM Building. (See Exhibit "N" in the accompanying Compendium of Exhibits.)

---

[6] Despite Trump's allegation that the buy/sell provision was no longer valid, under well-settled law, the parties would still have had to arbitrate the dispute because the arbitration provision in the 767, LLC Operating Agreement provided that "if any dispute arises between the Members [767 Manager and Carmel Fifth], or between the Company [767 LLC—which owned the building] and any member, including any dispute arising out of or relating to this agreement…such dispute shall be submitted to arbitration.)

241. In furtherance of its position that 767 Manager had exercised the sell option of the Operating Agreement, on or about March 26, 2002, Carmel Fifth instituted arbitration proceedings against 767 Manager, before the American Arbitration Association (the "AAA"), as required by the Operating Agreement, and requested an Award purchasing 767 Manager's interest in the GM Building for the price of 15.5 Million Dollars. (See Exhibit "**O**" in the accompanying Compendium of Exhibits.)

242. Pursuant to the Operating Agreement of 767 LLC, the arbitration had to be conducted before a Panel of three arbitrators, one selected by each of the parties, with a third arbitrator, required to be a former Judge, selected by the two party-appointed arbitrators.

243. Upon information and belief, in April 2002, Conseco Medical Insurance Co. agreed to pay at least 1.3 Million Dollars in restitution and fines in Texas for failure to promptly pay health care claims in mid-2001.

244. In conspiracy with the RICO Enterprise, Trump continued the pattern of racketeering by delaying the Arbitration.

245. Upon information and belief, on or about April 9, 2002, Trump sent a letter to Conseco that it would sue Conseco or any third parties who attempted to purchase the GM Building for tortious interference.

246. Despite the arbitration agreement in the 767 LLC Operating Agreement, on or about April 15, 2002, hoping to further delay the resolution of the dispute, Trump moved for a stay of the Arbitration proceedings in New York State Supreme Court, claiming that the July 3 Agreement between him and Conseco abrogated the arbitration provision in the 767 LLC Operating Agreement.

247. Oral argument on the motion to stay the Arbitration took place before Justice Moskowitz of the New York State Supreme Court, New York County on May 2, 2002. By Order dated May 2, 2002, entered May 7, 2002, the New York State Supreme Court denied Trump's motion for a stay of the arbitration before the American Arbitration Association (per Moskowitz, J.). (See Exhibit "**P**" in the accompanying Compendium of Exhibits.)

248. In response, on May 31, 2002, Trump appealed the Decision of Justice Moskowitz to the Appellate Division First Department, and then, in another about-face, after further delaying the resolution of the ownership of the General Motors Building, on June 12, 2002, Trump stipulated to stay his state court action and advance his arguments against Conseco and Carmel Fifth before the American Arbitration Association.

## X. BEHIND THE SCENES OF THE GM DISPUTE THE RICO ENTERPRISE <u>IMPLEMENTS THE RICO ACTIVITY</u>

249. Upon information and belief, on June 7, 2002 Conseco retained Lazard to assist it with its financial difficulties. Lazard analyzed the value of Conseco Finance and

provide such information to the RICO Enterprise including, Fortress Financial and Soros to enable the RICO Enterprise to acquire and maintain an interest in Conseco's affiliate Conseco Finance and to secure the Debtor-in-possession financing of Conseco to launder money.

250. Upon information and belief, at or about this time, George Soros, or someone else to be identified acting on behalf of the Enterprise, began implementing the pattern of racketeering activities which could be accomplished by having Conseco file for Bankruptcy protection under Chapter 11 of the Bankruptcy Code, to act as the Debtor-in-possession financier, acquire Conseco's assets at a discount price, including Conseco Finance and the GM Building, and launder illegally derived funds through these entities in furtherance of the RICO Enterprise and in conspiracy therewith.

251. These activities by Soros, SFM, Fortress, Macklowe, Vornado, and Trump, constituted a pattern of racketeering activity involving interstate commerce to acquire an interest in Conseco, to invest proceeds of a pattern of racketeering activities in Conseco, and to conduct the affairs of Conseco through a pattern of racketeering, through Money Laundering and Bankruptcy Fraud.

252. Fortress, Vornado, Trump, Soros, SFM and others, acquired or maintained, directly or indirectly, an interest in, or control of Conseco, an enterprise which was engaged in, or the activities of which affected, interstate or foreign commerce in two ways: (a) by purchasing Conseco Finance with laundered money deriving from

illegal sources, and (b) by obtaining the Debtor in Possession Financing (the "DIP Financing") of Conseco through racketeering activities.

253. To secure their control over Conseco, Conseco, in furtherance of the racketeering conspiracy, agreed that the amount paid by CFN (Fortress and Cerberus) for Conseco Finance would go to pay down the FPS DIP financing, controlled by Fortress and Soros.

254. The other target of the RICO Enterprise of was to ensure the sale of the GM Building to defendant Macklowe in conspiracy with the other defendants of the Enterprise, so that Soros, SFM, Fortress, Mapeley, Quantum, and Trump, could launder money through the purchase and eventual sale of the GM Building.

255. Upon information and belief, Wendt, or other officers or directors of Conseco were promised a substantial consideration by the RICO Enterprise if they participated in the unlawful Money Laundering and Bankruptcy Fraud activities engineered, and later carried out by the RICO Enterprise and the conspirators therewith.

256. Upon information and belief, in connection with the GM Building scheme, the plan of the RICO Enterprise was to perpetuate the dispute as to the ownership of the GM Building between Trump and Conseco until after Conseco's Bankruptcy proceedings were concluded to allow the RICO Enterprise to purchase and sell the General Motors Building to the RICO Enterprise's designated straw-man buyer Harry Macklowe without the oversight of the Conseco Bankruptcy Court to engage in money laundering.

257. The RICO Enterprise employed money laundering to purchase the GM Building in the name of Harry Macklowe, who paid no consideration therefor, to launder money into the purchase, and to thereafter continue the RICO Enterprise to launder proceeds of the sale into a real estate venture of Trump in Chicago, named Trump International Hotel & Tower, Chicago ("Trump Chicago"), which broke ground May 17, 2005.[7]

**George Soros And**
**His History of Illegal**
**Monetary Activities**

258. Upon information and belief, George Soros is the Chairman of SFM, a private investment management firm, managed by Grove Capital, LLP, and serves as a principal advisor to Quantum, based in the tax free Caribbean Country of Curaçao, a Caribbean tax haven, and a possession of the Netherlands Antilles, which protects the identity of investors from disclosure.

259. Upon information and belief, the Netherland Antilles has repeatedly been cited by the Task Force on Money Laundering of the Organization for Economic Cooperation and Development as one of the world's most important centers for laundering illegal proceeds of Latin American cocaine and other drug traffic.

---

[7] Among the other investors in Trump International Hotel & Tower are virtually the same defendants in this action: **Deutsche Bank, AG,** the parent company of German American, Blackacre Institutional Capital Management, LLC, which is the real estate affiliate of **Cerberus Capital Management, LP** (which is not presently a defendant in this action), **Grove Capital, LLP, which manages Soros Fund Management,** and **Fortress Investment Group, LLC,**

260. Upon information and belief, in 1979, Soros entered into a consent decree with the Securities and Exchange Commission in a case involving stock manipulation.

261. Upon information and belief, according to the New Yorker Magazine, in 1986 Soros was fined 75 thousand dollars by the Commodity Futures Trading Commission "for having held positions in excess of speculative limits."

262. In August of 1990, according to Reuters News Agency, the US Drug Enforcement Agency agents claimed that Banco de Columbia and other banks were conduits for Latin American drug money.

263. In or about August 1994, according to Reuters, Soros acquired a nine percent interest in Banco de Columbia.

264. According to the BBC, Soros was found guilty of felony criminal insider trading in France on January 29, 2002, and from profiting from inside knowledge of a 1998 takeover bid for Societé Generale, a French Bank, and was fined 2.9 Million Dollars, which felony conviction was upheld by the French Court of Appeals, the Cour de Cassation, France's highest Court, on June 14, 2006.

---

which is a partner of **Mapeley Holdings, Ltd.**, one of George Soros' companies, **and George Soros**. (See Exhibit "**Q**" in the accompanying Compendium of Exhibits.)

**The RICO Enterprise Puts in Place the Elements Necessary To Launder Money and To Engage In Bankruptcy and Wire Fraud**

265. Lazard and Conseco entered into a second engagement letter dated August 12, 2002, which was amended by a letter agreement dated October 21, 2002, and further amended December 16, 2002, one day prior to the Conseco Bankruptcy (the "Engagement Letter," annexed as Exhibit "**R**" to the accompanying Compendium of Exhibits).

266. Pursuant to the Engagement Letter, Lazard was entitled to the sum of 250 Thousand Dollars per month, 11 Million Dollars upon restructuring of Conseco, and 5 Million Dollars for the restructuring of Conseco Finance. Upon information and belief, these huge sums may have been paid, upon information and belief to Lazard, Bruce Wasserstein and Frank Savage, by Conseco, a RICO conspirator, in furtherance of conspiracy with the RICO Enterprise involving Conseco, or an individual controlling Conseco.

267. Upon information and belief, from June 2002 to December 2002, the six month period prior to the Bankruptcy filing of Conseco, the defendants in furtherance of the pattern of racketeering of the Enterprise, including Soros, SFM, Fortress, Vornado, Conseco, and Kirkland & Ellis entered into various conspiratorial agreements to facilitate the goals and purposes of the Enterprise to launder money through the Conseco Bankruptcy using the acquisition of Conseco Finance, which was a violation of 18 U.S.C. 1962 (a), and the DIP Financing by FPS, LLC, which was a violation of 18 U.S.C. §1962

(c), and ultimately allowing the defendants through a pattern of racketeering to purchase the GM Building, to launder money through its sale, and thereafter into Trump Chicago.

268. Upon information and belief, from July 2002 to December 2002, in furtherance of its pattern of RICO activity to commit Bankruptcy Fraud and money laundering derived from illegal activities, Conseco entered into a conspiratorial agreement with Kirkland & Ellis to make it appear to the financial markets and to defraud Conseco's creditors, that Conseco was serious about non-judicial reorganization and to avoid an *involuntary* bankruptcy by creditors which would frustrate the abilities of the RICO Enterprise to put the necessary pieces in place to further the conspiracy.

269. Upon information and belief, Fried Frank was engaged by the unsecured creditors of Conseco, but failed to take any steps to investigate or any affirmative steps against Conseco in furtherance of its conspiracy with Conseco and the other defendants.

270. In July 2002, the price of Conseco stock fell below $1 for the first time in more than 12 years and the company was delisted from the Standard & Poors 500 of the New York Stock Exchange to the detriment of the shareholders of Conseco.

271. On or about August 9, 2002, Gary C. Wendt, Chairman and Chief Executive Officer of Conseco, publicly announced the retention by Conseco of Lazard and Kirkland & Ellis to allow the RICO Enterprise time to lay the ground work to gain control of Conseco through a pattern of racketeering activity.

272. Upon information and belief, this announcement was an act in furtherance of the conspiracy of the defendants of misdirection to prevent the creditors of Conseco from filing an Involuntary Petition in Bankruptcy against Conseco.

273. From August to December 2002, upon information and belief, the RICO Enterprise structured the elements of the criminal conspiracy, plan and pattern of racketeering. One of the first affirmative acts of the RICO Enterprise involved creating CFN on or about July 11, 2002, in Delaware and then applied for authority to do business in the State of New York on August 15, 2002, as the instrumentality to acquire Conseco Finance[8] through a pattern of racketeering involving money laundering. (See Exhibit "S" annexed to the accompanying Compendium of Exhibits.) The members of CFN were Cerberus, Fortress, and J.C. Flowers & Co.[9]

274. Upon information and belief, the RICO Enterprise also set up FPS DIP to obtain the valuable position of Debtor-in-Possession financier to Conseco to launder money in the Conseco Bankruptcy. Upon information and belief, FPS DIP was controlled by Fortress and Soros, who have been, and, upon information and belief, remain co-conspirators in Money Laundering through partnerships they maintain in Curaçao, N.A. and Bermuda.

---

[8] The motion of Conseco to approve bidding procedures for Conseco Finance only identifies the purchaser as "Fortress/Flowers," "an affiliate of FPS DIP." FPS DIP was only identified as having an address "c/o Fortress Investment Group" but was actually a company whose members included Soros.

[9] Interestingly, there was no creation or registration of CFN Investments Holdings LLC to do business in Illinois or New York.

275. Upon information and belief, Quantum and Mapeley were the sources of the illegally derived funds that were funneled into the acquisition of Conseco Finance by defendant Fortress and by Soros and/or Fortress with the assistance of German American and Vornado into the GM Building on behalf of the RICO Enterprise.

276. These racketeering activities were implemented and executed for a pre-packaged Bankruptcy Fraud in a conspiracy by the defendants to overwhelm the other creditors of Conseco and take control of the sale of Conseco Finance to CFN (Fortress and Cerberus) and to put in place their own Debtor in Possession Financier, FPS DIP (only identified as c/o Fortress, but believed to include Soros or SFM).

277. On August 12, 2002 and October 21, 2002, once the RICO Enterprise was ready to file the voluntary Petition in Bankruptcy of defendant Conseco, Conseco restated its retention agreement with defendant Lazard under extremely lucrative terms.

278. On or about October 3, 2002, Gary C. Wendt resigned as Chief Executive of Conseco but remained on as Chairman of the Board in the meantime. Upon information and belief, Wendt did this to provide him with plausible deniability regarding the Money Laundering and Bankruptcy Fraud planned by Soros and the members and co-conspirators of the Enterprise perpetrated on Conseco's creditors, the bidders for Conseco Finance and the bidders for GM Building.

279. In or about and between August 2002 and December 17, 2002, Frank Savage of Lazard, a long-time financial adviser to George Soros and Conseco negotiated a

pre-arranged highly discounted sale of Conseco Finance to CFN and provided the lucrative position of Debtor in Possession Financing to Conseco to FPS DIP, an affiliate of CFN Holdings, to acquire an interest in, and maintain and conduct the affairs of Conseco by obtaining virtually complete control of the Conseco Bankruptcy proceeding. Upon information and belief, Frank Savage and or Lazard may appear in discovery to be one of the John Doe defendants.

280. Thus, the RICO Enterprise was now in a position to use the Conseco bankruptcy to launder money through the DIP facility and through the acquisition of Conseco Finance to hide the illegal source and origin of such funds.

## XI. THE RICO ENTERPRISE TAKES CONTROL OF THE CONSECO BANKRUPTCY

281. Accordingly, on December 16, 2002, the day before Conseco filed for bankruptcy, upon the advice and with the assistance of Lazard and Conseco's counsel Kirkland & Ellis, Conseco signed an asset purchase agreement with CFN Holdings to acquire Conseco Finance (the "Asset Purchase Agreement") for the amount of Conseco Finance's debt to Conseco.

282. Upon information and belief, since the members of CFN had been reviewing the assets of Conseco Finance since at least July 2002, only the members of CFN, Fortress and Cerberus, Soros, Conseco, Kirkland & Ellis and Lazard knew the true worth of Conseco Finance, which facts were never disclosed by CFN, Conseco, Lazard or

Kirkland & Ellis to the creditors' committee or third parties who attempted to bid on the purchase of Conseco Finance.

283. On the very next day, December 17, 2002, with the CFN Holdings Asset Purchase Agreement and the FPS DIP agreements in hand, Kirkland & Ellis caused Conseco, Conseco Finance, and the other holding companies of Conseco, CIHC, Inc., CTIHC, Inc., Partners Health Group, Inc., Conseco Finance Servicing Corp. (collectively, the "Holding Company Debtors") to file Bankruptcy petitions for relief under Chapter 11 of the Bankruptcy Code in the Northern District of Illinois, Eastern Division, case no. 02-B-49672 (CAD). The Bankruptcy filing of Conseco was the third largest Bankruptcy proceeding, smaller only than Enron and WorldCom.

284. In order to exercise even greater control over the operations of Conseco in Bankruptcy, and to profit at the expense of Conseco's creditors, Conseco entered a financing agreement with FPS DIP to become Conseco's DIP financer and Kirkland & Ellis in conspiracy with Conseco and the other defendants applied on December 17, 2002 to have the bankruptcy court approve such financing.

285. Kirkland & Ellis by James H.M. Sprayregen, Esq. represented to the bankruptcy court in connection with the aforesaid motion that a Priming Lien allowing FPS to take a senior position on most of Conseco's valuable assets was made "after a reasonable effort to obtain financing from other sources." These representations constituted Bankruptcy Fraud within the meaning of 18 USC § 152 (2) and/or (3).

286. In its application to the bankruptcy court to authorize the FPS DIP facility, dated December 17, 2002, Kirkland & Ellis by James H.M. Sprayregen, Esq. and Richard L. Wynne, Esq. falsely represented that the DIP facility with FPS was negotiated "at arm's length," that Kirkland & Ellis was a "disinterested person" as defined under section 101 (14) of the bankruptcy code, and that, absent this financing "Conseco would be unable to continue its operations and a liquidation would be the inevitable result." These representations constituted Bankruptcy Fraud within the meaning of 18 USC § 152 (2) and/or (3).

287. In order to protect the disclosure of their underhanded pre-bankruptcy agreements, by emergency motion dated December 19, 2002, Kirkland & Ellis, counsel for Conseco, falsely represented to the Bankruptcy Court that "there was no other place to obtain DIP financing other than from FPS" and that if the Court did not authorize the retention of FPS DIP, the consequence for Conseco would be "immediate liquidation."[10] These representations constituted Bankruptcy Fraud within the meaning of 18 USC § 152 (2) and/or (3).

288. In fact, at least thirty other bidders applied for the position of DIP financier in October 2002, and Conseco chose FPS as the financier not because it was the best, but to allow the Enterprise to infiltrate the bankruptcy. In furtherance of this pattern of

[10] In connection therewith, Conseco, by its counsel, Kirkland & Ellis, represented that the DIP Credit Agreement was the result of "arms-length negotiations between the CFC Debtors and the DIP Lenders." This representation constitutes Bankruptcy Fraud within the meaning of 18 USC § 152 (2) and/or (3). (See Page 8 of Emergency motion for interim and Final Order Authorizing, *inter alia*, the CFC Debtors to obtain post-petition financing annexed to the accompanying Compendium of Exhibits as Exhibit "T.")

racketeering, on December 19, 2002, Conseco requested the Court to approve the Secured Super-Priority Debtor in Possession Credit Agreement dated December 19, 2002 between Conseco Finance and FPS DIP to obtain secured post-petition financing up to the principal amount of 125 Million from FPS DIP.

289. In connection with the application for the FPS DIP facility Conseco agreed to provide a perfected first priority priming lien in favor of FPS DIP on the stock of Mill Creek Bank, Green Tree Retail Services Bank, Inc. and Rice Park Properties Corporation, three of the most valuable assets of Conseco, Inc.; for authority to borrow up to 87 Million Dollars under the FPS DIP Credit Agreement pending the final hearing on the DIP financing motion; for an order providing FPS DIP with a lien against all unencumbered prepetition and post-petition property of the Holding Company Debtors; and, most significantly, for an order providing that *the proceeds of any asset sales by Conseco to CFN, the affiliate of FPS, would pay down the FPS DIP Revolving loan.* Thus, any money paid by Fortress for Conseco Finance would be paid to FPS, owned by Fortress and Soros in a clear example of the conspiracy of Conseco with the Enterprise.

290. In connection with the aforesaid motion, Conseco, by its counsel, Kirkland & Ellis, represented to the Bankruptcy Court that CFN was the potential purchaser of Conseco Finance[11] but that without the approval of the FPS DIP financing order, Conseco "will not be able to continue operations for more than a few days, and will not allow them

[11] Fortress Investment Group LLC would later act the limited liability company named "CFN Holdings LLC" in which Cerberus Capital Management, LP was also a member.

to fund the completion of their restructuring process." (See Exhibit "**T**" annexed to the accompanying Compendium of Exhibits.)

291. Conseco's motion by Kirkland & Ellis to approve financing by FPS that it was an affiliate of the potential purchaser of Conseco Finance, CFN, described by Conseco as "Fortress/Flowers, the "stalking horse" purchaser of substantially all of the assets of the CFC Debtors…" was alleged to have been negotiated by Conseco "at arms' length." This was false and known to be false and constituted Bankruptcy Fraud within the meaning of 18 USC § 152 (2) and/or (3).

292. Conseco also disclosed in connection with this motion that Fortress,[12] Cerberus and J.C. Flowers & Co., the proposed buyers of Conseco Finance, had previously issued a term sheet to Conseco in "late November 2002." Conseco never made the term sheet available to the creditors of Conseco.

293. On December 19, 2002, Conseco Finance entered into a restated asset purchase agreement with CFN Holdings to purchase substantially all of the assets of Conseco Finance for the benefit of the RICO Enterprise.

---

[12] On January 11, 2006, the SEC filed a complaint against Fortress Financial Corp. and its President Jeffrey A. Richie, alleging that between March 2000 and April 2001, Fortress raised approximately $2.9 million through the sales of shares of preferred stock to approximately 85 investors in a purported private placement. Richie and Fortress made material misrepresentations and omissions to investors relating to (1) financial projections, (2) undisclosed liabilities in excess of $1 million, (3) plans to conduct an IPO, and (4) representations that Fortress would not spend any of the offering proceeds until it raised $2 million. (See Exhibit "**W**" annexed to the accompanying Compendium of Exhibits.)

294. On January 14, 2003, Kirkland & Ellis, applied for an order allowing Conseco to retain Kirkland & Ellis as counsel for Conseco as of the date of the Bankruptcy Petition. In this application, Kirkland & Ellis represented that it had no conflicts of interest in representing the entire Conseco Bankruptcy Estate, including subsidiaries having obligations to Conseco and was "a disinterested person" under the bankruptcy code. These representations constituted Bankruptcy Fraud within the meaning of 18 USC § 152 (2) and/or (3).

**The Racketeering Enterprise**
**Commences Its Flood of Motions**
**<u>To Overwhelm the Creditors</u>**

295. Key to the success of the RICO Enterprise was to flood the Bankruptcy Court with motions to approve the FPS DIP financing and the CFN Holdings Asset Purchase Agreement prior to the appointment of the Official Committees, by making emergency motions on short notice and to litigate every objection raised by the creditors to restrict the security which FPS, DIP would receive for the DIP financing and to restrict the Creditors from discovering information regarding the purchase of Conseco Finance by CFN.[13]

296. Upon information and belief, these acts were part of the scheme to conduct the activities of, and control and maintain an interest in Conseco through a pattern of racketeering by defrauding the Bankruptcy Court and in furtherance of the RICO Enterprise's illegal transactions.

297. On the date of Conseco's Bankruptcy filing, December 17, 2002, Conseco made motions for an order authorizing the retention and employment of Lazard[16] as Conseco's investment bankers, upon the affidavit of Frank Savage,[18] and for an order authorizing the employment and retention of Kirkland & Ellis, as attorneys for debtors. Thus, the RICO Enterprise had its key conspirators in place to manipulate and control the Conseco Bankruptcy for the benefit of the RICO Enterprise. In this connection, two days after it filed for Bankruptcy under Chapter 11, Conseco made the following additional motions on December 19, 2002:

a. for an order to approve the Asset Purchase Agreement between Conseco Finance and CFN Holdings entered on December 19, 2003;

b. or an order establishing bidding procedures in connection with the sale of substantially all of the assets of Conseco Finance to CFN Holdings including certain buyer protections;

---

[13] See, e.g., Emergency motion of Unsecured Creditors for Disclosure from CFN Holdings as to the assets of Conseco Finance, dated February 6, 2003, which motion was denied.

[16] Conseco acknowledged in this application that it previously paid Lazard the sum of $2,500,000, plus expenses of $123,934.08 for pre-petition expenses and an advance of $4,000,000. The December 16, 2002 Retention letter annexed to the application indicates that Lazard was retained as early as June 7, 2002, that the initial retention letter was revised on August 12, 2002 and again on October 21, 2002. The engagement letter provided that Lazard would be paid $250,000 per month, plus $11,000,000 upon a restructuring, and $1,000,000 plus 0.75% of the purchase price of Conseco Finance. (See Exhibit "**U**" annexed to the accompanying Compendium of Exhibits.)

c. For an order approving the form and manner of notices;

d. For an order approving the form of the Asset Purchase Agreement;

e. For an order setting a sale hearing;

f. For an order approving the sale of the Conseco Finance's assets free and clear of all liens, claims and encumbrances to the successful bidder;

g. For an order allowing CFN Holdings to purchase all or substantially all of the assets of Conseco Finance with certain conditions to protect CFN Holdings, including:

h. A "break-up fee" of 30 Million Dollars;

i. An expense reimbursement of 5 Million Dollars;

j. A 10 Million Dollar overbid protection;

k. The right of CFN to exclude any assets of Conseco Finance from its purchase;

---

[18] In or about February 2004 Frank Savage, an officer of Lazard, Ltd. was indicted in connection with an investigation of Enron by the U.S. Department of Labor for mismanaging the Enron Pension Plans. (See Exhibit "V" annexed to the accompanying Compendium of Exhibits.)

l. Potential purchasers of the Conseco Finance assets had to "offer to purchase all or substantially all of Conseco Finance's assets upon the same terms and conditions" as CFN;

m. The right of CFN to "exclude any assets, properties, contracts, and rights from the purchased assets [of Conseco Finance] in CFN's sole discretion; and

n. Setting the purchase price for CFN to purchase Conseco Finance for no cash component—only assumption of debt.

298. On December 20, 2002, the Bankruptcy Court approved the break-up fee, "as defined in the Asset Purchase Agreement [with CFN Holdings], and under the terms and conditions set forth therein." The other relief described in the Order was deferred to a Hearing on January 6, 2003.

299. On December 22, 2002, Willkie, Farr filed a Notice of Appearance on behalf of J.C. Flowers & Co., LLC and Fortress Investors Group, LLC, the members of CFN Holdings. (See Exhibit "**X**" annexed to the accompanying Compendium of Exhibits.)

300. On December 27, 2002, US Bank made a motion to the Bankruptcy Court for clarification and reconsideration of Conseco's emergency motion for relief, specifically, the basis for the 30 Million Dollar break-up fee and requested the court to reconsider the "terms and conditions" of the break-up fee.

301. On December 30, 2000, the Unofficial ad hoc Committee of B2 class guaranty holders made a motion to the Bankruptcy court to reconsider the terms and conditions of CFN's 30 Million Dollar break-up fee.

302. On January 6, 2003, the Unsecured Creditors' Committee objected to the 30 Million Dollar break-up fee provided to CFN in its role as the stalking horse bidder of Conseco Finance. Its motion was denied.

303. On the same date the Bankruptcy Court appointed FPS DIP as the main DIP Financer of Conseco.

304. All of these motions by Kirkland & Ellis, and the actions taken prior to the Bankruptcy of Conseco, support the conclusion that Kirkland & Ellis was involved in conspiracy with the operation and management of the RICO Enterprise. This constituted an agreement to conspire with the Enterprise through a pattern of racketeering activities in interstate commerce.

305. On or about January 6, 2003, Conseco made motions for an order authorizing the Holding Company Debtors to reject certain non-residential real property leases and for an order allowing the Holding Company Debtors to abandon certain de minimus assets by debtors and debtors-in-possession.

306. On or about and between December 27, 2002 and January 7, 2003, US Bank, the Unofficial Ad Hoc Committee of B2 Class Guaranty Holders, the United States

Trustee and the Unofficial Committee of Noteholders objected to certain of the conditions of the Asset Purchase Agreement between Conseco and CFN.

307. On January 21, 2003, the Committee of Unsecured Creditors objected to the CFN asset purchase agreement of Conseco Finance. According to the Committee, the CFN Asset Purchase Agreement of Conseco Finance didn't contain a definitive or fair purchase price and that the terms and conditions that did exist were vague, ambiguous and wholly in the discretion of CFN so as to be "illusory."

**The Acquisition of**
**Conseco Finance By**
**The RICO Enterprise**

308. On January 20, 2003, after the Bankruptcy Court approved the bidding procedures for the purchase of Conseco Finance pursuant to 11 USC §363 by CFN Holdings in substantially the same form as requested by co-conspirators Kirkland & Ellis and Conseco, the bankruptcy court scheduled a sale Hearing for March 5, 2003. This Order further provided that any other bidders must submit their bids no later than February 24, 2003.

309. On January 27, 2003, Counsel for the Official Committee of Con*seco Finan*ce served a subpoena for a Rule 2004 examination of CFN, whose members were Fortress, Cerberus and J.C. Flowers & Co, LLC.