310.   By *letter dat*ed February 3, 2003, Cerberus objected to the subpoena on the grounds that it sought confidential research, development and commercial information as well as other privileged or protected matter.

311.   On February 8, 2003, the Unsecured Creditors' Committee by Fried Frank, in an effort to obtain information on the Asset Purchase Agreement between Conseco and CFN Holdings, also requested the bankruptcy court to allow discovery of CFN Holdings, since, it argued, if the Asset Purchase Agreement were approved, and CFN Holdings would be allowed to purchase the assets of Conseco Finance, among other things, the Asset Purchase Agreement would cancel $250 Million of guarantees by CIHC of loans to the Conseco Debtors.

312.   On February 11, 2003, CFN Holdings, by Willkie Farr, objected to the discovery of the CFN Holdings Asset Purchase Agreement on the basis that there was public information available to the Committee and what was not public was privileged.

313.   Upon information and belief, this representation by Willkie Farr, by Steven Wilamowsky, may have been in furtherance of the criminal conspiracy, plan and scheme of the RICO Enterprise to conceal material financial information provided by Conseco and Lazard to CFN prior to the Bankruptcy filing of Conseco. Willkie Farr and/or Steven Wilamowsky may later be discovered in this case to be defendants' John Doe.

[74]

David H. Relkin, Esq.

314.    Upon information and belief, Fried Frank argued that CFN Holdings had acquired proprietary information during the six months prior to the Conseco Bankruptcy from Conseco, Kirkland & Ellis, and Lazard which gave CFN Holdings an advantage in bidding for the assets of Conseco Finance.

315.    In response to these motions, Kirkland & Ellis repeatedly submitted opposition to the aforesaid motions so as to keep material financial information provided to CFN from the Bankruptcy Court, the potential bidders on Conseco Finance and the creditors of Conseco, which opposition was repeatedly upheld by the Bankruptcy Court. The affidavits or declarations of Kirkland & Ellis were in furtherance of the RICO Enterprise to conceal the true value of the assets.  These acts were taken in response to the instructions of Conseco, or certain officers thereof and may have been violations of 18 U.S.C. §152.

316.    On February 14, 2003, Conseco filed its final sale order of the assets of Conseco Finance, with the court setting the time for objections to be filed no later than February 24, 2003.

317.    On February 18, 2003, Conseco issued a press release that it would be selling the GM Building pursuant to, and "in furtherance of the Conseco, Inc. Plan of Reorganization."

318.    Despite the fact that only CFN had the necessary information on Conseco Finance to make an appropriate offer for Conseco Finance, on February 28 through

[75]

David H. Relkin, Esq.

March 3, 2003, the bidding process for the sale of Conseco Finance took place under the guise that it was a fair process.

319.     Since CFN had received proprietary information from Lazard, Conseco and Kirkland & Ellis prior to the Bankruptcy to assess the true value of Conseco Finance, and since the bankruptcy court had granted CFN certain protections in connection with the purchase of Conseco Finance, only CFN had a realistic chance of acquiring Conseco Finance, on behalf of the RICO Enterprise, to allow Fortress to launder money through the Conseco Finance purchase.  Upon information and belief, CFN's acquisition of Conseco Finance was in furtherance of defendants' racketeering activities and Bankruptcy Fraud on the bankruptcy court, the creditors of Conseco and others.

320.     On March 5, 2003, CFN won the bidding to acquire most of Conseco Finance for 772 Million Dollars.  Upon information and belief, this constituted an investment of income derived by racketeering activities of money laundering in the acquisition of an enterprise affecting interstate commerce in violation of 18 U.S.C. §1956 and 1957, as more fully described in Section XIII, Predicate Acts.

321.     CFN Holdings also acquired the right to sell Mill Creek Bank to GE Capital for 323 Million Dollars, reducing the true purchase price it paid for Conseco Finance by 270 Million Dollars.

[76]

David H. Relkin, Esq.

**The Machinations of Trump
And Conseco to Confuse and
Delay Resolution of The
Ownership of the
General Motors Building**

323.    Upon information and belief, as part of the criminal conspiracy, plan and

scheme by the RICO Enterprise in or about mid-2002, Soros, Fortress or someone else

acting on behalf of them approached Trump with a proposal to use money laundering to

acquire the GM Building and, once acquired by the Enterprise, Soros and the other

individuals associated in fact with Soros, Fortress, Vornado, Harry Macklowe, Trump,

Eastdil and German American to engage in a Money Laundering scheme through which

they could launder money through the sale of the GM Building into a Trump real estate

property.  All of the aforesaid parties agreed to engage in the conspiracy.

324.    In furtherance of the conspiracy pattern of Racketeering, to lay the

groundwork for the money laundering through the sale of the GM Building, Conseco

continued to fight about the ownership of the GM Building, with Trump suing in State

Court in violation of the Arbitration Agreement in the Operating Agreement with Carmel

Fifth, intentionally halting the arbitration, making motion after motion to the Bankruptcy

Court, applying to the Bankruptcy Court to resolve the dispute, arguing that the

Bankruptcy Court had jurisdiction to hear the dispute, and then arguing that the

Bankruptcy Court did not have jurisdiction, resuming hearings before the American

Arbitration Association (the "AAA"), then returning to the Bankruptcy Court to vacate

the Award, then stipulating to dismiss the Bankruptcy action, fighting in the State Court

David H. Relkin, Esq.

to vacate the Award, removing the action to Federal Court, then resuming State Court

proceedings to confirm the Award of the arbitrators and then, finally, resolving their

alleged "disputes" in a "confidential agreement" to hide the racketeering activities of the

Enterprise which funneled approximately 275 Million Dollars derived from illegal

sources into the hands of Trump to invest in Trump, Chicago to conceal the origin and

nature of such funds.

325.    On August 20, 2002, Carmel Fifth and Trump held their Preliminary

Conference before the AAA.  By Order dated August 26, 2002, Hon. George C. Pratt

provided for seven days of Hearing during September and October 2002.

326.    After most of the Hearings, in or about November 2002, Trump sought to

disqualify Conseco's party-appointed arbitrator, Kenneth Feinberg,[21] and to force the

parties to start the Arbitration again.  The AAA denied Trump's request and ordered the

parties to complete the Arbitration.

327.    After at least five days of hearing, submission of pre- and post-Hearing

Memoranda of Law, in late November, 2002, on the eve of the Award of the Arbitrators,

and a month before the RICO Enterprise planned to file the Bankruptcy Petition on behalf

of Conseco, Trump through 767 Manager moved to dismiss the neutral Arbitrator, former

Second Circuit Judge George A. Pratt, for allegedly failing to disclose a potential conflict.

---

[21] Kenneth Feinberg was the special master of the September 11th Victim's Compensation Fund.

[78]

David H. Relkin, Esq.

328.    On December 13, 2002, after Trump challenged the impartiality of the neutral arbitrator, former Second Circuit Judge Hon. George C. Pratt, the AAA disqualified Judge Pratt.

329.    Upon information and belief, while no actual conflict existed, the AAA nevertheless disqualified Judge Pratt based upon false allegations by Trump as to Judge Pratt's conflict of interest.

330.    According to the rules of the Operating Agreement of 767 LLC, the two party arbitrators were to appoint a third, who was to act as a neutral.

331.    Instead, on a conference call with the remaining two arbitrators, on January 13, 2003, Trump instructed his arbitrator Howard Lorber in furtherance of the RICO Enterprise to refuse to appoint another arbitrator as the third arbitrator because, he claimed, 767 Manager was unwilling to continue the almost-finished hearings before a new third arbitrator and that the Arbitration should begin anew.

332.    In furtherance of the defendants' scheme to keep the ownership of the GM Building in dispute in furtherance of the pattern of racketeering, on or about January 13, 2003, Trump objected to the appointment of a new neutral arbitrator proposed by the AAA to complete the Hearings.

333.    By letter dated January 22, 2003, Carmel Fifth attempted to have the AAA appoint the third arbitrator pursuant to the Commercial Rules, but the AAA refused due

[79]

David H. Relkin, Esq.

to Trump's refusal to consent. (See Exhibit "**Y**" annexed to the accompanying Compendium of Exhibits.)

334.    On February 1, 2003, Conseco filed its first reorganization Plan. The Plan provided for the extinguishment of over 5 Billion Dollars in debt and provided that the sale of the GM Building was to be "in furtherance of and pursuant to the Conseco, Inc. Plan of Reorganization." This representation constituted Bankruptcy Fraud by Kirkland & Ellis since the principals of Conseco, Soros, Fortress, Vornado, German American, Eastdil and Trump had made sure that the GM Building would be sold to a front-man: Harry Macklowe.

335.    On February 3, 2003, most of Conseco's subsidiaries filed voluntary petitions in Bankruptcy. However, Conseco did not file for Bankruptcy on behalf of Carmel Fifth in furtherance of the RICO conspiracy to keep the GM Building outside the purview and control of the Bankruptcy Court.

336.    On February 3, 2003, Trump met with Andrew Hubregsen, to discuss the refinancing of the GM Building. By letters dated February 4, 2003, February 7, 2003 and March 6, 2003, Carmel Fifth's counsel wrote to the AAA in an attempt to have the other two party arbitrators appoint a third, neutral arbitrator, or, in the alternative to have the AAA appoint a new neutral arbitrator. (See Exhibit "**Z**" annexed to the accompanying Compendium of Exhibits.) Based on Trump's refusal to agree with these procedures, in furtherance of the pattern of racketeering, the AAA refused to act.

David H. Relkin, Esq.

337.    In order to intimidate the AAA, between February 4, 2003 and February 7, 2003, Trump through 767 Manager threatened legal action against the AAA to intimidate it form appointing a new arbitrator and again challenged the continued appointment of Carmel Fifth's Arbitrator Kenneth Feinberg.

338.    Then, precipitously, at Trump's urging and in furtherance of the conspiracy, on February 5, 2003, 767 Manager instructed its Arbitrator, Howard Lorber to resign, putting a complete halt to the arbitration proceedings.

339.    Upon information and belief, on or about February 8, 2003, in furtherance of the conspiracy, Trump caused a letter to be sent to Conseco to the effect that Trump would sue anyone who made an offer on the GM Building for tortuous interference with contractual relations.

340.    Upon information and belief, on or about February 12, 2003, Trump sent a letter to a prospective buyer of the GM Building that if he pursued the deal was Conseco he would be sued.

341.    On February 21, 2003, Trump filed a 1 Billion Dollar Proof of Claim with the Conseco Bankruptcy Court in furtherance of the criminal conspiracy, plan and scheme of the RICO Enterprise.

342.    Then, on or about February 25, 2003, in furtherance of the conspiracy, Trump proposed an offer to refinance the Mortgages on the GM Building by a mortgage

[81]

David H. Relkin, Esq.

from Column Financial Inc., a wholly owned subsidiary of Credit Suisse First Boston, and provided Conseco with a Term Sheet, but required Conseco to approve the proposal (and the 250 Thousand Dollar commitment fee) within two days, which proposal Conseco again rejected.

343.    Accordingly, in an about-face, on March 3, 2003, Conseco and Carmel Fifth commenced an adversary proceeding against Donald J. Trump and 767 Manager and Trump 767 Management in the Bankruptcy Court, tacitly admitting that the Bankruptcy Court had jurisdiction over the GM Building. (See Exhibit "AA" annexed to the accompanying Compendium of Exhibits.) These acts were taken in response to the instructions of Conseco, or certain officers thereof, was a violation of 18 U.S.C. §152 (2).

344.    In connection with such motion, Conseco represented to the Bankruptcy Court that the proceeds of the sale of the General Motors Building were "necessary to the successful reorganization of Conseco, Inc," and that the Bankruptcy Court had core jurisdiction over the dispute. These statements by Kirkland & Ellis acts were taken in response to the instructions of Conseco, or certain officers thereof, in conspiracy therewith and was a violation of 18 U.S.C. §152 (2).

345.    On March 5, 2003, Conseco then made a motion for an Order granting Conseco authority to sell the General Motors Building, establish bidding procedures, establishing the date and time of the auction and Hearing to sell the property, and for authority to enter into a contract including a break-up fee. (See Exhibit "BB" annexed to the accompanying Compendium of Exhibits.)

[82]

David H. Relkin, Esq.

346.    On or about March 5, 2003, Conseco made an Emergency motion for an Expedited Hearing on the Complaint and filed a Memorandum of Law in support of emergency relief against Trump.

347.    In this Memorandum, Conseco argued to the Bankruptcy Court that its proceeding involved resolution of claims against the Bankruptcy Estate and that the Bankruptcy Court had "core jurisdiction" over the dispute pursuant to 11 USC §157 (b) (2). (See Exhibit "**BB**" annexed to the accompanying Compendium of Exhibits.)  Either this declaration was an instance of Bankruptcy Fraud pursuant to 18 U.S.C. §157 (2), or the prior claim by Conseco that the GM Building was not an asset of the Estate was bankruptcy fraud.

348.    Conseco further requested that Trump be removed as the manager of the GM Building and supply copies of his records so that Conseco could avoid the default under the two mortgages on the GM Building, which came due on July 31, 2003, to allow Conseco to refinance the Building.

349.    Conseco also requested that the Bankruptcy Court make a determination of the parties' rights based on the Transcripts and documentary evidence submitted at the Arbitration Hearings.  Either this request by Kirkland & Ellis was an instance of Bankruptcy Fraud pursuant to 18 U.S.C. §157 (2) by asserting that the dispute was a core proceeding, or the prior claim by Conseco that the GM Building was *not an asset of the Estate* was bankruptcy fraud.

[83]

David H. Relkin, Esq.

350.    Notwithstanding its prior claim that the General Motors Building could not be part of the Conseco Estate, in direct contradiction of its earlier representations to the Bankruptcy Court, and in furtherance of its fraudulent misdirection, Conseco instructed its counsel Kirkland & Ellis moved on March 5, 2003 for authority to sell the GM Building free and clear of any liens, pursuant to Section 363 of the Bankruptcy Code, to establish bidding procedures, fixing the date, time and place of the sale.

351.    In this motion Conseco represented to the Bankruptcy Court and the creditors that the Ownership Dispute between it and Trump would attach to the proceeds of the sale of the GM Building, to the detriment of the creditors whom they knew would receive nothing in furtherance of the conspiracy, plan and scheme of the RICO Enterprise. This request by Kirkland & Ellis was an instance of Bankruptcy Fraud pursuant to 18 U.S.C. §157 (2) by asserting that the GM Building was property of the Estate.

352.    Conseco proposed an auction date of June 2, 2003 at the offices of Kirkland & Ellis.  Conseco provided that qualified bidders would be allowed to raise their bid at the auction, however, no auction was held, and it is now known and apparent that this caused direct and proximate injury to plaintiffs quantifiable in 2008.

353.    In addition, by motion dated March 5, 2003, returnable on May 7, 2003, Conseco moved the Court to approve Conseco's exclusive real estate agent agreement with Eastdil Realty, a real estate company in New York.  (See Exhibit "**CC**" annexed to the accompanying Compendium of Exhibits.)

[84]

David H. Relkin, Esq.

354.     Pursuant to the Eastdil Realty motion by Conseco, which was part of and in furtherance of the racketeering Enterprise, Eastdil Reality was to receive an advisory fee of 55 Thousand Dollars per month, plus 0.175% of the amount in the first contract signed—even if Conseco did not close with that purchaser—plus 0.175% of the final purchase price up to One Billion Dollars, 0.5% of the purchase price between One Billion Dollars and One Billion One Hundred Million Dollars, and 2.5% of the purchase price in excess of One Billion One Hundred Million Dollars. (See Exhibit "**CC**" annexed to the accompanying Compendium of Exhibits.)

355.     Upon information and belief, this motion was in furtherance of the Bankruptcy Fraud perpetrated by George Soros and Trump, and the pattern of Racketeering activity of the RICO Enterprise, in order to deceive the Conseco creditors that the GM Building would return a substantial yield to the creditors of Conseco.

356.     On March 6, 2003, the Bankruptcy Court adjourned the Hearing on the sale of the General Motors Building and the retention of Eastdil to March 17, 2003.

357.     On March 11, 2003, at the request of the Trump entities, the American Arbitration Association appointed former United States District Judge Nicholas Politan to the Panel and issued new ruling to allow the arbitration to proceed.

358.     On March 12, 2003, Conseco filed its First Amended Disclosure Statement for the Debtor's Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan").

[85]

David H. Relkin, Esq.

359.    Conseco argued to the Bankruptcy Court in its March 5, 2003 motion to sell the General Motors Building that the sale was necessary to the reorganization of Conseco, in departure from its prior position, and represented in the Plan on March 8, 2003, that the sale of the General Motors Building was a condition precedent to the confirmation of a Plan and that the proceeds from the sale of the GM Building would be distributed to Conseco creditors.

360.    On March 12, 2003, Trump made a motion to the Bankruptcy Court to dismiss the Adversary Proceeding between Trump and Carmel Fifth based on the allegation that, although Conseco owned the GM Building through various subsidiaries, Carmel Fifth, a subsidiary of four non-debtor insurance companies was a non-debtor subsidiary and therefore not under the jurisdiction of the Bankruptcy Court.

361.    As a consequence, with the assistance of the RICO conspirators of the racketeering Enterprise, Trump argued that the Bankruptcy Court had no subject matter jurisdiction over the dispute with Trump and the matter should instead be arbitrated since Conseco had no property interest in the outcome of the Arbitration between Carmel Fifth and 767 Manager.

362.    Trump also pointed out that Conseco never listed the General Motors Building on its statement of assets.  However, on Conseco's Financial Statement, Conseco listed an investment in Carmel Fifth of approximately 212.7 Million Dollars. (See Exhibit "G" annexed to the accompanying Compendium of Exhibits.)

[86]

David H. Relkin, Esq.

363.   This allegation by Trump was bankruptcy fraud since Trump had previously argued to the Court that Conseco and Carmel Fifth were alter egos of each other.

364.   According to Conseco, Trump had to make this argument because his only possible claim to Carmel's stake in the Building was the July 3 Agreement, to which Conseco was a party.

365.   Trump's position in the Arbitration was that Conseco was bound by the July 3 Agreement to modify the LLC Agreement of 767 LLC and defer the Buy/Sell provision.  These representations were made by Trump to further delay and confuse the Bankruptcy Court and the Conseco creditors as to the true ownership of the GM Building.

366.   On or about March 12, 2003, the Official Committee of Trust Preferred Debt Holders argued to the Bankruptcy Court that the Conseco/Trump dispute was a core proceeding because: "it affects the amount of property available for distribution or the allocation of such property among creditors."  It further stated that "the General Motors Building was an important asset of the Bankruptcy Estate."

367.   On or about March 12, 2003, Fried Frank Harris Shriver & Jacobson, counsel to the Unsecured Creditors' Committee, also made a motion for an Order determining that Carmel Fifth was no more than a shell company to hold Conseco's ownership interest in the GM Building and that the Court should exercise jurisdiction

[87]

David H. Relkin, Esq.

over the dispute to strengthen the insurance business core of Conseco and that, absent Bankruptcy Court intervention, the Building would go into foreclosure.

368.    On March 12, 2003, Conseco filed a Memorandum in further support of its motion to sell the GM Building free and clear of all liens.  In this motion, Conseco argued that "Carmel was organized by Conseco solely to hold Conseco's interest in the General Motors Building."  (See Exhibit "**BB**" annexed hereto.)  This claim was in direct opposition to its prior position that it owned no real estate and that the GM Building was owned by four non-debtor subsidiaries.

369.    On or about March 13, 2003, with a few modifications requested by other creditors of Conseco, the Bankruptcy Court approved the CFN Holdings Asset Purchase Agreement free and clear of any liens.

370.    This constituted the acquisition or maintenance of an interest and an investment of income from racketeering activities in an RICO Enterprise through a pattern of racketeering activities.  This also constituted the conduct of the affairs of an Enterprise affecting interstate commerce through a pattern of racketeering activity.

371.    Among the direct beneficiaries of the sale of Conseco Finance was the RICO Enterprise and Chuck Cremens, the former CEO of Conseco Finance, who received 1.5 Million Dollars for consummating the Asset Purchase Agreement, and Lazard, which received 5 Million Dollars for the pre-arranged sale of Conseco Finance.

[88]

David H. Relkin, Esq.

372.    On March 14, 2003, the Bankruptcy Court made a preliminary decision that it had core jurisdiction to hear all aspects of the Verified Amended Adversary Complaint and Counterclaims and to decide the rights of the parties with respect to the July 3 Agreement, the issues raised in the Trump One Billion Dollar Proof of Claim and the basic contract dispute issues regarding the Buy/Sell agreement in the 767 LLC Operating Agreement.

373.    On March 14, 2003, the Bankruptcy Court approved the CFN Holdings and General Electric Asset Purchase Agreement for certain assets of Conseco Finance, which Agreement the Bankruptcy Court approved free and clear of liens for 1.110 Million Dollars and 200 Million Dollars in assumed liabilities which was to close on June 23, 2003.

374.    Thereafter, CFN Holdings sold Mill Creek Bank to GE for 310 Million Dollars, further reducing the true price it was paying for Conseco Finance.

375.    On March 17, 2003, Eastdil Realty submitted an affidavit, by its attorneys Kirkland & Ellis, in support of its motion to be retained to sell by Conseco the GM Building.  This submission by Kirkland & Ellis was in conflict of interest to its duties to Conseco which had previously maintained that the GM Building was not owned by Conseco and may have constituted bankruptcy fraud.

[89]

David H. Relkin, Esq.

376.   This motion was in furtherance of the racketeering activity of George

Soros on behalf of the Enterprise, including Trump and Fortress, to deceive the creditors

of the Conseco bankruptcy as to the ownership of the GM Building.

377.   Also, on March 17, 2003, the Bankruptcy Court ordered (on consent)

Trump, 767 Manager and 767 Management, LLC to immediately allow Conseco access to

all books and records of 767 LLC.

378.   On March 18, 2003, the Debtor issued its Second Amended Disclosure

Statement for Reorganizing Debtors' Joint Plan of Reorganization Pursuant to Chapter 11

of the United States Bankruptcy Code (the "Second Plan"), drafted by Kirkland & Ellis.

379.   The Second Plan states that "the sale or transfer of the GM Building (or

entities owning the GM Building or interests therein) pursuant to or consistent with an

Order of the Bankruptcy Court shall be deemed a transfer under, pursuant and in

furtherance of the Plan."

380.   On March 18, 2003, the Bankruptcy Court approved the Second Amended

Disclosure Statement.

381.   On March 20, 2003, the Bankruptcy Court ordered the parties in the

*Conseco, Inc. and Carmel Fifth, LLC v. Donald J. Trump, 767 Manager, LLC and Trump*

*776 Management, LLC* action to file a joint Pretrial Statement no later than April 8, 2003

[90]

David H. Relkin, Esq.

providing all witnesses, stipulated facts, material facts in dispute and set Trial Dates for
April 10, 11, 14, 15, 21 and 22, 2003.

382.    On March 21, 2003, in furtherance of the RICO conspiracy, Trump filed a
Verified Statement and Memorandum in Opposition to the Retention of Eastdil Realty.
In the application, Trump argued that the General Motors Building should be sold to him
pursuant to the July 3 Agreement, which would save on transfer taxes and the Eastdil
Realty Brokerage fees, which he claimed were "double" what is commercially reasonable.
He also argued that he had retained Credit Suisse First Boston to refinance the Building,
which would save 15.5 Million Dollars of interest per year.   However, Trump argued, if
Eastdil Realty were to be retained, no substantial lender would spend the time on the
refinancing.  (See Exhibit "**DD**" annexed to the accompanying Compendium of Exhibits.)

383.    Trump further argued against the retention of Eastdil Realty since, he
argued consistently with Conseco earlier in the bankruptcy that the GM Building was not
part of the Conseco Bankruptcy Estate because Conseco did not own the property.   In
furtherance of this position, Trump argued that, even if the Court had subject matter
jurisdiction over the dispute between Carmel and 767 Manager, it lacked authority under
Section 363 of the Bankruptcy Code to conduct a sale of the Property. (See Exhibit "**DD**"
annexed to the accompanying Compendium of Exhibits.)

384.    Finally, Trump argued that he was ready, willing and able to pay 995
Million Dollars for the GM Building which Eastdil Realty estimated would sell by early
2004 for approximately 1.05 Billion Dollars. "After deductions for commissions,"

[91]
David H. Relkin, Esq.

Trump argued, transfer taxes and other fees, these prices are virtually identical." Thus, argued Trump, the debtors could not demonstrate that Eastdil Realty could provide a significant improvement to the Trump offer.

385.    On March 31, 2003, Conseco and Carmel Fifth—which was not in bankruptcy and thus had no standing to make such motion—made an emergency motion to add a request for damages against Trump and 767 Manager caused by their refusal to convey the GM Building.

386.    On March 31, 2003, Trump made an emergency motion to the Bankruptcy Court to stay the trial in the adversary proceeding between Trump and Carmel Fifth based on lack of subject matter jurisdiction by the Bankruptcy Court over the dispute since, he claimed, regardless of who succeeded, there would be no recovery to Conseco or any other debtor entity. (See Exhibit "EE" annexed to the accompanying Compendium of Exhibits.)  Notably, Kirkland & Ellis, counsel for Conseco, in furtherance of the RICO Enterprise did not contest Trump's motion.

387.    On April 3, 2003, the Bankruptcy Court agreed with Trump and dismissed the claims between Carmel Fifth and Trump regarding the sale of the GM Building for lack of jurisdiction and lifted the automatic stay to the extent necessary to allow the parties to participate in the arbitration process.

388.    In furtherance of the RICO conspiracy, on April 14, 2003, Eastdil Realty withdrew its application to be retained by Conseco as the seller's agent of the GM

[92]

David H. Relkin, Esq.

Building since Eastdil Realty, in its conspiracy with Conseco, George Soros and Donald J. Trump, were all attempting to keep the GM Building in play so that it could not be sold under the jurisdiction of the Bankruptcy Court to advance the pattern of racketeering to launder money through the sale of the Building.

389.    On April 22, 2003, by stipulated Order Donald J. Trump and Conseco proceeded back to arbitration before the AAA.

390.    On May 28, 2003, the Arbitrators rendered an Award in *Carmel Fifth, LLC and Conseco v. Donald J. Trump, 767 Manager, and 767 Management LLC*. (See Exhibit "FF" annexed to the accompanying Compendium of Exhibits.)

391.    The Award directed 767 Manager, LLC to transfer all of its right, title and interest to 767, LLC, which owned the General Motors Building, for the sum of $15,588,025.00.

392.    Despite the fact that the Bankruptcy Court had previously declined jurisdiction over the dispute or the transfer of the GM Building, in furtherance of the Bankruptcy fraud on the Conseco creditors and the Bankruptcy Court, by motion dated May 28, 2003, Kirkland & Ellis applied to the Bankruptcy Court to confirm the Award of the Arbitrators in direct contradiction of the Court's prior order that the Building was not part of the Estate. (See Exhibit "GG" annexed to the accompanying Compendium of Exhibits.)

[93]

393.    Upon information and belief, this application by Kirkland & Ellis was a
further act of the RICO conspiracy in connection with the sale of the GM Building to
keep the building in a type of three-card Monty game until the GM Building could be sold
outside of the Bankruptcy Court's scrutiny since there was no basis to apply to the
Bankruptcy court for such confirmation.

394.    In furtherance of the racketeering Enterprise of defendants, on May 29,
2003, Donald J. Trump filed a proceeding with the New York State Supreme Court to
vacate the Arbitration Award. (See Memorandum of Law, Exhibit "**HH**" annexed to the
accompanying Compendium of Exhibits.)

395.    On the same date, Kirkland & Ellis, on behalf of Conseco, removed the
vacatur motion by Donald J. Trump to the United States District Court for the Southern
District of New York, despite the fact that the District Court clearly had no jurisdiction
over the confirmation of the Award under the Federal Arbitration Act in contradiction to
its prior position.

396.    On May 30, 2003, Donald J. Trump submitted his opposition to the
Bankruptcy Court to Conseco's motion to confirm the Award based on lack of
jurisdiction.

397.    On June 2, 2003, the Bankruptcy Court found that Trump had violated the
automatic stay by commencing the petition to confirm the Award and naming Conseco.
Nevertheless, the Bankruptcy Court allowed the Petition to Vacate the Arbitration Award

[94]

David H. Relkin, Esq.

to proceed in State Court with the proviso that Conseco was dropped from the Petition to
Vacate.

398.    By Order dated June 12, 2003, entered June 17, 2003, New York Supreme
Court Justice Karla Moskowitz denied the Trump motion to vacate the Award and
confirmed the Award of the Arbitrators.  (See Exhibit "H" annexed to the accompanying
Compendium of Exhibits.)

399.    In furtherance of the RICO conspiracy, Donald J. Trump fraudulently
publicly stated that he would appeal the Decision, but never did.

400.    In June 2003, in furtherance of the RICO conspiracy, Conseco, through its
counsel Kirkland & Ellis, fraudulently claimed that it would use the proceeds of the sale
of the General Motors Building to pay back creditors of Conseco.

401.    On June 23, 2003, the sale of Conseco Finance to CFN Holdings and GE
Capital closed, and concluded one part of the racketeering activity of defendants' RICO
Enterprise.

## XII.    THE MONEY LAUNDERING
## IS SET IN PLACE BY THE CREATION
## OF EPHEMERAL ENTITIES
## AND ILLUSORY OBLIGATIONS

402.    Despite the fact that Carmel Fifth could have entered judgment upon the
Arbitration Award against Donald J. Trump which would have netted Trump

[95]

David H. Relkin, Esq.

approximately only 15 Million Dollars, and created a massive windfall for Conseco and

Carmel Fifth, on or about June 24, 2003, in furtherance of the racketeering activity of the

Enterprise, Conseco and Trump instead agreed to dismiss the state court proceeding to

confirm the Arbitration Award with prejudice and entered into "a confidential

agreement." (See Exhibit "**JJ**" annexed to the accompanying Compendium of Exhibits.)

403.    Upon information and belief, the confidential agreement concerned the

division of the proceeds of the sale of the GM Building by paying Trump 275 Million

Dollars as an investment in Trump, Chicago for the benefit of the Enterprise.

404.    This confidential agreement was in furtherance of the pattern of

racketeering to launder money through the sale of the GM Building.

405.    In fact, the essence of the acquisition of the GM Building was to launder

money through the purchase of the building and the steps that were taken by the

Enterprise to control the bidding and designate its straw-man purchaser was simply an

extension of this pattern of racketeering activity to launder money.

406.    After the confidential agreement was executed, Trump and Conseco

agreed to dismiss the adversary proceeding in the Bankruptcy Court and the case was

closed.

407.    Upon information and belief, this confidential agreement was in

furtherance of the racketeering activity, and fraudulently transferred 275 Million Dollars

[96]

in assets to Donald J. Trump, far in excess of what Trump was entitled to receive under the Arbitration Award, namely 15 Million Dollars, and in furtherance of the Money Laundering predicate of the Enterprise to launder money into a construction project of Donald J. Trump in Chicago, Illinois named Trump International Hotel & Tower.

408.    On June 24, 2003, Trump withdrew his 1 Billion Dollar Proof of Claim from the Conseco Bankruptcy proceeding.  (See Exhibit "**KK**" annexed to the accompanying Compendium of Exhibits.)

409.    On July 16, 2003, Conseco filed its Fourth Amended Joint Liquidating Plan of Reorganization.  Nothing in the Plan mentions the sale of the GM Building.

410.    On July 16, 2003, Conseco retained Eastdil Realty to sell the GM Building *outside the purview of the Bankruptcy Court*, in furtherance of the RICO Enterprise.

411.    The racketeering Enterprise already decided to whom the General Motors building was to be sold, namely Harry Macklowe as a proxy for George Soros, and in furtherance of the racketeering Enterprise for the purpose of consummating the Money Laundering activities of the Enterprise.

412.    On July 22, 2003, Eastdil Realty published the outline of the bid requirements for the purchase of the GM Building.

[97]

David H. Relkin, Esq.

413.    Soros as the head of the racketeering Enterprise used Harry Macklowe as the front man for the purchase of the GM Building in order to further the intent of the Enterprise to launder money through the sale and to conceal the criminal conspiracy, plan and scheme of the RICO Enterprise.

414.    Upon information and belief, defendants Soros, Fortress, Trump, Conseco, Macklowe, Kirkland & Ellis, Vornado, Eastdil and German American all knew that the bidding process was merely a dumb-show, and that the winner of the bidding was going to be Harry Macklowe, and conspired to achieve this result for the purpose of Money Laundering.

415.    In July 2003, the RICO Enterprise through its conspirator Eastdil Realty, circulated an informational memorandum regarding the GM Building, a memorandum inviting bids, and a confidentiality agreement to prospective bidders which had to be executed before conducting initial due diligence.

416.    Upon information and belief, the implications that the bidding process was going to take place in good faith were false and were intended for plaintiffs to rely thereupon to their detriment.

417.    Eastdil, Soros, Macklowe, Conseco and Kirkland & Ellis failed to conduct the auction in good faith or in a fair or consistent way pursuant to the terms of the bidding agreements which were relied upon by plaintiffs.

[98]

David H. Relkin, Esq.

418.    On July 24, 2003, the Bankruptcy Court approved the Fourth Amended Joint Liquidating Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code. There is no mention of Carmel Fifth, the GM Building or the interest of Conseco therein.

419.    On July 31, 2003, the Lehman Brothers Holdings and Secore Mortgages on the General Motors Building came due but neither mortgagee took any efforts to foreclose on their mortgages in possible conspiracy with the racketeering activity of the RICO Enterprise.

420.    On August 11, 2003, the first bids on the GM Building were opened and Eastdil narrowed the group which could take part in the second bid.

421.    Unknown to plaintiffs, the racketeering Enterprise never intended to adhere to the bidding procedure or the rules of the bidding process and never intended to sell the GM Building to plaintiff, who was the highest and best bidder for the GM Building.

422.    On August 13, 2003, Eastdil scheduled the final bid for August 27, 2003 at 5:00 p.m.

423.    On August 27, 2003, despite the fact that plaintiffs' bid was the highest and best, and the fact that Macklowe's bid was well below other bidders, was untimely submitted and as part of the criminal conspiracy, plan and scheme by defendants

[99]

David H. Relkin, Esq.

Conseco, Soros, Fortress, Eastdil, German American and Vornado, Macklowe was privately allowed to increase his bid to appear to have won the fraudulent auction.

424.    This bidding process was manipulated by Conseco, Kirkland & Ellis, and Eastdil, in conspiracy with Soros and Fortress, and was rife with fraud, bad faith and in violation of the rule of law that every contract contains an obligation of good faith and in violation of RICO by reason of the Money Laundering purpose of the sale.

425.    Upon information and belief, Harry Macklowe was present at the opening of the bids in the presence of certain attorneys of Kirkland & Ellis to allow Macklowe to beat any bid received by Eastdil despite the fact that the opening of the bids was represented to be private and the winner based on Conseco's own criteria.

426.    Moreover, the criminal conspiracy, scheme and goal of the RICO Enterprise and Fortress' and George Soros' unlawful intent was to use the GM Building for the purpose of Money Laundering.

427.    In fact, the racketeering Enterprise never had an intention to hold a free and fair bidding process of selling the GM Building to plaintiffs or anyone else; and, in fact, after the bidding show took place, a Soros proxy told plaintiffs that it would never sell the property to plaintiffs, no matter what they bid.

428.    Upon information and belief, on the morning after the final bid, Eastdil Realty contacted George Soros and/or Harry Macklowe and told them that if they would

[100]

David H. Relkin, Esq.

raise the bid to 1.4 Billion Dollars, they would be considered the winner of the bidding process.

429.    With the approval of Soros, Harry Macklowe agreed to raise his bid to $1.4 Billion and was a benefit to the Enterprise since it allowed the RICO Enterprise to launder additional money.

430.    As a result, Harry Macklowe, the straw man of the Enterprise, was announced by The New York Times as the winner of the rigged auction.

431.    This constituted the acquisition or maintenance of an interest and an investment of income from racketeering activities in an Enterprise through a pattern of racketeering activities.  This also constituted the conduct of the affairs of an Enterprise affecting interstate commerce through a pattern of racketeering activity.

432.    Plaintiffs properly submitted a bid for the General Motors Building that was highest and best since it was 1.5 Billion Dollars, required no due diligence and put up a 50 Million Dollars deposit.  Defendants' pattern of racketeering  and manipulation of the auction was in violation of plaintiffs' right to a fair auction and violated Conseco's and Eastdil's published auction procedures.

433.    Plaintiffs' offer was unconditional, as is, no due diligence and had the firm commitments of Plaintiffs' equity and debt financing.

[101]

David H. Relkin, Esq.

434.    Upon information and belief, while Harry Macklowe represented that he had secured the "requisite approvals" from its proposed lender, Wachovia Bank, and that "no additional approvals were required to close," as required by the Bidding Procedures of Conseco, in truth, Wachovia's approval for financing *was **conditional*** on conducting additional due diligence on the General Motors Building.

435.    The terms of the confidentiality agreement were a sham and never intended to be followed by the racketeering defendants.

436.    On August 30, 2003, the New York Times reported that Harry Macklowe won the bid to purchase the General Motors Building for 1.4 Billion Dollars—100 Million Dollars less than plaintiffs' offer.

437.    The closing of the GM Building was scheduled for twenty-eight days later, or September 27, 2003, eighteen days after the Conseco Bankruptcy proceeding was closed on September 9, 2003.  Accordingly, the proceeds of the sale never reached pre-bankruptcy Conseco; rather, the beneficiary of the proceeds of the sale was New Conseco.

**The Structuring of the Money**
**Laundering Transactions**
**In Connection With The**
**Purchase of the GM Building**[22]

---

[22] A chart of these activities in annexed hereto as Exhibit "LL" annexed to the accompanying Compendium of Exhibits.

[102]

David H. Relkin, Esq.

438.    During the twenty-eight days between the announcement that Macklowe had won the bidding and the closing date, Soros with the other RICO defendants of the racketeering Enterprise and conspirators therewith engineered the creation of shell entities and various illusory obligations and transactions which would make it appear that Macklowe was buying the GM Building instead of Soros to accomplish the actual purpose of Money Laundering.

439.    In fact, it was George Soros, together with the assistance of the other members and co-conspirators of the RICO Enterprise, who purchased the General Motors Building with monies laundered through numerous ephemeral entities formed exclusively for the illegal purpose of Money Laundering.

440.    On September 3, 2003, Fried Frank Harris Shriver & Jacobson, in conflict with its former representation of the unsecured creditors in the Conseco Bankruptcy Case, made an emergency application to the Bankruptcy Court to represent Macklowe in the purchase of the General Motors Building. (See Exhibit "**MM**" annexed to the accompanying Compendium of Exhibits.)

441.    Upon information and belief, Fried Frank Harris Shriver & Jacobson's representation of Macklowe may have been in conspiracy with the racketeering Enterprise and in furtherance of the Bankruptcy Fraud, perpetrated against plaintiffs, Conseco creditors and the Bankruptcy Court and such firm may be later identified as a John Doe defendant.

[103]

David H. Relkin, Esq.

442. On September 4, 2003, Macklowe formed Acquisition as a Delaware Limited Liability Company and received authorization to do business in New York. (See Exhibit "A" annexed to the accompanying Compendium of Exhibits.)

443. Acquisition was specifically formed to acquire the GM Building and to launder money on behalf of the RICO Enterprise.

444. On September 9, 2003, the Bankruptcy Court approved Conseco's Sixth Amended Joint Liquidating Plan pursuant to Chapter 11 of the Bankruptcy Code and, one day later, Conseco emerged from Chapter 11 Protection with R. Glenn Hillard replacing Gary Wendt as Chairman of the Board of Directors.

445. On the same day, the Bankruptcy Court approved Fried Frank Harris Shriver & Jacobson's application to represent Harry Macklowe in connection with his purported purchase of the GM Building.

446. The scheme of the RICO Enterprise was to engage in racketeering activity of Money Laundering to make it appear that Macklowe acquired the GM Building, when, in fact, Soros, SFM, Fortress, Mapeley, Quantum and Macklowe, together with the unlawful and knowing conspiracy of Conseco, Vornado, Eastdil, German American, and other presently unknown defendants, and numerous entities which are no longer existing, contrived a massive fraud to use various shell entities and instrumentalities to use the purchase of the GM Building for Money Laundering.

[104]

David H. Relkin, Esq.

447.   On September 23, 2003, Vornado formed Vornado GM III, at the behest of George Soros, SFM, and other members of the Enterprise, and in collusion with them, with the promise of a side deal to sell prime 250 Million Dollars of mezzanine debt on the GM Building to Vornado after the closing. (See Exhibit "D" annexed to the accompanying Compendium of Exhibits.)

448.   On September 23, 2003, Soros, or someone acting in conspiracy with him, formed the shell entity Soros Credit II, which entered into a joint venture with the shell entity Vornado GM III. (See Exhibit "LL" annexed to the accompanying Compendium of Exhibits.)

449.   Upon information and belief, Soros, SFM, Mapeley or Quantum, by means of wire fraud, infused Soros Credit II with 25 Million Dollars which derived from illegal activities.

450.   Upon information and belief, Soros, SFM, Mapeley or Quantum, by means of wire fraud, infused Vornado GM III with 25 Million Dollars, which capital derived from illegal sources.

451.   On the next day, Soros Credit II and Vornado GM III each *loaned* 25 Million Dollars to German American by the use of wire fraud.   Upon information and belief, these purported loans were never repaid to German American and were merely an attempt to hide the true source of the nature, location, source, ownership or control of the proceeds of unlawful activity.

[105]

David H. Relkin, Esq.

452.    Upon information and belief, neither Soros Credit II nor Vornado GM III created a receivable on its books for this loan since the loans were made to hide the true source of the nature, location, source, ownership or control of the proceeds of unlawful activity.

453.    On September 23, 2003, in furtherance of the racketeering activities of the Enterprise Soros formed a shell entity Mezzanine Fourth. (See Exhibit "C" annexed to the accompanying Compendium of Exhibits.)

454.    Upon information and belief, on September 23, 2003, in furtherance of the Money Laundering scheme of the RICO Enterprise, by means of wire fraud, German American funneled the aforesaid 50 Million Dollar *loans* from Soros Credit II and Vornado GM III *as a loan* to Mezzanine Fourth, an entity owned or controlled by Soros or other members of the Enterprise.

455.    Upon information and belief, such criminal activity was a hidden quid pro quo for German American getting the first mortgage on the GM Building in furtherance of the conspiracy, scheme and plan of the RICO Enterprise.

456.    On the same date, upon information and belief, Soros directed Mezzanine Fourth to funnel the aforesaid "dirty money transfers" by wire fraud into Acquisition as an "investment."

[106]

David H. Relkin, Esq.

457.    Upon information and belief, since the laundered money came into Acquisition as an "investment" it should have made Mezzanine Fourth a partner or member of Acquisition, which it did not.

458.    On September 25, 2003, Soros, or someone acting on his behalf, formed Soros Credit I. (See Exhibit "NN" annexed to the accompanying Compendium of Exhibits.)

459.    Upon information and belief, on September 25, 2003, by means of wire fraud, Soros then funneled the sum of 250 Million Dollars as a bogus "loan" into Soros Credit I. (See Exhibit "LL" annexed to the accompanying Compendium of Exhibits.)

460.    On the same date Soros created Credit Funding I he funneled by means of wire fraud the aforesaid 250 Million Dollars as a bogus "loan" to Junior Mezzanine, a shell company owned by Soros, SFM or Fortress. (See Exhibit "B" annexed to the accompanying Compendium of Exhibits.)

461.    Upon information and belief, such "loans" were never paid back to Soros Credit I or Junior Mezzanine and such ephemeral entities were dissolved immediately after they served the purpose of hiding the true source of the nature, location, source, ownership or control of the proceeds of unlawful activity. (See Exhibit "NN" annexed to the accompanying Compendium of Exhibits.)

[107]

David H. Relkin, Esq.

462.    On the same date, George Soros on behalf of the Enterprise laundered the aforesaid 250 Million Dollars through Junior Mezzanine into Acquisition as an *investment*.  (See Exhibit "**LL**" annexed hereto.)

463.    Upon information and belief, since the 250 Million Dollars of laundered money derived from unlawful activity came into Acquisition as an investment by Junior Mezzanine, this should have made Junior Mezzanine a partner or member of Acquisition Co., which it did not.

464.    Such act constituted money laundering since it was made to hide the true source of the nature, location, source, ownership or control of Soros' proceeds of unlawful activity and derived from Soros, SFM, Fortress, Mapeley or Quantum.

465.    Upon information and belief, at the end of funneling the illicitly derived funds through a byzantine structure of shell entities, Soros and Fortress had funneled the sum of 300 Million Dollars by means of wire fraud through Soros Credit II, Vornado, German American, Soros Credit I and Junior Mezzanine into Acquisition Co. as investments.

466.    In reality each of these money transfers were made by means of wire fraud to hide the true source of the nature, location, source, ownership or control of Soros' and Fortress' proceeds of unlawful activity.

[108]

David H. Relkin, Esq.

467.    The cumulative appearance of such transactions was that Macklowe had invested 300 Million Dollars into Acquisition, in effect, controlling Acquisition, when, in fact, the source of the money was entirely from the RICO Enterprise, Soros, SFM, Fortress, Mapeley or Quantum, as part of their Money Laundering activities.

468.    Upon information and belief, Kirkland & Ellis and others, conspired to facilitate these activities by the racketeering Enterprise by fraudulently documenting the transaction as an acquisition by Macklowe.

469.    As "payment" for the bogus loan made by German American of 50 Million Dollars to Mezzanine Fourth of the laundered money coming from Soros, upon information and belief, the RICO Enterprise arranged for German American to have a first position mortgage on the General Motors Building in the sum of 1.14 Billion Dollars.

470.    Upon the sale of the GM Building, Bill Shea, then the CEO of Conseco announced that 380 Million Dollars, the amount that Conseco purportedly realized on the sale, was upstreamed to Conseco, not the four insurance companies which purportedly owned Carmel Fifth.

471.    Since the price paid for the General Motors building was 1.4 Billion Dollars, and Conseco's subsidiary insurance companies realized 380 Million Dollars, and there was a payment to Lehman Brothers Holdings to pay off their mortgage of 500

[109]

David H. Relkin, Esq.

Million Dollars, and to Secore Mortgage to pay off its 200 Million Dollar Mortgage, this left approximately 310 Million Dollars.

472.    Eastdil, who had sold the GM Building as an agent, was paid a commission of 2.5%, or 35 Million Dollars.

473.    Thus, after payment of the broker's fee, there remained another 275 Million Dollars which was unaccounted for.

474.    Upon information and belief, despite the fact that the Arbitration Award between Carmel Fifth and Trump obligated Carmel Fifth to pay to Trump only the sum of 15.6 Million Dollars, these unaccounted-for proceeds from the sale of the GM Building were paid to Trump as part of Conseco's "confidential settlement" of the arbitration between it and Trump

475.    This payment was in furtherance of the pattern of racketeering to launder money by the Enterprise into the pockets of Trump so that the money could be funneled into Trump International Hotel & Tower being built in Chicago, Illinois ("Trump Illinois").

476.    The other investors in Trump Illinois were Blackacre Institutional Capital Management LLC, an affiliate of Cerberus, which was a member of CFN; Grove Capital LLP, which manages Soros Fund Management; Deutsche Bank, whose subsidiary German American was granted a mortgage originated by Deutsche Bank, A.G. to

[110]

Macklowe of 1.14 Billion Dollars in connection with Macklowe's apparent purchase of

the GM Building, and which provided a 650 Million Dollar construction loan to Trump;

and Fortress, a member of CFN Holdings, which provided 160 Million Dollars of

mezzanine financing to Trump Illinois.

477.    These acts by defendants constituted a pattern of racketeering activity and

demonstrated a continuity of the RICO Enterprise and a continuing threat of continuity of

the Enterprise.

**The RICO Enterprise**
**Continues as Macklowe Purchases**
**Seven Buildings And**
**Uses the General Motors**
**Building As Collateral**

478.    The criminal conspiracy, plan and scheme continued to launder money on

behalf of the RICO Enterprise through property acquisition when, in 2007, Macklowe

purchased seven office buildings from Blackstone through Eastdil Realty in New York

City, for approximately 7 Billion Dollars with only 50 Million Dollars of equity from

Macklowe.

479.    Macklowe borrowed 5.8 Billion Dollars from Deutsche Bank and, as

security for the loan, Macklowe pledged 49% of his purported ownership interest in the

GM Building, which was, in fact owned by Soros and/or Fortress.

[111]

David H. Relkin, Esq.

480.    In this illegal transaction, Harry Macklowe also borrowed 1.2 Billion Dollars in furtherance of the criminal conspiracy, plan and scheme from Fortress which eventually grew to an outstanding indebtedness of approximately 1.4 Billion Dollars.

481.    Deutsche Bank then bought 25 percent of the equity from Fortress in order to launder this money through the acquisition of other property interests.

482.    Vornado also holds a stake in four of the seven office Buildings purchased by Macklowe.  Thus the Enterprise is continuing in nature since the same parties who laundered 300 Million Dollars through the GM acquisition continued their pattern of racketeering.

483.    As a result of Macklowe's inability to generate sufficient cash to carry the loans on the seven office buildings, Macklowe was forced to sell the GM Building to avoid foreclosure proceedings.

484.    On or about May 22, 2008, the GM Building was sold by Harry Macklowe, on behalf of the Enterprise controlled by Soros, for the sum of 2.8 Billion Dollars, or a 1.4 Billion Dollar profit, the exact amount of Macklowe's indebtedness to Fortress.

485.    Upon information and belief, these highly leveraged transactions were in furtherance of the RICO Enterprise to launder proceeds of a pattern of racketeering by disguising the source, origin, ownership or control of the proceeds of unlawful activity.

[112]

David H. Relkin, Esq.

486.    According to the New York Times, George Soros has been linked to money laundering operations involving Global Telesystems, based in McLean, Virginia, doing business in Russia. "Federal Investigators, who thought they had a possible case of money laundering, were dismayed. The case was not aggressively pursued, said one senior law enforcement official. An investigator from another Federal Agency said that the case had been prematurely closed." (See Exhibit "OO" annexed to the accompanying Compendium of Exhibits.)

## XIII.   THE RICO PREDICATE ACTS

487.    The defendants and each of them are individuals, partnerships, corporations, associations or other legal entities associated in fact although not a legal entity for the common purpose of engaging in a course of conduct and functioning as a continuing unit in perpetrating their criminal conduct and conspiracy of acquiring assets through and by means of money laundering and bankruptcy and wire fraud for profit. In connection with, and in furtherance of their pattern of racketeering, the defendants acquired Conseco Finance and the GM Building through and by means of illegal conduct and conspiracies, including bankruptcy and wire fraud, for the purpose of laundering money through such acquisitions for profit.

488.    The defendants, and each of them, associated, participated and conspired with the Enterprise in the conduct of the Enterprise's affairs through a pattern of racketeering, in and affecting interstate and international commerce, and which pattern of racketeering activity involved two or more criminal acts committed by each defendant, proximately causing damage to plaintiffs' business and property, which damage was a

[113]

David H. Relkin, Esq.

foreseeable result and proximate cause of such conduct, constituting violations of the

Racketeering Influenced and Corrupt Organization Act, 18 U.S.C. §1962, *et seq*.  Such

criminal acts are described herein, including, but not limited to the following criminal

acts.

489.    Upon information and belief, the unknown sources of the money

laundering from illegal activities include, but are not limited to, Narco Drug Trafficking,

Black market arms dealing, prostitution slave trading and Organized Crime syndicates.


490.    With respect to defendant **George Soros**, the said defendant violated the

provisions of 18 U.S.C. §1962 (a), (b), (c), (d), in that the said defendant conducted

and/or participated in the conduct of the affairs of the criminal enterprise through a

pattern of racketeering activity involving at least two acts, and conspired with the other

members of the enterprise to do so in interstate and international commerce.  In

connection therewith, the said defendant has, among other things, engaged in the

following criminal acts.


491.    The said defendant **George Soros**, received income derived, directly or

indirectly, from a pattern of racketeering activity and used or invested, directly or

indirectly, a part of such income or the proceeds of such income, in acquisition of an

interest in, or the establishment or operation of any enterprise, engaged in, or the

activities of which affected interstate and international commerce, by forming numerous

shell entities, on or about and between September 1, 2003 and September 23, 2003, with

[114]

David H. Relkin, Esq.

no officers, directors or shareholders, offices or assets, to invest or use, directly or indirectly, a part of such income or the proceeds of such income, by laundering such funds derived from illegal activities in violation of 18 U.S.C. §§1956 and 1957, by funneling 300 Million Dollars into a limited liability company, 5th Avenue 58/59 Acquisition Co., to acquire an interest in an enterprise controlled by the defendants, in violation of 18 U.S.C. § 1962 (a).

492.    The said defendant, **George Soros**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affect interstate or foreign commerce, including money laundering derived from, or the proceeds of unlawful activity, including but not limited to, Organized Crime activities in violation of 18 U.S.C. §§1956 and 1957, in association with, and in control of the RICO Enterprise, on or about and between June 2002 and the present , did acquire, maintain, directly or indirectly an interest in, and the control of the RICO Enterprise in violation of 18 U.S.C. §1962 (b).

493.    The said defendant, **George Soros**, directly and indirectly in association with, in the conduct of, and in participation in, directly and indirectly, and control the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, through a pattern of racketeering in violation 18 U.S.C. § 1962 (c). Such conduct by Soros was furtherance of a scheme to profit from laundering money derived from illegal activities in violation of 18 U.S.C. §1956 and 1957, including but not limited to Organized Crime activities, from, on or about and between June 2002 and the present, through the Conseco Bankruptcy involving the purchase of Conseco Finance through

[115]

David H. Relkin, Esq.

CFN, the financing of Conseco through FPS, the acquisition of the GM Building and the investment of proceeds therefrom into Trump, Chicago in violation of 18 U.S.C. §1962 (c).

494.    The said defendant, **George Soros**, in furtherance of, and in association with the illegal conduct and pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, and in conspiracy with, and the participation of the defendants, including Harry Macklowe, FIG, Vornado and German American, formed numerous ephemeral shell entities, on or about and between September 1, 2003 and September 25, 2003, with no officers, directors, shareholders, offices or assets, to funnel 300 Million Dollars derived from illegal activities in violation of 18 U.S.C. §1956 and 1957, including, but not limited to, Organized Crime activities, and to conceal and disguise their true illegal nature and origin for profit, by falsely representing to, and deceiving others, including plaintiffs, that said limited liability company, and the assets thereof was controlled by defendant Harry Macklowe, which funds derived from SFM, FIG, Mapeley, Quantum, or from other entities uniquely known to George Soros, into a limited liability company 5th Avenue 58/59 Acquisition Co. controlled by Soros and/or the said defendants, in violation of 18 U.S.C. § 1962 (c).

495.    The said defendant, **George Soros**, in furtherance of the conduct, and in association, participation, and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, in order to profit by laundering funds derived from illegal activities and to

[116]

David H. Relkin, Esq.

conceal and disguise their true illegal nature and origin for profit in violation of 18 U.S.C.

§§1956 and 1957, specifically funneled 25 Million Dollars of illegally derived funds from

SFM, FIG, Mapeley, Quantum, or from other criminal entities uniquely known to George

Soros, as a "loan" to an ephemeral, shell entity, Soros Credit Funding II, formed on or

about September 23, 2003, controlled by Soros and/or the other defendants, in violation

of 18 U.S.C. § 1962 (c).

496.    The said defendant, **George Soros**, in furtherance of the conduct, and in

association, participation, and in control of the pattern of racketeering of the RICO

Enterprise, engaged in or the activities of which affected interstate and international

commerce, in order to profit from laundering funds derived from illegal activities and to

conceal and disguise their true illegal nature and origin for profit in violation of 18 U.S.C.

§§1956 and 1957, specifically funneled 25 Million Dollars of illegally derived funds from

SFM, FIG, Mapeley, Quantum, or from other criminal entities uniquely known to George

Soros, as a "loan" to German American Capital,  in violation of 18 U.S.C. § 1962 (c).

497.    The said defendant, **George Soros**, in furtherance of, in association with,

and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the

activities of which affected interstate and international commerce, in order to profit from

laundering funds derived from illegal activities and to conceal and disguise their true

illegal nature and origin in violation of 18 U.S.C. §§1956 and 1957, by funneling 250

Million Dollars of such illegally derived funds from SFM, FIG, Mapeley, Quantum, or

from other entities uniquely known to George Soros, as a "loan" to an ephemeral, shell

[117]

David H. Relkin, Esq.

entity, Soros Credit Funding I, formed on or about September 22, 2003, controlled by Soros and/or the other defendants, in violation of 18 U.S.C. § 1962 (c).

498.   The said defendant, **George Soros,** in furtherance of, in association with, and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, in order to profit from laundering funds derived from illegal activities and to conceal and disguise their true illegal nature and origin in violation of 18 U.S.C. §§1956 and 1957, by funneling 250 Million Dollars of such illegally derived funds from SFM, FIG, Mapeley, Quantum, or from other entities uniquely known to George Soros, as a "loan" from an ephemeral, shell entity, Soros Credit Funding I, controlled by Soros and/or the other defendants, into 58/59 Junior Mezzanine, LLC, another ephemeral, shell entity, formed on or about September 22, 2003, controlled by Soros and/or the other defendants as a "loan" from Soros Credit Funding I, in violation of 18 U.S.C. § 1962 (c).

499.   The said defendant, **George Soros,** in furtherance of, in association with, and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, in order to profit from laundering funds derived from illegal activities and to conceal and disguise their true illegal nature and origin in violation of 18 U.S.C. §§1956 and 1957, by funneling 250 Million Dollars of such illegally derived funds from SFM, FIG, Mapeley, Quantum, or from other entities uniquely known to George Soros, as an "investment" from 58/59 Junior Mezzanine, LLC, an ephemeral, shell entity, formed on or about September 22,

[118]

David H. Relkin, Esq.

2003, as an "investment" into a limited liability company 5th Avenue 58/59 Acquisition Co. controlled by Soros and/or the said defendants  in violation of 18 U.S.C. § 1962 (c).

500.    The said defendant, **George Soros**, conspired to directly and indirectly associate with, and control the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, through a pattern of racketeering, on or about and between June 2002 and September 2007, in conspiracy with FIG, Fortress Investment Holdings, Mapeley, Quantum, Conseco, Carmel Fifth, <sup>T</sup>rump, German American, Vornado, Macklowe, Eastdil, and Kirkland & Ellis to violate 18 U.S.C. 1962 (a), (b) and (c) through bankruptcy fraud perpetrated by such conspirators in violation of 18 U.S.C. §152 (1), (2), and (3), involving the acquisition of Conseco Finance, and to control and manipulate the bidding process for the GM Building in order to profit by laundering money derived from illegal sources into the acquisition of the GM Building and to conceal and disguise their true illegal nature and origin of such laundered money for profit in violation of 18 U.S.C. §1956 and 1957, including, but not limited to, Organized Crime activities, in violation of 18 U.S.C. §1962 (d).

501.    The said defendant, **George Soros**, conspired to directly and indirectly associate with, and control the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, through a pattern of racketeering, on or about and between June 2002 and September 2007, in conspiracy with Fortress Mapeley, Quantum, to violate 18 U.S.C. §1343 and 18 U.S.C. §1952(a)(3) by illegally using an interstate telecommunications device to funnel monies into Vornado GM III, Soros Credit

David H. Relkin, Esq.

II, German American, Mezzanine Fourth, Soros Credit I, Junior Mezzanine and ultimately into Acquisition in violation of 18 U.S.C. §1962 (c) and (d).

502.    With respect to defendant **Soros Fund Management**, the said defendant violated the provisions of 18 U.S.C. §1962 (c) and (d), in that the said defendant conducted and/or participated in the conduct of the affairs of the criminal enterprise through a pattern of racketeering activity involving at least two acts, and conspired with the other members of the enterprise to do so in interstate and international commerce. In connection therewith, the said defendant has, among other things, engaged in the following criminal acts.

503.    The said defendant **Soros Fund Management**, received income derived, directly or indirectly, from a pattern of racketeering activity and used or invested, directly or indirectly, a part of such income or the proceeds of such income, in acquisition of an interest in, or the establishment or operation of any enterprise, engaged in, or the activities of which affected interstate and international commerce, by forming numerous shell entities, on or about and between September 1, 2003 and September 23, 2003, with no officers, directors or shareholders, offices or assets, to invest or use, directly or indirectly, a part of such income or the proceeds of such income, by laundering such funds derived from illegal activities in violation of 18 U.S.C. §§1956 and 1957, by funneling 300 Million Dollars into a limited liability company, 5th Avenue 58/59 Acquisition Co., to acquire an interest in an enterprise controlled by the defendants, in violation of 18 U.S.C. § 1962 (a).

[120]

504.    The said defendant, **Soros Fund Management**, in furtherance of, in association with, and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conducted and participated in, directly or indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering, in order to profit from laundering funds derived from illegal activities and conceal their true illegal nature and origin for profit in violation of 18 U.S.C. §§1956 and 1957, by funneling 250 Million Dollars of such illegally derived funds from Fortress, Mapeley, Quantum, or from other entities uniquely known to George Soros, Soros Fund Management or FIG, as a "loan" to an ephemeral, shell entity, Soros Credit Funding I, formed on or about September 22, 2003, controlled by Soros Fund Management or the other defendants, in violation of 18 U.S.C. § 1962 (c).

505.    The said defendant, **Soros Fund Management**, in furtherance of, in association with, and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conducted and participated in, directly or indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering, in order to profit from laundering funds derived from illegal activities and conceal their true illegal nature and origin for profit in violation of 18 U.S.C. §§1956 and 1957, by funneling 250 Million Dollars of such illegally derived funds from Fortress, Mapeley, Quantum, or from other entities uniquely known to George Soros, Soros Fund Management or FIG, from an ephemeral, shell entity, Soros Credit Funding I, formed on or about September 22, 2003, as a "loan" to another ephemeral, shell entity, 58/59 Junior Mezzanine, LLC, formed on or about

[121]

David H. Relkin, Esq.

September 22, 2003, controlled by Soros Fund Management or the other defendants, in violation of 18 U.S.C. § 1962 (c).

506.    The said defendant, **Soros Fund Management**, in furtherance of, in association with, and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, in order to profit from laundering funds derived from illegal activities and to conceal and disguise their true illegal nature and origin in violation of 18 U.S.C. §§1956 and 1957, by funneling 250 Million Dollars of such illegally derived funds from SFM, FIG, Mapeley, Quantum, or from other entities uniquely known to George Soros, Soros Fund Management and/or FIG, as an "investment" from 58/59 Junior Mezzanine, LLC, an ephemeral, shell entity, formed on or about September 22, 2003, into a limited liability company 5th Avenue 58/59 Acquisition Co. controlled by Soros and/or the said defendants  in violation of 18 U.S.C. § 1962 (c).

507.    The said defendant **Soros Fund Management**, in furtherance of, in association with, and in control of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conducted and participated in, directly or indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering, on or about September 23, 2003, in order to profit by illegally laundering money derived from illegal sources, including but not limited to Organized Crime activities in violation of 18 U.S.C. §§1956 and 1957 by funneling 25 Million Dollars from Mapeley, Quantum, or through other entities in the unique knowledge of defendants Soros, Soros Fund Management and/or FIG , as a "loan"

[122]

David H. Relkin, Esq.

to an ephemeral shell entity, Soros Credit Funding II, formed on or about September 22, 2003, in furtherance of a pattern of racketeering for the purpose of concealing the origin and nature of such funds in violation of 18 U.S.C. §1962 (c).

508.    The said defendant **Soros Fund Management**, in furtherance of the illegal business of, and the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conducted and participated in, directly or indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering, on or about September 23, 2003, in order to profit by illegally laundering money derived from illegal sources, including but not limited to Organized Crime activities and affecting interstate commerce as described herein in violation of 18 U.S.C. §§1956 and 1957 through German American Capital into 58/59 Mezzanine Fourth, LLC, an ephemeral, shell entity to conceal the source and nature thereof in violation of 18 U.S.C. §1962 (c).

509.    The said defendant, **Soros Fund Management**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in, or the activities of which affected interstate and international commerce, conducted and participated in, directly or indirectly in the conduct of the affairs of the enterprise, in order to profit from laundering funds derived from illegal activities and conceal their origin in violation of 18 U.S.C. §§1956 and 1957, funneled 25 Million Dollars on or about September 25, 2003 into 5th Avenue 58/59 Acquisition in order to conceal the true source and nature of such funds in violation of 18 U.S.C. §1962 (c).

[123]

David H. Relkin, Esq.

510.   The said defendant, **Soros Fund Management**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in, or the activities of which affected interstate and international commerce, conducted and participated in, directly or indirectly in the conduct of the affairs of the enterprise, in order to profit from laundering funds derived from illegal activities and conceal their origin in violation of 18 U.S.C. §§1956 and 1957, in or about June 2003, and numerous other dates, believed to be provided by Fortress, Mapeley, Quantum, or another entity in the exclusive knowledge of Soros, Soros Fund Management or FIG, to purchase Conseco Finance in furtherance of a pattern of racketeering in violation of 18 U.S.C. §§ 1962 (c).

511.   The said defendant **Soros Fund Management**, violated the provisions of 18 U.S.C. §1962 (d), in that the said defendant engaged in a conspiracy with defendants to conduct and/or participate in the conduct of the affairs of the RICO enterprise described herein through a pattern of racketeering activity, in interstate or international commerce, and conspired with the other members of the enterprise to do so.

512.   In connection therewith, the said defendant **Soros Fund Management**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affect interstate or foreign commerce, including money laundering derived from, or the proceeds of unlawful activity, including but not limited to, Organized Crime activities in violation of 18 U.S.C. §§1956 and 1957, in order to profit by concealing the origin or nature of such funds, from on or about and between June 2002 to the present, by, among other things, engaging in a conspiracy with Fortress, CFN

[124]

David H. Relkin, Esq.

Investment Holdings, and FPS DIP, on or about and beginning October 2002 and
continuing through September 2008 in violation of 18 U.S.C. §1962 (d).

513.    The said defendant **Soros Fund Management**, in furtherance of the
pattern of racketeering of the RICO Enterprise, affecting interstate or international
commerce by initiating and participating in a criminal conspiracy, plan and scheme
involving the participation and conduct of Mapeley, Quantum, Conseco, Carmel Fifth,
Kirkland & Ellis, Trump, 767 Manager, German American, Vornado, Macklowe and
Eastdil to purchase the GM Building from Conseco in order to launder money for profit
and conceal the origin and nature of such funds, in violation of 18 U.S.C. §1962 (d).

514.    The said defendant **Soros Fund Management**, in furtherance of the
pattern of racketeering of the RICO Enterprise, affecting interstate or international
commerce by initiating and participating in a criminal conspiracy, plan and scheme
involving the participation and conduct of Soros, Fortress, Mapeley, Quantum, Trump,
German American, and Vornado to illegally use an interstate telecommunications device
in violation of 18 U.S.C. §1343 and 18 U.S.C. §1952(a)(3) to purchase the GM Building
from Conseco in order to launder money for profit and conceal the origin and nature of
such funds, in violation of 18 U.S.C. §1962 (c) and (d).

515.    With respect to defendant **FIG**, the said defendant violated the provisions
of 18 U.S.C. §1962 (c) and (d), in that the said defendant conducted and/or participated in
the conduct of the affairs of the criminal enterprise through a pattern of racketeering
activity involving at least two acts, and conspired with the other members of the

[125]

David H. Relkin, Esq.

enterprise to do so in interstate and international commerce.  In connection therewith, the said defendant has, among other things, engaged in the following criminal acts.

516.    The said defendant **FIG**, received income derived, directly or indirectly, from a pattern of racketeering activity and used or invested, directly or indirectly, a part of such income or the proceeds of such income, in acquisition of an interest in, or the establishment or operation of any enterprise, engaged in, or the activities of which affected interstate and international commerce, by forming numerous shell entities, on or about and between September 1, 2003 and September 23, 2003, with no officers, directors or shareholders, offices or assets, to invest or use, directly or indirectly, a part of such income or the proceeds of such income, by laundering such funds derived from illegal activities in violation of 18 U.S.C. §§1956 and 1957, by funneling 300 Million Dollars into a limited liability company, 5th Avenue 58/59 Acquisition Co., in the acquisition of an interest in an enterprise controlled by the defendants, in violation of 18 U.S.C. § 1962 (a).

517.    The said defendant, **FIG**, directly and indirectly in association with, in the conduct of, and in participation in, directly and indirectly, the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, in furtherance of a scheme to profit from laundering money derived from illegal activities in violation of 18 U.S.C. §1956 and 1957, including but not limited to Organized Crime activities, from, on or about and between June 2002 and September 2003, through the Conseco Bankruptcy in order to purchase of Conseco Finance through CFN, the financing of Conseco through FPS, the acquisition of the GM Building and the investment of

[126]

David H. Relkin, Esq.

proceeds therefrom into Trump, Chicago in October 16, 2004 in violation of 18 U.S.C. §1962 (c).

518.   The said defendant, **FIG**, directly and indirectly in association with, in the conduct of, and in participation in, directly and indirectly, the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, in furtherance of a scheme to profit from laundering money derived from illegal activities in violation of 18 U.S.C. §1956 and 1957, including but not limited to Organized Crime activities, from, on or about and between June 2002 and September 2003, through the Conseco Bankruptcy in order to purchase of the GM Building and the investment of proceeds therefrom into Trump, Chicago in October 16, 2004 to illegally use an interstate telecommunications device in violation of 18 U.S.C. §1343 and 18 U.S.C. §1952(a)(3), which acts are in violation of 18 U.S.C. §1962 (c) and (d).

519.   With respect to defendant **Conseco, Inc.,** the said defendant violated the provisions of 18 U.S.C. §1962 (c) and (d), in that the said defendant conducted and/or participated in the conduct of the affairs of the criminal enterprise through a pattern of racketeering activity involving at least two acts, and conspired with the other members of the enterprise to do so in interstate and international commerce.  In connection therewith, the said defendant has, among other things, engaged in the following criminal acts.

520.   With respect to defendant **Conseco, Inc.,** the said defendant has violated the provisions of 18 U.S.C. §1962 (c) and (d), in that the said defendant has conducted and/or participated in the conduct of the affairs of the criminal enterprise which affects interstate and international commerce through a pattern of racketeering activity, by and

[127]

David H. Relkin, Esq.

between July 2001 and September 2003, participated in a conspiracy with defendant Trump, among other defendants to launder money for profit derived from illegal sources, including but not limited to, Organized Crime activities, in violation of 18 U.S.C. §§1962 (c).

521.    The said defendant, **Conseco, Inc.,** in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affect interstate or international commerce, on or about and between December 17, 2002, and September 2003, illegally, knowingly and intentionally conspired with CFN, FIG and Kirkland & Ellis to misrepresent material facts to the United States Bankruptcy Court and the creditors of Conseco in numerous bankruptcy documents, including but not limited to Conseco's Disclosure Statements and motions to adjudicate Conseco's dispute with Trump, in violation of 18 U.S.C. §152 (1), (2), and (3), that the GM Building was part of the Conseco Estate and that the sale of the GM Building would produce proceeds for the Conseco creditors and which proceeds were "essential to the reorganization of Conseco," in violation of 18 U.S.C. §1962 (c).

522.    The said defendant, **Conseco, Inc.,** in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, and pursuant to, and in conspiracy with the defendants, specifically Trump, Soros and/or Soros Fund Management and/or FIG, and their fraudulent and illegal scheme set forth herein, on or about and between July 2001 and August 2003, illegally, knowingly and intentionally conspired to conceal that the

[128]

David H. Relkin, Esq.

purpose of the sale of the GM Building was to commit money laundering for profit through bankruptcy fraud in violation of 18 U.S.C. §1962 (d).

523.    The said defendant, **Conseco, Inc.**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affect interstate or foreign commerce, including money laundering derived from, or the proceeds of unlawful activity, including but not limited to, Organized Crime activities in violation of 18 U.S.C. §§1956 and 1957, in order to profit by concealing the origin or nature of such funds, and in furtherance of, and in conspiracy with the pattern of racketeering of the RICO Enterprise, and specifically in conspiracy with Soros, Soros Fund Management, CFN and/or FIG, on or about and between December 2002 and September 2003, agreed to, and did agree to and did conspire to conduct or participate, directly or indirectly in knowingly and intentionally misrepresenting material facts to the United States Bankruptcy Court and the creditors thereof in violation of 18 U.S.C. §152 (1), (2) and (3), as to the value and worth of Conseco Finance, to conceal such value from the which constitutes a violation of 18 U.S.C. §1962 (d).

524.    The said defendant, **Conseco, Inc.**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, beginning on or about June 2001 through September 2003, conspired with the defendants, specifically CFN, FIG, Trump, Soros and/or Soros Fund Management, to illegally, knowingly and intentionally omit, and fail to disclose to the Bankruptcy Court, the creditors of Conseco and others, including plaintiffs, in

[129]

David H. Relkin, Esq.

violation of 18 U.S.C. §152 (1), (2) and (3), that Conseco actually owned Carmel Fifth and the GM Building, which is a violation of 18 U.S.C.§ 1962 (d).

525.   The said defendant, **Conseco, Inc.,** in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, participated in the conduct of the enterprise, on or about June 2003, by illegally, knowingly and intentionally misrepresenting and by making material omissions to the United States Bankruptcy Court, plaintiffs and the creditors thereof in violation of 18 U.S.C. §152 (1), (2) and (3),that the resolution of the ownership of the GM Building would benefit the creditors of Conseco in violation of 18 U.S.C. 1962 (d).

526.   The said defendant, **Conseco, Inc.,** in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, participated in the conduct of the enterprise, on or about June 2003, by illegally, knowingly and intentionally misrepresenting and by making material omissions to the United States Bankruptcy Court, plaintiffs and the creditors thereof in violation of 18 U.S.C. §152 (1), (2), (3) and (9), that the resolution of the ownership of the GM Building in fact involved a transfer of the property of Conseco in excess of 270 bankruptcy assets to defendant Trump in violation of 18 U.S.C. §1962 (c).

527.   The said defendant, **Conseco, Inc.,** in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, on or about and between July 2001 and August 2003, conspired with defendants Soros, SFM, FIG, Kirkland & Ellis, and Trump to

[130]

David H. Relkin, Esq.

manipulate the ownership of the GM Building in order for the enterprise to launder money for profit in violation of 18 U.S.C. §§1956 and 1957 through the sale of the GM Building for the purpose of concealing the origin and nature of illegal such funds in violation of 18 U.S.C. §1962 (d).

528.    The said defendant, **Conseco, Inc.,** in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, and in conspiracy with the defendants' fraudulent and illegal scheme set forth herein, on or about and between December 2002 and June 2003, illegally, knowingly and intentionally misrepresented and omitted material facts regarding the value of the assets of Conseco Finance purchased by CFN to the United States Bankruptcy Court, the creditors of Conseco, the plaintiffs and other potential bidders for Conseco Finance in violation of 18 U.S.C. §152 (1), (2) and (3) and 18 U.S.C. §1962 (d).

529.    With respect to **Vornado**, the said defendant violated the provisions of 18 U.S.C. §1962 (c) and (d), in that the said defendant was employed by, associated with or in conspiracy with the RICO Enterprise, engaged in, or the activities of which affect interstate or international commerce, and conducted and/or participated in the conduct of the affairs of the criminal enterprise through a pattern of racketeering activity, and conspired with the other members of the enterprise to do so. In connection therewith, the said defendant has, among other things, engaged in the following criminal acts.

530.    The said defendant, **Vornado**, in furtherance of, and in association with the RICO Enterprise, which was engaged in or the activities of which affected interstate

[131]

and international commerce, conducted and participated in, directly or indirectly, the

conduct of the affairs of the RICO Enterprise, through a pattern of racketeering, in order to

launder funds derived from illegal activities and conceal their origin in violation of 18

U.S.C. §§1956 and 1957 from Fortress, Mapeley, Quantum, or from other entities

uniquely known to Vornado, formed Vornado GM III, which had no officers, directors or

capital and funneled 25 Million Dollars of illegally derived funds into such shell entity in

violation of 18 U.S.C. §1962 (c).

531.    The said defendant, **Vornado**, in furtherance of, and in association with

the RICO Enterprise, engaged in or the activities of which affected interstate and

international commerce, conducted and participated in, directly or indirectly, the conduct

of the affairs of the RICO Enterprise, through a pattern of racketeering, in order to launder

funds derived from illegal activities and conceal their illegal origin and nature in violation

of 18 U.S.C. §§1956 and 1957, funneled 25 Million Dollars from Fortress, Mapeley,

Quantum, or from other entities uniquely known to Vornado, Soros, Soros Fund

Management or FIG, directly or indirectly funneled 25 Million Dollars as a "loan" into

German American Bank in violation of 18 U.S.C. § 1962 (c).

532.    The said defendant, **Vornado**, in furtherance of, and in association with

the RICO Enterprise, engaged in or the activities of which affected interstate and

international commerce, conducted and participated in, directly or indirectly, the conduct

of the affairs of the RICO Enterprise, through a pattern of racketeering, in order to

launder funds derived from illegal activities by the illegal use of an interstate

telecommunications device in violation of 18 U.S.C. §1343 and 18 U.S.C. §1952(a)(3) to

[132]

David H. Relkin, Esq.

purchase the GM Building from Conseco with funneled money into the purchase of the GM Building in violation of 18 U.S.C. § §1962 (c).

533. The said defendant, **Vornado**, in furtherance of, and in association with the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conspired and agreed with defendants to launder funds derived from illegal activities and conceal their origin in violation of 18 U.S.C. §§1956 and 1957, so as to profit from the affairs of the enterprise to obtain a valuable interest of 250 Million Dollars of mezzanine debt in the GM Building in violation of by 18 U.S.C. § §1962 (c).

534. The said defendant, **Vornado**, in furtherance of, and in association with the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conspired and agreed with defendants to launder funds derived from illegal activities and conceal their origin in violation of 18 U.S.C. §§1956 and 1957, so as to profit from the affairs of the enterprise to obtain a valuable interest of 250 Million Dollars of mezzanine debt in the GM Building in violation of by 18 U.S.C. § §1962 (d).

535. The said defendant, **Vornado**, in furtherance of, and in association with the RICO Enterprise, which was engaged in or the activities of which affected interstate and international commerce, conducted and participated in, directly or indirectly, the conduct of the affairs of the RICO Enterprise, through a pattern of racketeering, in order to launder funds derived from illegal activities and conceal their origin in violation of 18 U.S.C. §§1956 and 1957 from Fortress, Mapeley, Quantum, or from other entities

[133]

David H. Relkin, Esq.

uniquely known to Vornado, and funneled 25 Million Dollars of illegally derived funds into such shell entity in violation of 18 U.S.C. §1962 (c).

536.    With respect to defendant, **German American Capital,** the said defendant violated the provisions of 18 U.S.C. §1962 (c) and (d), in that the said defendant conducted and/or participated in the conduct of the affairs of the criminal enterprise through a pattern of racketeering activity, and conspired with the other members of the enterprise to do so. In connection therewith, the said defendant has, among other things, engaged in the following criminal acts.

537.    The said defendant, **German American Capital,** in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, on or about September 2003, in association with the enterprise to conduct or participate, directly or indirectly in the conduct of the enterprise by illegally laundering money in the sum of 50 Million Dollars derived from unlawful sources including but not limited to, Organized Crime activities, into 58/59 Mezzanine Fourth, LLC, originating from Fortress, Mapeley, Quantum, or from other entities uniquely known to Vornado, Soros, Soros Fund Management or FIG, which it received from two shell entities, Soros Credit Funding II, and Vornado GM III, in violation of 18 U.S.C. § §1962 (c).

538.    The said defendant, **German American Capital,** in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, on or about September 24, 2003, illegally laundered money derived from unlawful activity, including, but not limited to, Organized

[134]

David H. Relkin, Esq.

Crime activities and affecting interstate and international commerce as described herein by funneling 25 Million Dollars it received from Soros Credit Funding I, a shell company created by Soros, SFM, or Fortress, and/or 25 Million Dollars from another ephemeral shell company created by Vornado, Vornado GM III, into Fifth Avenue 58/59 Mezzanine Fourth, LLC as a "loan" in violation of 18 U.S.C. § §1962 (c).

539.    The said defendant, **German American Capital**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, on or about September 24, 2003, illegally laundered money derived from unlawful activity, including, but not limited to, Organized Crime activities and affecting interstate and international commerce as described herein by funneling 25 Million Dollars it received from Soros Credit Funding I, a shell company created by Soros, SFM, or Fortress, and/or 25 Million Dollars from another ephemeral shell company created by Vornado, Vornado GM III, into Fifth Avenue 58/59 Mezzanine Fourth, LLC as a "loan" by the illegal use of an interstate telecommunications device in violation of 18 U.S.C. §1343 and 18 U.S.C. §1952(a)(3) to purchase the GM Building from Conseco with funneled money into the purchase of the GM Building in violation of 18 U.S.C. § §1962 (c).

540.    As a quid pro quo for conspiring to and laundering the unlawful funds for the benefit of the Enterprise, for the purpose of concealing the origin and nature of such funds, in violation of 18 U.S.C. §§1956 and 1957, and in furtherance of, and in conspiracy with the pattern of racketeering of the Enterprise, engaged in or the activities of which affected interstate and international commerce, defendant **German American**

[135]

David H. Relkin, Esq.

**Capital** obtained a 1.1 Million Dollar mortgage on the GM Building, from conspiring with and participating directly or indirectly in the conduct of the enterprise, which violates 18 U.S.C. §1962 (c).

541.    As a quid pro quo for conspiring to and laundering the unlawful funds for the benefit of the Enterprise, for the purpose of concealing the origin and nature of such funds, in violation of 18 U.S.C. §§1956 and 1957, and in furtherance of, and in conspiracy with the pattern of racketeering of the Enterprise, engaged in or the activities of which affected interstate and international commerce, defendant **German American Capital** conspired with and participated directly or indirectly in the conduct of the enterprise, which violates 18 U.S.C. §1962 (d).

542.    With respect to defendant, **Eastdil Secured, LLC**, the said defendant violated the provisions of 18 U.S.C. §1962 (d), in that the said defendant conspired to conduct and/or participate in the conduct of the affairs of the criminal enterprise engaged in or the activities of which affected interstate and international commerce through a pattern of racketeering activity.  In connection therewith, the said defendant has, among other things, engaged in the following criminal acts.

543.    The said defendant, **Eastdil Secured, LLC**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, on or about and between March and September 2003, in conspiracy with the fraudulent and illegal schemes of the enterprise conducted by the defendants, set forth herein, to illegally launder money for profit through the sale

[136]

David H. Relkin, Esq.

of the GM Building, derived from unlawful sources, including but not limited to Organized Crime activities, in violation of 18 U.S.C. §§1956 and 1957, engaged in bid rigging activities to ensure that defendant Harry Macklowe obtained the GM Building in violation of 18 U.S.C. §1962 (d).

544.    The said defendant, **Eastdil Secured, LLC**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, in conspiracy with the fraudulent and illegal schemes of defendants, in conspiracy with the fraudulent and illegal schemes of the enterprise conducted by the defendants, set forth herein, to illegally launder money for profit through the sale of the GM Building, derived from unlawful sources, including but not limited to Organized Crime activities, in violation of 18 U.S.C. §§1956 and 1957, set forth herein, in or about July and August 2003, illegally, knowingly and intentionally misrepresented to the bidders for the GM Building that the sale was to be a legitimate and fair process, while in reality misleading the bidders by concealing that Harry Macklowe was the pre-selected winner of the bid, in furtherance of the conspiracy to launder money for profit and to conceal the illegal origin thereof in violation of 18 U.S.C. §1956, 1957 and 1962 (d).

545.    The said defendant, **Eastdil Secured, LLC**, in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conspired with and agreed to participate in the conduct of the enterprise to illegally launder money for profit through the sale of the GM Building, derived from unlawful sources, including but not limited to Organized Crime

[137]

David H. Relkin, Esq.

activities, and to conceal the origin and nature of such funds in violation of 18 U.S.C. §§1956 and 1957, by conspiring to, and agreeing to make fraudulent representations, including representations to the news media to deceive plaintiffs and third parties that the bidding process for the GM Building was fair and did not involve a conspiracy between the enterprise and defendant Harry Macklowe in violation of 18 U.S.C. § 1962 (d).

546.    With respect to defendant, **Harry Macklowe,** the said defendant violated the provisions of 18 U.S.C. §1962 (c) and (d), in that the said defendant conducted and/or participated in the conduct of the affairs of the criminal enterprise through a pattern of racketeering activity, and conspired with the other defendants to do so.  In connection therewith, the said defendant, among other things, engaged in the following criminal acts.

547.    The said defendant, **Harry Macklowe,** in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conspired with and agreed to participate, and did participate in the conduct of the enterprise to illegally launder money for profit through the sale of the GM Building, derived from unlawful sources, including but not limited to Organized Crime activities, and to conceal the origin and nature of such funds in violation of 18 U.S.C. §§1956 and 1957, on or about and between September and October 2008 to funnel the proceeds of the sale of the GM Building in the sum of 1.4 Billion Dollars back to the enterprise in violation of  18 U.S.C. §1962 (c).

548.    The said defendant, **Harry Macklowe,** in furtherance of the pattern of racketeering of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, conspired with and agreed to participate in the

[138]

David H. Relkin, Esq.

conduct of the enterprise to illegally launder money for profit through the sale of the GM

Building, derived from unlawful sources, including but not limited to Organized Crime

activities, and to conceal the origin and nature of such funds in violation of 18 U.S.C.

§§1956 and 1957, by conspiring to, and agreeing to make fraudulent representations that

he was the buyer of the GM Building in violation of 18 U.S.C. §1962 (d).

549.    With respect to defendant, **Kirkland & Ellis, LLP,** the said defendant

violated the provisions of 18 U.S.C. §1962 (d), in that the said defendant conspired with

the affairs of the criminal enterprise through a pattern of racketeering activity, and

conspired with the other members of the enterprise to do so.  In connection therewith, the

said defendant , among other things, engaged in the following criminal acts.

550.    The said defendant, **Kirkland & Ellis, LLP,** in furtherance of the illegal

business of the RICO Enterprise, engaged in or the activities of which affected interstate

and international commerce, and in conspiracy with the defendants' pattern of

racketeering, on or about and between July 2001 and September 2003, conspired and

agreed with defendants to engage in a bogus dispute with Trump regarding the ownership

of the GM Building misrepresent the ownership of the GM Building in violation of 18

U.S.C. §152 (1), (2) and (3), arguing to the Bankruptcy Court in March 2003 that the GM

Building was owned by Conseco, and then, in April 2003, took the position that the GM

Building was not owned by Conseco to allow the enterprise to acquire the GM Building

outside of the jurisdiction of the Bankruptcy Court in order to illegally launder funds for

profit, derived from illegal sources, including but not limited to, Organized Crime

[139]

activities, affecting interstate and international commerce as described herein in violation of 18 U.S.C. §§1956 and 1957.  This was a violation of 18 U.S.C. §1962 (d).

551.    The said defendant, **Kirkland & Ellis, LLP**, in furtherance of the illegal business of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, and in conspiracy with the defendants' pattern of racketeering to illegally launder funds for profit, derived from illegal sources, including but not limited to, Organized Crime activities, affecting interstate and international commerce as described herein in violation of 18 U.S.C. §§1956 and 1957, on or about and between December 17, 2002 and September 2003, conspired with the defendants to knowingly and intentionally misrepresent material facts to the United States Bankruptcy Court, plaintiffs and the creditors of Conseco and third parties that the sale of the GM Building would produce proceeds for the Conseco creditors which were "essential to the reorganization of Conseco" in violation of 18 U.S.C. §152 (1), (2) and (3) and, in their motion dated March 5, 2003, and their declaration by attorney James H. M. Sprayregen on March 6, 2003, that the proceeds of the sale of the GM Building were assets of the Conseco Bankruptcy Estate and would be sold as a 363 sale pursuant to the Bankruptcy code and on March 8, 2003 in the Debtor's Second Disclosure Statement,[23] and, by attorney Sprayregen, on May 26, 2003 that the proceeds of the sale of the GM Building were part of Conseco's Bankruptcy Estate in violation of 18 U.S.C. §1962 (d).

---

[23] "The sale or transfer of the GM Building for entities owning the GM Building (or interests therein, pursuant to or consistent with an Order of the Bankruptcy Court shall be deemed a transfer under, pursuant to, and in furtherance of the Plan."

[140]

David H. Relkin, Esq.

552.   The said defendant, **Kirkland & Ellis, LLC**, in furtherance of the illegal business of the RICO Enterprise, engaged in or the activities of which affected interstate and international commerce, and in conspiracy with the defendants' pattern of racketeering to illegally launder funds for profit, derived from illegal sources, including but not limited to, Organized Crime activities, affecting interstate and international commerce as described herein in violation of 18 U.S.C. §§1956 and 1957, knowingly and intentionally misrepresented to the United States Bankruptcy Court that Carmel Fifth was not under the control of Conseco and omitted crucial information that Carmel Fifth was capitalized by Conseco, in violation of 18 U.S.C. §152 (1), (2) and (3).  This was a violation of 18 U.S.C. §1962 (d).

553.   With respect to defendant, **Donald J. Trump**, the said defendant violated the provisions of 18 U.S.C. §1962 (a), (c) and (d), in that the said defendant acquired an interest in the enterprise by using the income from the pattern of racketeering activity, conducted and/or participated in the conduct of the affairs of the criminal enterprise through a pattern of racketeering activity, and has conspired with the other members of the enterprise to do so.  In connection therewith, the said defendant has, among other things, engaged in the following criminal acts.

554.   The said defendant, **Donald J. Trump**, received income derived, directly or indirectly, from a pattern of racketeering activity and used or invested, directly or indirectly, a part of such income or the proceeds of such income, in acquisition of an interest in, or the establishment or operation of any enterprise, engaged in, or the activities of which affected interstate and international commerce, by forming numerous

[141]

David H. Relkin, Esq.

shell entities, on or about and between September 1, 2003 and September 23, 2003, with

no officers, directors or shareholders, offices or assets, to invest or use, directly or

indirectly, a part of such income or the proceeds of such income, by laundering such

funds derived from illegal activities in violation of 18 U.S.C. §§1956 and 1957, by

funneling 300 Million Dollars into a limited liability company, 5th Avenue 58/59

Acquisition Co., in the acquisition of an interest in an enterprise controlled by the

defendants, in violation of  18 U.S.C. § 1962 (a).

555.   The said defendant, **Donald J. Trump,** in furtherance of the illegal

business of the RICO Enterprise, engaged in or the activities of which affected interstate

and international commerce, and in conspiracy with the defendants' pattern of

racketeering to illegally launder funds for profit, derived from illegal sources, including

but not limited to, Organized Crime activities, affecting interstate and international

commerce as described herein in violation of 18 U.S.C. §§1956 and 1957, received

income derived from the pattern of racketeering activity of the enterprise and used such

income in acquisition of an interest in, or establishment or operation of the defendants'

enterprise through the sale of the GM Building and the funneling of such proceeds into

Trump, Chicago, affecting interstate and international commerce as described herein in

violation of 18 U.S.C. §1962 (c).

556.   The said defendant, **Donald J. Trump,** in furtherance of the illegal

business of the RICO Enterprise, engaged in or the activities of which affected interstate

and international commerce, and in furtherance and in conspiracy with the defendants'

pattern of racketeering to illegally launder funds for profit, derived from illegal sources,

[142]

David H. Relkin, Esq.

including but not limited to, Organized Crime activities, affecting interstate and
international commerce as described herein in violation of 18 U.S.C. §§1956 and 1957, in
connection with the sale of the GM Building to Conseco, received approximately 275
Million Dollars in a confidential agreement entered into on or about April 23, 2003
between Conseco and Trump in violation of 18 U.S.C. §1962 (c).

557.    With respect to defendant, **Conseco, Inc.—post bankruptcy**, the said
defendant violated the provisions of 18 U.S.C. §1962 (c) and (d), in that the said
defendant conducted and/or participated in the conduct of the affairs of the criminal
enterprise through a pattern of racketeering activity, and conspired with the other
members of the enterprise to do so. In connection therewith, the said defendant has,
among other things, engaged in the following criminal acts.

558.    The said defendant, **Conseco, Inc.—post bankruptcy**, in furtherance of
the illegal business of the RICO Enterprise, engaged in or the activities of which affected
interstate and international commerce, and in furtherance and in conspiracy with the
defendants' pattern of racketeering to illegally launder funds for profit, derived from
illegal sources, including but not limited to, Organized Crime activities, affecting
interstate and international commerce as described herein in violation of 18 U.S.C.
§§1956 and 1957, in or about September 25, 2003, conspired with the RICO defendants
by knowingly and intentionally acquiring the proceeds of the sale of the GM Building in
violation of 18 U.S.C. §1962 (c).

559.    The said defendant, **Conseco, Inc.—post bankruptcy**, in furtherance of
the illegal business of the RICO Enterprise, engaged in or the activities of which affected

[143]

David H. Relkin, Esq.

interstate and international commerce, and in furtherance and in conspiracy with the

defendants' pattern of racketeering to illegally launder funds for profit, derived from

illegal sources, including but not limited to, Organized Crime activities, affecting

interstate and international commerce as described herein in violation of 18 U.S.C.

§§1956 and 1957, in or about September 25, 2003, conspired with defendants Soros,

SFM, FIG and/or Trump, to illegally launder money through the sale of the GM Building

in violation of 18 U.S.C. §1962 (d).


## COUNT I

### Violation of Chapter 96, Part I of Title 18: RICO
### [18 U.S.C. §1962 (a)]
### Money Laundering
### 18 U.S.C. §§ 1956 and 1957


560.    Plaintiffs repeat and reallege allegations "1" through "559" as if fully set

forth herein.


561.    Any person injured in his business or property by reason of a violation of

18 U.S.C. § 1962, may sue therefor in any appropriate United States District Court and

shall recover threefold the damages he sustains and the cost of the suit, including a

reasonable attorney's fee.  Plaintiffs were the foreseeable victims of such conduct and

have been proximately injured in their business and property by reason of violation by

defendants of 18 U.S.C. §1962.


562.    Pursuant to 18 U.S.C. §1962 (a), it is unlawful:

[144]

David H. Relkin, Esq.

"for any person who has received any income . . . from a pattern of racketeering activity . . . to use . . . any part of such income" in the "operation of . . . any enterprise which is engaged in, or the activities of which affect, interstate . . . commerce"

563.    Upon information and belief, George Soros, Soros Fund Management, LLC, FIG, LLC and Donald J. Trump received income derived, directly or indirectly from a pattern of racketeering activity and used or invested such income in the acquisition of an interest in, or the establishment or operation of an enterprise which affects interstate or international commerce.

564.    The enterprise did not cause damages to plaintiffs until the GM Building was sold and the illegally derived proceeds became ascertainable.

565.    Money Laundering is defined a predicate act under RICO pursuant to 18 U.S.C. § 1961.

566.    A person, company or corporation violates 18 U.S.C. § 1956 if, knowing that the property involved in a transaction represents the proceeds of some form of illegal activity, conducts or attempts to conduct, such financial transaction which involves the proceeds of such unlawful activity to conceal or disguise the nature, location, the source, the ownership, or the control of the proceeds of such unlawful activity in interstate or international commerce.

[145]

David H. Relkin, Esq.

567.    A person, company or corporation violates 18 U.S.C. § 1957 if he engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than 10 Thousand Dollars and is derived from unlawful activity if such transaction takes place in the United States, or the defendant is in the United States, a citizen of the United States or a sole proprietorship, partnership, company, or association composed principally of nationals or permanent resident aliens of the United States or a corporation organized under the laws of the United States, any State, the District of Columbia, or any territory or possession of the United States, and a foreign subsidiary of such corporation.

568.    Each of the defendants identified in this Count violated 18 U.S.C. §§1956 and 1957.

569.    Each defendant is both a RICO person and, together, constitutes an Enterprise that is distinct from each of them.

570.    Each of the defendants participated directly or indirectly in the conduct of the Enterprise's affairs, including the control, operation and management thereof.

571.    The acts perpetrated by defendants were in an ongoing organization, formal or informal, and constituted by their acts, a continuing unit or an association in fact.

572.    The Enterprise shared a common purpose and a distinctiveness of structure.

[146]

David H. Relkin, Esq.

573.     Defendants George Soros, Soros Fund Management, LLC, FIG, LLC, and Donald J. Trump violated 18 U.S.C. §§1956 and 1957, in order to acquire, maintain or operate an enterprise affecting interstate commerce in violation of 18 U.S.C. §1962 (a).

574.     These defendants committed the RICO predicate transactions identified herein over a period of at least six years, which conduct constitutes a pattern of racketeering activity, causing damages to plaintiffs' person and property by acquiring assets of Conseco including Conseco Finance and the GM Building for the purpose of laundering money for profit.

575.     Accordingly, Soros, Soros Fund Management, FIG, LLC, and Donald J. Trump have violated 18 USC §1962 (a), and are liable to plaintiffs, who were injured in their business or property, trebled by 18 U.S.C. §1962 to 4.2 Billion Dollars, plus attorneys' fees.

## COUNT II

### Violation of Chapter 96, Part I of Title 18: RICO
### [18 U.S.C. §1962 (b)]
### Money Laundering
### 18 U.S.C. §§ 1956 and 1957

576.     Plaintiffs repeat and reallege allegations "1" through "575" as if fully set forth herein.

577.     Pursuant to 18 U.S.C. §1962 (b) , it is unlawful:

[147]

David H. Relkin, Esq.

> "for any person through a pattern of racketeering activity . . . to
> acquire or maintain, directly or indirectly, any interest in or any
> control of any [such] enterprise."

578.    Soros, and FIG, LLC, acquired or maintained, directly or indirectly an

interest in, or control of an enterprise through a pattern of racketeering which is engaged

in, or the activities of which affect, interstate or international commerce.

579.    Such conduct by such defendants involved numerous predicate acts of

RICO, including, but not limited to 18 U.S.C. §1956, 1957.

580.    Plaintiffs were the reasonably expected victims of defendants' conduct

which proximately caused damage to their person and business by the unlawful and illicit

activities of such defendants in carrying out their pattern of racketeering.

581.    The acts perpetrated by defendants were in an ongoing organization,

formal or informal, and constituted by their acts and association in fact, a continuing unit.

582.    The defendants also shared a common purpose and had a continuity of

structure.

583.    Accordingly, the aforesaid defendants are jointly and severally liable to

plaintiffs in the sum of 1.4 Billion Dollars, trebled by 18 U.S.C. §1962 to 4.2 Billion

Dollars, plus attorneys' fees.

[148]

David H. Relkin, Esq.

## COUNT III

**Violation of Chapter 96, Part I of Title 18: RICO**
**[18 U.S.C. §1962 (c)]**
**Money Laundering**
**18 U.S.C. §§ 1956 and 1957**

584.    Plaintiffs repeat and reallege allegations "1" through "583" as if fully set forth herein.

585.    Pursuant to 18 USC §1962 (c), it is unlawful "for any person employed by or associated with any [such] enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

586.    The racketeering activity of Soros, Soros Fund Management, LLC, FIG, LLC, Vornado Realty Trust, German American Capital Corp., Conseco, Inc., Conseco, Inc. post bankruptcy, and Donald J. Trump involved numerous predicate acts of RICO, pursuant to 11 USC 1962 (c), which acts constituted a pattern of racketeering that injured the interests and property of plaintiffs.

587.    Defendants committed predicate acts pursuant to 18 U.S.C. §§1956 and 1957, and 18 U.S.C. §157 (1), (2) and (3), and Conseco—post bankruptcy committed the additional offense of 18 U.S.C. §157 (9), and such acts were part of a pattern of racketeering activity in interstate and international commerce.

[149]

David H. Relkin, Esq.

588.    Such acts constitute predicate acts under 18 USC §1961 in that they were in furtherance of RICO racketeering activities, and in conspiracy with a racketeering enterprise and damaged plaintiffs.

589.    Accordingly, such are liable to plaintiffs jointly and severally in the amount of 1.4 Billion Dollars, trebled by 18 U.S.C. §1962 to 4.2 Billion Dollars, plus attorneys' fees.

## COUNT IV

### Violation of Chapter 96, Part I of Title 18: RICO
### [18 U.S.C. §1962 (d)]
### Money Laundering 18 U.S.C. §§ 1956 and 1957

590.    Plaintiffs repeat and reallege allegations "1" through "589" as if fully set forth herein.

591.    Pursuant to 18 USC §1962 (d) "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section [1962].

592.    In connection with the purchase of Conseco Finance, the DIP facility and the purchase and sale of the GM Building, George Soros, Soros Fund Management, LLC, Conseco, Inc., Conseco, Inc.—Post Bankruptcy, Vornado Realty Trust, German American Capital Corp., Kirkland & Ellis, LLP, Eastdil Secured, LLC, Harry Macklowe, and Donald J. Trump, conspired to violate 18 U.S.C. 1962 (a), (b) and (c) to the injury of

[150]

David H. Relkin, Esq.

plaintiffs, their property and business by committing money laundering pursuant to 18

U.S.C.§§ 1956 and 1957.

593.    Defendants proximately caused damages to, plaintiffs' property and

business, and plaintiffs' damages to their property and business were the reasonably

foreseeable consequences of defendants' conduct, and each of them, perpetrated by

themselves and in connection with the other conspirators.

594.    Accordingly, each of these defendants is jointly and severally liable to

plaintiffs in the sum of 1.4 Billion Dollars, trebled by 18 U.S.C. §1964 to the sum of 4.2

Billion Dollars, plus attorneys' fees.

## COUNT V

### Violation of Chapter 96, Part I of Title 18: RICO
### [18 U.S.C. §1962 (d)]
### Wire Fraud 18 U.S.C. §§1343 and 1952

595.    Plaintiffs repeat and reallege allegations "1" through "594" as if fully set

forth herein.

596.    Pursuant to 18 USC §1962 (d), "it is unlawful for any person to conspire

to violate any of the provisions of subsection (a), (b), or (c) of this section [1962].

597.    Mapeley, Quantum, George Soros, Soros Fund Management, LLC,

Fortress, Vornado Realty Trust, German American Capital and Donald J. Trump agreed

to conspire with, and participate in the pattern of racketeering conducted by the Enterprise

[151]

David H. Relkin, Esq.

and the defendants in violating 18 U.S.C. §1343, 18 U.S.C. §1952 (a) (3) by illegally

using interstate and international telecommunications devices to launder money from

Mapeley, Quantum, Soros, SFM, or Fortress to ephemeral shell entities described

hereinabove, in violation of 18 U.S.C. §1956 and 1957.

598.    The plaintiffs were the reasonably foreseeable victims of the foregoing

acts and conspiracy by defendants, which were also the proximate cause of damage to

plaintiffs' property and business.

599.    Such acts constitute predicate acts under 18 USC §1961 in that they were

in furtherance of RICO racketeering activities, and in conspiracy with a racketeering

enterprise and damaged plaintiffs.

600.    Accordingly, such defendants are liable to plaintiffs jointly and severally

in the amount of 1.4 Billion Dollars, trebled by 18 U.S.C. §1962 to 4.2 Billion Dollars,

plus attorneys' fees.

**WHEREFORE,** plaintiffs Leslie Dick Worldwide, Ltd. and Leslie Dick hereby

request this Court to enter an Order and Judgment finding:

(a)     On the first Count, defendants George Soros, Soros Fund Management,

LLC, FIG, LLC and Donald J. Trump jointly and severally liable to plaintiffs for RICO

damages pursuant to 18 U.S.C. §1964 in the sum of 4.2 Billion Dollars, plus attorneys'

fees;

[152]

David H. Relkin, Esq.

(b)    On the second Count, defendants George Soros and FIG, LLC, jointly and severally liable to plaintiffs, for RICO damages pursuant to 18 U.S.C. §1962 (b) and 18 U.S.C. §1964 in the sum of 4.2 Billion Dollars, plus attorneys' fees;

(c)    On the third Count, defendants George Soros, SFM Management and Soros Fund Management, FIG, LLC, Conseco, Inc., Conseco, Inc.—post bankruptcy, Vornado Realty Trust, German American Capital Corp., and Donald J. Trump, jointly and severally liable to plaintiffs, for RICO damages pursuant to 18 U.S.C. §1962 (c) and 18 U.S.C. §1964 in the sum of 4.2 Billion Dollars, plus attorneys' fees;

(d)    On the fourth Count, defendants George Soros, Soros Fund Management, LLC, FIG, LLC, Conseco, Inc., Conseco Inc.—post bankruptcy, Vornado Realty Trust, German American Capital Corp., Eastdil Secured, LLC, Harry Macklowe, Kirkland & Ellis, LLP, and Donald J. Trump, for RICO damages pursuant to 18 U.S.C. §1962 (d) and 18 U.S.C. §1964 in the sum of 4.2 Billion Dollars, plus attorneys' fees;

(e)    On the fifth Count, defendants George Soros, Soros Fund Management, LLC, Fortress, Vornado Realty Trust and German American Capital and Donald J. Trump, for RICO damages in violation of 18 U.S.C. §1343, 18 U.S.C. §1952 (a) (3), and pursuant to 18 U.S.C. §1962 (d) and 18 U.S.C. §1964 in the sum of 4.2 Billion Dollars, plus attorneys' fees;

[153]

David H. Relkin, Esq.

All together with the costs and disbursements of this action and such other, further and

different relief as this Court may deem just and proper.

Dated: New York, New York
      February 22, 2009
      [corrected for typographical errors
      On March 11, 2009]

                    LAW OFFICES OF
                    DAVID H. RELKIN, ESQ.
                    Attorneys for Plaintiffs

                    By:_____
                    David H. Relkin, Esq. (DHR-1049)
                    575 Eighth Avenue, Ste. 1706
                    New York, NY 10018
                    212-244-8722
                    *David@RelkinLaw.com*

David H. Relkin, Esq.