

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
LESLIE DICK WORLDWIDE, LTD. and
LESLIE DICK,

                Plaintiffs,    :

            -against-

GEORGE SOROS, SOROS FUND
MANAGEMENT LLC, SFM MANAGEMENT,
LLC, CONSECO, INC., VORNADO REALTY
TRUST, GERMAN AMERICAN CAPITAL,
CORP, DEUTSCHE BANK, AG, EASTDIL
SECURED, LLC, HARRY MACKLOWE, FIG,
LLC, CERBERUS CAPITAL MANAGEMENT,
LP, LAZARD FRERES & CO., LLC,
KIRKLAND & ELLIS, LLP, FRIED,
FRANK, HARRIS, SHRIVER & JACOBSON
LLP, CARMEL FIFTH, LLC, 767
MANAGER, LLC, DONALD J. TRUMP and
JOHN DOES "1" THROUGH "10",

                Defendants.    :
------------------------------------X

08 Civ. 7900 (BSJ) (THK)

**MEMORANDUM OPINION
AND ORDER**

**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

    This action is one of a number of federal and state court cases that have been brought in response to the auction of the General Motors Building ("GM Building"), in 2003, when its majority owner, Conseco, Inc. ("Conseco"), was forced to sell the building while in bankruptcy. At or around the time of the auction, there was a dispute between Conseco and Donald Trump over the ownership of the building. That dispute went to arbitration, where it was determined that Conseco was the owner of the building and Trump was entitled to $15 million from its sale.

    Plaintiff Leslie Dick Worldwide Ltd. ("Worldwide") and Leslie

-1-

Dick ("Dick" or "Mr. Dick") (collectively "Plaintiffs"), who unsuccessfully bid for the GM Building, seek to recover damages resulting from an alleged conspiracy, through which numerous defendants, including Conseco, Trump, George Soros, and Harry Macklowe (the successful bidder and acquirer of the GM Building), are alleged to have engaged in money laundering, bankruptcy fraud, and bid-rigging in order to invest in, operate, and acquire control of various entities, including the GM Building, in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1961, et seq. ("RICO"). Plaintiffs were parties to an earlier proceeding in the New York courts, in which they sued many of the same defendants, but not Trump, claiming, among other things, that there was fraud and bid-rigging involved in the auction of the GM Building. See Leslie Dick Worldwide, Ltd., et al. v. Macklowe Props., Inc., et al., Index No. 600222/2006 (N.Y. Sup. Ct. 2006) ("the state court action"). That action was dismissed in December, 2006.

Presently before the Court is Plaintiffs' motion to disqualify Defendant Donald J. Trump's counsel, Phillips Nizer LLP ("Phillips Nizer"), because of an alleged conflict of interest.[1] For the

---

[1] Phillips Nizer represents Donald J. Trump and 767 Manager, LLC. On February 22, 2009, Plaintiffs filed an Amended Complaint dropping 767 Manager, LLC as a Defendant. Therefore, their motion is moot as to that entity.

Plaintiffs contend that virtually all of the other Defendants' law firms are laboring under a conflict of interest as well. Those contentions, however, have not yet ripened into

reasons stated below, the motion is DENIED.

## BACKGROUND

In essence, Plaintiffs contend that they were represented by Phillips Nizer in their state court action challenging the auction of the GM Building, as well as in other related matters.   (See Memorandum of Law in Support of Plaintiffs' Motion to Disqualify Phillips Nizer, dated Jan. 26, 2009 ("Pls.' Mem."), at 1-2.)   Yet, Phillips Nizer is now representing Donald Trump in the instant, closely related action.   (See id.)   Plaintiffs argue that they provided confidential information to Phillips Nizer in the course of their prior representation, and, as a result, Phillips Nizer is laboring under a clear conflict of interest.   (See id. at 2.) Phillips Nizer contends that it never represented Plaintiffs in the state court action, but was retained for a very limited purpose — consulting with Plaintiffs' attorney, Robert Hantman, on his oral argument before the Appellate Division — and it was never privy to any confidential communications from Plaintiffs.[2]   (See Memorandum of Law in Opposition to Plaintiffs' Motion to Disqualify Phillips Nizer LLP, dated Feb. 9, 2009 ("Def. Mem.") at 1-2.)

On May 12, 2009, the Court held a hearing at which Plaintiff

---

full-blown disqualification motions.

[2] Phillips Nizer also worked on a brief transactional project for Mr. Dick that it contends is not related to the current action.   (See Affidavit in Opposition of Perry S. Galler, Esq., dated Feb. 5, 2009 ("Galler Aff."), at 5-6.)

Leslie Dick and several attorneys from Phillips Nizer testified. The following factual findings are derived from the evidence adduced at the hearing and the parties' supplemental affidavits.

On or around February 25, 2008, Robert Hantman, counsel for Worldwide and Mr. Dick, contacted Wilfredo Pesante, a former contract attorney at Phillips Nizer. (See Galler Aff. at 3; see also Hearing Transcript, dated May 12, 2009 ("Tr."), at 6-7.) Mr. Hantman was representing Plaintiffs in the appeal of the dismissal of the state court action. (See Galler Aff. at 4; see also Tr. at 6.) Hantman explained to Mr. Pesante that he wished to consult with Phillips Nizer with respect to a notice of pendency filed against the GM Building, then owned by Macklowe Properties, which had been cancelled by Justice Karla Moskowitz following her dismissal of the state court action. (See Galler Aff. at 4; see also Tr. at 5.) At the time, the GM Building was owned by Macklowe Properties, the successful bidder in the 2003 auction. (See Galler Aff. at 3.)

Mr. Dick testified that he initially met with Pesante and Hantman at a boxing match, where Mr. Dick told Pesante about the status of his case, the appeal pending before the Appellate Division, First Department, who the underlying defendants were, and the core components of the state court complaint. (See Tr. at 6-7.) Mr. Dick testified that Pesante spoke highly of Phillips Nizer and mentioned that Alfred Lerner, a retired justice of the

-4-

Appellate Division, First Department, was a partner in the firm and someone who could be "helpful in potentially reversing the appeal." (Id. at 7-8.)  Pesante called Mr. Dick several days later, after running a conflicts check[3] and notifying Phillips Nizer's managing partner of the matter, to suggest that Mr. Dick and Hantman meet with several members of the firm.  (See id. at 8; Galler Aff. at 3.)

On or around February 26, 2008, Mr. Dick and Hantman met with Pesante, Galler, Phillips Nizer's managing partner, and Dan Kolko,

---

[3] In January, 2008, Phillips Nizer was retained by Mr. Trump, his corporation, the Trump Organization, Donald Trump, Jr., and several other individuals and entities, to represent them in an action brought by a former condominium owner in a Trump building.  (See Galler Aff. at 2.)  See also Eugenia Kaye v. Donald J. Trump, et al., Index No. 116572/2007 (N.Y. Sup. Ct. 2007).  That action has no relation to the instant action or Plaintiffs' state court action.  (See Galler Aff. at 2.)  When the conflicts check was run, Phillips Nizer had no reason to believe that Plaintiffs had asserted or intended to assert claims against Donald Trump.  (See id. at 3-4.)  He was not a named defendant in the state court action; nor was he the owner of the GM Building at the point when Plaintiffs sought to overturn the vacatur of their notice of pendency.  (See id.)
  Plaintiffs contend that Phillips Nizer should have been aware of Trump's involvement in the GM Building controversy, and, at the very least, should have disclosed the potential conflict prior to entering into a retainer agreement with Plaintiffs. (See Affidavit of Leslie Dick in Support of Plaintiffs' Motion to Disqualify Phillips Nizer, LLP from Representing Donald J. Trump and 767 Manager, LLC, dated Feb 12, 2009 ("Dick Aff. II.").)  The Court finds no support for this contention and, in any event, the purported conflict of interest Phillips Nizer had in February, 2008, when Plaintiffs consulted with Phillips Nizer, is not in issue here.  The only reason Phillips Nizer's knowledge at that time is relevant is because it reflects its knowledge at the time it undertook to represent Trump in the instant action, in December, 2008.

-5-

a Phillips Nizer associate.  (<u>See</u> Tr. at 8; Galler Aff. at 4.)   At the meeting, Galler suggested that Hantman could consult with retired Justice Alfred Lerner, who had joined Phillips Nizer as counsel in 2005, about the notice of pendency.[4]  (<u>See</u> Galler Aff. at 4.)   During that meeting, Mr. Dick asked if Hantman could also meet with Lerner to consult about his upcoming argument before the Appellate Division, where Mr. Dick was seeking to reverse the dismissal of his state court action.  (<u>See</u> <u>id.</u>)   Mr. Dick testified that, at this initial meeting, he and Hantman discussed the state case, the underlying issues, and the defendants involved.  (<u>See</u> Tr. at 9-10.)

Following this initial meeting at Philips Nizer, Galler called Mr. Lerner in Florida, where he was vacationing, and confirmed that he would be willing to meet with Hantman to discuss his oral argument.  (<u>See</u> <u>id.</u> at 180.)   It was agreed that Lerner would not represent Plaintiffs in the appeal, that his name would not be publicly connected with it, and that he would merely consult with Hantman on how best to present his argument.[5]  (<u>See</u> <u>id.</u> at 154-58.)

---

[4] Daniel Kolko was assigned to do research on the notice of pendency issue following the meeting.  He devoted a limited amount of time to the issue and concluded that there was no reasonable possibility of overturning its vacatur.  (<u>See</u> Galler Aff. at 4; <u>see also</u> Tr. at 160.)   Thus, Lerner was only involved in preparing Hantman for his oral argument.

[5] Lerner and the firm wanted it to be clear that Lerner would not use, or want to be perceived as using, his former position on the Appellate Division as leverage in the appeal.  (<u>See</u> Tr. at 154-58.)

-6-

On March 18, 2008, Phillips Nizer sent Mr. Dick an engagement letter stating:

> You have asked this firm [] to serve as a consultant to Robert Hantman, Esq. on behalf of Leslie Dick Worldwide, Ltd. and yourself with respect to the appeal on the claims against various parties from interference with its bid to purchase the GM building . . . . You have agreed to pay Phillips Nizer a fee of $10,000 up-front plus a bonus . . . if the matter is resolved by either a reversal by the Appellate Division or through a settlement that you agree to accept . . . . You agree not to discuss this matter or the involvement of Phillips Nizer or its attorneys publicly under any circumstances, including any news or information services, without agreement in writing from Phillips Nizer.

(See Affidavit of Leslie Dick in Support of Plaintiffs' Motion to Disqualify Phillips Nizer, LLP from Representing Donald J. Trump and 767 Manager, LLC, dated Jan. 26, 2009 ("Dick Aff. I"), Ex. A.).[6]

The principle service Phillips Nizer provided to Mr. Dick was to serve as a consultant to his attorney, Hantman, in preparing for the oral argument of the appeal in the Appellate Division. (See Tr. at 163, 166-67.) Mr. Trump, Phillips Nizer's client in this action, was not a party to the appeal or in the underlying state court action. (See Galler Aff. at 3.) At the time Phillips Nizer

---

[6] Galler explained that it was unusual to require a client to refrain from publicizing Phillips Nizer's services. In Mr. Dick's case, however, Phillips Nizer had some concern about the appropriateness of a press release Mr. Dick had issued about the state court action, and, in addition, Phillips Nizer did not want Mr. Dick using Mr. Lerner's name in connection with the appeal because of its concern that he not be perceived as using his former position to influence the Appellate Division. (See Tr. at 154-58.)

undertook to consult on that matter, the appeal had been fully briefed and oral argument was imminent.  (See Tr. at 13, 112.) Phillips Nizer did not work on Plaintiffs' brief and did not enter an appearance on Plaintiffs' behalf.  (See id.)  After the initial Phillips Nizer meeting, Lerner met with Hantman on two occasions, with Mr. Dick present on at least one of those occasions.  (See id. at 105-06.)  Lerner read the appellate briefs and the record on appeal, advised Mr. Dick and Hantman that they had little chance of success, and counseled Hantman on the strongest arguments he could advance at oral argument — most particularly, that it was premature to have dismissed the complaint without allowing for any pretrial discovery.  (See id. at 105-07.)  In addition, Lerner testified that there was no discussion of representing Plaintiffs after the appeal was argued, Trump's name never came up at the meetings, and he did not know that Trump had been an owner of the GM Building.[7]

---

[7] Although the Amended Complaint in the state court action makes fleeting reference to Trump and a Trump-related entity (see, e.g., State Am. Compl. ¶¶ 18, 65), there is no suggestion in the State Court Complaint that Trump was involved in the allegedly fraudulent auction or any other wrongdoing.  Similarly, although Plaintiffs point to an affidavit they submitted in the state court action that referred to Trump's arbitration with Conseco and alleged that he subsequently received far more than he was entitled to from the sale of the GM Building (see Hearing Exhibit 3, dated May 12, 2009 ("Hearing Ex.") at 380), it also referred to Conseco wanting to sell the building in such a way as to "get rid of Donald J. Trump."  (Id. at 387.)  This affidavit was part of the record on appeal.  There is nothing in the affidavit that suggests that Plaintiffs had a dispute with Trump, or that Trump was implicated in the allegedly fraudulent auction which was the basis of Plaintiffs' claims in the state court action, and is the basis of this action.  In fact, Trump himself

-8-

(<u>See</u> <u>id.</u> at 109, 111-16.)   In his affidavit, Lerner affirms that he "never received any confidential information from Mr. Dick [or] Mr. Hantman."   (Affidavit of Alfred D. Lerner, dated Feb. 4, 2009 ("Lerner Aff.") ¶ 4.)

Subsequent to the meetings with Lerner, Mr. Dick also met with three other Phillips Nizer attorneys — Monte Engler, Richard Langsam, and Marc Landis.   (<u>See</u> Tr. at 55, 138.)   Over the course of a few days in late March and early April of 2008, Mr. Dick was involved in a discussion with Arun Savkur, a purported business associate of Soros, to acquire an interest in the GM Building and for funding of his state court action, should his appeal succeed.[8] (<u>See</u> Tr. at 54-72.)   Several memoranda were exchanged between Mr. Savkur and Mr. Dick, and Mr. Dick asked Mr. Engler to review them. (<u>See</u> <u>id.</u>)   Mr. Engler is the Chair of the Phillips Nizer Corporate Department.   (<u>See</u> <u>id.</u> at 117.)   He and Richard Langsam, also a member of the Corporate Department, as well as Marc Landis,[9] the

---

had a dispute with Conseco, the bankrupt principle owner of the GM Building, over the building's ownership.   Plaintiffs' State Court Amended Complaint accused Conseco of colluding with Macklowe and Soros to defraud other bidders out of acquiring the building.   It in no way implicated Trump in the fraud.   (<u>See</u> Tr. at 14-17, 198-200.)

[8] Dick claims that attached to those documents was a chart concerning how Savkur was going to structure a transaction settling the state court action between Mr. Dick, Mr. Soros, and related entities.   (<u>See</u> Dick Aff. II at 4.)   The chart, however, does not appear to mention Soros or Fortress directly.   (<u>See</u> Hearing Ex. 5.)

[9] Landis had only peripheral involvement in addressing one or two real estate questions and does not recall directly

Chair of the Real Estate Department, met with Mr. Dick.  (See id. at 138-39, 143.)   Langsam and Engler agreed to undertake the revision of two memoranda of understanding.  (See Tr. 119-23, 129-30, 135 & Hearing Ex. 5.)

According to Mr. Dick, one memorandum would be used by him to obtain an equity interest in the GM Building, controlled by Mr. Soros, and the second memorandum would be used to finance the state court action.  In exchange, Mr. Dick would settle the state court action against Soros and Fortress.[10]  (See Dick Aff. II at 4; see also Tr. at 59-68 & Hearing Ex. 5.)

Engler and Langsam again met with Mr. Dick on April 4, at which time Dick asked them to make some further revisions to the memoranda.  (See Tr. at 134.)   They never had an opportunity to redraft the memoranda because, within a matter of days, the discussions between Mr. Dick and Savkur ended, and neither Engler nor Langsam saw Mr. Dick after their April 4 meeting.  (See id. at 136.)   Mr. Dick was never billed for Phillips Nizer's services on the matter.  (See Galler Aff. at 6.)

Engler testified that, other than knowing that one of the

revising the memoranda.  (See Tr. at 138.)

[10] Although Dick contends that his discussions with Savkur were intended to result in a settlement of the state court action with Soros, Trump, and related entities, the documents make no mention of Trump or settling the action, and the Phillips Nizer attorneys denied having any understanding or knowledge that the primary purpose of the memoranda was to settle the litigation.  (See Tr. at 54-72, 119-23, 131-32, 144-46.)

memorandum purported to provide financing for Mr. Dick's state court action, should it proceed, Mr. Dick had no discussions with him concerning the litigation or any anticipated litigation by Mr. Dick.  Engler further testified that there was never any mention of Donald Trump during their discussions.[11]  (See Tr. at 131-32.)  Nor is Trump mentioned in any of the documents that were exchanged with Savkur.  (See Hearing Ex. 5; see also Langsam Aff. at 2.)

During the course of Mr. Dick's brief relationship with Phillips Nizer, he claims to have discussed, inter alia, (i) the fraudulent activities of Donald J. Trump and 767 Manager, LLC, and the possibility of adding them as defendants in the state court action as John Does, if the dismissal was reversed on appeal; (ii) Mr. Dick's proposed financing of his bid to acquire the GM Building; (iii) the dispute between Trump and Conseco regarding the ownership of the GM Building; and (iv) the settlement dispute between Conseco and Trump and the amount Trump received to transfer his interest in the GM Building to Conseco.  (See Dick Aff. I at 2.)  Additionally, Mr. Dick contends that he spoke to Phillips Nizer attorneys about their representing him in his anticipated federal court action, as well as the state court action, should he

---

[11] Langsam did not testify at the hearing; however, he did submit an affidavit in which he states that "Mr. Dick did not tell me or Mr. Engler anything about that case during either meeting.  Neither Mr. Dick nor Mr. Hantam [sic] shared any confidences with us concerning that case."  (See Affidavit in Opposition of Richard H. Langsam, dated Feb. 5, 2009, ("Langsam Aff.") at 2.)

prevail on appeal.[12]   (See generally Dick Aff. I & II.)

The Phillips Nizer attorneys were unequivocal in testifying that they had a minimal and superficial relationship with Mr. Dick, that was only marginally related to the state court action, and had nothing to do with Mr. Trump.  (See Tr. Testimony of Alfred Lerner at 105-16; Monte Engler at 117-36; Marc Landis at 136-48; and Perry Galler at 148-96.)  The nature of the relationship was such that they had no need to, and did not, receive any confidential communications from Mr. Dick that were related to the matters in issue in this action.  Moreover, they had done a conflicts check to ensure that they could consult with Dick on the state court appeal, confirming that none of the defendants listed in the state court action were their clients.

In sum, the entire relationship between Plaintiffs and Phillips Nizer occurred within a five to six week period in March and April 2008,[13] and concerned two very discrete matters — consultation on the oral argument before the Appellate Division and

---

[12] Early in March 2008, Mr. Dick reported to Mr. Galler that Mr. Pesante, the contact attorney at Phillips Nizer, had approached him about purchasing a share in the GM Building in exchange for dropping the state court action.  Mr. Dick thought that Pesante's offer was inappropriate and Galler agreed.  Galler promptly addressed the matter, Pesante left the firm, and the matter was never raised again.  There is no contention that Phillips Nizer secured any confidential information from Plaintiffs as a result of this incident.  (See Tr. at 38-42, 186-87.)

[13] Phillips Nizer has had no relationship with Mr. Dick or Mr. Hantman, of any kind, since April 8, 2008.  (See Tr. at 151.)

-12-

consultation on two memoranda that related to Dick's attempt to purchase an equity interest in the GM Building in 2008.

The instant action was filed on September 10, 2008. (<u>See</u> Compl.) Phillips Nizer first appeared in this case as counsel for Defendants, Donald J. Trump and 767 Manager, LLC, on December 5, 2008. (<u>See</u> Notice of Appearance, dated Dec. 5, 2008.)

## DISCUSSION

### I. <u>Law on Disqualification</u>

Federal courts have the inherent power to disqualify attorneys in order to "preserve the integrity of the adversar[ial] process." <u>Hempstead Video, Inc. v. Incorporated Village of Valley Stream</u>, 409 F.3d 127, 132 (2d Cir. 2005) (citation omitted). The decision to disqualify "is a matter committed to the sound discretion of the district court." <u>Cresswell v. Sullivan & Cromwell</u>, 922 F.2d 60, 72 (2d Cir. 1990).

Federal courts look to state disciplinary rules and the American Bar Association's Code of Professional Responsibility and Model Rules of Professional Conduct for guidance on disqualification issues,[14] yet "such rules merely provide general

---

[14] New York has recently adopted the Model Rules of Professional Conduct. <u>See Pu v. Greenthal Mgmt. Corp.</u>, No. 08 Civ. 10084 (RJH) (RLE), 2009 WL 648898, at *4 & n.3 (S.D.N.Y. Mar. 10, 2009). These Rules became effective April 1, 2009. The parties submitted their motion papers using the former New York Rules; the relevant newly adopted rules are substantively equivalent to the former rules. Thus, at times, the Court references the former rules.

guidance and not every violation of a disciplinary rule will necessarily lead to disqualification." <u>Hempstead Video</u>, 509 F.3d at 132; <u>see also</u> <u>In re Ski Train Fire in Kaprun Austria on November 11, 2000</u>, MDL No. 1428 (SAS), 2007 WL 2398697, at *1 (S.D.N.Y. Aug. 16, 2007) ("The American Bar Association Code of Professional Responsibility ("Code"), as adopted by the New York courts, sets forth the appropriate guidelines for attorneys' professional conduct in the United States District Courts in this state."); <u>Artandi v. Buzack</u>, No. 02 Civ. 5759 (JCF), 2004 WL 764907, at *7 (S.D.N.Y. Apr. 9, 2004) ("New York's Code of Professional Responsibility (the "Code") establishes appropriate guidelines for the professional conduct of attorneys in the United States District Courts in this state."); <u>Mercedes v. Blue</u>, No. 00 Civ. 9225 (RMB)(MHD), 2001 WL 527477, at *1 (S.D.N.Y. May 17, 2001) ("The generally accepted standards for disqualification of attorneys are found in the American Bar Association's Code of Professional Responsibility, as well as the ABA's more recently adopted Model Rules of Professional Responsibility."); <u>cf.</u> Local Civil Rule 1.5(b)(5) of the Local Rules of the Southern and Eastern Districts of New York (providing that a violation of the New York State Rules for Professional Conduct serves as grounds for attorney discipline). "[I]n a technical sense the only truly binding authority on disqualification issues is [Second] Circuit precedent, because our authority to disqualify an attorney stems from the

-14-

Court's inherent supervisory authority." Skidmore v. Warburg Dillon Read LLC, No. 99 Civ. 10525 (NRB), 2001 WL 504876, at *2 (S.D.N.Y. May 11, 2001).

When deciding whether to disqualify counsel, a court must balance "the need to maintain the highest standards of the profession" against "a client's right freely to choose his counsel." Hempstead Video, 509 F.3d at 132 (citations omitted). "Courts are reluctant to grant such motions because they are often tactically motivated . . . and have an immediate adverse effect on the client by separating him from counsel of his choice." D.R.T., Inc. v. Universal City Studios, Inc., No. 02 Civ. 0958 (BSJ) (JCF), 2003 WL 1948798, at *2 (S.D.N.Y. Apr. 24, 2003) (internal quotation marks and citations omitted). Additionally, motions to disqualify inevitably result in delay and added expense. See Cole Mech. Corp. v. Nat'l Grange Mut. Ins. Co., No. 06 Civ. 2875 (LAK) (HBP), 2007 WL 2593000, at *4 (S.D.N.Y. Sept. 7, 2007) (citing Evans v. Artek Sys. Corp., 715 F.2d 788, 791 (2d Cir. 1983)). Thus, "the Second Circuit requires a high standard of proof on the part of the party seeking to disqualify an opposing party's counsel . . . ." Scantek Med. Inc. v. Sabella, No. 08 Civ. 453 (CM) (HBP), 2008 WL 5210562, at *2 (S.D.N.Y. Dec. 12, 2008); accord Gov't of India v. Cook Indus., Inc., 569 F.2d 737, 739 (2d Cir. 1978) ("[T]here is a particularly trenchant reason for requiring a high standard of proof on the part of one who seeks to disqualify his former

-15-

counsel, for in disqualification matters we must be solicitous of a client's right freely to choose his counsel [—] a right which of course must be balanced against the need to maintain the highest standards of the profession."); Artandi, 2004 WL 764907, at *7 (same).   Nevertheless, any doubts about whether a conflict of interest will taint the proceedings should be resolved in favor of disqualification.   Pu, 2009 WL 648898, at *4; Artandi, 2004 WL 764907, at *7.

Courts generally address disqualification motions in two situations.  See Bd. of Ed. of City of New York v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979).  First, disqualification may be warranted where an attorney's simultaneous representation of two clients undermines the court's confidence in the attorney's loyalty to his clients.   See Nyquist, 590 F.2d at 1246.   Second, disqualification may be warranted where the attorney is in a position to use privileged information gained from a former client, to the advantage of a current client.   See Nyquist, 590 F.2d at 1246.   Courts have found the basis for such disqualification in Canons 4 ("Canon 4") and 5 ("Canon 5") of the Model Code of Professional Responsibility.[15]   Canon 9 of the Model Code of Professional Responsibility ("Canon 9"), which bars attorneys from actions that give the appearance of impropriety, is also invoked in

---

[15] Canon 4 states: "A lawyer should preserve the confidences and secrets of a client."  Model Code of Prof. Resp., Canon 4. Canon 5 provides: "A lawyer should exercise independent judgment on behalf of a client."  Model Code of Prof. Resp., Canon 5.

conjunction with Canons 4 and 5, but is rarely a separate ground for disqualification.[16]   See Nyquist, 590 F.2d at 1247 ("[The] appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases.").

Conduct that is serious enough to justify disqualification is conduct that "tends to taint the underlying trial by disturbing the balance of the presentations in one of the two ways indicated above." Id. at 1246 (internal quotation marks and citation omitted).   However, unless there is a risk of taint to a court proceeding, courts are usually hesitant to disqualify an attorney. See id.; accord In Re MTBE Prod. Liab. Litig., 438 F. Supp. 2d 305, 309 (S.D.N.Y. 2006) ("Disqualification is only warranted where an attorney's conduct tends to taint the underlying trial.") (internal quotation marks and citation omitted).

## II. Application to Plaintiffs' Claim of Prior Representation

Plaintiffs argue that Phillips Nizer should be disqualified because it may use, or has already used, confidences learned during its prior representation of Plaintiffs, to the advantage of the Defendants in the current litigation.   (See Pls.' Mem. at 1-2.)[17]

---

[16] Canon 9 states: "A lawyer should avoid even the appearance of professional impropriety."   Model Code of Prof. Resp., Canon 9.

[17] Plaintiffs also argue summarily that Phillips Nizer violated New York Disciplinary Rule 5-105 [formerly 22 NYCRR § 1200.24] by engaging in a simultaneous representation.   (See Pls.' Mem. at  4.)   Because Plaintiffs do not allege, and this Court finds no basis to conclude, that Plaintiffs are current

-17-

Specifically, Plaintiffs claim that Mr. Dick provided confidential information concerning Defendant Trump to the Phillips Nizer firm on numerous occasions, when they were representing him in the state court action. (See id.)

Disqualification on grounds of access to attorney-client confidences in a prior representation is governed by Canons 4 and 5 of the Model Code of Professional Responsibility, and Rule 1.9 of the New York Rules of Professional Conduct.  Rule 1.9 prohibits an attorney from representing a client "in the same or a substantially related matter in which that person's interests are materially adverse to the interests of a former client."  N.Y. Rules of Prof. Conduct Law Rule 1.9 (McKinney 2009).[18]  Whether disqualification is required is determined applying the following three-part test established by the Second Circuit in Evans v. Artek Sys. Corp., 715 F.2d 788 (2d Cir. 1983): "(1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had

_____

clients of Phillips Nizer, and that Phillips Nizer is simultaneously representing two parties to this action, this motion must be analyzed applying only the disqualification test for successive representation.

[18] This Rule was formerly referred to as Disciplinary Rule 5-108 under Canon 5 of the Model Code of Professional Responsibility, and was codified as 22 N.Y.C.R.R. § 1200.27(a).

access to, or was likely to have had access to, relevant, privileged information in the course of his prior representation of the client." Evans, 715 F.2d at 791 (citing Cheng v. GAF Corp., 631 F.2d 1052, 1055-56 (2d Cir. 1980)); see also Med. Diagnostic Imaging, PLLC v. Carecore Nat'l, LLC, 542 F. Supp. 2d 296, 311 (S.D.N.Y. 2008); Cole Mech. Corp., 2007 WL 2593000, at *5; Skidmore, 2001 WL 504876, at *3-4).[19]

   A. Attorney-Client Relationship

   With respect to the first element of this test, Phillips Nizer places a great deal of reliance on the fact that it did not "represent" Plaintiffs in the state court action — that is, it did not appear on Plaintiffs' behalf, did not participate in the preparation of the appellate brief, and was not present at the appellate argument. Phillips Nizer contends that it merely acted as a consultant to Plaintiffs' attorney, Mr. Hantman, and, in that capacity, it did not have access to relevant privileged information. (See Def. Mem. at 3.) Nevertheless, at the hearing on this matter, Phillips Nizer conceded that, whether or not it represented Plaintiffs in the state court action, it had a relationship which entailed fiduciary obligations to Mr. Dick.

---

[19] This test finds its origin in Judge Weinfeld's "seminal" opinion in T.C. Theatre Corp. v. Warner Bros. Pictures, Inc., 113 F. Supp. 265 (S.D.N.Y. 1953), which established the general rule that an attorney may only be disqualified from a subsequent representation where there exists a "substantial relationship" between the subject matter of the earlier and present representations.

(See Tr. at 169.)

There can be no dispute that Phillips Nizer had an attorney-client relationship with Plaintiffs on matters related to the state court action.  While there is no single, well-defined test used to determine whether an attorney-client relationship exists, see Parkins v. St. John, No. 01 Civ. 11660 (RCC), 2004 WL 1620897, at *4 (S.D.N.Y. July 19, 2004), courts in the Southern District of New York have identified six relevant factors:

> 1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or a retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the individual in one aspect of the matter (e.g., at a deposition); 5) whether the attorney excluded the individual from some aspect of a litigation in order to protect another (or a) client's interest; 6) whether the purported client believes that the attorney was representing him and whether this belief is reasonable.

Med. Diagnostic Imaging, 542 F. Supp. 2d at 307 (quoting First Hawaiian Bank v. Russell & Volkening, Inc., 861 F. Supp. 233, 238 (S.D.N.Y. 1994)); see also Ritchie v. Gano, No. 07 Civ. 7269 (VM) (JCF), 2008 WL 4178152, at *5 (S.D.N.Y. Sept. 8, 2008); Ello v. Singh, No. 05 Civ. 9625 (KMK), 2006 WL 2270871, at *3 (S.D.N.Y. Aug. 7, 2006).

Here, Mr. Dick and Worldwide entered into a fee arrangement with Phillips Nizer where Plaintiffs agreed to make a one-time payment of $10,000, with a bonus of $250,000 in the event of success in the Appellate Division or if the matter was resolved by

-20-

settlement. (<u>See</u> Dick Aff. I, Ex. A; <u>see also</u> Galler Aff. at 5.)
Moreover, Plaintiffs were parties to an engagement letter with
Phillips Nizer. (<u>See</u> Dick Aff. I, Ex. A.)   Exhibit A to the
engagement letter is a list of Phillips Nizer's terms and
conditions for legal representation. (<u>See</u> <u>id.</u>)   Third, although
Phillips Nizer contends that Plaintiffs were not billed for certain
work unrelated to the claims in the current lawsuit, Phillips Nizer
received at least $10,000 from Plaintiffs for its work on the state
court action appeal. (<u>See</u> Galler Aff. at 5-6.)   Finally,
Plaintiffs express their belief that an attorney-client
relationship existed between them and Phillips Nizer. (<u>See</u> Dick
Aff. I at 1-3; <u>see also</u> Dick Aff. II at 2-4.)   That belief has a
reasonable basis in fact, in that Plaintiffs had an interest they
were seeking to advance by securing legal advice from Phillips
Nizer — they were seeking to maximize their chances of securing a
reversal in the Appellate Division of the dismissal of their case.

The only factor weighing against the existence of an attorney-
client relationship is that Phillips Nizer never formally
represented Plaintiffs in the state court action.   However, a
formal appearance in litigation is not required in order to have an
attorney-client relationship.

The Court, therefore, concludes that Plaintiffs and Phillips
Nizer had an attorney-client relationship that entailed all of the
ethical obligations that arise out of such relationships, most

particularly, the obligation to preserve a client's confidences and not use them to his disadvantage in a subsequent proceeding in which the attorney is representing someone whose interests are adverse to the former client.   Plaintiff has therefore satisfied the first prong of the Evans test.

B. Substantially Related

Applying the "substantial relationship" element of the Evans test requires a "'painstaking' factual analysis." Chichilnisky v. Trustees of Columbia University in New York, No. 91 Civ. 4617 (MJL), 1993 WL 403972, at *3 (S.D.N.Y. Oct. 7, 1993) (quoting United States v. Standard Oil Co., 136 F. Supp. 345, 367 (S.D.N.Y. 1955)).   The party seeking disqualification must show "that the relationship between the issues in the prior and present cases is 'patently clear,'" and that the issues are "identical" or "essentially the same." Gov't of India, 569 F.2d at 739-40 (quotation marks omitted); accord Med. Diagnostic Imaging, 542 F. Supp. 2d at 312.   In comparing the issues in earlier and current matters, "the inquiry is not limited to whether there are common legal claims or theories . . . , but extends to whether there are common factual issues that are material to the adjudication of the prior and current representations." Mitchell v. Metropolitan Life Ins. Co., Inc., No. 01 Civ. 2112 (WHP), 2002 WL 441194, at *8 (S.D.N.Y. Mar. 21, 2002) (emphasis added); see Battagliola v. Nat'l Life Ins. Co., No. 03 Civ. 8558 (GBD) (AJP), 2005 WL 101353, at *11

-22-

(S.D.N.Y. Jan. 19, 2005) (quoting <u>Mitchell</u>). A substantial relationship exists "if the facts giving rise to an issue which is material in both the former and the present litigations are as a practical matter the same." <u>United States Football League v. Nat'l Football League</u>, 605 F. Supp. 1448, 1459 (S.D.N.Y. 1985); <u>see Hickman v. Burlington Bio-Medical Corp.</u>, 371 F. Supp. 2d 225, 230 (E.D.N.Y. 2005) ("[I]t is the congruence of factual matters that establishes a substantial relationship.") (quotation marks, citation, and alterations omitted).

There is an obvious relationship between the issues in the prior state court action and the current action. In the state court action, four of the Defendants in this action were sued for allegedly fraudulent representations concerning the auction of the GM Building. Here, although a broader scheme is alleged, at the heart of the RICO conspiracy pled by Plaintiffs is the alleged fraud connected with the auction of the GM Building in 2003. The earlier case thus arose from the same underlying events, and involved many of the same parties as the current action.

However, that the state court action and this action share a common background does not establish that the "issues" Phillips Nizer confronted in its relationship with Dick are "identical" to or "essentially the same" as those it faces in acting on Trump's behalf in this action. After all, the question is whether "the subject matter of . . . counsel's prior <u>representation</u> of the

-23-

moving party," and not the genesis of the earlier lawsuit, is substantially related to the current action. <u>Evans</u>, 715 F.2d at 791 (emphasis added).

Although the absence of a formal appearance on behalf of Mr. Dick makes little difference in applying the first <u>Evans</u> factor, it carries greater importance for the second and third factors. The principal task for which Mr. Dick engaged Phillips Nizer was to consult with his attorney, Hantman, on preparing for his oral argument on Mr. Dick's appeal of the dismissal of the state court action. (<u>See</u> Tr. at 105-06, 111-12.) In this respect, the issue facing the firm was whether the state trial court abused its discretion in determining that Mr. Dick's complaint had not stated a cause of action for fraud. <u>See Leslie Dick Worldwide, Ltd. v. Macklowe Prop., Inc.</u>, 50 A.D.3d 596, 857 N.Y.S.2d 86 (1st Dep't 2008). More specifically, the issues to be addressed were defined by Mr. Dick's brief to the Appellate Division, which raised two arguments. First, he contended that the trial court erred in dismissing his fraud claim under New York law. Second, he argued that the trial court erred in citing a confidentiality statement as evidence that the plaintiffs could not have justifiably relied on alleged misrepresentations. <u>See</u> Brief for Plaintiffs-Appellants, <u>Leslie Dick Worldwide, Ltd. v. Macklowe Prop., Inc.</u>, No. 2008-03516 (Dec. 28, 2007), 2007 WL 6225997, at *2-3. The legal questions of whether the state court abused its discretion in these two ways

-24-

cannot ever be presented in this action.[20]   They thus cannot be "material in both the former and the present litigations." <u>United States Football League</u>, 605 F. Supp. at 1459.

Moreover, Phillips Nizer did not "represent" Mr. Dick on his appeal in the traditional sense.  The firm did not assist in the preparation of Mr. Dick's appellate brief — which had been completed before he met with anyone from the firm — did not argue the appeal or any other part of the case, and did not even enter an appearance on his behalf.  Indeed, to be even more accurate, the issue for Phillips Nizer to address was how to assist Hantman in presenting two predetermined legal grounds for appeal in oral argument.  This is the area in which Hantman and Mr. Dick sought Mr. Lerner's expertise.  Mr. Dick understood that Lerner "was going to advise [Hantman how] to handle the oral argument."  (<u>Id.</u> at 52.)  Lerner testified that he "reviewed the record on appeal and the briefs of both sides."  (<u>Id.</u> at 105-06.)  Lerner and Hantman then "rehearsed" the argument (<u>id.</u> at 107), and Lerner "offered some suggestions of what [Hantman] might omit, [and] what he might

---

[20] Whether the doctrine of <u>res judicata</u> provides grounds for dismissal, as some Defendants in this action have asserted, is a separate question.  The defense of claim preclusion turns on what the relationship is between an earlier case and a later one, not whether an earlier decision was right or wrong.  <u>See</u> <u>Spitzer v. Applied Card Sys., Inc.</u>, 11 N.Y.3d 105, 122, 863 N.Y.S.2d 615 (2008) ("[C]laim preclusion . . . bars successive litigation based upon the 'same transaction or series of connected transactions' . . . .") (internal citations omitted).  In other words, the merits of the Appellate Division's analysis will not be at issue here.

emphasize" (id. at 106).

Judging by this evidence, the nature of Phillips Nizer's engagement refutes Plaintiffs' claim to substantial similarity. The only plausible basis for disqualification would be misuse of Mr. Dick's confidential information.  Thus, the critical question is whether any factual issues in the former and current representations are identical or essentially the same, because in that case, it would be reasonable to assume that Phillips Nizer obtained confidential factual information from Mr. Dick that would be pertinent to the current action.  The answer is no.  There were no "factual issues that [were] material" to the firm's consultation with Mr. Dick and Hantman about the state court action.  Mitchell, 2002 WL 441194, at *8.  When Phillips Nizer became involved, the factual record was fixed for purposes of appeal.  In fact, the state court action was dismissed on the pleadings, there was no pretrial discovery, the case never went to trial, and the appeal did not seek a reversal on the basis of a trial record. Investigating and establishing facts was therefore not "material" to arguing the matter before the Appellate Division, or to Phillips Nizer's work for Mr. Dick.  The Court finds entirely credible the testimony of the Phillips Nizer attorneys that, because of their limited role, there was no need to delve into the underlying facts

of the case.[21]   (See Tr. at 109-112, 195-96; see also Lerner Aff.

¶ 4.)  For these reasons, notwithstanding the fact that the former

and present actions grew from the same original nucleus of events,

there are no identical or even similar questions of fact that are

"material in both" representations.[22]    United States Football

League, 605 F. Supp. at 1459; see Hickman, 371 F. Supp. 2d at 230

(explaining  that  "material  facts"  in  earlier  and  later

representations must be "the same" to establish a substantial

relationship).

This also holds true for Phillips Nizer's work in connection

with the proposed Memoranda of Understanding.  That work allegedly

involved a potential business transaction allowing Mr. Dick to

purchase an equity interest in the GM Building.  (See Affidavit in

Opposition of Richard H. Langsam, dated Feb. 9, 2009 ("Langsam

---

[21] Mr. Dick asserted that he shared with Lerner his thoughts
on "what the actual core of the case was" (Tr. at 52), and
related his allegations about the parties who had participated in
the fraud (id. at 53).  However, as explained further below,
there is no reason to conclude that Mr. Dick conveyed pertinent
private information.  Rather, even accepting Mr. Dick's
testimony, the information he purportedly shared was publicly
available, and largely comprised the allegations contained in the
state court complaint or the Complaint in this action.

[22] Nothing in this Court's opinion is intended to reflect on
the merits of whether, for purposes of claim preclusion, the
state court action and the present action arise from the "same
transaction or series of connected transactions."  Applied Card
Sys., 11 N.Y.3d at 122, 863 N.Y.S.2d at 615.  The legal standards
governing a res judicata defense, and the underlying policies,
are distinct from those applicable to the question of
disqualification.

Aff."); see also Tr. at 119.)  Mr. Dick approached Phillips Nizer
to help edit and comment on two Memoranda of Understanding that
would allegedly be used to effect the purchase.  (See Tr. at 119.)
As a result of this transaction, Mr. Dick would also receive
financing for his state court action, the "Investors" in the state
court action would receive a multiple of their investment from any
settlement of the state court action, and, according to Mr. Dick,
he would extinguish the state court claims against Soros and
Fortress.  (See Pls.' Hearing Ex. 5; see also Tr. at 57.)  Although
Mr. Dick contends that these documents were intended to result in
a settlement of the state court action with Soros, and related
entities, the documents make no mention of settling the action.
(See Pls.' Hearing Ex. 5.)  This work was assigned to two partners
in Phillips Nizer's corporate department, Richard Langsam and Monte
Engler.  Engler and Langsam were merely asked to revise the two
Memoranda of Understanding, which they themselves had not
negotiated.  (See Langsam Aff. at 2.)  In addition, Marc Landis, a
real estate attorney from Philips Nizer, addressed one or two
questions relating to the transaction.  (See Tr. at 138.)  Engler
credibly testified that this work did not require a discussion of
the state court action.   (See Tr. at 123.)   He and Langsam
understood that this transaction would provide funding for
"whatever litigation was going to occur," but Engler testified that
he was not aware that one memorandum of understanding was intended

-28-

to settle the state court action.  (<u>See</u> <u>id.</u> at 123, 129; <u>see also</u> Langsam Aff. at 2 (stating that Dick never told "me or Mr. Engler anything about that case during either meeting.").)    Further, Landis testified that he was aware Mr. Dick was involved in litigation, but he was not aware of the substantive allegations in the state court action or any strategy for future conduct (<u>see</u> Tr. at 146) "other than the fact that there was a proposal to finance litigation."  (<u>See</u> Tr. at 140.)    In the end, the Phillips Nizer attorneys concluded that the two proposed memoranda were hopelessly confusing and that they had to be redrafted.    That never occurred, however, because the negotiation of the transaction ended abruptly and Dick never sought further legal assistance.

     It is clear that the nature of Phillips Nizer's short-lived work on this matter cannot meet the standards of the substantial relationship test.    <u>See, e.g.</u>, <u>Gov't of India</u>, 569 F.2d at 739-40 (stating that the relationship between issues must be "identical" or "essentially the same.").    The business transaction at issue involved a proposed acquisition of an equity interest in a real estate holding, and the structure by which investors would fund and recoup their funding of a litigation.    These legal issues are not presented in the current action; nor could they be considered "material" to the present litigation.    <u>See</u> <u>United States Football League</u>, 605 F. Supp. at 1459.    While the current litigation does involve the GM Building, the issues alleged in the Amended

-29-

Complaint involve a RICO conspiracy, through which numerous defendants are said to have engaged in money laundering, bankruptcy fraud, and bid-rigging in order to invest in, operate, and acquire control of various entities, including the GM Building. The auction of the GM Building out of which Mr. Dick's legal claims arise occurred in 2003. Neither the purchase of an equity interest in a real estate holding in 2008, nor the structure by which a litigation would be funded and those funds repaid, is "material" to the resolution of the issues mentioned above.

Nor do Phillips Nizer's preliminary consultations with Mr. Dick, on February 25 and 26, 2008, create grounds for disqualification. The firm did not begin any of its legal work for Mr. Dick at those meetings. Furthermore, the credible testimony shows that the only topics of discussion were what Mr. Dick could do to reinstate a notice of pendency that the judge in the state court action had cancelled, and whether Mr. Lerner could be of assistance to Hantman in preparing for his oral argument. (See Tr. at 154-55.) Neither issue is material to the resolution of the present matter. The initial meetings thus cannot establish a substantial relationship between Phillips Nizer's prior and current engagements. See Mindy's Restaurant, Inc. v. Watters, No. 08 Civ. 5488, 2009 WL 500634, at *3 (N.D. Ill. Feb. 27, 2009) (finding that the party seeking disqualification could not establish a substantial relationship on the basis of an "initial brief

-30-

[c]onsultation" with the opposing party's counsel, where the issues discussed at the consultation had "very little relevance to the actual substance of the instant litigation").

In sum, although the state court action and the current matter originate from the same dispute, the very limited and specialized purpose for which Mr. Dick retained Phillips Nizer forecloses any substantial relationship between its earlier work for Mr. Dick and its current representation of Trump. See Med. Diagnostic Imaging, 542 F. Supp. 2d at 314 ("Because there is only very limited factual overlap between [an attorney's] prior representation[s] . . . and the current actions, the Court finds that there is not a substantial relationship . . . .").

C. Access to Confidential Information

The lack of a substantial relationship between the two representations at issue is fatal to Plaintiffs' motion for disqualification.   However, even assuming, arguendo, that the common origins of the state court action itself and the present action could satisfy the second factor of the Evans test, Plaintiffs still could not prevail.  They also fail to satisfy the third factor: showing that the firm had, or was likely to have had, access to Plaintiffs' confidential information.

After a court finds a substantial relationship between two matters, a presumption arises that any attorney who participated in both likely had access to pertinent privileged information.

-31-

However, this presumption may be rebutted.  See Silver Chrysler
Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d 751, 753-54 (2d
Cir. 1975) (explaining that an attorney who worked for an opposing
party at a prior firm could rebut the presumption of confidential
information); Miroglio, S.P.A. v. Morgan Fabrics Corp., 340 F.
Supp. 2d 510, 512 (S.D.N.Y. 2004) ("[T]he presumption that the
attorney was likely to have had access to client confidences may be
rebutted . . . ."); Almonte v. City of Long Beach, No. CV-04-4192
(JS)(JO), 2007 WL 951863, at *3 (E.D.N.Y. Mar. 27, 2007) ("Once the
court determines that an attorney-client relationship existed and
that the matters were substantially related, a rebuttable
presumption of access arises."); see also Gov't of India, 569 F.2d
at 740 ("Having determined that the district court correctly held
that the issues in the prior and present cases were substantially
related, we turn to the remaining question whether [the attorney's]
involvement in the prior case was such that he would have had
access to relevant privileged information.").

        Pursuant to the third Evans factor, attorneys may attempt to
show that their work for the party seeking disqualification did not
put them in a position to access confidential material.   The
inquiry focuses on what role the lawyer played in the prior matter,
and the nature of the attorney's relationship with the client.  For
instance, where lawyers "enter briefly on the periphery" of a
matter "for a limited and specific purpose relating solely to legal

-32-

questions," their "role cannot be considered 'representation.'" <u>Silver Chrysler</u>, 518 F.2d at 756-57.   In <u>Silver Chrysler</u>, an attorney's work on matters substantially related to the one at issue took place at a prior law firm.   The Second Circuit found that the attorney's "involvement" in those representations "was, at most, limited to brief, informal discussions on a procedural matter or research on a specific point of law."   <u>Id.</u> at 756.   Therefore, his current firm could not be deemed to have been in a position to access confidential information from the party seeking disqualification.

Thus, if an attorney can demonstrate that her level of involvement in a prior case was minimal, and that she did not "become heavily involved in the facts," <u>Id.</u> at 756-57, a court is free to conclude that the attorney was not "likely" to have had access to confidential information.   See <u>Evans</u>, 715 F.2d at 791; <u>GAF Corp.v. Heyman</u>, 559 F. Supp. 748, 751 (S.D.N.Y. 1983)("[W]hen a lawyer plays a peripheral role in a matter, spending a short time on tasks such as legal research, he may later rebut the presumption that he received client confidences."); <u>UAW v. Nat'l Caucus of Labor Comms.</u>, 466 F. Supp. 564, 571 (S.D.N.Y. 1979) (finding the presumption of access to confidential material rebutted where the attorneys were not "involved . . . to an important, material degree, in the investigative processes" of a prior representation, and where the attorneys asserted they had not received privileged

-33-

information); see also Solow v. W.R. Grace & Co., 83 N.Y.2d 303, 313-14, 610 N.Y.S.2d 128, 133-34 (1994) (adopting a legal standard similar to that used in the Second Circuit, and finding the presumption of access to confidential information rebutted because the attorneys at issue "had, at most, limited contact with" the earlier matter for their firm's former client); cf. Human Elec., Inc. v. Emerson Radio Corp., 375 F. Supp. 2d 102, 107 (N.D.N.Y. 2004) ("If the tainted attorney's involvement was peripheral, the nature of the work performed on the case was such that the attorney was not a 'strategy-maker', or a long period of time has [passed] since the prior representation, the firm may rebut the presumption of shared confidences [that imputes an attorney's knowledge of confidential information to other members of the firm].").

Nevertheless, a lawyer cannot avoid disqualification by simply professing not to remember receiving any privileged material.  See Battagliola, 2005 WL 101353, at *14 ("While [an attorney] asserts that he does not recall any confidential information, that is not sufficient.") (internal citations omitted).  Requiring a response to such a defense would intrude on attorney-client privilege.

> [A] court may not inquire into the nature of the confidences alleged to have been revealed to the tainted attorney.   To require proof of access to privileged information would "put the former client to the Hobson's choice of either having to disclose his privileged information in order to disqualify his former attorney or having to refrain from the  disqualification altogether."

Cheng, 631 F.2d at 1056 (quoting Gov't of India, 569 F.2d at 740));

see <u>T.C. Theatre Corp.</u>, 113 F. Supp. at 268-69 ("Only [by assuming
that confidences were disclosed during a substantially related
representation] can the lawyer's duty of absolute fidelity be
enforced and the spirit of the rule . . . be maintained."); <u>cf.</u>
<u>Decora Inc.v. DW Wallcovering, Inc.</u>, 899 F. Supp. 132, 138-39
(S.D.N.Y. 1995) (conducting <u>ex parte</u> review of evidence of
confidential disclosures to firm defending disqualification
motion). As a result, once it is established that an attorney's
role in a prior substantially related case was "more than
peripheral," <u>Argonaut Ins. Co. v. Halvanon Ins. Co.</u>, 545 F. Supp.
21, 25 (S.D.N.Y. 1981), such that she was "in a position to receive
client confidences," <u>Fund of Funds, Ltd. v. Arthur Andersen & Co.</u>,
567 F.2d 225, 235 (2d Cir. 1977), the inquiry ends. At that point,
a court must "assume that during the course of the former
representation confidences were disclosed."[23]    <u>Fund of Funds</u>, 567

---

[23] It is for this reason that some courts describe the
presumption of access to confidential information as
"irrebuttable." <u>See, e.g.</u>, <u>DeFazio v. Wallis</u>, 459 F. Supp.2d
159, 164-65 (E.D.N.Y. 2006) ("In cases such as this, where the
same individual lawyer participated in the prior and current
representation, the movant is not required to make a specific
showing that confidences were passed to counsel. Instead, the
movant is entitled to the benefit of an irrebutable presumption
that confidences were shared."); <u>Tiuman v. Canant</u>, No. 92 Civ.
5813 (JFK), 1994 WL 198690, at *3 (S.D.N.Y. May 19, 1994) (same).
The Court acknowledges that these cases appear to undermine the
principle espoused in <u>Silver Chrysler</u> that a lawyer can rebut the
presumption of access to confidential material. However, the
practical effect of making the presumption irrebuttable would be
to "eviscerate the third requirement articulated in <u>Evans</u>."
<u>Ritchie v. Gano</u>, No. 07 Civ. 7269 (VM)(JCF), 2008 WL 4178152, at
*8 (S.D.N.Y. Sept. 8, 2008). This Court's interpretation of the

-35-

F.2d at 235 (quoting <u>T.C. Theatre Corp.</u>, 113 F. Supp. at 268-69);
<u>accord</u> <u>Cheng</u>, 631 F.2d at 1056.  This taints the proceedings, and
the court must order disqualification.

In this case, there is no claim that Phillips Nizer set up an
"ethical wall" between the attorneys who consulted with Mr. Dick on
the state court action and the attorneys who are representing Mr.
Trump in this action.  This would have allowed Phillips Nizer to
protect the latter group from being deemed to possess any
confidences disclosed to the former.  <u>See</u> <u>Hempstead Video</u>, 409 F.3d
at 138-39 (discussing the use of ethical walls to rebut the
presumption that attorneys share confidences with other members of
the same firm); <u>Cole Mechanical Corp.</u>, 2007 WL 2593000, at *7 n.4
(noting that where one attorney is "walled off" from the rest of
the firm, "disqualification of the individual attorney may not
necessarily require disqualification of the firm").  In the absence
of such measures, the question remains whether the Phillips Nizer
firm as an entity was in a position to obtain confidential

---

cases gives effect to both lines of authority.  The third <u>Evans</u>
factor allows lawyers to demonstrate that their level of
involvement in an earlier substantially related matter was so
peripheral or limited that it did not put them in a position to
access confidential information.  What they cannot do is try to
show that they did not actually receive client confidences once
it has been established that their role afforded them access to
such information.  Thus, as one court observed, "[t]he law in
this Circuit has evolved and the presumption that an attorney was
likely to have had access to client confidences may be rebutted;
the issue remains that of access rather than the content of
confidential communications."  <u>Miroglio</u>, 340 F. Supp. 2d at 512.

information from Mr. Dick.

This case presents a rather unique situation.  Senior members of Phillips Nizer met with Mr. Dick and his attorney about matters related to the state court action.  Although, as explained above, Plaintiffs fail to establish that Phillips Nizer's consultation with Mr. Dick in this capacity bears a substantial relationship to its work on the present matter, the state court action and the instant lawsuit unquestionably arise from the same events. Furthermore, unlike some of the cases in which attorneys successfully rebutted the presumption of access to confidences, here the same firm is involved in both representations; they occurred within relative temporal proximity; and there is no attempt to disclaim imputing the firm's knowledge to all of its attorneys, regardless of the level of their involvement in the matter in issue.

Nevertheless, because of the discrete purpose of the consultation, Phillips Nizer argues that its involvement in the action was peripheral, and it had no need to, and did not, secure any confidences from Mr. Dick.  (See Pls.' Mem. at 9.)  Phillips Nizer was retained simply to consult with Mr. Dick's attorney, Mr. Hantman, in anticipation of his appellate argument in the state court action, where the briefs had already been filed.  (See Tr. at 166-67.)  The nature of this relationship was such that there was no need for Phillips Nizer to discuss or receive confidential

-37-

information from Mr. Dick.  The sum of Mr. Dick's relationship with Phillips Nizer occurred over a five to six week period, and in particular, the work relating to the state court action itself was handled in no more than three meetings.  Mr. Dick and Mr. Hantman met with Perry Galler, Wilfredo Pesante, and Daniel Kolko on one occasion, where they discussed whether it was possible to get a reversal of the state court's dismissal of Mr. Dick's notice of pendency — a purely legal question that, as explained above, is not substantially related to any issues in this litigation.

In addition, Mr. Hantman met with Mr. Lerner on two occasions (Mr. Dick was present at least one of the meetings), to secure advice concerning the oral argument.  (See Tr. at 106; see also Galler Aff. ¶¶ 8-10; Lerner Aff. ¶¶ 1-3.)  Prepping an attorney for an oral argument where an action had been dismissed on purely legal grounds, without any fact discovery or development of the case, and where the appeal had already been briefed, does not require any deep involvement in factual matters underlying the case, or the sharing of client confidences.  As Mr. Lerner testified, he reviewed the record on appeal and the parties' appellate briefs, which were part of the public record, and viewed his role as merely advising Mr. Hantman, the appellate attorney, on the strongest arguments he could advance in his oral argument.  Indeed, without any objection on the basis of the attorney-client privilege, Lerner testified that he advised Hantman that his best argument would be

-38-

that the case had been dismissed prematurely, without allowing for any pretrial discovery.  He also advised Hantman that he thought that his chances of success were insubstantial, because the dismissal was based on a purely legal ground.  Lerner further testified, entirely credibly, that there was no need for Mr. Dick to share any confidential facts about the case with him.  (<u>See</u> Tr. at 109-112; <u>see also</u> Lerner Aff. ¶ 4.)

Mr. Dick's meeting with members of Phillips Nizer's corporate and real estate departments to discuss the redrafting of two Memoranda of Understanding posed an even lesser risk of exposure to confidential information relevant to the current action.  Phillips Nizer was approached to comment on and revise Memoranda of Understanding that would allegedly be used to effect the purchase of an equity interest in a real estate holding, as well as to structure the further financing of Mr. Dick's state court litigation.  (<u>See</u> Tr. 59-68, 119-23; <u>see also</u> Pls.' Hearing Ex. 5.) This type of transactional work clearly does not require the discussion of confidential facts relating to the state court litigation.  Nor would such a discussion be of any assistance to lawyers in structuring these types of deals.  Moreover, the attorneys assigned to this matter only met with Mr. Dick twice; they did not negotiate the transaction or draft the original documents; the redrafting was never completed; and Mr. Dick was not billed for the work.  Mr. Dick contends that as a result of this

-39-

transaction he would have settled his state court claims against Soros, and other related defendants.   Yet, even assuming such a settlement would result, Plaintiffs provide no reasonable explanation for why Phillips Nizer's corporate and real estate attorneys would have needed or even found useful confidential information concerning the state court action, which centered on events occurring in 2003, for a real estate and financial transaction occurring in 2008.

Under these circumstances, the Court does not need, and has not required, Mr. Dick to disclose any confidential information that he purportedly provided to Phillips Nizer attorneys.  Phillips Nizer never actually represented Plaintiffs in the state court action, and their involvement in the case did not require or entail the type of exchanges with a client that "representation" normally involves.   Phillips Nizer's only substantive participation in the state court action was prepping an attorney for an oral argument. The Court has heard testimony on this issue and has determined that the testimony of the Phillips Nizer attorneys — describing their limited role in the state court action and unequivocally attesting to the absence of any sharing of confidences — is entirely credible.   There is no credible basis for finding that, under the circumstances presented here, the Phillips Nizer attorneys secured, or were likely to have had access to, information from Plaintiffs that would give them an unfair advantage in the present litigation

-40-

or otherwise taint this proceeding.

Finally, although neither the Court nor Phillips Nizer attorneys questioned Mr. Dick about the substance of the confidential information he claims to have shared, Mr. Dick volunteered much of what he supposedly divulged to Phillips Nizer. He has taken pains to demonstrate that the firm should have known Trump was a party to the fraud he was alleging in the state court action, and that he was planning to sue Trump. Although these issues are ultimately of little significance,[24] Mr. Dick's testimony nevertheless reinforces the conclusion that Phillips Nizer was not "likely" to have learned any privileged facts from him. See Evans, 715 F.2d at 791. Mr. Dick asserts that he spoke to Phillips Nizer attorneys about (i) Mr. Trump's involvement in the fraud, (ii) the possibility of adding him as a defendant in the state court action; (iii) Mr. Dick's proposed financing for acquiring the GM Building; (iv) the dispute between Trump and Conseco regarding ownership of the GM building; (v) Conseco's payment to Trump for his interest in the property; and (vi) the possibility of Phillips Nizer representing Mr. Dick in litigation about the GM Building subsequent to the decision on appeal. (See Dick Aff. I at 2; Tr. at 22-24, 28-40.)  Mr. Dick also testified that he explained to

---

[24] For present purposes, the question of how much Phillips Nizer knew about Trump's involvement is not critical.  The dispositive issue is the likelihood of access to relevant confidential material from Mr. Dick, which could relate to any topic pertinent to the current action, not just Trump.

-41-

Lerner "what the actual core of the case was" (Tr. at 52), and related his allegations about the parties to the purported conspiracy (id. at 53).

The Court finds Mr. Dick's testimony is not credible, as it contradicts credible testimony provided by Phillips Nizer attorneys that they never discussed confidential information about the state court action with him.[25]   Yet, even taking Mr. Dick's representations at face value, none of the topics that he himself claims to have discussed would have likely encompassed any confidential information that can now be used against him.   In fact, most are now matters of public record, and many were already part of the record in the state court action at the time. According to Mr. Dick, he had already addressed Trump's participation in Conseco's fraud in his affidavit filed in connection with the appeal of the state court action.   Mr. Dick claims that he actually referred to that affidavit, which is a public document, in meetings with Phillips Nizer attorneys.   (See

_____

[25] In this respect, the sharp contrast between Mr. Dick's testimony and that of Phillips Nizer attorneys, regarding what he told them about Trump, damages Mr. Dick's broader credibility in claiming to have made other disclosures to the firm.   In the Court's view, Mr. Dick's unilateral testimony that he repeatedly raised the issue of Trump's involvement in the conspiracy was simply not believable.   Each of the Phillips Nizer attorneys corroborated one another in declaring that Mr. Dick never even mentioned Trump, and that had he done so they would have immediately concluded their consultation, as they were already representing Trump in an unrelated matter.   The Court finds their testimony totally believable and reliable.

-42-

Tr. at 29-30.)  Furthermore, the Complaint in this action, and the complaint in the state court action, set forth Mr. Dick's allegations concerning Trump's involvement in the alleged fraud, Mr. Dick's financing and bid for the GM Building, and the Trump-Conseco dispute resulting in Conseco's payment to Trump.  (See Compl. at 22-27, 75-76.)  See Amended Verified Complaint at 7-14, Leslie Dick Worldwide Ltd. et al. v Macklowe Prop. Inc. et al., No. 06/600222 (N.Y. Sup. Ct. May 30, 2006).  Thus, to the extent that the discussion of these subjects touched on confidential information at the time Mr. Dick was consulting with Phillips Nizer, that information can no longer be considered confidential. Finally, neither Mr. Dick's intent to sue Trump, nor his purported desire to have Phillips Nizer continue representing him, constitute material privileged information that Defendants could exploit in this case.  Indeed, "Plaintiffs do not elaborate" on how any of the foregoing information "could be used to [their] disadvantage" here. Team Obsolete Ltd. v. A.H.R.M.A. Ltd., No. 01 Civ. 1574 (ILG)(RML), 2006 WL 2013471, at *8 (E.D.N.Y. July 18, 2006) ("Put another way, even if sensitive, confidential information was discussed during the [earlier representation], there is no indication that any such information would be relevant to the dispute at bar.").

In conclusion, the discrete nature of Phillips Nizer's involvement with Mr. Dick precludes a likelihood of exposure to confidential material.  Moreover, the credible testimony

-43-

establishes that the nature of Phillips Nizer's actual work for Mr. Dick created no need to obtain confidential factual information. Thus, even if Plaintiffs could establish a substantial relationship between that work and the firm's current engagement for Trump — which they fail to do — Phillips Nizer has rebutted any presumption of access to relevant confidential information.  The Court can conclude with confidence that the firm was not in a position to obtain, and did not obtain, confidential information from Plaintiffs that could be exploited in this action.  <u>See</u> <u>Etna Products Co., Inc. v. Tactica Intern., Inc.</u>, 234 F. Supp. 2d 442, 444-45 (S.D.N.Y. 2002) ("The nature of the prior representation — brief, episodic, and limited — does not suggest a strong likelihood that relevant confidential information passed from defendants to [the attorney in question]."); <u>United States v. Armaza</u>, 280 F. Supp. 2d 174, 183-84 (S.D.N.Y. 2003) (finding that a lawyer had rebutted the presumption of access to confidential information because she had "persuasively shown that she herself did not possess any of [the client's] confidences or secrets, and that there is no conceivable way she could learn them from the . . . [f]irm's files or any other source").  As Judge Kaufman noted years ago:

> When dealing with ethical principles, it is apparent that we cannot paint with broad strokes.  The lines are fine and must be so marked.  Guide-posts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts and precise application

-44-

of precedent.

Fund of Funds, 567 F.2d at 227 (quoting Standard Oil Co., 136 F. Supp. at 367).  Here, the Court has fully explored the facts and finds that Phillips Nizer has not conducted itself in a manner that creates a conflict of interest that would taint the underlying proceedings.  Further, "[c]onsidering the strong public policy to allow persons to retain counsel of their choice and the need to avoid causing severe prejudice to the client, who would have to secure new counsel to deal with somewhat complex litigation with the accompanying increased expense and loss of time[,] disqualification is not warranted."  In re MTBE Prods. Liab. Litig., 438 F. Supp. 2d at 309-10 (internal quotation marks and citations omitted).

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion to disqualify Phillips Nizer as counsel for Donald J. Trump is DENIED.

SO ORDERED.

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: July 22, 2009
       New York, New York